530

1    PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2    Name  FILGORE        IVAN    D
           (Last)         (First)        (Initial)              FILED

3    Prisoner Number   V31306

4    Institutional Address: CALIFORNIA STATE PRISON SACRAMENTO

5    P.O. BOX 290006, REPRESA  CA  95671           Clerk
                                                   NORThern

6                     UNITED STATES DISTRICT COURT                    OF CALIFORNIA        (PR)
7                     NORTHERN DISTRICT OF CALIFORNIA

                                                                                            SI
8    IVAN KILGORE
     (Enter the full name of plaintiff in the action.)     C    )    C 07         5124
9                                                               )
                    vs.                                         )    Case No.
10                                                              )    (To be provided by the clerk of court)
     J. WALKER(ACTING WARDEN)                                   )
11   _____                            )    PETITION FOR A WRIT
                                                                )    OF HABEAS CORPUS
12   _____                            )
                                                                )    EVIDENTIARY HEARING
13   _____                            )        REQUESTED
                                                                )
14   (Enter the full name of respondent(s) or jailor in this action)  )
                                                                )
15
16                          Read Comments Carefully Before Filling In

17   When and Where to File

18         You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23         If you are challenging your conviction or sentence and you were not convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

     PET. FOR WRIT OF HAB. CORPUS              1 -

1 | Who to Name as Respondent

2    You must name the person in whose actual custody you are. This usually means the Warden or

3 | jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 | you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 | respondents.

6    If you are not presently in custody pursuant to the state judgment against which you seek relief

7 | but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 | custody you are now and the Attorney General of the state in which the judgment you seek to attack

9 | was entered.

10 | A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11    1. What sentence are you challenging in this petition?

12    (a)    Name and location of court that imposed sentence (for example; Alameda

13            County Superior Court, Oakland):

14 | ALAMEDA COUNT SUPERIOR COURT ___ OAKLAND

15            Court                          Location

16    (b)    Case number, if known __141033__

17    (c)    Date and terms of sentence 4-9-06, life without parole

18    (d)    Are you now in custody serving this term? (Custody means being in jail, on

19            parole or probation, etc.)        Yes X     No ____

20            Where?

21            Name of Institution: CSP-SACRAMENTO

22            Address: P.O. BOX 290066, REPRESA CA   95671

23    2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 | more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 | challenging more than one sentence, you should file a different petition for each sentence.)

26 | ONE COUNT OF FIRST DEGREE MURDER, PC187; SPECIAL CIRCUMSTANCE

27 | DISCHARGING A FIREARM FROM A MOTOR VEHICLE PC 190.2(a)(21)

28

PET. FOR WRIT OF HAB. CORPUS      - 2 -

3. Did you have any of the following?

Arraignment:                                    Yes _X_        No _____

Preliminary Hearing:                            Yes _X_        No _____

Motion to Suppress:                             Yes _X_        No _____

4. How did you plead?

Guilty _____    Not Guilty _X_    Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury _X_    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?                Yes _X_        No _____

7. Did you have an attorney at the following proceedings:

(a)    Arraignment                              Yes _X_        No _____

(b)    Preliminary hearing                      Yes _X_        No _____

(c)    Time of plea                             Yes _X_        No _____

(d)    Trial                                    Yes _X_        No _____

(e)    Sentencing                               Yes _X_        No _____

(f)    Appeal                                   Yes _X_        No _____

(g)    Other post-conviction proceeding         Yes _X_        No _____

8. Did you appeal your conviction?               Yes _x_        No _____

(a)    If you did, to what court(s) did you appeal?

Court of Appeal                                 Yes _X_        No _____

Year: _2004_      Result: _DENIED_ _____

Supreme Court of California         Yes _X_        No _____

Year: _2006_      Result _DENIED_ _____

Any other court                                 Yes _____      No _X_

Year: _____    Result: _____

(b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                          Yes _X_    No _____

(c)    Was there an opinion?                       Yes _X_    No _____
       **SEE EXHIBIT #5**
(d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                                   Yes _____    No _X_

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?                     Yes _x_    No _____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

       I.    Name of Court: CALIFORNIA SUPREME COURT

             Type of Proceeding: HABEAS CORPUS

             Grounds raised (Be brief but specific):

             a. IAC OF APPELLATE COUNSEL

             b. IAC OF TRIAL COUNSEL: FAILURE TO OBJECT

             c. IAC OF TRIAL COUNSEL: FAILURE TO INVESTIGATE

             d. _____

             Result: DENIED _____ Date of Result: 9-10-07

       II.   Name of Court: _____

             Type of Proceeding: _____

             Grounds raised (Be brief but specific):

1        a._____

2        b._____

3        c._____

4        d._____

5        Result:_____Date of Result:_____

6   III.  Name of Court:_____

7        Type of Proceeding:_____

8        Grounds raised (Be brief but specific):

9        a._____

10       b._____

11       c._____

12       d._____

13       Result:_____Date of Result:_____

14  IV.   Name of Court:_____

15        Type of Proceeding:_____

16        Grounds raised (Be brief but specific):

17        a._____

18        b._____

19        c._____

20        d._____

21        Result:_____Date of Result:_____

22  (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                          Yes ____   No _X__

24       Name and location of court:_____

25  **B. GROUNDS FOR RELIEF**

26  State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS      - 5 -

1  need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR WHEN

5  Claim One:  IT RULED THAT IF APPELLANT TESTIFIED THE PROSEC-
UTION COULD CROSS-EXAMINE APPELLANT ON HIS TESTIMONY IN

6  HIS OKLAHOMA(INVOLUNTARY) MANSLAUGHTER CASE.

SEE ATTACHED MEMORANDUM AND POINTS OF AUTHORITIES

7  Supporting Facts: FROM PETITION FOR REVIEW AT pp.5-10&10(A) ***NOTE:
THE UNDERLINED FACTS AT pp.6-7 ARE NOT CORRECT AND

8  SHOULD READ,"APPELLANT WAS INFORMED THAT AN ASSOCIATE
BRYANT JONES WAS IN POSSESSION OF ONE OF HIS STOLEN

9  GUNS(45 cal). APPELLANT APPROACHED JONES.

10

Claim Two:  INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL,

11  WHERE APPELLANT COUNSEL FAILED TO PRESENT THE STATE COURT
WITH THE FEDERAL QUESTION CONCERNING THE INSTRUCTIONAL

12  ERROR REGARDING THE TRIAL COURTS FAILURE TO INSTRUCT ON

13  PARTICULAR POINTS OF SECOND DEGREE DRIVE-BY MURDER.

SUPPORTING FACTS: SEE ATTACHED "SUPPLEMENT" MEMORANDUM

14

15  AND POINTS OF AUTHORITIES AT pp 18-20.

16

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR

17  Claim Three: WHEN IT FAILED TO INSTRUCT THE JURY ON THE
DOCTRINE OF TRANSFERRED INTENT APPLING WHEN ONE SHOOTS

18  IN SELF-DEFENSE.

19  Supporting Facts: SEE ATTACHED MEMORANDUM AND POINTS OF

20  AUTHORITIES FROM PETITION FOR REVIEW AT pp19-22

21

22

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25

26

27

28

CLAIM #4   THE TRIAL COURT PREJUDICIALLY ERRORED IN BARRING
APPELLANT FROM INTRODUCING BAD CHARACTOR EVIDENCE
REGARDING WILLIAM ANDERSON AND T. DANDY: IT WAS
ADMISSIBLE TO REBUT PROSECUTIONS GOOD CHARACTOR
EVIDENCE.
SUPPORTING FACTS: SEE ATTACHED MEMORANDUM AND POINTS OF
AUTHORITIES FROM PETITION FOR REVIEW AT pp 25.

CLAIM #5: INEFFECTIVE ASSISTANCE OF COUNSEL

(A) TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE MADE AN
ERRONEOUS OFFER OF PROOF.
SUPPORTING FACTS: SEE ATTACHED MEMORANDUM AND POINTS
OF AUTHORITIES FROM PETITION FOR WRIT OF HABEAS
CORPUS AT pp 8-12.

(B) TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED
TIMELY TO OBTAIN A RULING PRIOR TO TRIAL REGARDING
THE ADMISSIBILITY OF THE OKLAHOMA TESTIMONY.
SUPPORTING FACTS: SEE ATTACHED MEMORANDUM AND POINTS
OF AUTHORITIES FROM PETITION FOR WRIT OF HABEAS
CORPUS AT pp 12-18.

(C) APPELLANT'S CONSTITUTIONAL RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL WAS VIOLATED AS A RESULT
OF HER FAILURE TO OBJECT TO THE UNTIMELY INTRODUCTION
OF THE OKLAHOMA TESTIMONY; RESULTING IN PETITIONER
FOREGOING HIS RIGHT TO TESTIFY AND PRESENT THE
MERITORIOUS DEFENSE OF SELF-DEFENSE.
SUPPORTING FACTS: SEE ATTACHED "SUPPLEMENT" MEMORANDUM
AND POINTS OF AUTHORITIES AT pp 1-12.

(D) INEFFECTIVE ASSISTANCE OF COUNSEL; FAILURE TO
INVESTIGATE AND PREPARE APPELLANT'S PRIOR OKLAHOMA
TRIAL EVIDENCE BEFORE MAKING TACTICAL DECISIONS.
SUPPORTING FACTS: SEE ATTACHED "SUPPLEMENT" MEMORANDUM
AND POINTS OF AUTHORITIES AT pp 13-17.

(E) TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE SWITCHED
DEFENSE THEORIES MIDSTREAM FROM SELF-DEFENSE TO
REASONABLE DOUBT(MISTAKEN IDENTITY); THUS MAKING
A FARCE OF APPELLANT'S TRIAL BY DISCREDITING ANY
MATTER OF FACT PRESENTED BY DEFENSE.
SUPPORTING FACTS: SEE ATTACHED MEMORANDUM AND POINTS
OF AUTHORITIES FROM PETITION FOR WRIT OF HABEAS
CORPUS AT pp 19-25.

(F) TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF
COUNSEL WHEN SHE ADVISED AND CAUSED APPELLANT
NOT TO TESTIFY.(NOTE: THIS CLAIM IS CONJOINED
WITH[C])
SUPPORTING FACTS: SEE ATTACHED MEMORANDUM AND POINTS
OF AUTHORITIES FROM THE PETITION FOR WRIT OF HABEAS
CORPUS AT pp 26-29.

6(A)

1

**(G)** TRIAL COUNSEL NEGLIGENTLY OPENED THE DOOR TO BAD
CHARACTOR EVIDENCE THAT APPELLANT HAD BEEN CONVICTED
OF A FELONY; THEREBY DESTROYING HER OWN STRATEGY OF
NOT HAVING APPELLANT TESTIFY IN ORDER TO KEEP
THE OKLAHOMA CASE FROM THE JURY.
   **SUPPORTING FACTS:** SEE ATTACHED MEMORANDUM AND POINTS
   OF AUTHORITIES FROM THE PETITION FOR WRIT OF HABEAS
   CORPUS AT pp 30-32.

**(H)** TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO
MOVE THAT THE TAPE RECORDED STATEMENT OF PROSECUTION
WITNESS MATTHEW BRYANT BE REDACTED TO ELIMINATE HIS
STATEMENT "HE THOUGHT APPELLANT WAS A DRUG DEALER."
   **SUPPORTING FACTS:** SEE ATTACHED MEMORANDUM AND POINTS
   OF AUTHORITIES FROM THE PETITION FOR WRIT OF HABEAS
   CORPUS AT pp 33-34.

**(I)** TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO
CALL APPELLANTS SISTER AND GIRLFRIEND AS WITNESSES
TO ESTABLISH THE VIOLENT CHARACTOR OF WILLIAM
ANDERSON AND T. DANDY.
   **SUPPORTING FACTS:** SEE ATTACHED MEMORANDUM AND POINTS
   OF AUTHORITIES FROM THE PETITION FOR WRIT OF HABEAS
   CORPUS AT pp 35.

