# IN THE SUPREME COURT

# FOR THE STATE OF CALIFORNIA

IVAN KILGORE

Petitioner

No.

(Related to Marin County Superior Court No. [illegible])

(Court of Appeal No. [illegible])

Marin County Superior Court No. [illegible]
Kenneth Kato, Judge

## PETITION FOR WRIT OF HABEAS CORPUS

STEPHEN B. BEDRICK
Attorney at Law
State Bar # 058757
1970 Broadway, Suite 1200
Oakland, CA 94612
(510) 452-1900

Attorney for Defendant, Appellant, and
Petitioner IVAN KILGORE

(by appointment of the Court of Appeal
under the FDAP independent case system)

## PETITION FOR WRIT OF HABEAS CORPUS

To the Chief Justice and Associate Justices of the California Supreme Court:

Petitioner Ivan Kilgore hereby petitions for a writ of habeas corpus and by this verified petition sets forth the following facts and causes for the issuance of said writ:

I.

Defendant and Petitioner Ivan Kilgore (Petitioner) was convicted on March 24, 2003 in Alameda County Superior Court, case #A141033, of one count of murder 1°, Penal Code §187, with the special circumstance of shooting from a motor vehicle with intent to kill, Penal Code §190.2(a)(21), and was sentenced to life without parole. He is confined in Folsom Prison, in custody of the director of the California Department of Corrections.

On August 30, 2006, the Court of Appeal affirmed Petitioner's conviction on direct appeal, People v. Kilgore, case no. A106142. It also denied by order without opinion his habeas corpus petition alleging ineffective assistance of counsel. In re Kilgore, case no. A110317. The Court of Appeal's opinion on direct appeal and order on habeas corpus are appended to the Petition for Review which is filed concurrently with this habeas corpus petition.

II.

Petitioner's imprisonment is illegal and contrary to the 5th, 6th, and 14th Amendments of the United States Constitution, and by Art. I, §§15, 16 of the California Constitution, in that Petitioner was denied the due process of law, the right to present evidence on his own behalf, the right to confront and cross-examine witnesses, and the right to be defended by competent counsel, in the following manner:

III.

Petitioner was convicted of shooting from a Cadillac automobile and killing William Anderson (William), while William was standing on the corner, next to Terry (or "T") Dandy.

### IV.

William, Dandy, and Petitioner knew each other. William and Dandy were friends. They had beaten and robbed Petitioner more than once.

### V.

Raymond Jones was driving Petitioner's Cadillac. Petitioner was a passenger in the back seat. The car pulled up at 30th and San Pablo in Oakland. Jones thought Petitioner was going there to have a fistfight with Dandy or William.

### VI.

Petitioner called out a greeting from the car to William and Dandy.

### VII.

Dandy responded by pulling a handgun and firing one shot at Petitioner. That shot missed both Petitioner and the car.

### VIII.

Petitioner fired back in self-defense at Dandy. Petitioner fired one shot with a shotgun. The shot missed Dandy, but struck and killed William.

### IX.

Petitioner's homicide of William was justified by the combination of the doctrine of self-defense and doctrine of transferred intent

### X.

Petitioner was represented at trial by court-appointed counsel, attorney Deborah Levy of Oakland. Trial defense counsel Levy rendered ineffective assistance of counsel (IAC) within the meaning of People v. Pope (1979) 23 Cal.3d 412 and Strickland v. Washington (1984) 466 U.S. 668 in the following ways:

XI.

One of the major issues in this case was whether Petitioner's testimony in a 1997 Oklahoma homicide was admissible to impeach him if he testified. Petitioner was convicted of the crime of manslaughter in Oklahoma in 1997. The trial court here found that crime was the equivalent of involuntary manslaughter in California (in 1997) under the theory of imperfect self-defense. The trial court excluded evidence of that conviction, because it was not a crime of moral turpitude. The trial court ruled, however, that Petitioner's testimony from that case could be admitted here for impeachment if Petitioner testified at trial.

XII.

Trial counsel was ineffective when, in her motion to exclude Petitioner's testimony in the Oklahoma manslaughter case, she made an erroneous offer of proof that Petitioner would testify here that Dandy was reaching for a gun. Instead, the offer of proof should have been that Petitioner would testify that Dandy actually shot at him. Petitioner had previously told Ms. Levy that Dandy had actually fired a gun at him.

XIII.

That inaccurate offer of proof caused the trial court to disbelieve the corrected offer of proof that Petitioner would testify that Dandy actually fired one shot at him.

XIV.

That inaccurate offer of proof caused the trial court to think that the Oklahoma case was similar to the instant case.

XV.

That inaccurate offer of proof caused the trial court to rule, incorrectly, that Petitioner's testimony in the Oklahoma case would be admissible as impeachment in this trial under Evid. Code §1101(b) if

Petitioner testified.

## XVI.

Trial counsel was ineffective when she failed timely to obtain a ruling prior to trial regarding the admissibility of Petitioner's testimony from the Oklahoma case, and/or when she failed to move for a continuance to obtain such a ruling pre-trial. Instead, that ruling did not come until three-quarters of the way through trial.

## XVII.

Trial counsel was ineffective when she switched defense theories midstream from self-defense to reasonable doubt as to identity.

## XVIII.

Trial counsel rendered ineffective assistance when she advised and caused Petitioner not to testify in this trial.

## XIX.

Trial counsel ineffectively opened the door to admission of bad character evidence that Petitioner had been convicted of a felony, and thereby destroyed her own strategy of not having Petitioner testify in order to keep the Oklahoma case from the jury.

## XX.

Trial counsel was ineffective when she failed to move that the tape-recorded statement by Matthew Bryant be redacted to eliminate his statement that he thought Petitioner was a drug-dealer.

## XXI.

Trial counsel was ineffective when she failed to call Petitioner's sister Halevchia Osborne and Petitioner's girlfriend as witnesses to show that William Anderson and his friend "T." Dandy were violent.

## XXII.

Trial counsel was ineffective when she failed to request an

instruction that the doctrine of transferred intent applied to a shooting in self-defense.

## XXIII.

Trial counsel was ineffective when she failed to object to the prosecutor's inaccurate argument that first degree drive-by murder was a strict liability crime.

## XXIV.

There is a reasonable probability that the result of this trial would have been more favorable to Petitioner if trial defense counsel had acted competently in one or more of the instances described above.

## XXV.

Petitioner has no other plain, speedy, or adequate remedy at law, in that the present petition is based, in part, upon information contained in this verified petition and upon the declarations of Petitioner Ivan Kilgore, Halevchia Osborne (Petitioner's sister), Betsy Varela (Petitioner's girlfriend), and attorney Harold Rosenthal, which were not before the trial court, and upon other information not timely presented to the trial court. Consequently, the issues presented here are only fully reviewable by consideration of the facts presented in this pleading and the attached declaration.

## XXVI.

Although in the typical habeas corpus case alleging IAC a petitioner would supply a declaration from trial counsel, explaining the presence or absence of any strategic reasons for the challenged acts or omissions, no such declaration is supplied or needed here. Trial counsel Deborah Levy testified on two separate days before the trial court on the motion for new trial. (RT 937-955, 975-1033) That testimony sets forth her reasons for her acts and omissions. Thus, her reasons do not need to be explicated any

further by declaration.

## XXVII.

No other applications, petitions, or motions have been filed in regard to the matters complained of, except as stated herein. This petition is addressed to this Court's original habeas corpus jurisdiction because Petitioner has no other remedy at the trial court or at this Court.

## XXVIII.

This petition is timely filed, insofar as it is filed concurrently with the Petition for Review.

## XXIX.

Petitioner incorporates in this petition the declarations of Petitioner Ivan Kilgore as exhibit 1, Halevchia Osborne as exhibit 2, Betsy Varela as exhibit 3, and attorney Harold Rosenthal as exhibit 4, the originals of which were filed at the Court of Appeal in case no. A110317.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1. Consolidate this habeas corpus proceeding with the Petition for Review pending before this Court, People v. Kilgore, case _____ , or consider it concurrently;

2. Take judicial notice of the record and briefs in the direct appeal in People v. Kilgore, Court of Appeal case A106142, and in the habeas corpus petition at the Court of Appeal in case no. A110317, which records are referred to herein to clarify and amplify various allegations;

3. Incorporate by reference the entirety of Appellant's Opening Brief and Appellant's Reply Brief in case A106142 and the habeas corpus petition, case no. A110317;

4. Issue a writ of habeas corpus, or order to show cause, to the

Director of the Department of Corrections to inquire into the legality of
Petitioner's incarceration; and

    5. After hearing, issue an order granting Petitioner a new trial and/or
such further relief as is appropriate in the interests of justice.

DATED: September ___, 2006

Respectfully submitted,

STEPHEN B. BEDRICK
Attorney for Appellant and Petitioner

## VERIFICATION

    STEPHEN B. BEDRICK declares and states:

    I am the court-appointed attorney for Petitioner in this matter and in
his direct appeal. I am authorized to bring this petition. I make this
verification on Petitioner's behalf, because Petitioner is unable to make this
verification because he is incarcerated in state prison, in a county other than
that where I maintain my office; because I have more particular knowledge
than he concerning most of the factual and legal matters set forth herein;
and because the allegations herein all relate to the conduct of the prosecutor
and/or Petitioner's trial counsel, as to which I am qualified to state an
opinion as an attorney, while Petitioner, as a layperson, is not so qualified.

    I have read the foregoing petition for writ of habeas corpus and
verify that all the factual allegations contained therein are supported by the
record on appeal in case no. A106142 and case no. A110317, and by the
attached exhibits.

    I declare under penalty of perjury that the foregoing is true and
correct, except as to allegations stated on information and belief, and as to
those allegations, I believe them to be true.

    Executed this ___ day of September, 2006 at Oakland, California.

STEPHEN B. BEDRICK
Attorney for Petitioner

I.

## TRIAL DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL

Each and every aspect of ineffective assistance of counsel (IAC) alleged herein violated Petitioner's 6th and 14th Amendment rights to competent counsel. Strickland v. Washington (1984) 466 U.S. 668.

**A.    Trial Counsel Was Ineffective When She Made an Erroneous Offer of Proof that Petitioner Would Testify that Dandy Was Reaching for a Gun; Instead the Offer of Proof Should Have Been that Petitioner Would Testify that Dandy Actually Shot at Him**

### 1.    The trial court's ruling on the motion for new trial does not limit this Court's review of this habeas corpus petition

Although the trial court reviewed allegations of IAC when it denied the motion for new trial, that ruling does not restrict this petition for several reasons: (1) The trial court did not make any factual findings warranting any deference, when it ruled on the motion for new trial. (2) The issue of whether trial counsel rendered prejudicial IAC, warranting a new trial, is a question of law, which an appellate court reviews *de novo.* People v. Taylor (1984) 162 Cal.App.3d 720, 724. Respondent appears to agree. (See Respondent's Brief (RB) 36.) (3) Many aspects of this petition depend on the declarations of Appellant Ivan Kilgore, his sister, and his girlfriend, which were not before the trial court. (4) Many of these allegations of IAC depend on the appended declaration of expert counsel Harold Rosenthal, which was not before the trial court. (5) Several of the issues raised herein were not presented to the trial court at all. (6) Because this petition argues cumulative IAC and cumulative prejudice, all such allegations need to be reviewed *de novo* because of this additional evidence and argument.

## 2. The inaccurate offer of proof

In her initial written motion to exclude evidence of the Oklahoma case, trial counsel Levy presented a written offer of proof, prior to trial, that Petitioner would testify that he saw Dandy "raise his shirt and pull out a weapon." (CT 290) That offer of proof presented the defense of imperfect self-defense. In re Christian S. (1994) 7 Cal.4th 768.

Trial counsel later admitted that this offer of proof was inaccurate, because Petitioner told her that Dandy actually fired at him, and that Petitioner fired back, in actual self-defense. (RT 629-633) Trial counsel thus admitted that she made a mistake, without any strategic basis. (RT 629-633) If trial counsel had presented the correct facts in her initial offer of proof as Petitioner had described to her, that would have presented a different defense, namely, complete self-defense.

The presentation of an inaccurate offer of proof constitutes ineffective assistance of counsel (IAC). People v. Ledesma (1987) 43 Cal.3d 171, 207 (IAC for failure to investigate facts and for failure to present proper defense).

This instance of IAC was prejudicial as follows: If Petitioner had testified here, as counsel stated in the initial, inaccurate offer of proof, that he thought that Dandy was merely reaching for a gun, that would have been similar to his testimony in his Oklahoma case that he thought that victim Conan Emery was reaching for a gun. This degree of alleged similarity between two scenarios of imperfect self-defense would probably have rendered the Oklahoma testimony admissible under Evid. Code §1101(b), because imperfect self-defense involves a mistake of fact, which is a factor authorizing admission of priors under §1101(b).

Ms. Levy later tried to correct the erroneous offer of proof to

accurately state Petitioner's proposed testimony, namely, that Dandy
actually fired a shot at Petitioner.[1]  (RT 629-633) That would have
substantially changed the §1101(b) analysis performed by the trial judge
here, for two reasons. First, complete self-defense presented a different
defense than that which Petitioner raised in the Oklahoma case. Second,
complete self-defense does not involve mistake, or any other §1101(b)
factor. Accordingly, nothing in an imperfect self-defense case was relevant
to §1101(b) factors in a self-defense case.

However, the trial court discounted the restated offer of proof, and
ruled against the defense argument based upon it, because it was highly
suspicious of trial counsel's change in story.

> THE COURT: what I'm suggesting is that the defendant's
> explanation of these is similar enough, and, as Wigmore apparently
> stated, the occurrences are unusual enough with their repetition, they
> become less believable.

> MS. LEVY [trial defense counsel]: What I'm saying, the only
> repetition is somebody died. That's it.

> THE COURT: No, it's not. The other similarity is that following the
> death, the defendant apparently said, "I thought he was going for a
> gun." (RT 629:4-13)

* * *

> THE COURT: I guess part of the concern is – and I haven't read
> your papers again lately -- this is a little different from what you
> told me before.

> MS. LEVY: It is. In my papers, there is a word missing on my -- I
> didn't number my pages. It's the last page, the top line, I left out
> "and shot" after "pulled out the weapon." And that is my mistake,
> and, frankly, until I was talking to Mr. Kilgore closely this morning,
> I had not noticed that. (RT 629:6-630:6)

---

[1]Petitioner ultimately testified on the motion for new trial that Dandy
shot at him first. (RT 1046)

* * *

And I'm sorry, your Honor. That is very unclear there, and it sounds like unreasonable self-defense in the moving papers. . . .

THE COURT: Yes. The problem is, it keeps fluctuating here, and I've been looking and literally doing hours of research based on one theory, and now at 12:25 [p.m.] I am hearing a different theory. (RT 630:27-631:6)

* * *

MS. LEVY: Your Honor, if I might, Mr. Kilgore is insistent that I inform the Court that he had told me his defense, and when I wrote this motion, when he read it, he had told me to correct it, and it was the defense attempt perhaps to go either way that it came out the way it was written. But Mr. Kilgore wanted me to tell you that.

THE COURT: Anybody have an additional plot they want to put on the record? (RT 632:26-633:6)

The trial court's final sarcastic comment on this issue "Anybody have an additional plot they want to put on the record?" is a strong indication that the trial court refused to honor the changed offer of proof simply because it was changed. This sarcastic comment reinforces Petitioner's argument that trial counsel's negligent failure to state the offer of proof correctly, from the outset, severely prejudiced Petitioner's position on this point.

If trial counsel had correctly stated the offer of proof from the outset, that clearly would have made a difference, because the trial court conceded the issue regarding the Oklahoma case was "a close call." (RT 634) If that were done correctly, there is a reasonable probability that the trial court would have ruled that the Oklahoma imperfect self-defense testimony was not admissible under §1101, because it was so different than the actual self-defense testimony which Petitioner intended to give here. Under such circumstances, the Oklahoma testimony would have been excluded, and Petitioner would have been able to testify without the jury learning of the

facts of the Oklahoma case. As shown above, Petitioner's self-defense case
would have been much stronger if he testified. Accordingly, the IAC in
failing to state the offer of proof correctly at the outset was prejudicial.

## B.  Trial Counsel Was Ineffective When She Failed Timely to Obtain a Ruling Prior to Trial Regarding the Admissibility of the Oklahoma Testimony

### 1.  Because there was no pre-trial ruling, defense counsel was not able to prepare her case properly

Trial defense counsel failed to obtain a ruling prior to trial as to
whether the Oklahoma case would be admissible. Instead, the trial court
did not rule, until three-quarters of the way through trial, that the Oklahoma
testimony would be admissible if Petitioner testified.

A defendant has a right to a pre-trial ruling on an issue as important
as whether he can be cross-examined on his testimony in a prior homicide.
Evid. Code §402(b); People v. Simon (1986) 184 Cal.App.3d 125, 131.
Competent counsel does not begin a trial without investigating and knowing
what prior testimony the prosecutor can use to cross-examine the defendant.

The failure to seek such a ruling prior to trial, rather than mid-trial,
was IAC, because no reasonably competent defense counsel would begin a
case without knowing whether the defense was self-defense or identity.
Although in some cases multiple defense theories could be developed or
presented in the alternative, that was not the situation here. The defense
that "I shot in self-defense" and the defense that "I wasn't there" are totally
self-contradictory. No reasonably competent attorney could simultaneously
present both of those defenses to the jury, because the jury would invariably
disbelieve both.

