1  farce of Petitioner's trial.(AS NOTED. TRIAL COUNSEL TESTIFIED

2  ON PETITIONER'S MOTION FOR NEW TRIAL, BASED ON IAC, ALTHOUGH IN

3  THE TYPICAL HABEAS CORPUS CASE ALLEGING IAC A PETITIONER WOULD

4  SUPPLY A DECLARATION FROM TRIAL COUNSEL, EXPLAINING THE PRESENCE

5  OR ABSENCE OF ANY STRATEGIC REASONS FOR THE CHALLENGED ACTS OR

6  OMISSIONS, NO SUCH DECLARATION IS NEEDED OR SUPPLIED HERE. TRIAL

7  COUNSEL, DEBORAH LEVY, TESTIFIED ON TWO SEPARATE DAYS BEFORE THE

8  TRIAL COURT ON THE MOTION FOR NEW TRIAL.(RT 937-955, 975-1033)

9  ALL HER REASONS FOR HER ACTS AND OMISSIONS WERE ADQUATELY

10 EXPLAINED IN THAT TESTIMONY.) Trial counsel admitted the farce in

11 her testimony at the motion for new trial. Ms. Levy's testimony

12 at the hearing was, because of the combination of the prosecution

13 witnesses' identification testimony, and the adverse inference

14 from the Petitioner's stolen car report, "I did'nt think there

15 was a defense of "It was'nt me." I didn't think that was possible

16 possible."(RT 1027, 1031) Yet, that was the defense she argued.

17     In light of trial counsels actions and omissions, had she

18 made the objection to exclude the Oklahoma testimony, there is a

19 reasonable probability that the court would have sustained the

20 objection on the grounds that the prosecution violated discovery

21 rules in the untimely introduction of the Oklahoma testimony, and

22 his explaination was not acceptable to excuse the misconduct.

23     Had such an objection been made and sustained, the Petition-

24 er would have testified, " That Terry Dandy fired a shot at me

25 first and that I fired back in self-defense and missed Dandy, and

26 apparently struck William."( PETITIONER TESTIFIED TO THE NATURE

27 OF THESE STATEMENT UNDER OATH AT THE MOTION FOR NEW TRIAL.(RT

28 1043-1047)

(3)

1   Witnesses Halevchia Osborne and Betsy Varela would would have

2   taken the stand supporting Petitioner's self-defense case.(NOTE:

3   THEIR DECLARATIONS DETAILING THEIR ANTICIPATED TRIAL TESTIMONIES

4   ARE ATTACHED AS EXHIBIT(S) TWO[2] AND THREE[3]).

5       In light of the forgoing and other independant evidence sup-

6   porting the Petitioners self-defense case, there is a reasonable

7   probability that, but for trial counsel's IAC in failing to

8   object to the untimely pivotal introduction of the Petitioner's

9   prior Oklahoma testimony, the result of the proceeding would have

10  been different.

11      The following independant evidence supported Petitioner's

12  self-defense case:

13      Despite the prosecution's arguement that no one standing at

14  at the coner was seen with a gun or had fired at the Petitioner

15  there was evidence to the contrary.

16      (1) In trial counsel's cross-examination of investigating

17  officer Sgt. Phil Green, she established that despite the lack

18  of physical evidence, more than one weapon could have been fired.

19  Green also testified that it was reported to him that two shots

20  had been fired...(RT 574, 593)

21      In addition, Green's testimony established the fact that

22  key prosecution witness Raymond Jones' testimony was inconsistant

23  from the initial statements given at the interrogation. Green's

24  testimony was that, "Jones told him that the assults and robbery

25  accured within a short period of time; This is consistant with

26  the fact that Petitioner was in severe distress having been

27  assulted and robbed twice within a one week period.(RT 596) Also

28  initial statements given to Sgt Green By Jones that were incon-

(4)

1 | sistant to his trial testimony was, Jones told Sgt. Green that
2 | Petitioner had built the barricade on his apartment door after
3 | the first assult and robbery by William and his friends.(RT 595-
4 | 596)

5 |     (2) On direct-examination of defense witness Mary Washing-
6 | ton, trial counsel established the fact several shots were fired;
7 | this is consistant with Terry Dandy firing initially at Petition-
8 | er.(RT 678) There's no evidence Petitioner fired more than once.

9 |     (3) On direct-examination of defense witness Mary Loggins,
10 | trial counsel established the fact that a man was seen running
11 | from the alleged crime scene with his hands and arms close to his
12 | body, as if he was concealing something under his jacket; this
13 | testimony is consistant with Terry Dandy fleeing with a concealed
14 | gun.(RT 671-672)

15 |     (4) On cross-examination of prosecution witness Bianca Moore
16 | trial counsel established that Moore deliberately concealed Terry
17 | Dandy's description and identity from the police; this conceal-
18 | ment was consistant with Moore protecting Dandy from getting ar-
19 | rested for shooting at Petitioner.

20 |     At the PX Moore testifed that,"She would not tell anyone if
21 | Dandy did fire a shot at Petitioner.(CT[PX]Cross-examination re-
22 | sumed, 33)

23 |     (5)On cross-examination of prosecution witness Shanae Ander-
24 | son, trial counsel established that Shanae deliberately concealed
25 | Dandy's physical description and identity from the police.(RT 197
-199, 204, 206, 216)

26 |     (6) During the presentation of the prosecutions case a
27 | defense witness was allowed to testify out of the usual order,
28 | on direct-examination of defense witness Kevin Tomlinsonn trial

(5)

1  counsel established Petitioner installed barricades on his apart-

2  ment door after being assulted and robbed by the associates of

3  william Anderson, William Anderson, and Terry Dandy.(RT 414-417)

4     (7)In the initial tape statements by prosecution witness

5  Matthew Bryant, his statements were adverse to Petitioner's Self-

6  defense case.(RT 351-366) However, Bryant testified at trial

7  under oath that the comments on the taped statement that reflect-

8  ed alleged statements told to him by Petitioner were lies induced

9  with coercion from Sgt. Green to get him out of jail.(RT 343-350,

10  367-368, 394-396, 398-399)

11     Ms. Levy, in her cross-examination of Bryant attempted to

12  establish testimony contradicting prosecution's key witness

13  Raymond Jones. Jones conveniently claimed that at no time prior

14  to the actual shooting was he aware of a firearm to be in the

15  Petitioner's car or possession. Trial counsel questioned Bryant a

16  at trial in regards to a statement made to him by Jones', "And in

17  fact on the tape you mentioned that Raymond told you that he knew

18  there was a gun in the car, but he thought it was only going to

19  be used for protection...(RT 394) Here counsel mistates the

20  source and content of the evidence. The source was the handwritt-

21  en notes of Sgt. Green. The content was, Bryant told Green that,

22  "Jones told him Petitioner brought the gun to protect himself if

23  needed."(PETITIONER REQUEST OF THIS COURT TO SUBPOENA THESE HAND

24  WRITTEN NOTES TO MAKE THEM A MATTER OF THE OFFICAL RECORD OF THE

25  COURT)

26     (8) Prosecution witness Raymond Jones at PX testified to,

27  "You, as a matter of fact, told the district attorney that you

28  told Ivan not to do anything stupid right like shoot someone?"

1  ('ANSWER) Yes. "and Ivan in fact agreed with you; right? (ANSWER)
2  Right.(CT[PX] futher cross-examination, 16)

3      Jones testimony at the PX stated that the weapon was already
4  in the Petitioner's car when the Petitioner returned; Given
5  inference to the fact that if Petitioner intended to shoot first
6  he would have shot William and Friends at the alleged initial
7  sighting. (CT[PX] Futher cross-examination, 13)

8      Jones testimony at the PX stated that Petitioner told him
9  momments before the shooting that his only intention for going
10  over to where William and Dandy where was to fight at worse.(CT
11  [PX] Futher cross-examination , 15)

12      Jones testimony at the PX stated that he did not see "T" AKA
13  Terry Dandy, When he initially pulled up to 30th and San Pablo,
14  it was not until he had made an U-turn, after the Petioner fired
15  the shot. Jones also stated that due to his level of intoxication
16  his senses were dulled as to what was happening that day.(CT[PX]
17  Futher cross-examination,1-5)

18      Jones testimony at the PX stated, At one of the assults
19  prior to the shooting Petitioner had informed him that he was
20  assulted with a pistol by William or Dandy.(CT[PX]Cross-examinat-
21  ion, 89)

22      Jones testimony at PX stated, He did not know if any other
23  shots were fired out on 30th and San Pablo.(CT[PX]Futher cross-
24  examination, 3)

25      Jones testimony at trial, the day after shootin Dandy came
26  by apartments, Jones obtained a gun to protect himself; this
27  supported the contention that Jones knew Dandy was armed.(RT 297)

28      Jones testimony at trial stated,"After he heard Petitioner

(7)

had' been assulted and robbed by William and his friends, Jones gave Petitioner a bat for protection. (RT 266)

Jones testimony tends to disprove that Petitioner had any intent to shoot first. Futher, if Petitioner had planned in advance to shoot, he most likely would have fired at both William and T. Dandy, not just at one because, if retaliation was Petitioner's motive, as the prosecution argued, it was well established that both men had participated in the assults and robbery against the Petitioner. If Petitioner did not fire first then at worst, he shot in self-defense under the theory of transferred intent.

(9) In addition to Ms. Levy's uninformed tactical decisions to advise and cause Petitioner not to testify, abandon the meritorious defense of self-defense and the Petitioner's rigth to call witness supporting the self-defense defense, due to the prosecutor's misconduct in introducing the Oklahoma testimony in the midst of the trial, even if the court had not sustained an object objection to exclude the Oklahoma testimony, trial counsel's tactical explainations were an oversight because no investigation was made to procure other evidence from the Oklahoma trial that supported Petitioner's credibility.

Had competent investigation been made with regards to the affect(s) the Oklahoma evidence would have had on the Petitioner credibility, Ms.Levy would have discovered sufficient evidence corroborating the Petitioner's Oklahoma trial testimony. For example, In the Petitioner's Oklahoma trial testimony, at page(s) 37-45, the testimony at first glance is subject to speculation that Petitioner wrote a letter to a friend requesting him and

(8)

others to lie and testify that the victim had a weapon ... Had Ms. Levy investigated the Oklahoma trial evidence she would have discovered that, Testimony from the victims very own sister, Carmen Randolph corroborated the Petitioner's letter and testimony. The letter was written with hopes of getting witnesses to come forth with the facts discussed within related to the case in face of overwhelming harassment from the decease's gang and friends. Ms. Randolph testified that," The evening her brother was killed, hours shortly thereafter, Stephanie Brothers brought a gun(Tech 22) belonging to the victim to her(Randolph) house. Stephanie Brothers testified she removed the gun from the crime scene. The gun she testified was suspiciously found in her kitchen oven.It did not take a genius within the Oklahoma jury to infer that the weapon had been moved within the house before it was removed from the alleged crime scene. Witness(s) testified the Tech 22 was seen in the victim's possession at the alleged crime scene the night before. Witnesses testified that the victim had stayed over the night at the alleged crime scene. The Oklahoma D.A. investigator, Allen Foster, testified to the recovery of the Tech 22 from Ms. Randolph's home after receiving information from Petitioner's attorney. Petitioner informed attorney of this discovery after having been visited at the jail by his wife, whom Stephanie Brothers had confided in with regard to moving the weapon from the alleged crime scene. The independant testimonies and sequence of events leading to the recovery of the weapon Petitioner believed to be in the victims possession at the momment of the shooting incident, corroborate Petitioner's credibility in the matter discussed .

(9)

1  ` ` ` In regards to Ms. Levy's tactical explaination, Oklahoma
2  testimony would inform the Alameda jury that Petitioner had shot
3  and killed someone else..." Though it would have presented bad
4  charactor evidence that Petitioner shot Emory, nonetheless, coun-
5  sel's opinion as to the significant prejudice is without merit
6  due to the standard of prejudice the courts apply to these type
7  of evidentiary issues when faced with prior convictions of the
8  same nature being introduced for impeachment purposes. Futhermore
9  Ms. Levy could have countered this factor by informing the
10 Alameda jury that, the Oklahoma jury and the trial judge (The
11 trial judge in the Oklahoma case commented to the Petitioner
12 having been honest and remorseful during the course of the proce-
13 edings) found Petitioner credible. The jury found him credible
14 when it returned a manslaughter verdict equivalent to Califoria's
15 imperfect seld-defense (In re Christian S. (1994) 7 Cal. 4th 768)
16 a killing the honest but unreasonable belief in the need for self
17 defense.

18                          CONCLUSION

19     The above instance(s) of IAC violated Petitioner's 6th
20 Amendment right to representation by competent counsel. Trial
21 counsel rendered IAC when she failed to object to the untimely
22 introduction of the Oklahoma testimony. As a result of counsel's
23 failure to object to the introduction of this evidence, she
24 advised and caused Petitioner to waive his right to testify own
25 behalf. This right is afforded by the 5th, 6th, and 14th Amend-
26 ment.

27     This IAC was prejudical because the likelihood of the trial
28 court sustaining such an objection was probable. Yet, because no

                            (10)

1  'such objection was made, not only was Petitioner's right to test-

2  ify foregone, counsel abandoned a meritorious defense of self-

3  defense, Petitioner's right to call witnesses was forsaken and

4  the affect of the inconsistant defense strategies, self-defense

5  and mistaken identity, as presented to the jury, prevented them

6  from entertaining any set of credible factors presented by the

7  defense, thus making a farce of the Petitioner's right to present

8  a defense.

9      The following factors are the arguements and ect. trial

10  counsel set before the jury in arguing mistaken identity:

11      (1) In her February 25, 2003 "Proposed Jury Questionnair

12  Questions" she requested that the jury be asked "Have you ever

13  been in fear of being assulted or killed?"(CT 301)

14      (2)In arguing on March 11, 2003 to introduce evidence of

15  William Andrson drug-dealing, she stated that she was presenting

16  the defense of reasonable self-defense. (RT 424-425)

17      (3) In her March 17, 2003 "Defendant's Proposed Jury Instru-

18  ction's," she asked that the jury receive the following self-

19  defense instructions: "CALJIC 5.12, 5.13, 5.15, 5.16,5.50,5.51."

20  (CT 341)

21      (4) At the jury instruction conference on March 18, 2003 Ms.

22  Levy argued for instructions to be given on self-defense,(RT 720-

23  727)

24      (5) In her March 19, 2003 jury arguement, more than 95% of

25  her arguement was that there was a reasonable doubt whether Pet-

26  tioner was the shooter. She did contend that Terry dandy fired

27  the first shot.(RT 805) However, at no point in her jury argue-

28  ment did she contend that Petitioner fired in self-defense.

(11)

1 | Indeed, the word "self-defense" does not appear once in her 27-
2 | page jury arguement, even though the jury received several stan-
3 | dard instructions on self-defense.

4 | In Ms. Levy's jury arguement she first argued "Mr. Stall-
5 | worth[the prosecutor] in his opening said this is not a who-done-
6 | it. You bet it is...We don't know who fired out of the Cadillac."
7 | (RT 802) Then she challenged Shanae's identification of Petition-
8 | er as the shooter in the back seat of the Cadillac,(RT 804-805)
9 | She criticized officer Green for not conducting a gunshot residue
10 | test on the rear seat of Petitioner's Cadillac.(RT 808) She deni-
11 | ed that Petitioner was the shooter.(RT 809) She argued that Ray-
12 | mond Jones lied when he testified that Petitioner was the shooter
13 | (RT 812) She challenged Bianca Moore's Identification of Petit-
14 | ioner as the shooter.(RT 814) She argued difficulties with eye-
15 | witness testimony.(RT 820) Then she argued that prosecutor
16 | "Stallworth can not put [Petitioner] Ivan Kilgore in that car."
17 | (RT 826) She argued in conclusion that "it has not been proven be
18 | beyond a reasonable doubt that Ivan Kilgore was the person with
19 | the weapon in the back seat of that Cadillac."(RT 817, 827)

(12)

## SUPPORTING FACTS FOR CLAIM #5(D)

As noted at page one of the supporting facts for claim **#5(C)**, the parties (Trial counsel Levy and Prosecutor Stallworth) belie-ved the Oklahoma conviction resulted from a plea.(CT 289) Ms Levy despite the appearance, was informed by the Petitioner long before the trial that there was a jury trial in the prior Okla-homa conviction. Yet, Levy's investigation was limited to the plea form of "Judgment and Sentence" from the Oklahoma case.(CT 291) Prosecutor Stallworth discovered there was a jury trial and requested transcripts of the Petitioner's Oklahoma testimony to utilize in damaging Petitioner's self-defense defense, credibil-ity and ect.(RT 19, 604-634) The trial court ultimately ruled, at the end of the presentation of the prosecution's case, that if Petitioner testified, he could be cross-examinated with his Okla-homa testimony.(RT 634-646) It deemed the prior admissible on three grounds: (i) to prove or disprove Petitioners "credibility" concerning the presence or absence of the need for self-defense," (ii) to prove or disprove "any mistake of fact testified to by the Petitioner," and (iii) "as to the existence or nonexistence of malice aforethought.(RT 615, 621, 635)

Ms. Levy at no time,prior to the trial or after the prosec-tions election to use the Oklahoma evidence, did investigation or preparation of the Oklahoma trial evidence(other testimonies, exhibits or ect.) Levy testified at the Petitioner's motion for new trial, " she did no additional investigation".(RT 1005) Levy's arguements at the hearing to exclude the prior Oklahoma conviction reflect her lack of investigation and preparation.

