Ivan Kilgore V31306
CSP-SACRAMENTO
FC1-216
P.O. BOX 290066
Represa, CA 95671

FILED

08 AUG 29 PM 1:54

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ivan Kilgore,<br><br>          Petitioner,<br><br><br>J. Walker, acting warden.<br><br>          Respondent. | No. C 07-5124 SI(pr)<br><br>MOTION FOR REHEARING THE<br>HONERABLE SUSAN ILLSTON'S<br>JULY 16, 2008 ORDER DENYING<br>MOTION FOR FUNDS.<br><br>IMMEDIATE RELIEF REQUESTED |

Petitoner, Ivan Kilgore, hereby seeks a rehearing to review and consider the July 16, 2008 Order Denying Motion For Funds presented to the District Court.

Petitioner notes to the reviewing court that he has since applied for leave to conduct discovery and appointment of counsel to facilitate said discovery pursuant to Rule 6(a) of the Federal Rules Govering Section 2254 cases, 28 U.S.C. foll. §2254, and 18 U.S.C. §30006A subsection 2(b).

Attached hereto are petitioner's Memorandum of Points and Authorities in support of motion for production of transcript and augmentation of the court record.

**Note to the Court:** All records(transcripts, ect) can be review-ed online via electronic filing in connection to the motion for leave to conduct discovery---See Exhibits[A]-[D] attached thereto.

1

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF MOTION FOR PRODUCTION OF TRANSCRIPT/AUGMENTATION**

I

**THE COURT MAY DIRECT THAT A TRANSCRIPT
OF PRIOR PROCEEDINGS BE FURNISHED FREE
WITHOUT COST TO THE PETITIONER IN FORMA
PAUPERIS UPON SHOWING OF NEED**

**U.S.C.A.** Title 28 §2250 states:  If any application for a writ of habeas corpus an order has been made permitting the petitioner to prosecute the application in forma pauperis, the Clerk of any court of the United States shall furnish to the petitioner without cost certified copies of such documents or parts of the record on file in his office as may be required by order of the judge before whom the application is pending.  **U.S. V. NEWSOME,** 257 **F.SUPP.** 201.

In the case of **UNITED STATES V. CONNORS,** (9TH CIR. 1990) 904 **F.2d** 535,536, the court held: "Prisoner proceeding in forma pauperis on a habeas corpus petition is entitled to receive at government expense, copies of court documents" but must file habeas corpus petition to trigger entitlement.

Petitioner's need of the transcripts requested in this motion are critical to establishing several claims he raises on habeas corpus, the proof of which, if successfully litigated to the court could result in petitioner's life sentence being vacated by the court. **WILLIAM V. STATE OF DEL.,** 427 **F.SUPP.** 72, Touchstones of indigent habeas corpus petitioner's motion for free transcripts are need and relevance.

Also see, **GRIFFIN v. ILLINOIS,** (1956) 351 **U.S.** 12, 19, a transcript must afford a record of sufficient completeness to permit proper consideration of[an indigent petitioner's] claims. **DRAPER v. WASHINGTON,** (1963) 272 **U.S.** 487, where indigent pro se defendants

1  were denied copies of trial transcripts for purposes of appeal after
2  trial judge determined that appeal assertions were frivolous, pet-
3  itioner's 14th Amendment right were violated. **FULLAN v. COMMISSIONER**,
4  **(2nd Cir 1989) 891 F.2d 1007**, if the convicted person is indigent
5  and has not had control over the funds raised to pay his appellate
6  attorney, the State is obligated to provide him with a free trans-
7  cript. **LANE v. BROWN,** 372 U.S. 477, Indiana state procedure that
8  allowed only a public defender to procure a transcript for a coram
9  nobis hearing for an indigent defendant, but would not provide the
10  transcript to the defendant representing himself, was found un-
11  constitutional. **THOMPSON v. HOUSEWRIGHT,**(5th Cir 1984) 741 F.2d 213,
12  indigent prisoner filing pro se petition for writ of habeas corpus
13  alleging IAC at his criminal trial should have been provide a copy
14  of his transcript in order to effectively present the issues he
15  raises in his petition.

16      In the case of **U.S. v TYLER**, 934 F.2d 420, the court held that
17  "State must provide indigent defendant with transcript of prior
18  proceeding when that transcript is needed for effective deefense or
19  appeal."

                                II
20              **THE COURT HAS DISCRETION TO DIRECT A COURT**
                **CLERK TO PRODUCE A COPY OF TRANSCRIPTS**
21            **WHERE A PETITIONER DEMONSTRATES LEGAL NEED**

22      Petitioner sought to prove that the State Court's ruling with
23  regards to claim #5(E)(F)(I)(J) and especially (D) "IAC;FAILURE TO
24  INVESTIGATE AND PREPARE APPELLANT'S(petitioner) PRIOR OKLAHOMA
25  TRIAL EVIDENCE BEFORE MAKING TACTICAL DECISIONS," of his pending
26  Writ of Habeas Corpus challenge under 28 U.S.C. §2254(d) was/is
27  contrary to/unreasonable application of clearly established Federal
28  Law as determined by the United States Supreme Court in Strickland

                                3

1  v. Washington(1984) 446 U.S. 668, specifically the second prong
2  ---ESTABLISHING PREJUDICE!

3      During the State Court proceedings petitioner requested of
4  the reviewing court provision of funds to obtain evidence--- a
5  complete transcription of petitioner's prior Oklahoma trial---
6  so as to make a fair determination of the merits raised in the
7  State Court. The State Court denied petitioner's request. It also
8  denied petitioner's request for an evidence hearing to review the
9  the evidence from the prior that was not part of the court record,
10 so as to make a fair determination of trial counsel's IAC.

11     Presently petitioner has a pending Writ of Habeas Corpus in
12 the District Court. On July 16, 2008 the District Court denied
13 petitioner's motion for provision of funds to obtain the complete
14 Oklahoma trial transcript on three grounds(1) petitioner failed to
15 identify the legal basis for the court to authorize the expenditure,
16 (2) petitioner had, at that time, failed to request leave of court
17 to conduct discovery, and (3) the material the court deemed from
18 limited scope was not material to the question of determining the
19 merits of the claims petitioner had raised before the court. In
20 addressing the claim of IAC, the District Court resounded, as basis
21 for their ruling, the State Court's conclusion with regards to the
22 second prong of Strickland v. Washington, i.e., THE LACK OF PRE-
23 JUDICE IN TRIAL COUNSEL'S OMISSIONS. (See Exhibit[A], pp.3)

24     Here, petitoner contends this ruling for it has blanketly denied
25 fair consideration of evidence not yet reviewed, nor part of the
26 record of appeal to make such a determination. Moreover, the Dis-
27 trict Court's determination relies on the State Court's Opinion,
28 whereas, the claim of IAC "FAILURE TO INVESTIGATE...PRIOR OKLAHOMA

4

TRIAL EVIDENCE....," was not a claim in which the officer's of the court entertained at the point the State Court's Opinion was rendered. This particular claim, among others, was raised in a subsequent filing in which petitioner raised the ineffectiveness of his appellete counsel for not raising this issue before the State Court on direct appeal or in the accompanying State Writ of Habeas Corpus. (See Exhibit[B], attached hereto)

Among other related claims of IAC, petitioner has raised before this court the question of the contrary to/unreasonable application of Strickland v. Washington as applied by the State Court in dening his claim that trial counsel rendered IAC in failing to investigate, obtain and prepare[favorable] evidence to support petitioner's creditability stemming from a 1997 Oklahoma jury trial which resulted in a manslaughter conviction that is the equivalent under California's imperfect self-defense. (See initial filing, Writ of Habeas Corpus, claim 5[D])

During the trial in the present case, the prosecution sought to introduce evidence of petitioner's testimony stemming from the Oklahoma trial relevant to the prosecution's contentions as to the petitioner's ability to fabricate a defense of self-defense. (RT 609-612; CT 325) The trial court readily accepted the prosecut-ion's contentions with regards to the relevance of the evidence in face of defense counsel failing to partake in the adversarial process.(RT 1073-1075) U.S. v. Cronic, 446 U.S. 648

The Court of Appeal affirmed on the theory that the trial court properly exericed its discretion in ruling that the Oklahoma prior was admissible to prove intent under Evid. Code §1101(b).(See Exhibit[C], Op. pp. 14-16) That conclusion misstated the record. The trial court never ruled that the prior was admissible under §1101 (b) to prove intent. Accordingly, the Court of Appeal's opinion

5

1   is defective, because it depends on a finding never made by the

2   trial court. **TAYLOR v. MADDOX**, 366 F.3d 992

3        Despite the Court of Appeal's ruling, the grounds for the

4   trial court's ruling allowing the prosecution to cross-examine

5   on petitioner's Oklahoma testimony was, (a) because such testimony

6   was relevant to his credibility, and (b) because of the so-called

7   "doctrine of chances,"(RT 1073-1075)

8        Trial counsel at all points relevant to the admission of the

9   Oklahoma evidence abandoned her adversarial duties for when the

10  prosecution informed both the court and defense he sought to intro-

11  duce the isolated evidence---only the petitioner's testimony from

12  that case---which standing in its entirety was manipulated to con-

13  form with the prosecution's contentions of it being evidence of

14  petitioner's alleged deceit to fabricate a self-defense defense,

15  defense counsel just sat there like a knot on a log when her adver-

16  sarial obligations and common sense beckoned of her to investigate

17  the totality of the Oklahoma trial proceeding so as, in making

18  tactical decisions thereafter, she would be informed of the prevail-

19  ing evidence presented in the Oklahoma trial which refuted the

20  prosecutions allegations of a fabricated self-defense defense in

21  the Oklahoma trial; as it would refute the allegations of the pro-

22  secution in the present case. Counsel however did no such thing.

23  Surely, counsel had to ponder the weight of the totality of the

24  evidence presented at the Oklahoma trial and relize in light of the

25  petitioners prior conviction, and the fact that he informed her

26  among other related issues with regard to the Oklahoma case that

27  the conviction was the result of a hung jury[9 to 3 in his favor

28  to aquit in self-defense], that their was suffcient evidence sup-

1  porting petitioner's testimony from that case and his credibility.

2  Counsel's purported failures not only attributed to claim #5
3  (E)(F)(I) & (J) of petitioner's Writ of Habeas Corpus pending be-
4  fore this court which were the byproducts of an uninformed tactical
5  decision based on counsel's opinion, an opinion that had no premise
6  in absence of proper investigation, "he(petitioner) sounded like
7  a liar..." with regard to the content of petitioner's Oklahoma
8  trial testimony(See counsel's evidence hearing  testimony at RT
9  1029-1030), they also infringed upon petitioner's constitutional
10 right to present before the trier of fact evidence of actual innoc-
11 ence with regard to the issue of "intent."

