# EXHIBIT A

## COURT OF APPEAL OPINION

Filed 8/30/06

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

**FILED**

Court of Appeal-First App. Dist.

AUG 3 0 2006

DIANA HERBERT

BY _____

DEPUTY

THE PEOPLE,

    Plaintiff and Respondent,

    v.

IVAN KILGORE,

    Defendant and Appellant.

A106142

(Alameda County
Super. Ct. No. 141033)

        Ivan Kilgore appeals from a judgment of conviction and sentence entered after a jury found him guilty of first degree murder in a drive-by shooting. Kilgore contends: (1) the trial court erred when it ruled that, if Kilgore testified, the prosecution could cross-examine him on his testimony in another case; (2) the court erred in failing to instruct the jury on "second degree drive-by murder"; (3) the jury should have been instructed that the doctrine of transferred intent applied to his self-defense claim; (4) the court improperly precluded him from introducing evidence of the character of his victim and a prosecution witness; and (5) his trial counsel rendered ineffective assistance of counsel. We will affirm the judgment.

## 1. FACTS AND PROCEDURAL HISTORY

        An information charged Kilgore with the murder of William Anderson (Pen. Code, § 187)[1] and alleged the special circumstance that he committed the murder by shooting from inside a vehicle with the intent to kill (§ 190.2, subd. (a)(21)). As a

---

[1]    Except where otherwise indicated, all statutory references are to the Penal Code.

sentence enhancement, it was further alleged that Kilgore discharged a firearm causing death. (§ 12022.53, subd. (d).) A 1997 Oklahoma conviction for manslaughter was alleged as a serious felony prior offense (§ 667, subd. (a)) and as a strike (§ 1170.12).

A. PROSECUTION CASE

At approximately 5:45 p.m. on July 16, 2000, William Anderson (William) was shot to death while standing on the corner of San Pablo Avenue and 30th Street in Oakland. An autopsy determined that he was killed by a shotgun blast to the chest and abdomen, with 11 penetrating wounds. The ammunition was buckshot, fired from a distance of about 8 to 12 feet. Police found no casings, slugs, strike marks, or other evidence of any other gun being fired at the scene.

1. Eye-Witness Shanae Anderson's Testimony

William's cousin, Shanae Anderson, described the circumstances of the shooting.

On July 16, 2000, Shanae and her boyfriend Terry Dandy, as well as William's girlfriend Bianca Moore, were visiting William at his parents' house on 30th Street in Oakland. Around 5:00 p.m., Shanae and Bianca went to a pay telephone at 30th Street and San Pablo Avenue; William and Terry joined them shortly thereafter. None of them had a weapon, and Shanae had never seen William or Terry involved in violence or illegal behavior. As Shanae talked on the pay telephone, she heard William say, "There is that punk ass nigga right there." William and Terry were laughing.

Shanae then heard a "bang" and thought it was a car backfire. She turned around and saw a man pointing a gun out of the rear window of a gray Cadillac. Shanae stood there as Bianca and Terry ran. William said "I'm shot" and fell to the sidewalk.

Shanae noticed three people in the Cadillac: the driver, a front-seat passenger, and the man in the back seat with the gun. She did not see the face of the driver or front passenger, but identified Kilgore as the man in the back seat. She specifically remembered his eyes and brown complexion.

The Cadillac made a U-turn and pulled up to the curb, where Shanae was standing and William remained on the ground. Kilgore, still in the back seat, switched to the other

2

side of the car and pointed the gun at William. William continued saying. "I'm hit. I'm shot." The Cadillac drove off.

When speaking with the police about the incident. Shanae identified Terry incorrectly as "Richard Davis." Bianca had told her to give a false name, Shanae explained at trial, because Bianca thought Terry had a warrant out for his arrest. For the same reason, Shanae said Terry was 5'8" when he is really 6'3."

Shanae's trial testimony differed in a few details from the account she gave to police on the day of the shooting. She did not tell the police that Terry said something to the effect of "There is that punk ass nigga," claiming instead that he said only, "Oh shit." Although Shanae stated at trial that she remembered Kilgore's eyes, she did not mention his eyes to the police. Furthermore, while she told the police the shooter had a "brown" complexion, she acknowledged at trial that Kilgore's complexion was lighter than "brown."

### 2. Eye-Witness Bianca Moore's Testimony

William's girlfriend Bianca testified that she had never seen William or Terry engage in violent behavior. William told her in June 2000 that Kilgore owed him money, but he did not appear upset about it. In early July 2000, he said that he and a friend had tried to collect the money from Kilgore, and Kilgore and the friend got into a fight. He did not seem upset about this incident either.

Bianca's recollection of the shooting was much the same as Shanae's. Late in the afternoon on July 16, 2000, Bianca recounted, she and Shanae walked from the Andersons' house to the pay telephone at 30th Street and San Pablo Avenue to make a telephone call. William and Terry met them there shortly thereafter. William pointed at a gray Cadillac passing by and nonchalantly said, "There go that N-I-G-G-A Ivan." The Cadillac, having stopped, made a U-turn and went off the way it came. About 15-20 minutes later, the Cadillac returned. Terry said, "he got a gun," and Bianca turned to look. As the Cadillac passed, William pushed her, and she heard a single gunshot. William was shot.

The Cadillac turned around and pulled up next to Bianca. She saw a man—Kilgore—with a gun in the back seat. When Kilgore pointed the gun at her, she began to pray and told Kilgore, "I got a son to live for." The Cadillac drove off. William was lying on the ground, saying he had been shot. She had not seen either William or Terry with a weapon.

Bianca was scared and did not want to talk to the police. When she spoke to them, she did not say that she had seen Kilgore shoot William, or that William or Terry had said, "There go that nigga, Ivan." When asked about Terry, she misidentified him as Richard Davis, at his request. Not wanting to be a witness at a trial, Bianca told police that she was unsure whether she could identify the shooter because the windows in the back of the Cadillac were tinted and the rear window was down only half way.[2]

### 3. Testimony of Investigating Officer Green

Oakland Police Sergeant Phil Green arrived at the scene about two hours after the shooting. Although there were references over the 911 communication system to "shots" being fired, and another officer at the scene said there had been one or two shots, Sergeant Green found no strike marks or other evidence suggesting that more than one shot had been fired.

Sergeant Green interviewed Shanae, Bianca, and Terry. Each of them gave the officer a false identification for Terry. Shanae was cooperative but very anxious to terminate the interview. She did not tell Sergeant Green that there was anything distinct about the shooter's eyes. Bianca was distraught and, in Green's estimation, "didn't appear to be too thrilled to be down at [his] office." She was unsure whether she could identify the shooter and did not offer that William had named Kilgore as the man in the back seat of the Cadillac. Terry told Sergeant Green that he heard two shots.

---

[2]    Kilgore contends that, at the preliminary hearing, Bianca said she did not get a good look at the shooter because her mind "went blank." In fact, when asked whether she got a good look at the shooter, Bianca responded "yes and no," explaining that she was able to see "the whole top part" of the person.

After considering the witnesses' statements—and learning that Kilgore had called the police minutes after the shooting to report his 1985 Cadillac stolen—Sergeant Green concluded that Kilgore was a suspect. When police searched Kilgore's apartment later that evening, he was not there.