**(J)** TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO
REQUEST AN INSTRUCTION THAT THE DOCTRINE OF
TRANFERRED INTENT APPLIED TO SHOOTING IN SELF-
DEFENSE.
   **SUPPORTING FACTS:** SEE ATTACHED MEMORANDUM AND POINTS
   OF AUTHORITIES FROM THE PETITION FOR WRIT OF HABEAS
   CORPUS AT pp 36-38.

**(K)** TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO
OBJECT TO THE PROSECUTORS INACCURATE ARGUEMENT
REGARDING DRIVE-BY MURDER.
   **SUPPORTING FACTS:** SEE ATTACHED MEMORANDUM AND POINTS
   OF AUTHORITIES FROM THE PETITION FOR WRIT OF HABEAS
   CORPUS AT pp 39.

**(L)** TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO
OBJECT TO BALLISTICS TESTIMONY BY THE PATHOLOGIST.
   **SUPPORTING FACTS:** SEE ATTACHED MEMORANDUM AND POINTS
   OF AUTHORITIES FROM THE PETITION FOR WRIT OF HABEAS
   CORPUS AT pp 40.

****NOTE:** IN THE STATEMENT OF THE CASE AND OF THE FACTS,
pp 4 OF THE MEMORANDUM AND POINTS AUTHORITIES
FROM THE PETITION FOR REVIEW; THE UNDERLINE
FACTS ARE NOT CORRECT AND SHOULD READ: "TERRY
DANDY, FIRED ONE SHOT WITH A HANDGUN AT HIM..."

6(B)

1      List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3 of these cases:

4 _____

5 _____

6 _____

7 Do you have an attorney for this petition?             Yes_____    No_X__

8 If you do, give the name and address of your attorney:

9 _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

                       EVIDENTIARY HEARING REQUESTED

12

13 Executed on ___10- 1- 07___         _____

14             Date                 Signature of Petitioner

15

16

17

18

19

20 (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 7 -

MEMORANDUM AND POINTS OF AUTHORITIES
FROM PETITION FOR REVIEW

## IN THE SUPREME COURT

## FOR THE STATE OF CALIFORNIA

| | |
|---|---|
| The People of the State of California, | ) ) ) Case no. _____ |
| Plaintiff and Respondent, | ) ) ) (Court of Appeal |
| v. | ) case no. A106142) ) |
| IVAN KILGORE, | ) ) |
| Defendant and Appellant | ) ) ) |

Alameda County County Superior Court Case No. 141033
Kenneth Kingsbury, Judge

\* \* \*

### PETITION FOR REVIEW

STEPHEN B. BEDRICK
SBN 058787
Attorney at Law
1970 Broadway, Suite 1200
Oakland, CA 94612
(510) 452-1900

Attorney for Defendant and Appellant
IVAN KILGORE

(by appointment of the Court of Appeal under
the FDAP's independent case system)

## PETITION FOR REVIEW

Defendant and Appellant Ivan Kilgore (Appellant) respectfully petitions for review of the decision of the Court of Appeal, First District, Div. 5, which affirmed his conviction for murder. People v. Kilgore, case #A106142, opinion filed August 30, 2006. (Appendix A.)

Appellant has concurrently filed a habeas corpus petition, asserting ineffective assistance of counsel. Appellant requests and has formally moved that the Court consider the two petitions together.

## QUESTIONS PRESENTED

1. Does the so-called "doctrine of chances" (People v. Carpenter (1997) 15 Cal.4th 312, 379) authorize admission of evidence of a prior crime to prove intent, when the prior is found otherwise inadmissible to prove intent under Evid. Code §1101(b)?

2. Under Apprendi v. New Jersey (2000) 530 U. S. 436, is a trial court required to instruct on lesser-included enhancements, or lesser-included offenses-plus-enhancements?

In particular, is instruction required on second degree drive-by murder as a lesser-included offense, or lesser-included offense-plus-enhancement, of first degree drive-by murder?

3. In a self-defense case, is instruction on transferred intent required *sua sponte*, when the defendant shot at one person in self-defense, but missed, and, instead, struck a bystander?

4. Was the independence of the appellate process compromised, because the pro tem justice who wrote the Court of Appeal opinion sits in the same Superior Court as the trial judge whose decision he was reviewing?

5. After prosecution witnesses testify to the good character of the victim and his companion, may the defense be barred from presenting

evidence of bad character?

6. Did trial counsel render ineffective assistance by changing the
defense in midstream from self-defense to identity. even though counsel
conceded that defending on identity was impossible?

## GROUNDS FOR REVIEW

Review is warranted under Rule 28 to secure uniformity of decision
and for the settlement of important questions of law.

(1) The trial court ruled that testimony from Appellant's prior
Oklahoma case was inadmissible to prove intent under Evid. Code
§1101(b), but nonetheless found that it was admissible under the so-called
"doctrine of chances." (People v. Carpenter (1997) 15 Cal.4th 312, 379).
The issue warranting review is whether evidence may be independently
admitted under the "doctrine of chances," even though it is found
inadmissible under the statutory limitations of Evid. Code §1101.

(2) Whether instruction is required on lesser-included enhancements,
or lesser-included offenses-plus-enhancements, is an issue which needs
resolution in light of Apprendi v. New Jersey (2000) 530 U. S. 436.  Prior
to Apprendi, instructions on lesser-included enhancements, or lesser-
included offense-plus-enhancements, were not required, because they were
merely enhancements to be considered by the judge. People v. Wolcott
(1983) 34 Cal.3d 91, 101. In Apprendi the United States Supreme Court
required that enhancements, other than recidivist ones, must be proven to
the jury beyond a reasonable doubt in the same way as crimes.  Wolcott is
thus no longer good law.  Accordingly, this Court needs to re-examine the
question of when and how to instruct on lesser-included enhancements in
light of Apprendi.

Related issues are pending before this Court as follows:

In People v. Izaguirre, no. S132980, one question is whether the firearm enhancement in Penal Code §12022.53(d) is necessarily included within the drive-by shooting special circumstance in Penal Code §190.2(a)(21).

In People v. Sloan, no. S132605 the question is: For purposes of the ban on conviction of necessarily included offenses, should enhancement allegations be considered in determining whether a lesser offense is necessarily included in a charged offense as pled in the information or indictment?

While these two pending cases do not involve jury instructions, they do involve the preliminary issue presented here of whether enhancements should be considered when identifying lesser-included offenses.

(3) On whether instruction on transferred intent is required *sua sponte*, review is warranted because of the conflict between a 27-year old Court of Appeal opinion which says "no," and a subsequent line of authority, including CALCRIM, which suggests "yes."

(4) The independence of appellate review is compromised when a Superior Court judge, sitting as a pro tem justice on the Court of Appeal, writes the opinion in a case which arose from his own superior court in his own county. This presents an issue of first impression. A Judicial Council study confirmed that the independence of judicial review would be improperly compromised in a similar situation.

## STATEMENT OF THE CASE AND OF THE FACTS

Appellant Ivan Kilgore was convicted of first degree "drive-by" murder, with the special circumstance of shooting from a vehicle. Four witnesses testified that Appellant's Cadillac pulled up to a curb in Oakland, near two men who had previously beaten Appellant, and that Appellant

fired one shot from a shotgun which killed William Anderson.

When trial began, the prosecution had pending a motion to admit under Evid. Code § 1101(b) Appellant's testimony from an Oklahoma case where Appellant had been convicted a crime which was of the equivalent of involuntary manslaughter under the theory of imperfect self-defense. Trial defense counsel failed to move for a continuance, in order to know, before the trial started, whether that evidence would be admitted. Three quarters of the way through trial, the trial court held that evidence admissible if Appellant testified.

In opposing the prior, Appellant had submitted an offer of proof that he would testify that, as his car pulled up to the curb, Anderson's companion, Terry Dandy, fired one shot with a shotgun at him, which missed. Appellant then fired back in self-defense.

Throughout the first three quarters of the trial, the intended defense was self-defense. Appellant was planning to testify. After the ruling authorizing the admission of the Oklahoma testimony, trial counsel completely changed the defense from self-defense to identity, even though no investigation of an identity defense had been done. Trial counsel advised and caused Appellant not to testify. No alibi evidence was presented. Appellant was convicted.

At the motion for new trial hearing, alleging ineffective assistance of counsel Appellant testified that he wanted to testify at trial, and that he fired in self-defense. Trial defense counsel testified that an identity defense was impossible. Nonetheless, she presented it.

**I.**

## THE TRIAL COURT ERRED WHEN IT RULED THAT, IF APPELLANT TESTIFIED, THE PROSECUTION COULD CROSS-EXAMINE APPELLANT ON HIS TESTIMONY IN HIS OKLAHOMA (INVOLUNTARY)MANSLAUGHTER CASE

### A. Procedural Facts

Appellant was convicted in Oklahoma in 1997 of manslaughter. The prosecutor moved to impeach Appellant, if he testified, with his Oklahoma testimony.

The Oklahoma manslaughter statute punishes, inter alia, a homicide "perpetrated unnecessarily . . . while resisting an attempt by the person killed to commit a crime." The Oklahoma conviction was the equivalent of California involuntary manslaughter. (RT 43-47) See In re Christian S. (1994) 7 Cal.4th 768. Because involuntary manslaughter is not a crime of moral turpitude, People v. Solis (1985) 172 Cal.App.3d 877, 883, the trial court barred impeachment with the conviction. (RT 43-52)

The prosecutor urged admission of Appellant's Oklahoma testimony under Evid. Code §1101(b) to prove modus operandi, common plan, and absence of malice. (RT 55) Later, the prosecutor argued that the prior testimony was admissible under the so-called "doctrine of chances," which provides "that the more often one does something, the more likely something was intended." (RT 611)

Defense counsel argued the prior was too dissimilar to prove intent under People v. Ewoldt (1994) 7 Cal.4th 380. (RT 612-613) The trial court agreed. Several times it rejected the prosecutor's argument that the prior was similar enough to be introduced to prove intent, or modus operandi, or common scheme or plan. (RT 607-615, 621, 628-629, 634-635) The only similarity the court found was in the defendant's explanation as to the two events. (RT 621)

The trial court ultimately ruled, two-thirds of the way through trial, that, if Appellant testified, he could be cross-examined with his Oklahoma testimony. (RT 634-646) It deemed the prior admissible on three grounds: (i) to prove or disprove Appellant's "credibility concerning the presence or absence of the need for self-defense," (ii) to prove or disprove "any mistake of fact testified to by the defendant," and (iii) "as to the existence or non-existence of malice aforethought. (RT 615, 621, 635)

The trial court conceded that the decision to admit Appellant's Oklahoma testimony was a "close call." (RT 634)

Appellant did not testify at trial, on the advice of counsel, to avoid the introduction of the Oklahoma testimony. (RT 707, 1004-1005, 1018, 1029-1030)

At the motion for new trial hearing the trial court restated the grounds for its ruling. It would have allowed cross-examination on Appellant's Oklahoma testimony, (a) because such testimony was relevant to his credibility, and (b) because of the so-called "doctrine of chances." (RT 1073-1075)

The Court of Appeal affirmed on the theory that the trial court properly exercised its discretion in ruling that the Oklahoma prior was admissible to prove intent under Evid. Code §1101(b). (slip op. pp. 14-16) That conclusion misstated the record. The trial court never ruled that the prior was admissible under §1101(b) to prove intent. Accordingly, the Court of Appeal's opinion is defective, because it depends on a finding never made by the trial court.

### B.    Facts: Appellant's Testimony in the Oklahoma Case

Appellant was helping raise two children and a younger sister in Oklahoma. He worked at Farris body and fender. Appellant had recently loaned his .45 handgun to a friend named Bryant Jones, because Jones'

brother had been shot. Appellant's apartment was burglarized and several of his guns were stolen.