The facts underlying trial counsel's failure timely to obtain a pre-trial
ruling on this point are as follows: On February 24, 2003 the case was

called for trial.[2] At that time Petitioner presented his initial written motion
to exclude the Oklahoma conviction. (CT 288)

The parties then believed that the Oklahoma conviction resulted
from a plea. The parties began to litigate the sole question of whether the
conviction was admissible. (CT 290)

The next day prosecutor Stallworth stated that he just learned from
the Oklahoma prosecutor that there was a jury trial in that case, not just a
plea, and that the jury found first degree manslaughter. He was requesting
the transcript of Petitioner's Oklahoma testimony. (RT 19) That ultimately
allowed the prosecutor to argue, in the alternative, even if the conviction
were not admissible, that the testimony was admissible.

Trial defense counsel failed to move to continue the trial date in
order to allow time to obtain, prior to trial, the transcript of Petitioner's
Oklahoma testimony. That failure constituted IAC. Competent defense
counsel would not begin a trial without possessing a defendant's prior
testimony with which he could be impeached.

Penal Code §1054.1(b) requires the prosecutor, as part of pre-trial
discovery, to disclose "statements of all defendants." That was not done
here. When, as here, the prosecutor fails to disclose the defendant's
statement by the date set for trial, competent defense counsel must move to
continue the trial. Ms. Levy failed to do so.

It took close to two weeks to obtain the Oklahoma trial transcript. It
was not obtained until sometime after Thursday, March 6, 2003 (RT 40, 51,
53, 58) and after jury selection had been completed. However, on March 6
the prosecutor conceded, and the trial court ruled, that the conviction itself

---

[2]Petitioner withdrew his time waiver on January 13, 2003. The 60-day
period for trial remained open until March 14, 2003, some three weeks
thence. (CT 283) The Oklahoma transcript was made available by then. In
any event, the time waiver could have been reinstated.

was not admissible. The trial court had not yet ruled whether the testimony
was admissible, because the transcript of Petitioner's Oklahoma testimony
had not yet arrived. (RT 50, 53)

The prosecution presented its case-in-chief from March 10 to March
13, 2003.

The trial court did not rule until Friday, March 14, 2004 that
Petitioner's Oklahoma testimony was admissible. That was three-quarters
of the way through trial, and after the prosecution's case was virtually
completed. (RT 634) This ruling cut the legs out from under Petitioner's
self-defense case, because trial defense counsel then advised and caused
Petitioner not to testify.

Worse, trial defense counsel then decided, over the weekend, to
change her entire defense strategy, from self-defense to reasonable doubt as
to identity. (RT 1004-1005, 1018)[3] As shown above, this eleventh-hour
change in strategy severely damaged the defense.

Trial counsel should have obtained a ruling prior to trial as to
whether the Oklahoma testimony was admissible. People v. Simon, supra.
She should have had a pre-trial hearing, pursuant to Evid. Code §§402 and
403, as to exactly what happened in Oklahoma. She should have then
presented an accurate offer of proof as to Petitioner's proposed testimony if

---

[3]As noted, trial counsel testified on Petitioner's motion for new trial,
based on IAC, and explained all of this. (RT 937-955, 975-1033)

Although in the typical habeas corpus case alleging IAC a petitioner
would supply a declaration from trial counsel, explaining the presence or
absence of any strategic reasons for the challenged acts or omissions, no
such declaration is supplied or needed here. Trial counsel Deborah Levy
testified on two separate days before the trial court on the motion for new
trial. (RT 937-955, 975-1033) All her reasons for her acts and omissions
were adequately explained in that testimony.

the Oklahoma case were excluded. See People v. Simon, supra. She did
none of that. And she never even considered doing that. (RT 1021)

By failing to obtain such a pre-trial ruling, trial counsel was forced to
litigate with one hand tied behind her back. Did she have a self-defense
case or a reasonable-doubt-as-to-identity case? She did not know. Did she
have a self-defense case with Petitioner's testimony, or without Petitioner's
testimony? She did not know.

Because trial defense counsel did not obtain a timely pre-trial ruling
on this crucial point, she was not prepared to go to trial. She should have
moved for a continuance until she knew whether the Oklahoma testimony
would be admissible, but she failed to move for any such continuance.
Accordingly, she rendered IAC by proceeding to trial without being
properly prepared, and without knowing what her case would be.[4] People v.
Pope, supra, 23 Cal.3d at 427 (IAC for failure to make pre-trial motions).

According to the opinion of Appellant's Strickland expert, attorney
Harold Rosenthal of San Francisco, trial defense counsel rendered
ineffective assistance by such failure. (See declaration of Harold Rosenthal,
Esq., exh. #4)

## 2. Trial Counsel Was Ineffective When She Failed to Move to Redact Improper Prejudicial Matter from the Oklahoma Transcript

Several of the arguments in this habeas corpus petition contain
similar presentation of arguments made in the AOB. However, other

---

[4]If part of the problem was the withdrawal of the time waiver, then trial
counsel rendered IAC when she failed to reinstate the time waiver so that
she could obtain a ruling regarding the Oklahoma testimony before trial
began. Strickland v. Washington, supra. Trial counsel never asserted in her
two days of testimony on the motion for new trial that reinstating the time
waiver would have been a problem.

arguments, including I(B)(2) (this one), I(B)(3), and I(D) are new, because they heavily depend upon Petitioner's declaration, attached as Exh. 1.

As shown in Petitioner's declaration, trial counsel urged and advised Petitioner not to testify. Trial counsel Levy told Petitioner that, if he were to testify, all of his testimony in his Oklahoma manslaughter trial would supposedly be admitted. That included not only the story of Petitioner shooting Emory in imperfect self-defense, but also a large quantity of prejudicial material which should not have been admissible in this case under Evid. Code §1101(b), even if the evidence of the actual shooting were admissible. That excludable material included: (i) evidence that Petitioner owned several semi-automatic handguns in Oklahoma; (ii) evidence that in Oklahoma Petitioner traded guns for items such as motorcycles and jewelry; (iii) evidence that Petitioner associated in Oklahoma with people in gangs; (iv) evidence that Petitioner allegedly had personal involvement in a gang in Oklahoma; this was damaging for several reasons, including that there was no evidence whatsoever that Petitioner had any gang involvement of any kind in Oakland; (v) further, the Oklahoma prosecutor accused Petitioner in cross-examination of possessing a "machine gun," and directly accused Petitioner of being a member of an Oklahoma gang called the "Eight Trey Crip." Petitioner denied these allegations, but the sting of those accusations was still present.

Petitioner explains in his declaration (Exh. 1) that he wanted to testify, but that he accepted trial counsel's advice that he not testify. Petitioner explains that a major factor in his decision not to testify was trial counsel's opinion that all this extraneous material would be admitted. That extraneous material would have been unduly prejudicial, over and above any damage which would have arisen from the jury hearing of the Oklahoma homicide.

Trial counsel rendered ineffective assistance when she failed to make a motion under Evid. Code §352 to redact the Oklahoma testimony to exclude this extraneous and prejudicial material. People v. Fosselman (1983) 33 Cal.3d 572; Strickland v. Washington, supra. People v. Ledesma, supra. There could not have been any valid tactical reason not to try to exclude it. The failure to make such a motion may have resulted from counsel's failure to obtain a timely ruling on the Oklahoma testimony until one court day before the defense was to begin its case. However, while the timing may be an explanation, it is not an excuse.[5]

In People v. Hines (1964) 61 Cal.2d 164, 174-175 (disapproved on another point in People v. Murtishaw (1981) 29 Cal.3d 733, 774-775, n. 40) the Supreme Court found error when the trial court allowed the jury to hear a taped statement, without deleting portions which referred to unrelated criminal transactions. As the court held in People v. Guizar (1986) 180 Cal.App.3d 487, 492, "It is inconceivable to us that defense counsel did not object to the introduction of this portion of the tape and transcript on the ground that it was more prejudicial than probative." In the same way it is inconceivable that trial counsel did not move to redact all the inadmissible material from the Oklahoma transcript.

Under such circumstances, a motion to exclude this extraneous and damaging evidence would have succeeded. People v. Hines, supra.

This aspect of IAC was prejudicial here. It rendered Petitioner's waiver of his right to testify unknowing, because, as shown below, when he made that decision, counsel caused him to believe that all those extraneous portions of the Oklahoma testimony would be admitted, if he testified.

---

[5]See sec. I(B)(1) where Petitioner contends that trial counsel rendered IAC by not continuing the trial until she had such a ruling.

**3. Because there was no pre-trial ruling regarding the Oklahoma testimony, Petitioner's waiver of his right to testify was unknowing, and thus, invalid**

As shown in Petitioner's declaration (Exh. 1) Petitioner wanted to testify on his own behalf, but he waived that right based on advice of counsel. Petitioner asserts here that any waiver was void, because that advice was ineffective.

A defendant has 5th, 6th, and 14th Amendment rights to testify on his own behalf, even when trial counsel does not want him to testify. Rock v. Arkansas (1987) 483 U. S. 44, 49; 97 L.Ed.2d 37; People v. Robles (1970) 2 Cal.3d 205, 214.

Trial defense counsel has the obligation to give competent advice before a defendant waives a trial right, such as the right to testify. See, e.g., In re Alvernaz (1992) 2 Cal.4th 924, 934.

Trial counsel's failure to obtain a ruling regarding the Oklahoma testimony until one court day before the start of the defense case prevented her from giving competent advice on, and prevented Petitioner from making a knowing, and intelligent decision on, whether or not to waive his right to testify. That failure constituted IAC. People v. Pope, supra; In re Alvernaz, supra.

A waiver is not valid unless it is knowing and intelligent (as well as voluntary). Johnson v. Zerbst (1938) 304 U. S. 458, 464. Petitioner's waiver of his right to testify was not knowing and intelligent for multiple reasons.

First, because the ruling on the Oklahoma testimony came so late in the trial, defense counsel failed, probably because of lack of time, to file a motion to redact irrelevant and unduly prejudicial evidence from the Oklahoma testimony. For example, there was testimony as to alleged gang membership and as to multiple gun usage, which testimony should not have

been admissible here under any circumstances. That testimony should have been redacted on prior motion, but was not. (Petitioner addresses this issue above. See sec. I(B)(2).)

This failure made Petitioner's waiver of his right to testify unknowing and unintelligent. It was unknowing and unintelligent because, when Petitioner decided not to testify, he did not know what portions of the Oklahoma testimony would be admitted, and which portions would not. Thus, he was unable to know the full weight of the disadvantage stemming from the Oklahoma testimony. Therefore, he was unable fairly to weigh or compare the advantages of testifying against these unknown disadvantages.

Second, because the ruling regarding the Oklahoma case came so late in the trial, Petitioner and trial counsel lacked adequate time to do additional legal research, or to do additional factual investigation, on how to develop or present the defense, once the trial court ruled that the Oklahoma testimony would be admitted if Petitioner testified. (See Petitioner's declaration, exhibit 1.) Because they lacked such time, Petitioner's waiver was not knowing and intelligent. Because the waiver was not knowing and intelligent, Petitioner was deprived by this IAC of his 5th Amendment, 6th Amendment, and 14th Amendment rights to testify in his own behalf. Johnson v. Zerbst, supra. In In re Alvernez, supra.

## C. Trial Counsel Was Ineffective When She Switched Defense Theories Midstream from Self-defense to Reasonable Doubt as to Identity

### 1. Facts

Trial counsel Levy began this case as a self-defense case, and she continued to present it as self-defense case throughout the prosecution's

case, as follows: (1) In her first motion to exclude the Oklahoma prior, filed February 24, 2003, she presented a written offer of proof that, if the prior were excluded, Petitioner "would testify that . . . he saw . . . Dandy raise his shirt and pull out a weapon. He only shot in self-defense . . . ." (CT 290) (2) In her February 25, 2003 "Proposed Jury Questionnaire Questions" she requested that the jury be asked "Have you ever been in fear of being assaulted or killed?" (CT 301) (3) In her March 10, 2003 cross-examination of officer Festag, she asked if he or anyone else found a weapon on William Anderson. (RT 129-130) (4) In her March 10, 2003 cross-examination of officer Vigilienzone, she asked whether he checked for evidence that William had fired a weapon. (RT 147-148) (5) In arguing on March 11, 2003 to introduce evidence of William's drug-dealing, she stated that she was presenting the defense of reasonable self-defense. (RT 424-425) (6) In her March 14, 2003 argument in opposition to the introduction of the Oklahoma testimony, she repeatedly stated that, if the Oklahoma prior were excluded, Petitioner would testify that Dandy shot at him, that Petitioner fired back, and that the defense here was actual self-defense. (RT 620, 622, 629-630) (7) In her March 17, 2003 "Defendant's Proposed Jury Instructions," she asked that the jury receive the following self-defense instructions: "CALJIC 5.12, 5.13, 5.15, 5.16, 5.17, 5.50, 5.51." (CT 341) (8) At the jury instruction conference on March 18, 2003 Ms. Levy argued for instructions to be given on self-defense. (RT 720-727)

However, things changed after the trial court ruled on March 14, 2003, three-quarters of the way through trial, and virtually at the end of the prosecution's case, that the Oklahoma testimony would be admissible. Up until that point, stated Ms. Levy, "it was the defense wish to have Mr. Kilgore testify." (RT 707) However, after that ruling, Ms. Levy decided that Petitioner would not testify. (Id., RT 1004) She largely abandoned the

self-defense argument, and relied almost totally upon reasonable doubt as to
identity, instead.

Ms. Levy testified as a witness on Petitioner's motion for new trial,
which was based on allegations of IAC. She stated that she decided not to
have Petitioner testify at all, and advised and caused him not to testify, once
the trial court ruled the Oklahoma testimony admissible for impeachment,
because she thought the Oklahoma testimony was too damaging. She
thought it was damaging because it informed the jury that Petitioner had
shot and killed someone. She also thought it was damaging because she
believed the testimony reflected poorly on Petitioner's credibility.
However, she also believed that she could not present a self-defense case
without Petitioner's testimony. Thus, when she decided not to have
Petitioner testify, she also decided to abandon self-defense, and to rely
exclusively upon reasonable-doubt-as-to-identity defense.[6] (RT 1004-1005,
1018, 1029-1030)

In Ms. Levy's one-page opening statement, which she had reserved,
until the beginning of the defense case, and which she gave on Monday,
March 17, 2003, she said nothing about self-defense. She merely said "the
evidence . . . is of a nature that you necessarily must have a doubt." (RT
658)

Ms. Levy presented four defense witnesses for a total of 45 transcript
pages of defense testimony. (RT 659-703) Petitioner did not testify. Ms.
Levy told the trial court that Petitioner wanted to testify, but

in view of the Court's ruling, counsel and Mr. Kilgore met over the
weekend, and he will not be testifying. And I just would indicate

---

[6]When Ms. Levy testified as a witness on the motion for new trial (RT
937-956, 975-1042), she explained the strategic bases for these acts and
decisions.

> for the record it is based solely on the issue of the Oklahoma prior
> coming in. (RT 707)

In Ms. Levy's March 19, 2003 jury argument, more than 95% of her
argument was that there was reasonable doubt whether Petitioner was the
shooter. She did contend that Terry Dandy fired the first shot. (RT 805)
However, at no point in her jury argument did she contend that Petitioner
fired in self-defense. Indeed, the word "self-defense" does not appear once
in her 27-page jury argument, even though the jury received several
standard instructions on self-defense. (CT 400-403)

In Ms. Levy's jury argument she first argued "Mr. Stallworth [the
prosecutor] in his opening said this is not a who-done-it. You bet it is. . . .
We don't know who fired out of the Cadillac." (RT 802) Then she
challenged Shanae's identification of Petitioner as the shooter in the back
seat of the Cadillac. (RT 804-805) She criticized officer Green for not
conducting a gunshot residue test on the rear seat of Petitioner's Cadillac.
She argued that the fatal shot was not fired from the Cadillac. (RT 808) She
denied that Petitioner was the shooter. (RT 809) She argued that Raymond
Jones lied when he testified that Petitioner was the shooter. (RT 812) She
challenged Bianca Moore's identification of Petitioner as the shooter. (RT
814) She argued difficulties with eyewitness testimony. (RT 820) The she
argued that prosecutor "Stallworth cannot put [Petitioner] Ivan Kilgore in
that car." (RT 826) She argued in conclusion that "it has not been proven
beyond a reasonable doubt that Ivan Kilgore was the person with the
weapon in the back seat of that Cadillac." (RT 817, 827)

## 2.    Trial counsel rendered IAC when she switched defenses in mid stream

Trial defense counsel violated the classic aphorism against switching
horses in midstream when she changed the defense two-thirds of the way
through trial from self-defense to reasonable doubt as to identity.

Petitioner argues in this section that it was IAC to abandon self-defense even if Petitioner did not testify. Petitioner argues below in subsection (D) that the combination of the decision (a) to abandon self-defense and (b) to cause Petitioner not to testify constituted IAC.

> **a.    Trial counsel rendered IAC when she abandoned the defense of self-defense; that defense could have been presented even if Petitioner did not testify**

This case was investigated, developed, and prepared for trial as a self-defense case. No investigation or research was done to present any defense other than self-defense. Yet trial counsel abandoned self-defense at the eleventh hour. Instead, at the eleventh hour, defense counsel decided to argue reasonable doubt as to the identity of the man who shot from the back seat of Petitioner's car. This last-minute total change in strategy constituted IAC.