(13).

1    (RT 623-626) These comments by Levy are a clear indication she
2    was not aware of the evidence at the Oklahoma trial, other than
3    the Petitioners testimony.

4        Based on this limited evidence Levy made a (uninformed) tac-
5    tical decision to advise and caused the Petitioner not to testify
6    abandoned a meritorious defense of self-defense, elected not to
7    call witnesses supporting the self-defense defense and instead
8    persued a mistaken I.D. defense, she knew would get the Petition-
9    er convicted.(RT 1027, 1031)

10       As discussed on page(s) 2-3, in the supporting facts for
11   ground #(1)Levy explained her tactical reason.

### Controlling Legal Principles:
### Ineffective Assistance of Counsel Claims and the Duty to Investigate

The general principles which apply to Appellant's claim that he received constitutionally inadequate representation are well settled. A defendant claiming ineffective representation bears the burden of proving by a preponderance of the evidence both: (1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant – in other words, a probability sufficient to undermine confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). At the same time, a defendant has the right to the effective assistance of counsel at trial, and thus is "entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate". See, e.g., In re Ross, 10 Cal.4th 184, 201 (1995).

With respect to the question of what constitutes an "objective standard of reasonableness" for attorney performance, the United States Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct, and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Wiggins v. Smith, 539 U.S. 510 (2003). Accordingly, "before counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation." In re Marquez, 1 Cal.4th 584, 602 (1992). Hence, although a court must presume that counsel's conduct falls within the "wide range of reasonable professional assistance", see Bell v. Cone, 535 U.S. 685, 702 (2002), counsel's alleged tactical decisions must be subjected to "meaningful scrutiny", see In re Avena, 12 Cal.4th 694 (1996), and must be "informed", so that *before* counsel acts, he or she "will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." Marquez, supra, at 602; see also In re Jones, 13 Cal.4th 552, 565 (1996).

(14)

1       In Strickland, the Supreme Court emphasized that "tactical" decisions, although entitled to a heavy measure of

2   deference if undertaken following a reasonable investigation, are only as reasonable as the investigation on which they are

3   based:

4           Strategic choices made after thorough investigation of law and facts relevant to plausible options
        are virtually unchallengeable; and strategic choices made after less than complete investigation are
        reasonable precisely to the extent that reasonable professional judgments support the limitations on
5       investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable
        decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision
6       not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy
        measure of deference to counsel's judgments.

7   Strickland, supra, 466 U.S. at pp. 690-691.

8       In Wiggins v. Smith, supra, 539 U.S. 510, the Supreme Court applied this basic principle in expressly determining

9   whether a lawyer's pre-trial investigation was constitutionally deficient. In Wiggins, a Maryland state court trial, the defendant

10  was convicted of robbing an elderly woman and drowning her in the bathtub of her apartment. The defendant was eligible for the

11  death penalty, but the defense decided not to put on any mitigation evidence. The defendant was convicted, and alleged on

    habeas corpus that his counsel had been ineffective.

12      The high court explained that its focus was not on whether counsel should have presented a case in mitigation, but on

13  "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background

14  was itself reasonable." Wiggins, supra, 539 U.S. at p. 523. In reviewing the adequacy of defense counsel's legal representation,

15  the high court found that trial counsel had abandoned their investigation of the defendant's background after having acquired

    only "rudimentary" knowledge of his history from a narrow set of sources. Id., at p. 524. The court found that this limited

16  investigation not only was unreasonable under then-applicable standards, but that it was also unreasonable in light of the leads

17  that counsel actually discovered – leads which would have caused any reasonably competent attorney to realize "that pursuing

18  these leads was necessary to making an informed choice among possible defenses...." Ibid. The court also found that, because

19  counsel spent insufficient time considering and developing a trial strategy, counsel's failure to investigate thoroughly resulted

20  from inattention, not reasoned strategic judgment. The Wiggins court also rejected the idea that because counsel had some

21  information to work with, they were in a position to make a tactical choice not to present a mitigation defense. Instead, the court

22  stated that, in assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence

    already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate *further*. Hence,

23  Strickland could not be read to render trial counsel's conduct bulletproof under the Sixth Amendment merely by saying it was

24  done for "strategic reasons". Rather:

25          [E]ven assuming that counsel limited the scope of their investigation for "strategic reasons",
        Strickland does not establish that a cursory investigation automatically justifies a tactical decision with
        respect to ... strategy. Rather, a reviewing court must consider *the reasonableness of the investigation said to*
26      *support that strategy.*

27  Wiggins, supra, 539 U.S. at p. 527 [emphasis added].

28

                                    (15)

Applying the above principles as a guide to determining whether counsel's performance was deficient, the Wiggins court found that counsel "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to ... strategy impossible." Id., at pp. 527-528. The court therefore concluded: "Counsel's investigation ... did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered ... – evidence that would have led a reasonably competent attorney to investigate further. Ibid; see also In re Thomas, 37 Cal.4th 1249, 1264 (2006), applying Wiggins ["What matters is the substance of the investigation – whether counsel in fact explored those avenues reasonable counsel would have pursued in light of what was known and in light of the defense strategy."]

In sum, the Strickland test does not afford any slavish deference to decisions by trial counsel that are based – not on informed "tactical" choices, but rather on a *failure to conduct reasonable investigation in the first place.* Similarly, in the case at bar, it is trial counsel's failure to investigate that is assailed, rather than informed tactical decisions made in the wake of a reasonably thorough investigation.

## Deficient Performance

### *Failure To Investigate and Prepare For Trial*

The duty to investigate is part of a defendant's right to reasonably competent counsel. Indeed, "The principle is so fundamental that the failure to conduct a reasonable pretrial investigation may in itself amount to ineffective assistance of counsel." United States v. Tucker, 716 F.2d 576, 583 n. 16 (9th Cir. 1983). The American Bar Association states the duty as follows:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities.

ABA Standard 4-4-1. Moreover, "The investigatory process should begin immediately on appearance as counsel for a defendant." (Id., Standard 4-4.1.) As summarized in the Commentary to Standard 4.3 [emphasis added]:

> An adequate defense cannot be framed if the lawyer does not know what is likely to develop at trial ... In criminal litigation, as in other matters, the information is the key guide to decisions and action. *The lawyer who is ignorant of the facts of the case cannot serve the client effectively.*

Furthermore, the duty to investigate does not depend upon the lawyer's ability or experience: "The most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense." Harris v. Blodgett, 853 F.Supp. 1239, 1255 (W.D. Wash. 1994) [citing Tucker, supra, and McQueen v. Swensen, 498 F.2d 207, 217 (8th Cir. 1994)].

(16)

## CONCLUSION

The above instance(s) of IAC violated Petitioner's 6th
Amendment right to reasonably competent counsel. Trial counsel
rendered IAC when she failed to investigate and/or prepare in-
dependant evidence from the Oklahoma trial that corroborated
Petitioner's Oklahoma trial testimony that the trial court allow-
ed for previously stated reasons. As discussed at page (8) in
claim #5(C) of this writ, had such investigation been made suff-
icient corroboration of  Petitioner's credibility would have been
discovered**(Note: Examples are given at pp.8-10 of claim#5(C)**which supported
his successfully asserted defense in the Oklahoma trial. Yet, because
of counsel's failure to conduct pretrial investigation and pre-
paration of the Oklahoma trial evidence, she was not aware of the
readily available facts which would have afforded Petitioner a
justiciable defense in face of any adverse factor the prosecution
would have attempted to introduce from that case. Therefore, in
light of counsel's reason for tactical decision and strategy
being made without investigation of all the facts of the Oklahoma
evidence, this renders her thought process inadequate and in-
competent.

(17)

## SUPPORTING FACTS FOR CLAIM #3

1      During the direct appeal appellate counsel, Stephen

2  Bedrick, presented the legal question concerning the trial court

3  erroneously failed to instruct on the "lesser-inclued offense-

4  plus-enhancement of second degree drive-by-murder."(see

5  Petiton for Review, p.11). However appellate counsel failed to

6  present the state courts with the federal question to preserve

7  the matter for federal court review where appellate counsel fail-

8  ed to cite U.S. court decision **Neder v. US 119 S.ct 1827** and

9  couch the claim with specific quotation to the federal constitu-

0  tional right which was violated. As a result Petitioner's feder-

1  al constitutional right to effective assistance of counsel on

2  appeal violated in contravention to the guarantee of the sixth

3  amendment to the US Constitution. **(In re Smith 3C3d 192)**

4      There is no clearly established law that the Due Process

5  Clause requires a trial court to instruct on lesser-included  of-

6  fenses. The Supreme Court held in **Beck v. Alabama, 447 U.S. 625**

7  (1980) that an instruction on a lesser included offense must be

8  given in a capital case; however, the law is unsettled as to

9  wheather such an instruction must be given in noncapital cases.

20  The NInth Circuit has noted that "[t]here is no settled rule of

21  law on whether Beck applies to noncapital cases such as the

22  present one. In fact, this circuit, without specifically address-

23  ing the issue of extending Beck, has declined to find constitu-

24  tional error arising from failure to instruct on a lesser includ-

25  ed offense in a noncapital case." **Turner v. Marshall, 63 F.3d 807**

26  819(9th Cir.1995) (citing Bashor v. Risley, 730 F.2d 1228, 1240

27  (9th Cir. 1984)),overruled on other grounds, Tolbert v. Page, 182

28  F.3d 677(9th Cir. 1999). With this unsettled state of law, the

(18)

1 | state court's rejection of a claim that the trial court failed to
2 | sua sponte instruct on the lesser-included offense could not be
3 | contrary to or an unreasonable application of clearly established
4 | law, as set forth by the U.S. Supreme Court necessary for federal
5 | habeas relief under 28 U.S.C. § 2254(d). Although appellate
6 | counsel Bedrick argued otherwise, the decision in Apprendi v.
7 | New Jersey, 530 U.S. 436(2000), does not require a trial court to
8 | instruct on lesser-included offenses or the enhancements for
9 | lesser-included offenses.

10 | However, it is contrary to or an unreasonable application of
11 | clearly established law, as set forth in SULLIVAN V. LOUISIANA,
12 | 508 U.S. 275, 113 S.ct, when the trial court fails to give instr-
13 | uctions of particular points, as here in the present case whereas
14 | the second-degree murder instruction(CALJIC 8.30 and 8.31) given
15 | in Petitioner's trial were incomplete and defective due to the
16 | fact they did not inform the jury of the great bodily injury
17 | element of the offense as it applied to second-degree murder in
18 | a drive-by shooting(See CALJIC 8.35.2). Also the trial court
19 | failed to provide the verdict form under CALJIC 8.35.2, requiring
20 | a special finding on second degree drive-by murder.

21 | Because the jury was not properly instructed, and
22 | consequently did not render a finding, on the actual element of
23 | the offense, the Petitioner's trial did not result in a "complete
24 | verdict". The jury was forced to conclude the aspect of guilt on
25 | (1) a first degree murder charge tapered to the offense (2) a
26 | second-degree murder charge detailing aspects of law not material
27 | to the offense or its' facts as applied to a second-degree drive-
28 | by murder. Thus the jury rested its' verdict on evidence that its

(19)

1  instructions allowed it to consider. The jury was not told what

2  crime occured if Petitioner fired from the car with the intent to

3  inflict GBI, but not kill. That crime, plus enhancement, is

4  second degree drive-by murder. Penal Code § 190(d).

5      The prejudical effect of failing to give the second degree

6  drive-by instruction was argued at pages 14-18 of the Petition

7  for Review.

8      The prejudice suffered due to appellate cousnel failure

9  to couch the due process violation has forgone Petitioner's

0  right to adequate representation on appeal in effectively

1  presenting the correct legal issues and principles of law to the

2  reviewing courts.

3      The failure to instruct corresctly on a necessary element of

4  the crime of homicide, particular points, violated Petitioner's

5  5th and 14th Amendment due process rights. **Carella v. California**

6  **(1989) 491 U.S. 263; Sandstrom V. Montana(1979) 442 U.S. 510.**

**EXHIBIT # 1**

## IN THE COURT OF APPEAL

## FOR THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

### Division 5

|  |  |
|---|---|
| In re IVAN KILGORE | ) ) ) Case # _____ |
| on habeas corpus | ) ) (direct appeal pending in People ) v. Kilgore, case #A106142) |
| _____ / | ) **DECLARATION OF IVAN KILGORE** |

Ivan Kilgore, being duly sworn, declares and states:

I am the Defendant, Appellant, and Petitioner in this case.

Several times prior to trial I told my lawyer, Deborah Levy, that Terry Dandy fired a shot at me first, and that I fired back in self-defense, and missed Dandy, and apparently struck William instead. I told her that I wanted to testify and explain this to the jury.

The trial judge did not rule until Friday, March 14, 2003, almost at the end of the prosecution's case, that the testimony from my Oklahoma manslaughter case would be admissible to impeach me if I testified. The defense case was set to begin the next Monday, March 17.

Ms. Levy visited me in jail during the weekend. Once again I told her that Dandy had fired one shot at me, and that I shot back at Dandy in self-defense, but missed, and struck William, instead. Once again I told her that I wanted to testify and explain this to the jury.

Ms. Levy advised me not to admit that I fired at "T." Dandy, because, in her opinion, that was still murder. This now suggests to me that

1

Ms. Levy did not fully understand how the doctrine of transferred intent applies to self-defense.

Ms. Levy told me that the Oklahoma testimony would be very damaging. She told me that the DA could tell the jury about all of the Oklahoma testimony, and not just about the shooting. That meant that the DA could talk about other facts in the Oklahoma case, such as my ownership of several guns, and about my supposed gang involvement in Oklahoma.

Ms. Levy did not tell me that a motion could be made to eliminate some or all of this extra damaging information from the Oklahoma testimony. One major reason why I decided not to testify was to avoid having the jury hear all this additional damaging information.

Ms. Levy did not tell me that I could point out to my Alameda County jury that the Oklahoma jury had found me credible, when it found the equivalent of California's imperfect self-defense. Ms. Levy did not tell me that fact could help support my credibility, and could help balance out some of the potentially damaging parts of the Oklahoma case.

Ms. Levy told me that, if the jury heard all the Oklahoma testimony, it would disbelieve my self-defense testimony. Ms. Levy told me that I would be foolish to testify. She strongly advised me not to testify. She told me that the only way to get a not guilty verdict was to agree with her not to testify and to change the defense to reasonable doubt, because I didn't stand a chance with self-defense.

I still wanted to testify, but I reluctantly accepted her advice not to testify, because she was my lawyer and because, with her professional training, she supposedly knew better about these things; because there was only one weekend between Friday, March 14 and Monday, March 17 to make this decision, which forced a hasty decision; and because that short time period did not allow her, or me, the opportunity

2

to do any more legal research or factual investigation regarding how my case would look, or how it would develop, with the Oklahoma case admitted. Her advice directly caused me not to testify. Her advice was the sole reason why I did not testify.

I asked Ms. Levy to call as witnesses my sister, Halevchia Osborne and my girlfriend, Betsy Varela. Both Halevchia and Betsy would have testified that during the week prior to the shooting William Anderson, "T." Dandy, and two of their friends twice attacked me, and robbed and pistol-whipped me. Halevchia and Betsy would have testified that the beatings and robbery put both me and them in a state of great fear. I attach as exhibit A a true and accurate declaration about this, signed by Halevchia. I attach as exhibit B, a true and accurate copy of a declaration signed by Betsy.