12 In connection to the available evidence counsel failed to
13 investigate and prepare to refute the prosecutions contentions that
14 the Oklahoma testimony of petitioner was evidence of his alleged
15 ploy,as argued by the Oklahoma prosecutor too, to deceive the
16 people with a fabricated defense of self-defense listed at pages
17 8-10 of the "Supplement" Memorandum and Points of Authorities filed
18 in petitioner's pending Writ of Habeas Corpus, petitioner brings
19 to the attention of the reviewing court the fact that in the prior
20 case multiple witness and the medical examiner testified that there
21 was only one shot fired and decedent was only hit once as a result
22 of the circumstances leading up to the shooting incident. Cirum-
23 stances, that the Oklahoma jury expressively found petitioner's
24 actions not in accordance to a malicious intent, rather one of
25 the "unnecessary" belief in the need to use self-defense. The
26 jury implicitly found, due to the one shot fired by petitioner,
27 his intent was to deter his assailant which opposed the retaliatory
28 contentions of the prosecution. This evidence, had counsel procured

1  it, was relevant to the present case for the evidence screams at
2  the trier of fact that petitioner's intent very well could have
3  been in sinc with the need to defend himself in face of imminent
4  danger. The fact that in both cases petitioner only fired one shot,
5  as the Oklahoma jury implicitly found, reflected his intent to
6  deter his assailant, which in itself opposes the prosecutions
7  retaliatory contentions, especially in the present case where there
8  was two objects of retaliation. Both the decedent and Terry Dandy
9  AKA "T" were reported as having assulted and robbed petitioner on
10 multiple occasions. Moreover, the physical evidence in the present
11 case does not support retaliation for acts motivated on such prem-
12 ise, the courts have witnessed, are over-kills---multiple injuries
13 or gun shots are inflicted on "all" persons of retaliatory con-
14 viction. Without question this evidence would have assisted the
15 trier of the fact to determine innocence.

16     For reasons cited herein this motion and in connection to
17 petitioner's Writ of Habeas Corpus claims of IAC, it is imperative
18 to prevail on these claims that petitioner set before the court
19 the sought discovery of the complete transcription of the Oklahoma
20 trial proceeding so as to provide to reviewing court the materials
21 (testimonies, ect) to make a fair determination of the State Courts
22 ruling under Strickland v. Washington, 446 U.S. 668 with regards
23 to IAC---specifically prejudice. For said reasons petitioner re-
24 spectfully request his motion for Provision of Funds be granted.

25

26 Dated: _8-28-08_                              _Dwan Kilgore_
27                                                  (Petitioner)

28

8

# EXHIBIT COVER PAGE



EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: ___4___ pages.

JURISDICTION:   (Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Applellate Court |
| ☐ | State Supreme Court |
| ☑ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Supreme Court |
| ☐ | Grand Jury |

1

2

3

4

FILED

JUL 1 6 2008

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8  IVAN KILGORE,                          No. C 07-5124 SI (pr)

9         Petitioner,                     **ORDER DENYING MOTION FOR FUNDS**

10     v.

11  J. WALKER, acting warden,

12         Respondent.

13  _____/

14

15        Ivan Kilgore filed this pro se action for a writ of habeas corpus pursuant to 28 U.S.C. §

16  2254 to challenge his 2006 conviction in Alameda County Superior Court of first degree murder

17  with a special circumstance of discharging a firearm from a motor vehicle. The matter is now

18  before the court for consideration of Kilgore's "ex parte motion for provision of funds to obtain

19  transcripts of Oklahoma trial and court order to produce and submit transcript to the court and

20  petitioner." Respondent has opposed the motion.

21        Kilgore does not identify the legal basis for the court to authorize the expenditure of

22  public funds for him to obtain the transcripts. The Criminal Justice Act, 18 U.S.C. § § 3006A(a)

23  and 3006A(e), might provide a basis under which funds could in some circumstances be

24  supplied, if requested by counsel. Leaving aside the question of whether such expenditure can

25  be ordered when requested by a pro se litigant, petitioner would have to show that the

26  expenditure is necessary. 18 U.S.C. § 3006A(e). Additionally, Kilgore would need permission

27  to conduct discovery. Discovery is only allowed to the extent that the court, in the exercise of

28  its discretion and for good cause shown, allows it. See Rule 6(a) of the Federal Rules Governing

Section 2254 Cases, 28 U.S.C. foll. § 2254. Good cause for discovery under Rule 6(a) is shown

United States District Court

For the Northern District of California

1  '"where specific allegations before the court show reason to believe that the petitioner may, if
2  the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . .'" See
3  Bracy v. Gramley, 520 U.S. 899, 908-09 (1997) (citation omitted); Pham v. Terhune, 400 F.3d
4  740, 743 (9th Cir. 2005). In order for the court to figure out whether there is good cause to allow
5  discovery and the expenditure of public funds is necessary, the court identifies what is requested,
6  why the material is requested, and what value the material would have in the federal habeas
7  proceedings.

8         Kilgore was convicted in Oklahoma in 1997 of manslaughter. Apparently, the only part
9  of the Oklahoma trial that was transcribed and made available to Kilgore when he faced trial in
10  California in 2006 was his own testimony. Kilgore wants this court to authorize the expenditure
11  of up to $5,000 for him to obtain the rest of the transcript from the Oklahoma case. He wants
12  the transcript to help him prove that the California Court of Appeal made unreasonable
13  inferences about the Oklahoma case from the limited portion that was transcribed.

14         At his 2006 trial in Alameda County Superior Court, the trial court determined that
15  Kilgore could be cross-examined with his Oklahoma testimony if he testified. The trial court
16  ruled that the evidence was admissible to show his mental state as relevant to his claim of self-
17  defense and not as impeachment with a prior felony conviction. Kilgore then chose not to
18  testify. On appeal, the California Court of Appeal determined that the trial court had not erred.
19  The evidence was admissible under state law because Kilgore claimed in both the California and
20  Oklahoma cases that he shot the victims in self-defense. The California Court of Appeal
21  concluded that the evidence was properly admitted under both California Evidence Code §
22  1101(b) on the issue of intent and under the state law doctrine of chances.[1]  See Cal. Court App.
23  Opinion, pp. 14-16. The appellate court also rejected Kilgore's argument that the evidence

24

25         [1]"[T]he doctrine of chances maintains that with each repetition of an act under similar
26  circumstances, the more reasonable it is to conclude the act was intended and premeditated. . . As
   applied here, the fact that Kilgore, for the second time, shot a victim at close range with a firearm he
27  took to the scene of a confrontation (either to get his stolen guns back or to avenge a robbery and
   assault), the less likely it is that the homicide was perpetrated in self-defense." Cal. Ct. App. Opinion,
28  p. 15.

2

1  should have been excluded as unduly prejudicial under California Evidence Code § 352. Cal.
2  Ct. App. Opinion, pp. 15-16.[2]

3  Upon due consideration, this court concludes that it is not the Oklahoma conviction, but
4  is Kilgore's story in Oklahoma that matters. His testimony in the Oklahoma case – not all the
5  other evidence in that case – is key to the question of his intent and self-defense. Kilgore already
6  has the transcript of his own testimony, and it is not necessary for the rest of the transcript of the
7  Oklahoma trial to be produced. Further, Kilgore wants the Oklahoma transcript to show that the
8  California appellate court erred under California Evidence Code § 1101(b), but even if he could
9  establish that, he would not be entitled to relief in a federal habeas action because the writ is
10  unavailable for violations of state law or for alleged error in the interpretation or application of
11  state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

12  Kilgore also seems to urge that the evidence would be probative on an ineffective
13  assistance of counsel claim. He reports that his counsel advised him not to testify and to pursue
14  a mistaken identity defense because "she believed he was 'lieing [sic] in every other line' of the
15  prior testimony. (RT 1004))." Motion p. 5. The California Court of Appeal rejected the
16  ineffective assistance of counsel claim for lack of prejudice. "None of these purported failures
17  of counsel was prejudicial to Kilgore's case, as neither the identity defense nor the self-defense
18  theory had any merit and neither would have improved if counsel had performed as Kilgore
19  insists she should have." Cal. Ct. App. Opinion, p. 27. It is not necessary to order the
20  expenditure of public funds that might enable a petitioner to prove only half a claim, (i.e.,
21  deficient performance) when he would be unable to prove the other half of the claim (i.e.,
22  prejudice) that is necessary to prevail on an ineffective assistance of counsel claim.

23  The court stresses that it has made its ruling based on the very limited record made
24  available to it. This order does not mean that any claims in the petition are meritless or may be

26  [2]The recitation of what occurred in the trial court and in the appellate court is based on the
27  information provided in the California Court of Appeal's opinion attached to Kilgore's motion. The
    transcripts of the trial and related proceedings in Alameda County Superior Court have not yet been
28  made part of the record in this court.

3

ignored when it is time to file an answer and traverse. For example, the court does not today rule that the ineffective assistance of counsel claim is meritless, but only that the court will not authorize funds with regard to it based on the record now before the court.

Kilgore has not shown good cause for the court to permit the discovery or that the expenditure of public funds is necessary. The motion for provision of funds therefore is DENIED. (Docket # 3.) In light of the resolution of the motion, the court now sets the following briefing schedule on the petition for writ of habeas corpus:

1.    Respondent must file and serve upon petitioner, on or before **September 5, 2008**, an answer conforming in all respects to Rule 5 of the Rules Governing Section 2254 Cases, showing cause why a writ of habeas corpus should not be issued. Respondent must file with the answer a copy of all portions of the parole hearing record that have been previously transcribed and that are relevant to a determination of the issues presented by the petition.

2.    If petitioner wishes to respond to the answer, he must do so by filing a traverse with the court and serving it on respondent on or before **October 10, 2008.**

Petitioner is cautioned that he must mail a copy of his traverse (and any other filing) to respondent's counsel. It is not enough that the document eventually is e-filed and respondent's counsel might be able to retrieve it from the electronic filing system.

IT IS SO ORDERED.

DATED: July 16, 2008

_____
SUSAN ILLSTON
United States District Judge

4

# EXHIBIT COVER PAGE

$\beta$

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: _____ pages.

JURISDICTION:   (Check only one)

| | |
|---|---|
| ☐ | Municipal Court |
| ☐ | Superior Court |
| ☐ | Applellate Court |
| ☑ | State Supreme Court |
| ☐ | United States District Court |
| ☐ | State Circuit Court |
| ☐ | United States Supreme Court |
| ☐ | Grand Jury |

S151828

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re IVAN KILGORE on Habeas Corpus

The petition for writ of habeas corpus is denied. (See *In re Clark* (1993) 5 Cal.4th 750.)

SUPREME COURT
FILED

SEP 1 2 2007

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

MC-275

Ivan Kilgore
California State Prison Sacramento
PO Box 290066
Represa, CA 95671
CDC# V31306

**SUPREME COURT**
**FILED**

APR 1 6 2007

Frederick K. Ohlrich **Clerk**

DEPUTY

## CALIFORNIA SUPREME COURT

| | |
|---|---|
| Ivan Kilgore | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | $S\ 1\ 5\ 1\ 8\ 2\ 8$ |
| vs. | No. |
| A.J. Malfi(Warden) | (To be supplied by the Clerk of the Court) |
| Respondent | **EVIDENTIARY HEARING REQUESTED** |

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

IVAN KILGORE V31306
CALIFORNIA STATE PRISON SACRAMENTO
PO BOX 290066
REPRESA, CA 95671

CALIFORNIA SUPREME COURT

IVAN KILGORE,

      PETITIONER

A.J. MALFI(WARDEN)

      RESPONDENT

CASE NO: S151828

MOTION TO AMEND PET-
ITION FOR WRIT OF
HABEAS CORPUS

I, Ivan Kilgore, am the Petitioner in the above entitled action before this court. Petitioner respectfully request this court allow him to amend the pending Petition for Writ of Habeas Corpus filed on April 16, 2007, to include one additional claim of IAC. If motion is granted this additional ground will set forth a second claim within the writ. Petitioner's show for good cause why this claim was not presented with the initial filing is due to ineffective assistance of appellate counsel and the recent obtaining and review of trial transcripts. The claim is "potentially meritorious" and reads as follows:

    CLAIM # (2) INEFFECTIVE ASSISTANCE OF COUNSEL; FAILURE TO
                INVESTIGATE AND PREPARE OKLAHOMA TRIAL EVIDENCE
                BEFORE MAKING TACTICAL DECISION(S).