A confidential informant advised police that the Cadillac's getaway driver was Raymond Jones. Sergeant Green arrested Jones for murder the next morning. Jones eventually admitted driving the car used in the shooting and implicated Kilgore. Sergeant Green later received a phone call disclosing the location of car, which showed no sign of forced entry or having been struck by bullets.

Three months after the shooting, Kilgore surrendered to Sergeant Green.

4. Testimony of Getaway Driver Raymond Jones

Jones testified at trial as part of a plea agreement, which provided that in exchange for truthful testimony Jones would plead guilty to being an accessory to murder after the fact (§ 32) and could serve up to one year in county jail.[3] At trial, Jones also acknowledged that he had previously been convicted of misdemeanor possession of stolen property and, at the time of the shooting, was using heroin about twice a week.

In December 1999, Jones recalled, he lived next door to Kilgore in an apartment building at 509 Sycamore Street in Oakland. Kilgore worked as a manager for the building, fixing things, cleaning, and collecting rent. Kilgore drove a Cadillac.

In early 2000, Jones met William, who appeared at the apartment building at times with Terry, also known as "T." Jones never saw William or Terry engage in illegal or violent behavior, or have any weapon. In the spring of 2000, however, Kilgore told Jones that William and Terry had attacked him twice within a month. On one of those occasions, they robbed him. The other time, they "jumped" him and beat him up. On the day of the latter assault, Jones recounted, he heard Kilgore calling for help and, looking

---

[3]    To the extent Kilgore requests that we take judicial notice of the Alameda County Superior Court file in Jones's case, he has not complied with applicable rules and the request is denied.

out his window, saw William and Terry running away. The next day. Jones saw that Kilgore had a black eye. Jones gave Kilgore a baseball bat to put in his car for protection, but he never heard Kilgore say anything about getting a gun or doing anything violent to William or Terry.

On the day of the shooting, Jones and a man named "Sic" helped Kilgore clean up part of the Sycamore apartment building. Jones had already consumed a "tall can of beer," and he and Kilgore split a 40-ounce beer while they worked. Jones had also smoked a "blunt" and might have snorted heroin that day but, nonetheless, professed to be "sober."

In the afternoon, Kilgore and Sic went to Home Depot to buy cleaning supplies. When they returned about 10 or 15 minutes later without the supplies, Kilgore said he had seen the guys with whom he was "having problems." He asked Jones to "ride with him," leading Jones to think that Kilgore wanted to fight William and Terry.

Jones drove Kilgore's Cadillac, at Kilgore's instruction, with Sic in the front-passenger seat and Kilgore in the back. Kilgore directed Jones to drive to San Pablo Avenue, and then north towards Berkeley. As they approached the corner of San Pablo Avenue and 30th Street, Kilgore said, "There they go." Jones observed a group of "guys and girls" standing on the corner and pulled the car up to the curb. He believed Kilgore was going to fight "the guy" (ostensibly William) one on one. Then Kilgore said something like, "What's up, now? What's up, punk?" and Jones heard a gunshot from the rear seat. He looked toward the back seat and saw Kilgore with a gun. Jones was shocked. He had not seen the people on the street display a weapon or do anything before Kilgore fired the gun. On cross-examination, he "guess[ed]" that it was "possible" that a second shot was fired when Kilgore fired his shotgun because Kilgore's discharge of the gun in the backseat had made such a loud noise.

Jones made a U-turn and observed someone lying on the ground. He did not see anyone, other than Kilgore, with a gun and thought that Kilgore had "just shot somebody on a drive-by." Jones drove quickly back to the Sycamore apartment building and returned to his apartment, without discussing the incident with Kilgore.

6

Within 24 hours of the shooting, Jones obtained a gun for his own protection, afraid of retaliation from William and Terry's "people" and believing Terry and his friends might have guns. After seeing a wooden barricade Kilgore had put on his door, Jones put up a barricade on his own door as well. Sometime later that day, he saw Terry drive by his building on Sycamore Street.

Jones told Matthew Bryant that Kilgore shot William.

5. Matthew Bryant's Testimony

Bryant, previously convicted of narcotics possession and grand theft, was in jail in April 2001 after being arrested for the theft of his girlfriend's car. With the hope of getting out of jail, he contacted Sergeant Green and claimed to have information regarding a July 16, 2000 homicide. In a taped interview, Bryant advised Sergeant Green that he had met Kilgore, whom he knew as "Gill," through Jones.

Bryant recalled at trial that Kilgore told him that "a few people jumped on him." He professed, however, not to remember any further substance of his interview with Sergeant Green. The court then permitted the prosecutor, to play an audiotape of the interview.

As recorded by the audiotape, Bryant explained to Sergeant Green that "Giz [Kilgore] had just got jumped on and got some weed took from him." Before the shooting, Bryant added, Kilgore had said he was going to "smoke" the people who had "jumped" and robbed him. A few weeks after the murder, Jones told Bryant that Kilgore had shot somebody while Jones was driving Kilgore's Cadillac. Kilgore told Bryant the same thing, explaining that he had fired a 12-gauge shotgun one time, hitting William.

Bryant also stated in the interview that Kilgore had offered him $500 to retrieve a shotgun Kilgore had hidden in the "balcony" area (attic) of the Sycamore apartments. Bryant tried to crawl through a cubbyhole into the attic, but he was too big. In addition, Kilgore asked Bryant to break the ignition in his automobile to make it look like the car had been stolen, but Kilgore did not take him to the car.

Bryant asserted at trial that the statements he made to Sergeant Green implicating Kilgore were lies and that he made the statements to get out of jail on the automobile

7

theft charge. In fact, after implicating Kilgore, Bryant was released from jail and not charged with that particular car theft. Bryant maintained that Kilgore had not said anything to him about the shooting or retrieving a gun and that the things he told Sergeant Green about the shooting he had heard from Jones or on "the street."

### 6. Officer Miller's Testimony

Oakland Police Officer Allan Miller testified that he was able to gain access to the attic at 509 Sycamore Street. At 6' tall and weighing 180 pounds, he had to take off his gun belt to fit through the opening. He did not find a gun in the attic.

### B. DEFENSE CASE

Before the prosecution rested its case, the trial court ruled that, if Kilgore testified, he could be cross-examined on his testimony in the 1997 Oklahoma homicide case in which he was convicted of manslaughter. Thereafter, the defense called several witnesses, but Kilgore did not testify.

### 1. Testimony of Character Witness Kevin Tomlinsonn

Kevin Tomlinsonn testified that he was the owner of the apartment building at 509 Sycamore Street, where Kilgore lived. Tomlinsonn met Kilgore when Kilgore was working for his contractor, who was renovating the building. Kilgore became a tenant and also performed small jobs in the building. Tomlinsonn viewed Kilgore as reliable and trustworthy.

Tomlinsonn also knew William, because William's parents had rented an apartment in the building and, although Tomlinsonn expected the parents to move in, William moved in instead. Jones was a tenant as well.

Kilgore told Tomlinsonn at some point that he had been robbed and assaulted. Tomlinsonn observed small cuts and bruises on Kilgore's face, and a couple of weeks later, Kilgore had a "good-sized" black eye. Some time after these assaults, Kilgore built a barricade on his door.