Appellant was once friends with Conan Emery (the Oklahoma homicide victim). Emery had stayed in Appellant's apartment. Emery was a leader of the 83rd Crips gang. Emery was a professional boxer and a street fighter. Appellant knew that Emery hurt several people.

Appellant followed Jones to Stephanie's house, to retrieve his .45. As Appellant approached, Jones fled in a panic. He did not have Appellant's gun. (Exh. #14, p 19-20) Appellant entered and saw Emery. He was scared, because he did not expect to see Emery. Appellant asked about his missing guns. Emery stood and said, "Don't [ask] me about your guns, or I will let your ass have it." Emery reached into his waistband. Appellant thought Emery was reaching for a gun. Appellant fired first. (Exh. #14, pp. 20-22)

Appellant wrote to friends asking them to testify that Emery had a gun. Appellant testified that no one else was willing to testify in his favor, because it would be risky to testify against a member of the 83rd Crips.

## C. Appellant's Testimony in the Oklahoma Case Should Not Have Been Ruled Admissible

The improper introduction of evidence of a prior crime, which introduces bad character evidence, violates the due process clause of the 5th Amendment. Old Chief v. United States (1997) 519 U. S. 172, 136 L.Ed.2d 574; McKinney v. Rees (9th Cir. 1993) 993 F.2d 1378, 1380.

Appellant's Oklahoma testimony should not have been ruled admissible because it constituted improper bad character evidence. Evid. Code §1101(a); People v. Sam (1969) 71 Cal.2d 194, 203. This testimony was not admissible under any Evid. Code §1101(b) exceptions.

1. **Intent.** The trial court ruled that the Oklahoma testimony was not admissible under Evid. Code §1101(b) to prove intent, because the two

cases were dissimilar. (RT 604-605, 621, 628-629, 634-635)  That ruling was correct.

2. **Credibility.** The trial court found the Oklahoma testimony admissible as evidence of Appellant's credibility. (RT 635, 1073-1075) That ruling was erroneous. Appellant's Oklahoma testimony failed to establish anything adverse about his credibility. Appellant testified in the Oklahoma case that he shot Emery in self-defense, believing that Emery was reaching for a gun. The jury acquitted Appellant of murder, but convicted him of manslaughter on the theory of imperfect self-defense, namely, that Appellant honestly but unreasonably or, in the terms of the Oklahoma statute, "unnecessarily," believed he needed to shoot in self-defense. Thus, the Oklahoma jury implicitly found Appellant credible. See In re Christian S. (1994) 7 Cal.4th 768.

3. **Malice aforethought.** (i) Evid. Code §1101(b) does not authorize a prior to prove "malice aforethought." (ii) In any event, manslaughter under imperfect self-defense does not establish malice aforethought. Proof of imperfect self-defense negates malice aforethought.

4. **So-called "doctrine of chances."** The trial court relied upon the so-called "doctrine of chances." 2 Wigmore, Evidence (Chadbourn Rev. 1979) §302, at p. 241; People v. Carpenter (1997) 15 Cal.4th 312, 379:

> . . . similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act. (RT 627-628)

This theory does not apply here for several reasons:

First, Wigmore makes clear that the "doctrine of chances" only applies when the same explanation, or "unusual and abnormal element"

reoccurs. That did not happen here. In Oklahoma, the defense, or "unusual and abnormal element," was a combination of self-defense and mistake. Here, there was no mistake. The defense was complete self-defense.

Second, when there are insufficient similarities to prove intent, as the trial judge found, the prior is not admissible under the "doctrine of chances."

However, assuming, arguendo, that the trial court could be deemed to have ruled that the Oklahoma prior was admissible to prove intent under Evid. Code § 1101(b), that ruling was erroneous, because there was insufficient similarity between the two crimes. The only similarity is that Appellant shot both victims. That is not enough. People v. Ewoldt, supra.

Improper reliance upon a prior to show criminal propensity violates the 5th and 14th Amendments' due process clause. Garceau v. Woodford (9th Cir. 2001) 275 F.3d 769, rev'd on other grounds (2003) 538 U. S. 202.

In Appellant's Oklahoma case, Appellant went alone to a private home looking for an acquaintance. The man fled. Appellant entered the house, encountered the victim, a gang leader, and asked for his missing guns. The victim stood, told Appellant that if he kept asking about his guns, he would "let [his] ass have it," and reached into his waistband. Appellant was scared. He believed Emery was reaching for a gun to shoot him. Appellant fired first.

Here, the situation was quite different. Appellant's car pulled to the curb so Appellant could speak with Dandy and William, who previously robbed him. Dandy fired one shot from a handgun at Appellant. Appellant then fired one shot from a shotgun in actual self-defense at Dandy, but missed and struck William instead. (RT 1046) Several witnesses heard multiple shots.

Because there are no significant facts in common between these two

cases, except that Appellant shot and killed someone, the trial court ruled correctly that there were insufficient similarities to prove intent. Accordingly, there were insufficient similarities to allow admission under the so-called "doctrine of chances," either. That doctrine is merely another way of admitting a prior under §1101(b) to prove intent.

In People v. Erving (1998) 63 Cal.App.4th 652, 662, the Court of Appeal effectively acknowledged that the "doctrine of chances" does not provide an independent basis for admitting priors, but merely illustrates methods of proving Evid. Code §1101(b) factors, such as motive, intent and identity. Erving supports Appellant's argument that, because the prior was not admissible to prove intent because it was too dissimilar, that it could not be admitted under the "doctrine of chances," either. Such theory merely functions as a proxy for proving intent. Because the prior was inadmissible to prove intent, it was inadmissible under the doctrine of chances, also.

5. **Mistake**: The prior was not admissible to prove mistake, because there was no mistake here. Appellant would have testified that Dandy fired at him, and that he fired back in self-defense. Mistake was not at issue.

### D.    Prejudice

The trial court's ruling was prejudicial. Appellant's self-defense case would have been indisputably stronger if he testified at trial, as he testified on the motion for new trial, that Dandy fired one shot at him, and that he fired in self-defense. Conversely, Appellant's self-defense case would have been damaged if the prosecution introduced the Oklahoma testimony that Appellant was a killer. Indeed, the prosecutor admitted at trial that "evidence of other crimes is inherently prejudicial." (RT 611)

1       In addition, the court's ruling to allow the Oklahoma prior

2 testimony for impeachment purposes had significant influence on

3 the direction of the defense. As noted in claim #5(C)(D)(E)(F)(G)

4 AND (I) of the ineffective assistance of counsel claims, trial

5 counsel advised and caused Appellant to forego his right to testify,

6 present witnesses on his behalf and present the meritorious defense

7 of self-defense. Moreover, the impact of trial counsel's decision

8 to shift defense strategies in mid-trial,because of this ruling,

9 from self-defense to the inconsistant defense of mistaken identity,

10 had the most devastating effect before the jury because it deminished

11 all credibility within any particular set of factors the defense

12 placed before them to consider Appellant's innocence or guilt on

13 the lesser-included offences given at the trial.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10(A)

## II.

## THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON THE LESSER-INCLUDED OFFENSE-PLUS-ENHANCEMENT OF SECOND DEGREE DRIVE-BY MURDER

### A.   Facts and Introduction

Murder by shooting a firearm from a motor vehicle, "drive-by murder," has two degrees.

First degree drive-by murder does not require premeditation and deliberation. Intent to kill is enough, when shooting from a vehicle. Penal Code §189. There also is a drive-by special circumstance, Penal Code §190.2(a)(21), with identical elements.

Second degree drive-by murder can be committed by shooting from a vehicle with intent to inflict great bodily injury (GBI). Penal Code §190(d). Second degree drive-by differs from other second degree murders because (a) it requires shooting from a vehicle, (b) it requires the intent to inflict GBI, and (c) it carries a five-year enhancement, such that the penalty is 20 - life, not 15 - life.

The trial court instructed on first degree murder under (a) premeditation and deliberation, pursuant to CALJIC 8.20 (CT 408), and (b) first degree drive-by murder, pursuant to CALJIC 8.25.1. (CT 409), and on the drive-by special circumstance, Penal Code §190.2(a)(21), under CALJIC 8.81.21. (CT 416)

The trial court instructed on second degree murder under alternate theories of express malice (CALJIC 8.30, CT 410), and implied malice. (CALJIC 8.31, CT 411)  It instructed that unanimity on theory was not required.

However, the trial court failed to instruct on the lesser-included offense-plus-enhancement of second degree drive-by murder, Penal Code

§190(d). It failed to give the second degree drive-by instruction, CALJIC 8.35.2. It failed to provide the verdict form under CALJIC 8.35.2, requiring a special finding on second degree drive-by murder.

## B.   The Failure to Deliver the Second Degree Drive-by Instruction Was Error

There is a sua sponte duty to instruct on lesser-included offenses if there is substantial evidence that the defendant is guilty of the lesser offense or enhancement, but not guilty of the greater offense. People v. Breverman (1998) 19 Cal.4th 142, 177; People v. Flannel (1979) 25 Cal.3d 668, 684; People v. Barton (1995) 12 Cal.4th 186, 196.

The failure here correctly to instruct on all elements of a crime or enhancement violates the 5th Amendment's due process clause. Sandstrom v. Montana (1979) 442 U. S. 500, 520. Sandstrom error includes the failure correctly to instruct on lesser-included crimes. Middleton v. McNeil (2004) ____ U. S. ____, 124 S.Ct. 1830.

Second degree drive-by murder is a lesser-included offense-plus-enhancement of first degree drive-by murder. People v. Garcia (1998) 63 Cal.App.4th 820, 827. These two crimes vary in one particular, only. First degree drive-by requires an intent to kill. Second degree drive-by requires merely an intent to inflict GBI. One necessarily commits second degree drive-by (shooting with intent to inflict GBI) when one commits first degree drive-by (shooting with intent to kill). People v. Clark (1990) 50 Cal.3d 583, 636.

Although second degree drive-by is a lesser-included of first degree drive-by, the trial court failed to instruct on it. The failure to instruct on a lesser-included constituted error. The pro tem justice who wrote the opinion in this case misstated the law on lesser-includeds, when he wrote that there was no obligation to instruct on a lesser-included, as long as the jury is correctly instructed on all the elements of the greater crime. (slip op.

pp. 18-20) That is not the correct test. The failure to instruct on a lesser-included is prejudicial, even if instructions on the greater crime were accurate, as long as there is substantial evidence that only the lesser, but not the greater, crime was committed. People v. Blakeley (2000) 23 Cal.4th 82, 93; People v. Breverman, supra, 19 Cal.4th at 177-178, esp. fn. 25; People v. Anderson (2006) 141 Cal.App.4th 431, 442.

Here, Appellant only fired one shot at one man. If he had the intent to kill, he probably would have fired at both men. Thus, the circumstantial evidence was equally strong that he only fired with the intent to injure, not the intent to kill. Accordingly, the failure to instruct on the lesser was error.

## C.    The Court of Appeal Opinion Was Further Defective, Because it Relied on Pre-Apprendi Law

The Court of Appeal further rejected Appellant's lesser-included argument, on the theory that People v. Wolcott (1983) 34 Cal.3d 91, 101 and People v. Garcia (1998) 63 Cal.App.4th 820 found no *sua sponte* duty to instruct on lesser-included enhancements. (slip op. p. 19) However, Wolcott and Garcia are no longer good law in light of Apprendi v. New Jersey (2000) 530 U. S. 436, Blakely v. Washington (2004) 542 U. S. ___, 124 S.Ct. 2531, and Middleton v. McNeil, supra, 124 S.Ct. 1830.