Although the defense of self-defense was much weaker without Petitioner's testimony than with it,[7] nonetheless, self-defense still could have been argued, because other evidence supported it. The eyewitness testimony that two or more shots were fired supports the defense of self-defense. Raymond Jones testified that he thought he was driving Petitioner to a fist-fight, not a shooting. The trial court believed that self-defense was adequately supported by the evidence. It delivered several standard self-defense instructions. (CT 400-402) Ms. Levy conceded that there was enough evidence to argue self-defense even if Petitioner did not testify. (RT 1031-1032) And even the prosecutor conceded that there was enough evidence to warrant a self-defense instruction. This establishes that there was more than enough evidence to argue self-defense to the jury. (RT 720)

---

[7]Petitioner testified on the motion for new trial that he fired in self-defense, after Dandy shot at him. (RT 1043-1047)

Competent trial counsel should present the defendant's exculpatory explanation, when it is supported by the evidence. Ms. Levy failed to do so. For all these reasons, trial counsel rendered IAC when she abandoned the defense of self-defense, even if Petitioner were not going to testify.

According to the opinion of Appellant's Strickland expert, attorney Harold Rosenthal of San Francisco, trial defense counsel rendered ineffective assistance by such failure. (See declaration of Harold Rosenthal, Esq., exh. #4)

### b.    Trial counsel rendered IAC when she switched to an identity defense

Switching to an identity defense had substantial problems. Shanae Anderson, who said she knew Petitioner, identified him as the shooter. Bianca Moore, who said she knew Petitioner, identified him as the shooter. Raymond Jones, who was one of Petitioner's friends, testified that he drove Petitioner to the scene, and he testified that Petitioner was the shooter. Matthew Bryant told the police that Petitioner admitted the shooting. Minutes after the shooting, Petitioner telephoned the police to report his car stolen, which Ms. Levy admitted sounded suspicious. (RT 1027, 1031) William and Dandy had previously beaten and robbed Petitioner, so there was an arguable motive for retaliation.

Given this quantity of adverse evidence as to identity, if trial defense counsel were going to defend from the outset on the grounds of reasonable doubt of identity, a substantial amount of investigative work and preparation would have been required. Yet, no such investigation was done at all. (RT 1004-1005) For example, witnesses made reference to a third person in the Cadillac, variously referred to as "Sic," or Steven Hill, but he was never located, identified, or questioned by defense counsel or her investigators. (Id.)

Case 3:07-cv-05124-SI   Document 1-2   Filed 10/05/2007   Page 26 of 97

A claim that Petitioner was not the shooter needed to be supported either by proof that Petitioner was seated in the front seat, not the back seat, of the car, or else by an alibi defense. Yet no such defense was investigated or developed, let alone presented. (Id.)

It is no surprise that this type of investigation was not done, and that this type of evidence was not developed, because the case began as a self-defense case, and proceeded three-quarters of the way through trial as a self-defense case.

Because no investigation or preparation of an identity case was done, trial counsel rendered IAC when she switched horses in midstream, and changed defense theories to an identity defense, barely minutes before the defense case began. People v. Pope (1979) 23 Cal.3d 412, 425, and n. 15 (IAC for failure to investigate and for failure "to obtain adjudication of the stronger of two potential defenses.") This drastic last minute change constituted IAC, because there was no preparation, and no investigation, and no development of evidence to support the new defense theory of reasonable doubt as to identity. In re Sixto (1989) 48 Cal.3d 1247 (IAC for failure to investigate and develop defense); In re Cordero (1988) 46 Cal.3d 161, 171 (IAC to select theory of defense, from among possible defenses, without proper investigation).

Ms. Levy testified on the motion for new trial that, because of the combination of the prosecution witnesses' identification testimony, and the adverse inference from Petitioner's stolen car report, "I didn't think there was a defense of 'It wasn't me.' I didn't think that was possible." (RT 1027, 1031) Yet, that was the defense she argued. When trial counsel abandons an arguable self-defense case, and presents, instead, an identity defense which she concedes was not "possible," and which she has not investigated properly, she indisputably renders IAC. People v. Pope, supra.

kilgore supreme court habeas.wpd                          25

According to Appellant's <u>Strickland</u> expert, attorney Harold
Rosenthal of San Francisco, trial counsel rendered ineffective assistance by
such failure. (See declaration of Harold Rosenthal, Esq., exh. #4)

## D. Trial Counsel Rendered Ineffective Assistance When She Advised and Caused Petitioner Not to Testify

### 1. Facts

As noted, the trial court did not rule until Friday, March 14, almost at
the end of the prosecution's case, that the Oklahoma testimony would be
admissible to impeach Petitioner if he testified. The defense case was set to
begin the next Monday, March 17. Petitioner and trial defense counsel had
only the weekend to decide what to do.

Ms. Levy visited Petitioner in jail during the weekend. Once again
Petitioner told Ms. Levy that he had shot at Dandy in self-defense, but
missed, and struck William, instead. Petitioner wanted to testify and to
explain this to the jury. Ms. Levy told Petitioner that the Oklahoma
testimony would be very damaging. She told him that, if the jury heard the
Oklahoma testimony, it would disbelieve his self-defense testimony, and
that it would convict him. She strongly advised Petitioner not to testify.
(RT 1004, declaration of Petitioner Ivan Kilgore, Exh. 1)

Petitioner still wanted to testify. However, he reluctantly accepted
Ms. Levy's advice not to testify, because she was his lawyer, and because
he relied on her as his lawyer. (id.) Her advice directly caused Petitioner
not to testify. Her advice was the sole reason why he did not testify. (id.)

Then, Ms. Levy told Petitioner that he could not possibly succeed
with the defense of self-defense if he did not testify. (id.)

Ms. Levy told Petitioner he would be much better off defending on
identity, and not testifying, even though four witnesses directly inculpated
Petitioner, and even though Ms. Levy acknowledged that Petitioner's stolen
car report cast strong suspicion on him. (id.)

## 2.    Trial counsel rendered IAC

As noted above, a defendant has a 5th, 6th, and 14th Amendment right to testify on his own behalf, even when trial counsel does not want him to testify. Rock v. Arkansas (1987) 483 U. S. 44, 49, 97 L.Ed.2d 37; People v. Robles (1970) 2 Cal.3d 205, 214.  Trial counsel rendered IAC when she advised and caused Petitioner to waive that right. Strickland v. Washington, supra; People v. Pope, supra.

This IAC was prejudicial, because, when trial counsel advised and caused Petitioner not to testify, she did so as part of an altered strategy to abandon self-defense, and to rely exclusively upon an identification defense, but such altered strategy was hopeless and futile.

In Daniels v. Woodford (9th Cir. 2005) 428 F.3d 1181, 1206-1210, the Ninth Circuit reversed a conviction because defense counsel was ineffective, inter alia, for defending on the theory that the defendant was not the perpetrator, when that theory was against the overwhelming weight of evidence. Instead, counsel should have defended on the theory that, even though the defendant was the perpetrator, he lacked the mental state necessary for first degree murder, or for capital murder. Daniels supports Petitioner's argument here that trial counsel was ineffective for switching defense theories midstream from self-defense to reasonable doubt as to identity, when that switch was contrary to the overwhelming weight of the evidence.

There was significant evidence that Petitioner was the shooter. Three eyewitnesses who knew, or said they knew, Petitioner (Raymond Jones, Shanae Anderson, Bianca Moore) identified him as the shooter. A fourth person (Matthew Bryant) told the police that Petitioner admitted being the shooter. Defense counsel admitted that Petitioner's stolen car report looked highly suspicious. No alibi witnesses were investigated. No alibi defense was prepared or presented.

• •

On the record here, no competent counsel would advise a defendant that he would have any reasonable chance of succeeding with an identity defense. On this record, there was not even the proverbial "snowball's chance" of an identity defense succeeding. Accordingly, trial counsel rendered IAC when she switched strategies in mid-stream.

If, on the other hand, trial counsel had advised or allowed Petitioner to testify, he would have told the jury, as he told the trial judge, under oath, on his motion for new trial, that Dandy fired one shot at him, and that Petitioner fired back in self-defense, but struck William instead. Thus, there was a reasonable probability of a better result within the meaning of Strickland, if Petitioner had testified to shooting in self-defense.

As shown in Petitioner's declaration (exhibit 1 to PHC), Petitioner had a solid self-defense case if he testified at trial, as he testified at the post-trial hearing, that he fired only after Dandy fired and shot at him. That self-defense case was supported by independent evidence, including (i) Dandy's flight from the scene; (ii) Bianca's and Shanae's deliberate concealment of Dandy's physical description and identity from the police; (iii) Mary Loggins' testimony that she saw a man running away with his hands and arms close to his body, as if he had something under his jacket; this testimony is consistent with Dandy fleeing with a concealed gun; (iv) the statements from the multiple eyewitnesses -- both Mary Washington and other persons who telephoned to the police and to officer Greene -- that they heard more than one shot; (v) the absence of any evidence that Petitioner fired a second shot; and (vi) Bianca's testimony at the PX, she probably would not tell anyone if Dandy did fire a shot at Petitioner.

Petitioner's self-defense case would have been much stronger if he testified, than if he did not testify. Thus, trial counsel rendered IAC when she failed to present a self-defense case and when she advised Petitioner not

to testify. Without his testimony, there was not much of a self-defense case. Without self-defense, there was no viable defense at all.

Respondent claimed at the Court of Appeal that Petitioner's proposed testimony that "Dandy fired a shot at him from point blank range, but was unable even to hit his car, an older model Cadillac no less, is simply absurd." (Opp. Br. 21) Respondent's sarcasm and hyperbole is poorly taken. Petitioner was sitting in the back seat of the Cadillac, which was moving while preparing to park. The rear window was open 8." Only Petitioner's head was visible. If Dandy shot at Petitioner's head in the moving car and missed because the shot was high merely by 8" - 10," then the bullet would have passed over the roof of the Cadillac and missed everything.[8]

There was no forensic evidence disputing this proposed testimony. There was no evidence that the police searched for a bullet across San Pablo Avenue, where it would have gone, if it were fired over the Cadillac.

Although there was some evidence adverse to self-defense, it was not very strong. For example, although William's and Dandy's girlfriends testified that neither man had a weapon, their testimony is suspect, given the fact that the two women lied to the police in concealing Dandy's identity, so he could escape. Further, at the preliminary examination, at page 33 of the cross-examination, William's girlfriend Bianca Moore was asked: "If Terry Dandy had in fact fired a shot at Mr. Kilgore's car, you," meaning Bianca Moore, "probably wouldn't tell us that, would you?" Bianca replied that she was "not sure." (See RT 999)

Nor would admission of the Oklahoma testimony have destroyed Petitioner's self-defense case. Although it would have presented bad character evidence that Petitioner shot Emory, nonetheless, defense counsel

---

[8]The recoil of a handgun, in the hand of an inexperienced marksman, will often cause the shooter's hand to jerk upward, which will cause the shot to be high. (See ARB 34)

could have told the Alameda jury that the Oklahoma jury found Petitioner credible. It found him credible when it returned a manslaughter verdict, because that was the equivalent (in 1997) of involuntary manslaughter (under imperfect self-defense) in California, namely, a killing the honest but unreasonable belief in the need for self-defense.

Because of all these factors, no reasonable jury could have ruled in Petitioner's favor on an identity defense. However, a reasonable jury could have ruled in Petitioner's favor on actual self-defense. Thus, trial counsel's ineffectiveness was prejudicial, when she caused Petitioner not to testify, and not to tell the jury that he shot at Dandy in self-defense, but missed and struck William instead. Daniels v. Woodford, supra.

According to the opinion of Appellant's Strickland expert, attorney Harold Rosenthal of San Francisco, trial defense counsel rendered IAC by such failure. (See declaration of Harold Rosenthal, Esq., exh. #4)

E.    **Trial Counsel Negligently Opened the Door to Bad Character Evidence that Petitioner Had Been Convicted of a Felony, and Thereby Destroyed Her Own Strategy of Not Having Petitioner Testify in Order to Keep the Oklahoma Case from the Jury**

Ms. Levy called as a witness Kevin Tomlinsonn, the owner of the apartment building where Petitioner lived. Petitioner originally worked for the contractor who was rehabilitating this building. Petitioner subsequently became a tenant. Petitioner performed maintenance work and managerial tasks at the building. Petitioner told Tomlinsonn that he had been robbed and assaulted. He saw Petitioner with cuts and bruises on his face, and with a black eye. Petitioner reinforced the front door of his apartment to protect himself from assaults.

///

///

///

Trial counsel elicited good character evidence from Tomlinsonn that Petitioner was reliable and trustworthy. (RT 403) Trial counsel elicited testimony that Petitioner had always been truthful with him. (RT 409)

Because trial counsel elicited this good character evidence, the prosecutor was allowed to elicit otherwise inadmissible bad character evidence, pursuant to Evid. Code §1102(b). The prosecutor was allowed to ask Tomlinsonn if he knew that Petitioner had a criminal history. (RT 419-420) The prosecutor was allowed to ask whether he would have hired Petitioner if he knew Petitioner "had a felony conviction in 1997." (RT 419-420) He was allowed to ask if he would have hired Petitioner as the manager of a building where children lived, if he knew that Petitioner had a "felony conviction." (RT 420) These questions clearly informed the jury that Petitioner had a felony conviction in 1997.

Trial counsel rendered ineffective assistance when she asked Tomlinsonn about Petitioner's reliability and credibility, because that opened the door, under Evid. Code §1102(b), for the prosecutor to ask him about Petitioner's 1997 felony conviction. People v. Pope, supra.

This IAC did substantial damage. Petitioner declined to testify at trial, to the great disadvantage of his self-defense case. Petitioner declined to testify for the sole purpose of keeping the jury from knowing of his Oklahoma manslaughter case. Yet this IAC, which allowed the jury to learn of the 1997 felony, largely undermined this strategy.

At the hearing on the motion for new trial, Ms. Levy acknowledged that her questions to Tomlinsonn "opened the door" for admission of Petitioner's felony conviction. (RT 985) She purported to explain why she took the risk of opening the door:

> While the damage was about Mr. Kilgore's prior felony, and when I had spoken to Tomlinsonn prior to his testifying, he indicated that he was aware that there had been something. He didn't know what

In People v. Hines (1964) 61 Cal.2d 164, 174-175 (disapproved on another point in People v. Murtishaw (1981) 29 Cal.3d 733, 774-775, n. 40) the Supreme Court found error when the trial court allowed the jury to hear a taped statement, without deleting portions which referred to unrelated drug transactions. As the court held in People v. Guizar (1986) 180 Cal.App.3d 487, 492, "It is inconceivable to us that defense counsel did not object to the introduction of this portion of the tape and transcript on the ground that it was more prejudicial than probative."

This aspect of IAC was prejudicial here. Evidence that Petitioner was a drug-dealer was damaging to his character. This damaging evidence tended to support the prosecution's theory that Petitioner, because he was a man of bad character, fired first, and without provocation. As in Guizar, "It is inconceivable . . . that defense counsel did not object to the introduction of this portion of the tape and transcript on the ground that it was more prejudicial than probative."

## G.    Trial Counsel Was Ineffective When She Failed to Call Appellant's Sister and Appellant's Girlfriend as Witnesses to Establish the Violent Character of William Anderson and "T" Dandy

Appellant asked Ms. Levy to call as witnesses his sister, Halevchia Osborne (Halevchia) and his girlfriend, Betsy Varela (Betsy). Both Halevchia and Betsy would have testified that, during the week prior to this homicide, William Anderson, "T." Dandy, and two of their friends twice attacked Appellant, and robbed and pistol-whipped Appellant. Halevchia and Betsy would have testified that the beatings and robbery put Appellant and them in a state of great fear. (See Kilgore declaration, exh. 1, declaration by Halevchia, exh. 2, and declaration by Betsy, exh. 3.)

Their testimony would have assisted Appellant's defense of self-defense in many ways.

(1) It would have shown that Anderson and Dandy were violent, disliked Appellant, and possessed a handgun.

(2) The evidence that these men used a handgun when they pistol-whipped Appellant would have supported Appellant's credibility if he had taken the stand and testified that Dandy shot at him with a handgun.

(3) The testimony that these men were violent would have weakened and undercut the credibility of Bianca Moore and Shanae Anderson when they testified that they had never seen Dandy or William engage in violent or illegal activities.

(4) Undercutting these women's credibility was important, because they were the only witnesses who claimed that Dandy did not shoot at Appellant in the moments before Appellant fired back.

Ms. Levy decided not to call Halevchia and Betsy as witnesses when she advised and caused the defense to be changed from self-defense to identity.

Trial counsel rendered IAC when she failed to call Halevchia and Betsy to introduce this testimony in support of self-defense. Strickland v. Washington, supra.

According to the opinion of Appellant's Strickland expert, attorney Harold Rosenthal of San Francisco, trial defense counsel rendered ineffective assistance by such failure. (See declaration of Harold Rosenthal, Esq., exh. #4)

## H. Trial Counsel Was Ineffective When She Failed to Request an Instruction That the Doctrine of Transferred Intent Applied to Shooting in Self-defense

The doctrine of transferred intent applies to self-defense. If a defendant shoots at one man in valid self-defense, and aims poorly, and hits the man next to him instead, then self-defense applies as to the shooting of that victim, too. People v. Matthews (1979) 91 Cal.App.3d 1018, 1023.

evidence suggests that Dandy, standing next to William, had a pistol, and fired it at Petitioner, and then ran away.

Dandy fled to the Anderson family house. The police never found Dandy in time to search for a weapon or to conduct a gunshot residue test.