I believe that their testimony would have assisted my defense of self-defense.

Ms. Levy decided not to call them as witnesses when she advised and caused the defense to be changed from self-defense to identity.

Then Ms. Levy told me that I could not possibly succeed with the defense of self-defense if I did not testify.

Ms. Levy told me that my only chance for acquittal was defending on the basis of reasonable doubt as to identity, and not testifying. She gave me this advice, even though four witnesses identified me as the shooter, and even though Ms. Levy believed that my stolen car report cast strong suspicion on me, and even though she had earlier told me that she thought an identity defense would fail.

Ms. Levy did not advise me that, if I did not testify, I risked waiving my right to challenge on appeal the trial judge's ruling on admission of the Oklahoma case.

Ms. Levy did not advise me that it would be foolish to change

3

defenses in midstream and rely upon a new theory of defense, incorrect identification, as to which there had been no investigation. Ms. Levy did not tell me that good investigation was needed to present such a defense. Ms. Levy did not advise me that successful misidentification defenses are almost always accompanied by good alibi testimony, none of which had been investigated or prepared here.

If I had been correctly advised on these points, I would have insisted on my right to testify, and I would have insisted that the defense remain self-defense (under the doctrine of transferred intent).

I declare under penalty of perjury the foregoing is true and correct, except as to allegations made on information and belief, and as to those, I believe them to be true.

Executed at Represa, California on _11 - 8 -_ , 2004.


_Ivan Kilgore_
IVAN KILGORE

4

EXHIBIT #2

## Affidavit

Counsel failed to call Halevchia Osborne, who is the defendant's sister and was present during both assaults and robberies against the defendant by the deceased, Jamario Hennen, T and an unknown assailant. Ms. Osborne would have testified to the fact that seven days before the shooting, the deceased attempted to commit an act of home invasion upon her moments before he robbed and assaulted the defendant. She would have testified because of that incident the defendant built a barricade on the apartment door and took to carrying a weapon (shotgun) because of his fears of being assaulted and robbed again before they could move out of the apartment. Ms. Osborne would have testified that five days later while her and Raymond Jones where in the living room of the defendant's apartment, that they heard the defendant yelling for help from down stairs to look and see the decease, Jamario Hennen, "T", and an unknown assailant pistol whipping the defendant (this was two days before the shooting incident). Ms. Osborne would have testified to the terror these assaults, robberies, and threats to kill the defendant and family caused her. Ms. Osborne would have testified that because of this terror, she would occasionally have someone escort her to the corner store and etc. due to the terrifying affect the assault the deceased perpetrated upon her and the defendant. *Miss Debra Leury did call me Halevkhia Osburne, but declined my writeup of Jestimony. To that I well agree* Halevkhia Osborne

5-12-03

I, [signature], declare that the anticipated trial testimony in which the defendant used to support his motion for new trial is a true statement acknowledged by me under the penalty of perjury.

5/12/03
Date

[signature]
Signature

EXHIBIT #3

## Affidavit

Counsel failed to call Betsy Varela, who was living with the defendant during the time frame and before this incident with the deceased. She would have testified to the facts that after defendant was assaulted and robbed by the deceased and his gang that she observed not only the defendants wounds from the assault but also the trauma. She would have testified that because of the traumatic state the defendant was in, the defendant built a barricade on the apartment door, took to carrying a weapon (shotgun) at all times (even sleeping with it on the best rest and carrying it in the car). She would have testified that the defendant would go as far as having a friend, sometimes Raymond Jones, guard her and the children with a shotgun when they (defendant too) would exit and return to the apartment building, day and night alike. She would have testified to the traumatic affect the situation had upon her and the defendant and their readiness to relocate so that the decease and gang wouldn't be able to act on the further threats to kill them, but before the family could move the decease and gang had attacked had attacked (twice in a seven day period) the defendant in another robbery by gunpoint.

I, Betsy Varela , declare that the anticipated trial testimony in which the defendant used to support his motion for new trial is a true statement acknowledged by me under the penalty of perjury.

5/1/2003

_Betsy Varela,_

Date

Signature

EXHIBIT #4

STEPHEN B. BEDRICK
Attorney at Law, SBN #058787
1970 Broadway, Suite 1200
Oakland, California 94612
(510) 452-1900

Attorney for Defendant and Appellant IVAN KILGORE

## IN THE COURT OF APPEAL

## FOR THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

### Division 5

|  |  |
|---|---|
| In re IVAN KILGORE | )<br>)<br>) Case # _____ |
| on habeas corpus | )<br>) (direct appeal pending in<br>) case no. A106142)<br>) |
| _____ / | **DECLARATION OF<br>ATTORNEY HAROLD<br>ROSENTHAL** |

I, Harold Rosenthal, being duly sworn, declare and state:

I am an attorney licensed to practice law in the State of California, and have been so licensed since 1976. I received my bachelor's degree from the University of Pennsylvania, and my Juris Doctor degree from Boalt Hall, the law school of the University of California at Berkeley.

I have practiced criminal law since 1976, when I served as a deputy public defender in Contra Costa County. I worked as a Deputy Public Defender in Contra Costa County until 1981, and tried approximately sixty felony and misdemeanor jury trials. I left the Public Defender's Office in

1981, when I became Co-Directing Attorney of the University of San Francisco Law School's Criminal Law Clinic. I continued in that position until 1983, when I began the private practice of criminal law, which I have continued until the present time. From 1984 until 1999 I taught the Criminal Trial Practice course at the Boalt Hall School of Law at the University of California at Berkeley. I have also taught trial advocacy for the National Institute for Trial Advocacy (NITA)

I am admitted to practice in the federal trial courts of the Northern, Eastern, Central and Southern Districts of California, and have tried jury trials in all of these districts, as well as in the District of Maryland and in Harris County, Texas. I have practiced in federal courts throughout the United States. I have tried murder cases, attempted murder cases, complex fraud cases, racketeering cases, drug cases, bank robbery cases, bank embezzlement cases, rape cases, riot cases, drunk driving cases, petty theft cases, pension fraud cases, malicious mischief cases, tax fraud cases, procurement fraud cases, and other types of cases as well. I estimate that I have tried well in excess of 100 cases to juries. I am named in the 2005 edition of the publication entitled The Best Lawyers in America in the section regarding criminal law, and was named by the California Lawyer in 2001 as one of the top ten criminal trial lawyers in the state. I am a member of the Criminal Justice Act Panel from which attorneys are appointed to represent indigent defendants in the United States District Court for the Northern District of California.

As mentioned above, I have taught trial advocacy and I am familiar with articles and text books discussing how to effectively try cases. I have also engaged in numerous discussions with colleagues regarding the trial of cases, and continue to do so on an ongoing basis. I am familiar with the standard of practice regarding the trial of murder and other cases.

I am familiar with the standard for ineffective assistance of counsel as stated in Strickland v. Washington (1984) 466 U.S. 668, and I base this declaration upon such a standard.

I have reviewed the following materials in this case: the Appellant's Opening Brief (AOB); the Respondent's Brief (RB); a close-to-final draft of Appellant's Reply Brief (ARB); a close-to-final draft of the habeas corpus petition; the transcript of the testimony of trial counsel Deborah Levy on the motion for new trial; and the transcript of Petitioner's testimony in his Oklahoma trial. I rely upon the facts as stated in the AOB and RB. I have not read any other portions of the transcript, because the 7.2 hours authorized by the Court for this expert review does not allow much time to read the transcript. On the basis of this review, it is my opinion as follows:

While all charges are serious and the trial of any case is important, the representation of a defendant in a murder case is regarded as particularly serious responsibility among criminal practitioners. There are no crimes more serious than murder. For many years almost no prisoners serving life top sentences for murder have received parole, and any life sentence, whether for first or second degree murder, is effectively a sentence of life without possibility of parole. Criminal practitioners therefore hold themselves to a high standard when assuming the grave responsibility of representing a defendant charged with murder.

Thus, the standard of practice, particularly in homicide cases, calls for defense counsel to ascertain prior to trial and to the greatest extent possible precisely what prosecution evidence s/he will be required to meet during the course of the trial. In order to affect this goal criminal practitioners are diligent in ensuring that the prosecution satisfies its statutory and constitutional discovery obligations prior to trial. Moreover,

wherever possible, reasonably competent defense counsel will seek to obtain resolution of evidentiary issues prior to the commencement of trial; this is done to eliminate uncertainty and promote intelligent strategic choices, and also to avoid the necessity of registering objections before the jury, which often create the impression that counsel is attempting to conceal the truth. In connection with these tasks reasonably competent counsel will utilize when necessary pretrial motions which are well written, adequately researched, and supported by persuasive authority.

In order to effectively try a case to a jury, it is critical that defense counsel have settled upon a theory of defense prior to the commencement of trial. To do so intelligently the defense must know what the prosecution case will be. While in rare instances this may not be possible, in most cases it is, in part because of California's discovery scheme. It is important to settle upon a defense because counsel will have no credibility before a jury if the jury cannot discern from the beginning of the trial that the defense has an interpretation of the facts to which counsel will adhere throughout the trial. If the jury detects uncertainty as to the defense version of the events which underlie the trial, they will conclude that the defense presented is related to maximizing chances of prevailing rather than conveying the truth as defendant knows it to be. Juries are first and foremost concerned with the truth. While a jury need not be convinced that a defense is true in order for a defendant to prevail, it must believe that the defense could be true. A jury will not entertain such a belief if it senses uncertainty on the part of the defense as to the facts of a case, or inconsistency in its approach.

Settling on a defense prior to the commencement of trial is likewise important because the defense to be used impacts the manner in which counsel will approach the various parts of the trial. For example, a decision to utilize the defense of self-defense will impact the questions counsel asks

on voir dire, because there may be some jurors who because of personal or religious beliefs will apply a stricter standard in that regard than the standard set forth in the instructions that ultimately will be given to the jury.

The defense chosen likewise impacts upon opening statement. Opening statement is an extremely important part of a criminal trial, perhaps even more important than final argument. Psychological studies demonstrate that notwithstanding instructions that jurors keep an open mind, people generally reach an initial decision early in a trial, and will usually adhere to that decision as the trial progresses. The cognitive principles of primacy and recency indicate that individuals generally retain what they hear first and last, and the opening statements are among the first things heard in a trial. Additionally, because the prosecution goes first, and because its presentation in a murder trial is typically lengthy, if the defense does not give an opening statement it may be many days or even weeks before the jury will be given the defendant's side of the story. For these reasons the standard of practice involves giving an opening statement whenever possible so as to provide the jurors from the outset with a cogent and powerful alternative to the prosecution's theory of the case. Of course, once an opening statement is given it cannot be taken back; this likewise underscores the importance of knowing to the greatest extent possible what the prosecution case will be before beginning the trial.

There are several ways in which defense counsel ascertains what the prosecution case will be. S/he does so through discovery, through pretrial investigation, and through securing, as mentioned above and to the extent possible, pretrial rulings through in limine motions regarding the evidence which the Court will admit.

Of the types of evidence it is important to possess pretrial, there may be none more critical than a defendant's prior statements, particularly those

statements made under oath. Because of the importance of these statements the entitlement to these statements iS clearly delineated in Penal Code Section 1054.1, the statute governing criminal discovery. Additionally, even before the enactment of Section 1054.1 precedent indicated that fundamental fairness – to my understanding, due process – dictates that such statements be provided to a criminal defendant. See, e.g., Cash v. Superior Court (1959) 53 Cal.2d 72, 75.

Finally, in any self defense case the testimony of a defendant is critical. Unless the prosecution introduces a defendant's exculpatory statement in its case, it is virtually impossible to raise this defense and to receive instructions from court on self defense if a defendant does not testify. Moreover, if a defendant does testify he must be prepared to deal with any prior statements s/he has made that are germane to his/her testimony. This further adds to the importance of possessing all prior statements by a defendant before the beginning of trial.

In Mr. Kilgore's case, it was apparent well before trial that the prosecution would attempt to introduce Mr. Kilgore's prior testimony given in the Oklahoma homicide trial which resulted in the equivalent of a conviction for involuntary manslaughter. Thus, the importance of this testimony was clear, and reasonably competent counsel would have obtained a copy of this testimony prior to trial. As mentioned above, it appears that counsel was entitled to discovery of this testimony under Penal Code Section 1054.1. Even if this were not the case, competent counsel would have made every effort to obtain this testimony and any other materials regarding the Oklahoma homicide through investigation. It is difficult to imagine that the trial court would not have made available funds for her to do so. Finally, competent counsel would attempt to secure a ruling pretrial regarding the admissibility of whatever evidence it was that

the prosecution sought to place before the jury regarding the Oklahoma homicide, because the court's decision in that regard would have multiple implications as to which defense would be raised and the manner in which that would be accomplished. Competent counsel would have urged the exclusion of this evidence because noncompliance with discovery requirements, and in the alternative sought a pretrial continuance to allow the defense to deal with this evidence. Additionally, competent counsel would have been prepared through investigation to introduce other evidence regarding the Oklahoma homicide which supported Mr. Kilgore's successfully asserted defense in that case.

Counsel here did none of these things. There is no indication that she ever sought to enforce the People's discovery obligations to furnish Mr. Kilgore's statement during the Oklahoma trial. She did not seek a continuance when the prosecution indicated it would attempt to use this evidence. She conducted no investigation regarding the Oklahoma prior. Her motion to prohibit use of the Oklahoma prior to impeach defendant was less than one page.[1] It did not cite any authority on its relevance under Evidence Code Sections 1101 et seq. - the primary basis for its proposed admission. It contained no discussion of the facts of the Oklahoma case. It is very distressing that such a pleading would be filed on a critical issue in a matter in which a defendant faced life in prison.

It is therefore my opinion that:

(1) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she failed to seek a continuance of trial until she possessed all statements of Mr. Kilgore which could be used during his trial. It is my opinion that her representation fell below the standards of the profession in

---

[1]The balance of the motion dealt with the issue of whether the prior constituted a strike for purposes of enhancing sentence.

this regard. In my opinion no reasonably competent counsel would assent to commencing a trial without these materials.

(2) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she failed to investigate the facts underlying the Oklahoma prior. It is my opinion that her representation fell below the standards of the profession in this regard. In my opinion no reasonably competent counsel would fail to have this investigation performed under these circumstances.

(3) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she failed to seek a continuance of trial until she had obtained a ruling on the question of whether the Oklahoma testimony would be admissible. It is my opinion that her representation fell below the standards of the profession in this regard. In my opinion no reasonably competent counsel would agree to commence trial without first attempting to secure a ruling on this issue or a continuance pending that ruling. To the extent that Ms. Levy did attempt to secure such a ruling, her motion was incomplete and very poorly executed, and written without having obtained the necessary factual information to make such a motion; it did not meet the minimum standards of the profession in regard to motions of this nature.

(4) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she abandoned the defense of self defense. Because of the nature of the alleged victim and the prior acts of violence perpetrated upon Mr. Kilgore, self defense was the best defense in this case. Advancing a defense other than self defense where a defendant has informed counsel that he acted in self defense is ethically questionable. Here it was not reasonable to advance an identification defense because the evidence of identity was so strong; according to her testimony at the motion for new trial, trial counsel recognized this prior to trial. Even if counsel exercised a

reasonable strategic choice to pursue an identity defense (or, as she puts it, "a reasonable doubt defense," the nature of which is unclear), that choice should have been made before trial and after securing a pretrial in limine ruling, rather than during trial. It also should have been made only after a full factual investigation of the Oklahoma prior. An attorney is required to undertake reasonable investigations before making strategic choices, and it is my opinion that her representation fell below the standards of the profession in this regard. In my opinion no reasonably competent counsel would under these circumstances abandon a defense well into the trial and invoke a new and different defense.

(5) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she advised and caused petitioner not to testify. The only viable defense was self-defense. Thai is true irrespective of the Oklahoma prior. To the extent that the Oklahoma prior was a problem counsel should have been prepared to meet that evidence as defendant successfully had met that evidence in Oklahoma. Before advising Appellant not to testify she should have investigated the Oklahoma prior and obtained the prosecution evidence in that matter. Petitioner should have testified. It is my opinion that her representation fell below the standards of the profession in this regard. No reasonably competent counsel would have advised defendant not to testify under these circumstances.

(6) Trial counsel Deborah Levy rendered ineffective assistance of counsel when she failed to call Petitioner's sister and girlfriend to support the defense of self defense. It is my opinion that her representation fell below the standards of the profession in this regard. No reasonably competent counsel would have declined to call them.