1

2

## SUPPORTING FACTS FOR GROUND #2

3   As noted at page one of the supporting facts for ground #1
4 the parties (Trial counsel Levy and Prosecutor Stallworth) belie-
5 ved the Oklahoma conviction resulted from a plea.(CT 289) Ms Levy
6 despite the appearance, was informed by the Petitioner long
7 before the trial that there was a jury trial in the prior Okla-
8 homa conviction. Yet, Levy's investigation was limited to the
9 plea form of "Judgment and Sentence" from the Oklahoma case.(CT
10 291) Prosecutor Stallworth discovered there was a jury trial and
11 requested transcripts of the Petitioner's Oklahoma testimony to
12 utilize in damaging Petitioner's self-defense defense, credibil-
13 ity and ect.(RT 19, 604-634) The trial court ultimately ruled, at
14 the end of the presentation of the prosecution's case, that if
15 Petitioner testified, he could be cross-examinated with his Okla-
16 homa testimony.(RT 634-646) It deemed the prior admissible on
17 three grounds: (i) to prove or disprove Petitioners "credibility"
18 concerning the presence or absence of the need for self-defense,"
19 (ii) to prove or disprove "any mistake of fact testified to by
20 the Petitioner," and (iii) "as to the existence or nonexistence
21 of malice aforethought.(RT 615, 621, 635)

22   Ms. Levy at no time,prior to the trial or after the prosec-
23 tions election to use the Oklahoma evidence, did investigation
24 or preparation of the Oklahoma trial evidence(other testimonies,
25 exhibits or ect.) Levy testified at the Petitioner's motion for
26 new trial, " she did no additional investigation".(RT 1005)
27 Levy's arguements at the hearing to exclude the prior Oklahoma
28 conviction reflect her lack of investigation and preparation.

1  (RT 623-626) These comments by Levy are a clear indication she
2  was not aware of the evidence at the Oklahoma trial, other than
3  the Petitioners testimony.

4      Based on this limited evidence Levy made a (uninformed) tac-
5  tical decision to advise and caused the Petitioner not to testify
6  abandoned a meritorious defense of self-defense, elected not to
7  call witnesses supporting the self-defense defense and instead
8  persued a mistaken I.D. defense, she knew would get the Petition-
9  er convicted.(RT 1027, 1031)

10     As discussed on page(s) 2-3, in the supporting facts for
11 ground #(1)Levy explained her tactical reason.

### Controlling Legal Principles:
### Ineffective Assistance of Counsel Claims and the Duty to Investigate

The general principles which apply to Appellant's claim that he received constitutionally inadequate representation are well settled. A defendant claiming ineffective representation bears the burden of proving by a preponderance of the evidence both: (1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant – in other words, a probability sufficient to undermine confidence in the outcome. Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). At the same time, a defendant has the right to the effective assistance of counsel at trial, and thus is "entitled to the reasonably competent assistance of an attorney acting as his diligent and conscientious advocate". See, e.g., In re Ross, 10 Cal.4th 184, 201 (1995).

With respect to the question of what constitutes an "objective standard of reasonableness" for attorney performance, the United States Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct, and instead has emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Wiggins v. Smith, 539 U.S. 510 (2003). Accordingly, "before counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation." In re Marquez, 1 Cal.4th 584, 602 (1992). Hence, although a court must presume that counsel's conduct falls within the "wide range of reasonable professional assistance", see Bell v. Cone, 535 U.S. 685, 702 (2002), counsel's alleged tactical decisions must be subjected to "meaningful scrutiny", see In re Avena, 12 Cal.4th 694 (1996), and must be "informed", so that *before* counsel acts, he or she "will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." Marquez, supra, at 602; see also In re Jones, 13 Cal.4th 552, 565 (1996).

In Strickland, the Supreme Court emphasized that "tactical" decisions, although entitled to a heavy measure of deference if undertaken following a reasonable investigation, are only as reasonable as the investigation on which they are based:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, supra, 466 U.S. at pp. 690-691.

In Wiggins v. Smith, supra, 539 U.S. 510, the Supreme Court applied this basic principle in expressly determining whether a lawyer's pre-trial investigation was constitutionally deficient. In Wiggins, a Maryland state court trial, the defendant was convicted of robbing an elderly woman and drowning her in the bathtub of her apartment. The defendant was eligible for the death penalty, but the defense decided not to put on any mitigation evidence. The defendant was convicted, and alleged on habeas corpus that his counsel had been ineffective.

The high court explained that its focus was not on whether counsel should have presented a case in mitigation, but on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." Wiggins, supra, 539 U.S. at p. 523. In reviewing the adequacy of defense counsel's legal representation, the high court found that trial counsel had abandoned their investigation of the defendant's background after having acquired only "rudimentary" knowledge of his history from a narrow set of sources.  Id., at p. 524. The court found that this limited investigation not only was unreasonable under then-applicable standards, but that it was also unreasonable in light of the leads that counsel actually discovered – leads which would have caused any reasonably competent attorney to realize "that pursuing these leads was necessary to making an informed choice among possible defenses...." Ibid. The court also found that, because counsel spent insufficient time considering and developing a trial strategy, counsel's failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment. The Wiggins court also rejected the idea that because counsel had some information to work with, they were in a position to make a tactical choice not to present a mitigation defense. Instead, the court stated that, in assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate *further*. Hence, Strickland could not be read to render trial counsel's conduct bulletproof under the Sixth Amendment merely by saying it was done for "strategic reasons". Rather:

> [E]ven assuming that counsel limited the scope of their investigation for "strategic reasons", Strickland does not establish that a cursory investigation automatically justifies a tactical decision with respect to ... strategy. Rather, a reviewing court must consider *the reasonableness of the investigation said to support that strategy.*

Wiggins, supra, 539 U.S. at p. 527 [emphasis added].

Applying the above principles as a guide to determining whether counsel's performance was deficient, the Wiggins court found that counsel "chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to ... strategy impossible." Id., at pp. 527-528. The court therefore concluded: "Counsel's investigation ... did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered ... – evidence that would have led a reasonably competent attorney to investigate further. Ibid; see also In re Thomas, 37 Cal.4th 1249, 1264 (2006), applying Wiggins ["What matters is the substance of the investigation – whether counsel in fact explored those avenues reasonable counsel would have pursued in light of what was known and in light of the defense strategy."]

In sum, the Strickland test does not afford any slavish deference to decisions by trial counsel that are based – not on informed "tactical" choices, but rather on a *failure to conduct reasonable investigation in the first place*. Similarly, in the case at bar, it is trial counsel's failure to investigate that is assailed, rather than informed tactical decisions made in the wake of a reasonably thorough investigation.

## Deficient Performance

### *Failure To Investigate and Prepare For Trial*

The duty to investigate is part of a defendant's right to reasonably competent counsel. Indeed, "The principle is so fundamental that the failure to conduct a reasonable pretrial investigation may in itself amount to ineffective assistance of counsel." United States v. Tucker, 716 F.2d 576, 583 n. 16 (9th Cir. 1983). The American Bar Association states the duty as follows:

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities.

ABA Standard 4-4-1. Moreover, "The investigatory process should begin immediately on appearance as counsel for a defendant." (Id., Standard 4-4.1.) As summarized in the Commentary to Standard 4.3 [emphasis added]:

An adequate defense cannot be framed if the lawyer does not know what is likely to develop at trial ... In criminal litigation, as in other matters, the information is the key guide to decisions and action. *The lawyer who is ignorant of the facts of the case cannot serve the client effectively.*

Furthermore, the duty to investigate does not depend upon the lawyer's ability or experience: "The most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense." Harris v. Blodgett, 853 F.Supp. 1239, 1255 (W.D. Wash. 1994) [citing Tucker, supra, and McQuen v. Swensen, 498 F.2d 207, 217 (8th Cir. 1994)].

1

## CONCLUSION

2

3    **The** above instance(s) of IAC violated Petitioner's 6th

4    Amendment right to reasonably competent counsel. Trial counsel

5    rendered IAC when she failed to investigate and/or prepare in-

6    dependant evidence from the Oklahoma trial that corroborated

7    Petitioner's Oklahoma trial testimony that the trial court allow-

8    ed for previously stated reasons. As discussed at page (8) in

9    ground #(1) of this writ, had such investigation been made suff-

10   icient corroboration of  Petitioner's credibility would have been

11   discovered**(Note: Examples are given at pp.8-10 of ground#1)**which supported

12   his successfully asserted defense in the Oklahoma trial. Yet, because

13   of counsel's failure to conduct pretrial investigation and pre-

14   paration of the Oklahoma trial evidence, she was not aware of the

15   readily available facts which would have afforded Petitioner a

16   justiciable defense in face of any adverse factor the prosecution

17   would have attempted to introduce from that case. Therefore, in

18   light of counsel's reason for tactical decision and strategy

19   being made without investigation of all the facts of the Oklahoma

20   evidence, this renders her thought process inadequate and in-

21   competent.

22

23   For the forgoing reasons the petitioner respectfully request

24   this motion to Amend be granted.

25   I declare under the penalaty of perjury the forgoing is true

26   and correct.

27   Excuted at Represa, California on_____

28
                                        _____
                                          (Petitioner)

# EXHIBIT COVER PAGE

$C$

EXHIBIT

Description of this Exhibit:

Number of pages to this Exhibit: __33__ pages.

JURISDICTION:   (Check only one)

☐ Municipal Court

☐ Superior Court

☑ Appllelate Court

☐ State Supreme Court

☐ United States District Court

☐ State Circuit Court

☐ United States Supreme Court

☐ Grand Jury

Filed 8/30/06

COPY

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

**FILED**

Court of Appeal-First App. Dist.

AUG 3 0 2006

DIANA HERBERT

BY _____

DEPUTY

| | |
|---|---|
| THE PEOPLE,<br><br>**Plaintiff and Respondent,**<br><br>v.<br><br>**IVAN KILGORE,**<br><br>**Defendant and Appellant.** | A106142<br><br>(Alameda County<br>Super. Ct. No. 141033) |

Ivan Kilgore appeals from a judgment of conviction and sentence entered after a jury found him guilty of first degree murder in a drive-by shooting. Kilgore contends: (1) the trial court erred when it ruled that, if Kilgore testified, the prosecution could cross-examine him on his testimony in another case; (2) the court erred in failing to instruct the jury on "second degree drive-by murder"; (3) the jury should have been instructed that the doctrine of transferred intent applied to his self-defense claim; (4) the court improperly precluded him from introducing evidence of the character of his victim and a prosecution witness; and (5) his trial counsel rendered ineffective assistance of counsel. We will affirm the judgment.

I. FACTS AND PROCEDURAL HISTORY

An information charged Kilgore with the murder of William Anderson (Pen. Code, § 187)[1] and alleged the special circumstance that he committed the murder by shooting from inside a vehicle with the intent to kill (§ 190.2, subd. (a)(21)). As a

---

[1]    Except where otherwise indicated, all statutory references are to the Penal Code.