### 2. Testimony of Witness Mary Loggins

Mary Loggins recounted that, as she was driving on San Pablo Avenue on July 16 at 5:45 p.m., she heard a gunshot and observed a man fall near the phone booth. While

8

she continued driving, she looked in her rear view mirror and saw someone wearing a puffy jacket and dark clothes running in the street. She did not see him holding a gun or other weapon, although he might have had something under his jacket, since he was holding his arms close to his body while running. Loggins also observed a gray Cadillac leave the scene and speed around the corner. When Loggins turned her car around, she saw two women standing next to the fallen body.

### 3. Testimony of Witness Mary Washington

Mary Washington was riding in the front passenger seat of Mary Loggins's car. She heard several "bangs," looked in the car's rear view mirror, and saw a man on the ground and the people around him running away. An older gray Cadillac or Buick proceeded north on San Pablo Avenue, turned around, and sped away south.

### 4. Defense Investigator Monte Beers' Testimony

Monte Beers, a defense investigator, interviewed Bianca. During the interview, she claimed that William had been in three fights with Kilgore. Although she could not identify anybody in the Cadillac, she was sure it was Kilgore's car. In addition, Bianca asserted, the shooter's weapon appeared to be a sawed-off shotgun.

### C. VERDICT, NEW TRIAL MOTION, AND SENTENCE

The jury convicted Kilgore of first degree murder and found true the drive-by special circumstance and the firearm enhancement.

Kilgore filed a posttrial *Marsden* motion, seeking new counsel. The court relieved trial counsel and appointed another attorney to represent Kilgore in regard to a motion for a new trial based on allegations of ineffective assistance of counsel. After an evidentiary hearing in which trial counsel and Kilgore both testified, the court denied the new trial motion.

Kilgore was sentenced to life without the possibility of parole. The term on the enhancement for use of a firearm was stayed.

This appeal followed.

9

## II. DISCUSSION

As mentioned, Kilgore contends the trial court erred in (1) ruling that, if Kilgore testified, the prosecution could cross-examine him on his testimony in his Oklahoma manslaughter case; (2) failing to instruct the jury on second degree drive-by murder; (3) failing to instruct the jury that the doctrine of transferred intent applied to self-defense; and (4) barring Kilgore from introducing bad character evidence regarding William and Terry. In addition, Kilgore urges that he did not receive effective assistance at trial and that the cumulative effect of the purported errors compels reversal.

### A. ADMISSIBILITY OF KILGORE'S TESTIMONY IN THE OKLAHOMA CASE

Kilgore argues that the trial court erred when it denied his motion to exclude evidence of his Oklahoma manslaughter case, and particularly in ruling that he could be cross-examined with his Oklahoma testimony if he testified in the instant case. We first summarize his Oklahoma testimony and his motion to exclude the evidence, and then consider the arguments of the parties on appeal.

#### 1. Kilgore's Oklahoma Trial Testimony

Kilgore was convicted of manslaughter in 1997 in Oklahoma. He testified at the Oklahoma trial about the circumstances of the shooting, contending he shot his victim in self-defense.

Specifically, Kilgore explained, he had owned a "semi-automatic Tec-22, a semi-automatic 45, and semi-automatic nine millimeter Tec," two of which had been stolen from his home. (The third gun was not stolen because he carried it in the trunk of his car.) When he confronted a man named Bryant Jones (Jones) about the stolen guns, Jones admitted that he had one of them and told Kilgore to accompany him to a friend's house. As Kilgore entered the porch of the house—armed with his semi-automatic Tec-9 and a 20-round magazine—Jones came "busting out of the ho[use] in some kind of panic," claimed he did not have Kilgore's gun, and left the scene. Kilgore went inside, where he encountered Conan Emery, sitting in a chair and "looking at me like he had some kind of grudge against" Kilgore. Kilgore claimed he was scared of Emery, a gang leader, because of his violent history. He nevertheless asked Emery about his stolen

10

guns. to which Emery responded that he would let Kilgore's "ass have it" if his inquiries persisted. When Emery made a motion towards his waistband. Kilgore. thinking Emery had a gun. pulled out his Tec-9 and fatally shot him.

After being arrested for the homicide. Kilgore wrote a letter to a friend, claiming that the woman who owned the house where Emery was shot had removed a gun from Emery's body. The letter stated, "In order for me to get off she's going to have [to] tell the police she moved [Conan's] gun." Kilgore also wrote that he might need to have "Blunt, Yogie, Sidlo and Pic" say that Emery "had a gun." According to Kilgore. he would have a strong case of self-defense "if we can get these statements out of people."

On cross-examination in the Oklahoma case, Kilgore acknowledged that he "ran around" with the Eight Trey Crips gang as a juvenile but denied being an actual gang member. He maintained that all of his friends who identified him as a Crips member were lying. He denied telling friends that he was going to kill the people who had stolen his guns. He acknowledged that, after killing Emery, he had not informed the police about the shooting.

2. Motion to Exclude Evidence of the Oklahoma Conviction

At trial in the present action, defense counsel moved to exclude any reference to Kilgore's prior Oklahoma homicide conviction, which Kilgore contends was roughly equivalent to an involuntary manslaughter conviction in California. (Respondent does not dispute this assertion.) The prosecutor opposed the motion, asserting that the evidence was admissible under Evidence Code section 1101 and the "doctrine of chances," with respect to Kilgore's claim that he shot William in self-defense.

The trial court denied Kilgore's motion, finding that his testimony in the Oklahoma case showed that he had offered a similar explanation for the death of his Oklahoma victim as he offered in this case, and the "occurrences [were] unusual enough with their repetition" to suggest his self-defense explanation was not believable. Kilgore insists this was error.

### 3. Forfeiture

Before turning to the merits of the trial court's ruling, respondent contends that Kilgore is barred from challenging the ruling because he did not testify at the trial in this case. For this proposition he refers us to *People v. Collins* (1986) 42 Cal.3d 378 *(Collins)*, which held that a defendant must testify in order to preserve a claim of improper impeachment with a prior felony conviction. *(Id.* at pp. 383-389.) Without the defendant's testimony, the court in *Collins* observed, an appellate court cannot review the trial court's balancing of probative value and undue prejudice. In addition, consideration of the harm caused by the trial court's ruling is speculative, such that the prejudicial effect of the purported error is difficult to determine. *(Id.* at pp. 384, 393.)

*Collins* was decided in a different factual context. The matter before us does not involve impeachment with a prior felony conviction, but, rather, evidence admitted to show Kilgore's mental state as relevant to his claim of self-defense. Respondent argues that *Collins* should nevertheless apply because, like the defendant in *Collins*, Kilgore placed his credibility before the jury and should not be allowed to present himself in a false light. Kilgore counters that *Collins* is inapplicable because in this case: the proffered evidence included facts and testimony from the prior case, not just the conviction itself; the conviction itself is inadmissible, because the crime is not one of moral turpitude; and impeachment with such testimony is not constitutionally required pursuant to California Constitution article I, section 28, subdivision (f), as it was in *Collins*. Furthermore, he contends that the reasoning underlying *Collins*—that an appellate court cannot fairly be asked to weigh prejudice against probative value if the defendant's testimony is unknown—is not at issue here because Kilgore presented a pretrial offer of proof as to the content of his proposed testimony and testified under oath on the motion for new trial. Neither party cites a decision directly on point.