Apprendi and Blakely provide that enhancements (except recidivist enhancements), just like crimes, must be proven to the jury beyond a reasonable doubt, pursuant to the 5th Amendment's due process clause and the 6th Amendment's jury trial clause. And see People v. Wims (1995) 10 Cal.4th 293, 298; People v. Clark (1997) 55 Cal.App.4th 709, 714 (trial court must properly instruct on all aspects and enhancements of a GBI enhancement).

Thus, instruction should be required on lesser-included enhancements, or lesser-included offenses-plus-enhancements, for the same reasons why instruction is required on lesser-included offenses, to wit:

Truth may lie neither with the defendant's protestations of
innocence nor with the prosecution's assertion that the defendant is
guilty of the offense charged, but at a point between these two
extremes: the evidence may show that the defendant is guilty of
some intermediate offense included within, but lesser than, the
crime charged. A trial court's failure to inform the jury of its
option to find the defendant guilty of the lesser offense would
impair the jury's truth-ascertainment function.

   -- People v. Barton, supra, 12 Cal.4th at 196.

This means that, post-Apprendi, the rules on *sua sponte* instruction
on lesser-included offenses need to be revised to apply to lesser-included
enhancements, too. Thus, review is warranted, so that this Court may
update its rulings on lesser-included enhancements to conform with the
Apprendi line of authority.

## D.   The Failure to Instruct on Second Degree Drive-by Murder Was Rendered Prejudicial by the Prosecutor's Numerous Misstatements During Argument

After Apprendi, standard of prejudice for failure properly to instruct
on an enhancement is the federal harmless beyond a reasonable doubt test
under Chapman v. California (1967) 386 U. S. 18, 24. California's rule,
before Apprendi and Blakely, was that the more forgiving Watson standard
of prejudice (People v. Watson (1956) 46 Cal.2d 818) applied to errors
regarding enhancements. See, e.g., Garcia, supra, 63 Cal.App.4th at 834.
However, this prior rule is no longer valid, in light of Apprendi's
requirement that such sentencing findings must be made by a jury beyond a
reasonable doubt.

The failure to instruct on the lesser-included offense-plus-
enhancement was prejudicial as follows:

(1) The jury was not told what crime occurred if Appellant fired
from the car with the intent to inflict GBI, but not to kill. That crime, plus

enhancement, is second degree drive-by murder. Penal Code §190(d).

(2) In jury argument the prosecutor misstated several aspects of homicide law. First, he argued:

> . . . if you find that the defendant in this case intentionally discharged a firearm from a motor vehicle, you don't even have to consider premeditation or deliberation. The State of California has deemed this act to be so inherently offensive and so inherently dangerous that it's pretty much said strict liability, you shoot a firearm from out of a car intentionally, . . . that's first degree murder. (RT 786)

This argument was legally incorrect in several ways. (a) The argument that first degree drive-by murder is a "strict liability" crime is wrong. First degree drive-by is not a "strict liability" crime. It requires the intent to kill. (b) There is no first degree drive-by if the shooter merely intends to injure. (c) Similarly, there is no first degree murder if the shooter fires in conscious disregard of the risk, with no intent to hit anyone. (d) The argument that if "you shoot a firearm out of a car intentionally, and you cause the death" of someone, then you have committed first degree murder, was similarly wrong. Shooting from a vehicle with intent to injure, but not kill, is second degree drive-by murder.

(3) The problem of the omitted instruction and erroneous argument here was further aggravated when the trial court instructed that the jurors did not have to agree, as to second degree murder, whether malice was express or implied. (CT 413) This instruction was wrong. If some jurors relied upon implied malice, there was no intent to inflict the GBI necessary for second degree drive-by murder.

(4) The prosecutor repeated his inaccurate argument that shooting from a car would be first degree murder, regardless of the shooter's intent.

. . . you don't even have to agree amongst the twelve of you that it was premeditated and deliberate. Six of you could say premeditation and deliberation, and another six could say he fired from a vehicle.

Six of you could say implied malice. Six could say express malice. It doesn't matter. You could all come to the agreement that it's first degree murder. You don't have to be in agreement as to the theory behind it. (RT 801)

The argument was wrong. (a) "Fir[ing] from a vehicle" is insufficient to establish first degree murder. Express malice (intent to kill) is needed, too. (b) The argument in the second paragraph is also incorrect. A finding of "implied malice" is insufficient for first degree murder. Even under the drive-by theory, there must be express malice, or an intent to kill, for first degree drive-by murder.

## E. The Trial Court's Failure to Instruct, as Exacerbated by the Prosecutor's Defective Argument, Was Prejudicial

The omission of second degree drive-by instructions was prejudicial. There was no direct evidence, only circumstantial evidence, of premeditation, or intent to kill, necessary for first degree drive-by murder. Even then, there was no more circumstantial evidence of intent to kill than there was of intent to injure.

Several witnesses heard multiple shots. Dandy heard two shots. Officer Green testified that witnesses reported hearing one or two shots. The 911 callers reported multiple shots. Mary Washington heard "several" shots.

Mary Loggins, saw someone running down that street, with his hands and arms close to his body as if he had something under his jacket. (RT 514, 523) This evidence suggested that Dandy, standing next to William, had a pistol, and fired it at Appellant, and then ran away.

There was no evidence that more than one shot was fired from the Cadillac and toward William and Dandy. That means that the additional shots heard by the witnesses were fired by someone else, and in another direction. Appellant offered to prove, and testified on the motion for new trial, that he only shot at Dandy after Dandy fired one shot at him.

The Court of Appeal discounted the evidence of a second shot, on the ground that there was no physical or forensic evidence of it. (slip op. pp. 21-23) That conclusion is unwarranted. There was no evidence that the police looked for bullets on the opposite side of San Pablo Avenue, where bullets would travel if fired from where William and Dandy stood. Thus, the absence of forensic or physical evidence of the second bullet does not prove it did not exist. It merely reflects that the police did not look for it.

Dandy fled to the Andersons' house. The police never found Dandy in time to search for a weapon or to conduct a gunshot residue test, because Bianca and Shanae intentionally concealed Dandy's identity from the police to protect him from being arrested for shooting at Appellant. They falsely identified Dandy as "Richard Davis," and falsely described "Davis" as standing 5'8," when, in fact, Dandy was 6'3."

If Dandy fired at Appellant, and if Appellant only fired after Dandy shot at him, there was no premeditation. Appellant may only have fired instinctively, to disarm Dandy. If Appellant aimed at Dandy, but struck William instead, who was next to Dandy and moving toward Appellant, to try to shield his girlfriend, then there was no intent to kill. Instead, there was merely a shooting with an intent to injure.

If the jury found those facts, then the correct verdict would have been second degree drive-by murder. Yet the jury received no instruction on these theories.

Cadillac driver Jones' testimony further helps establish prejudice. (i)

After Jones heard Appellant was robbed and beaten by William and Dandy, Jones gave Appellant a baseball bat for protection. Appellant never spoke about getting a gun. Instead, he installed barricades on his apartment door for protection. (ii) When Appellant asked Jones to drive him to encounter William and Dandy, Jones assumed Appellant was intending a fist fight. (iii) Jones did not see Appellant with a weapon. (iv) When Jones drove to the corner of 30th and San Pablo, he stopped and parked, because he thought that, at worst, Appellant would have a fist fight.

Jones' testimony tends to disprove that Appellant had any intent to kill, or to shoot first. If Appellant had planned in advance to kill, and/or if he shot first, he most likely would have fired at both men, not just at one. This provides further substantial evidence that Appellant only shot with intent to injure. However, the jury was never told to decide this question.

III.

## THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY THAT THE DOCTRINE OF TRANSFERRED INTENT MAY APPLY WHEN ONE SHOOTS IN SELF-DEFENSE

### A.    Transferred Intent Applies to Self-defense

Under the doctrine of transferred intent, if a defendant shoots at one person with a particular mental state, but misses, and hits a bystander, the defendant's mental state when shooting at the first person applies to the shooting of the bystander.  People v. Scott (1996) 14 Cal.4th 544, 548; People v. Leavitt (1984) 156 Cal.App.3d 500, 507;

Transferred intent applies to a shooting in self-defense.  People v. Matthews (1979) 91 Cal.App.3d 1018, 1023-1024; People v. Curtis (1994) 80 Cal.App.4th 1337, 1357.

William and Dandy were standing next to each other.  If Dandy fired one shot at Appellant, and if Appellant fired back at Dandy in justifiable self-defense, and struck William because he aimed poorly, or because William was moving to shield his girlfriend, then Appellant's homicide of Dandy could be excused under the law of self-defense. The trial court erred when it failed so to instruct. People v. Scott, supra; People v. Matthews, supra.

### B.    Even If, Arguendo, Trial Counsel Withdrew Her Request for the Transferred Intent Instruction, the Trial Court Still Had a Sua Sponte Duty to Deliver It

A trial court has the sua sponte duty to give correct instructions on recognized defenses. People v. Saille (1991) 54 Cal.3d 1103, 1117.  This includes correct instructions on self-defense. People v. Sedeno (1979) 10 Cal.3d 703, 721.

Defense counsel requested in writing CALJIC 8.65, transferred

intent. (CT 341) Later, trial counsel withdrew this request at the instruction conference. (RT 728) However, there was no valid tactical reason to withdraw the request.

Trial counsel argued to the jury that Dandy fired the first shot. (RT 805) If Dandy fired the first shot, and if Appellant fired back at Dandy, and struck William, instead, only the combination of transferred intent and self-defense would justify the shot that struck William. Accordingly, trial counsel should have stuck with her original request for CALJIC 8.65.

In People v. Matthews, supra, 91 Cal.App.3d at 1023, the leading case on transferred intent and self-defense, the Court of Appeal divided 2-1 on requiring sua sponte instruction. Justice Evans, writing for the majority, held it was not required. Justice Reynoso dissented. He would have found sua sponte instruction warranted. Appellant submits that the 27-year old majority opinion on this topic is outdated and should be re-considered.

The majority in Matthews found two reasons for declining to apply the sua sponte rule. First, the main defense was whether "rape trauma syndrome" could be relied upon as a basis for diminished capacity or self-defense. Thus, self-defense was not the central issue. Accordingly, reasoned the majority, transferred intent was "inconsequential to a proper resolution of defendant's guilt." Id., 91 Cal.App.3d at 1025.

That distinction does not apply here. This was a classic case of self-defense. If Dandy shot at Appellant, then Appellant had the right to fire back. Whether Appellant's shooting of William could be justified by transferred intent was a central question for the defense.

Second, the Matthews majority relied heavily upon another instruction in that case which stated "if the right of self-defense exists, it is a complete defense to any crime committed during the exercise of the right." Id., 91 Cal.App.3d at 1025 (emphasis added). Accordingly, held the

Matthews majority, that other instruction, former CALJIC 5.30, sufficiently presented the issue of whether self-defense justified shooting a bystander.

However, no such instruction was given in this case. Accordingly, unlike in Matthews, nothing here told the jury that an act against a bystander could be justified.

Justice Reynoso would have held in Matthews that instruction on transferred intent and self-defense is required sua sponte, when supported by the evidence. Otherwise, "absent the appropriate instruction, the jury could not evaluate self-defense as it applied to" the shooting of the person next to the aggressor. People v. Matthews, supra, 91 Cal.App.3d at 1029 (Reynoso, J., dissenting). Justice Reynoso's analysis should be applied here.

The relationship between transferred intent and self-defense, 25 years after Matthews, is now a basic principle of law. People v. Scott, supra, 14 Cal.4th at 550-551.

Similarly, the sua sponte doctrine is far better developed now than when Matthews was decided. For example, in 1991 in People v. Saille this Court referred to the "familiar rule" that "a trial court has a sua sponte duty to give instructions relating to a recognized defense to enhancements of a charged offense." Id., 54 Cal.3d at 1117. Saille relied in part upon the concurring opinion in People v. Whitler (1985) 171 Cal.App.3d 337, 342. Neither of these authorities was available when Matthews was decided in 1979.