Bianca and Shanae intentionally concealed Dandy's identity from the police. Bianca and Shanae falsely identified Dandy as "Richard Davis," and falsely described "Davis" as standing 5'8" tall, when, in fact, Dandy was 6'3" tall. One reasonable inference as to why Bianca and Shanae, who was Dandy's girlfriend, concealed Dandy's identity, was to protect him from being arrested for shooting at Petitioner.

Dandy and William had previously assaulted, robbed, and beaten Petitioner on more than one occasion. One reasonable inference is that, on this day, Dandy upped the ante and fired a shot at Petitioner, which shot missed the Cadillac and flew over it.

If Dandy fired the additional shot at Petitioner, as this evidence suggested, and if Petitioner only fired after Dandy fired, then Petitioner was entitled to fire at Dandy in self-defense. If Petitioner fired at Dandy, and missed, but hit William, who was standing next to Dandy, then Petitioner's shooting of William would be unfortunate, but it would be excused under the doctrine of transferred intent.

Raymond Jones' testimony helps establish prejudice. (i) After Jones heard that Petitioner was robbed and beaten by William and his friends, Jones gave Petitioner a baseball bat for protection. But even then, according to Jones, Petitioner never said anything about getting a gun, or doing anything violent to William or Dandy. All Petitioner did was barricade the door of his apartment for protection. (ii) When Petitioner asked Jones to drive him to the corner where Petitioner saw William and Dandy, Jones assumed, from what Petitioner told him, that, at worst,

Petitioner was intending to have a fist fight with them. (iii) Jones did not see Petitioner bring any weapon into the car, nor did Jones hear any discussion about a weapon. (iv) When Jones, driving the Cadillac, arrived at the corner of 30th and San Pablo, he pulled up as if to stop and park, because he thought that, at worst, Petitioner would have a fist fight. (v) The day after this shooting, Jones obtained a gun to protect himself from Dandy. (RT 297) This supported the contention that Jones knew that Dandy was armed.

Jones' testimony tends to disprove that Petitioner had any intent to shoot first. Further, if Petitioner had planned in advance to shoot, he most likely would have fired at both men, not just at one. If Petitioner did not fire first, then, at worst, he shot in self-defense.

However, nothing told the jury that the shooting of William, who was not armed, could be excused, if Petitioner justifiably shot at Dandy in self-defense, but had bad aim and struck William. Nothing told the jury that this was a valid defense. Yet, that was Petitioner's best defense. Accordingly, the IAC in withdrawing the request for the instruction on transferred intent was prejudicial.

## I.     Trial Counsel Negligently Failed to Object to the Prosecutor's Inaccurate Argument Regarding Drive-by Murder

As noted at Petition for Review, sec. II, the prosecutor's jury argument on the law of homicide was riddled with legal misstatements. For example, he incorrectly told the jury that first degree drive-by murder was a "strict liability" crime. He incorrectly argued, in effect, that neither premeditation nor intent to kill were needed for first degree drive-by murder.

Trial counsel did not object to any of these misstatements. This
failure to object constituted ineffective assistance of counsel (IAC). People
v. Fosselman, supra, 33 Cal.3d at 582.

The failure to object to the prosecutor's repeated misstatements of
law was prejudicial for the reasons stated at AOB pp. 36-42 why the
misstatements themselves were prejudicial.

The fact that the text of the homicide instructions may have been
accurate did not cure the prejudice. There is, of course, the general rule that
misstatements of law in argument may be deemed harmless, if the
instructions are accurate, on the theory that the jury is told and presumed to
follow the instructions, if there is any conflict between instructions and
argument. (See CALJIC 1.00) That general rule should not be followed,
because to apply it here would be to adopt an inaccurate legal fiction.

When instructions are as abstruse as are those on premeditation,
specific intent, and implied malice, a jury of laypersons could not possibly
understand them without help. Thus, a normal jury will invariably follow
the prosecutor's explanation of those pertinent principles, and not the
unadorned text of the instructions, when, as here, that explanation is
unchallenged.[10]

Accordingly, trial counsel rendered prejudicial IAC when she
allowed the prosecutor to misargue and distort these instructions.

## J.    Trial Counsel's Failure to Object to Ballistics Testimony
by the Pathologist

After pathologist Dr. Hermann testified that William was killed by a
single shotgun blast, he testified that it was his opinion, based upon the
pattern and distribution of shotgun pellets in the victim's body, that the

---

[10]Perhaps that may not be the case once the project to rewrite the
CALJIC instructions in "plain English" is completed.

shotgun was fired from a distance from 8 to 12 feet away. Trial defense counsel did not object to that opinion. The failure so to object was IAC. Strickland v. Washington, supra. The pathologist was not qualified to give such opinion, and the opinion lacked foundation, for the following reasons: (i) Dr. Hermann was not a firearms or ballistics expert. (ii) The opinion did not take into account whether or not the shotgun had a full barrel, or if it was sawed-off, or whether any shortening or sawing off would have affected the pellet pattern. (iii) No test firing was done with shotguns, both sawed-off and not sawed-off, in order to show what shot pattern would be established from what distance.

For all these reasons, Dr. Hermann's opinion on the matter was speculation without adequate foundation. Trial counsel was ineffective for failure to object thereto.

## K.    Expert Counsel States His Opinion that Trial Counsel Rendered Ineffective Assistance in Many Ways

Petitioner attaches as Exhibit 4, the declaration of Harold Rosenthal, Esq. of San Francisco. Mr. Rosenthal is an experienced criminal trial lawyer. He has tried many homicide cases. He taught the criminal trial practice course at Boalt Hall for 15 years. He was named by California Lawyer in 2001 as one of the top ten criminal trial lawyers in the state.

Mr. Rosenthal has reviewed the materials in this case, and it is his opinion that trial defense counsel rendered ineffective assistance of counsel in at least the following ways:[11]    (1) She rendered ineffective assistance when she failed to seek a continuance of trial until she obtained all statements of Mr. Kilgore that could be used against him during his trial,

---

[11]Because of the limited compensation allotted by this Court for expert testimony in court-appointed cases, Mr. Rosenthal has only addressed some, but not all, of the instances of ineffective assistance of counsel alleged herein.

especially the Oklahoma trial testimony. (2) She rendered ineffective assistance when she failed to investigate the facts underlying the Oklahoma prior. (3) She rendered ineffective assistance when she failed to seek a continuance of trial until she obtained a ruling on the question of whether the Oklahoma testimony would be admissible. (4) She rendered ineffective assistance of counsel when she abandoned the defense of self-defense, and, instead, pursued a defense of identity, which was unreasonable, because the prosecution's evidence of identity was so strong. (5) She rendered ineffective assistance when she advised and caused Petitioner not to testify. (6) She rendered ineffective assistance when she failed to call Petitioner's sister and girlfriend to testify to support the defense of self-defense.

    Mr. Rosenthal explains, inter alia, as follows:

> In order to effectively try a case to a jury, it is critical that defense counsel have settled upon a theory of defense prior to the commencement of trial. To do so intelligently the defense must know what the prosecution case will be. While in rare instances this may not be possible, in most cases it is, in part because of California's discovery scheme. It is important to settle upon a defense because counsel will have no credibility before a jury if the jury cannot discern from the beginning of the trial that the defense has an interpretation of the facts to which counsel will adhere throughout the trial. If the jury detects uncertainty as to the defense version of the events which underlie the trial, they will conclude that the defense presented is related to maximizing chances of prevailing rather than conveying the truth as defendant knows it to be. . . .
>
> The defense chosen likewise impacts upon opening statement. Opening statement is an extremely important part of a criminal trial, perhaps even more important than final argument. Psychological studies demonstrate that notwithstanding instructions that jurors keep an open mind, people generally reach an initial decision early in a trial, and will usually adhere to that decision as the trial progresses. The cognitive principles of primacy and recency indicate that individuals generally retain what they hear first and last, and the opening statements are among the first things heard in a trial. . . . this likewise underscores the importance of

knowing to the greatest extent possible what the prosecution case
will be before beginning the trial. . . .

## L.  Conclusion

Each of the above instances of IAC violated Petitioner's 6th
Amendment right to representation by competent counsel. Strickland v.
Washington, supra. Each of these instances of IAC was individually and
cumulatively prejudicial for the reasons stated herein. People v. Hill (1988)
17 Cal.4th 800, 844.

What this all comes down to is that a reasonable jury could go either
way on Petitioner's proffered defense of self-defense. If that is the case,
then Petitioner is entitled to a new trial to let a jury, not a judge, decide, for
the first time, whether his self-defense testimony is credible, and whether
there was a reasonable doubt that he fired in self-defense after Terry Dandy
fired one shot at him.

WHEREFORE, for all these reasons, Petitioner prays for the
issuance of the writ, and/or for the issuance of an order to show cause.

DATE: September $\overbrace{25}$, 2006

Respectfully submitted,

$\mathcal{S} \leftharpoondown \mathcal{B} \cdot \mathcal{B}edic$

STEPHEN B. BEDRICK
Attorney for Appellant and Petitioner

REARDON. J.*

We concur.

JONES, P. J.

GEMELLO, J.

(A106142)

---

\*     Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI. section 6 of the California Constitution.

33

COPY

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 5

**FILED**
Court of Appeal-First App. Dist.

IN RE IVAN KILGORE ON HABEAS CORPUS.

A110317
Alameda County No. 14103

AUG 3 0 2006

DIANA HERBERT

BY _____
                      DEPUTY

BY THE COURT:

    The petition for writ of habeas corpus is denied.

Date: **AUG 3 0 2006**           **JONES, P.J.**          P.J.

    ✓Jones, P.J. ___Simons, J. ✓Gemello, J. ✓Reardon, J. (Judge of the Alameda
County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the
California Constitution.)[

orcc

EXHIBIT # 1

## IN THE COURT OF APPEAL

## FOR THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

### Division 5

|  |  |
|---|---|
| In re IVAN KILGORE | ) <br> ) <br> ) Case # _____ <br> ) |
| on habeas corpus | ) (direct appeal pending in <u>People</u> <br> ) <u>v. Kilgore</u>, case #A106142) <br> ) |
| _____ / | **DECLARATION OF IVAN KILGORE** |

Ivan Kilgore, being duly sworn, declares and states:

I am the Defendant, Appellant, and Petitioner in this case.

Several times prior to trial I told my lawyer, Deborah Levy, that Terry Dandy fired a shot at me first, and that I fired back in self-defense, and missed Dandy, and apparently struck William instead. I told her that I wanted to testify and explain this to the jury.

The trial judge did not rule until Friday, March 14, 2003, almost at the end of the prosecution's case, that the testimony from my Oklahoma manslaughter case would be admissible to impeach me if I testified. The defense case was set to begin the next Monday, March 17.

Ms. Levy visited me in jail during the weekend. Once again I told her that Dandy had fired one shot at me, and that I shot back at Dandy in self-defense, but missed, and struck William, instead. Once again I told her that I wanted to testify and explain this to the jury.

Ms. Levy advised me not to admit that I fired at "T." Dandy, because, in her opinion, that was still murder. This now suggests to me that

1

Ms. Levy did not fully understand how the doctrine of transferred intent applies to self-defense.

Ms. Levy told me that the Oklahoma testimony would be very damaging. She told me that the DA could tell the jury about all of the Oklahoma testimony, and not just about the shooting. That meant that the DA could talk about other facts in the Oklahoma case, such as my ownership of several guns, and about my supposed gang involvement in Oklahoma.

Ms. Levy did not tell me that a motion could be made to eliminate some or all of this extra damaging information from the Oklahoma testimony. One major reason why I decided not to testify was to avoid having the jury hear all this additional damaging information.

Ms. Levy did not tell me that I could point out to my Alameda County jury that the Oklahoma jury had found me credible, when it found the equivalent of California's imperfect self-defense. Ms. Levy did not tell me that fact could help support my credibility, and could help balance out some of the potentially damaging parts of the Oklahoma case.

Ms. Levy told me that, if the jury heard all the Oklahoma testimony, it would disbelieve my self-defense testimony. Ms. Levy told me that I would be foolish to testify. She strongly advised me not to testify. She told me that the only way to get a not guilty verdict was to agree with her not to testify and to change the defense to reasonable doubt, because I didn't stand a chance with self-defense.

I still wanted to testify, but I reluctantly accepted her advice not to testify, because she was my lawyer and because, with her professional training, she supposedly knew better about these things; because there was only one weekend between Friday, March 14 and Monday, March 17 to make this decision, which forced a hasty decision; and because that short time period did not allow her, or me, the opportunity

2

to do any more legal research or factual investigation regarding how my case would look, or how it would develop, with the Oklahoma case admitted. Her advice directly caused me not to testify. Her advice was the sole reason why I did not testify.

I asked Ms. Levy to call as witnesses my sister, Halevchia Osborne and my girlfriend, Betsy Varela. Both Halevchia and Betsy would have testified that during the week prior to the shooting William Anderson, "T." Dandy, and two of their friends twice attacked me, and robbed and pistol-whipped me. Halevchia and Betsy would have testified that the beatings and robbery put both me and them in a state of great fear. I attach as exhibit A a true and accurate declaration about this, signed by Halevchia. I attach as exhibit B, a true and accurate copy of a declaration signed by Betsy.

I believe that their testimony would have assisted my defense of self-defense.

Ms. Levy decided not to call them as witnesses when she advised and caused the defense to be changed from self-defense to identity.

Then Ms. Levy told me that I could not possibly succeed with the defense of self-defense if I did not testify.

Ms. Levy told me that my only chance for acquittal was defending on the basis of reasonable doubt as to identity, and not testifying. She gave me this advice, even though four witnesses identified me as the shooter, and even though Ms. Levy believed that my stolen car report cast strong suspicion on me, and even though she had earlier told me that she thought an identity defense would fail.

Ms. Levy did not advise me that, if I did not testify, I risked waiving my right to challenge on appeal the trial judge's ruling on admission of the Oklahoma case.

Ms. Levy did not advise me that it would be foolish to change

3

defenses in midstream and rely upon a new theory of defense, incorrect identification, as to which there had been no investigation. Ms. Levy did not tell me that good investigation was needed to present such a defense. Ms. Levy did not advise me that successful misidentification defenses are almost always accompanied by good alibi testimony, none of which had been investigated or prepared here.

If I had been correctly advised on these points, I would have insisted on my right to testify, and I would have insisted that the defense remain self-defense (under the doctrine of transferred intent).

I declare under penalty of perjury the foregoing is true and correct, except as to allegations made on information and belief, and as to those, I believe them to be true.

Executed at Represa, California on $//- 8 -$ , 2004.

_Ivan Kilgore_
IVAN KILGORE

4

EXHIBIT #2

## Affidavit

Counsel ~~failed to~~ call Halevchia Osborne, who is the defendant's sister and was present during both assaults and robberies against the defendant by the deceased, Jamario Hennen, T and an unknown assailant. Ms. Osborne would have testified to the fact that seven days before the shooting, the deceased attempted to commit an act of home invasion upon her moments before he robbed and assaulted the defendant. She would have testified because of that incident the defendant built a barricade on the apartment door and took to carrying a weapon (shotgun) because of his fears of being assaulted and robbed again before they could move out of the apartment. Ms. Osborne would have testified that five days later while her and Raymond Jones where in the living room of the defendant's apartment, that they heard the defendant yelling for help from down stairs to look and see the decease, Jamario Hennen, "T", and an unknown assailant pistol whipping the defendant (this was two days before the shooting incident). Ms. Osborne would have testified to the terror these assaults, robberies, and threats to kill the defendant and family caused her. Ms. Osborne would have testified that because of this terror, she would occasionally have someone escort her to the corner store and etc. due to the terrifying affect the assault the deceased perpetrated upon her and the defendant. *Miss Delia Leury did call me Halevehia Ochone, but declined my antups of Jestemony. To that el well agree Halvefthin Delue* 5-12-03

_____, declare that the anticipated trial testimony in which the defendant used to support his motion for new trial is a true statement acknowledged by me under the penalty of perjury.

5/2-03
Date

_____
Signature

EXHIBIT #3

**Affidavit**

Counsel failed to call Betsy Varela, who was living with the defendant during the time
frame and before this incident with the deceased. She would have testified to the facts
that after defendant was assaulted and robbed by the deceased and his gang that she
observed not only the defendants wounds from the assault but also the trauma. She
would have testified that because of the traumatic state the defendant was in, the
defendant built a barricade on the apartment door, took to carrying a weapon (shotgun)
at all times (even sleeping with it on the best rest and carrying it in the car). She would
have testified that the defendant would go as far as having a friend, sometimes
Raymond Jones, guard her and the children with a shotgun when they (defendant too)
would exit and return to the apartment building, day and night alike. She would have
testified to the traumatic affect the situation had upon her and the defendant and their
readiness to relocate so that the decease and gang wouldn't be able to act on the further
threats to kill them, but before the family could move the decease and gang had
attacked had attacked (twice in a seven day period) the defendant in another robbery by
gunpoint.

I, ___Betsy Varela___ , declare that the anticipated trial testimony in which the
defendant used to support his motion for new trial is a true statement acknowledged
by me under the penalty of perjury.