Although there are other allegations of ineffective assistance in the briefs, I was unable to form an opinion about these allegations because of the limited time allotted to me.

I declare under penalty of perjury the foregoing is true and correct, except as to allegations made on information and belief, and as to those, I believe them to be true.

Executed this 27 day of May, 2005 at San Francisco California.

HAROLD J. ROSENTHAL

**EXHIBIT # (3)**

Robert D. Lawrence, M.D.
Forensic Consultant                              March 26, 2007
2291 W. March Lane, Suite 179 E.
Stockton, CA 95207

Dear Mr. Lawrence,

I'm writing you with regard to a report you did in October
21, 2002 for attorney Deborah L. Levy; RE: People of the State
of California V. Ivan Kilgore, Alameda County Superior Court-
Oakland #141033.

Recently, I reviewed the report you made and I noted in the
"Materials Received and Reviewed" you received a (1) page cover
letter from Ms. Levy dated June 5, 2002. I hope you have this
material still on file, for I would like a copy of that letter.
Reason for the request is your conclusions lead me to believe
you where not provided specific information with regards to
modifications ( a choke) on the firearm. Givin the signifience of
a choke and it's purpose on a shotgun, I believe that your opinion
would    significally change. Thus you would not be in agreement
with Dr. Herrmann, that the distance of this particular shot was
within 5 to 8 feet due to the indication the tight spread pattern
of 00 buck presented on the wound.

I also noted in the materials you reviewed that you did not
receive the decease's clothing or any pictures of the clothing or
alleged crime scene photos. These materials were relevant to de-
termine if the decease had moved after being shot. See the quest-
ion was or should not have been,could the decease walk after be_
ing shoot but the question Ms. Levy should have asked you is:

Is it possible that the decease could run a distance of 13 to 18 feet and no blood trail or significant amount of blood be present on his clothing from such a gunshot wound?

A witness testified that the decease was sitting on the fire hydrant, it sets on the coner( See technician diagram and photo-graph of alleged crime scene), he then "ran" over to the area in front of the phone both(13 to 18 ft) and collasped, after be-ing shot.

My theory is, had this accured there would be physical evid-ence to corroborate the testimony. Keep in mind, Dr, Herrman testified that there was a great deal of hemorrhage associated with the injuries. Yet there was not a large amount of blood pre-sent on the clothing, nor was there a blood trail to indicate he indeed had moved after beening shot.          .

If you give credence to the witnesses testimony would not there be a significant amount of blood present on the deceases chothing due to the extent of the wound, the vertical position, the cardiac function at this level of activity "running" would cause the wound to bleed profusely? Yet the lack of this evid-ence seems to indicate that the deceased collasped immediately ounce shot?

Dr. Lawrence, in light of the facts I have discussed in this letter, Provided information you did not have before, would these factors and information change your opinion in agreeing with Dr. Herrmann's opinion as to the distance the shot was fired and give discredence to the witnesses testimony?

If you can be of assistance please inform me of the material and ect. you need to review to compose a comprehensive report. Also, I request that you inform me of the associated cost for your services. Thank You.

Sincerely Yours,


IVAN KILGORE V31306
CSP-SACRAMENTO
PO BOX 2990066
REPRESA, CA 95671



00- 064017

N

16JUL00
MURDER 187PC
ANDERSON, WILLIAM
3000 BLK SAN PABLO AVE
T. VIGLIENZONE 5401P
NOT TO SCALE

Ⓐ PHONE BOOTH



This is a summary mapping of all four witnesses testimony concerning the location of car-shoot at time of ~~the~~ firing fatal shot at deceased and the distance shot would've to travel to strike him according to where witnesses claim him to be positioned, ~~of~~or at least the general area.

16 JUL 00
MURDER 187 PC
ANDERSON, WILLIAM
3000 BLK SAN PABLO AVE
T. VIGLIENZONE 7401P
NOT TO SCALE

Ⓐ PHONE BOOTH

#1) Distance shot would've traveled to strike deceased according to BM testimony.

#2) Distance shot would've traveled to strike deceased according to T. Dandy testimony (Also see map map by I/0s)

#3) Distance shot would've traveled to strike deceased according to S. Anderson,

(#4#) Raymond Jones . . .

*Exhibit # D*

# FCMG INC.

**FORENSIC CONSULTANTS' MEDICAL GROUP, INC.**
2291 W. March Lane, Suite 179 E Stockton, California 95207
(209) 477-4432 Fax 477-8730

*A E to inquire
into questions asked
by A on back of
this report. Also
A E to present
info helpful to
defense.*

October 21, 2002

Deborah L. Levy
Attorney at Law
360 Grand Avenue #197
Oakland, California 94610

### Re: People of the State of California v. Ivan Kilgore
### Alameda County Superior Court - Oakland #141033

Dear Ms. Levy:

This letter constitutes my brief report in the above captioned case.

### Materials Received and Reviewed:

~~1 page        Cover letter from Deborah L. Levy dated June 6, 2002~~
~~25 pages       Autopsy report/Technician report~~
~~10 pages       Coroner's testimony at preliminary hearing~~

*There's no info.
provided from Highlan
Hospital as requested
by A*

### Event:

The victim was shot during a drive-by shooting. He collapsed at the scene, was transported and underwent emergency thoracotomy. The shooting was at 1747 and he was pronounced dead at 1835, approximately 53 minutes after the shooting.

### Autopsy Results:

Autopsy by Dr. Herrmann. The subject is a 21-year-old Negro male, 6'1" tall, 165 pounds. There were shotgun pellet wounds consistent with 00 buckshot involving the upper abdomen and lower chest. ~~There were perforations of the left lung, liver, stomach, pancreas, abdominal aorta, left kidney, and soft tissues of back as well as thoracic spine.~~     *# 1*

Two of the pellets penetrated the vertebral body and were recovered there. One pellet passed on    *# 2*
either side of the vertebral column, exiting the back. Thus, it would appear that none of the

Robert D. Lawrence, M.D.        Jennifer J. Ruion, M.D.

Deborah L. Levy
People of the State of California v. Ivan Kilgore
Page Two

pellets perforated the spinal cord. ~~The spinal cord is not specifically mentioned as having been examined, however.~~    # 3 →

There were eleven entry wounds in the upper abdomen and lower chest, and two exit wounds in the back. Nine pellets were recovered. There were extensive lacerations of the aorta and liver, as well as injuries to the above mentioned organs. There was also a wad abrasion on the abdomen.    # 4 →

**Toxicology Results:**
~~Negative.~~    *There was no testing for weed or MDA (ecstasy)*    # 5 →

**Testimony of Dr. Herrmann:**
There were ~~eleven~~ entrance wounds and a wad abrasion.

There was no injury of the heart.

The direction was front to back. He cannot determine right, left, up, or down.

A wad mark is possible with ranges of 20 feet or less.

He feels that the range in this case is 5-8 feet (I agree).    *why wmy*    # 6 →

He feels that the victim could talk after the shooting.

He also states that the victim would not necessarily collapse immediately, and could possibly move about.

**Opinions:**
1. The subject would be able to talk after the shooting.

2. The subject could take a few steps after the shooting, and there is no medical reason to prevent this.    # 7 →

3. The subject could also collapse immediately.

4. In any case, the subject would be unconscious from shock within a few minutes of the shooting due to the massive injury of the aorta and liver.

**Summary:**
This is a 21-year-old Negro male who was shot at close range with 00 buckshot during a drive-by shooting. There were massive injuries of the liver and aorta, as well as perforations of the lung, stomach, and pancreas. Two pellets lodged in the ~~thoracic~~ spine and two pellets passed on either    # 8 →

Deborah L. Levy
People of the State of California v. Ivan Kilgore
Page Three

~~side of the spine exiting the back.~~  ~~There is no indication that the spinal cord itself was struck.~~
With such a gunshot wound, it would be possible for the victim to talk after the shooting, as well
as take a few steps. ~~It is also possible that the victim would immediately collapse. In any case,~~
~~the victim would be unconscious in shock within a few minutes of the shooting.~~

This constitutes my report in this case.  Please call or write should you have additional
information, questions, or comments.

Sincerely yours,

Robert D. Lawrence, M.D.

RDL:kl

**EXHIBIT #(4)**

COPY

Filed 8/30/06

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

**FILED**
Court of Appeal-First App. Dist.

AUG 3 0 2006

DIANA HERBERT
BY _____
DEPUTY

**THE PEOPLE,**

    **Plaintiff and Respondent,**

    **v.**

**IVAN KILGORE,**

    **Defendant and Appellant.**

A106142

**(Alameda County
Super. Ct. No. 141033)**

      Ivan Kilgore appeals from a judgment of conviction and sentence entered after a jury found him guilty of first degree murder in a drive-by shooting. Kilgore contends: (1) the trial court erred when it ruled that, if Kilgore testified, the prosecution could cross-examine him on his testimony in another case; (2) the court erred in failing to instruct the jury on "second degree drive-by murder"; (3) the jury should have been instructed that the doctrine of transferred intent applied to his self-defense claim; (4) the court improperly precluded him from introducing evidence of the character of his victim and a prosecution witness; and (5) his trial counsel rendered ineffective assistance of counsel. We will affirm the judgment.

### I. FACTS AND PROCEDURAL HISTORY

      An information charged Kilgore with the murder of William Anderson (Pen. Code, § 187)[1] and alleged the special circumstance that he committed the murder by shooting from inside a vehicle with the intent to kill (§ 190.2, subd. (a)(21)). As a

---

[1]    Except where otherwise indicated, all statutory references are to the Penal Code.

1

sentence enhancement, it was further alleged that Kilgore discharged a firearm causing
death. (§ 12022.53, subd. (d).) A 1997 Oklahoma conviction for manslaughter was
alleged as a serious felony prior offense (§ 667, subd. (a)) and as a strike (§ 1170.12).

A. PROSECUTION CASE

At approximately 5:45 p.m. on July 16, 2000, William Anderson (William) was
shot to death while standing on the corner of San Pablo Avenue and 30th Street in
Oakland. An autopsy determined that he was killed by a shotgun blast to the chest and
abdomen, with 11 penetrating wounds. The ammunition was buckshot, fired from a
distance of about 8 to 12 feet. Police found no casings, slugs, strike marks, or other
evidence of any other gun being fired at the scene.

1. Eye-Witness Shanae Anderson's Testimony

William's cousin, Shanae Anderson, described the circumstances of the shooting.

On July 16, 2000, Shanae and her boyfriend Terry Dandy, as well as William's
girlfriend Bianca Moore, were visiting William at his parents' house on 30th Street in
Oakland. Around 5:00 p.m., Shanae and Bianca went to a pay telephone at 30th Street
and San Pablo Avenue; William and Terry joined them shortly thereafter. None of them
had a weapon, and Shanae had never seen William or Terry involved in violence or
illegal behavior. As Shanae talked on the pay telephone, she heard William say, "There
is that punk ass nigga right there." William and Terry were laughing.

Shanae then heard a "bang" and thought it was a car backfire. She turned around
and saw a man pointing a gun out of the rear window of a gray Cadillac. Shanae stood
there as Bianca and Terry ran. William said "I'm shot" and fell to the sidewalk.

Shanae noticed three people in the Cadillac: the driver, a front-seat passenger, and
the man in the back seat with the gun. She did not see the face of the driver or front
passenger, but identified Kilgore as the man in the back seat. She specifically
remembered his eyes and brown complexion.

The Cadillac made a U-turn and pulled up to the curb, where Shanae was standing
and William remained on the ground. Kilgore, still in the back seat, switched to the other

2

side of the car and pointed the gun at William. William continued saying, "I'm hit. I'm shot." The Cadillac drove off.

When speaking with the police about the incident, Shanae identified Terry incorrectly as "Richard Davis." Bianca had told her to give a false name, Shanae explained at trial, because Bianca thought Terry had a warrant out for his arrest. For the same reason, Shanae said Terry was 5'8" when he is really 6'3."

Shanae's trial testimony differed in a few details from the account she gave to police on the day of the shooting. She did not tell the police that Terry said something to the effect of "There is that punk ass nigga," claiming instead that he said only, "Oh shit." Although Shanae stated at trial that she remembered Kilgore's eyes, she did not mention his eyes to the police. Furthermore, while she told the police the shooter had a "brown" complexion, she acknowledged at trial that Kilgore's complexion was lighter than "brown."

### 2. Eye-Witness Bianca Moore's Testimony

William's girlfriend Bianca testified that she had never seen William or Terry engage in violent behavior. William told her in June 2000 that Kilgore owed him money, but he did not appear upset about it. In early July 2000, he said that he and a friend had tried to collect the money from Kilgore, and Kilgore and the friend got into a fight. He did not seem upset about this incident either.

Bianca's recollection of the shooting was much the same as Shanae's. Late in the afternoon on July 16, 2000, Bianca recounted, she and Shanae walked from the Andersons' house to the pay telephone at 30th Street and San Pablo Avenue to make a telephone call. William and Terry met them there shortly thereafter. William pointed at a gray Cadillac passing by and nonchalantly said, "There go that N-I-G-G-A Ivan." The Cadillac, having stopped, made a U-turn and went off the way it came. About 15-20 minutes later, the Cadillac returned. Terry said, "he got a gun," and Bianca turned to look. As the Cadillac passed, William pushed her, and she heard a single gunshot. William was shot.

3

The Cadillac turned around and pulled up next to Bianca. She saw a man—Kilgore—with a gun in the back seat. When Kilgore pointed the gun at her, she began to pray and told Kilgore, "I got a son to live for." The Cadillac drove off. William was lying on the ground, saying he had been shot. She had not seen either William or Terry with a weapon.

Bianca was scared and did not want to talk to the police. When she spoke to them, she did not say that she had seen Kilgore shoot William, or that William or Terry had said, "There go that nigga, Ivan." When asked about Terry, she misidentified him as Richard Davis, at his request. Not wanting to be a witness at a trial, Bianca told police that she was unsure whether she could identify the shooter because the windows in the back of the Cadillac were tinted and the rear window was down only half way.[2]

### 3. Testimony of Investigating Officer Green

Oakland Police Sergeant Phil Green arrived at the scene about two hours after the shooting. Although there were references over the 911 communication system to "shots" being fired, and another officer at the scene said there had been one or two shots, Sergeant Green found no strike marks or other evidence suggesting that more than one shot had been fired.

Sergeant Green interviewed Shanae, Bianca, and Terry. Each of them gave the officer a false identification for Terry. Shanae was cooperative but very anxious to terminate the interview. She did not tell Sergeant Green that there was anything distinct about the shooter's eyes. Bianca was distraught and, in Green's estimation, "didn't appear to be too thrilled to be down at [his] office." She was unsure whether she could identify the shooter and did not offer that William had named Kilgore as the man in the back seat of the Cadillac. Terry told Sergeant Green that he heard two shots.

---

[2]     Kilgore contends that, at the preliminary hearing, Bianca said she did not get a good look at the shooter because her mind "went blank." In fact, when asked whether she got a good look at the shooter, Bianca responded "yes and no," explaining that she was able to see "the whole top part" of the person.

4

After considering the witnesses' statements—and learning that Kilgore had called the police minutes after the shooting to report his 1985 Cadillac stolen—Sergeant Green concluded that Kilgore was a suspect. When police searched Kilgore's apartment later that evening, he was not there.

A confidential informant advised police that the Cadillac's getaway driver was Raymond Jones. Sergeant Green arrested Jones for murder the next morning. Jones eventually admitted driving the car used in the shooting and implicated Kilgore. Sergeant Green later received a phone call disclosing the location of car, which showed no sign of forced entry or having been struck by bullets.

Three months after the shooting, Kilgore surrendered to Sergeant Green.

4. Testimony of Getaway Driver Raymond Jones

Jones testified at trial as part of a plea agreement, which provided that in exchange for truthful testimony Jones would plead guilty to being an accessory to murder after the fact (§ 32) and could serve up to one year in county jail.[3] At trial, Jones also acknowledged that he had previously been convicted of misdemeanor possession of stolen property and, at the time of the shooting, was using heroin about twice a week.

In December 1999, Jones recalled, he lived next door to Kilgore in an apartment building at 509 Sycamore Street in Oakland. Kilgore worked as a manager for the building, fixing things, cleaning, and collecting rent. Kilgore drove a Cadillac.

In early 2000, Jones met William, who appeared at the apartment building at times with Terry, also known as "T." Jones never saw William or Terry engage in illegal or violent behavior, or have any weapon. In the spring of 2000, however, Kilgore told Jones that William and Terry had attacked him twice within a month. On one of those occasions, they robbed him. The other time, they "jumped" him and beat him up. On the day of the latter assault, Jones recounted, he heard Kilgore calling for help and, looking

---

[3]     To the extent Kilgore requests that we take judicial notice of the Alameda County Superior Court file in Jones's case, he has not complied with applicable rules and the request is denied.