1

sentence enhancement, it was further alleged that Kilgore discharged a firearm causing death. (§ 12022.53, subd. (d).) A 1997 Oklahoma conviction for manslaughter was alleged as a serious felony prior offense (§ 667, subd. (a)) and as a strike (§ 1170.12).

A. PROSECUTION CASE

At approximately 5:45 p.m. on July 16, 2000, William Anderson (William) was shot to death while standing on the corner of San Pablo Avenue and 30th Street in Oakland. An autopsy determined that he was killed by a shotgun blast to the chest and abdomen, with 11 penetrating wounds. The ammunition was buckshot, fired from a distance of about 8 to 12 feet. Police found no casings, slugs, strike marks, or other evidence of any other gun being fired at the scene.

1. Eye-Witness Shanae Anderson's Testimony

William's cousin, Shanae Anderson, described the circumstances of the shooting.

On July 16, 2000, Shanae and her boyfriend Terry Dandy, as well as William's girlfriend Bianca Moore, were visiting William at his parents' house on 30th Street in Oakland. Around 5:00 p.m., Shanae and Bianca went to a pay telephone at 30th Street and San Pablo Avenue; William and Terry joined them shortly thereafter. None of them had a weapon, and Shanae had never seen William or Terry involved in violence or illegal behavior. As Shanae talked on the pay telephone, she heard William say, "There is that punk ass nigga right there." William and Terry were laughing.

Shanae then heard a "bang" and thought it was a car backfire. She turned around and saw a man pointing a gun out of the rear window of a gray Cadillac. Shanae stood there as Bianca and Terry ran. William said "I'm shot" and fell to the sidewalk.

Shanae noticed three people in the Cadillac: the driver, a front-seat passenger, and the man in the back seat with the gun. She did not see the face of the driver or front passenger, but identified Kilgore as the man in the back seat. She specifically remembered his eyes and brown complexion.

The Cadillac made a U-turn and pulled up to the curb, where Shanae was standing and William remained on the ground. Kilgore, still in the back seat, switched to the other

2

side of the car and pointed the gun at William. William continued saying, "I'm hit. I'm shot." The Cadillac drove off.

When speaking with the police about the incident, Shanae identified Terry incorrectly as "Richard Davis." Bianca had told her to give a false name, Shanae explained at trial, because Bianca thought Terry had a warrant out for his arrest. For the same reason, Shanae said Terry was 5'8" when he is really 6'3."

Shanae's trial testimony differed in a few details from the account she gave to police on the day of the shooting. She did not tell the police that Terry said something to the effect of "There is that punk ass nigga," claiming instead that he said only, "Oh shit." Although Shanae stated at trial that she remembered Kilgore's eyes, she did not mention his eyes to the police. Furthermore, while she told the police the shooter had a "brown" complexion, she acknowledged at trial that Kilgore's complexion was lighter than "brown."

### 2. Eye-Witness Bianca Moore's Testimony

William's girlfriend Bianca testified that she had never seen William or Terry engage in violent behavior. William told her in June 2000 that Kilgore owed him money, but he did not appear upset about it. In early July 2000, he said that he and a friend had tried to collect the money from Kilgore, and Kilgore and the friend got into a fight. He did not seem upset about this incident either.

Bianca's recollection of the shooting was much the same as Shanae's. Late in the afternoon on July 16, 2000, Bianca recounted, she and Shanae walked from the Andersons' house to the pay telephone at 30th Street and San Pablo Avenue to make a telephone call. William and Terry met them there shortly thereafter. William pointed at a gray Cadillac passing by and nonchalantly said, "There go that N-I-G-G-A Ivan." The Cadillac, having stopped, made a U-turn and went off the way it came. About 15-20 minutes later, the Cadillac returned. Terry said, "he got a gun," and Bianca turned to look. As the Cadillac passed, William pushed her, and she heard a single gunshot. William was shot.

3

The Cadillac turned around and pulled up next to Bianca. She saw a man—Kilgore—with a gun in the back seat. When Kilgore pointed the gun at her, she began to pray and told Kilgore, "I got a son to live for." The Cadillac drove off. William was lying on the ground, saying he had been shot. She had not seen either William or Terry with a weapon.

Bianca was scared and did not want to talk to the police. When she spoke to them, she did not say that she had seen Kilgore shoot William, or that William or Terry had said, "There go that nigga, Ivan." When asked about Terry, she misidentified him as Richard Davis, at his request. Not wanting to be a witness at a trial, Bianca told police that she was unsure whether she could identify the shooter because the windows in the back of the Cadillac were tinted and the rear window was down only half way.[2]

### 3. Testimony of Investigating Officer Green

Oakland Police Sergeant Phil Green arrived at the scene about two hours after the shooting. Although there were references over the 911 communication system to "shots" being fired, and another officer at the scene said there had been one or two shots, Sergeant Green found no strike marks or other evidence suggesting that more than one shot had been fired.

Sergeant Green interviewed Shanae, Bianca, and Terry. Each of them gave the officer a false identification for Terry. Shanae was cooperative but very anxious to terminate the interview. She did not tell Sergeant Green that there was anything distinct about the shooter's eyes. Bianca was distraught and, in Green's estimation, "didn't appear to be too thrilled to be down at [his] office." She was unsure whether she could identify the shooter and did not offer that William had named Kilgore as the man in the back seat of the Cadillac. Terry told Sergeant Green that he heard two shots.

---

2    Kilgore contends that, at the preliminary hearing, Bianca said she did not get a good look at the shooter because her mind "went blank." In fact, when asked whether she got a good look at the shooter, Bianca responded "yes and no," explaining that she was able to see "the whole top part" of the person.

4

After considering the witnesses' statements—and learning that Kilgore had called the police minutes after the shooting to report his 1985 Cadillac stolen—Sergeant Green concluded that Kilgore was a suspect. When police searched Kilgore's apartment later that evening, he was not there.

A confidential informant advised police that the Cadillac's getaway driver was Raymond Jones. Sergeant Green arrested Jones for murder the next morning. Jones eventually admitted driving the car used in the shooting and implicated Kilgore. Sergeant Green later received a phone call disclosing the location of car, which showed no sign of forced entry or having been struck by bullets.

Three months after the shooting, Kilgore surrendered to Sergeant Green.

4. Testimony of Getaway Driver Raymond Jones

Jones testified at trial as part of a plea agreement, which provided that in exchange for truthful testimony Jones would plead guilty to being an accessory to murder after the fact (§ 32) and could serve up to one year in county jail.[3] At trial, Jones also acknowledged that he had previously been convicted of misdemeanor possession of stolen property and, at the time of the shooting, was using heroin about twice a week.

In December 1999, Jones recalled, he lived next door to Kilgore in an apartment building at 509 Sycamore Street in Oakland. Kilgore worked as a manager for the building, fixing things, cleaning, and collecting rent. Kilgore drove a Cadillac.

In early 2000, Jones met William, who appeared at the apartment building at times with Terry, also known as "T." Jones never saw William or Terry engage in illegal or violent behavior, or have any weapon. In the spring of 2000, however, Kilgore told Jones that William and Terry had attacked him twice within a month. On one of those occasions, they robbed him. The other time, they "jumped" him and beat him up. On the day of the latter assault, Jones recounted, he heard Kilgore calling for help and, looking

---

[3]    To the extent Kilgore requests that we take judicial notice of the Alameda County Superior Court file in Jones's case, he has not complied with applicable rules and the request is denied.

5

out his window, saw William and Terry running away. The next day, Jones saw that
Kilgore had a black eye. Jones gave Kilgore a baseball bat to put in his car for
protection, but he never heard Kilgore say anything about getting a gun or doing anything
violent to William or Terry.

On the day of the shooting, Jones and a man named "Sic" helped Kilgore clean up
part of the Sycamore apartment building. Jones had already consumed a "tall can of
beer," and he and Kilgore split a 40-ounce beer while they worked. Jones had also
smoked a "blunt" and might have snorted heroin that day but, nonetheless, professed to
be "sober."

In the afternoon, Kilgore and Sic went to Home Depot to buy cleaning supplies.
When they returned about 10 or 15 minutes later without the supplies, Kilgore said he
had seen the guys with whom he was "having problems." He asked Jones to "ride with
him," leading Jones to think that Kilgore wanted to fight William and Terry.

Jones drove Kilgore's Cadillac, at Kilgore's instruction, with Sic in the
front-passenger seat and Kilgore in the back. Kilgore directed Jones to drive to San
Pablo Avenue, and then north towards Berkeley. As they approached the corner of San
Pablo Avenue and 30th Street, Kilgore said, "There they go." Jones observed a group of
"guys and girls" standing on the corner and pulled the car up to the curb. He believed
Kilgore was going to fight "the guy" (ostensibly William) one on one. Then Kilgore said
something like, "What's up, now? What's up, punk?" and Jones heard a gunshot from
the rear seat. He looked toward the back seat and saw Kilgore with a gun. Jones was
shocked. He had not seen the people on the street display a weapon or do anything
before Kilgore fired the gun. On cross-examination, he "guess[ed]" that it was "possible"
that a second shot was fired when Kilgore fired his shotgun because Kilgore's discharge
of the gun in the backseat had made such a loud noise.

Jones made a U-turn and observed someone lying on the ground. He did not see
anyone, other than Kilgore, with a gun and thought that Kilgore had "just shot somebody
on a drive-by." Jones drove quickly back to the Sycamore apartment building and
returned to his apartment, without discussing the incident with Kilgore.

6

Within 24 hours of the shooting, Jones obtained a gun for his own protection, afraid of retaliation from William and Terry's "people" and believing Terry and his friends might have guns. After seeing a wooden barricade Kilgore had put on his door, Jones put up a barricade on his own door as well. Sometime later that day, he saw Terry drive by his building on Sycamore Street.

Jones told Matthew Bryant that Kilgore shot William.

5. Matthew Bryant's Testimony

Bryant, previously convicted of narcotics possession and grand theft, was in jail in April 2001 after being arrested for the theft of his girlfriend's car. With the hope of getting out of jail, he contacted Sergeant Green and claimed to have information regarding a July 16, 2000 homicide. In a taped interview, Bryant advised Sergeant Green that he had met Kilgore, whom he knew as "Gill," through Jones.

Bryant recalled at trial that Kilgore told him that "a few people jumped on him." He professed, however, not to remember any further substance of his interview with Sergeant Green. The court then permitted the prosecutor, to play an audiotape of the interview.

As recorded by the audiotape, Bryant explained to Sergeant Green that "Giz [Kilgore] had just got jumped on and got some weed took from him." Before the shooting, Bryant added, Kilgore had said he was going to "smoke" the people who had "jumped" and robbed him. A few weeks after the murder, Jones told Bryant that Kilgore had shot somebody while Jones was driving Kilgore's Cadillac. Kilgore told Bryant the same thing, explaining that he had fired a 12-gauge shotgun one time, hitting William.

Bryant also stated in the interview that Kilgore had offered him $500 to retrieve a shotgun Kilgore had hidden in the "balcony" area (attic) of the Sycamore apartments. Bryant tried to crawl through a cubbyhole into the attic, but he was too big. In addition, Kilgore asked Bryant to break the ignition in his automobile to make it look like the car had been stolen, but Kilgore did not take him to the car.