We need not decide whether *Collins* applies to this case involving evidence admitted under Evidence Code section 1101. Even if *Collins* applied, Kilgore provided to the trial court his proposed testimony by an offer of proof, which our Supreme Court has suggested may preserve the challenge. *(Collins, supra,* 42 Cal.3d at p. 393.)

Moreover, because we conclude *post* that the court did not err in ruling the Oklahoma testimony admissible. we need not determine if Kilgore forfeited his right to challenge it.

4. Admissibility

As a general matter, evidence of a defendant's character or criminal propensity. as shown by his past conduct. is inadmissible to prove he acted in conformity with that character or propensity on another occasion. (Evid. Code. § 1101, subd. (a).) Evidence of a defendant's prior bad act may be admissible, however, if relevant to prove another material fact, such as motive. intent, plan. knowledge, identity, or absence of mistake or accident. (Evid. Code, § 1101, subd. (b).)

The trial court found it was a "close call" whether the Oklahoma incident was sufficiently similar to the shooting of William to render Kilgore's Oklahoma testimony admissible under Evidence Code section 1101, subdivision (b), for purposes of proving his state of mind in regard to his self-defense claim. It ultimately concluded that the evidence was admissible under the doctrine of chances, because he offered an explanation for the death of his Oklahoma victim that was similar to the explanation he offered in this case, and the repetition of the occurrences suggested his self-defense explanation was not believable.

Kilgore claims the doctrine of chances is merely another way of stating that a prior crime was sufficiently similar to the charged crime to be admissible for purposes of proving intent under Evidence Code section 1101, subdivision (b), so the court's ruling that the Oklahoma homicide was not sufficiently similar to be admitted under Evidence Code section 1101 rendered it inadmissible under the doctrine of chances as well. In making this argument. Kilgore misrepresents the trial court's ruling.[4] In any event,

---

[4]    The trial court did not find that the Oklahoma homicide was *insufficiently similar* for admission under Evidence Code section 1101, observing only that it was a close call. It is true the court remarked that the issue of general intent was not *at issue*, but Kilgore misrepresents the court's concern to make it seem as if the trial judge believed there was no issue of "intent" within the meaning of Evidence Code section 1101. He quotes the trial court as ruling: "it doesn't appear that there is an issue concerning the general intent that the act was performed with, in other words, he meant to fire the gun and he fired the

13

whether characterized as a ruling under Evidence Code section 1101, subdivision (b), or the doctrine of chances, the trial court did not abuse its discretion in concluding that the Oklahoma evidence was admissible. (See *People v. Kipp* (1998) 18 Cal.4th 349, 369 [admission of other crimes evidence reviewed for abuse of discretion].)

As mentioned, under Evidence Code section 1101, evidence of other crimes may be admitted to show identity, common design or plan, or intent, if the other crime was sufficiently similar to the charged crime. While the other crimes must be highly similar to the charged offenses to be admitted on the issue of identity, a lesser degree of similarity is required for admission as to common design or plan, and the least degree of similarity is needed for admission on the issue of intent. In the last instance, the other crimes need only be sufficiently similar to the charged offenses to support the inference that the defendant probably harbored the same intent in each instance. (*People v. Lewis* (2001) 25 Cal.4th 610, 636-637; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

In the matter before us, the circumstances of the Oklahoma homicide and William's shooting were sufficiently similar to warrant admission of Kilgore's Oklahoma testimony under Evidence Code section 1101, subdivision (b). In both the Oklahoma case and the instant case, Kilgore claimed to have killed his victims in self-defense. In both cases, he shot at close range an unarmed victim with whom he had a dispute. In both cases, he had threatened to harm those who had wronged him. In both cases, he carried a gun to the scene, yet claimed that he discharged the weapon only because he thought he was about to be shot, either because his victim was pulling out a gun or had

---

gun . . . ." But the complete sentence, which Kilgore quotes only partially, reads as follows: "As I indicated, this does not appear, given [defense counsel's] offer of proof as of today that there is an issue concerning identity of the shooter, and it doesn't appear there is an issue concerning the general intent that the act was performed with, in other words, he meant to fire the gun and he fired the gun, *the issue is about mental state and the existence or non-existence of the element of self-defense and the existence or non-existence of an honest but unreasonable belief of a need to defend oneself against imminent peril to life or great bodily injury.*" (Italics added.) From the portion of the judge's statement that Kilgore omits, it is clear that the court thought the Oklahoma testimony, though not germane to *general* intent, *was* relevant to Kilgore's state of mind.

14

actually fired. In both instances. Kilgore suffered no harm. while his victims were killed. The Oklahoma evidence suggests his self-defense theory may have been a fabrication. His claim of self-defense in the prior case was therefore probative of the legitimacy of his purported belief in this case of the need to defend himself.

The doctrine of chances obtains the same result in a slightly different way. In essence. the doctrine of chances maintains that with each repetition of an act under similar circumstances, the more reasonable it is to conclude the act was intended and premeditated. *(People v. Steele* (2002) 27 Cal.4th 1230, 1243 [evidence of prior murder admissible to show intent in charged murder in light of the doctrine of chances].) As applied here, the fact that Kilgore, for the second time, shot a victim at close range with a firearm he took to the scene of a confrontation (either to get his stolen guns back or to avenge a robbery and assault), the less likely it is that the homicide was perpetrated in self-defense. It was not an abuse of discretion to conclude that Kilgore's Oklahoma testimony was admissible.

Kilgore asserts that the Oklahoma testimony should have been excluded nonetheless, as more prejudicial than probative. For purposes of Evidence Code section 352, "prejudice refers to evidence that uniquely tends to evoke an emotional bias against the defendant without regard to its relevance on material issues." *(People v. Killebrew* (2002) 103 Cal.App.4th 644, 650; see also *People v. Lenart* (2004) 32 Cal.4th 1107, 1123 [uncharged crime evidence is admissible only if it has "substantial probative value that is not greatly outweighed by the potential that undue prejudice will result from admitting the evidence"]; *People v. Carpenter* (1997) 15 Cal.4th 312, 378-379 ["The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved. (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence."].)

As explained *ante*, Kilgore's Oklahoma testimony was probative because. in both cases, he claimed to have killed his victims in self-defense. Although Kilgore protests that the probative value was slight because the Oklahoma jury implicitly found his self-defense theory *credible* (in convicting him of the purported equivalent of involuntary

manslaughter), the point is not whether the jury accepted his claim in Oklahoma, but how unlikely it is that he shot a *second* person to death in rather similar circumstances only because he thought he had to defend himself. In the end, not even Kilgore disputes the relevance of the Oklahoma evidence, arguing instead that the evidence was "*too* probative," (italics added) and thus unduly prejudicial.