CALCRIM 562, Benchnotes, provides that a transferred intent instruction should be given *sua sponte*, "if transferred intent is one of the general principles of law relevant to the issues raised by the evidence." Those Benchnotes similarly provide that "Any defenses that apply to the intended killing apply to the unintended killing as well." Accordingly CALCRIM supports the position that instruction on transferred intent as a

defense should be given *sua sponte*.

For all these reasons, *sua sponte* instruction should have been required. People v. Saille, supra.

The Court of Appeal rejected this argument on two grounds. (1) Defense counsel withdrew her initial request for transferred intent instructions. (slip op. p. 21) But that does not effect the trial court's *sua sponte* duty to instruct, especially because trial counsel did not withdraw her request for other self-defense instructions. (2) The Court of Appeal found insufficient evidence that Terry Dandy fired a shot at Appellant. (id.) However, Appellant disagrees for the reasons stated above at pp. 16-20.

### C. Federal Constitutional Error and Prejudice

The failure to instruct correctly on a necessary element of the crime of homicide, lack of justification, violated Appellant's 5th and 14th Amendment due process rights. Carella v. California (1989) 491 U.S. 263; Sandstrom v. Montana (1979) 442 U.S. 510.

The applicable standard of prejudice is the harmless beyond a reasonable doubt test. Chapman v. California (1966) 368 U.S. 18. The error was prejudicial here, for the reasons stated at pp. 16-17 why the failure to instruct on second degree drive-by was prejudicial.

## APPELLANT WAS DENIED FAIR AND INDEPENDENT APPELLATE REVIEW BECAUSE THE PRO TEM JUSTICE WHO WROTE THE COURT OF APPEAL'S OPINION IS A SUPERIOR COURT JUDGE FROM THE SAME COUNTY AS THE TRIAL JUDGE WHOSE DECISION WAS BEING REVIEWED

This is an Alameda County case. The trial judge was Alameda County Judge Kingsbury. The Court of Appeal opinion was written by a pro tem justice, Judge Thomas Reardon, who is also an Alameda County Superior Court judge. Judges Kingsbury and Reardon regularly sit in the same Alameda County main courthouse at 1225 Fallon Street, Oakland. Their courtrooms are relatively close. There are approximately one dozen Alameda County Superior Court judges in that building.

Appellant's motion to recuse Judge Reardon on this basis was denied.

Judge/Justice pro tem Reardon should not have been allowed to rule on this appeal, let alone write the opinion, because it is inappropriate, and gives the appearance of bias and undue deference, for one Superior Court judge to review at the Court of Appeal the actions of another Superior Court judge from the same court in the same building. Such assignment fails to provide for sufficient independence between the trial court function and the appellate function.

In May 2001 an Ad Hoc Task Force established by the Judicial Council submitted a report called "Report to the Appellate Process Task Force on the Superior Court Appellate Divisions." (See www.courtinfo.ca.gov/reference/4_12courtssupct.htm) That committee examined the problem "that the appearance of impartial appellate justice at the Superior Court level is seriously threatened in many counties because of (1) negative perceptions associated with "peer review" (i.e., judges on

the appellate division of the Superior Court reviewing decisions by their colleagues on the same Superior Court) . . ." The committee cited a Law Revision Commission report with the following warning: "The primary concern with appellate jurisdiction within the unified court is the problem of conflicts of interest arising in peer review. A judge should not be in the position of having to reverse a judge of equal rank. There may be a collegiality or deference on the court that will destroy the independent judgment necessary for a fair review."

Because Judge/Justice pro tem Reardon sits in the same court and same building as trial judge Kingsbury, this situation presented the identical problem identified by the Appellate Process Task Force, namely, "the problem of conflicts of interest arising in peer review. A judge should not be in the position of having to reverse a judge of equal rank. There may be a collegiality or deference on the court that will destroy the independent judgment necessary for a fair review."

California Code of Judicial Ethics, Canon 2, states "A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." California Code of Judicial Ethics, Canon 3(E)(4)(c) provides that an appellate justice should disqualify himself if "the circumstances are such that a reasonable person aware of the facts would doubt the judge's ability to be impartial."

Decision by a biased judge violates the due process clause of the 5th and 14th Amendments. Tumey v. Ohio (1927) 273 U. S. 510.

Accordingly, review is warranted because the independence of appellate review was compromised here.

V.

## THE TRIAL COURT ERRED IN BARRING APPELLANT FROM INTRODUCING BAD CHARACTER EVIDENCE REGARDING WILLIAM ANDERSON AND DANDY; IT WAS ADMISSIBLE TO REBUT THE PROSECUTION'S GOOD CHARACTER EVIDENCE

The prosecutor elicited good character testimony from three witnesses about William and Dandy.

(1) Shanae Anderson never saw either her cousin William or her boyfriend Dandy involved in violent or illegal behavior. (RT 432)

(2) Bianca, William's girlfriend, said she had never seen either William or Dandy involved in violent behavior.

(3) Raymond Jones said he had never observed William or Dandy engage in violent behavior.

Defense counsel tried to cross-examine Shanae by asking "Are you aware William Anderson and Terry Dandy had twice assaulted and robbed Mr. Kilgore?" The prosecutor's objection to this question was sustained.

The trial court also barred defense counsel from directly examining Kevin Tomlinsonn, Appellant's landlord, to show he had seen William selling drugs. (RT 425)

This bad character evidence should have been admitted.

1. Proof that the victim engaged in violent behavior is admissible in a self-defense case where the defendant knows the victim's violent acts. Evid. Code §1103(a); People v. Cash (2002) 28 Cal.4th 703, 726; 1 Witkin, Calif. Evidence (4th ed.), Circumstantial Evidence, §57, p. 389.

2. Evidence that the victim's friend Dandy had engaged in violent behavior was similarly admissible. People v. Minifie (1996) 13 Cal.4th 1055, 1064.

3. Evidence that William sold drugs was admissible because it rebutted the good character testimony by Shanae and Bianca that they had

never seen William engage in illegal activity. Evid. Code §356; <u>People v.</u> <u>Holloway</u> (2004) 33 Cal.4th 96, 146.

4. Evidence that William was a drug dealer was admissible for another reason. It tended to show William was armed. As the trial judge acknowledged, drug dealers in Oakland are often armed. The fact that the victim is armed is admissible. That may cause the defendant to reasonably fear the victim.

Denial of this cross-examination violated Appellant's 6th Amendment confrontation rights. <u>Davis v. Alaska</u> (1974) 415 U. S. 308.

Denial of this direct examination violated Appellant's 6th Amendment right to present evidence on his own behalf. <u>Washington v.</u> <u>Texas</u> (1967) 388 U. S. 14.

The error in excluding bad character evidence was prejudicial. It would have supported Appellant's defense that he reasonably feared William and Dandy when he shot. Without this evidence, the jury was largely left with the saccharine impression -- given by their respective girlfriends -- that they were fine, upstanding members of the community.

This evidence also would have impeached Shanae's and Bianca's credibility, insofar as they claimed that William and Dandy were law-abiding and non-violent. If this additional hole had been punched in their credibility, there is a reasonable probability that the jury would have disbelieved them when they testified that Dandy was unarmed.

## VI.

### TRIAL DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant's arguments on ineffective assistance of counsel (IAC) are abbreviated due to Rule 28.1(d)'s page/word limits. Thus, this section should be read together with Appellant's concurrently filed habeas corpus petition.

Each aspect of IAC stated here violated Appellant's 6th Amendment right to competent counsel. Strickland v. Washington (1984) 466 U.S. 668.

1. Trial counsel was ineffective when she made an erroneous offer of proof.

In moving to excluded the Oklahoma testimony, trial counsel Levy initially presented a written offer of proof that Appellant would testify that he saw Dandy "raise his shirt and pull out a weapon." (CT 290) That presented the defense of imperfect self-defense. In re Christian S. (1994) 7 Cal.4th 768.

Trial counsel later admitted that this offer of proof was inaccurate. Appellant told her that Dandy actually fired at him, and that Appellant fired back, in actual self-defense. (RT 629-633) If trial counsel had presented those facts in her initial offer of proof, that would have presented the defense of complete self-defense, and the motion to exclude the Oklahoma prior would have been more persuasive.

When Ms. Levy tried to correct this error, the trial court commented sarcastically: "Anybody have an additional plot they want to put on the record?" (RT 633) This comment is a strong indication that the trial court disbelieved the changed offer of proof, because it was changed. This IAC caused the trial court to discredit Appellant's motion, once it was correctly stated.

2. Trial counsel was ineffective when she switched defense theories

midstream from self-defense to reasonable doubt as to identity.

Defense counsel Levy defended on self-defense throughout the prosecution's case. Up until that point, stated Ms. Levy, "it was the defense wish to have Mr. Kilgore testify." (RT 707) Indeed, at the jury instruction conference Ms. Levy requested self-defense instructions. (RT 720-727)

However, things changed after the trial court ruled three-quarters of the way through trial that the Oklahoma testimony would be admissible. After that ruling, Ms. Levy decided that Appellant would not testify. (Id.) She largely abandoned the self-defense argument, and relied almost totally upon reasonable doubt as to identity, instead. Vartually all of Ms. Levy's March 19, 2003 jury argument focused on the contention that there was reasonable doubt whether Appellant was the shooter. She did contend that Dandy fired the first shot. (RT 805) However, at no point in her jury argument did she contend that Appellant fired in self-defense.

Defense counsel violated the classic aphorism against switching horses in midstream when she changed the defense three-quarters of the way through trial from self-defense to reasonable doubt as to identity. This last-minute change in strategy constituted IAC. Even without Appellant's testimony, self-defense still could have been argued. The eyewitness testimony as to the number of shots fired tended to support the defense of self-defense. Raymond Jones thought he was driving Appellant to a fist-fight, not a shooting.

The identity defense had substantial problems. There were three eyewitnesses and a confession witness. Shortly after the shooting, Appellant telephoned the police to report his car stolen, which Ms. Levy knew sounded suspicious. (RT 1027, 1031)

A claim that Appellant was not the shooter needed to be supported by an alibi defense. Yet no alibi defense was investigated or developed, let alone presented. (Id.)

Ms. Levy testified on the motion for new trial "I didn't think there was a defense of 'It wasn't me.' I didn't that that was possible." (RT 1027, 1031) Yet, that was the defense she argued. When trial counsel abandons an arguable self-defense case, and presents, instead, an identity defense which she concedes was not "possible," she renders IAC. People v. Pope (1979) 23 Cal.3d 412, 425, and n. 15.

The Court of Appeal discounted the IAC arguments because it disbelieved Appellant's testimony at the hearing on the motion for new trial that he fired in self-defense. (slip op. pp. 21-23, 27-29) Such resolution of credibility is not the province of the appellate court. This is the province of the jury.

3. Trial counsel's failure to move for a continuance, or otherwise to obtain a pre-trial ruling, rather than a mid-trial ruling, on the admissibility of the Oklahoma prior, constituted IAC.

No reasonably competent defense counsel would begin trial without knowing whether the defense was self-defense or identity. No reasonably competent attorney could simultaneously present both of those defenses to the jury, because the jury would invariably disbelieve both.

Trial counsel should have obtained a pre-trial ruling on whether the Oklahoma testimony was admissible. People v. Simon (1986) 184 Cal.App.3d 125, 131. She should have sought a pre-trial hearing, pursuant to Evid. Code §§402 and 403, as to exactly what happened in Oklahoma. She did none of that. And she never even considered doing that. (RT 1021)

By failing to obtain a pre-trial ruling, trial counsel was forced to litigate with one hand tied behind her back. Did she have a self-defense case or a reasonable-doubt-as-to-identity case? She did not know. Did she have a self-defense case with Appellant's testimony, or without Appellant's testimony? She did not know.