5/1/2003
___Date___

Betsy Varela,
___Signature___

EXHIBIT #4

STEPHEN B. BEDRICK
Attorney at Law, SBN #058787
1970 Broadway, Suite 1200
Oakland, California 94612
(510) 452-1900

Attorney for Defendant and Appellant IVAN KILGORE

## IN THE COURT OF APPEAL

## FOR THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

### Division 5

| | |
|---|---|
| In re IVAN KILGORE | Case # _____ |
| on habeas corpus | (direct appeal pending in case no. A106142) |
| | **DECLARATION OF ATTORNEY HAROLD ROSENTHAL** |

I, Harold Rosenthal, being duly sworn, declare and state:

I am an attorney licensed to practice law in the State of California,
and have been so licensed since 1976. I received my bachelor's degree
from the University of Pennsylvania, and my Juris Doctor degree from
Boalt Hall, the law school of the University of California at Berkeley.

I have practiced criminal law since 1976, when I served as a deputy
public defender in Contra Costa County. I worked as a Deputy Public
Defender in Contra Costa County until 1981, and tried approximately sixty
felony and misdemeanor jury trials. I left the Public Defender's Office in

1981, when I became Co-Directing Attorney of the University of San Francisco Law School's Criminal Law Clinic. I continued in that position until 1983, when I began the private practice of criminal law, which I have continued until the present time. From 1984 until 1999 I taught the Criminal Trial Practice course at the Boalt Hall School of Law at the University of California at Berkeley. I have also taught trial advocacy for the National Institute for Trial Advocacy (NITA)

I am admitted to practice in the federal trial courts of the Northern, Eastern, Central and Southern Districts of California, and have tried jury trials in all of these districts, as well as in the District of Maryland and in Harris County, Texas. I have practiced in federal courts throughout the United States. I have tried murder cases, attempted murder cases, complex fraud cases, racketeering cases, drug cases, bank robbery cases, bank embezzlement cases, rape cases, riot cases, drunk driving cases, petty theft cases, pension fraud cases, malicious mischief cases, tax fraud cases, procurement fraud cases, and other types of cases as well. I estimate that I have tried well in excess of 100 cases to juries. I am named in the 2005 edition of the publication entitled The Best Lawyers in America in the section regarding criminal law, and was named by the California Lawyer in 2001 as one of the top ten criminal trial lawyers in the state. I am a member of the Criminal Justice Act Panel from which attorneys are appointed to represent indigent defendants in the United States District Court for the Northern District of California.

As mentioned above, I have taught trial advocacy and I am familiar with articles and text books discussing how to effectively try cases. I have also engaged in numerous discussions with colleagues regarding the trial of cases, and continue to do so on an ongoing basis. I am familiar with the standard of practice regarding the trial of murder and other cases.

I am familiar with the standard for ineffective assistance of counsel as stated in <u>Strickland v. Washington</u> (1984) 466 U.S. 668, and I base this declaration upon such a standard.

I have reviewed the following materials in this case: the Appellant's Opening Brief (AOB); the Respondent's Brief (RB); a close-to-final draft of Appellant's Reply Brief (ARB); a close-to-final draft of the habeas corpus petition; the transcript of the testimony of trial counsel Deborah Levy on the motion for new trial; and the transcript of Petitioner's testimony in his Oklahoma trial. I rely upon the facts as stated in the AOB and RB. I have not read any other portions of the transcript, because the 7.2 hours authorized by the Court for this expert review does not allow much time to read the transcript. On the basis of this review, it is my opinion as follows:

While all charges are serious and the trial of any case is important, the representation of a defendant in a murder case is regarded as particularly serious responsibility among criminal practitioners. There are no crimes more serious than murder. For many years almost no prisoners serving life top sentences for murder have received parole, and any life sentence, whether for first or second degree murder, is effectively a sentence of life without possibility of parole. Criminal practitioners therefore hold themselves to a high standard when assuming the grave responsibility of representing a defendant charged with murder.

Thus, the standard of practice, particularly in homicide cases, calls for defense counsel to ascertain prior to trial and to the greatest extent possible precisely what prosecution evidence s/he will be required to meet during the course of the trial. In order to affect this goal criminal practitioners are diligent in ensuring that the prosecution satisfies its statutory and constitutional discovery obligations prior to trial. Moreover,

wherever possible, reasonably competent defense counsel will seek to obtain resolution of evidentiary issues prior to the commencement of trial; this is done to eliminate uncertainty and promote intelligent strategic choices, and also to avoid the necessity of registering objections before the jury, which often create the impression that counsel is attempting to conceal the truth. In connection with these tasks reasonably competent counsel will utilize when necessary pretrial motions which are well written, adequately researched, and supported by persuasive authority.

In order to effectively try a case to a jury, it is critical that defense counsel have settled upon a theory of defense prior to the commencement of trial. To do so intelligently the defense must know what the prosecution case will be. While in rare instances this may not be possible, in most cases it is, in part because of California's discovery scheme. It is important to settle upon a defense because counsel will have no credibility before a jury if the jury cannot discern from the beginning of the trial that the defense has an interpretation of the facts to which counsel will adhere throughout the trial. If the jury detects uncertainty as to the defense version of the events which underlie the trial, they will conclude that the defense presented is related to maximizing chances of prevailing rather than conveying the truth as defendant knows it to be. Juries are first and foremost concerned with the truth. While a jury need not be convinced that a defense is true in order for a defendant to prevail, it must believe that the defense could be true. A jury will not entertain such a belief if it senses uncertainty on the part of the defense as to the facts of a case, or inconsistency in its approach.

Settling on a defense prior to the commencement of trial is likewise important because the defense to be used impacts the manner in which counsel will approach the various parts of the trial. For example, a decision to utilize the defense of self-defense will impact the questions counsel asks

4

on voir dire, because there may be some jurors who because of personal or religious beliefs will apply a stricter standard in that regard than the standard set forth in the instructions that ultimately will be given to the jury.

The defense chosen likewise impacts upon opening statement. Opening statement is an extremely important part of a criminal trial, perhaps even more important than final argument. Psychological studies demonstrate that notwithstanding instructions that jurors keep an open mind, people generally reach an initial decision early in a trial, and will usually adhere to that decision as the trial progresses. The cognitive principles of primacy and recency indicate that individuals generally retain what they hear first and last, and the opening statements are among the first things heard in a trial. Additionally, because the prosecution goes first, and because its presentation in a murder trial is typically lengthy, if the defense does not give an opening statement it may be many days or even weeks before the jury will be given the defendant's side of the story. For these reasons the standard of practice involves giving an opening statement whenever possible so as to provide the jurors from the outset with a cogent and powerful alternative to the prosecution's theory of the case. Of course, once an opening statement is given it cannot be taken back; this likewise underscores the importance of knowing to the greatest extent possible what the prosecution case will be before beginning the trial.

There are several ways in which defense counsel ascertains what the prosecution case will be. S/he does so through discovery, through pretrial investigation, and through securing, as mentioned above and to the extent possible, pretrial rulings through in limine motions regarding the evidence which the Court will admit.

Of the types of evidence it is important to possess pretrial, there may be none more critical than a defendant's prior statements, particularly those

statements made under oath. Because of the importance of these statements the entitlement to these statements iS clearly delineated in Penal Code Section 1054.1, the statute governing criminal discovery. Additionally, even before the enactment of Section 1054.1 precedent indicated that fundamental fairness – to my understanding, due process – dictates that such statements be provided to a criminal defendant. See, e.g., Cash v. Superior Court (1959) 53 Cal.2d 72, 75.

Finally, in any self defense case the testimony of a defendant is critical. Unless the prosecution introduces a defendant's exculpatory statement in its case, it is virtually impossible to raise this defense and to receive instructions from court on self defense if a defendant does not testify. Moreover, if a defendant does testify he must be prepared to deal with any prior statements s/he has made that are germane to his/her testimony. This further adds to the importance of possessing all prior statements by a defendant before the beginning of trial.

In Mr. Kilgore's case, it was apparent well before trial that the prosecution would attempt to introduce Mr. Kilgore's prior testimony given in the Oklahoma homicide trial which resulted in the equivalent of a conviction for involuntary manslaughter. Thus, the importance of this testimony was clear, and reasonably competent counsel would have obtained a copy of this testimony prior to trial. As mentioned above, it appears that counsel was entitled to discovery of this testimony under Penal Code Section 1054.1. Even if this were not the case, competent counsel would have made every effort to obtain this testimony and any other materials regarding the Oklahoma homicide through investigation. It is difficult to imagine that the trial court would not have made available funds for her to do so. Finally, competent counsel would attempt to secure a ruling pretrial regarding the admissibility of whatever evidence it was that

the prosecution sought to place before the jury regarding the Oklahoma homicide, because the court's decision in that regard would have multiple implications as to which defense would be raised and the manner in which that would be accomplished. Competent counsel would have urged the exclusion of this evidence because noncompliance with discovery requirements, and in the alternative sought a pretrial continuance to allow the defense to deal with this evidence. Additionally, competent counsel would have been prepared through investigation to introduce other evidence regarding the Oklahoma homicide which supported Mr. Kilgore's successfully asserted defense in that case.

Counsel here did none of these things. There is no indication that she ever sought to enforce the People's discovery obligations to furnish Mr. Kilgore's statement during the Oklahoma trial. She did not seek a continuance when the prosecution indicated it would attempt to use this evidence. She conducted no investigation regarding the Oklahoma prior. Her motion to prohibit use of the Oklahoma prior to impeach defendant was less than one page.[1] It did not cite any authority on its relevance under Evidence Code Sections 1101 et seq. - the primary basis for its proposed admission. It contained no discussion of the facts of the Oklahoma case. It is very distressing that such a pleading would be filed on a critical issue in a matter in which a defendant faced life in prison.

It is therefore my opinion that:

(1) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she failed to seek a continuance of trial until she possessed all statements of Mr. Kilgore which could be used during his trial. It is my opinion that her representation fell below the standards of the profession in

---

[1] The balance of the motion dealt with the issue of whether the prior constituted a strike for purposes of enhancing sentence.

this regard. In my opinion no reasonably competent counsel would assent to commencing a trial without these materials.

(2) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she failed to investigate the facts underlying the Oklahoma prior. It is my opinion that her representation fell below the standards of the profession in this regard. In my opinion no reasonably competent counsel would fail to have this investigation performed under these circumstances.

(3) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she failed to seek a continuance of trial until she had obtained a ruling on the question of whether the Oklahoma testimony would be admissible. It is my opinion that her representation fell below the standards of the profession in this regard. In my opinion no reasonably competent counsel would agree to commence trial without first attempting to secure a ruling on this issue or a continuance pending that ruling. To the extent that Ms. Levy did attempt to secure such a ruling, her motion was incomplete and very poorly executed, and written without having obtained the necessary factual information to make such a motion; it did not meet the minimum standards of the profession in regard to motions of this nature.

(4) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she abandoned the defense of self defense. Because of the nature of the alleged victim and the prior acts of violence perpetrated upon Mr. Kilgore, self defense was the best defense in this case. Advancing a defense other than self defense where a defendant has informed counsel that he acted in self defense is ethically questionable. Here it was not reasonable to advance an identification defense because the evidence of identity was so strong; according to her testimony at the motion for new trial, trial counsel recognized this prior to trial. Even if counsel exercised a

reasonable strategic choice to pursue an identity defense (or, as she puts it, "a reasonable doubt defense," the nature of which is unclear), that choice should have been made before trial and after securing a pretrial in limine ruling, rather than during trial. It also should have been made only after a full factual investigation of the Oklahoma prior. An attorney is required to undertake reasonable investigations before making strategic choices, and it is my opinion that her representation fell below the standards of the profession in this regard. In my opinion no reasonably competent counsel would under these circumstances abandon a defense well into the trial and invoke a new and different defense.

(5) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she advised and caused petitioner not to testify. The only viable defense was self-defense. Thai is true irrespective of the Oklahoma prior. To the extent that the Oklahoma prior was a problem counsel should have been prepared to meet that evidence as defendant successfully had met that evidence in Oklahoma. Before advising Appellant not to testify she should have investigated the Oklahoma prior and obtained the prosecution evidence in that matter. Petitioner should have testified. It is my opinion that her representation fell below the standards of the profession in this regard. No reasonably competent counsel would have advised defendant not to testify under these circumstances.

(6) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she failed to call Petitioner's sister and girlfriend to support the defense of self defense. It is my opinion that her representation fell below the standards of the profession in this regard. No reasonably competent counsel would have declined to call them.

Although there are other allegations of ineffective assistance in the briefs, I was unable to form an opinion about these allegations because of the limited time allotted to me.

I declare under penalty of perjury the foregoing is true and correct, except as to allegations made on information and belief, and as to those, I believe them to be true.

Executed this 27 day of May, 2005 at San Francisco California.

HAROLD J. ROSENTHAL

**EXHIBIT #5**

Filed 8/30/06

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

DIVISION FIVE

**FILED**
Court of Appeal-First App. Dist.

AUG 3 0 2006

DIANA HERBERT

BY _____
DEPUTY

**THE PEOPLE,**

    **Plaintiff and Respondent,**

    v.

**IVAN KILGORE,**

    **Defendant and Appellant.**

**A106142**

**(Alameda County
Super. Ct. No. 141033)**

    Ivan Kilgore appeals from a judgment of conviction and sentence entered after a jury found him guilty of first degree murder in a drive-by shooting. Kilgore contends: (1) the trial court erred when it ruled that, if Kilgore testified, the prosecution could cross-examine him on his testimony in another case; (2) the court erred in failing to instruct the jury on "second degree drive-by murder"; (3) the jury should have been instructed that the doctrine of transferred intent applied to his self-defense claim; (4) the court improperly precluded him from introducing evidence of the character of his victim and a prosecution witness; and (5) his trial counsel rendered ineffective assistance of counsel. We will affirm the judgment.

### I. FACTS AND PROCEDURAL HISTORY

    An information charged Kilgore with the murder of William Anderson (Pen. Code, § 187)[1] and alleged the special circumstance that he committed the murder by shooting from inside a vehicle with the intent to kill (§ 190.2, subd. (a)(21)). As a

---

[1]    Except where otherwise indicated, all statutory references are to the Penal Code.

1

sentence enhancement, it was further alleged that Kilgore discharged a firearm causing death. (§ 12022.53, subd. (d).) A 1997 Oklahoma conviction for manslaughter was alleged as a serious felony prior offense (§ 667, subd. (a)) and as a strike (§ 1170.12).

A. PROSECUTION CASE

At approximately 5:45 p.m. on July 16, 2000, William Anderson (William) was shot to death while standing on the corner of San Pablo Avenue and 30th Street in Oakland. An autopsy determined that he was killed by a shotgun blast to the chest and abdomen, with 11 penetrating wounds. The ammunition was buckshot, fired from a distance of about 8 to 12 feet. Police found no casings, slugs, strike marks, or other evidence of any other gun being fired at the scene.

1. Eye-Witness Shanae Anderson's Testimony

William's cousin, Shanae Anderson, described the circumstances of the shooting.

On July 16, 2000, Shanae and her boyfriend Terry Dandy, as well as William's girlfriend Bianca Moore, were visiting William at his parents' house on 30th Street in Oakland. Around 5:00 p.m., Shanae and Bianca went to a pay telephone at 30th Street and San Pablo Avenue; William and Terry joined them shortly thereafter. None of them had a weapon, and Shanae had never seen William or Terry involved in violence or illegal behavior. As Shanae talked on the pay telephone, she heard William say, "There is that punk ass nigga right there." William and Terry were laughing.

Shanae then heard a "bang" and thought it was a car backfire. She turned around and saw a man pointing a gun out of the rear window of a gray Cadillac. Shanae stood there as Bianca and Terry ran. William said "I'm shot" and fell to the sidewalk.

Shanae noticed three people in the Cadillac: the driver, a front-seat passenger, and the man in the back seat with the gun. She did not see the face of the driver or front passenger, but identified Kilgore as the man in the back seat. She specifically remembered his eyes and brown complexion.

The Cadillac made a U-turn and pulled up to the curb, where Shanae was standing and William remained on the ground. Kilgore, still in the back seat, switched to the other

2

side of the car and pointed the gun at William. William continued saying, "I'm hit. I'm shot." The Cadillac drove off.

When speaking with the police about the incident, Shanae identified Terry incorrectly as "Richard Davis." Bianca had told her to give a false name, Shanae explained at trial, because Bianca thought Terry had a warrant out for his arrest. For the same reason, Shanae said Terry was 5'8" when he is really 6'3."

Shanae's trial testimony differed in a few details from the account she gave to police on the day of the shooting. She did not tell the police that Terry said something to the effect of "There is that punk ass nigga," claiming instead that he said only, "Oh shit." Although Shanae stated at trial that she remembered Kilgore's eyes, she did not mention his eyes to the police. Furthermore, while she told the police the shooter had a "brown" complexion, she acknowledged at trial that Kilgore's complexion was lighter than "brown."

### 2. Eye-Witness Bianca Moore's Testimony

William's girlfriend Bianca testified that she had never seen William or Terry engage in violent behavior. William told her in June 2000 that Kilgore owed him money, but he did not appear upset about it. In early July 2000, he said that he and a friend had tried to collect the money from Kilgore, and Kilgore and the friend got into a fight. He did not seem upset about this incident either.

Bianca's recollection of the shooting was much the same as Shanae's. Late in the afternoon on July 16, 2000, Bianca recounted, she and Shanae walked from the Andersons' house to the pay telephone at 30th Street and San Pablo Avenue to make a telephone call. William and Terry met them there shortly thereafter. William pointed at a gray Cadillac passing by and nonchalantly said, "There go that N-I-G-G-A Ivan." The Cadillac, having stopped, made a U-turn and went off the way it came. About 15-20 minutes later, the Cadillac returned. Terry said, "he got a gun," and Bianca turned to look. As the Cadillac passed, William pushed her, and she heard a single gunshot. William was shot.