5

out his window, saw William and Terry running away. The next day, Jones saw that Kilgore had a black eye. Jones gave Kilgore a baseball bat to put in his car for protection, but he never heard Kilgore say anything about getting a gun or doing anything violent to William or Terry.

On the day of the shooting, Jones and a man named "Sic" helped Kilgore clean up part of the Sycamore apartment building. Jones had already consumed a "tall can of beer," and he and Kilgore split a 40-ounce beer while they worked. Jones had also smoked a "blunt" and might have snorted heroin that day but, nonetheless, professed to be "sober."

In the afternoon, Kilgore and Sic went to Home Depot to buy cleaning supplies. When they returned about 10 or 15 minutes later without the supplies, Kilgore said he had seen the guys with whom he was "having problems." He asked Jones to "ride with him," leading Jones to think that Kilgore wanted to fight William and Terry.

Jones drove Kilgore's Cadillac, at Kilgore's instruction, with Sic in the front-passenger seat and Kilgore in the back. Kilgore directed Jones to drive to San Pablo Avenue, and then north towards Berkeley. As they approached the corner of San Pablo Avenue and 30th Street, Kilgore said, "There they go." Jones observed a group of "guys and girls" standing on the corner and pulled the car up to the curb. He believed Kilgore was going to fight "the guy" (ostensibly William) one on one. Then Kilgore said something like, "What's up, now? What's up, punk?" and Jones heard a gunshot from the rear seat. He looked toward the back seat and saw Kilgore with a gun. Jones was shocked. He had not seen the people on the street display a weapon or do anything before Kilgore fired the gun. On cross-examination, he "guess[ed]" that it was "possible" that a second shot was fired when Kilgore fired his shotgun because Kilgore's discharge of the gun in the backseat had made such a loud noise.

Jones made a U-turn and observed someone lying on the ground. He did not see anyone, other than Kilgore, with a gun and thought that Kilgore had "just shot somebody on a drive-by." Jones drove quickly back to the Sycamore apartment building and returned to his apartment, without discussing the incident with Kilgore.

6

Within 24 hours of the shooting, Jones obtained a gun for his own protection, afraid of retaliation from William and Terry's "people" and believing Terry and his friends might have guns. After seeing a wooden barricade Kilgore had put on his door, Jones put up a barricade on his own door as well. Sometime later that day, he saw Terry drive by his building on Sycamore Street.

Jones told Matthew Bryant that Kilgore shot William.

5. Matthew Bryant's Testimony

Bryant, previously convicted of narcotics possession and grand theft, was in jail in April 2001 after being arrested for the theft of his girlfriend's car. With the hope of getting out of jail, he contacted Sergeant Green and claimed to have information regarding a July 16, 2000 homicide. In a taped interview, Bryant advised Sergeant Green that he had met Kilgore, whom he knew as "Gill," through Jones.

Bryant recalled at trial that Kilgore told him that "a few people jumped on him." He professed, however, not to remember any further substance of his interview with Sergeant Green. The court then permitted the prosecutor, to play an audiotape of the interview.

As recorded by the audiotape, Bryant explained to Sergeant Green that "Giz [Kilgore] had just got jumped on and got some weed took from him." Before the shooting, Bryant added, Kilgore had said he was going to "smoke" the people who had "jumped" and robbed him. A few weeks after the murder, Jones told Bryant that Kilgore had shot somebody while Jones was driving Kilgore's Cadillac. Kilgore told Bryant the same thing, explaining that he had fired a 12-gauge shotgun one time, hitting William.

Bryant also stated in the interview that Kilgore had offered him $500 to retrieve a shotgun Kilgore had hidden in the "balcony" area (attic) of the Sycamore apartments. Bryant tried to crawl through a cubbyhole into the attic, but he was too big. In addition, Kilgore asked Bryant to break the ignition in his automobile to make it look like the car had been stolen, but Kilgore did not take him to the car.

Bryant asserted at trial that the statements he made to Sergeant Green implicating Kilgore were lies and that he made the statements to get out of jail on the automobile

7

theft charge. In fact, after implicating Kilgore, Bryant was released from jail and not charged with that particular car theft. Bryant maintained that Kilgore had not said anything to him about the shooting or retrieving a gun and that the things he told Sergeant Green about the shooting he had heard from Jones or on "the street."

### 6. Officer Miller's Testimony

Oakland Police Officer Allan Miller testified that he was able to gain access to the attic at 509 Sycamore Street. At 6' tall and weighing 180 pounds, he had to take off his gun belt to fit through the opening. He did not find a gun in the attic.

### B. DEFENSE CASE

Before the prosecution rested its case, the trial court ruled that, if Kilgore testified, he could be cross-examined on his testimony in the 1997 Oklahoma homicide case in which he was convicted of manslaughter. Thereafter, the defense called several witnesses, but Kilgore did not testify.

### 1. Testimony of Character Witness Kevin Tomlinsonn

Kevin Tomlinsonn testified that he was the owner of the apartment building at 509 Sycamore Street, where Kilgore lived. Tomlinsonn met Kilgore when Kilgore was working for his contractor, who was renovating the building. Kilgore became a tenant and also performed small jobs in the building. Tomlinsonn viewed Kilgore as reliable and trustworthy.

Tomlinsonn also knew William, because William's parents had rented an apartment in the building and, although Tomlinsonn expected the parents to move in, William moved in instead. Jones was a tenant as well.

Kilgore told Tomlinsonn at some point that he had been robbed and assaulted. Tomlinsonn observed small cuts and bruises on Kilgore's face, and a couple of weeks later, Kilgore had a "good-sized" black eye. Some time after these assaults, Kilgore built a barricade on his door.

### 2. Testimony of Witness Mary Loggins

Mary Loggins recounted that, as she was driving on San Pablo Avenue on July 16 at 5:45 p.m., she heard a gunshot and observed a man fall near the phone booth. While

8

she continued driving, she looked in her rear view mirror and saw someone wearing a puffy jacket and dark clothes running in the street. She did not see him holding a gun or other weapon, although he might have had something under his jacket, since he was holding his arms close to his body while running. Loggins also observed a gray Cadillac leave the scene and speed around the corner. When Loggins turned her car around, she saw two women standing next to the fallen body.

### 3. Testimony of Witness Mary Washington

Mary Washington was riding in the front passenger seat of Mary Loggins's car. She heard several "bangs," looked in the car's rear view mirror, and saw a man on the ground and the people around him running away. An older gray Cadillac or Buick proceeded north on San Pablo Avenue, turned around, and sped away south.

### 4. Defense Investigator Monte Beers' Testimony

Monte Beers, a defense investigator, interviewed Bianca. During the interview, she claimed that William had been in three fights with Kilgore. Although she could not identify anybody in the Cadillac, she was sure it was Kilgore's car. In addition, Bianca asserted, the shooter's weapon appeared to be a sawed-off shotgun.

### C. VERDICT, NEW TRIAL MOTION, AND SENTENCE

The jury convicted Kilgore of first degree murder and found true the drive-by special circumstance and the firearm enhancement.

Kilgore filed a posttrial *Marsden* motion, seeking new counsel. The court relieved trial counsel and appointed another attorney to represent Kilgore in regard to a motion for a new trial based on allegations of ineffective assistance of counsel. After an evidentiary hearing in which trial counsel and Kilgore both testified, the court denied the new trial motion.

Kilgore was sentenced to life without the possibility of parole. The term on the enhancement for use of a firearm was stayed.

This appeal followed.

9

## II. DISCUSSION

As mentioned, Kilgore contends the trial court erred in (1) ruling that, if Kilgore testified, the prosecution could cross-examine him on his testimony in his Oklahoma manslaughter case; (2) failing to instruct the jury on second degree drive-by murder; (3) failing to instruct the jury that the doctrine of transferred intent applied to self-defense; and (4) barring Kilgore from introducing bad character evidence regarding William and Terry. In addition, Kilgore urges that he did not receive effective assistance at trial and that the cumulative effect of the purported errors compels reversal.

### A. ADMISSIBILITY OF KILGORE'S TESTIMONY IN THE OKLAHOMA CASE

Kilgore argues that the trial court erred when it denied his motion to exclude evidence of his Oklahoma manslaughter case, and particularly in ruling that he could be cross-examined with his Oklahoma testimony if he testified in the instant case. We first summarize his Oklahoma testimony and his motion to exclude the evidence, and then consider the arguments of the parties on appeal.

#### 1. Kilgore's Oklahoma Trial Testimony

Kilgore was convicted of manslaughter in 1997 in Oklahoma. He testified at the Oklahoma trial about the circumstances of the shooting, contending he shot his victim in self-defense.

Specifically, Kilgore explained, he had owned a "semi-automatic Tec-22, a semi-automatic 45, and semi-automatic nine millimeter Tec," two of which had been stolen from his home. (The third gun was not stolen because he carried it in the trunk of his car.) When he confronted a man named Bryant Jones (Jones) about the stolen guns, Jones admitted that he had one of them and told Kilgore to accompany him to a friend's house. As Kilgore entered the porch of the house—armed with his semi-automatic Tec-9 and a 20-round magazine—Jones came "busting out of the ho[use] in some kind of panic," claimed he did not have Kilgore's gun, and left the scene. Kilgore went inside, where he encountered Conan Emery, sitting in a chair and "looking at me like he had some kind of grudge against" Kilgore. Kilgore claimed he was scared of Emery, a gang leader, because of his violent history. He nevertheless asked Emery about his stolen

10

guns, to which Emery responded that he would let Kilgore's "ass have it" if his inquiries persisted. When Emery made a motion towards his waistband, Kilgore, thinking Emery had a gun, pulled out his Tec-9 and fatally shot him.

After being arrested for the homicide, Kilgore wrote a letter to a friend, claiming that the woman who owned the house where Emery was shot had removed a gun from Emery's body. The letter stated, "In order for me to get off she's going to have [to] tell the police she moved [Conan's] gun." Kilgore also wrote that he might need to have "Blunt, Yogie, Sidlo and Pic" say that Emery "had a gun." According to Kilgore, he would have a strong case of self-defense "if we can get these statements out of people."

On cross-examination in the Oklahoma case, Kilgore acknowledged that he "ran around" with the Eight Trey Crips gang as a juvenile but denied being an actual gang member. He maintained that all of his friends who identified him as a Crips member were lying. He denied telling friends that he was going to kill the people who had stolen his guns. He acknowledged that, after killing Emery, he had not informed the police about the shooting.

2. <u>Motion to Exclude Evidence of the Oklahoma Conviction</u>

At trial in the present action, defense counsel moved to exclude any reference to Kilgore's prior Oklahoma homicide conviction, which Kilgore contends was roughly equivalent to an involuntary manslaughter conviction in California. (Respondent does not dispute this assertion.) The prosecutor opposed the motion, asserting that the evidence was admissible under Evidence Code section 1101 and the "doctrine of chances," with respect to Kilgore's claim that he shot William in self-defense.

The trial court denied Kilgore's motion, finding that his testimony in the Oklahoma case showed that he had offered a similar explanation for the death of his Oklahoma victim as he offered in this case, and the "occurrences [were] unusual enough with their repetition" to suggest his self-defense explanation was not believable. Kilgore insists this was error.

11

### 3. Forfeiture

Before turning to the merits of the trial court's ruling, respondent contends that Kilgore is barred from challenging the ruling because he did not testify at the trial in this case. For this proposition he refers us to *People v. Collins* (1986) 42 Cal.3d 378 (*Collins*), which held that a defendant must testify in order to preserve a claim of improper impeachment with a prior felony conviction. (*Id.* at pp. 383-389.) Without the defendant's testimony, the court in *Collins* observed, an appellate court cannot review the trial court's balancing of probative value and undue prejudice. In addition, consideration of the harm caused by the trial court's ruling is speculative, such that the prejudicial effect of the purported error is difficult to determine. (*Id.* at pp. 384, 393.)

*Collins* was decided in a different factual context. The matter before us does not involve impeachment with a prior felony conviction, but, rather, evidence admitted to show Kilgore's mental state as relevant to his claim of self-defense. Respondent argues that *Collins* should nevertheless apply because, like the defendant in *Collins*, Kilgore placed his credibility before the jury and should not be allowed to present himself in a false light. Kilgore counters that *Collins* is inapplicable because in this case: the proffered evidence included facts and testimony from the prior case, not just the conviction itself; the conviction itself is inadmissible, because the crime is not one of moral turpitude; and impeachment with such testimony is not constitutionally required pursuant to California Constitution article I, section 28, subdivision (f), as it was in *Collins*. Furthermore, he contends that the reasoning underlying *Collins*—that an appellate court cannot fairly be asked to weigh prejudice against probative value if the defendant's testimony is unknown—is not at issue here because Kilgore presented a pretrial offer of proof as to the content of his proposed testimony and testified under oath on the motion for new trial. Neither party cites a decision directly on point.

We need not decide whether *Collins* applies to this case involving evidence admitted under Evidence Code section 1101. Even if *Collins* applied, Kilgore provided to the trial court his proposed testimony by an offer of proof, which our Supreme Court has suggested may preserve the challenge. (*Collins, supra*, 42 Cal.3d at p. 393.)

12

Moreover, because we conclude *post* that the court did not err in ruling the Oklahoma testimony admissible, we need not determine if Kilgore forfeited his right to challenge it.

4. Admissibility

As a general matter, evidence of a defendant's character or criminal propensity, as shown by his past conduct, is inadmissible to prove he acted in conformity with that character or propensity on another occasion. (Evid. Code, § 1101, subd. (a).) Evidence of a defendant's prior bad act may be admissible, however, if relevant to prove another material fact, such as motive, intent, plan, knowledge, identity, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).)

The trial court found it was a "close call" whether the Oklahoma incident was sufficiently similar to the shooting of William to render Kilgore's Oklahoma testimony admissible under Evidence Code section 1101, subdivision (b), for purposes of proving his state of mind in regard to his self-defense claim. It ultimately concluded that the evidence was admissible under the doctrine of chances, because he offered an explanation for the death of his Oklahoma victim that was similar to the explanation he offered in this case, and the repetition of the occurrences suggested his self-defense explanation was not believable.

Kilgore claims the doctrine of chances is merely another way of stating that a prior crime was sufficiently similar to the charged crime to be admissible for purposes of proving intent under Evidence Code section 1101, subdivision (b), so the court's ruling that the Oklahoma homicide was not sufficiently similar to be admitted under Evidence Code section 1101 rendered it inadmissible under the doctrine of chances as well. In making this argument, Kilgore misrepresents the trial court's ruling.[4] In any event,

---

[4]     The trial court did not find that the Oklahoma homicide was *insufficiently similar* for admission under Evidence Code section 1101, observing only that it was a close call. It is true the court remarked that the issue of general intent was not *at issue*, but Kilgore misrepresents the court's concern to make it seem as if the trial judge believed there was no issue of "intent" within the meaning of Evidence Code section 1101. He quotes the trial court as ruling: "it doesn't appear that there is an issue concerning the general intent that the act was performed with, in other words, he meant to fire the gun and he fired the

13

whether characterized as a ruling under Evidence Code section 1101, subdivision (b), or the doctrine of chances, the trial court did not abuse its discretion in concluding that the Oklahoma evidence was admissible. (See *People v. Kipp* (1998) 18 Cal.4th 349, 369 [admission of other crimes evidence reviewed for abuse of discretion].)

As mentioned, under Evidence Code section 1101, evidence of other crimes may be admitted to show identity, common design or plan, or intent, if the other crime was sufficiently similar to the charged crime. While the other crimes must be highly similar to the charged offenses to be admitted on the issue of identity, a lesser degree of similarity is required for admission as to common design or plan, and the least degree of similarity is needed for admission on the issue of intent. In the last instance, the other crimes need only be sufficiently similar to the charged offenses to support the inference that the defendant probably harbored the same intent in each instance. (*People v. Lewis* (2001) 25 Cal.4th 610, 636-637; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

In the matter before us, the circumstances of the Oklahoma homicide and William's shooting were sufficiently similar to warrant admission of Kilgore's Oklahoma testimony under Evidence Code section 1101, subdivision (b). In both the Oklahoma case and the instant case, Kilgore claimed to have killed his victims in self-defense. In both cases, he shot at close range an unarmed victim with whom he had a dispute. In both cases, he had threatened to harm those who had wronged him. In both cases, he carried a gun to the scene, yet claimed that he discharged the weapon only because he thought he was about to be shot, either because his victim was pulling out a gun or had

---

gun . . . ." But the complete sentence, which Kilgore quotes only partially, reads as follows: "As I indicated, this does not appear, given [defense counsel's] offer of proof as of today that there is an issue concerning identity of the shooter, and it doesn't appear there is an issue concerning the general intent that the act was performed with, in other words, he meant to fire the gun and he fired the gun, *the issue is about mental state and the existence or non-existence of the element of self-defense and the existence or non-existence of an honest but unreasonable belief of a need to defend oneself against imminent peril to life or great bodily injury*." (Italics added.) From the portion of the judge's statement that Kilgore omits, it is clear that the court thought the Oklahoma testimony, though not germane to *general* intent, *was* relevant to Kilgore's state of mind.