Bryant asserted at trial that the statements he made to Sergeant Green implicating Kilgore were lies and that he made the statements to get out of jail on the automobile

7

theft charge. In fact, after implicating Kilgore, Bryant was released from jail and not charged with that particular car theft. Bryant maintained that Kilgore had not said anything to him about the shooting or retrieving a gun and that the things he told Sergeant Green about the shooting he had heard from Jones or on "the street."

### 6. Officer Miller's Testimony

Oakland Police Officer Allan Miller testified that he was able to gain access to the attic at 509 Sycamore Street. At 6' tall and weighing 180 pounds, he had to take off his gun belt to fit through the opening. He did not find a gun in the attic.

### B. DEFENSE CASE

Before the prosecution rested its case, the trial court ruled that, if Kilgore testified, he could be cross-examined on his testimony in the 1997 Oklahoma homicide case in which he was convicted of manslaughter. Thereafter, the defense called several witnesses, but Kilgore did not testify.

### 1. Testimony of Character Witness Kevin Tomlinsonn

Kevin Tomlinsonn testified that he was the owner of the apartment building at 509 Sycamore Street, where Kilgore lived. Tomlinsonn met Kilgore when Kilgore was working for his contractor, who was renovating the building. Kilgore became a tenant and also performed small jobs in the building. Tomlinsonn viewed Kilgore as reliable and trustworthy.

Tomlinsonn also knew William, because William's parents had rented an apartment in the building and, although Tomlinsonn expected the parents to move in, William moved in instead. Jones was a tenant as well.

Kilgore told Tomlinsonn at some point that he had been robbed and assaulted. Tomlinsonn observed small cuts and bruises on Kilgore's face, and a couple of weeks later, Kilgore had a "good-sized" black eye. Some time after these assaults, Kilgore built a barricade on his door.

### 2. Testimony of Witness Mary Loggins

Mary Loggins recounted that, as she was driving on San Pablo Avenue on July 16 at 5:45 p.m., she heard a gunshot and observed a man fall near the phone booth. While

8

she continued driving, she looked in her rear view mirror and saw someone wearing a puffy jacket and dark clothes running in the street. She did not see him holding a gun or other weapon, although he might have had something under his jacket, since he was holding his arms close to his body while running. Loggins also observed a gray Cadillac leave the scene and speed around the corner. When Loggins turned her car around, she saw two women standing next to the fallen body.

### 3. Testimony of Witness Mary Washington

Mary Washington was riding in the front passenger seat of Mary Loggins's car. She heard several "bangs," looked in the car's rear view mirror, and saw a man on the ground and the people around him running away. An older gray Cadillac or Buick proceeded north on San Pablo Avenue, turned around, and sped away south.

### 4. Defense Investigator Monte Beers' Testimony

Monte Beers, a defense investigator, interviewed Bianca. During the interview, she claimed that William had been in three fights with Kilgore. Although she could not identify anybody in the Cadillac, she was sure it was Kilgore's car. In addition, Bianca asserted, the shooter's weapon appeared to be a sawed-off shotgun.

### C. VERDICT, NEW TRIAL MOTION, AND SENTENCE

The jury convicted Kilgore of first degree murder and found true the drive-by special circumstance and the firearm enhancement.

Kilgore filed a posttrial *Marsden* motion, seeking new counsel. The court relieved trial counsel and appointed another attorney to represent Kilgore in regard to a motion for a new trial based on allegations of ineffective assistance of counsel. After an evidentiary hearing in which trial counsel and Kilgore both testified, the court denied the new trial motion.

Kilgore was sentenced to life without the possibility of parole. The term on the enhancement for use of a firearm was stayed.

This appeal followed.

9

## II. DISCUSSION

As mentioned, Kilgore contends the trial court erred in (1) ruling that, if Kilgore testified, the prosecution could cross-examine him on his testimony in his Oklahoma manslaughter case; (2) failing to instruct the jury on second degree drive-by murder; (3) failing to instruct the jury that the doctrine of transferred intent applied to self-defense; and (4) barring Kilgore from introducing bad character evidence regarding William and Terry. In addition, Kilgore urges that he did not receive effective assistance at trial and that the cumulative effect of the purported errors compels reversal.

### A. ADMISSIBILITY OF KILGORE'S TESTIMONY IN THE OKLAHOMA CASE

Kilgore argues that the trial court erred when it denied his motion to exclude evidence of his Oklahoma manslaughter case, and particularly in ruling that he could be cross-examined with his Oklahoma testimony if he testified in the instant case. We first summarize his Oklahoma testimony and his motion to exclude the evidence, and then consider the arguments of the parties on appeal.

#### 1. Kilgore's Oklahoma Trial Testimony

Kilgore was convicted of manslaughter in 1997 in Oklahoma. He testified at the Oklahoma trial about the circumstances of the shooting, contending he shot his victim in self-defense.

Specifically, Kilgore explained, he had owned a "semi-automatic Tec-22, a semi-automatic 45, and semi-automatic nine millimeter Tec," two of which had been stolen from his home. (The third gun was not stolen because he carried it in the trunk of his car.) When he confronted a man named Bryant Jones (Jones) about the stolen guns, Jones admitted that he had one of them and told Kilgore to accompany him to a friend's house. As Kilgore entered the porch of the house—armed with his semi-automatic Tec-9 and a 20-round magazine—Jones came "busting out of the ho[use] in some kind of panic," claimed he did not have Kilgore's gun, and left the scene. Kilgore went inside, where he encountered Conan Emery, sitting in a chair and "looking at me like he had some kind of grudge against" Kilgore. Kilgore claimed he was scared of Emery, a gang leader, because of his violent history. He nevertheless asked Emery about his stolen

10

guns, to which Emery responded that he would let Kilgore's "ass have it" if his inquiries persisted. When Emery made a motion towards his waistband, Kilgore, thinking Emery had a gun, pulled out his Tec-9 and fatally shot him.

After being arrested for the homicide, Kilgore wrote a letter to a friend, claiming that the woman who owned the house where Emery was shot had removed a gun from Emery's body. The letter stated, "In order for me to get off she's going to have [to] tell the police she moved [Conan's] gun." Kilgore also wrote that he might need to have "Blunt, Yogie, Sidlo and Pic" say that Emery "had a gun." According to Kilgore, he would have a strong case of self-defense "if we can get these statements out of people."

On cross-examination in the Oklahoma case, Kilgore acknowledged that he "ran around" with the Eight Trey Crips gang as a juvenile but denied being an actual gang member. He maintained that all of his friends who identified him as a Crips member were lying. He denied telling friends that he was going to kill the people who had stolen his guns. He acknowledged that, after killing Emery, he had not informed the police about the shooting.

### 2. Motion to Exclude Evidence of the Oklahoma Conviction

At trial in the present action, defense counsel moved to exclude any reference to Kilgore's prior Oklahoma homicide conviction, which Kilgore contends was roughly equivalent to an involuntary manslaughter conviction in California. (Respondent does not dispute this assertion.) The prosecutor opposed the motion, asserting that the evidence was admissible under Evidence Code section 1101 and the "doctrine of chances," with respect to Kilgore's claim that he shot William in self-defense.

The trial court denied Kilgore's motion, finding that his testimony in the Oklahoma case showed that he had offered a similar explanation for the death of his Oklahoma victim as he offered in this case, and the "occurrences [were] unusual enough with their repetition" to suggest his self-defense explanation was not believable. Kilgore insists this was error.

### 3. Forfeiture

Before turning to the merits of the trial court's ruling, respondent contends that Kilgore is barred from challenging the ruling because he did not testify at the trial in this case. For this proposition he refers us to *People v. Collins* (1986) 42 Cal.3d 378 (*Collins*), which held that a defendant must testify in order to preserve a claim of improper impeachment with a prior felony conviction. (*Id.* at pp. 383-389.) Without the defendant's testimony, the court in *Collins* observed, an appellate court cannot review the trial court's balancing of probative value and undue prejudice. In addition, consideration of the harm caused by the trial court's ruling is speculative, such that the prejudicial effect of the purported error is difficult to determine. (*Id.* at pp. 384, 393.)

*Collins* was decided in a different factual context. The matter before us does not involve impeachment with a prior felony conviction, but, rather, evidence admitted to show Kilgore's mental state as relevant to his claim of self-defense. Respondent argues that *Collins* should nevertheless apply because, like the defendant in *Collins*, Kilgore placed his credibility before the jury and should not be allowed to present himself in a false light. Kilgore counters that *Collins* is inapplicable because in this case: the proffered evidence included facts and testimony from the prior case, not just the conviction itself; the conviction itself is inadmissible, because the crime is not one of moral turpitude; and impeachment with such testimony is not constitutionally required pursuant to California Constitution article I, section 28, subdivision (f), as it was in *Collins*. Furthermore, he contends that the reasoning underlying *Collins*—that an appellate court cannot fairly be asked to weigh prejudice against probative value if the defendant's testimony is unknown—is not at issue here because Kilgore presented a pretrial offer of proof as to the content of his proposed testimony and testified under oath on the motion for new trial. Neither party cites a decision directly on point.

We need not decide whether *Collins* applies to this case involving evidence admitted under Evidence Code section 1101. Even if *Collins* applied, Kilgore provided to the trial court his proposed testimony by an offer of proof, which our Supreme Court has suggested may preserve the challenge. (*Collins*, *supra*, 42 Cal.3d at p. 393.)

Moreover, because we conclude *post* that the court did not err in ruling the Oklahoma testimony admissible, we need not determine if Kilgore forfeited his right to challenge it.

4. Admissibility

As a general matter, evidence of a defendant's character or criminal propensity, as shown by his past conduct, is inadmissible to prove he acted in conformity with that character or propensity on another occasion. (Evid. Code, § 1101, subd. (a).) Evidence of a defendant's prior bad act may be admissible, however, if relevant to prove another material fact, such as motive, intent, plan, knowledge, identity, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).)

The trial court found it was a "close call" whether the Oklahoma incident was sufficiently similar to the shooting of William to render Kilgore's Oklahoma testimony admissible under Evidence Code section 1101, subdivision (b), for purposes of proving his state of mind in regard to his self-defense claim. It ultimately concluded that the evidence was admissible under the doctrine of chances, because he offered an explanation for the death of his Oklahoma victim that was similar to the explanation he offered in this case, and the repetition of the occurrences suggested his self-defense explanation was not believable.

Kilgore claims the doctrine of chances is merely another way of stating that a prior crime was sufficiently similar to the charged crime to be admissible for purposes of proving intent under Evidence Code section 1101, subdivision (b), so the court's ruling that the Oklahoma homicide was not sufficiently similar to be admitted under Evidence Code section 1101 rendered it inadmissible under the doctrine of chances as well. In making this argument, Kilgore misrepresents the trial court's ruling.[4] In any event,

---

4      The trial court did not find that the Oklahoma homicide was *insufficiently similar* for admission under Evidence Code section 1101, observing only that it was a close call. It is true the court remarked that the issue of general intent was not *at issue*, but Kilgore misrepresents the court's concern to make it seem as if the trial judge believed there was no issue of "intent" within the meaning of Evidence Code section 1101. He quotes the trial court as ruling: "it doesn't appear that there is an issue concerning the general intent that the act was performed with, in other words, he meant to fire the gun and he fired the

13

whether characterized as a ruling under Evidence Code section 1101, subdivision (b), or the doctrine of chances, the trial court did not abuse its discretion in concluding that the Oklahoma evidence was admissible. (See *People v. Kipp* (1998) 18 Cal.4th 349, 369 [admission of other crimes evidence reviewed for abuse of discretion].)