Given the probative value of the Oklahoma evidence, however, it was within the court's discretion to conclude that the evidence would not be unduly prejudicial. The circumstances of the Oklahoma case were no more inflammatory than the circumstances of this case: both involved shooting an unarmed victim at point-blank range. Although Kilgore complains that admission of the Oklahoma evidence would have risked the jury improperly deciding that "if he did it before, he would do it again," the trial court was prepared to protect against any such possibility by instructing the jury, in accordance with CALJIC No. 2.50, to use the evidence only as it related to Kilgore's self-defense claim, and not as evidence of bad character or predisposition. Kilgore also argues there were adverse facts in the Oklahoma case that were absent from the instant case (e.g., he owned semi-automatic handguns and had friends who were gang members), but this cannot be used to demonstrate error in the court's ruling, since this concern was never brought to the trial court's attention.[5]

Kilgore also asserts that the prejudicial impact of the Oklahoma evidence outweighed its probative value because, after learning the trial court's ruling, he opted not to testify. For this proposition he relies on *People v. Beagle* (1972) 6 Cal.3d 441, 453. Although the court in *Beagle* did refer to this consideration, it also interjected "a word of caution": "We do not propose to encourage or countenance a form of blackmail by defendants. No witness including a defendant who elects to testify in his own behalf

---

5       Kilgore contends this was another instance of his trial counsel's ineffective assistance. Counsel's failure to object in this regard does not require reversal, however, for the same reason we conclude *post* that her failure to request redaction of evidence or interpose other objections does not compel reversal: it was not sufficiently prejudicial. (See *post.*)

16

is entitled to a false aura of veracity." (*Ibid.*) In the matter before us, it was not an abuse of discretion to decide—as the court here did implicitly—that the otherwise admissible Oklahoma testimony evidence should be permitted, even if it were so damaging to the defendant that he might opt not to testify in order to keep it from the jury.

Lastly, Kilgore argues in his reply brief that admission of the Oklahoma testimony was inconsistent with his right not to be impeached with a manslaughter conviction, which was not a crime of moral turpitude (see *People v. Castro* (1985) 38 Cal.3d 301, 313), and that a defendant may be impeached with a prior conviction only by name of the crime and date of conviction, not the underlying facts (see *People v. Allen* (1986) 42 Cal.3d 1222, 1270). But as Kilgore elsewhere urges, his testimony in the Oklahoma case was not offered as *impeachment* with a prior conviction under Evidence Code section 787, but as substantive evidence of his mental state under Evidence Code section 1101, relevant to his claim of self-defense.

In the final analysis, we find no prejudicial abuse of discretion.

B. FAILING TO INSTRUCT ON SECOND DEGREE MURDER BY DRIVE-BY SHOOTING

Kilgore next argues that the trial court erred in failing to instruct the jury sua sponte on second degree drive-by murder, contending it is a "lesser-included 'offense-plus-enhancement'" of first degree murder and the special circumstance of drive-by murder.[6] While the court instructed the jury on the elements of first degree drive-by murder, which requires an intent to kill, it did not instruct on second degree drive-by murder, which he claims requires a mere intent to injure.

Degrees of murder are distinguished in section 189. As relevant here, first degree murder is murder that is committed with premeditation and deliberation, or murder that is "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at

---

6    Specifically, Kilgore asserts: "Second degree drive-by murder may be deemed a lesser-included offense within the special circumstance of drive-by murder and within the crime of first degree murder. Alternatively, second degree drive-by murder may be deemed a lesser-included enhancement, or offense plus enhancement, within the special circumstance of drive-by murder and within the crime of first degree drive-by murder."

17

another person outside of the vehicle with the intent to inflict death." (§ 189.) "All other kinds of murders are of the second degree." (§ 189.)

The trial court instructed the jury on first degree murder, with premeditation and deliberation. (CALJIC No. 8.20.) It further instructed on first degree murder by drive-by shooting, as murder perpetrated by discharging a firearm from a motor vehicle "intentionally at another person outside of the vehicle when the perpetrator specifically intended to inflict death." (CALJIC No. 8.25.1.)

The trial court also instructed the jury on second degree murder, under theories of express malice (intent to kill) and implied malice (conscious disregard of the danger to human life). (CALJIC Nos. 8.30, 8.31.) The jury rejected this option, finding instead that Kilgore committed murder in the first degree. From this verdict, the jury necessarily found that Kilgore intended to kill William.

In addition to its instructions on the substantive offenses of first degree murder and second degree murder, the court also instructed on the special circumstance set forth in section 190.2, subdivision (a)(21), pertaining to the discharge of a firearm from a motor vehicle with the intent to kill. (CALJIC No. 8.81.21.) This special circumstance, if found true, mandates that a person convicted of first degree murder receive the death penalty or life imprisonment without the possibility of parole. The jurors found that this special circumstance was true, confirming their conclusion that Kilgore harbored an intent to kill.

Nevertheless, Kilgore complains that the trial court did not give an instruction based on section 190, subdivision (d), which dictates the *sentence* for certain persons found guilty of murder in the *second* degree. The statute provides: "Every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 20 years to life if the killing was perpetrated by means of shooting a firearm from a motor vehicle. intentionally at another person outside of the vehicle with the intent to inflict great bodily injury." (See CALJIC No. 8.35.2.) Section 190, subdivision (d). is a *penalty provision* for second degree murder. not a substantive offense. (*People v.*

18

*Garcia* (1998) 63 Cal.App.4th 820, 832-833 (*Garcia*) [former § 190, subd. (c), now subd. (d), constitutes a penalty provision rather than a substantive offense].)

A trial court has a sua sponte duty to instruct on *lesser included offenses* for which there is substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) The court does not, however, have a sua sponte duty to instruct on lesser-included enhancements. (*People v. Wolcott* (1983) 34 Cal.3d 92, 101 (*Wolcott*).)[7] And although a trial court must sua sponte instruct on general principles of law that are closely connected to the facts and necessary for the jury's understanding of the case, the failure to do so does not compel reversal unless it was reasonably probable that a more favorable result would have been obtained in the absence of the error. (*Garcia, supra*, 63 Cal.App.4th at pp. 833-834.)

Kilgore would not have obtained a better verdict if the court had given an instruction under section 190, subdivision (d). His argument on this point is that the absence of the instruction was particularly prejudicial due to the following statement by the prosecutor in closing argument: "First-degree murder in this particular case can also be derived by the special instructions that you have been given already that says if you find that the defendant . . . intentionally discharged a firearm from a motor vehicle, you don't even have to consider premeditation or deliberation. The State of California has deemed this act to be so inherently offensive and so inherently dangerous that it's pretty much said *strict liability*, you shoot a firearm from out of a car intentionally, and you cause the death of someone other than an occupant of that vehicle, that's first-degree murder." (Italics added.)

The trial court, however, instructed the jury correctly on the requirements for a finding of first degree murder by drive-by shooting, and further instructed the jury that, if

---

7    Kilgore argues *Wolcott* is no longer good law, and that there is a sua sponte duty to instruct on lesser-included enhancements, in light of the holding in *Blakely v. Washington* (2004) 542 U.S. 296. Our Supreme Court has determined, however, that *Blakely* does not apply to California's sentencing scheme. (*People v. Black* (2005) 35 Cal.4th 1238.)

19

the attorneys said anything contrary to the court's instructions, the instructions given by the court had to be followed. In addition, defense counsel specifically corrected the prosecutor's statement in closing argument. The prosecutor's closing argument, therefore, did not render prejudicial the omission of an instruction under section 190, subdivision (d), and he would not have obtained a more favorable verdict if the instruction had been given.