Thus, trial counsel rendered IAC by proceeding to trial without being

properly prepared, and without knowing what her case would be.

4. There were several other instances of IAC, which are discussed in greater detail in the companion habeas corpus petition.

(a) Trial counsel elicited good character evidence from Kevin Tomlinsonn that Appellant was reliable and trustworthy. (RT 403) That negligently opened the door to bad character evidence that Appellant had been convicted of a felony. That destroyed counsel's own strategy of not having Appellant testify in order to keep the Oklahoma case from the jury. That opened the door for the prosecutor to ask whether Tomlinsonn would have hired Appellant, if he knew Appellant "had a felony conviction in 1997" (RT 419-420); and to ask if he would have hired Appellant as the manager of a building where children lived, if he knew Appellant had a "felony conviction." (RT 420)

This IAC did substantial damage. Appellant declined to testify at trial, to the great disadvantage of his self-defense case, to avoid revealing to the jury the testimony from his Oklahoma manslaughter trial. Yet allowing the jury to learn of the 1997 felony undermined this strategy.

(b) Trial counsel was ineffective when she failed to move that the tape-recorded statement by Matthew Bryant be redacted to eliminate his statement that he thought appellant was a drug-dealer.

The prosecutor played a tape-recorded statement in which Bryant stated he believed Appellant was a drug-dealer. Trial counsel rendered ineffective assistance by failing to move the tape-recording be redacted to exclude this testimony.

(c) Trial counsel was ineffective when she failed to request an instruction that the doctrine of transferred intent applied to shooting in self-defense. (See pp. 18-21, *supra*)

(d) Trial counsel negligently failed to object to the prosecutor's inaccurate argument regarding drive-by murder. (See pp. 14-16. *supra*)

**"SUPPLEMENT" MEMORANDUM AND**

**POINTS OF AUTHORITIES**

## SUPPORTING FACTS FOR CLAIM #5(C)

On February 14, 2003 the case was called for trial. At the time Petitioner presented his initial written motion to exclude the Oklahoma conviction. (CT 288)

The parties then believed that the Oklahoma conviction resulted from a plea. The parties began to litigate the sole question of whether the conviction was admissible.(CT 290)

The next day prosecutor Stallworth stated that he just learned from the Oklahoma prosecuter that there was a jury trial in that case, not just a plea, and that a jury found first degree manslaughter. He was requesting the transcript of Petitioner's Oklahoma testimony.(RT 19) That ultimately allowed the prosecutor to argue, in the alternative, even if the conviction were not admissible, that the testimony was admissible.(RT 604-634)

The prosecutor explained reason for the untimely introduction of the Oklahoma testimony.(RT 19).The court rejected the explaination:

THE COURT: ONE OF THE THINGS--I CAN APPRECIATE YOUR FRUSTRATION ABOUT THAT AND ALSO MS. LEVY'S FRUSTRATION ABOUT NOT SEEING IT IN ADVANCE, MUCH IN ADVANCE OF WHAT IS GOING ON HERE. OBVIOUSLY. SINCE THIS CASE HAS BEEN AROUND SINCE 2000, WHEN SOMEBODY SEES A OUT-OF-STATE PRIOR-- AND I REALIZE YOU HAVE'NT HAD THE CASE THAT LONG, BUT THAT's IRRELEVANT SINCE YOUR OFFICE HAS HAD THE CASE SINCE 2000-- SOMEONE NEEDS TO DIG INTO THOSE EARLIER ON TO CLARIFY WHAT THE ISSUES ARE.(RT 58)

Trial counsel, Deborah Levy, failed to object to the introduction of the Oklahoma testimony on the ground that the prosec-

(1)

1   utor'violated discovery rules, thus not allowing the defense pre-
2   paration and investigation to introduce other evidence regarding
3   the Oklahoma homicide which supported the Petitioner's success-
4   fully asserted defense in that case. **See:Brady v. Maryland(1963) 373 U.S. 83**

5   Failure to object resulted in trial counsel making an un-
6   informed tactical decision to advise and cause Petitioner not to
7   testify.

8   Ms. Levy testified as a witness on Petitioner's motion for
9   new trial, which was based on allegations of IAC. She stated that
10  she decided not have Petitioner testify at all, and advised him
11  not to testify, once the trial court ruled the Oklahoma testimony
12  admissible for impeachment, because she thought the Oklahoma
13  testimony was too damaging. She thought it was damaging because
14  it informed the jury that Petitioner had shot and killed someone.
15  She also believed the testimony reflected poorly on the Petition-
16  er's credibility. However, she also believed that she could not
17  present a self-defense case without Petitioner's testimony, Thus,
18  when she decided not to have Petitioner testify, she also decided
19  to abandon self-defense, and to rely exclusively upon an undeve-
20  loped defense of mistaken identity which was inconsistant to the
21  foundation already presented to the jury and witness in respect
22  to the self-defense defense. In addition she did no investigation
23  for the Identity defense.(RT 1004-1005) Counsel's uninformed
24  tactical decision to switch defense theorys in the middle of the
25  trial destroyed all credibility with the jury for neither the
26  defense of self-defense or the defense of mistaken identity could
27  be persued simultaneously and allow the jury to entertain the
28  facts of the case as presented by the defense. Thus making a

(2)

1    farce of Petitioner's trial.(AS NOTED. TRIAL COUNSEL TESTIFIED
2    ON PETITIONER'S MOTION FOR NEW TRIAL, BASED ON IAC, ALTHOUGH IN
3    THE TYPICAL HABEAS CORPUS CASE ALLEGING IAC A PETITIONER WOULD
4    SUPPLY A DECLARATION FROM TRIAL COUNSEL, EXPLAINING THE PRESENCE
5    OR ABSENCE OF ANY STRATEGIC REASONS FOR THE CHALLENGED ACTS OR
6    OMISSIONS, NO SUCH DECLARATION IS NEEDED OR SUPPLIED HERE. TRIAL
7    COUNSEL, DEBORAH LEVY, TESTIFIED ON TWO SEPARATE DAYS BEFORE THE
8    TRIAL COURT ON THE MOTION FOR NEW TRIAL.(RT 937-955, 975-1033)
9    ALL HER REASONS FOR HER ACTS AND OMISSIONS WERE ADQUATELY
10   EXPLAINED IN THAT TESTIMONY.) Trial counsel admitted the farce in
11   her testimony at the motion for new trial. Ms. Levy's testimony
12   at the hearing was, because of the combination of the prosecution
13   witnesses' identification testimony, and the adverse inference
14   from the Petitioner's stolen car report, "I did'nt think there
15   was a defense of "It was'nt me." I didn't think that was possible
16   possible."(RT 1027, 1031) Yet, that was the defense she argued.

17       In light of trial counsels actions and omissions, had she
18   made the objection to exclude the Oklahoma testimony, there is a
19   reasonable probability that the court would have sustained the
20   objection on the grounds that the prosecution violated discovery
21   rules in the untimely introduction of the Oklahoma testimony, and
22   his explaination was not acceptable to excuse the misconduct.

23       Had such an objection been made and sustained, the Petition-
24   er would have testified, " That Terry Dandy fired a shot at me
25   first and that I fired back in self-defense and missed Dandy, and
26   apparently struck William."( PETITIONER TESTIFIED TO THE NATURE
27   OF THESE STATEMENT UNDER OATH AT THE MOTION FOR NEW TRIAL.(RT
28   1043-1047)

1   Witnesses Halevchia Osborne and Betsy Varela would would have
2   taken the stand supporting Petitioner's self-defense case.(**NOTE:**
3   **THEIR DECLARATIONS DETAILING THEIR ANTICIPATED TRIAL TESTIMONIES**
4   **ARE ATTACHED AS EXHIBIT(S) TWO[2] AND THREE[3]).**

5       In light of the forgoing and other independant evidence sup-
6   porting the Petitioners self-defense case, there is a reasonable
7   probability that, but for trial counsel's IAC in failing to
8   object to the untimely pivotal introduction of the Petitioner's
9   prior Oklahoma testimony, the result of the proceeding would have
10  been different.

11      The following independant evidence supported Petitioner's
12  self-defense case:

13      Despite the prosecution's arguement that no one standing at
14  at the coner was seen with a gun or had fired at the Petitioner
15  there was evidence to the contrary.

16      (1) In trial counsel's cross-examination of investigating
17  officer Sgt. Phil Green, she established that despite the lack
18  of physical evidence, more than one weapon could have been fired.
19  Green also testified that it was reported to him that two shots
20  had been fired...(RT 574, 593)

21      In addition, Green's testimony established the fact that
22  key prosecution witness Raymond Jones' testimony was inconsistant
23  from the initial statements given at the interrogation. Green's
24  testimony was that, "Jones told him that the assults and robbery
25  accured within a short period of time; This is consistant with
26  the fact that Petitioner was in severe distress having been
27  assulted and robbed twice within a one week period.(RT 596) Also
28  initial statements given to Sgt Green By Jones that were incon-

(4)

1   sistant to his trial testimony was, Jones told Sgt. Green that
2   Petitioner had built the barricade on his apartment door after
3   the first assult and robbery by William and his friends.(RT 595-
4   596)

5   (2) On direct-examination of defense witness Mary Washing-
6   ton, trial counsel established the fact several shots were fired;
7   this is consistant with Terry Dandy firing initially at Petition-
8   er.(RT 678) There's no evidence Petitioner fired more than once.

9   (3) On direct-examination of defense witness Mary Loggins,
10  trial counsel established the fact that a man was seen running
11  from the alleged crime scene with his hands and arms close to his
12  body, as if he was concealing something under his jacket; this
13  testimony is consistant with Terry Dandy fleeing with a concealed
14  gun.(RT 671-672)

15  (4) On cross-examination of prosecution witness Bianca Moore
16  trial counsel established that Moore deliberately concealed Terry
17  Dandy's description and identity from the police; this conceal-
18  ment was consistant with Moore protecting Dandy from getting ar-
19  rested for shooting at Petitioner.

20  At the PX Moore testifed that,"She would not tell anyone if
21  Dandy did fire a shot at Petitioner.(CT[PX]Cross-examination re-
22  sumed, 33)

23  (5)On cross-examination of prosecution witness Shanae Ander-
24  son, trial counsel established that Shanae deliberately concealed
25  Dandy's physical description and identity from the police.(RT 197
    -199, 204, 206, 216)

26  (6) During the presentation of the prosecutions case a
27  defense witness was allowed to testify out of the usual order,
28  on direct-examination of defense witness Kevin Tomlinsonn trial

(5)

1  counsel established Petitioner installed barricades on his apart-
2  ment door after being assulted and robbed by the associates of
3  william Anderson, William Anderson, and Terry Dandy.(RT 414-417)

4     (7)In the initial tape statements by prosecution witness
5  Matthew Bryant, his statements were adverse to Petitioner's Self-
6  defense case.(RT 351-366) However, Bryant testified at trial
7  under oath that the comments on the taped statement that reflect-
8  ed alleged statements told to him by Petitioner were lies induced
9  with coercion from Sgt. Green to get him out of jail.(RT 343-350,
10  367-368, 394-396, 398-399)

11     Ms. Levy, in her cross-examination of Bryant attempted to
12  establish testimony contradicting prosecution's key witness
13  Raymond Jones. Jones conveniently claimed that at no time prior
14  to the actual shooting was he aware of a firearm to be in the
15  Petitioner's car or possession. Trial counsel questioned Bryant a
16  at trial in regards to a statement made to him by Jones', "And in
17  fact on the tape you mentioned that Raymond told you that he knew
18  there was a gun in the car, but he thought it was only going to
19  be used for protection...(RT 394) Here counsel mistakes the
20  source and content of the evidence. The source was the handwritt-
21  en notes of Sgt. Green. The content was, Bryant told Green that,
22  "Jones told him Petitioner brought the gun to protect himself if
23  needed."(PETITIONER REQUEST OF THIS COURT TO SUBPOENA THESE HAND
24  WRITTEN NOTES TO MAKE THEM A MATTER OF THE OFFICAL RECORD OF THE
25  COURT)

26     (8) Prosecution witness Raymond Jones at PX testified to,
27  "You, as a matter of fact, told the district attorney that you
28  told Ivan not to do anything stupid right like shoot someone?"