3

The Cadillac turned around and pulled up next to Bianca. She saw a man—Kilgore—with a gun in the back seat. When Kilgore pointed the gun at her, she began to pray and told Kilgore, "I got a son to live for." The Cadillac drove off. William was lying on the ground, saying he had been shot. She had not seen either William or Terry with a weapon.

Bianca was scared and did not want to talk to the police. When she spoke to them, she did not say that she had seen Kilgore shoot William, or that William or Terry had said, "There go that nigga, Ivan." When asked about Terry, she misidentified him as Richard Davis, at his request. Not wanting to be a witness at a trial, Bianca told police that she was unsure whether she could identify the shooter because the windows in the back of the Cadillac were tinted and the rear window was down only half way.[2]

3. Testimony of Investigating Officer Green

Oakland Police Sergeant Phil Green arrived at the scene about two hours after the shooting. Although there were references over the 911 communication system to "shots" being fired, and another officer at the scene said there had been one or two shots, Sergeant Green found no strike marks or other evidence suggesting that more than one shot had been fired.

Sergeant Green interviewed Shanae, Bianca, and Terry. Each of them gave the officer a false identification for Terry. Shanae was cooperative but very anxious to terminate the interview. She did not tell Sergeant Green that there was anything distinct about the shooter's eyes. Bianca was distraught and, in Green's estimation, "didn't appear to be too thrilled to be down at [his] office." She was unsure whether she could identify the shooter and did not offer that William had named Kilgore as the man in the back seat of the Cadillac. Terry told Sergeant Green that he heard two shots.

---

[2]     Kilgore contends that, at the preliminary hearing, Bianca said she did not get a good look at the shooter because her mind "went blank." In fact, when asked whether she got a good look at the shooter, Bianca responded "yes and no," explaining that she was able to see "the whole top part" of the person.

4

After considering the witnesses' statements—and learning that Kilgore had called the police minutes after the shooting to report his 1985 Cadillac stolen—Sergeant Green concluded that Kilgore was a suspect. When police searched Kilgore's apartment later that evening, he was not there.

A confidential informant advised police that the Cadillac's getaway driver was Raymond Jones. Sergeant Green arrested Jones for murder the next morning. Jones eventually admitted driving the car used in the shooting and implicated Kilgore. Sergeant Green later received a phone call disclosing the location of car, which showed no sign of forced entry or having been struck by bullets.

Three months after the shooting, Kilgore surrendered to Sergeant Green.

### 4. Testimony of Getaway Driver Raymond Jones

Jones testified at trial as part of a plea agreement, which provided that in exchange for truthful testimony Jones would plead guilty to being an accessory to murder after the fact (§ 32) and could serve up to one year in county jail.[3]  At trial, Jones also acknowledged that he had previously been convicted of misdemeanor possession of stolen property and, at the time of the shooting, was using heroin about twice a week.

In December 1999, Jones recalled, he lived next door to Kilgore in an apartment building at 509 Sycamore Street in Oakland. Kilgore worked as a manager for the building, fixing things, cleaning, and collecting rent. Kilgore drove a Cadillac.

In early 2000, Jones met William, who appeared at the apartment building at times with Terry, also known as "T." Jones never saw William or Terry engage in illegal or violent behavior, or have any weapon. In the spring of 2000, however, Kilgore told Jones that William and Terry had attacked him twice within a month. On one of those occasions, they robbed him. The other time, they "jumped" him and beat him up. On the day of the latter assault, Jones recounted, he heard Kilgore calling for help and, looking

---

[3]     To the extent Kilgore requests that we take judicial notice of the Alameda County Superior Court file in Jones's case, he has not complied with applicable rules and the request is denied.

out his window, saw William and Terry running away. The next day, Jones saw that Kilgore had a black eye. Jones gave Kilgore a baseball bat to put in his car for protection, but he never heard Kilgore say anything about getting a gun or doing anything violent to William or Terry.

On the day of the shooting, Jones and a man named "Sic" helped Kilgore clean up part of the Sycamore apartment building. Jones had already consumed a "tall can of beer," and he and Kilgore split a 40-ounce beer while they worked. Jones had also smoked a "blunt" and might have snorted heroin that day but, nonetheless, professed to be "sober."

In the afternoon, Kilgore and Sic went to Home Depot to buy cleaning supplies. When they returned about 10 or 15 minutes later without the supplies, Kilgore said he had seen the guys with whom he was "having problems." He asked Jones to "ride with him," leading Jones to think that Kilgore wanted to fight William and Terry.

Jones drove Kilgore's Cadillac, at Kilgore's instruction, with Sic in the front-passenger seat and Kilgore in the back. Kilgore directed Jones to drive to San Pablo Avenue, and then north towards Berkeley. As they approached the corner of San Pablo Avenue and 30th Street, Kilgore said, "There they go." Jones observed a group of "guys and girls" standing on the corner and pulled the car up to the curb. He believed Kilgore was going to fight "the guy" (ostensibly William) one on one. Then Kilgore said something like, "What's up, now? What's up, punk?" and Jones heard a gunshot from the rear seat. He looked toward the back seat and saw Kilgore with a gun. Jones was shocked. He had not seen the people on the street display a weapon or do anything before Kilgore fired the gun. On cross-examination, he "guess[ed]" that it was "possible" that a second shot was fired when Kilgore fired his shotgun because Kilgore's discharge of the gun in the backseat had made such a loud noise.

Jones made a U-turn and observed someone lying on the ground. He did not see anyone, other than Kilgore, with a gun and thought that Kilgore had "just shot somebody on a drive-by." Jones drove quickly back to the Sycamore apartment building and returned to his apartment, without discussing the incident with Kilgore.

6

Within 24 hours of the shooting, Jones obtained a gun for his own protection, afraid of retaliation from William and Terry's "people" and believing Terry and his friends might have guns. After seeing a wooden barricade Kilgore had put on his door, Jones put up a barricade on his own door as well. Sometime later that day, he saw Terry drive by his building on Sycamore Street.

Jones told Matthew Bryant that Kilgore shot William.

5. Matthew Bryant's Testimony

Bryant, previously convicted of narcotics possession and grand theft, was in jail in April 2001 after being arrested for the theft of his girlfriend's car. With the hope of getting out of jail, he contacted Sergeant Green and claimed to have information regarding a July 16, 2000 homicide. In a taped interview, Bryant advised Sergeant Green that he had met Kilgore, whom he knew as "Gill," through Jones.

Bryant recalled at trial that Kilgore told him that "a few people jumped on him." He professed, however, not to remember any further substance of his interview with Sergeant Green. The court then permitted the prosecutor, to play an audiotape of the interview.

As recorded by the audiotape, Bryant explained to Sergeant Green that "Giz [Kilgore] had just got jumped on and got some weed took from him." Before the shooting, Bryant added, Kilgore had said he was going to "smoke" the people who had "jumped" and robbed him. A few weeks after the murder, Jones told Bryant that Kilgore had shot somebody while Jones was driving Kilgore's Cadillac. Kilgore told Bryant the same thing, explaining that he had fired a 12-gauge shotgun one time, hitting William.

Bryant also stated in the interview that Kilgore had offered him $500 to retrieve a shotgun Kilgore had hidden in the "balcony" area (attic) of the Sycamore apartments. Bryant tried to crawl through a cubbyhole into the attic, but he was too big. In addition, Kilgore asked Bryant to break the ignition in his automobile to make it look like the car had been stolen, but Kilgore did not take him to the car.

Bryant asserted at trial that the statements he made to Sergeant Green implicating Kilgore were lies and that he made the statements to get out of jail on the automobile

7

theft charge. In fact, after implicating Kilgore, Bryant was released from jail and not charged with that particular car theft. Bryant maintained that Kilgore had not said anything to him about the shooting or retrieving a gun and that the things he told Sergeant Green about the shooting he had heard from Jones or on "the street."

### 6. Officer Miller's Testimony

Oakland Police Officer Allan Miller testified that he was able to gain access to the attic at 509 Sycamore Street. At 6' tall and weighing 180 pounds, he had to take off his gun belt to fit through the opening. He did not find a gun in the attic.

### B. DEFENSE CASE

Before the prosecution rested its case, the trial court ruled that, if Kilgore testified, he could be cross-examined on his testimony in the 1997 Oklahoma homicide case in which he was convicted of manslaughter. Thereafter, the defense called several witnesses, but Kilgore did not testify.

### 1. Testimony of Character Witness Kevin Tomlinsonn

Kevin Tomlinsonn testified that he was the owner of the apartment building at 509 Sycamore Street, where Kilgore lived. Tomlinsonn met Kilgore when Kilgore was working for his contractor, who was renovating the building. Kilgore became a tenant and also performed small jobs in the building. Tomlinsonn viewed Kilgore as reliable and trustworthy.

Tomlinsonn also knew William, because William's parents had rented an apartment in the building and, although Tomlinsonn expected the parents to move in, William moved in instead. Jones was a tenant as well.

Kilgore told Tomlinsonn at some point that he had been robbed and assaulted. Tomlinsonn observed small cuts and bruises on Kilgore's face, and a couple of weeks later, Kilgore had a "good-sized" black eye. Some time after these assaults, Kilgore built a barricade on his door.

### 2. Testimony of Witness Mary Loggins

Mary Loggins recounted that, as she was driving on San Pablo Avenue on July 16 at 5:45 p.m., she heard a gunshot and observed a man fall near the phone booth. While

8

she continued driving, she looked in her rear view mirror and saw someone wearing a puffy jacket and dark clothes running in the street. She did not see him holding a gun or other weapon, although he might have had something under his jacket, since he was holding his arms close to his body while running. Loggins also observed a gray Cadillac leave the scene and speed around the corner. When Loggins turned her car around, she saw two women standing next to the fallen body.

3. Testimony of Witness Mary Washington

Mary Washington was riding in the front passenger seat of Mary Loggins's car. She heard several "bangs," looked in the car's rear view mirror, and saw a man on the ground and the people around him running away. An older gray Cadillac or Buick proceeded north on San Pablo Avenue, turned around, and sped away south.

4. Defense Investigator Monte Beers' Testimony

Monte Beers, a defense investigator, interviewed Bianca. During the interview, she claimed that William had been in three fights with Kilgore. Although she could not identify anybody in the Cadillac, she was sure it was Kilgore's car. In addition, Bianca asserted, the shooter's weapon appeared to be a sawed-off shotgun.

C. VERDICT, NEW TRIAL MOTION, AND SENTENCE

The jury convicted Kilgore of first degree murder and found true the drive-by special circumstance and the firearm enhancement.

Kilgore filed a posttrial *Marsden* motion, seeking new counsel. The court relieved trial counsel and appointed another attorney to represent Kilgore in regard to a motion for a new trial based on allegations of ineffective assistance of counsel. After an evidentiary hearing in which trial counsel and Kilgore both testified, the court denied the new trial motion.

Kilgore was sentenced to life without the possibility of parole. The term on the enhancement for use of a firearm was stayed.

This appeal followed.

9

## II. DISCUSSION

As mentioned. Kilgore contends the trial court erred in (1) ruling that, if Kilgore testified, the prosecution could cross-examine him on his testimony in his Oklahoma manslaughter case; (2) failing to instruct the jury on second degree drive-by murder: (3) failing to instruct the jury that the doctrine of transferred intent applied to self-defense: and (4) barring Kilgore from introducing bad character evidence regarding William and Terry. In addition, Kilgore urges that he did not receive effective assistance at trial and that the cumulative effect of the purported errors compels reversal.

### A. ADMISSIBILITY OF KILGORE'S TESTIMONY IN THE OKLAHOMA CASE

Kilgore argues that the trial court erred when it denied his motion to exclude evidence of his Oklahoma manslaughter case, and particularly in ruling that he could be cross-examined with his Oklahoma testimony if he testified in the instant case. We first summarize his Oklahoma testimony and his motion to exclude the evidence, and then consider the arguments of the parties on appeal.

### 1. Kilgore's Oklahoma Trial Testimony

Kilgore was convicted of manslaughter in 1997 in Oklahoma. He testified at the Oklahoma trial about the circumstances of the shooting, contending he shot his victim in self-defense.

Specifically, Kilgore explained, he had owned a "semi-automatic Tec-22, a semi-automatic 45, and semi-automatic nine millimeter Tec," two of which had been stolen from his home. (The third gun was not stolen because he carried it in the trunk of his car.) When he confronted a man named Bryant Jones (Jones) about the stolen guns, Jones admitted that he had one of them and told Kilgore to accompany him to a friend's house. As Kilgore entered the porch of the house—armed with his semi-automatic Tec-9 and a 20-round magazine—Jones came "busting out of the ho[use] in some kind of panic," claimed he did not have Kilgore's gun, and left the scene. Kilgore went inside, where he encountered Conan Emery, sitting in a chair and "looking at me like he had some kind of grudge against" Kilgore. Kilgore claimed he was scared of Emery, a gang leader, because of his violent history. He nevertheless asked Emery about his stolen

10

guns, to which Emery responded that he would let Kilgore's "ass have it" if his inquiries persisted. When Emery made a motion towards his waistband, Kilgore, thinking Emery had a gun, pulled out his Tec-9 and fatally shot him.

After being arrested for the homicide, Kilgore wrote a letter to a friend, claiming that the woman who owned the house where Emery was shot had removed a gun from Emery's body. The letter stated, "In order for me to get off she's going to have [to] tell the police she moved [Conan's] gun." Kilgore also wrote that he might need to have "Blunt, Yogie, Sidlo and Pic" say that Emery "had a gun." According to Kilgore, he would have a strong case of self-defense "if we can get these statements out of people."

On cross-examination in the Oklahoma case, Kilgore acknowledged that he "ran around" with the Eight Trey Crips gang as a juvenile but denied being an actual gang member. He maintained that all of his friends who identified him as a Crips member were lying. He denied telling friends that he was going to kill the people who had stolen his guns. He acknowledged that, after killing Emery, he had not informed the police about the shooting.

### 2. Motion to Exclude Evidence of the Oklahoma Conviction

At trial in the present action, defense counsel moved to exclude any reference to Kilgore's prior Oklahoma homicide conviction, which Kilgore contends was roughly equivalent to an involuntary manslaughter conviction in California. (Respondent does not dispute this assertion.) The prosecutor opposed the motion, asserting that the evidence was admissible under Evidence Code section 1101 and the "doctrine of chances," with respect to Kilgore's claim that he shot William in self-defense.

The trial court denied Kilgore's motion, finding that his testimony in the Oklahoma case showed that he had offered a similar explanation for the death of his Oklahoma victim as he offered in this case, and the "occurrences [were] unusual enough with their repetition" to suggest his self-defense explanation was not believable. Kilgore insists this was error.

11

3. Forfeiture

Before turning to the merits of the trial court's ruling, respondent contends that Kilgore is barred from challenging the ruling because he did not testify at the trial in this case. For this proposition he refers us to *People v. Collins* (1986) 42 Cal.3d 378 (*Collins*), which held that a defendant must testify in order to preserve a claim of improper impeachment with a prior felony conviction. (*Id.* at pp. 383-389.) Without the defendant's testimony, the court in *Collins* observed, an appellate court cannot review the trial court's balancing of probative value and undue prejudice. In addition, consideration of the harm caused by the trial court's ruling is speculative, such that the prejudicial effect of the purported error is difficult to determine. (*Id.* at pp. 384, 393.)

*Collins* was decided in a different factual context. The matter before us does not involve impeachment with a prior felony conviction, but, rather, evidence admitted to show Kilgore's mental state as relevant to his claim of self-defense. Respondent argues that *Collins* should nevertheless apply because, like the defendant in *Collins*, Kilgore placed his credibility before the jury and should not be allowed to present himself in a false light. Kilgore counters that *Collins* is inapplicable because in this case: the proffered evidence included facts and testimony from the prior case, not just the conviction itself; the conviction itself is inadmissible, because the crime is not one of moral turpitude; and impeachment with such testimony is not constitutionally required pursuant to California Constitution article I, section 28, subdivision (f), as it was in *Collins*. Furthermore, he contends that the reasoning underlying *Collins*—that an appellate court cannot fairly be asked to weigh prejudice against probative value if the defendant's testimony is unknown—is not at issue here because Kilgore presented a pretrial offer of proof as to the content of his proposed testimony and testified under oath on the motion for new trial. Neither party cites a decision directly on point.

We need not decide whether *Collins* applies to this case involving evidence admitted under Evidence Code section 1101. Even if *Collins* applied, Kilgore provided to the trial court his proposed testimony by an offer of proof, which our Supreme Court has suggested may preserve the challenge. (*Collins, supra*, 42 Cal.3d at p. 393.)

12

Moreover, because we conclude *post* that the court did not err in ruling the Oklahoma testimony admissible, we need not determine if Kilgore forfeited his right to challenge it.

### 4. Admissibility

As a general matter, evidence of a defendant's character or criminal propensity, as shown by his past conduct, is inadmissible to prove he acted in conformity with that character or propensity on another occasion. (Evid. Code, § 1101, subd. (a).) Evidence of a defendant's prior bad act may be admissible, however, if relevant to prove another material fact, such as motive, intent, plan, knowledge, identity, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).)