14

actually fired. In both instances, Kilgore suffered no harm, while his victims were killed. The Oklahoma evidence suggests his self-defense theory may have been a fabrication. His claim of self-defense in the prior case was therefore probative of the legitimacy of his purported belief in this case of the need to defend himself.

The doctrine of chances obtains the same result in a slightly different way. In essence, the doctrine of chances maintains that with each repetition of an act under similar circumstances, the more reasonable it is to conclude the act was intended and premeditated. (*People v. Steele* (2002) 27 Cal.4th 1230, 1243 [evidence of prior murder admissible to show intent in charged murder in light of the doctrine of chances].) As applied here, the fact that Kilgore, for the second time, shot a victim at close range with a firearm he took to the scene of a confrontation (either to get his stolen guns back or to avenge a robbery and assault), the less likely it is that the homicide was perpetrated in self-defense. It was not an abuse of discretion to conclude that Kilgore's Oklahoma testimony was admissible.

Kilgore asserts that the Oklahoma testimony should have been excluded nonetheless, as more prejudicial than probative. For purposes of Evidence Code section 352, "prejudice refers to evidence that uniquely tends to evoke an emotional bias against the defendant without regard to its relevance on material issues." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 650; see also *People v. Lenart* (2004) 32 Cal.4th 1107, 1123 [uncharged crime evidence is admissible only if it has "substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence"]; *People v. Carpenter* (1997) 15 Cal.4th 312, 378-379 ["The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence."].)

As explained *ante*, Kilgore's Oklahoma testimony was probative because, in both cases, he claimed to have killed his victims in self-defense. Although Kilgore protests that the probative value was slight because the Oklahoma jury implicitly found his self-defense theory *credible* (in convicting him of the purported equivalent of involuntary

15

manslaughter), the point is not whether the jury accepted his claim in Oklahoma, but how unlikely it is that he shot a *second* person to death in rather similar circumstances only because he thought he had to defend himself. In the end, not even Kilgore disputes the relevance of the Oklahoma evidence, arguing instead that the evidence was "*too probative*," (italics added) and thus unduly prejudicial.

Given the probative value of the Oklahoma evidence, however, it was within the court's discretion to conclude that the evidence would not be unduly prejudicial. The circumstances of the Oklahoma case were no more inflammatory than the circumstances of this case: both involved shooting an unarmed victim at point-blank range. Although Kilgore complains that admission of the Oklahoma evidence would have risked the jury improperly deciding that "if he did it before, he would do it again," the trial court was prepared to protect against any such possibility by instructing the jury, in accordance with CALJIC No. 2.50, to use the evidence only as it related to Kilgore's self-defense claim, and not as evidence of bad character or predisposition. Kilgore also argues there were adverse facts in the Oklahoma case that were absent from the instant case (e.g., he owned semi-automatic handguns and had friends who were gang members), but this cannot be used to demonstrate error in the court's ruling, since this concern was never brought to the trial court's attention.[5]

Kilgore also asserts that the prejudicial impact of the Oklahoma evidence outweighed its probative value because, after learning the trial court's ruling, he opted not to testify. For this proposition he relies on *People v. Beagle* (1972) 6 Cal.3d 441, 453. Although the court in *Beagle* did refer to this consideration, it also interjected "a word of caution": "We do not propose to encourage or countenance a form of blackmail by defendants. No witness including a defendant who elects to testify in his own behalf

---

[5]    Kilgore contends this was another instance of his trial counsel's ineffective assistance. Counsel's failure to object in this regard does not require reversal, however, for the same reason we conclude *post* that her failure to request redaction of evidence or interpose other objections does not compel reversal: it was not sufficiently prejudicial. (See *post*.)

16

is entitled to a false aura of veracity." (*Ibid.*) In the matter before us, it was not an abuse of discretion to decide—as the court here did implicitly—that the otherwise admissible Oklahoma testimony evidence should be permitted, even if it were so damaging to the defendant that he might opt not to testify in order to keep it from the jury.

Lastly, Kilgore argues in his reply brief that admission of the Oklahoma testimony was inconsistent with his right not to be impeached with a manslaughter conviction, which was not a crime of moral turpitude (see *People v. Castro* (1985) 38 Cal.3d 301, 313), and that a defendant may be impeached with a prior conviction only by name of the crime and date of conviction, not the underlying facts (see *People v. Allen* (1986) 42 Cal.3d 1222, 1270). But as Kilgore elsewhere urges, his testimony in the Oklahoma case was not offered as *impeachment* with a prior conviction under Evidence Code section 787, but as substantive evidence of his mental state under Evidence Code section 1101, relevant to his claim of self-defense.

In the final analysis, we find no prejudicial abuse of discretion.

B. FAILING TO INSTRUCT ON SECOND DEGREE MURDER BY DRIVE-BY SHOOTING

Kilgore next argues that the trial court erred in failing to instruct the jury sua sponte on second degree drive-by murder, contending it is a "lesser-included 'offense-plus-enhancement'" of first degree murder and the special circumstance of drive-by murder.[6] While the court instructed the jury on the elements of first degree drive-by murder, which requires an intent to kill, it did not instruct on second degree drive-by murder, which he claims requires a mere intent to injure.

Degrees of murder are distinguished in section 189. As relevant here, first degree murder is murder that is committed with premeditation and deliberation, or murder that is "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at

---

[6]     Specifically, Kilgore asserts: "Second degree drive-by murder may be deemed a lesser-included offense within the special circumstance of drive-by murder and within the crime of first degree murder. Alternatively, second degree drive-by murder may be deemed a lesser-included enhancement, or offense plus enhancement, within the special circumstance of drive-by murder and within the crime of first degree drive-by murder."

17

another person outside of the vehicle with the intent to inflict death." (§ 189.) "All other kinds of murders are of the second degree." (§ 189.)

The trial court instructed the jury on first degree murder, with premeditation and deliberation. (CALJIC No. 8.20.) It further instructed on first degree murder by drive-by shooting, as murder perpetrated by discharging a firearm from a motor vehicle "intentionally at another person outside of the vehicle when the perpetrator specifically intended to inflict death." (CALJIC No. 8.25.1.)

The trial court also instructed the jury on second degree murder, under theories of express malice (intent to kill) and implied malice (conscious disregard of the danger to human life). (CALJIC Nos. 8.30, 8.31.) The jury rejected this option, finding instead that Kilgore committed murder in the first degree. From this verdict, the jury necessarily found that Kilgore intended to kill William.

In addition to its instructions on the substantive offenses of first degree murder and second degree murder, the court also instructed on the special circumstance set forth in section 190.2, subdivision (a)(21), pertaining to the discharge of a firearm from a motor vehicle with the intent to kill. (CALJIC No. 8.81.21.) This special circumstance, if found true, mandates that a person convicted of first degree murder receive the death penalty or life imprisonment without the possibility of parole. The jurors found that this special circumstance was true, confirming their conclusion that Kilgore harbored an intent to kill.

Nevertheless, Kilgore complains that the trial court did not give an instruction based on section 190, subdivision (d), which dictates the *sentence* for certain persons found guilty of murder in the *second* degree. The statute provides: "Every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 20 years to life if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury." (See CALJIC No. 8.35.2.) Section 190, subdivision (d), is a *penalty provision* for second degree murder, not a substantive offense. (*People v.*

18

*Garcia* (1998) 63 Cal.App.4th 820, 832-833 (*Garcia*) [former § 190, subd. (c), now subd. (d), constitutes a penalty provision rather than a substantive offense].)

A trial court has a sua sponte duty to instruct on *lesser included offenses* for which there is substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) The court does not, however, have a sua sponte duty to instruct on lesser-included enhancements. (*People v. Wolcott* (1983) 34 Cal.3d 92, 101 (*Wolcott*).)[7] And although a trial court must sua sponte instruct on general principles of law that are closely connected to the facts and necessary for the jury's understanding of the case, the failure to do so does not compel reversal unless it was reasonably probable that a more favorable result would have been obtained in the absence of the error. (*Garcia, supra,* 63 Cal.App.4th at pp. 833-834.)

Kilgore would not have obtained a better verdict if the court had given an instruction under section 190, subdivision (d). His argument on this point is that the absence of the instruction was particularly prejudicial due to the following statement by the prosecutor in closing argument: "First-degree murder in this particular case can also be derived by the special instructions that you have been given already that says if you find that the defendant . . . intentionally discharged a firearm from a motor vehicle, you don't even have to consider premeditation or deliberation. The State of California has deemed this act to be so inherently offensive and so inherently dangerous that it's pretty much said *strict liability*, you shoot a firearm from out of a car intentionally, and you cause the death of someone other than an occupant of that vehicle, that's first-degree murder." (Italics added.)

The trial court, however, instructed the jury correctly on the requirements for a finding of first degree murder by drive-by shooting, and further instructed the jury that, if

---

7    Kilgore argues *Wolcott* is no longer good law, and that there is a sua sponte duty to instruct on lesser-included enhancements, in light of the holding in *Blakely v. Washington* (2004) 542 U.S. 296. Our Supreme Court has determined, however, that *Blakely* does not apply to California's sentencing scheme. (*People v. Black* (2005) 35 Cal.4th 1238.)

the attorneys said anything contrary to the court's instructions, the instructions given by the court had to be followed. In addition, defense counsel specifically corrected the prosecutor's statement in closing argument. The prosecutor's closing argument, therefore, did not render prejudicial the omission of an instruction under section 190, subdivision (d), and he would not have obtained a more favorable verdict if the instruction had been given.

Moreover, by rejecting implied malice second degree murder (requiring conscious disregard rather than intent to kill), and by *expressly* finding true the special circumstance under section 190.2, subdivision (a)(21)—that Kilgore intentionally shot out of the Cadillac *with the intent to kill William*—the jury necessarily found an intent to kill sufficient for first degree murder under section 189. This finding rendered irrelevant any instruction on drive-by shooting in the context of *second* degree murder under section 190, subdivision (d).

Kilgore has failed to demonstrate reversible error.

C. FAILING TO INSTRUCT ON DOCTRINE OF TRANSFERRED INTENT

Kilgore next contends that the trial court erred when it failed to instruct the jury sua sponte on the doctrine of transferred intent. (See CALJIC No. 8.65.)

The transferred intent doctrine imposes criminal liability on a defendant who attempts to kill one person but kills someone else by mistake or inadvertence. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 688.) In the context of self-defense cases, transferred intent may apply where the defendant intends to injure or kill the person who poses an imminent and unlawful threat of death or great bodily injury but inadvertently kills an innocent bystander. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357.) Kilgore contends that an instruction to this effect was required because he intended to shoot Terry but missed, striking William instead.

Kilgore is incorrect. As Kilgore vigorously contends elsewhere in this appeal, his trial counsel abandoned self-defense during trial, switched to an identity theory, and expressly withdrew the instruction on transferred intent. The court has no sua sponte

20

duty to give an instruction on a theory the defense has abandoned. (See *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1025.)

Moreover, a trial court has no sua sponte duty to instruct on a defense for which there is no substantial evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 469.) Here, no substantial evidence supported Kilgore's claim that he shot William after Terry shot at Kilgore.

In the first place, there was only scant evidence that *any* shot was fired other than the fatal shot fired by Kilgore. Shanae and Bianca testified to only one shot, and there was no shell casing or other physical evidence of any additional shot. Kilgore's effort to assemble evidence of an additional shot is weak at best.

Kilgore's assertion that witnesses reported hearing more than one shot is tainted by his misperceptions of the record. For example, he states in his opening brief on appeal that "Witnesses reported hearing one or two shots. Telephone calls to the Oakland Police Department 911 emergency line reported hearing 'shots' (plural) being fired. (RT 522-525)." In the cited portion of the record, however, the only references to the possibility of more than one shot apparently came from a 911 dispatcher, not a witness to the crime. In one instance, a speaker on the emergency system responds to an officer or other law enforcement agency personnel as follows: "There was shots fired 30 at that San Pablo [*sic*]. A young man was shot with a gun." It is uncertain who said these words, and the apparent error in the transcription creates some doubt as to whether the speaker really said "[t]here [were] shots" as opposed to "[t]here was [a] shot[]." Furthermore, the rest of the call discloses that the speaker *did not know* how many shots were fired, and was probably a 911 dispatcher, as he or she explained: "*I didn't find out how many shots were fired.* If they were rapid, I didn't get any information on that. Cause I wanted to get the medical rolling." (Italics added.) In fact, it appears the caller from the scene had told the 911 dispatcher that there was only *one* shot: "Okay. What she said when I connected to the ambulance was she heard *a* noise, she saw someone call and she knew they'd been shot." (Italics added.) Lastly, in another conversation captured by the 911 transcription, it appears that one law enforcement agency stated to another, "I'm sure you got the shots

21

fired over on San Pablo?" Again, while there is a reference to "shots," there is no indication it was based on witness information, or even that the speaker was using the word "shots" for the purpose of describing the number of times the gun discharged.

Kilgore's argument that *Terry* said he heard two shots fares no better. The fact that Terry *heard* two shots would not support the conclusion that *Terry* fired at Kilgore, and, indeed, Kilgore's characterization of the record on this point is disingenuous. Immediately after Sergeant Green testified on cross-examination that Terry told him there was a second shot, the following exchange occurred: "[Defense Counsel]: And from the questioning, nobody ever asked [Terry] if that shot came from anyone on the corner; correct? [¶] [Sergeant Green]: Correct. The implication was that *it was from the same person.* [¶] [Defense Counsel]: *From the vehicle.* [¶] A. *Right.*" (Italics added.) The testimony on which Kilgore relies, therefore, does not support Kilgore's self-defense theory, but negates it by confirming that no one other than Kilgore fired a gun. And if that were not enough, Sergeant Green thereafter confirmed that Shanae, when asked "if she heard any sounds [plural]," responded, "Well, I heard *the* pop [singular]." (Italics added.)

Kilgore also notes that Jones, the getaway driver, said he "guess[ed]" it was "possible" that he heard two shots, since the sound of Kilgore's shotgun blast was so loud. But there was no indication that Jones thought any shot came from Terry or William. To the contrary, Jones testified that he did not observe anyone on the street corner do anything before Kilgore fired the fatal shot.

Next, Kilgore refers us to the testimony of Mary Washington, a passenger in a car on San Pablo Avenue. Washington did testify at trial that she heard "several" "bangs" or shots. But in her statement to police on the day of the shooting, Washington stated: "Just when we were at the corner, I heard *a* loud bang. At first I did not know what this sound was. My friend Mary [Loggins] then said, 'Oh, my God, that boy has been shot.'" (Italics added.) And once again, there is no indication that Washington—or any other witness—believed that Terry or William ever fired at Kilgore.

Thus, there is little or no credible evidence that there was more than one shot fired, and even if there had been, no witness testified that any shot came *from Terry* (or William) or that anyone fired *at Kilgore*. Nor was there any physical evidence to that effect, such as strike marks on Kilgore's car. Kilgore's self-defense theory is unsubstantiated.

Moreover, the balance of the evidence was not that Kilgore fired in self-defense, but that he sought out William, with a loaded gun, to exact revenge. Kilgore had motive to harm William because Kilgore owed William money, William had twice approached him about the debt, and William had participated in robbing Kilgore or beating him up. Bryant told the police that Kilgore had threatened to "smoke" the "dudes who robbed him." Kilgore got Jones to take him to the scene of the murder, with a loaded gun. In fact, Kilgore acted as if he intended to shoot William—as opposed to Terry—in that he shot William from just 8-12 feet away, returned to the corner, pointed his gun at William, and seeing him shot drove off. In the context of the record in this case, the fact that a man ran from the scene holding his hands close to his body and the fact that Terry did not want to get involved with the police investigation immediately after the shooting do not constitute substantial evidence that Terry shot at Kilgore and Kilgore fired back in self-defense, accidentally hitting William. While the court did instruct the jury on self-defense (CALJIC Nos. 5.12, 5.50), it was more than Kilgore was entitled to.