As mentioned, under Evidence Code section 1101, evidence of other crimes may be admitted to show identity, common design or plan, or intent, if the other crime was sufficiently similar to the charged crime. While the other crimes must be highly similar to the charged offenses to be admitted on the issue of identity, a lesser degree of similarity is required for admission as to common design or plan, and the least degree of similarity is needed for admission on the issue of intent. In the last instance, the other crimes need only be sufficiently similar to the charged offenses to support the inference that the defendant probably harbored the same intent in each instance. (*People v. Lewis* (2001) 25 Cal.4th 610, 636-637; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

In the matter before us, the circumstances of the Oklahoma homicide and William's shooting were sufficiently similar to warrant admission of Kilgore's Oklahoma testimony under Evidence Code section 1101, subdivision (b). In both the Oklahoma case and the instant case, Kilgore claimed to have killed his victims in self-defense. In both cases, he shot at close range an unarmed victim with whom he had a dispute. In both cases, he had threatened to harm those who had wronged him. In both cases, he carried a gun to the scene, yet claimed that he discharged the weapon only because he thought he was about to be shot, either because his victim was pulling out a gun or had

---

gun . . . ." But the complete sentence, which Kilgore quotes only partially, reads as follows: "As I indicated, this does not appear, given [defense counsel's] offer of proof as of today that there is an issue concerning identity of the shooter, and it doesn't appear there is an issue concerning the general intent that the act was performed with, in other words, he meant to fire the gun and he fired the gun, *the issue is about mental state and the existence or non-existence of the element of self-defense and the existence or non-existence of an honest but unreasonable belief of a need to defend oneself against imminent peril to life or great bodily injury*." (Italics added.) From the portion of the judge's statement that Kilgore omits, it is clear that the court thought the Oklahoma testimony, though not germane to *general* intent, *was* relevant to Kilgore's state of mind.

14

actually fired. In both instances, Kilgore suffered no harm, while his victims were killed. The Oklahoma evidence suggests his self-defense theory may have been a fabrication. His claim of self-defense in the prior case was therefore probative of the legitimacy of his purported belief in this case of the need to defend himself.

The doctrine of chances obtains the same result in a slightly different way. In essence, the doctrine of chances maintains that with each repetition of an act under similar circumstances, the more reasonable it is to conclude the act was intended and premeditated. (*People v. Steele* (2002) 27 Cal.4th 1230, 1243 [evidence of prior murder admissible to show intent in charged murder in light of the doctrine of chances].) As applied here, the fact that Kilgore, for the second time, shot a victim at close range with a firearm he took to the scene of a confrontation (either to get his stolen guns back or to avenge a robbery and assault), the less likely it is that the homicide was perpetrated in self-defense. It was not an abuse of discretion to conclude that Kilgore's Oklahoma testimony was admissible.

Kilgore asserts that the Oklahoma testimony should have been excluded nonetheless, as more prejudicial than probative. For purposes of Evidence Code section 352, "prejudice refers to evidence that uniquely tends to evoke an emotional bias against the defendant without regard to its relevance on material issues." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 650; see also *People v. Lenart* (2004) 32 Cal.4th 1107, 1123 [uncharged crime evidence is admissible only if it has "substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence"]; *People v. Carpenter* (1997) 15 Cal.4th 312, 378-379 ["The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence."].)

As explained *ante*, Kilgore's Oklahoma testimony was probative because, in both cases, he claimed to have killed his victims in self-defense. Although Kilgore protests that the probative value was slight because the Oklahoma jury implicitly found his self-defense theory *credible* (in convicting him of the purported equivalent of involuntary

15

manslaughter), the point is not whether the jury accepted his claim in Oklahoma, but how unlikely it is that he shot a *second* person to death in rather similar circumstances only because he thought he had to defend himself. In the end, not even Kilgore disputes the relevance of the Oklahoma evidence, arguing instead that the evidence was "*too* probative," (italics added) and thus unduly prejudicial.

Given the probative value of the Oklahoma evidence, however, it was within the court's discretion to conclude that the evidence would not be unduly prejudicial. The circumstances of the Oklahoma case were no more inflammatory than the circumstances of this case: both involved shooting an unarmed victim at point-blank range. Although Kilgore complains that admission of the Oklahoma evidence would have risked the jury improperly deciding that "if he did it before, he would do it again," the trial court was prepared to protect against any such possibility by instructing the jury, in accordance with CALJIC No. 2.50, to use the evidence only as it related to Kilgore's self-defense claim, and not as evidence of bad character or predisposition. Kilgore also argues there were adverse facts in the Oklahoma case that were absent from the instant case (e.g., he owned semi-automatic handguns and had friends who were gang members), but this cannot be used to demonstrate error in the court's ruling, since this concern was never brought to the trial court's attention.[5]

Kilgore also asserts that the prejudicial impact of the Oklahoma evidence outweighed its probative value because, after learning the trial court's ruling, he opted not to testify. For this proposition he relies on *People v. Beagle* (1972) 6 Cal.3d 441, 453. Although the court in *Beagle* did refer to this consideration, it also interjected "a word of caution": "We do not propose to encourage or countenance a form of blackmail by defendants. No witness including a defendant who elects to testify in his own behalf

---

[5]    Kilgore contends this was another instance of his trial counsel's ineffective assistance. Counsel's failure to object in this regard does not require reversal, however, for the same reason we conclude *post* that her failure to request redaction of evidence or interpose other objections does not compel reversal: it was not sufficiently prejudicial. (See *post*.)

16

is entitled to a false aura of veracity." (*Ibid.*) In the matter before us, it was not an abuse

of discretion to decide—as the court here did implicitly—that the otherwise admissible

Oklahoma testimony evidence should be permitted, even if it were so damaging to the

defendant that he might opt not to testify in order to keep it from the jury.

Lastly, Kilgore argues in his reply brief that admission of the Oklahoma testimony

was inconsistent with his right not to be impeached with a manslaughter conviction,

which was not a crime of moral turpitude (see *People v. Castro* (1985) 38 Cal.3d 301,

313), and that a defendant may be impeached with a prior conviction only by name of the

crime and date of conviction, not the underlying facts (see *People v. Allen* (1986) 42

Cal.3d 1222, 1270). But as Kilgore elsewhere urges, his testimony in the Oklahoma case

was not offered as *impeachment* with a prior conviction under Evidence Code section

787, but as substantive evidence of his mental state under Evidence Code section 1101,

relevant to his claim of self-defense.

In the final analysis, we find no prejudicial abuse of discretion.

B. Failing to Instruct on Second Degree Murder By Drive-By Shooting

Kilgore next argues that the trial court erred in failing to instruct the jury sua

sponte on second degree drive-by murder, contending it is a "lesser-included

'offense-plus-enhancement'" of first degree murder and the special circumstance of

drive-by murder.[6] While the court instructed the jury on the elements of first degree

drive-by murder, which requires an intent to kill, it did not instruct on second degree

drive-by murder, which he claims requires a mere intent to injure.

Degrees of murder are distinguished in section 189. As relevant here, first degree

murder is murder that is committed with premeditation and deliberation, or murder that is

"perpetrated by means of discharging a firearm from a motor vehicle, intentionally at

---

[6]    Specifically, Kilgore asserts: "Second degree drive-by murder may be deemed a
lesser-included offense within the special circumstance of drive-by murder and within the
crime of first degree murder. Alternatively, second degree drive-by murder may be
deemed a lesser-included enhancement, or offense plus enhancement, within the special
circumstance of drive-by murder and within the crime of first degree drive-by murder."

another person outside of the vehicle with the intent to inflict death." (§ 189.) "All other kinds of murders are of the second degree." (§ 189.)

The trial court instructed the jury on first degree murder, with premeditation and deliberation. (CALJIC No. 8.20.) It further instructed on first degree murder by drive-by shooting, as murder perpetrated by discharging a firearm from a motor vehicle "intentionally at another person outside of the vehicle when the perpetrator specifically intended to inflict death." (CALJIC No. 8.25.1.)

The trial court also instructed the jury on second degree murder, under theories of express malice (intent to kill) and implied malice (conscious disregard of the danger to human life). (CALJIC Nos. 8.30, 8.31.) The jury rejected this option, finding instead that Kilgore committed murder in the first degree. From this verdict, the jury necessarily found that Kilgore intended to kill William.

In addition to its instructions on the substantive offenses of first degree murder and second degree murder, the court also instructed on the special circumstance set forth in section 190.2, subdivision (a)(21), pertaining to the discharge of a firearm from a motor vehicle with the intent to kill. (CALJIC No. 8.81.21.) This special circumstance, if found true, mandates that a person convicted of first degree murder receive the death penalty or life imprisonment without the possibility of parole. The jurors found that this special circumstance was true, confirming their conclusion that Kilgore harbored an intent to kill.

Nevertheless, Kilgore complains that the trial court did not give an instruction based on section 190, subdivision (d), which dictates the *sentence* for certain persons found guilty of murder in the *second* degree. The statute provides: "Every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 20 years to life if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury." (See CALJIC No. 8.35.2.) Section 190, subdivision (d), is a *penalty provision* for second degree murder, not a substantive offense. (*People v.*

18

*Garcia* (1998) 63 Cal.App.4th 820, 832-833 *(Garcia)* [former § 190, subd. (c), now subd. (d), constitutes a penalty provision rather than a substantive offense].)

A trial court has a sua sponte duty to instruct on *lesser included offenses* for which there is substantial evidence. *(People v. Breverman* (1998) 19 Cal.4th 142, 162.) The court does not, however, have a sua sponte duty to instruct on lesser-included enhancements. *(People v. Wolcott* (1983) 34 Cal.3d 92, 101 *(Wolcott)*.)[7] And although a trial court must sua sponte instruct on general principles of law that are closely connected to the facts and necessary for the jury's understanding of the case, the failure to do so does not compel reversal unless it was reasonably probable that a more favorable result would have been obtained in the absence of the error. *(Garcia, supra*, 63 Cal.App.4th at pp. 833-834.)

Kilgore would not have obtained a better verdict if the court had given an instruction under section 190, subdivision (d). His argument on this point is that the absence of the instruction was particularly prejudicial due to the following statement by the prosecutor in closing argument: "First-degree murder in this particular case can also be derived by the special instructions that you have been given already that says if you find that the defendant . . . intentionally discharged a firearm from a motor vehicle, you don't even have to consider premeditation or deliberation. The State of California has deemed this act to be so inherently offensive and so inherently dangerous that it's pretty much said *strict liability*, you shoot a firearm from out of a car intentionally, and you cause the death of someone other than an occupant of that vehicle, that's first-degree murder." (Italics added.)

The trial court, however, instructed the jury correctly on the requirements for a finding of first degree murder by drive-by shooting, and further instructed the jury that, if

---

7    Kilgore argues *Wolcott* is no longer good law, and that there is a sua sponte duty to instruct on lesser-included enhancements, in light of the holding in *Blakely v. Washington* (2004) 542 U.S. 296. Our Supreme Court has determined, however, that *Blakely* does not apply to California's sentencing scheme. *(People v. Black* (2005) 35 Cal.4th 1238.)