Moreover, by rejecting implied malice second degree murder (requiring conscious disregard rather than intent to kill), and by *expressly* finding true the special circumstance under section 190.2, subdivision (a)(21)—that Kilgore intentionally shot out of the Cadillac *with the intent to kill William*—the jury necessarily found an intent to kill sufficient for first degree murder under section 189. This finding rendered irrelevant any instruction on drive-by shooting in the context of *second* degree murder under section 190, subdivision (d).

Kilgore has failed to demonstrate reversible error.

C. FAILING TO INSTRUCT ON DOCTRINE OF TRANSFERRED INTENT

Kilgore next contends that the trial court erred when it failed to instruct the jury sua sponte on the doctrine of transferred intent. (See CALJIC No. 8.65.)

The transferred intent doctrine imposes criminal liability on a defendant who attempts to kill one person but kills someone else by mistake or inadvertence. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 688.) In the context of self-defense cases, transferred intent may apply where the defendant intends to injure or kill the person who poses an imminent and unlawful threat of death or great bodily injury but inadvertently kills an innocent bystander. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357.) Kilgore contends that an instruction to this effect was required because he intended to shoot Terry but missed, striking William instead.

Kilgore is incorrect. As Kilgore vigorously contends elsewhere in this appeal, his trial counsel abandoned self-defense during trial, switched to an identity theory, and expressly withdrew the instruction on transferred intent. The court has no sua sponte

duty to give an instruction on a theory the defense has abandoned. (See *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1025.)

Moreover, a trial court has no sua sponte duty to instruct on a defense for which there is no substantial evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 469.) Here, no substantial evidence supported Kilgore's claim that he shot William after Terry shot at Kilgore.

In the first place, there was only scant evidence that *any* shot was fired other than the fatal shot fired by Kilgore. Shanae and Bianca testified to only one shot, and there was no shell casing or other physical evidence of any additional shot. Kilgore's effort to assemble evidence of an additional shot is weak at best.

Kilgore's assertion that witnesses reported hearing more than one shot is tainted by his misperceptions of the record. For example, he states in his opening brief on appeal that "Witnesses reported hearing one or two shots. Telephone calls to the Oakland Police Department 911 emergency line reported hearing 'shots' (plural) being fired. (RT 522-525)." In the cited portion of the record, however, the only references to the possibility of more than one shot apparently came from a 911 dispatcher, not a witness to the crime. In one instance, a speaker on the emergency system responds to an officer or other law enforcement agency personnel as follows: "There was shots fired 30 at that San Pablo [*sic*]. A young man was shot with a gun." It is uncertain who said these words, and the apparent error in the transcription creates some doubt as to whether the speaker really said "[t]here [were] shots" as opposed to "[t]here was [a] shot[]." Furthermore, the rest of the call discloses that the speaker *did not know* how many shots were fired, and was probably a 911 dispatcher, as he or she explained: "*I didn't find out how many shots were fired.* If they were rapid, I didn't get any information on that. Cause I wanted to get the medical rolling." (Italics added.) In fact, it appears the caller from the scene had told the 911 dispatcher that there was only *one* shot: "Okay. What she said when I connected to the ambulance was she heard *a* noise, she saw someone call and she knew they'd been shot." (Italics added.) Lastly, in another conversation captured by the 911 transcription, it appears that one law enforcement agency stated to another, "I'm sure you got the shots

21

fired over on San Pablo?" Again, while there is a reference to "shots," there is no indication it was based on witness information, or even that the speaker was using the word "shots" for the purpose of describing the number of times the gun discharged.

Kilgore's argument that *Terry* said he heard two shots fares no better. The fact that Terry *heard* two shots would not support the conclusion that *Terry* fired at Kilgore, and, indeed, Kilgore's characterization of the record on this point is disingenuous. Immediately after Sergeant Green testified on cross-examination that Terry told him there was a second shot, the following exchange occurred: "[Defense Counsel]: And from the questioning, nobody ever asked [Terry] if that shot came from anyone on the corner; correct? [¶] [Sergeant Green]: Correct. The implication was that *it was from the same person.* [¶] [Defense Counsel]: *From the vehicle.* [¶] A. *Right.*" (Italics added.) The testimony on which Kilgore relies, therefore, does not support Kilgore's self-defense theory, but negates it by confirming that no one other than Kilgore fired a gun. And if that were not enough, Sergeant Green thereafter confirmed that Shanae, when asked "if she heard any sounds [plural]," responded, "Well, I heard *the* pop [singular]." (Italics added.)

Kilgore also notes that Jones, the getaway driver, said he "guess[ed]" it was "possible" that he heard two shots, since the sound of Kilgore's shotgun blast was so loud. But there was no indication that Jones thought any shot came from Terry or William. To the contrary, Jones testified that he did not observe anyone on the street corner do anything before Kilgore fired the fatal shot.

Next, Kilgore refers us to the testimony of Mary Washington. a passenger in a car on San Pablo Avenue. Washington did testify at trial that she heard "several" "bangs" or shots. But in her statement to police on the day of the shooting, Washington stated: "Just when we were at the corner. I heard *a* loud bang. At first I did not know what this sound was. My friend Mary [Loggins] then said, 'Oh. my God, that boy has been shot.'" (Italics added.) And once again, there is no indication that Washington—or any other witness—believed that Terry or William ever fired at Kilgore.

Thus, there is little or no credible evidence that there was more than one shot fired, and even if there had been, no witness testified that any shot came *from Terry* (or William) or that anyone fired *at Kilgore*. Nor was there any physical evidence to that effect, such as strike marks on Kilgore's car. Kilgore's self-defense theory is unsubstantiated.

Moreover, the balance of the evidence was not that Kilgore fired in self-defense, but that he sought out William, with a loaded gun, to exact revenge. Kilgore had motive to harm William because Kilgore owed William money, William had twice approached him about the debt, and William had participated in robbing Kilgore or beating him up. Bryant told the police that Kilgore had threatened to "smoke" the "dudes who robbed him." Kilgore got Jones to take him to the scene of the murder, with a loaded gun. In fact, Kilgore acted as if he intended to shoot William—as opposed to Terry—in that he shot William from just 8-12 feet away, returned to the corner, pointed his gun at William, and seeing him shot drove off. In the context of the record in this case, the fact that a man ran from the scene holding his hands close to his body and the fact that Terry did not want to get involved with the police investigation immediately after the shooting do not constitute substantial evidence that Terry shot at Kilgore and Kilgore fired back in self-defense, accidentally hitting William. While the court did instruct the jury on self-defense (CALJIC Nos. 5.12, 5.50), it was more than Kilgore was entitled to.

The court did not err in failing to instruct the jury sua sponte on the application of the transferred intent doctrine to self-defense.

D. PRECLUSION OF CHARACTER EVIDENCE REGARDING WILLIAM AND TERRY

Kilgore maintains that the trial court erred in barring Kilgore from introducing evidence of William's and Terry's bad character through Shanae and Tomlinsonn. He argues that this evidence was admissible to rebut the prosecution's good character evidence, which the prosecutor elicited through Shanae, Bianca, and Jones. His contention lacks merit.