1   (ANSWER) Yes. "and Ivan in fact agreed with you; right? (ANSWER)
2   Right.(CT[PX] futher cross-examination, 16)

3       Jones testimony at the PX stated that the weapon was already
4   in the Petitioner's car when the Petitioner returned; Given
5   inference to the fact that if Petitioner intended to shoot first
6   he would have shot William and Friends at the alleged initial
7   sighting. (CT[PX] Futher cross-examination, 13)

8       Jones testimony at the PX stated that Petitioner told him
9   momments before the shooting that his only intention for going
10  over to where William and Dandy where was to fight at worse.(CT
11  [PX] Futher cross-examination , 15)

12      Jones testimony at the PX stated that he did not see "T" AKA
13  Terry Dandy, When he initially pulled up to 30th and San Pablo,
14  it was not until he had made an U-turn, after the Petioner fired
15  the shot. Jones also stated that due to his level of intoxication
16  his senses were dulled as to what was happening that day.(CT[PX]
17  Futher cross-examination,1-5)

18      Jones testimony at the PX stated, At one of the assults
19  prior to the shooting Petitioner had informed him that he was
20  assulted with a pistol by William or Dandy.(CT[PX]Cross-examinat-
21  ion, 89)

22      Jones testimony at PX stated, He did not know if any other
23  shots were fired out on 30th and San Pablo.(CT[PX]Futher cross-
24  examination, 3)

25      Jones testimony at trial, the day after shootin Dandy came
26  by apartments, Jones obtained a gun to protect himself; this
27  supported the contention that Jones knew Dandy was armed.(RT 297)

28      Jones testimony at trial stated,"After he heard Petitioner

(7)

1  had been assulted and robbed by William and his friends, Jones
2  gave Petitioner a bat for protection.(RT 266)

3     Jones testimony tends to disprove that  Petitioner had any
4  intent to shoot first. Futher, if Petitioner had planned in ad-
5  vance to shoot, he most likely would have fired at both William
6  and T. Dandy, not just at one because, if retaliation was Petit-
7  ioner's motive, as the prosecution argued, it was well establish-
8  ed that both men had participated in the assults and robbery
9  against the Petitioner. If Petitioner did not fire first then at
10 worst, he shot in self-defense under the theory of transferred
11 intent.

12    (9) In addition to Ms. Levy's uninformed tactical decisions
13 to advise and cause Petitioner not to testify, abandon the merit-
14 orious defense of self-defense and the Petitioner's rigth to call
15 witness supporting the self-defense defense, due to the prosecut-
16 or's misconduct in introducing the Oklahoma testimony in the
17 midst of the trial, even if the court had not sustained an object
18 objection to exclude the Oklahoma testimony, trial counsel's tac-
19 tical explainations were an oversight because no investigation
20 was made to procure other evidence from the Oklahoma trial that
21 supported Petitioner's credibility.

22    Had competent investigation been made with regards to the
23 affect(s) the Oklahoma evidence would have had on the Petitioner
24 credibility, Ms.Levy would have discovered sufficient evidence
25 corroborating the Petitioner's Oklahoma trial testimony. For ex-
26 ample, In the Petitioner's Oklahoma trial testimony, at page(s)
27 37-45, the testimony at first glance is subject to speculation
28 that Petitioner wrote a letter to a friend requesting him and

(8)

1  others to lie and testify that the victim had a weapon ... Had Ms.

2  Levy investigated the Oklahoma trial evidence she would have dis-

3  covered that, Testimony from the victims very own sister, Carmen

4  Randolph corroborated the Petitioner's letter and testimony. The

5  letter was written with hopes of getting witnesses to come forth

6  with the facts discussed within related to the case in face of

7  overwhelming harassment from the decease's gang and friends. Ms.

8  Randolph testified that," The evening her brother was killed,

9  hours shortly thereafter, Stephanie Brothers brought a gun(Tech

10 22) belonging to the victim to her(Randolph) house. Stephanie

11 Brothers testified she removed the gun from the crime scene. The

12 gun she testified was suspiciously found in her kitchen oven.It

13 did not take a genius within the Oklahoma jury to infer that the

14 weapon had been moved within the house before it was removed from

15 the alleged crime scene. Witness(s) testified the Tech 22 was

16 seen in the victim's possession at the alleged crime scene the

17 night before. Witnesses testified that the victim had stayed over

18 the night at the alleged crime scene. The Oklahoma D.A. investi-

19 gator, Allen Foster, testified to the recovery of the Tech 22

20 from Ms. Randolph's home after receiving information from Petit-

21 ioner's attorney. Petitioner informed attorney of this discovery

22 after having been visited at the jail by his wife, whom Stephanie

23 Brothers had confided in with regard to moving the weapon from

24 the alleged crime scene. The independant testimonies and sequence

25 of events leading to the recovery of the weapon Petitioner belie-

26 ved to be in the victims possession at the momment of the shoot-

27 ing incident, corroborate Petitioner's credibility in the matter

28 discussed .

1  · In regards to Ms. Levy's tactical explaination, Oklahoma
2  testimony would inform the Alameda jury that Petitioner had shot
3  and killed someone else..." Though it would have presented bad
4  charactor evidence that Petitioner shot Emory, nonetheless, coun-
5  sel's opinion as to the significant prejudice is without merit
6  due to the standard of prejudice the courts apply to these type
7  of evidentiary issues when faced with prior convictions of the
8  same nature being introduced for impeachment purposes. Futhermore
9  Ms. Levy could have countered this factor by informing the
10 Alameda jury that, the Oklahoma jury and the trial judge (The
11 trial judge in the Oklahoma case commented to the Petitioner
12 having been honest and remorseful during the course of the proce-
13 edings) found Petitioner credible. The jury found him credible
14 when it returned a manslaughter verdict equivalent to Califoria's
15 imperfect seld-defense **(In re Christian S. (1994) 7 Cal. 4th 768)**
16 a killing the honest but unreasonable belief in the need for self
17 defense.

## CONCLUSION

19 The above instance(s) of IAC violated Petitioner's 6th
20 Amendment right to representation by competent counsel. Trial
21 counsel rendered IAC when she failed to object to the untimely
22 introduction of the Oklahoma testimony. As a result of counsel's
23 failure to object to the introduction of this evidence, she
24 advised and caused Petitioner to waive his right to testify own
25 behalf. This right is afforded by the 5th, 6th, and 14th Amend-
26 ment.

27 This IAC was prejudical because the likelihood of the trial
28 court sustaining such an objection was probable. Yet, because no

(10)

1  such objection was made, not only was Petitioner's right to test-

2  ify foregone, counsel abandoned a meritorious defense of self-

3  defense, Petitioner's right to call witnesses was forsaken and

4  the affect of the inconsistant defense strategies, self-defense

5  and mistaken identity, as presented to the jury, prevented them

6  from entertaining any set of credible factors presented by the

7  defense, thus making a farce of the Petitioner's right to present

8  a defense.

9      The following factors are the arguements and ect. trial

10 counsel set before the jury in arguing mistaken identity:

11     (1) In her February 25, 2003 "Proposed Jury Questionnair

12 Questions" she requested that the jury be asked "Have you ever

13 been in fear of being assulted or killed?"(CT 301)

14     (2)In arguing on March 11, 2003 to introduce evidence of

15 William Andrson drug-dealing, she stated that she was presenting

16 the defense of reasonable self-defense. (RT 424-425)

17     (3) In her March 17, 2003 "Defendant's Proposed Jury Instru-

18 ction's," she asked that the jury receive the following self-

19 defense instructions: "CALJIC 5.12, 5.13, 5.15, 5.16,5.50,5.51."

20 (CT 341)

21     (4) At the jury instruction conference on March 18, 2003 Ms.

22 Levy argued for instructions to be given on self-defense,(RT 720-

23 727)

24     (5) In her March 19, 2003 jury arguement, more than 95% of

25 her arguement was that there was a reasonable doubt whether Pet-

26 itioner was the shooter. She did contend that Terry dandy fired

27 the first shot.(RT 805) However, at no point in her jury argue-

28 ment did she contend that Petitioner fired in self-defense.

(11)

1  Indeed, the word "self-defense" does not appear once in her 27-
2  page jury arguement, even though the jury received several stan-
3  dard instructions on self-defense.

4      In Ms. Levy's jury arguement she first argued "Mr. Stall-
5  worth[the prosecutor] in his opening said this is not a who-done-
6  it. You bet it is...We don't know who fired out of the Cadillac."
7  (RT 802) Then she challenged Shanae's identification of Petition-
8  er as the shooter in the back seat of the Cadillac,(RT 804-805)
9  She criticized officer Green for not conducting a gunshot residue
10 test on the rear seat of Petitioner's Cadillac.(RT 808) She deni-
11 ed that Petitioner was the shooter.(RT 809) She argued that Ray-
12 mond Jones lied when he testified that Petitioner was the shooter
13 (RT 812) She challenged Bianca Moore's Identification of Petit-
14 ioner as the shooter.(RT 814) She argued difficulties with eye-
15 witness testimony.(RT 820) Then she argued that prosecutor
16 "Stallworth can not put [Petitioner] Ivan Kilgore in that car."
17 (RT 826) She argued in conclusion that "it has not been proven be
18 beyond a reasonable doubt that Ivan Kilgore was the person with
19 the weapon in the back seat of that Cadillac."(RT 817, 827)

20

21

22

23

24

25

26

27

28

(12)

## SUPPORTING FACTS FOR CLAIM #5(D)

As noted at page one of the supporting facts for claim **#5(C)**, the parties (Trial counsel Levy and Prosecutor Stallworth) belie- ved the Oklahoma conviction resulted from a plea.(CT 289) Ms Levy despite the appearance, was informed by the Petitioner long before the trial that there was a jury trial in the prior Okla- homa conviction. Yet, Levy's investigation was limited to the plea form of "Judgment and Sentence" from the Oklahoma case.(CT 291) Prosecutor Stallworth discovered there was a jury trial and requested transcripts of the Petitioner's Oklahoma testimony to utilize in damaging Petitioner's self-defense defense, credibil- ity and ect.(RT 19, 604-634) The trial court ultimately ruled, at the end of the presentation of the prosecution's case, that if Petitioner testified, he could be cross-examinated with his Okla- homa testimony.(RT 634-646) It deemed the prior admissible on three grounds: (i) to prove or disprove Petitioners "credibility" concerning the presence or absence of the need for self-defense," (ii) to prove or disprove "any mistake of fact testified to by the Petitioner," and (iii) "as to the existence or nonexistence of malice aforethought.(RT 615, 621, 635)

Ms. Levy at no time,prior to the trial or after the prosec- tions election to use the Oklahoma evidence, did investigation or preparation of the Oklahoma trial evidence(other testimonies, exhibits or ect.) Levy testified at the Petitioner's motion for new trial, " she did no additional investigation".(RT 1005) Levy's arguements at the hearing to exclude the prior Oklahoma conviction reflect her lack of investigation and preparation.

(13)

1. (RT 623-626) These comments by Levy are a clear indication she
2. was not aware of the evidence at the Oklahoma trial, other than
3. the Petitioners testimony.