The trial court found it was a "close call" whether the Oklahoma incident was sufficiently similar to the shooting of William to render Kilgore's Oklahoma testimony admissible under Evidence Code section 1101, subdivision (b), for purposes of proving his state of mind in regard to his self-defense claim. It ultimately concluded that the evidence was admissible under the doctrine of chances, because he offered an explanation for the death of his Oklahoma victim that was similar to the explanation he offered in this case, and the repetition of the occurrences suggested his self-defense explanation was not believable.

Kilgore claims the doctrine of chances is merely another way of stating that a prior crime was sufficiently similar to the charged crime to be admissible for purposes of proving intent under Evidence Code section 1101, subdivision (b), so the court's ruling that the Oklahoma homicide was not sufficiently similar to be admitted under Evidence Code section 1101 rendered it inadmissible under the doctrine of chances as well. In making this argument, Kilgore misrepresents the trial court's ruling.[4] In any event,

---

[4]    The trial court did not find that the Oklahoma homicide was *insufficiently similar* for admission under Evidence Code section 1101, observing only that it was a close call. It is true the court remarked that the issue of general intent was not *at issue*, but Kilgore misrepresents the court's concern to make it seem as if the trial judge believed there was no issue of "intent" within the meaning of Evidence Code section 1101. He quotes the trial court as ruling: "it doesn't appear that there is an issue concerning the general intent that the act was performed with, in other words, he meant to fire the gun and he fired the

13

whether characterized as a ruling under Evidence Code section 1101, subdivision (b), or the doctrine of chances, the trial court did not abuse its discretion in concluding that the Oklahoma evidence was admissible. (See *People v. Kipp* (1998) 18 Cal.4th 349, 369 [admission of other crimes evidence reviewed for abuse of discretion].)

As mentioned, under Evidence Code section 1101, evidence of other crimes may be admitted to show identity, common design or plan, or intent, if the other crime was sufficiently similar to the charged crime. While the other crimes must be highly similar to the charged offenses to be admitted on the issue of identity, a lesser degree of similarity is required for admission as to common design or plan, and the least degree of similarity is needed for admission on the issue of intent. In the last instance, the other crimes need only be sufficiently similar to the charged offenses to support the inference that the defendant probably harbored the same intent in each instance. (*People v. Lewis* (2001) 25 Cal.4th 610, 636-637; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

In the matter before us, the circumstances of the Oklahoma homicide and William's shooting were sufficiently similar to warrant admission of Kilgore's Oklahoma testimony under Evidence Code section 1101, subdivision (b). In both the Oklahoma case and the instant case, Kilgore claimed to have killed his victims in self-defense. In both cases, he shot at close range an unarmed victim with whom he had a dispute. In both cases, he had threatened to harm those who had wronged him. In both cases, he carried a gun to the scene, yet claimed that he discharged the weapon only because he thought he was about to be shot, either because his victim was pulling out a gun or had

---

gun . . . ." But the complete sentence, which Kilgore quotes only partially, reads as follows: "As I indicated, this does not appear, given [defense counsel's] offer of proof as of today that there is an issue concerning identity of the shooter, and it doesn't appear there is an issue concerning the general intent that the act was performed with, in other words, he meant to fire the gun and he fired the gun, *the issue is about mental state and the existence or non-existence of the element of self-defense and the existence or non-existence of an honest but unreasonable belief of a need to defend oneself against imminent peril to life or great bodily injury.*" (Italics added.) From the portion of the judge's statement that Kilgore omits, it is clear that the court thought the Oklahoma testimony, though not germane to *general* intent, *was* relevant to Kilgore's state of mind.

14

actually fired. In both instances, Kilgore suffered no harm, while his victims were killed. The Oklahoma evidence suggests his self-defense theory may have been a fabrication. His claim of self-defense in the prior case was therefore probative of the legitimacy of his purported belief in this case of the need to defend himself.

The doctrine of chances obtains the same result in a slightly different way. In essence, the doctrine of chances maintains that with each repetition of an act under similar circumstances, the more reasonable it is to conclude the act was intended and premeditated. (*People v. Steele* (2002) 27 Cal.4th 1230, 1243 [evidence of prior murder admissible to show intent in charged murder in light of the doctrine of chances].) As applied here, the fact that Kilgore, for the second time, shot a victim at close range with a firearm he took to the scene of a confrontation (either to get his stolen guns back or to avenge a robbery and assault), the less likely it is that the homicide was perpetrated in self-defense. It was not an abuse of discretion to conclude that Kilgore's Oklahoma testimony was admissible.

Kilgore asserts that the Oklahoma testimony should have been excluded nonetheless, as more prejudicial than probative. For purposes of Evidence Code section 352, "prejudice refers to evidence that uniquely tends to evoke an emotional bias against the defendant without regard to its relevance on material issues." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 650; see also *People v. Lenart* (2004) 32 Cal.4th 1107, 1123 [uncharged crime evidence is admissible only if it has "substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence"]; *People v. Carpenter* (1997) 15 Cal.4th 312, 378-379 ["The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence."].)

As explained *ante*, Kilgore's Oklahoma testimony was probative because, in both cases, he claimed to have killed his victims in self-defense. Although Kilgore protests that the probative value was slight because the Oklahoma jury implicitly found his self-defense theory *credible* (in convicting him of the purported equivalent of involuntary

‚ ‹

manslaughter), the point is not whether the jury accepted his claim in Oklahoma, but how unlikely it is that he shot a *second* person to death in rather similar circumstances only because he thought he had to defend himself. In the end, not even Kilgore disputes the relevance of the Oklahoma evidence, arguing instead that the evidence was "*too* probative," (italics added) and thus unduly prejudicial.

Given the probative value of the Oklahoma evidence, however, it was within the court's discretion to conclude that the evidence would not be unduly prejudicial. The circumstances of the Oklahoma case were no more inflammatory than the circumstances of this case: both involved shooting an unarmed victim at point-blank range. Although Kilgore complains that admission of the Oklahoma evidence would have risked the jury improperly deciding that "if he did it before, he would do it again," the trial court was prepared to protect against any such possibility by instructing the jury, in accordance with CALJIC No. 2.50, to use the evidence only as it related to Kilgore's self-defense claim, and not as evidence of bad character or predisposition. Kilgore also argues there were adverse facts in the Oklahoma case that were absent from the instant case (e.g., he owned semi-automatic handguns and had friends who were gang members), but this cannot be used to demonstrate error in the court's ruling, since this concern was never brought to the trial court's attention.[5]

Kilgore also asserts that the prejudicial impact of the Oklahoma evidence outweighed its probative value because, after learning the trial court's ruling, he opted not to testify. For this proposition he relies on *People v. Beagle* (1972) 6 Cal.3d 441, 453. Although the court in *Beagle* did refer to this consideration, it also interjected "a word of caution": "We do not propose to encourage or countenance a form of blackmail by defendants. No witness including a defendant who elects to testify in his own behalf

---

5    Kilgore contends this was another instance of his trial counsel's ineffective assistance. Counsel's failure to object in this regard does not require reversal, however, for the same reason we conclude *post* that her failure to request redaction of evidence or interpose other objections does not compel reversal: it was not sufficiently prejudicial. (See *post*.)

16

is entitled to a false aura of veracity." (*Ibid.*) In the matter before us, it was not an abuse of discretion to decide—as the court here did implicitly—that the otherwise admissible Oklahoma testimony evidence should be permitted, even if it were so damaging to the defendant that he might opt not to testify in order to keep it from the jury.

Lastly, Kilgore argues in his reply brief that admission of the Oklahoma testimony was inconsistent with his right not to be impeached with a manslaughter conviction, which was not a crime of moral turpitude (see *People v. Castro* (1985) 38 Cal.3d 301, 313), and that a defendant may be impeached with a prior conviction only by name of the crime and date of conviction, not the underlying facts (see *People v. Allen* (1986) 42 Cal.3d 1222, 1270). But as Kilgore elsewhere urges, his testimony in the Oklahoma case was not offered as *impeachment* with a prior conviction under Evidence Code section 787, but as substantive evidence of his mental state under Evidence Code section 1101, relevant to his claim of self-defense.

In the final analysis, we find no prejudicial abuse of discretion.

B. FAILING TO INSTRUCT ON SECOND DEGREE MURDER BY DRIVE-BY SHOOTING

Kilgore next argues that the trial court erred in failing to instruct the jury sua sponte on second degree drive-by murder, contending it is a "lesser-included 'offense-plus-enhancement'" of first degree murder and the special circumstance of drive-by murder.[6] While the court instructed the jury on the elements of first degree drive-by murder, which requires an intent to kill, it did not instruct on second degree drive-by murder, which he claims requires a mere intent to injure.

Degrees of murder are distinguished in section 189. As relevant here, first degree murder is murder that is committed with premeditation and deliberation, or murder that is "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at

---

[6] Specifically, Kilgore asserts: "Second degree drive-by murder may be deemed a lesser-included offense within the special circumstance of drive-by murder and within the crime of first degree murder. Alternatively, second degree drive-by murder may be deemed a lesser-included enhancement, or offense plus enhancement, within the special circumstance of drive-by murder and within the crime of first degree drive-by murder."

another person outside of the vehicle with the intent to inflict death." (§ 189.) "All other kinds of murders are of the second degree." (§ 189.)

The trial court instructed the jury on first degree murder, with premeditation and deliberation. (CALJIC No. 8.20.) It further instructed on first degree murder by drive-by snooting, as murder perpetrated by discharging a firearm from a motor vehicle "intentionally at another person outside of the vehicle when the perpetrator specifically intended to inflict death." (CALJIC No. 8.25.1.)

The trial court also instructed the jury on second degree murder, under theories of express malice (intent to kill) and implied malice (conscious disregard of the danger to human life). (CALJIC Nos. 8.30, 8.31.) The jury rejected this option, finding instead that Kilgore committed murder in the first degree. From this verdict, the jury necessarily found that Kilgore intended to kill William.

In addition to its instructions on the substantive offenses of first degree murder and second degree murder, the court also instructed on the special circumstance set forth in section 190.2, subdivision (a)(21), pertaining to the discharge of a firearm from a motor vehicle with the intent to kill. (CALJIC No. 8.81.21.) This special circumstance, if found true, mandates that a person convicted of first degree murder receive the death penalty or life imprisonment without the possibility of parole. The jurors found that this special circumstance was true, confirming their conclusion that Kilgore harbored an intent to kill.

Nevertheless, Kilgore complains that the trial court did not give an instruction based on section 190, subdivision (d), which dictates the *sentence* for certain persons found guilty of murder in the *second* degree. The statute provides: "Every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 20 years to life if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury." (See CALJIC No. 8.35.2.) Section 190, subdivision (d), is a *penalty provision* for second degree murder, not a substantive offense. (*People v.*

18

*Garcia* (1998) 63 Cal.App.4th 820, 832-833 (*Garcia*) [former § 190, subd. (c), now subd. (d), constitutes a penalty provision rather than a substantive offense].)

A trial court has a sua sponte duty to instruct on *lesser included offenses* for which there is substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) The court does not, however, have a sua sponte duty to instruct on lesser-included enhancements. (*People v. Wolcott* (1983) 34 Cal.3d 92, 101 (*Wolcott*).)[7] And although a trial court must sua sponte instruct on general principles of law that are closely connected to the facts and necessary for the jury's understanding of the case, the failure to do so does not compel reversal unless it was reasonably probable that a more favorable result would have been obtained in the absence of the error. (*Garcia, supra,* 63 Cal.App.4th at pp. 833-834.)

Kilgore would not have obtained a better verdict if the court had given an instruction under section 190, subdivision (d). His argument on this point is that the absence of the instruction was particularly prejudicial due to the following statement by the prosecutor in closing argument: "First-degree murder in this particular case can also be derived by the special instructions that you have been given already that says if you find that the defendant . . . intentionally discharged a firearm from a motor vehicle, you don't even have to consider premeditation or deliberation. The State of California has deemed this act to be so inherently offensive and so inherently dangerous that it's pretty much said *strict liability,* you shoot a firearm from out of a car intentionally, and you cause the death of someone other than an occupant of that vehicle, that's first-degree murder." (Italics added.)

The trial court, however, instructed the jury correctly on the requirements for a finding of first degree murder by drive-by shooting, and further instructed the jury that, if

---

7    Kilgore argues *Wolcott* is no longer good law, and that there is a sua sponte duty to instruct on lesser-included enhancements, in light of the holding in *Blakely v. Washington* (2004) 542 U.S. 296. Our Supreme Court has determined, however, that *Blakely* does not apply to California's sentencing scheme. (*People v. Black* (2005) 35 Cal.4th 1238.)

the attorneys said anything contrary to the court's instructions, the instructions given by the court had to be followed. In addition, defense counsel specifically corrected the prosecutor's statement in closing argument. The prosecutor's closing argument, therefore, did not render prejudicial the omission of an instruction under section 190, subdivision (d), and he would not have obtained a more favorable verdict if the instruction had been given.

Moreover, by rejecting implied malice second degree murder (requiring conscious disregard rather than intent to kill), and by *expressly* finding true the special circumstance under section 190.2, subdivision (a)(21)—that Kilgore intentionally shot out of the Cadillac *with the intent to kill William*—the jury necessarily found an intent to kill sufficient for first degree murder under section 189. This finding rendered irrelevant any instruction on drive-by shooting in the context of *second* degree murder under section 190, subdivision (d).

Kilgore has failed to demonstrate reversible error.

C. FAILING TO INSTRUCT ON DOCTRINE OF TRANSFERRED INTENT

Kilgore next contends that the trial court erred when it failed to instruct the jury sua sponte on the doctrine of transferred intent. (See CALJIC No. 8.65.)

The transferred intent doctrine imposes criminal liability on a defendant who attempts to kill one person but kills someone else by mistake or inadvertence. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 688.) In the context of self-defense cases, transferred intent may apply where the defendant intends to injure or kill the person who poses an imminent and unlawful threat of death or great bodily injury but inadvertently kills an innocent bystander. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357.) Kilgore contends that an instruction to this effect was required because he intended to shoot Terry but missed, striking William instead.

Kilgore is incorrect. As Kilgore vigorously contends elsewhere in this appeal, his trial counsel abandoned self-defense during trial, switched to an identity theory, and expressly withdrew the instruction on transferred intent. The court has no sua sponte

duty to give an instruction on a theory the defense has abandoned. (See *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1025.)

Moreover, a trial court has no sua sponte duty to instruct on a defense for which there is no substantial evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 469.) Here, no substantial evidence supported Kilgore's claim that he shot William after Terry shot at Kilgore.

In the first place, there was only scant evidence that *any* shot was fired other than the fatal shot fired by Kilgore. Shanae and Bianca testified to only one shot, and there was no shell casing or other physical evidence of any additional shot. Kilgore's effort to assemble evidence of an additional shot is weak at best.

Kilgore's assertion that witnesses reported hearing more than one shot is tainted by his misperceptions of the record. For example, he states in his opening brief on appeal that "Witnesses reported hearing one or two shots. Telephone calls to the Oakland Police Department 911 emergency line reported hearing 'shots' (plural) being fired. (RT 522-525)." In the cited portion of the record, however, the only references to the possibility of more than one shot apparently came from a 911 dispatcher, not a witness to the crime. In one instance, a speaker on the emergency system responds to an officer or other law enforcement agency personnel as follows: "There was shots fired 30 at that San Pablo [*sic*]. A young man was shot with a gun." It is uncertain who said these words, and the apparent error in the transcription creates some doubt as to whether the speaker really said "[t]here [were] shots" as opposed to "[t]here was [a] shot[]." Furthermore, the rest of the call discloses that the speaker *did not know* how many shots were fired, and was probably a 911 dispatcher, as he or she explained: "*I didn't find out how many shots were fired.* If they were rapid, I didn't get any information on that. Cause I wanted to get the medical rolling." (Italics added.) In fact, it appears the caller from the scene had told the 911 dispatcher that there was only *one* shot: "Okay. What she said when I connected to the ambulance was she heard *a* noise, she saw someone call and she knew they'd been shot." (Italics added.) Lastly, in another conversation captured by the 911 transcription, it appears that one law enforcement agency stated to another, "I'm sure you got the shots

21

fired over on San Pablo?" Again, while there is a reference to "shots," there is no indication it was based on witness information, or even that the speaker was using the word "shots" for the purpose of describing the number of times the gun discharged.

Kilgore's argument that *Terry* said he heard two shots fares no better. The fact that Terry *heard* two shots would not support the conclusion that *Terry* fired at Kilgore, and, indeed, Kilgore's characterization of the record on this point is disingenuous. Immediately after Sergeant Green testified on cross-examination that Terry told him there was a second shot, the following exchange occurred: "[Defense Counsel]: And from the questioning, nobody ever asked [Terry] if that shot came from anyone on the corner; correct? [¶] [Sergeant Green]: Correct. The implication was that *it was from the same person.* [¶] [Defense Counsel]: *From the vehicle.* [¶] A. *Right.*" (Italics added.) The testimony on which Kilgore relies, therefore, does not support Kilgore's self-defense theory, but negates it by confirming that no one other than Kilgore fired a gun. And if that were not enough, Sergeant Green thereafter confirmed that Shanae, when asked "if she heard any sounds [plural]," responded, "Well, I heard *the* pop [singular]." (Italics added.)

Kilgore also notes that Jones, the getaway driver, said he "guess[ed]" it was "possible" that he heard two shots, since the sound of Kilgore's shotgun blast was so loud. But there was no indication that Jones thought any shot came from Terry or William. To the contrary, Jones testified that he did not observe anyone on the street corner do anything before Kilgore fired the fatal shot.