The court did not err in failing to instruct the jury sua sponte on the application of the transferred intent doctrine to self-defense.

D. PRECLUSION OF CHARACTER EVIDENCE REGARDING WILLIAM AND TERRY

Kilgore maintains that the trial court erred in barring Kilgore from introducing evidence of William's and Terry's bad character through Shanae and Tomlinsonn. He argues that this evidence was admissible to rebut the prosecution's good character evidence, which the prosecutor elicited through Shanae, Bianca, and Jones. His contention lacks merit.

23

### 1. Cross-Examination of Shanae as to William's Character

Shanae testified on direct examination that she had never seen William or Terry, in her presence, engaged in violent or illegal behavior.[8]

On cross-examination of Shanae, defense counsel attempted to elicit evidence which, Kilgore claims, would have rebutted the good character evidence offered by Shanae and shown William and Terry's violent behavior. Defense counsel asked Shanae: "are you aware William Anderson and Terry Dandy had twice assaulted and robbed Mr. Kilgore?" The prosecutor objected on the ground that the question called for speculation. The court sustained the objection, noting as well that the question assumed facts not in evidence and contained an "insinuation" the court and counsel had previously discussed. In the latter regard, the court stated: "It's one of those things we talked about, the question that has an insinuation with it. So, sustained."

Kilgore contends that Shanae's testimony on direct examination about William's and Terry's good character opened the door to cross-examination regarding their violent behavior. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 146; *People v. Wagner* (1975) 13 Cal.3d 612, 617.) The reason the trial court sustained the objection, however, was not because the question called for impermissible character evidence, but because of the question's *form*.

Kilgore does not explain how the trial court might have abused its discretion in sustaining the prosecutor's objection to the question's form. The question may not have really asked Shanae to speculate, as the prosecutor insisted it did, since it arguably inquired whether she was or was not aware of the incidents of violence. However, as the court correctly noted, the question assumed facts that were at that time not in evidence. Although greater leeway in this regard may be given on cross-examination, we also detect that the trial court was concerned with the prejudicial and misleading "insinuation"

---

[8]    Bianca and Jones also testified that they had not personally seen William or Terry engaging in violent behavior, but their testimony came *after* the testimony of Shanae and the challenged rulings of the trial court. Their testimony is therefore immaterial to the court's ruling.

in the question, which suggests that the court was motivated to sustain the objection on grounds of undue prejudice as well. On balance, Kilgore has not established an abuse of discretion.

Regardless, any error the court may have made in precluding Kilgore's cross-examination of Shanae was harmless. Kilgore was permitted to ask other witnesses about William's propensity for violence, eliciting testimony from Jones and Tomlinsonn that they had observed Kilgore with injuries from two assaults. Jones testified specifically that Kilgore claimed he had twice been assaulted by William and Terry, and Jones had seen them fleeing the scene on one of those occasions. Furthermore, defense investigator Beers testified that Bianca reported William being in three fights with Kilgore. There was, therefore, no prejudice arising from defense counsel's inability to obtain much the same evidence from Shanae. Nor did the ruling make any substantial difference in the defense's efforts to discredit Shanae's credibility, especially since she admitted that she was William's cousin and had lied to the police about Terry's identity.

Kilgore has failed to demonstrate any probability that he would have obtained a more favorable verdict if the question to Shanae had been allowed.

## 2. Denial of Examination of Tomlinsonn on William's Bad Character

After Tomlinsonn had begun his testimony, defense counsel sought permission to have him state his belief that William was a drug dealer. Defense counsel argued at the time that she would be pursuing a "reasonable self-defense" case, and urged that testimony of William being a drug dealer would (1) rebut the testimony of the prosecution witnesses that they had never seen him do anything illegal and (2) suggest that it was likely William was armed with a gun.

The court denied the request, because there was no evidence linking the murder to a drug transaction, and the victim's character was irrelevant except insofar as it concerned his reputation for violence.

Kilgore contends he was entitled to examine Tomlinsonn to elicit bad character evidence regarding William, in order to rebut the prosecution's good character evidence.[9] (See Evid. Code, § 1103, subd. (a).)  Even if the court erred in precluding this inquiry of Tomlinsonn, the error was harmless.  Kilgore contends it was prejudicial for the same reason it was prejudicial to preclude his character inquiry of Shanae.  We have already concluded the preclusion of Shanae's testimony was harmless.  Kilgore offers no reason why we should not reach the same conclusion as to exclusion of Tomlinsonn's testimony.

E. INEFFECTIVE ASSISTANCE OF COUNSEL

Kilgore urges that the trial court erred by denying his motion for a new trial, in which he contended his trial counsel rendered ineffective assistance on numerous grounds.

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient because his representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) prejudice flowing from counsel's performance or lack thereof.  (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.)  We reverse convictions on the ground of inadequate counsel only if "the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581-582.)

We exercise our independent judgment in reviewing the legal question of whether Kilgore was deprived of his right to effective assistance of counsel.  In doing so, we accept trial court factual findings that are supported by substantial evidence.  (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

---

[9]    Before the court's ruling on the proffered testimony from Tomlinsonn, Shanae and Jones testified that they had never seen William or Terry engage in illegal or violent behavior.  Bianca's testimony on this point, however, came after Tomlinsonn's testimony and is not germane to the ruling.  Although a defense witness, Tomlinsonn was called during the People's case to accommodate scheduling.

1. Failure to Obtain Ruling on Oklahoma Homicide and Defense Theories

In connection with defense counsel's motion to exclude the evidence of Kilgore's Oklahoma testimony, Kilgore asserts that his attorney provided ineffective assistance in three ways: failing to obtain a timely ruling before trial on the admissibility of the testimony, so she could have made a definite decision whether to pursue self-defense or an identity defense; abandoning the self-defense theory and switching to an identity defense; and presenting an erroneous offer of proof that Kilgore thought Terry was reaching for a gun rather than firing a gun.

None of these purported failures of counsel was prejudicial to Kilgore's case, as *neither* the identity defense nor the self-defense theory had any merit and neither would have improved if counsel had performed as Kilgore insists she should have.

As to the purported identity defense, Bianca and Shanae identified Kilgore as the shooter. These identifications, from just feet away, were corroborated by evidence that it was Kilgore who had a motive to shoot William in that he owed William money and had been beaten by William, Kilgore said he was going to "smoke" people who robbed him, he directed Jones to take him where he had just seen the people with whom he had been "having problems," he fled after the shooting, he reported his car stolen within minutes after the shooting, he remained at large for several months, and he confessed the murder to both Jones and Bryant. Indeed, Kilgore agrees that the identity defense was "hopeless."

But the self-defense claim was no better. As discussed *ante*, there was little if any evidence of more than one shot being fired. Moreover, there was no testimony or physical evidence that any shot had been fired *by William or Terry*, or that anyone had fired at Kilgore or his car. In addition, the evidence was clear that it was Kilgore who sought out his victim with an intent to kill him: after finding William and Terry, he coaxed Jones to drive him to their location, armed with a gun and, after shooting William from 8-12 feet away, returned and aimed his gun at William again.

Kilgore's self-defense claim would not have gotten any better in the absence of trial counsel's purported errors. In particular, the theory of self-defense would not have

27

become meritorious if counsel had merely obtained an earlier ruling on the admissibility of the Oklahoma evidence, or pursued the weak self-defense theory throughout the entire trial.

Nor would it have improved if she had advised the judge from the beginning that Terry was not just reaching for a gun, but firing it. In this regard, Kilgore notes that the claim of Terry reaching for the gun was similar to Kilgore's explanation in the Oklahoma case that Emery was reaching for a gun, and thus contributed to the court's conclusion in this case that the Oklahoma testimony was admissible under Evidence Code section 1101. Although defense counsel corrected this error before the actual ruling on the Oklahoma evidence, the trial court was not persuaded by counsel's changing the facts. The implication, Kilgore urges, is that, if defense counsel had been accurate in her initial offer of proof, the court would *not* have ruled the Oklahoma testimony admissible. In light of our discussion of the admissibility of the Oklahoma evidence *ante*, we doubt the trial court would have reached that conclusion. Even if it had, and Kilgore had thereupon decided to testify, the self-defense theory was still so weak that we are confident no more favorable outcome would have been obtained.

Which brings us to Kilgore's argument that the self-defense case would have been stronger with his testimony, and counsel thus erred by not having him testify. As to this argument as well, we are not persuaded.

At the hearing on the new trial motion, Kilgore explained that on the afternoon of the murder, he, Jones and Sic went to Home Depot to buy cleaning supplies. As Jones drove Kilgore's car back to their apartment, he "made a sudden U-turn and approached some individuals on the corner that he had identified to be William and T." In the process of making the U-turn, Jones stated, "there goes William and T." As Jones approached the corner where William and T were standing, Kilgore saw T "pulling a weapon out from underneath his coat, and he fired at us, and I responded by firing back at T." The shotgun Kilgore used was in the back seat of the Cadillac. When Kilgore noticed that "someone had fell," Jones made another "U-turn and turned back around."

Kilgore then observed that William "had been struck." Kilgore testified that he did not intend to hit William.

While Kilgore's testimony would have stated his self-defense theory directly, it would not have made it any more persuasive. It purported to explain why Jones was driving, why Kilgore was in the back seat, and why there happened to be a loaded shotgun next to him. But Jones's act of making a U-turn and going back toward William and Terry is inconsistent with a theory of self-defense. Furthermore, Kilgore's version of the events would have had little credibility in light of the evidence from the Oklahoma homicide, which would have been properly admitted if Kilgore testified. Due to the inferences the jury could have drawn from the Oklahoma evidence—which Kilgore elsewhere in this appeal insists would have been severely prejudicial—it certainly was not unreasonable for trial counsel to conclude it unwise to put Kilgore on the stand. Nor was the failure to call Kilgore as a witness prejudicial. Indeed, once the court ruled that the prior homicide was admissible, Kilgore agreed that it was better for him not to testify, and to instead pursue an identity defense.

2.  Opening the Door to Bad Character Evidence

On direct examination, Tomlinsonn testified that he found Kilgore to be reliable and trustworthy. The charges against Kilgore had not changed his opinion, and he would hire Kilgore again, notwithstanding those charges. Defense counsel attempted to elicit Tomlinsonn's opinion as to Kilgore's reputation for truthfulness and veracity but could not lay an adequate foundation.

On cross-examination, the prosecutor asked Tomlinsonn whether the 1997 felony conviction would change his decision whether to hire Kilgore. The court permitted the questioning, because the door was opened when Tomlinsonn stated the current charges did not affect his view of Kilgore's reliability and trustworthiness or whether he would rehire Kilgore.

Kilgore argues that his attorney should not have introduced evidence of his good character because it opened the door to the prosecutor asking Tomlinsonn whether he was aware of Kilgore's 1997 felony conviction.

Kilgore has not established, on this record, that his trial counsel had no legitimate tactical purpose in eliciting character evidence from Tomlinsonn. It was not unreasonable for defense counsel to conclude that the benefit of Tomlinsonn's testimony regarding Kilgore's reliability and trustworthiness outweighed any harm to be caused by reference to Kilgore's 1997 felony conviction. Counsel had already spoken to Tomlinsonn and reasonably believed that Tomlinsonn's good opinion of Kilgore was unaffected by the 1997 conviction. Indeed, that was precisely how Tomlinsonn testified.

Furthermore, the prosecution witnesses also had criminal records. Jones had been convicted of misdemeanor possession of stolen property. Bryant had been convicted of grand theft and possession of narcotics. Shanae and Bianca admitted falsely identifying Terry as Richard Davis because they thought he was the subject of a warrant. In these circumstances, evidence that Kilgore had a 1997 felony conviction—without reference to the crime of which he was convicted—was minimally prejudicial, and it was not probable that he would have obtained a better verdict if the evidence had not been introduced.

3. Failure to Request Redaction of Bryant's Statement

When Matthew Bryant purported to have forgotten the substance of his statements to the police, a tape-recording of the statement was played for the jury. Kilgore now argues that his trial attorney was ineffective because she did not object to this evidence or, at least, seek redaction of Bryant's opinion that Kilgore sold marijuana.

We do not agree. As defense counsel disclosed in the new trial proceedings, she did not object to the introduction of Bryant's tape-recorded interview because she believed it was properly introduced as a prior inconsistent statement. She was right. Prior statements are admissible where it is shown that the witness's lack of memory was evasive and untruthful. (*People v. Ervin* (2000) 22 Cal.4th 48, 84-85.) There was a reasonable basis in the record for that conclusion, and counsel's failure to object was not error.

Trial counsel believed she had erred by not having the tape-recorded interview redacted to exclude Bryant's statement that Kilgore was "known to sell weed." Any error in this regard, however, was harmless. Kilgore's friends—Jones and Bryant—had

30

criminal records. So did Terry. There is no reasonable probability that Kilgore would not have been convicted absent the admission of the evidence that he was "known to sell weed."

### 4. Failure to Request Instruction on Transferred Intent

Kilgore's attorney withdrew her request for an instruction on the doctrine of transferred intent in the context of self-defense. We have already concluded that the transferred intent instruction was not warranted, because there was no substantial evidence supporting the self-defense theory. Counsel's failure to request the instruction was, therefore, not error.

### 5. Failure to Object to Prosecutor's Argument

Kilgore contends that his attorney was negligent in failing to object to the prosecutor's inaccurate argument regarding first degree drive-by murder. As set forth *ante*, the prosecutor stated that shooting from a car had been deemed "so inherently dangerous that it's pretty much *strict liability*, you shoot a firearm from out of a car intentionally, and you cause the death of someone other than an occupant of that vehicle, that's first-degree murder." (Italics added.) The prosecutor also remarked that first degree drive-by murder did not require a finding of premeditation and deliberation. Kilgore claims these statements erroneously suggested that first degree drive-by murder did not require an intent to kill.

Counsel's failure to object contemporaneously to the prosecutor's statements was not prejudicial. In her own closing argument, defense counsel advised the jury that, for first degree drive-by murder, "not only do you have to find that somebody drove by and shot out of the car, but that they intended to kill when they shot out of the car." In addition, the court instructed the jury correctly on the applicable law and that, if anything said by the attorneys conflicted with those instructions, the jury had to follow the instructions of the court. We must assume that the jury understood those instructions and followed them, disregarding any erroneous statement of law by the prosecutor.

Kilgore has failed to establish ineffective assistance of counsel.

31

F. CUMULATIVE ERROR

Kilgore contends that the cumulative effect of the asserted errors compels reversal. We do not agree. There is no basis for reversal of the judgment.[10]

III. DISPOSITION

The judgment is affirmed.