19

the attorneys said anything contrary to the court's instructions, the instructions given by the court had to be followed. In addition, defense counsel specifically corrected the prosecutor's statement in closing argument. The prosecutor's closing argument, therefore, did not render prejudicial the omission of an instruction under section 190, subdivision (d), and he would not have obtained a more favorable verdict if the instruction had been given.

Moreover, by rejecting implied malice second degree murder (requiring conscious disregard rather than intent to kill), and by *expressly* finding true the special circumstance under section 190.2, subdivision (a)(21)—that Kilgore intentionally shot out of the Cadillac *with the intent to kill William*—the jury necessarily found an intent to kill sufficient for first degree murder under section 189. This finding rendered irrelevant any instruction on drive-by shooting in the context of *second* degree murder under section 190, subdivision (d).

Kilgore has failed to demonstrate reversible error.

C. FAILING TO INSTRUCT ON DOCTRINE OF TRANSFERRED INTENT

Kilgore next contends that the trial court erred when it failed to instruct the jury sua sponte on the doctrine of transferred intent. (See CALJIC No. 8.65.)

The transferred intent doctrine imposes criminal liability on a defendant who attempts to kill one person but kills someone else by mistake or inadvertence. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 688.) In the context of self-defense cases, transferred intent may apply where the defendant intends to injure or kill the person who poses an imminent and unlawful threat of death or great bodily injury but inadvertently kills an innocent bystander. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357.) Kilgore contends that an instruction to this effect was required because he intended to shoot Terry but missed, striking William instead.

Kilgore is incorrect. As Kilgore vigorously contends elsewhere in this appeal, his trial counsel abandoned self-defense during trial, switched to an identity theory, and expressly withdrew the instruction on transferred intent. The court has no sua sponte

20

duty to give an instruction on a theory the defense has abandoned. (See *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1025.)

Moreover, a trial court has no sua sponte duty to instruct on a defense for which there is no substantial evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 469.) Here, no substantial evidence supported Kilgore's claim that he shot William after Terry shot at Kilgore.

In the first place, there was only scant evidence that *any* shot was fired other than the fatal shot fired by Kilgore. Shanae and Bianca testified to only one shot, and there was no shell casing or other physical evidence of any additional shot. Kilgore's effort to assemble evidence of an additional shot is weak at best.

Kilgore's assertion that witnesses reported hearing more than one shot is tainted by his misperceptions of the record. For example, he states in his opening brief on appeal that "Witnesses reported hearing one or two shots. Telephone calls to the Oakland Police Department 911 emergency line reported hearing 'shots' (plural) being fired. (RT 522-525)." In the cited portion of the record, however, the only references to the possibility of more than one shot apparently came from a 911 dispatcher, not a witness to the crime. In one instance, a speaker on the emergency system responds to an officer or other law enforcement agency personnel as follows: "There was shots fired 30 at that San Pablo [*sic*]. A young man was shot with a gun." It is uncertain who said these words, and the apparent error in the transcription creates some doubt as to whether the speaker really said "[t]here [were] shots" as opposed to "[t]here was [a] shot[]." Furthermore, the rest of the call discloses that the speaker *did not know* how many shots were fired, and was probably a 911 dispatcher, as he or she explained: "*I didn't find out how many shots were fired.* If they were rapid, I didn't get any information on that. Cause I wanted to get the medical rolling." (Italics added.) In fact, it appears the caller from the scene had told the 911 dispatcher that there was only *one* shot: "Okay. What she said when I connected to the ambulance was she heard *a* noise, she saw someone call and she knew they'd been shot." (Italics added.) Lastly, in another conversation captured by the 911 transcription, it appears that one law enforcement agency stated to another, "I'm sure you got the shots

21

fired over on San Pablo?" Again, while there is a reference to "shots," there is no indication it was based on witness information, or even that the speaker was using the word "shots" for the purpose of describing the number of times the gun discharged.

Kilgore's argument that *Terry* said he heard two shots fares no better. The fact that Terry *heard* two shots would not support the conclusion that *Terry* fired at Kilgore, and, indeed, Kilgore's characterization of the record on this point is disingenuous. Immediately after Sergeant Green testified on cross-examination that Terry told him there was a second shot, the following exchange occurred: "[Defense Counsel]: And from the questioning, nobody ever asked [Terry] if that shot came from anyone on the corner; correct? [¶] [Sergeant Green]: Correct. The implication was that *it was from the same person*. [¶] [Defense Counsel]: *From the vehicle*. [¶] A. *Right*." (Italics added.) The testimony on which Kilgore relies, therefore, does not support Kilgore's self-defense theory, but negates it by confirming that no one other than Kilgore fired a gun. And if that were not enough, Sergeant Green thereafter confirmed that Shanae, when asked "if she heard any sounds [plural]," responded, "Well, I heard *the* pop [singular]." (Italics added.)

Kilgore also notes that Jones, the getaway driver, said he "guess[ed]" it was "possible" that he heard two shots, since the sound of Kilgore's shotgun blast was so loud. But there was no indication that Jones thought any shot came from Terry or William. To the contrary, Jones testified that he did not observe anyone on the street corner do anything before Kilgore fired the fatal shot.

Next, Kilgore refers us to the testimony of Mary Washington, a passenger in a car on San Pablo Avenue. Washington did testify at trial that she heard "several" "bangs" or shots. But in her statement to police on the day of the shooting, Washington stated: "Just when we were at the corner, I heard *a* loud bang. At first I did not know what this sound was. My friend Mary [Loggins] then said, 'Oh, my God, that boy has been shot.'" (Italics added.) And once again, there is no indication that Washington—or any other witness—believed that Terry or William ever fired at Kilgore.

22

Thus, there is little or no credible evidence that there was more than one shot fired, and even if there had been, no witness testified that any shot came *from Terry* (or William) or that anyone fired *at Kilgore*. Nor was there any physical evidence to that effect, such as strike marks on Kilgore's car. Kilgore's self-defense theory is unsubstantiated.

Moreover, the balance of the evidence was not that Kilgore fired in self-defense, but that he sought out William, with a loaded gun, to exact revenge. Kilgore had motive to harm William because Kilgore owed William money, William had twice approached him about the debt, and William had participated in robbing Kilgore or beating him up. Bryant told the police that Kilgore had threatened to "smoke" the "dudes who robbed him." Kilgore got Jones to take him to the scene of the murder, with a loaded gun. In fact, Kilgore acted as if he intended to shoot William—as opposed to Terry—in that he shot William from just 8-12 feet away, returned to the corner, pointed his gun at William, and seeing him shot drove off. In the context of the record in this case, the fact that a man ran from the scene holding his hands close to his body and the fact that Terry did not want to get involved with the police investigation immediately after the shooting do not constitute substantial evidence that Terry shot at Kilgore and Kilgore fired back in self-defense, accidentally hitting William. While the court did instruct the jury on self-defense (CALJIC Nos. 5.12, 5.50), it was more than Kilgore was entitled to.

The court did not err in failing to instruct the jury sua sponte on the application of the transferred intent doctrine to self-defense.

D. PRECLUSION OF CHARACTER EVIDENCE REGARDING WILLIAM AND TERRY

Kilgore maintains that the trial court erred in barring Kilgore from introducing evidence of William's and Terry's bad character through Shanae and Tomlinsonn. He argues that this evidence was admissible to rebut the prosecution's good character evidence, which the prosecutor elicited through Shanae, Bianca, and Jones. His contention lacks merit.

### 1. Cross-Examination of Shanae as to William's Character

Shanae testified on direct examination that she had never seen William or Terry, in her presence, engaged in violent or illegal behavior.[8]

On cross-examination of Shanae, defense counsel attempted to elicit evidence which, Kilgore claims, would have rebutted the good character evidence offered by Shanae and shown William and Terry's violent behavior. Defense counsel asked Shanae: "are you aware William Anderson and Terry Dandy had twice assaulted and robbed Mr. Kilgore?" The prosecutor objected on the ground that the question called for speculation. The court sustained the objection, noting as well that the question assumed facts not in evidence and contained an "insinuation" the court and counsel had previously discussed. In the latter regard, the court stated: "It's one of those things we talked about, the question that has an insinuation with it. So, sustained."

Kilgore contends that Shanae's testimony on direct examination about William's and Terry's good character opened the door to cross-examination regarding their violent behavior. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 146; *People v. Wagner* (1975) 13 Cal.3d 612, 617.) The reason the trial court sustained the objection, however, was not because the question called for impermissible character evidence, but because of the question's *form*.

Kilgore does not explain how the trial court might have abused its discretion in sustaining the prosecutor's objection to the question's form. The question may not have really asked Shanae to speculate, as the prosecutor insisted it did, since it arguably inquired whether she was or was not aware of the incidents of violence. However, as the court correctly noted, the question assumed facts that were at that time not in evidence. Although greater leeway in this regard may be given on cross-examination, we also detect that the trial court was concerned with the prejudicial and misleading "insinuation"

---

[8]    Bianca and Jones also testified that they had not personally seen William or Terry engaging in violent behavior, but their testimony came *after* the testimony of Shanae and the challenged rulings of the trial court. Their testimony is therefore immaterial to the court's ruling.

in the question, which suggests that the court was motivated to sustain the objection on grounds of undue prejudice as well. On balance, Kilgore has not established an abuse of discretion.

Regardless, any error the court may have made in precluding Kilgore's cross-examination of Shanae was harmless. Kilgore was permitted to ask other witnesses about William's propensity for violence, eliciting testimony from Jones and Tomlinsonn that they had observed Kilgore with injuries from two assaults. Jones testified specifically that Kilgore claimed he had twice been assaulted by William and Terry, and Jones had seen them fleeing the scene on one of those occasions. Furthermore, defense investigator Beers testified that Bianca reported William being in three fights with Kilgore. There was, therefore, no prejudice arising from defense counsel's inability to obtain much the same evidence from Shanae. Nor did the ruling make any substantial difference in the defense's efforts to discredit Shanae's credibility, especially since she admitted that she was William's cousin and had lied to the police about Terry's identity.

Kilgore has failed to demonstrate any probability that he would have obtained a more favorable verdict if the question to Shanae had been allowed.

2. Denial of Examination of Tomlinsonn on William's Bad Character

After Tomlinsonn had begun his testimony, defense counsel sought permission to have him state his belief that William was a drug dealer. Defense counsel argued at the time that she would be pursuing a "reasonable self-defense" case, and urged that testimony of William being a drug dealer would (1) rebut the testimony of the prosecution witnesses that they had never seen him do anything illegal and (2) suggest that it was likely William was armed with a gun.

The court denied the request, because there was no evidence linking the murder to a drug transaction, and the victim's character was irrelevant except insofar as it concerned his reputation for violence.

25

Kilgore contends he was entitled to examine Tomlinsonn to elicit bad character evidence regarding William, in order to rebut the prosecution's good character evidence.[9] (See Evid. Code, § 1103, subd. (a).) Even if the court erred in precluding this inquiry of Tomlinsonn, the error was harmless. Kilgore contends it was prejudicial for the same reason it was prejudicial to preclude his character inquiry of Shanae. We have already concluded the preclusion of Shanae's testimony was harmless. Kilgore offers no reason why we should not reach the same conclusion as to exclusion of Tomlinsonn's testimony.

E. INEFFECTIVE ASSISTANCE OF COUNSEL

Kilgore urges that the trial court erred by denying his motion for a new trial, in which he contended his trial counsel rendered ineffective assistance on numerous grounds.