### 1. Cross-Examination of Shanae as to William's Character

Shanae testified on direct examination that she had never seen William or Terry, in her presence, engaged in violent or illegal behavior.[8]

On cross-examination of Shanae, defense counsel attempted to elicit evidence which, Kilgore claims, would have rebutted the good character evidence offered by Shanae and shown William and Terry's violent behavior. Defense counsel asked Shanae: "are you aware William Anderson and Terry Dandy had twice assaulted and robbed Mr. Kilgore?" The prosecutor objected on the ground that the question called for speculation. The court sustained the objection, noting as well that the question assumed facts not in evidence and contained an "insinuation" the court and counsel had previously discussed. In the latter regard, the court stated: "It's one of those things we talked about, the question that has an insinuation with it. So, sustained."

Kilgore contends that Shanae's testimony on direct examination about William's and Terry's good character opened the door to cross-examination regarding their violent behavior. (See, e.g., *People v. Holloway* (2004) 33 Cal.4th 96, 146; *People v. Wagner* (1975) 13 Cal.3d 612, 617.) The reason the trial court sustained the objection, however, was not because the question called for impermissible character evidence, but because of the question's *form*.

Kilgore does not explain how the trial court might have abused its discretion in sustaining the prosecutor's objection to the question's form. The question may not have really asked Shanae to speculate, as the prosecutor insisted it did, since it arguably inquired whether she was or was not aware of the incidents of violence. However, as the court correctly noted, the question assumed facts that were at that time not in evidence. Although greater leeway in this regard may be given on cross-examination, we also detect that the trial court was concerned with the prejudicial and misleading "insinuation"

---

8    Bianca and Jones also testified that they had not personally seen William or Terry engaging in violent behavior, but their testimony came *after* the testimony of Shanae and the challenged rulings of the trial court. Their testimony is therefore immaterial to the court's ruling.

in the question, which suggests that the court was motivated to sustain the objection on grounds of undue prejudice as well. On balance, Kilgore has not established an abuse of discretion.

Regardless, any error the court may have made in precluding Kilgore's cross-examination of Shanae was harmless. Kilgore was permitted to ask other witnesses about William's propensity for violence, eliciting testimony from Jones and Tomlinsonn that they had observed Kilgore with injuries from two assaults. Jones testified specifically that Kilgore claimed he had twice been assaulted by William and Terry, and Jones had seen them fleeing the scene on one of those occasions. Furthermore, defense investigator Beers testified that Bianca reported William being in three fights with Kilgore. There was, therefore, no prejudice arising from defense counsel's inability to obtain much the same evidence from Shanae. Nor did the ruling make any substantial difference in the defense's efforts to discredit Shanae's credibility, especially since she admitted that she was William's cousin and had lied to the police about Terry's identity.

Kilgore has failed to demonstrate any probability that he would have obtained a more favorable verdict if the question to Shanae had been allowed.

2. Denial of Examination of Tomlinsonn on William's Bad Character

After Tomlinsonn had begun his testimony, defense counsel sought permission to have him state his belief that William was a drug dealer. Defense counsel argued at the time that she would be pursuing a "reasonable self-defense" case, and urged that testimony of William being a drug dealer would (1) rebut the testimony of the prosecution witnesses that they had never seen him do anything illegal and (2) suggest that it was likely William was armed with a gun.

The court denied the request, because there was no evidence linking the murder to a drug transaction, and the victim's character was irrelevant except insofar as it concerned his reputation for violence.

Kilgore contends he was entitled to examine Tomlinsonn to elicit bad character evidence regarding William, in order to rebut the prosecution's good character evidence.[9] (See Evid. Code, § 1103, subd. (a).) Even if the court erred in precluding this inquiry of Tomlinsonn, the error was harmless. Kilgore contends it was prejudicial for the same reason it was prejudicial to preclude his character inquiry of Shanae. We have already concluded the preclusion of Shanae's testimony was harmless. Kilgore offers no reason why we should not reach the same conclusion as to exclusion of Tomlinsonn's testimony.

E. INEFFECTIVE ASSISTANCE OF COUNSEL

Kilgore urges that the trial court erred by denying his motion for a new trial, in which he contended his trial counsel rendered ineffective assistance on numerous grounds.

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient because his representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) prejudice flowing from counsel's performance or lack thereof. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) We reverse convictions on the ground of inadequate counsel only if "the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581-582.)

We exercise our independent judgment in reviewing the legal question of whether Kilgore was deprived of his right to effective assistance of counsel. In doing so, we accept trial court factual findings that are supported by substantial evidence. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

---

[9]     Before the court's ruling on the proffered testimony from Tomlinsonn, Shanae and Jones testified that they had never seen William or Terry engage in illegal or violent behavior. Bianca's testimony on this point, however, came after Tomlinsonn's testimony and is not germane to the ruling. Although a defense witness, Tomlinsonn was called during the People's case to accommodate scheduling.

1. Failure to Obtain Ruling on Oklahoma Homicide and Defense Theories

In connection with defense counsel's motion to exclude the evidence of Kilgore's Oklahoma testimony, Kilgore asserts that his attorney provided ineffective assistance in three ways: failing to obtain a timely ruling before trial on the admissibility of the testimony, so she could have made a definite decision whether to pursue self-defense or an identity defense; abandoning the self-defense theory and switching to an identity defense; and presenting an erroneous offer of proof that Kilgore thought Terry was reaching for a gun rather than firing a gun.

None of these purported failures of counsel was prejudicial to Kilgore's case, as *neither* the identity defense nor the self-defense theory had any merit and neither would have improved if counsel had performed as Kilgore insists she should have.

As to the purported identity defense, Bianca and Shanae identified Kilgore as the shooter. These identifications, from just feet away, were corroborated by evidence that it was Kilgore who had a motive to shoot William in that he owed William money and had been beaten by William, Kilgore said he was going to "smoke" people who robbed him, he directed Jones to take him where he had just seen the people with whom he had been "having problems," he fled after the shooting, he reported his car stolen within minutes after the shooting, he remained at large for several months, and he confessed the murder to both Jones and Bryant. Indeed, Kilgore agrees that the identity defense was "hopeless."

But the self-defense claim was no better. As discussed *ante*, there was little if any evidence of more than one shot being fired. Moreover, there was no testimony or physical evidence that any shot had been fired *by William or Terry*, or that anyone had fired at Kilgore or his car. In addition, the evidence was clear that it was Kilgore who sought out his victim with an intent to kill him: after finding William and Terry, he coaxed Jones to drive him to their location, armed with a gun and, after shooting William from 8-12 feet away, returned and aimed his gun at William again.

Kilgore's self-defense claim would not have gotten any better in the absence of trial counsel's purported errors. In particular, the theory of self-defense would not have

become meritorious if counsel had merely obtained an earlier ruling on the admissibility of the Oklahoma evidence, or pursued the weak self-defense theory throughout the entire trial.

Nor would it have improved if she had advised the judge from the beginning that Terry was not just reaching for a gun, but firing it. In this regard, Kilgore notes that the claim of Terry reaching for the gun was similar to Kilgore's explanation in the Oklahoma case that Emery was reaching for a gun, and thus contributed to the court's conclusion in this case that the Oklahoma testimony was admissible under Evidence Code section 1101. Although defense counsel corrected this error before the actual ruling on the Oklahoma evidence, the trial court was not persuaded by counsel's changing the facts. The implication, Kilgore urges, is that, if defense counsel had been accurate in her initial offer of proof, the court would *not* have ruled the Oklahoma testimony admissible. In light of our discussion of the admissibility of the Oklahoma evidence *ante*, we doubt the trial court would have reached that conclusion. Even if it had, and Kilgore had thereupon decided to testify, the self-defense theory was still so weak that we are confident no more favorable outcome would have been obtained.