4. Based on this limited evidence Levy made a (uninformed) tac-
5. tical decision to advise and caused the Petitioner not to testify
6. abandoned a meritorious defense of self-defense, elected not to
7. call witnesses supporting the self-defense defense and instead
8. persued a mistaken I.D. defense, she knew would get the Petition-
9. er convicted.(RT 1027, 1031)

10. As discussed on page(s) 2-3, in the supporting facts for
11. ground #(1)Levy explained her tactical reason.

### Controlling Legal Principles:
### Ineffective Assistance of Counsel Claims and the Duty to Investigate

The general principles which apply to Appellant's claim that he received constitutionally inadequate representation are well settled. A defendant claiming ineffective representation bears the burden of proving by a preponderance of the evidence both: (1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant – in other words, a probability sufficient to undermine confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). At the same time, a defendant has the right to the effective assistance of counsel at trial, and thus is "entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate". See, e.g., In re Ross, 10 Cal.4th 184, 201 (1995).

With respect to the question of what constitutes an "objective standard of reasonableness" for attorney performance, the United States Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct, and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Wiggins v. Smith, 539 U.S. 510 (2003). Accordingly, "before counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation." In re Marquez, 1 Cal.4th 584, 602 (1992). Hence, although a court must presume that counsel's conduct falls within the "wide range of reasonable professional assistance", see Bell v. Cone, 535 U.S. 685, 702 (2002), counsel's alleged tactical decisions must be subjected to "meaningful scrutiny", see In re Avena, 12 Cal.4th 694 (1996), and must be "informed", so that *before* counsel acts, he or she "will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." Marquez, supra, at 602; see also In re Jones, 13 Cal.4th 552, 565 (1996).

( 14 )

1      In Strickland, the Supreme Court emphasized that "tactical" decisions, although entitled to a heavy measure of

2   deference if undertaken following a reasonable investigation, are only as reasonable as the investigation on which they are

3   based:

4          Strategic choices made after thorough investigation of law and facts relevant to plausible options
       are virtually unchallengeable, and strategic choices made after less than complete investigation are
       reasonable precisely to the extent that reasonable professional judgments support the limitations on
5       investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable
       decision that makes particular investigation unnecessary. In any ineffectiveness case, a particular decision
6       not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy
       measure of deference to counsel's judgments.

7   Strickland, supra, 466 U.S. at pp. 690-691.

8      In Wiggins v. Smith, supra, 539 U.S. 510, the Supreme Court applied this basic principle in expressly determining

9   whether a lawyer's pre-trial investigation was constitutionally deficient. In Wiggins, a Maryland state court trial, the defendant

10  was convicted of robbing an elderly woman and drowning her in the bathtub of her apartment. The defendant was eligible for the

    death penalty, but the defense decided not to put on any mitigation evidence. The defendant was convicted, and alleged on

11  habeas corpus that his counsel had been ineffective.

12     The high court explained that its focus was not on whether counsel should have presented a case in mitigation, but on

13  "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background

14  was itself reasonable." Wiggins, supra, 539 U.S. at p. 523. In reviewing the adequacy of defense counsel's legal representation,

15  the high court found that trial counsel had abandoned their investigation of the defendant's background after having acquired

16  only "rudimentary" knowledge of his history from a narrow set of sources. Id., at p. 524. The court found that this limited

17  investigation not only was unreasonable under then-applicable standards, but that it was also unreasonable in light of the leads

    that counsel actually discovered – leads which would have caused any reasonably competent attorney to realize "that pursuing

18  these leads was necessary to making an informed choice among possible defenses...." Ibid. The court also found that, because

19  counsel spent insufficient time considering and developing a trial strategy, counsel's failure to investigate thoroughly resulted

20  from inattention, not reasoned strategic judgment. The Wiggins court also rejected the idea that because counsel had some

    information to work with, they were in a position to make a tactical choice not to present a mitigation defense. Instead, the court

21  stated that, in assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence

22  already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate *further*. Hence,

23  Strickland could not be read to render trial counsel's conduct bulletproof under the Sixth Amendment merely by saying it was

24  done for "strategic reasons". Rather:

25         [E]ven assuming that counsel limited the scope of their investigation for "strategic reasons",
       Strickland does not establish that a cursory investigation automatically justifies a tactical decision with
       respect to ... strategy. Rather, a reviewing court must consider *the reasonableness of the investigation said to*
26      *support that strategy.*

27  Wiggins, supra, 539 U.S. at p. 527 [emphasis added].

28

1.          Applying the above principles as a guide to determining whether counsel's performance was deficient, the Wiggins

2   court found that counsel "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision

3   with respect to ... strategy impossible." Id., at pp. 527-528. The court therefore concluded: "Counsel's investigation ... did not

4   reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the

5   professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered ... – evidence that would

     have led a reasonably competent attorney to investigate further. Ibid; see also In re Thomas, 37 Cal.4th 1249, 1264 (2006),

6   applying Wiggins ["What matters is the substance of the investigation – whether counsel in fact explored those avenues

7   reasonable counsel would have pursued in light of what was known and in light of the defense strategy."]

8          In sum, the Strickland test does not afford any slavish deference to decisions by trial counsel that are based – not on

9   informed "tactical" choices, but rather on a *failure to conduct reasonable investigation in the first place*. Similarly, in the case

     at bar, it is trial counsel's failure to investigate that is assailed, rather than informed tactical decisions made in the wake of a

10  reasonably thorough investigation.

11

12                          **Deficient Performance**

13                  *Failure To Investigate and Prepare For Trial*

14         The duty to investigate is part of a defendant's right to reasonably competent counsel. Indeed, "The principle is so

15  fundamental that the failure to conduct a reasonable pretrial investigation may in itself amount to ineffective assistance of

16  counsel." United States v. Tucker, 716 F.2d 576, 583 n. 16 (9th Cir. 1983). The American Bar Association states the duty as

17  follows:

18           It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and
           to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of
           conviction. The investigation should always include efforts to secure information in the possession of the
19       prosecution and law enforcement authorities.

20  ABA Standard 4-4-1. Moreover, "The investigatory process should begin immediately on appearance as counsel for a

     defendant." (Id., Standard 4-4.1.) As summarized in the Commentary to Standard 4.3 [emphasis added]:
21

22           An adequate defense cannot be framed if the lawyer does not know what is likely to develop at trial
           ... In criminal litigation, as in other matters, the information is the key guide to decisions and action. *The*
           *lawyer who is ignorant of the facts of the case cannot serve the client effectively.*

23  Furthermore, the duty to investigate does not depend upon the lawyer's ability or experience: "The most able and competent

24  lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his

25  failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense." Harris v.

26  Blodgett, 853 F.Supp. 1239, 1255 (W.D. Wash. 1994) [citing Tucker, supra, and McQuen v. Swensen, 498 F.2d 207, 217 (8th

     Cir. 1994)].

27

28

## CONCLUSION

The above instance(s) of IAC violated Petitioner's 6th Amendment right to reasonably competent counsel. Trial counsel rendered IAC when she failed to investigate and/or prepare independant evidence from the Oklahoma trial that corroborated Petitioner's Oklahoma trial testimony that the trial court allowed for previously stated reasons. As discussed at page (8) in claim #5(C) of this writ, had such investigation been made sufficient corroboration of Petitioner's credibility would have been discovered**(Note: Examples are given at pp.8-10 of claim#5(C)**which supported his successfully asserted defense in the Oklahoma trial. Yet, because of counsel's failure to conduct pretrial investigation and preparation of the Oklahoma trial evidence, she was not aware of the readily available facts which would have afforded Petitioner a justiciable defense in face of any adverse factor the prosecution would have attempted to introduce from that case. Therefore, in light of counsel's reason for tactical decision and strategy being made without investigation of all the facts of the Oklahoma evidence, this renders her thought process inadequate and incompetent.

(17)

## SUPPORTING FACTS FOR CLAIM #3

During the direct appeal appellate counsel, Stephen
Bedrick, presented the legal question concerning the trial court
erroneously failed to instruct on the "lesser-inclued offense-
plus-enhancement of second degree drive-by-murder."(see
Petiton for Review, p.11). However appellate counsel failed to
present the state courts with the federal question to preserve
the matter for federal court review where appellate counsel fail-
ed to cite U.S. court decision Neder v. US 119 S.ct 1827 and
couch the claim with specific quotation to the federal constitu-
tional right which was violated. As a result Petitioner's feder-
al constitutional right to effective assistance of counsel on
appeal violated in contravention to the guarantee of the sixth
amendment to the US Constitution. (In re Smith 3C3d 192)

There is no clearly established law that the Due Process
Clause requires a trial court to instruct on lesser-included of-
fenses. The Supreme Court held in Beck v. Alabama, 447 U.S. 625
(1980) that an instruction on a lesser included offense must be
given in a capital case; however, the law is unsettled as to
wheather such an instruction must be given in noncapital cases.
The NInth Circuit has noted that "[t]here is no settled rule of
law on whether Beck applies to noncapital cases such as the
present one. In fact, this circuit, without specifically address-
ing the issue of extending Beck, has declined to find constitu-
tional error arising from failure to instruct on a lesser includ-
ed offense in a noncapital case." Turner v. Marshall, 63 F.3d 807
819(9th Cir.1995) (citing Bashor v. Risley, 730 F.2d 1228, 1240
(9th Cir. 1984)),overruled on other grounds, Tolbert v. Page, 182
F.3d 677(9th Cir. 1999). With this unsettled state of law, the

(18)

1   state court's rejection of a claim that the trial court failed to

2   sua sponte instruct on the lesser-included offense could not be

3   contrary to or an unreasonable application of clearly established

4   law, as set forth by the U.S. Supreme Court necessary for federal

5   habeas relief under 28 U.S.C. § 2254(d). Although appellate

6   counsel Bedrick argued otherwise, the decision in **Apprendi v.**

7   **New Jersey, 530 U.S. 436(2000)**, does not require a trial court to

8   instruct on lesser-included offenses or the enhancements for

9   lesser-included offenses.

10   However, it is contrary to or an unreasonable application of

11   clearly established law, as set forth in **SULLIVAN V. LOUISIANA,**

12   **508 U.S. 275, 113 S.ct**, when the trial court fails to give instr-

13   uctions of particular points, as here in the present case whereas

14   the second-degree murder instruction(CALJIC 8.30 and 8.31) given

15   in Petitioner's trial were incomplete and defective due to the

16   fact they did not inform the jury of the great bodily injury

17   element of the offense as it applied to second-degree murder in

18   a drive-by shooting**(See CALJIC 8.35.2)**. Also the trial court

19   failed to provide the verdict form under CALJIC 8.35.2, requiring

20   a special finding on second degree drive-by murder.

21   Because the jury was not properly instructed, and

22   consequently did not render a finding, on the actual element of

23   the offense, the Petitioner's trial did not result in a "complete

24   verdict." The jury was forced to conclude the aspect of guilt on

25   (1) a first degree murder charge tapered to the offense (2) a

26   second-degree murder charge detailing aspects of law not material

27   to the offense or its' facts as applied to a second-degree drive-

28   by murder. Thus the jury rested its' verdict on evidence that its

(19)

1  instructions allowed it to consider. The jury was not told what

2  crime occured if Petitioner fired from the car with the intent to

3  inflict GBI, but not kill. That crime, plus enhancement, is

4  second degree drive-by murder. Penal Code § 190(d).

5      The prejudical effect of failing to give the second degree

6  drive-by instruction was argued at pages 14-18 of the Petition

7  for Review.

8      The prejudice suffered due to appellate cousnel failure

9  to couch the due process violation has forgone Petitioner's

0  right to adequate representation on appeal in effectively

1  presenting the correct legal issues and principles of law to the

2  reviewing courts.

3      The failure to instruct corresctly on a necessary element of

4  the crime of homicide, particular points, violated Petitioner's

5  5th and 14th Amendment due process rights. **Carella v. California**

6  **(1989) 491 U.S. 263; Sandstrom V. Montana(1979) 442 U.S. 510.**

MEMORANDUM AND POINTS OF AUTHORITIES

FROM PETITION FOR WRIT OF HABEAS

CORPUS