Next, Kilgore refers us to the testimony of Mary Washington, a passenger in a car on San Pablo Avenue. Washington did testify at trial that she heard "several" "bangs" or shots. But in her statement to police on the day of the shooting, Washington stated: "Just when we were at the corner, I heard *a* loud bang. At first I did not know what this sound was. My friend Mary [Loggins] then said, 'Oh, my God, that boy has been shot.'" (Italics added.) And once again, there is no indication that Washington—or any other witness-- believed that Terry or William ever fired at Kilgore.

22

Thus, there is little or no credible evidence that there was more than one shot fired, and even if there had been, no witness testified that any shot came *from Terry* (or William) or that anyone fired *at Kilgore*. Nor was there any physical evidence to that effect, such as strike marks on Kilgore's car. Kilgore's self-defense theory is unsubstantiated.

Moreover, the balance of the evidence was not that Kilgore fired in self-defense, but that he sought out William, with a loaded gun, to exact revenge. Kilgore had motive to harm William because Kilgore owed William money, William had twice approached him about the debt, and William had participated in robbing Kilgore or beating him up. Bryant told the police that Kilgore had threatened to "smoke" the "dudes who robbed him." Kilgore got Jones to take him to the scene of the murder, with a loaded gun. In fact, Kilgore acted as if he intended to shoot William—as opposed to Terry—in that he shot William from just 8-12 feet away, returned to the corner, pointed his gun at William, and seeing him shot drove off. In the context of the record in this case, the fact that a man ran from the scene holding his hands close to his body and the fact that Terry did not want to get involved with the police investigation immediately after the shooting do not constitute substantial evidence that Terry shot at Kilgore and Kilgore fired back in self-defense, accidentally hitting William. While the court did instruct the jury on self-defense (CALJIC Nos. 5.12, 5.50), it was more than Kilgore was entitled to.

The court did not err in failing to instruct the jury sua sponte on the application of the transferred intent doctrine to self-defense.

D. PRECLUSION OF CHARACTER EVIDENCE REGARDING WILLIAM AND TERRY

Kilgore maintains that the trial court erred in barring Kilgore from introducing evidence of William's and Terry's bad character through Shanae and Tomlinsonn. He argues that this evidence was admissible to rebut the prosecution's good character evidence, which the prosecutor elicited through Shanae, Bianca, and Jones. His contention lacks merit.

23

1. Cross-Examination of Shanae as to William's Character

Shanae testified on direct examination that she had never seen William or Terry, in her presence, engaged in violent or illegal behavior.[8]

On cross-examination of Shanae, defense counsel attempted to elicit evidence which, Kilgore claims, would have rebutted the good character evidence offered by Shanae and shown William and Terry's violent behavior. Defense counsel asked Shanae: "are you aware William Anderson and Terry Dandy had twice assaulted and robbed Mr. Kilgore?" The prosecutor objected on the ground that the question called for speculation. The court sustained the objection, noting as well that the question assumed facts not in evidence and contained an "insinuation" the court and counsel had previously discussed. In the latter regard, the court stated: "It's one of those things we talked about, the question that has an insinuation with it. So, sustained."

Kilgore contends that Shanae's testimony on direct examination about William's and Terry's good character opened the door to cross-examination regarding their violent behavior. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 146; *People v. Wagner* (1975) 13 Cal.3d 612, 617.) The reason the trial court sustained the objection, however, was not because the question called for impermissible character evidence, but because of the question's *form.*

Kilgore does not explain how the trial court might have abused its discretion in sustaining the prosecutor's objection to the question's form. The question may not have really asked Shanae to speculate, as the prosecutor insisted it did, since it arguably inquired whether she was or was not aware of the incidents of violence. However, as the court correctly noted, the question assumed facts that were at that time not in evidence. Although greater leeway in this regard may be given on cross-examination, we also detect that the trial court was concerned with the prejudicial and misleading "insinuation"

---

8       Bianca and Jones also testified that they had not personally seen William or Terry engaging in violent behavior, but their testimony came *after* the testimony of Shanae and the challenged rulings of the trial court. Their testimony is therefore immaterial to the court's ruling.

in the question, which suggests that the court was motivated to sustain the objection on grounds of undue prejudice as well. On balance, Kilgore has not established an abuse of discretion.

Regardless, any error the court may have made in precluding Kilgore's cross-examination of Shanae was harmless. Kilgore was permitted to ask other witnesses about William's propensity for violence, eliciting testimony from Jones and Tomlinsonn that they had observed Kilgore with injuries from two assaults. Jones testified specifically that Kilgore claimed he had twice been assaulted by William and Terry, and Jones had seen them fleeing the scene on one of those occasions. Furthermore, defense investigator Beers testified that Bianca reported William being in three fights with Kilgore. There was, therefore, no prejudice arising from defense counsel's inability to obtain much the same evidence from Shanae. Nor did the ruling make any substantial difference in the defense's efforts to discredit Shanae's credibility, especially since she admitted that she was William's cousin and had lied to the police about Terry's identity.

Kilgore has failed to demonstrate any probability that he would have obtained a more favorable verdict if the question to Shanae had been allowed.

### 2. Denial of Examination of Tomlinsonn on William's Bad Character

After Tomlinsonn had begun his testimony, defense counsel sought permission to have him state his belief that William was a drug dealer. Defense counsel argued at the time that she would be pursuing a "reasonable self-defense" case, and urged that testimony of William being a drug dealer would (1) rebut the testimony of the prosecution witnesses that they had never seen him do anything illegal and (2) suggest that it was likely William was armed with a gun.

The court denied the request, because there was no evidence linking the murder to a drug transaction, and the victim's character was irrelevant except insofar as it concerned his reputation for violence.

25

╷  ·  ╷  ╲

Kilgore contends he was entitled to examine Tomlinsonn to elicit bad character evidence regarding William, in order to rebut the prosecution's good character evidence.[9] (See Evid. Code, § 1103. subd. (a).) Even if the court erred in precluding this inquiry of Tomlinsonn, the error was harmless. Kilgore contends it was prejudicial for the same reason it was prejudicial to preclude his character inquiry of Shanae. We have already concluded the preclusion of Shanae's testimony was harmless. Kilgore offers no reason why we should not reach the same conclusion as to exclusion of Tomlinsonn's testimony.

E. INEFFECTIVE ASSISTANCE OF COUNSEL

Kilgore urges that the trial court erred by denying his motion for a new trial, in which he contended his trial counsel rendered ineffective assistance on numerous grounds.

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient because his representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) prejudice flowing from counsel's performance or lack thereof. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) We reverse convictions on the ground of inadequate counsel only if "the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581-582.)

We exercise our independent judgment in reviewing the legal question of whether Kilgore was deprived of his right to effective assistance of counsel. In doing so, we accept trial court factual findings that are supported by substantial evidence. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

---

9   Before the court's ruling on the proffered testimony from Tomlinsonn, Shanae and Jones testified that they had never seen William or Terry engage in illegal or violent behavior. Bianca's testimony on this point, however, came after Tomlinsonn's testimony and is not germane to the ruling. Although a defense witness, Tomlinsonn was called during the People's case to accommodate scheduling.

1. Failure to Obtain Ruling on Oklahoma Homicide and Defense Theories

In connection with defense counsel's motion to exclude the evidence of Kilgore's Oklahoma testimony, Kilgore asserts that his attorney provided ineffective assistance in three ways: failing to obtain a timely ruling before trial on the admissibility of the testimony, so she could have made a definite decision whether to pursue self-defense or an identity defense; abandoning the self-defense theory and switching to an identity defense; and presenting an erroneous offer of proof that Kilgore thought Terry was reaching for a gun rather than firing a gun.

None of these purported failures of counsel was prejudicial to Kilgore's case, as *neither* the identity defense nor the self-defense theory had any merit and neither would have improved if counsel had performed as Kilgore insists she should have.

As to the purported identity defense, Bianca and Shanae identified Kilgore as the shooter. These identifications, from just feet away, were corroborated by evidence that it was Kilgore who had a motive to shoot William in that he owed William money and had been beaten by William, Kilgore said he was going to "smoke" people who robbed him, he directed Jones to take him where he had just seen the people with whom he had been "having problems," he fled after the shooting, he reported his car stolen within minutes after the shooting, he remained at large for several months, and he confessed the murder to both Jones and Bryant. Indeed, Kilgore agrees that the identity defense was "hopeless."

But the self-defense claim was no better. As discussed *ante*, there was little if any evidence of more than one shot being fired. Moreover, there was no testimony or physical evidence that any shot had been fired *by William or Terry*, or that anyone had fired at Kilgore or his car. In addition, the evidence was clear that it was Kilgore who sought out his victim with an intent to kill him: after finding William and Terry, he coaxed Jones to drive him to their location, armed with a gun and, after shooting William from 8-12 feet away, returned and aimed his gun at William again.

Kilgore's self-defense claim would not have gotten any better in the absence of trial counsel's purported errors. In particular, the theory of self-defense would not have

27

become meritorious if counsel had merely obtained an earlier ruling on the admissibility of the Oklahoma evidence, or pursued the weak self-defense theory throughout the entire trial.

Nor would it have improved if she had advised the judge from the beginning that Terry was not just reaching for a gun, but firing it. In this regard, Kilgore notes that the claim of Terry reaching for the gun was similar to Kilgore's explanation in the Oklahoma case that Emery was reaching for a gun, and thus contributed to the court's conclusion in this case that the Oklahoma testimony was admissible under Evidence Code section 1101. Although defense counsel corrected this error before the actual ruling on the Oklahoma evidence, the trial court was not persuaded by counsel's changing the facts. The implication, Kilgore urges, is that, if defense counsel had been accurate in her initial offer of proof, the court would *not* have ruled the Oklahoma testimony admissible. In light of our discussion of the admissibility of the Oklahoma evidence *ante*, we doubt the trial court would have reached that conclusion. Even if it had, and Kilgore had thereupon decided to testify, the self-defense theory was still so weak that we are confident no more favorable outcome would have been obtained.

Which brings us to Kilgore's argument that the self-defense case would have been stronger with his testimony, and counsel thus erred by not having him testify. As to this argument as well, we are not persuaded.

At the hearing on the new trial motion, Kilgore explained that on the afternoon of the murder, he, Jones and Sic went to Home Depot to buy cleaning supplies. As Jones drove Kilgore's car back to their apartment, he "made a sudden U-turn and approached some individuals on the corner that he had identified to be William and T." In the process of making the U-turn, Jones stated, "there goes William and T." As Jones approached the corner where William and T were standing, Kilgore saw T "pulling a weapon out from underneath his coat, and he fired at us, and I responded by firing back at T." The shotgun Kilgore used was in the back seat of the Cadillac. When Kilgore noticed that "someone had fell," Jones made another "U-turn and turned back around."

28

` ' , ,

Kilgore then observed that William "had been struck." Kilgore testified that he did not intend to hit William.

While Kilgore's testimony would have stated his self-defense theory directly, it would not have made it any more persuasive. It purported to explain why Jones was driving, why Kilgore was in the back seat, and why there happened to be a loaded shotgun next to him. But Jones's act of making a U-turn and going back toward William and Terry is inconsistent with a theory of self-defense. Furthermore, Kilgore's version of the events would have had little credibility in light of the evidence from the Oklahoma homicide, which would have been properly admitted if Kilgore testified. Due to the inferences the jury could have drawn from the Oklahoma evidence—which Kilgore elsewhere in this appeal insists would have been severely prejudicial—it certainly was not unreasonable for trial counsel to conclude it unwise to put Kilgore on the stand. Nor was the failure to call Kilgore as a witness prejudicial. Indeed, once the court ruled that the prior homicide was admissible, Kilgore agreed that it was better for him not to testify, and to instead pursue an identity defense.

2. Opening the Door to Bad Character Evidence

On direct examination, Tomlinsonn testified that he found Kilgore to be reliable and trustworthy. The charges against Kilgore had not changed his opinion, and he would hire Kilgore again, notwithstanding those charges. Defense counsel attempted to elicit Tomlinsonn's opinion as to Kilgore's reputation for truthfulness and veracity but could not lay an adequate foundation.

On cross-examination, the prosecutor asked Tomlinsonn whether the 1997 felony conviction would change his decision whether to hire Kilgore. The court permitted the questioning, because the door was opened when Tomlinsonn stated the current charges did not affect his view of Kilgore's reliability and trustworthiness or whether he would rehire Kilgore.

Kilgore argues that his attorney should not have introduced evidence of his good character because it opened the door to the prosecutor asking Tomlinsonn whether he was aware of Kilgore's 1997 felony conviction.

` ` ` ` `     Kilgore has not established, on this record, that his trial counsel had no legitimate tactical purpose in eliciting character evidence from Tomlinsonn. It was not unreasonable for defense counsel to conclude that the benefit of Tomlinsonn's testimony regarding Kilgore's reliability and trustworthiness outweighed any harm to be caused by reference to Kilgore's 1997 felony conviction. Counsel had already spoken to Tomlinsonn and reasonably believed that Tomlinsonn's good opinion of Kilgore was unaffected by the 1997 conviction. Indeed, that was precisely how Tomlinsonn testified.

Furthermore, the prosecution witnesses also had criminal records. Jones had been convicted of misdemeanor possession of stolen property. Bryant had been convicted of grand theft and possession of narcotics. Shanae and Bianca admitted falsely identifying Terry as Richard Davis because they thought he was the subject of a warrant. In these circumstances, evidence that Kilgore had a 1997 felony conviction—without reference to the crime of which he was convicted—was minimally prejudicial, and it was not probable that he would have obtained a better verdict if the evidence had not been introduced.

3. Failure to Request Redaction of Bryant's Statement

When Matthew Bryant purported to have forgotten the substance of his statements to the police, a tape-recording of the statement was played for the jury. Kilgore now argues that his trial attorney was ineffective because she did not object to this evidence or, at least, seek redaction of Bryant's opinion that Kilgore sold marijuana.

We do not agree. As defense counsel disclosed in the new trial proceedings, she did not object to the introduction of Bryant's tape-recorded interview because she believed it was properly introduced as a prior inconsistent statement. She was right. Prior statements are admissible where it is shown that the witness's lack of memory was evasive and untruthful. (*People v. Ervin* (2000) 22 Cal.4th 48, 84-85.) There was a reasonable basis in the record for that conclusion, and counsel's failure to object was not error.

Trial counsel believed she had erred by not having the tape-recorded interview redacted to exclude Bryant's statement that Kilgore was "known to sell weed." Any error in this regard, however, was harmless. Kilgore's friends—Jones and Bryant—had

30

criminal records. So did Terry. There is no reasonable probability that Kilgore would not have been convicted absent the admission of the evidence that he was "known to sell weed."

### 4. Failure to Request Instruction on Transferred Intent

Kilgore's attorney withdrew her request for an instruction on the doctrine of transferred intent in the context of self-defense. We have already concluded that the transferred intent instruction was not warranted, because there was no substantial evidence supporting the self-defense theory. Counsel's failure to request the instruction was, therefore, not error.

### 5. Failure to Object to Prosecutor's Argument

Kilgore contends that his attorney was negligent in failing to object to the prosecutor's inaccurate argument regarding first degree drive-by murder. As set forth *ante*, the prosecutor stated that shooting from a car had been deemed "so inherently dangerous that it's pretty much *strict liability*, you shoot a firearm from out of a car intentionally, and you cause the death of someone other than an occupant of that vehicle, that's first-degree murder." (Italics added.) The prosecutor also remarked that first degree drive-by murder did not require a finding of premeditation and deliberation. Kilgore claims these statements erroneously suggested that first degree drive-by murder did not require an intent to kill.

Counsel's failure to object contemporaneously to the prosecutor's statements was not prejudicial. In her own closing argument, defense counsel advised the jury that, for first degree drive-by murder, "not only do you have to find that somebody drove by and shot out of the car, but that they intended to kill when they shot out of the car." In addition, the court instructed the jury correctly on the applicable law and that, if anything said by the attorneys conflicted with those instructions, the jury had to follow the instructions of the court. We must assume that the jury understood those instructions and followed them, disregarding any erroneous statement of law by the prosecutor.

Kilgore has failed to establish ineffective assistance of counsel.

31

F. CUMULATIVE ERROR

Kilgore contends that the cumulative effect of the asserted errors compels reversal.

We do not agree. There is no basis for reversal of the judgment.[10]

III. DISPOSITION

The judgment is affirmed.

---

[10]    Kilgore has filed a petition for writ of habeas corpus, which we deny by separate order. (A110317)

REARDON. J.*


We concur.


JONES, P. J.


GEMELLO, J.


(A106142)

---

\*      Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# PROOF OF SERVICE

(C.C.P. §§1013(a); 2015.5; 28 U.S.C. §1746)

I, _C. BENNETT_, am over the age of eighteen (18) years, and I (am) (am not) a party to the within cause of action. My address is:

_CSP - Sacramento_
_P.O. Box 29 0066_
_Represa, CA 95671_

On, _October 1, 2007_, I served the following documents:

PETITION FOR WRIT OF HABEAS CORPUS

on the below named individual(s) by depositing true and correct copies thereof in the United State mail in Represa, California, with postage fully prepaid thereon, addressed as follows:

1. US DISTRICT COURT            2.
   NORTHERN DISTRICT OF CA.
   450 GOLDEN GATE AVE.
   SAN FRANCISCO, CA 94102

I have read the above statements and declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this _1ST_ day of _October_, _2009_, at California State Prison - Sacramento, Represa, California.

(Signature) _Charles Bennett_