---

[10]    Kilgore has filed a petition for writ of habeas corpus, which we deny by separate order. (A110317)

**EXHIBIT #5**

IVAN KILGORE, PETITIONER
IVAN KILGORE V-31306
CSP-SACRAMENTO
PO BOX 290066
REPRESA, CA 95671

1

2

3

4                              UNITED STATES DISTRICT COURT
                              NORTHERN DISTRICT OF CALIFORNIA
5

6   IVAN KILGORE,                           CASE No.:

7              PETITIONER                    EX PARTE MOTION FOR
                                             PROVISIONS OF FUNDS TO
8              V.                            OBTAIN TRANSCRIPTS OF
                                             OKLAHOMA TRIAL AND
9   J. Walker(Acting Warden)                 COURT ORDER TO PRODUCE
                                             AND SUBMITT TRANSCRIPT
10             RESPONDENT                    TO THE COURT AND
                                             PETITIONER.
11

12

13  _____

14

15     I, IVAN KILGORE, DECLARES AND STATES:

16     I AM THE PETITIONER IN THE ABOVE ENTITLED CASE, PROCEEDING

17  PRO SE REQUESTING PROVISION OF FUNDS TO OBTAIN THE COMPLETE TRAN-

18  SCRIPT OF AN OKLAHOMA TRIAL TO INCLUDE IN THE TRAVERSE AS AN EX-

19  HIBIT TO MEET THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT

20  OF 1996 REASONABLE DILIGENCE REQUIREMENT TO REQUEST EVID. HEARING.

21     IN THE OPINION FILED AUGUST 30,2006, THE STATE COURT DREW

22  NUMEROUS INFERENCES ADVERSE TO PETITIONER FROM AN OKLAHOMA CASE

23  IN WHICH PETITIONER WAS CONVICTED IN 1997 OF MANSLAUGHTER UNDER

24  THE EQUIVALENT OF CALIFORNIA'S IMPERFECT SELF-DEFENSE**(SEE IN RE**

25  **CHRISTIAN S. (1994) 7,CAL.4th 768)**.(SEE OPINION EXHIBIT A). THE

26  STATE COURT RECORD CONTAINS THE TRANSCRIPT OF THE PETITIONER'S

27  TESTIMONY FROM THE OKLHOMA CASE, BUT DOES NOT CONTAIN ANY OTHER

28  PART OF THE TRANSCRIPT FROM THAT CASE.(SEE EXHIBIT B.)

1   THE STATE COURT'S INFERENCES AND CONCLUSIONS THAT THE OKLA-

2   HOMA CASE WAS SIMILAR ENOUGH TO BE ADMITTED UNDER **EVID. CODE §**

3   **1101(b)** AS EVIDENCE OF INTENT, WOULD NOT BE SUPPORTED IF THE

4   ENTIRE TRANSCRIPT OF THAT CASE WERE IN THE RECORD.

5   THE PROCESS THE STATE COURT EMPLOYED TO DRAW THESE INFER-

6   ENCES AND CONCLUSIONS WAS NOT RELIABLE BECAUSE IT MADE ASSUMP-

7   TIONS WITH REGARDS TO THE FACTS FROM ACCUSATORY CROSS EXAMINATION

8   FROM THE OKLAHOMA PROSECUTOR OR CAME TO CONCLUSIONS DUE TO INEF-

9   FECTIVE ASSISTANCE OF APPELLATE COUNSEL. FOR EXAMPLE, THE OPINION

10  ASSERTS THAT PETITIONER SHOT BOTH THE VICTIMS, IN THE OKLAHOMA

11  AND THE INSTANT CASE, AT "POINT BLANK" RANGE.(SLIP OP. p16) THE

12  INFERENCE WOULD NOT BE SUPPORTED IF THE TESTIMONIES OF THE PRO-

13  SECUTIONS PATHOLOGIST/MEDICAL EXAMINER AND THE DEFENSE BALLISTIC

14  EXPERT HAD BEEN A MATTER OF RECORD HERE IN THE INSTANT CASE.

15  THEIR TESTIMONIES WOULD ESTABLISH THAT THE OKLAHOMA HOMICIDE

16  WAS SIGNIFICANTLY DIFFERENT, ESPECIALLY THE OPINIONED DISTANCE

17  THE FATAL SHOT WAS FIRED. AS ANOTHER EXAMPLE, THE OPINION ASSERTS

18  THAT IN BOTH CASES, PETITIONER THREATENED TO HARM THOSE WHO

19  WRONGED HIM.(SLIP OP p.14). THE PROSECUTOR IN OKLAHOMA INQUIRED

20  AS TO THE VALIDITY OF THE ALLEGED THREATS AND IF THE WEAPON USED

21  IN THE HOMICIDE WAS CONVERTED INTO AN AUTOMATIC(THE FACTUAL BASIS

22  TO THESE ACCUSATIONS WERE ATTEMPTED TO BE ESTABLISHED WITH REBUT-

23  TAL TESTIMONY). THE STATE COURT HERE ASSUMED FROM THIS ACCUSATORY

24  CROSS EXAMINATION THAT A FACT WAS ESTABLISHED. PETITIONER DEINED

25  THESE ISSUSES AT THE OKLAHOMA TRIAL(SEE TRANSCRIPT, EXHIBIT B, P.

26  49-51). THE PROSECUTOR PRESENTED TO THE JURY REBUTTAL TESTIMONY

27  FROM JERMERYL WEAVER. WEAVER'S TESTIMONY WAS IMPEACHED. THE JURY

28  FOUND THIS TESTIMONY NOT CREDIBLE WHEN IT AQUITTED THE PETITIONER

1  OF CAPITAL MURDER AND INSTEAD CONVICTED UNDER OKLAHOMA MANSLAUGH-

2  TER STATUE 21-711, INTER ALIA, A HOMICIDE PERPETRATED UNNECESS-

3  ARILY WHILE RESISTING AN ATTEMPT BY THE PERSON KILLED TO COMMIT

4  A CRIME.

5      ANOTHER  EXAMPLE, THE ATTORNEY GENERAL SUCCESSFULLY ARGUED

6  THAT PETITIONER TRIED TO PERSUADE THE WITNESSES IN THE OKLAHOMA

7  CASE BY WRITING A LETTER TO A FRIEND REQUESTING HIM AND OTHERS

8  TO LIE AND TESTIFY THAT THE VICTIM DID HAVE A WEAPON. THIS WAS

9  AN OVERSIGHT BY THE ATTORNEY GENERAL AND THE COURT DUE TO THE

10  LACK OF A COMPLETE RECORD AND INEFFECTIVE ASSISTANCE OF APPELATE

11  COUNSEL. APPELATE COUNSEL FAILED TO REBUTT THE OVERSIGHT WITH

12  THE RECORD OF FACTS FROM THE PETITIONER'S PRIOR TESTIMONY AND

13  INDEPENDANT TESTIMONIES FROM THE OKLAHOMA CASE SUPPORTING IT.

14  (SEE EXHIBIT B, P.37-45). THE STATE COURT RELIED ON THE OVERSIGHT

15  TO MAKE A DETERMINATION OF RELEVANCY WITH REGARD TO THE INSTANT

16  CASE(SEE EXHIBIT A, P. 11). APPELATE COUNSEL FAILED TO SUBMITT

17  EVIDENCE SUPPORTING PETITIONER'S CREDIBILITY RELATED TO THE MAT-

18  TER. THE OKLAHOMA PROSECUTOR INTRODUCTION OF THE LETTER WAS UN-

19  INTELLIGENT IN LITE OF THE CORROBORATION PROVIDED BY THE VICTIMS

20  VERY OWN SISTER, CARMEN RANDOLPH. HAD IT BEEN A MATTER OF RECORD

21  HERE, MS. RANDOLPH'S TESTIMONY WOULD HAVE SUPPORTED PETITIONER'S

22  LETTER. THE LETTER WAS WRITTEN WITH HOPES OF GETTING WITNESSES TO

23  COME FORTH WITH THE FACTS DISCUSSED WITHIN RELATED TO THE CASE IN

24  FACE OF OVERWHELMING HARASSMENT FROM THE DECEASE's GANG. MS. RAN-

25  DOLPH TESTIFIED THAT THE EVENING HER BROTHER WAS KILLED, HOURS

26  SHORTLY THEREAFTER, STEPHANIE BROTHERS BROUGHT A GUN(TECH 22) BE-

27  LONGING TO THE VICTIM TO HER(RANDOLPH) HOUSE. STEPHANIE BROTHERS

28  TESTIFED SHE REMOVED THE VICTIMS GUN FROM THE CRIME SCENE. NUM-

EROUS STATE WITNESSES TESTIFIED THE TECH 22 WAS SEEN IN THE VICTIM'S
POSSESSION AT THE CRIME SCENE THE NIGHT BEFORE. THEY STATED THE
VICTIM HAD STAYED OVER NIGHT AT THE CRIME SCENE. THE OKLAHOMA
DISTRICT ATTORNEY INVESTIGATOR, ALLEN FOSTER, TESTIFIED TO THE
RECOVERY OF THE TECH 22 FROM MS. RANDOLPH'S HOME AFTER RECEIVING
INFORMATION FRON PETITIONER'S ATTORNEY, ERVIN BOX. PETITIONER INFORMED
HIS ATTORNEY OF THIS DISCOVERY AFTER HAVING BEEN VISTED AT THE JAIL
BY HIS WIFE, KAYLYNN LASKEY, WHO INFORMED HIM OF THE FACT THAT MS.
BROTHERS HAD CONFIDED IN HER ABOUT THE REMOVAL OF THE GUN. THE
INDEPENDANT TESTIMONIES AND SEQUENCE OF EVENTS LEADING TO THE RECOVERY
OF THE WEAPON PETITIONER BELIEVED TO BE IN COCAN EMORY'S POSSESSION
AT THE TIME OF THE FATAL SHOOTING INCIDENT SUPPORTS HIS CREDIBILITY
IN THE MATTER DISCUSSED. ALSO THE PETITIONER'S OKLAHOMA CONVICTION
WAS A RESULT OF A JURY COMPROMISE WHICH WAS THE RESULT OF A HUNG
JURY, NINE(9) TO THREE(3) IN THE PETITIONER'S FAVOR OF SELF-DEFENSE.
THIS EVIDENCE, HAD IT BEEN A MATTER OF THE RECORD HERE IN THE INSTANT
CASE, WOULD HAVE HAD SIGNIFICANT INFLUENCE ON THE PROCEEDINGS AND
WOULD HAVE SUCCESSFULLY COUNTERED ANY ADVERSE INFERENCES THE PROSECUTOR,
ATTORNEY GENERAL AND STATE COURT CHOSE TO CONCLUDE, JUST AS IT COUNTERED
THE OKLAHOMA PROSECUTOR'S FEEBLE ATTEMPTS TO PORTRAY THE PETITIONER
IN A NEGATIVE LIGHT. **FURTHERMORE, THE OKLAHOMA TRIAL EVIDENCE WHEN
COMPARED TO THE INSTANT CASE SUPPORTS PETITIONER'S DEFENSE OF SELF-
DEFENSE.** IN BOTH CASES PETITIONER ONLY FIRED ONE SHOT WHICH IS MORE
CONSISTANT WITH THE MENTAL MIND STATE TO DETER HIS ASSAILANT'S ASSAULT,
RATHER THAN A MENTAL REFLECTION OF A RETALIATORY ACT AS SUCCESSFULLY
ARGUED IN THE INSTANT CASE DUE TO THE IAC OF TRIAL COUNSEL'S FAILURE
TO INVESTIGATE AND PREPARE EVIDENCE FROM THE OKLAHOMA TRIAL.

IN ADDITION TO THE FOREMENTIONED, THE COMPLETE REVIEW OF THE

OKLAHOMA TRIAL IS WARRENTIED WITH REGARD TO PROVIDE THE REVIEWING

COURT THE NECESSARY TOOLS TO EVALUATE PETITIONERS CLAIMS OF IAC

OF TRIAL COUNSEL, DEBORAH LEVY'S FAILURE TO INVESTIGATE AND PREPARE

THE OKLAHOMA TRIAL EVIDENCE TO COUNTER ANY ADVERSE IMPLICATIONS THE

PROSECUTOR IN OAKLAND SOUGHT TO INTRODUCE WITH THE SOLE USE OF THE

PETITIONER'S TESTIMONY FROM THE PRIOR CASE. PETITIONER MOREOVER

DIRECTS THE REVIEWING COURT TO THE FACT THAT IN THE MOTION FOR

NEW TRIAL EVIDENTRARY HEARING, LEVY TESTIFIED BLATANTLY HER TACTICAL

DECISION TO ADVISE AND CAUSE PETITIONER NOT TO TESTIFY AND THE

DECISION TO CHANGE DEFENSE STRATEGIES IN MIDSTREAM FROM SELF-DEFENSE

TO THE INCONSISTANT AND UNPREPARED DEFENSE OF MISTAKEN IDENTITY,

WAS DUE TO THE COURT ALLOWING THE UNTIMELY INTRODUCTION OF THE PRIOR

OKLAHOMA EVIDENCE FOR IMPEACHMENT PURPOSES. IT WAS COUNSEL'S OPINION

PETITIONER'S PRIOR TESTIMONY WOULD REFLECT POORLY ON HIS CREDIBILITY.

THIS OPINION WAS BASED ON THE FACT SHE BELIEVED HE WAS "LIEING IN

EVERY OTHER LINE" OF THE PRIOR TESTIMONY.(RT 1004) SHE MADE SUCH

ASS-UMPTIONS BASED ON A VERY LIMITED (COLD TRANSCRIPT) INSIGHT

WHICH LACKED THE CORROBORATION OF THE TOTALITY OF THE EVIDENCE

PRESENTED IN OKLAHOMA TRIAL.

PURSUANT TO U.S.C. §2254(d)(1) AND (2), A STATE COURT'S CONCLUSION

MAY BE FOUND UNREASONABLE WHEN BASED ON FACTUAL ASSUMPTIONS WHICH HAVE

BEEN MADE IN THE ABSENCE OF AN APPROPRIATE INQUIRY WHICH COULD HAVE

DETERMINED THOSE FACTS(DYAS V. POOLE_____F3d____,2003 C.D.O.S 600

(9th CIR. 2003). THE UNREASONABLE INFERENCES, CONCLUSIONS AND ISSUSES

OF IAC OF THE STATE COURT WHEN DETERMINING THE FACTS OF THE OKLAHOMA

TRIAL TESTIMONY OF THE PETITIONER CAN ONLY BE REBUTTED BY "CLEAR AND

CONVINCING" EVIDENCE(§2254[e][1]). THERE IS NO EVIDENCE MORE CONVINCING

THAN THAT OF THE COMPLETE TRANSCRIPTION OF THE OKLAHOMA TRIAL EVIDENCE.

PETITIONER'S STATE APPELLATE COUNSEL FORMALLY REQUESTED OF

THE FIRST DISTRICT APPELLATE PROJECT, THE COURT OF APPEAL, AND

THE CALIFORNIA SUPREME COURT TO PROVIDE PROVISION OF FUNDS. ALL
REQUESTS AND MOTIONS WERE DEINED.(SEE EXHIBIT C.)

TO DENY AN INDIGENT DEFENDANT FUNDS FOR TRANSCRIPTS IS
VIOLATION OF **U.S.C.A. AMENDMENT #5,FEDERAL RULES OF LAW 302.1(1).**
INDIGENT DEFENDANTS MAY NOT BE DEPRIVED OF THE TOOLS NECESSARY TO
PREPARE A DEFENSE; THUS, A DEFENDANT HAS A CONSTITUTIONAL RIGHT
TO FREE TRANSCRIPTS OF PRIOR PROCEEDINDS**(U.S. V. SISK, E.D. TENN
1968, 309 F. SUPP. 86).**

PETITIONER IS INDIGENT AND CANNOT AFFORD TO PAY FOR THE
OKLAHOMA TRANSCRIPT.

FOR THE FORGOING REASONS AND IN THE INTEREST OF JUSTICE,
PETTIONER RESPECTFULLY REQUEST THAT THIS COURT ALLOCATE SUFFICI-
ENT FUNDS TO OBTAIN THE COMPLETE TRANSCRIPT OF **THE STATE OKLAHOMA
Vs. IVAN DONWELL KILGORE, CASE NO. CF-95-387.**

PETITIONER RESPECTFULLY REQUEST THAT THE CLERK OF THIS COURT
DIRECT THE ALLOCATED FUNDS TO THE SEMINOLE COUNTY COURT HOUSE,
COURT REPORTER: MIKE WEATHERLY(405-257-2223),P.O. BOX 1300,
WEWOKA, OK 74884.

PETITIONER RESPECTFULLY REQUEST AN ORDER TO MR. WEATHERLY
BE SUBMITTED TO PRODUCE TRANSCRIPT TO THIS COURT AND THE PETIT-
IONER.

I DECLARE UNDER THE PENALTY OF PERJURY THE FORGOING IS TRUE
AND CORRECT.

EXECUTED AT REPRESA, CALIFORNIA ON_____
                                         (DATE)


                                  _____
                                         (PETITIONER)

# PROOF OF SERVICE

(C.C.P. §§1013(a); 2015.5; 28 U.S.C. §1746)

I, _Ivan Kilgore_, am over the age of eighteen (18) years, and I (am) (am not) a party to the within cause of action. My address is:

_P.O. Box 290066,_
_Represa, CA 95671_

On, _July 13, 2008_, I served the following documents:

_Motion for Appointment of Counsel_

on the below named individual(s) by depositing true and correct copies thereof in the United State mail in Represa, California, with postage fully prepaid thereon, addressed as follows:

1. _Office of the Clerk_
_Northern District of CA_
_U.S. District Court_
_450 Golden Gate Avenue_
_San Francisco, CA 94102_

2. _Peggy S. Ruffra_
_Office of the Attorney General_
_455 Golden Gate Ave, Suite 11000_
_San Francisco, CA 94102-3664_

I have read the above statements and declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this _13_ day of _July_, _2008_, at California State Prison - Sacramento, Represa, California.

(Signature) _Ivan Kilgore_