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient because his representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) prejudice flowing from counsel's performance or lack thereof. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) We reverse convictions on the ground of inadequate counsel only if "the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581-582.)

We exercise our independent judgment in reviewing the legal question of whether Kilgore was deprived of his right to effective assistance of counsel. In doing so, we accept trial court factual findings that are supported by substantial evidence. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

---

[9]    Before the court's ruling on the proffered testimony from Tomlinsonn, Shanae and Jones testified that they had never seen William or Terry engage in illegal or violent behavior. Bianca's testimony on this point, however, came after Tomlinsonn's testimony and is not germane to the ruling. Although a defense witness, Tomlinsonn was called during the People's case to accommodate scheduling.

1. Failure to Obtain Ruling on Oklahoma Homicide and Defense Theories

In connection with defense counsel's motion to exclude the evidence of Kilgore's Oklahoma testimony, Kilgore asserts that his attorney provided ineffective assistance in three ways: failing to obtain a timely ruling before trial on the admissibility of the testimony, so she could have made a definite decision whether to pursue self-defense or an identity defense; abandoning the self-defense theory and switching to an identity defense; and presenting an erroneous offer of proof that Kilgore thought Terry was reaching for a gun rather than firing a gun.

None of these purported failures of counsel was prejudicial to Kilgore's case, as *neither* the identity defense nor the self-defense theory had any merit and neither would have improved if counsel had performed as Kilgore insists she should have.

As to the purported identity defense, Bianca and Shanae identified Kilgore as the shooter. These identifications, from just feet away, were corroborated by evidence that it was Kilgore who had a motive to shoot William in that he owed William money and had been beaten by William, Kilgore said he was going to "smoke" people who robbed him, he directed Jones to take him where he had just seen the people with whom he had been "having problems," he fled after the shooting, he reported his car stolen within minutes after the shooting, he remained at large for several months, and he confessed the murder to both Jones and Bryant. Indeed, Kilgore agrees that the identity defense was "hopeless."

But the self-defense claim was no better. As discussed *ante*, there was little if any evidence of more than one shot being fired. Moreover, there was no testimony or physical evidence that any shot had been fired *by William or Terry*, or that anyone had fired at Kilgore or his car. In addition, the evidence was clear that it was Kilgore who sought out his victim with an intent to kill him: after finding William and Terry, he coaxed Jones to drive him to their location, armed with a gun and, after shooting William from 8-12 feet away, returned and aimed his gun at William again.

Kilgore's self-defense claim would not have gotten any better in the absence of trial counsel's purported errors. In particular, the theory of self-defense would not have

27

become meritorious if counsel had merely obtained an earlier ruling on the admissibility of the Oklahoma evidence, or pursued the weak self-defense theory throughout the entire trial.

Nor would it have improved if she had advised the judge from the beginning that Terry was not just reaching for a gun, but firing it. In this regard, Kilgore notes that the claim of Terry reaching for the gun was similar to Kilgore's explanation in the Oklahoma case that Emery was reaching for a gun, and thus contributed to the court's conclusion in this case that the Oklahoma testimony was admissible under Evidence Code section 1101. Although defense counsel corrected this error before the actual ruling on the Oklahoma evidence, the trial court was not persuaded by counsel's changing the facts. The implication, Kilgore urges, is that, if defense counsel had been accurate in her initial offer of proof, the court would *not* have ruled the Oklahoma testimony admissible. In light of our discussion of the admissibility of the Oklahoma evidence *ante*, we doubt the trial court would have reached that conclusion. Even if it had, and Kilgore had thereupon decided to testify, the self-defense theory was still so weak that we are confident no more favorable outcome would have been obtained.

Which brings us to Kilgore's argument that the self-defense case would have been stronger with his testimony, and counsel thus erred by not having him testify. As to this argument as well, we are not persuaded.

At the hearing on the new trial motion, Kilgore explained that on the afternoon of the murder, he, Jones and Sic went to Home Depot to buy cleaning supplies. As Jones drove Kilgore's car back to their apartment, he "made a sudden U-turn and approached some individuals on the corner that he had identified to be William and T." In the process of making the U-turn, Jones stated, "there goes William and T." As Jones approached the corner where William and T were standing, Kilgore saw T "pulling a weapon out from underneath his coat, and he fired at us, and I responded by firing back at T." The shotgun Kilgore used was in the back seat of the Cadillac. When Kilgore noticed that "someone had fell," Jones made another "U-turn and turned back around."

Kilgore then observed that William "had been struck." Kilgore testified that he did not intend to hit William.

While Kilgore's testimony would have stated his self-defense theory directly, it would not have made it any more persuasive. It purported to explain why Jones was driving, why Kilgore was in the back seat, and why there happened to be a loaded shotgun next to him. But Jones's act of making a U-turn and going back toward William and Terry is inconsistent with a theory of self-defense. Furthermore, Kilgore's version of the events would have had little credibility in light of the evidence from the Oklahoma homicide, which would have been properly admitted if Kilgore testified. Due to the inferences the jury could have drawn from the Oklahoma evidence—which Kilgore elsewhere in this appeal insists would have been severely prejudicial—it certainly was not unreasonable for trial counsel to conclude it unwise to put Kilgore on the stand. Nor was the failure to call Kilgore as a witness prejudicial. Indeed, once the court ruled that the prior homicide was admissible, Kilgore agreed that it was better for him not to testify, and to instead pursue an identity defense.

### 2. Opening the Door to Bad Character Evidence

On direct examination, Tomlinsonn testified that he found Kilgore to be reliable and trustworthy. The charges against Kilgore had not changed his opinion, and he would hire Kilgore again, notwithstanding those charges. Defense counsel attempted to elicit Tomlinsonn's opinion as to Kilgore's reputation for truthfulness and veracity but could not lay an adequate foundation.

On cross-examination, the prosecutor asked Tomlinsonn whether the 1997 felony conviction would change his decision whether to hire Kilgore. The court permitted the questioning, because the door was opened when Tomlinsonn stated the current charges did not affect his view of Kilgore's reliability and trustworthiness or whether he would rehire Kilgore.

Kilgore argues that his attorney should not have introduced evidence of his good character because it opened the door to the prosecutor asking Tomlinsonn whether he was aware of Kilgore's 1997 felony conviction.

29

Kilgore has not established, on this record, that his trial counsel had no legitimate tactical purpose in eliciting character evidence from Tomlinsonn. It was not unreasonable for defense counsel to conclude that the benefit of Tomlinsonn's testimony regarding Kilgore's reliability and trustworthiness outweighed any harm to be caused by reference to Kilgore's 1997 felony conviction. Counsel had already spoken to Tomlinsonn and reasonably believed that Tomlinsonn's good opinion of Kilgore was unaffected by the 1997 conviction. Indeed, that was precisely how Tomlinsonn testified.

Furthermore, the prosecution witnesses also had criminal records. Jones had been convicted of misdemeanor possession of stolen property. Bryant had been convicted of grand theft and possession of narcotics. Shanae and Bianca admitted falsely identifying Terry as Richard Davis because they thought he was the subject of a warrant. In these circumstances, evidence that Kilgore had a 1997 felony conviction—without reference to the crime of which he was convicted—was minimally prejudicial, and it was not probable that he would have obtained a better verdict if the evidence had not been introduced.

3. Failure to Request Redaction of Bryant's Statement

When Matthew Bryant purported to have forgotten the substance of his statements to the police, a tape-recording of the statement was played for the jury. Kilgore now argues that his trial attorney was ineffective because she did not object to this evidence or, at least, seek redaction of Bryant's opinion that Kilgore sold marijuana.

We do not agree. As defense counsel disclosed in the new trial proceedings, she did not object to the introduction of Bryant's tape-recorded interview because she believed it was properly introduced as a prior inconsistent statement. She was right. Prior statements are admissible where it is shown that the witness's lack of memory was evasive and untruthful. (*People v. Ervin* (2000) 22 Cal.4th 48, 84-85.) There was a reasonable basis in the record for that conclusion, and counsel's failure to object was not error.

Trial counsel believed she had erred by not having the tape-recorded interview redacted to exclude Bryant's statement that Kilgore was "known to sell weed." Any error in this regard, however, was harmless. Kilgore's friends—Jones and Bryant—had

30

criminal records. So did Terry. There is no reasonable probability that Kilgore would not have been convicted absent the admission of the evidence that he was "known to sell weed."

### 4. Failure to Request Instruction on Transferred Intent

Kilgore's attorney withdrew her request for an instruction on the doctrine of transferred intent in the context of self-defense. We have already concluded that the transferred intent instruction was not warranted, because there was no substantial evidence supporting the self-defense theory. Counsel's failure to request the instruction was, therefore, not error.

### 5. Failure to Object to Prosecutor's Argument

Kilgore contends that his attorney was negligent in failing to object to the prosecutor's inaccurate argument regarding first degree drive-by murder. As set forth *ante*, the prosecutor stated that shooting from a car had been deemed "so inherently dangerous that it's pretty much *strict liability*, you shoot a firearm from out of a car intentionally, and you cause the death of someone other than an occupant of that vehicle, that's first-degree murder." (Italics added.) The prosecutor also remarked that first degree drive-by murder did not require a finding of premeditation and deliberation. Kilgore claims these statements erroneously suggested that first degree drive-by murder did not require an intent to kill.

Counsel's failure to object contemporaneously to the prosecutor's statements was not prejudicial. In her own closing argument, defense counsel advised the jury that, for first degree drive-by murder, "not only do you have to find that somebody drove by and shot out of the car, but that they intended to kill when they shot out of the car." In addition, the court instructed the jury correctly on the applicable law and that, if anything said by the attorneys conflicted with those instructions, the jury had to follow the instructions of the court. We must assume that the jury understood those instructions and followed them, disregarding any erroneous statement of law by the prosecutor.

Kilgore has failed to establish ineffective assistance of counsel.

31

F. CUMULATIVE ERROR

Kilgore contends that the cumulative effect of the asserted errors compels reversal. We do not agree. There is no basis for reversal of the judgment.[10]

III. DISPOSITION

The judgment is affirmed.

---

[10]     Kilgore has filed a petition for writ of habeas corpus, which we deny by separate order. (A110317)

32

_____
REARDON, J.*

We concur.

_____
JONES, P. J.

_____
GEMELLO, J.

(A106142)

_____

\*      Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

33

# PROOF OF SERVICE

(C.C.P. §§1013(a); 2015.5; 28 U.S.C. §1746)


I, ___Ivan Kilgore___, am over the age of eighteen (18) years, and I (am) (am not) a party to the within cause of action. My address is:

P.O. BOX 290066
REPRESA, CA 95671

_____

_____


On, ___August 28, 2008___, I served the following documents:

Motion for Rehearing on Provision of Funds to obtain
coplete transcription of Oklahoma Trial.

_____

on the below named individual(s) by depositing true and correct copies thereof in the United State mail in Represa, California, with postage fully prepaid thereon, addressed as follows:

| 1. Office of the Clerk | 2. Peggy S. Ruffra |
|---|---|
| U.S. District Northern | Attorney General |
| 450 Golden gate Ave. | 455 Golden Gate Ave., Suite 11000 |
| San Francisco, CA 94102 | San Francisco, CA 94102 |


I have read the above statements and declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this __28__ day of __August__, __2008__, at California State Prison - Sacramento. Represa, California.

(Signature) ___Ivan Kilgore___