Which brings us to Kilgore's argument that the self-defense case would have been stronger with his testimony, and counsel thus erred by not having him testify. As to this argument as well, we are not persuaded.

At the hearing on the new trial motion, Kilgore explained that on the afternoon of the murder, he, Jones and Sic went to Home Depot to buy cleaning supplies. As Jones drove Kilgore's car back to their apartment, he "made a sudden U-turn and approached some individuals on the corner that he had identified to be William and T." In the process of making the U-turn, Jones stated, "there goes William and T." As Jones approached the corner where William and T were standing, Kilgore saw T "pulling a weapon out from underneath his coat, and he fired at us, and I responded by firing back at T." The shotgun Kilgore used was in the back seat of the Cadillac. When Kilgore noticed that "someone had fell," Jones made another "U-turn and turned back around."

28

Kilgore then observed that William "had been struck." Kilgore testified that he did not intend to hit William.

While Kilgore's testimony would have stated his self-defense theory directly, it would not have made it any more persuasive. It purported to explain why Jones was driving, why Kilgore was in the back seat, and why there happened to be a loaded shotgun next to him. But Jones's act of making a U-turn and going back toward William and Terry is inconsistent with a theory of self-defense. Furthermore, Kilgore's version of the events would have had little credibility in light of the evidence from the Oklahoma homicide, which would have been properly admitted if Kilgore testified. Due to the inferences the jury could have drawn from the Oklahoma evidence—which Kilgore elsewhere in this appeal insists would have been severely prejudicial—it certainly was not unreasonable for trial counsel to conclude it unwise to put Kilgore on the stand. Nor was the failure to call Kilgore as a witness prejudicial. Indeed, once the court ruled that the prior homicide was admissible, Kilgore agreed that it was better for him not to testify, and to instead pursue an identity defense.

2. Opening the Door to Bad Character Evidence

On direct examination, Tomlinsonn testified that he found Kilgore to be reliable and trustworthy. The charges against Kilgore had not changed his opinion, and he would hire Kilgore again, notwithstanding those charges. Defense counsel attempted to elicit Tomlinsonn's opinion as to Kilgore's reputation for truthfulness and veracity but could not lay an adequate foundation.

On cross-examination, the prosecutor asked Tomlinsonn whether the 1997 felony conviction would change his decision whether to hire Kilgore. The court permitted the questioning, because the door was opened when Tomlinsonn stated the current charges did not affect his view of Kilgore's reliability and trustworthiness or whether he would rehire Kilgore.

Kilgore argues that his attorney should not have introduced evidence of his good character because it opened the door to the prosecutor asking Tomlinsonn whether he was aware of Kilgore's 1997 felony conviction.

29

Kilgore has not established, on this record, that his trial counsel had no legitimate tactical purpose in eliciting character evidence from Tomlinsonn. It was not unreasonable for defense counsel to conclude that the benefit of Tomlinsonn's testimony regarding Kilgore's reliability and trustworthiness outweighed any harm to be caused by reference to Kilgore's 1997 felony conviction. Counsel had already spoken to Tomlinsonn and reasonably believed that Tomlinsonn's good opinion of Kilgore was unaffected by the 1997 conviction. Indeed, that was precisely how Tomlinsonn testified.

Furthermore, the prosecution witnesses also had criminal records. Jones had been convicted of misdemeanor possession of stolen property. Bryant had been convicted of grand theft and possession of narcotics. Shanae and Bianca admitted falsely identifying Terry as Richard Davis because they thought he was the subject of a warrant. In these circumstances, evidence that Kilgore had a 1997 felony conviction—without reference to the crime of which he was convicted—was minimally prejudicial, and it was not probable that he would have obtained a better verdict if the evidence had not been introduced.

### 3. Failure to Request Redaction of Bryant's Statement

When Matthew Bryant purported to have forgotten the substance of his statements to the police, a tape-recording of the statement was played for the jury. Kilgore now argues that his trial attorney was ineffective because she did not object to this evidence or, at least, seek redaction of Bryant's opinion that Kilgore sold marijuana.

We do not agree. As defense counsel disclosed in the new trial proceedings, she did not object to the introduction of Bryant's tape-recorded interview because she believed it was properly introduced as a prior inconsistent statement. She was right. Prior statements are admissible where it is shown that the witness's lack of memory was evasive and untruthful. (*People v. Ervin* (2000) 22 Cal.4th 48, 84-85.) There was a reasonable basis in the record for that conclusion, and counsel's failure to object was not error.

Trial counsel believed she had erred by not having the tape-recorded interview redacted to exclude Bryant's statement that Kilgore was "known to sell weed." Any error in this regard, however, was harmless. Kilgore's friends—Jones and Bryant—had

criminal records. So did Terry. There is no reasonable probability that Kilgore would not have been convicted absent the admission of the evidence that he was "known to sell weed."

### 4. Failure to Request Instruction on Transferred Intent

Kilgore's attorney withdrew her request for an instruction on the doctrine of transferred intent in the context of self-defense. We have already concluded that the transferred intent instruction was not warranted, because there was no substantial evidence supporting the self-defense theory. Counsel's failure to request the instruction was, therefore, not error.

### 5. Failure to Object to Prosecutor's Argument

Kilgore contends that his attorney was negligent in failing to object to the prosecutor's inaccurate argument regarding first degree drive-by murder. As set forth *ante,* the prosecutor stated that shooting from a car had been deemed "so inherently dangerous that it's pretty much *strict liability,* you shoot a firearm from out of a car intentionally, and you cause the death of someone other than an occupant of that vehicle, that's first-degree murder." (Italics added.) The prosecutor also remarked that first degree drive-by murder did not require a finding of premeditation and deliberation. Kilgore claims these statements erroneously suggested that first degree drive-by murder did not require an intent to kill.

Counsel's failure to object contemporaneously to the prosecutor's statements was not prejudicial. In her own closing argument, defense counsel advised the jury that, for first degree drive-by murder, "not only do you have to find that somebody drove by and shot out of the car, but that they intended to kill when they shot out of the car." In addition, the court instructed the jury correctly on the applicable law and that, if anything said by the attorneys conflicted with those instructions, the jury had to follow the instructions of the court. We must assume that the jury understood those instructions and followed them, disregarding any erroneous statement of law by the prosecutor.

Kilgore has failed to establish ineffective assistance of counsel.

31

F. CUMULATIVE ERROR

Kilgore contends that the cumulative effect of the asserted errors compels reversal.

We do not agree. There is no basis for reversal of the judgment.[10]

III. DISPOSITION

The judgment is affirmed.

---

[10]   Kilgore has filed a petition for writ of habeas corpus, which we deny by separate order. (A110317)

32

REARDON, J.*

We concur.

_____

JONES, P. J.

_____

GEMELLO, J.

(A106142)

_____

\*    Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

33