# EXHIBIT C

**REPORTER'S TRANSCRIPT OF RECORD ON APPEAL**
**VOLUME 3(PAGES 428-636)**

1      DISTRICT COURT OF APPEAL OF THE STATE OF CALIFORNIA

2           IN AND FOR THE FIRST APPELLATE DISTRICT

3                        ---oOo---

4

5

6    THE PEOPLE OF THE STATE OF CALIFORNIA,

7                Plaintiff and Respondent,
                                          No.
8           vs.
                                          Alameda Co No.
9    IVAN KILGORE,                        141033

10              Defendant and Appellant.

11   _____/

12

13

14

15        **REPORTER'S TRANSCRIPT OF RECORD ON APPEAL**

16      From Judgment of the Superior Court of the State

17       of California, in and for the County of Alameda

18         THE HONORABLE KENNETH R. KINGSBURY, JUDGE

19                        ---oOo---

20            MARCH 13, 2003 & MARCH 14, 2003

21

22

23   For the Respondent:     BILL LOCKYER
                             Attorney General of California
24                           455 Golden Gate Ave,  Suite 11000
                             San Francisco, CA  94102-3664
25
     For the Appellant:      IN PROPRIA PERSONA
26

27

28   **VOLUME 3 (Pages 428 - 636)**

1     IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         IN AND FOR THE COUNTY OF ALAMEDA

3    BEFORE THE HONORABLE KENNETH R. KINGSBURY, JUDGE

4             DEPARTMENT NO. 6

5                ---oOo---

6

7

8  THE PEOPLE OF THE STATE OF CALIFORNIA

9                    Plaintiff,

10         vs.               Nos.  141033

11  IVAN KILGORE,

12                   Defendant.

13  _____/

14

15

16

17

18    COURTHOUSE, OAKLAND, ALAMEDA COUNTY, CALIFORNIA

19                 ---oOo---

20     TRANSCRIPT OF REPORTER'S RECORD ON APPEAL

21                 ---oOo---

22

23          A P P E A R A N C E S

24  For the Plaintiff:     THOMAS J. ORLOFF
                        District Attorney

25                        BY:  DARRYL STALLWORTH, Deputy

26
  For the Defendant:     DEBORAH LEVY, ESQ.

27

28

```
1              - DAYS OF PROCEEDINGS -
2                     ---o0o---
3                                              Page
```

| | |
|---|---|
| MONDAY, FEBRUARY 24, 2003 | 1 |
| TUESDAY, FEBRUARY 25, 2003 | 11 |
| THURSDAY, FEBRUARY 27, 2003 | 40 |
| MONDAY, MARCH 3, 2003 | 43 |
| THURSDAY, MARCH 6, 2003 | 47 |
| MONDAY, MARCH 10, 2003 | 78 |
| TUESDAY, MARCH 11, 2003 | 221 |
| THURSDAY, MARCH 13, 2003 | 428 |
| FRIDAY, MARCH 14, 2003 | 603 |
| MONDAY, MARCH 17, 2003 | 637 |
| TUESDAY, MARCH 18, 2003 | 712 |
| WEDNESDAY, MARCH 19, 2003 | 739 |
| MONDAY, MARCH 24, 2003 | 858 |
| FRIDAY, JUNE 27, 2003 | 871 |
| FRIDAY, JULY 11, 2003 | 906 |
| MONDAY, JULY 14, 2003 | 911 |
| MONDAY, JULY 21, 2003 | 920 |
| FRIDAY, AUGUST 15, 2003 | 923 |
| FRIDAY, DECEMBER 5, 2003 | 926 |
| FRIDAY, JANUARY 9, 2004 | 929 |
| THURSDAY, FEBRUARY 19, 2004 | 960 |
| WEDNESDAY, MARCH 10, 2004 | 1052 |
| FRIDAY, APRIL 9, 2004 | 1088 |

**- GENERAL INDEX -**

---o0o---

|                                                          | Vol. | Page |
|----------------------------------------------------------|------|------|
| MOTION TO BIFURCATE                                      | 1    | 20   |
| DUE DILIGENCE HEARING                                    | 1    | 59   |
| COURT'S PRE-INSTRUCTIONS TO THE JURY                     | 1    | 86   |
| OPENING STATEMENT BY MR. STALLWORTH                      | 1    | 98   |
| STIPULATION                                              | 1    | 159  |
| 402 HEARING                                              | 2    | 221  |
| STIPULATION                                              | 2    | 223  |
| STIPULATION                                              | 3    | 593  |
| DEFENDANT'S MOTION TO EXCLUDE PRIORS                     | 3    | 607  |
| STIPULATION                                              | 4    | 653  |
| PEOPLE REST                                              | 4    | 657  |
| OPENING STATEMENT BY MS. LEVY                            | 4    | 658  |
| DEFENDANT RESTS                                          | 4    | 703  |
| COURT'S INSTRUCTIONS TO THE JURY                         | 4    | 748  |
| OPENING ARGUMENT BY MR. STALLWORTH                       | 4    | 782  |
| CLOSING ARGUMENT BY MS. LEVY                             | 4    | 802  |
| FINAL ARGUMENT BY MR. STALLWORTH                         | 4    | 829  |
| COURT'S CONCLUDING INSTRUCTIONS TO THE JURY              | 4    | 848  |
| VERDICT OF THE JURY                                      | 5    | 861  |
| DEFENDANT'S MOTION FORE NEW TRIAL (In-Camera under separate cover) | 5 | 871 |
| APPOINTMENT OF WALTER K. PYLE, ESQ.                      | 5    | 920  |

1    DEFENDANT'S MOTION FOR NEW TRIAL          5      929
     (CONT'D)
2

3    ARGUMENTS AND RULING ON MOTION FOR        5     1052
     NEW TRIAL
4

5    PROCEEDINGS ON SENTENCE                   5     1088

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1              - INDEX OF WITNESSES -
 2                  (Alphabetical)
 3                    ---o0o---
 4    FOR THE PEOPLE:                    VOL.      PAGE
 5    ANDERSON, SHANAE                     1       168
 6    BRYANT, MATTHEW                      2       342
 7    CARLSON, PETER                       1        60
 8    FESTAG, SEAN                         1       114
 9    GREEN, PHIL                          3   503,570
10    HERRMANN, M.D., PAUL                 1       152
11    JONES, RAYMOND                       2   224,258
12    MILLER, ALLAN                        3       560
13    MOORE, BIANCA                        3       428
14    VIGILIENZONE, THOMAS                 1       136
15
16
17    FOR THE DEFENSE:
18    BEERS, MONTE (Trial & Motion)      4,5   696,973
19    GREEN, PHIL (Motion)                 5       960
20    KILGORE, IVAN (Motion)               5      1043
21    LEVY, DEBORAH (Motion)               5   937,975
22    LOGGINS, MARY                        4       659
23    MILLER, TAYLOR                       4       692
24    OLIVAS, ENOCH JOSEPH (Motion)        5       966
25    TOMLINSONN, KEVIN                    2       401
26    WASHINGTON, MARY                     4       676
27
28
```

1

2

3

4                    – INDEX OF WITNESSES –

5                      (CHRONOLOGICAL)

6                        ---o0o---

7  **FOR THE PEOPLE:**        DIR.   CRS.   RED.   REC.   VD.

8  PETER CARLSON              60     64     68     69
   (Due Diligence)
9

10 SEAN FESTAG                114    125

11 THOMAS VIGILIENZONE        136    145    150

12 PAUL HERRMANN, M.D.        152    163    167

13 SHANAE ANDERSON            168    190    210    214

14 RAYMOND JONES              224    229
   (402 Hearing)
15

16 RAYMOND JONES              258    287    327    332
                                            340    341
17

18 MATTHEW BRYANT             342    392    396    399

19 BIANCA MOORE               428    457    494    497
                                            501    502
20

21 PHIL GREEN                 503

22 ALLAN MILLER               560    564    568    569

23 PHIL GREEN (Cont'd)               570    645    650
                                            654    655
24

25

26

27

28

GERALD A. DOHRMANN, C.S.R.#2046

| | | DIR. | CRS. | RED. | REC. | VD. |
|---|---|---|---|---|---|---|
| 4 | **FOR THE DEFENDANT:** | | | | | |
| 5 | KEVIN TOMLINSONN | 401 | | | | 405 |
| 6 | | 411 | 417 | | | |
| 7 | MARY LOGGINS | 659 | 665 | 670 | | |
| 8 | MARY WASHINGTON | 676 | 681 | 690 | 691 | |
| 9 | TAYLOR MILLER | 692 | 695 | | | |
| 10 | MONTE BEERS | 696 | 700 | 702 | | |
| 11 | DEBORAH LEVY | 937 | | | | |
| 12 | PHIL GREEN | 960 | | | | |
| 13 | ENOCH JOSEPH OLIVAS | 966 | | | | |
| 14 | MONTE BEERS (Recalled) | 973 | | | | |
| 15 | DEBORAH LEVY (Continued) | 975 | 1021 | 1029 | | |
| 16 | IVAN KILGORE | 1043 | | | | |

1
2
3
17
18
19
20
21
22
23
24
25
26
27
28

1

2 **- INDEX OF EXHIBITS -**

3 ---o0o---

4 FOR THE PEOPLE:                                IDEN.    EVID.

5 10                                              229       252

6 11 & 11A                                        369

7 8C                                              532

8 1                                                         604

9 2 through 8                                               605

10 8B                                                       605

11 10 through 12                                            606

12 13                                                       607

13 14                                             636

14

15 FOR THE DEFENSE:

16 A through D                                              607

17 A (Motion)                                     961

18 B (Motion)                                     990

19

20

21

22

23

24

25

26

27

28

1                    **THURSDAY, MARCH 13, 2003**

2                              ---o0o---

3                         **- P R O C E E D I N G S -**

4                              ---o0o---

5          (Whereupon, the following proceedings were had in

6     open court with the presence of the jury)

7              THE COURT:  Good morning, everyone.  The

8     record should reflect that counsel are present, as are

9     our jurors and alternates, as is Mr. Kilgore.

10         Ready with your next witness, Mr. Stallworth?

11             MR. STALLWORTH:  Yes, Your Honor.  We call as

12    our next witness Bianca Moore.

13             THE COURT:  Ms. Moore, would you step forward

14    and be sworn, please?

15             THE CLERK:  Stop, please, and raise your right

16    hand.

17                         **BIANCA MOORE,**

18                   called as a witness on behalf of

19                   the People, after having been

20                   first duly sworn, testified as

21                   follows:

22             THE CLERK:  Please be seated.

23         Ms. Moore, after adjusting the microphone, please

24    spell your first name and spell your last name.

25             THE WITNESS:  B-i-a-n-c-a, M-o-o-r-e.

26             THE COURT:  Good morning, Ms. Moore.  I think

27    Mr. Stallworth put a cup of water there for you on your

28    left side if you need it.

```
 1                    DIRECT EXAMINATION
 2              MR. STALLWORTH:   Q.   Good morning, Ms. Moore.
 3    A.     Good morning.
 4    Q.     How are you doing?
 5    A.     All right.
 6    Q.     How old are you, Ms. Moore?
 7    A.     Twenty-three.
 8    Q.     Where were you born and raised?
 9    A.     Oakland.
10              MS. LEVY:   I'm sorry.   I missed that response.
11              THE COURT:   Oakland.
12              MS. LEVY:   Thank you.
13              MR. STALLWORTH:   Q.   Have any brothers and
14    sisters?
15    A.     Yes.
16    Q.     How many?
17    A.     Fourteen.
18    Q.     Was there a brother that you were particularly
19    close to while you were growing up?
20    A.     Yes.
21    Q.     What is his name?
22    A.     Travon.
23    Q.     How old is Travon?
24    A.     Twenty-four.
25    Q.     While you were growing up with Travon as a child,
26    did you ever come to know a young man by the name of
27    William Anderson?
28    A.     Yes.
```

1  Q.     How old were you when you first met Mr. William

2  Anderson?

3  A.     About 12.

4  Q.     Did you and William Anderson get along during

5  that time?

6  A.     Yes.

7  Q.     Did William Anderson know and get along with your

8  brother Travon?

9  A.     They -- they was best friends.

10 Q.     In the year 2000, January of 2000, did you come

11 to know William Anderson better?

12 A.     Yes.

13 Q.     How would you describe your relationship with

14 William Anderson at that time?

15 A.     We were boyfriend and girlfriend.

16        MR. STALLWORTH:  May the record reflect that

17 I'm referring to what has been identified as People's 6.

18        May I approach the witness?

19        THE COURT:  Yes.

20        MR. STALLWORTH:  Q.  Ms. Moore, I'm showing

21 you what has been marked as People's 6.  Do you

22 recognize the person in this photograph?

23 A.     Yes.

24 Q.     Who could you recognize that person to be?

25 A.     William.

26 Q.     In January of 2000, where did you and William

27 spend most of your time?

28 A.     Either at my mom's house or at his parents'

```
 1   house.
 2   Q.    And where did Will's parents live then?
 3   A.    In West Oakland.
 4   Q.    Approximately what area, if you can remember?
 5   A.    30th and San Pablo.
 6   Q.    Where were your parents living then?
 7   A.    Modesto and then they we moved to Fresno.
 8   Q.    Did Will have a best friend he hung out with
 9   during the time that you and him became involved in a
10   relationship?
11         MS. LEVY:  Your Honor, I'm going to object to
12   that question.  She already testified who.  It's her
13   brother.
14         THE COURT:  I understood.  I don't expect
15   that's going to be the answer, because I understood that
16   the witness is Ms. Moore's brother.  Travon and Will
17   were closest of friends earlier in their lives, but I
18   think we are about to hear about somebody else being a
19   best friend later.  I could be wrong.
20         MR. STALLWORTH:  I think you're right.
21         THE COURT:  I shouldn't anticipate.
22         MR. STALLWORTH:  Q.  In 2000 who was Will's
23   best friend?
24   A.    Terrence.
25   Q.    How did you know Terrence?
26   A.    Through Will.
27   Q.    Was Terrence dating someone at that point?
28   A.    Yes.
```

1    Q.    Who was he dating?

2    A.    Will's cousin.

3    Q.    Do you remember her name?

4    A.    Shay.

5    Q.    Shay also go by the name of Shanae?

6    A.    Yes.

7    Q.    The name you call her is Shay?

8    A.    Uh-huh (indicating yes).

9    Q.    Would the four of you spend -- did the four of

10   you spend time together in the months of January,

11   February and March of 2000?

12   A.    Not January, but February and March.

13   Q.    During those months, what were the type of things

14   that the four of you did?

15   A.    We usually go to the movies, parks, sit around in

16   the house, watch TV.

17   Q.    During the times that you were with William and

18   Terry and Shay, did you ever personally see William or

19   Terry involved in any violent behavior?

20   A.    No.

21   Q.    In the spring of 2000, around April and May, did

22   you and Will move away from the area?

23   A.    Yeah.

24   Q.    Where did you move to?

25   A.    Fresno.

26   Q.    Why did you decide to move to Fresno?

27   A.    Because that's my -- where my mom moved to.

28   Q.    Did anybody other than you and Will move to

```
 1   Fresno and stay with your mom?
 2   A.      Yes.
 3   Q.      Who was that?
 4   A.      Terrence.
 5   Q.      Did you have a son at that time?
 6   A.      Yes.
 7   Q.      How old was your son?
 8   A.      Three.
 9   Q.      Did he stay with you and your mom and Will and
10   Terrence in Fresno?
11   A.      Yes.
12   Q.      While the four of you were in Fresno in the
13   spring of 2000, would you ever come back to West Oakland
14   and visit with Will's parents?
15   A.      Yes.
16   Q.      How often would you do that?
17   A.      Occasionally.
18   Q.      In June of 2000, were you and Will and Terry in
19   West Oakland visiting with Will's parents?
20   A.      Yes.
21   Q.      Do you remember whether or not there was a
22   particular reason why you were visiting in West Oakland
23   at that time?
24   A.      There wasn't no particular reason.  We just came
25   out.
26   Q.      During that period of time, did you ever spend
27   time with Will near the Sycamore Apartments or Sycamore
28   Street near Telegraph?
```

```
1   A.     Yes.
2   Q.     Would you describe under what circumstances you
3   and Will were over at those apartments?
4   A.     He stopped over and was speaking to some guys out
5   there, and later on end up talking to someone else.
6   Q.     Do you remember -- strike that.  Did you
7   recognize any of the men that Will was talking to in
8   June of 2000 near the Sycamore Apartments?
9   A.     No.
10  Q.     Was there any particular person that Will spoke
11  to individually in your presence while you were visiting
12  at the Sycamore Apartments during that time?
13  A.     Yes.
14         MS. LEVY:  Objection, Your Honor.  The witness
15  just testified she didn't know who he had been talking
16  to at that time.
17         THE COURT:  Overruled.  You can clarify it on
18  cross.
19         I think I understand the drift.  I don't know
20  where it's going, though.
21         MR. STALLWORTH:  Q.  When you saw Will, did he
22  ever step aside from the group of people and talk to one
23  particular individual?
24  A.     Yes.
25  Q.     And that particular individual that Will spoke
26  to, had you ever seen that person before?
27  A.     No.
28  Q.     After Will spoke to this person, did Will tell
```

GERALD A. DOHRMANN, C.S.R.#2046

1   you who that person's name was?

2   A.      Yes.

3   Q.      What did he tell you?

4   A.      Told me his name was Ivan.

5   Q.      While you saw Will talking to this person named

6   Ivan, did you get a chance to take a look at that

7   person?

8   A.      Yes.

9   Q.      Do you see that person here in court this

10  morning?

11  A.      Yes.

12  Q.      Could you point to that person and describe what

13  he is wearing for the record?

14  A.      Beige shirt, checkered.

15          MR. STALLWORTH:   May the record reflect that

16  the witness has identified the defendant?

17          THE COURT:   It will.

18          MR. STALLWORTH:   Q.   During the time that you

19  saw Will talking to the defendant in June of 2000, did

20  you see them engage in any type of violent behavior?

21  A.      No.

22  Q.      Did Will say anything to you in particular after

23  speaking to the defendant on that occasion?

24  A.      No.

25  Q.      Did he seem to have any type of anger or problems

26  with the defendant after you saw him speaking to him on

27  that particular occasion?

28  A.      No.

GERALD A. DOHRMANN, C.S.R.#2046

```
 1  Q.    A couple of weeks later, in the later part of
 2  June of 2000, were you and Will still visiting with his
 3  parents in West Oakland at that time?
 4  A.    Yes.
 5  Q.    Did Will ever speak to you at that time about
 6  having any problems with Ivan Kilgore, the person you
 7  identified as the defendant this morning?
 8  A.    Yes.
 9  Q.    What if anything did he tell you?
10  A.    He said that Ivan owed him some money.
11  Q.    Did he seem particularly upset about the fact
12  that he believed the defendant owed him money?
13  A.    No, he wasn't upset about it.
14  Q.    Did he say anything in a threatening manner about
15  the defendant owing him money?
16  A.    No.
17  Q.    Did Will seem concerned or afraid about the fact
18  that the defendant owed him money?
19  A.    No.
20  Q.    Did Will later in the early part of July talk to
21  you about having anymore problems or concerns regarding
22  the defendant?
23  A.    Yes.
24  Q.    What did he tell you?
25  A.    He told me he went over a couple of times to ask
26  about his money, and the last time he went over there,
27  he went with a friend, and Ivan and his friend got into
28  a quarrel.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1  Q.     Did he tell you who that friend was that
 2  accompanied him over to talk to Ivan?
 3  A.     Some guy.
 4  Q.     Did he say whether or not it was Terry?
 5  A.     It wasn't Terry.  Terry wasn't there.  He was at
 6  Shay house.
 7          MS. LEVY:  Your Honor, I would object to that
 8  answer.  I don't know if that is something Mr. Anderson
 9  told her or she is assuming.
10          THE COURT:  I didn't -- said it was not Terry?
11  And you said something after that.
12          THE WITNESS:  It wasn't Terry.  Terry wasn't
13  at the house when Will left to go see him, to go visit
14  Ivan.
15          MS. LEVY:  Excuse me, Your Honor.
16          THE COURT:  I'm going to take it subject to a
17  motion to strike.  You need to clarify personal
18  knowledge here.
19          MR. STALLWORTH:  Sure.
20          MS. LEVY:  Before that, I was unable to hear
21  the witness's answer at all.
22          THE COURT:  Would you turn up your microphone
23  a little bit?
24          MR. STALLWORTH:  Q.  The night that Will left
25  to go see the defendant, did you see who was with Will?
26  A.     He left in the car with a guy.
27  Q.     And the guy that was with Will, did you recognize
28  that guy to be Terry Dandy?
```

```
1   A.      No, it wasn't.
2   Q.      You remember that person's name?
3   A.      No.
4           MS. LEVY:  Your Honor, I guess that whole
5   answer be stricken, too.
6           THE COURT:  The part that she recognized.
7   Tell me what the objection is.  I'm not sure I'm clear
8   on it.
9           I thought that the objection was that she had no
10  personal knowledge that it wasn't Terry.  She indicated
11  he did leave with somebody and it wasn't Terry.  She
12  recognized it wasn't him, but she doesn't know the guy's
13  name.
14          MS. LEVY:  I will withdraw my objection.
15          MR. STALLWORTH:  Q.  How long was Will gone
16  that night before he returned back to where you were?
17  A.      About an hour.
18  Q.      When he returned, what did he tell you about his
19  visit with the defendant that night?
20  A.      He said that Ivan and his friend got into a
21  fight.
22  Q.      Did he say whether or not he had physically got
23  into a fight with the defendant?
24  A.      No.
25  Q.      Did he seem concerned at all about what had just
26  happened that night?
27  A.      No, he figured it was over at that.
28          MS. LEVY:  Objection, Your Honor.  That's
```

```
1   speculation on the part of this witness.
2              THE COURT:  Well, so, the objection is
3   hearsay?
4              MS. LEVY:  Yes.
5              THE COURT:  Sustained.  That last answer will
6   be stricken.
7              MR. STALLWORTH:  Q.  Was there another time in
8   the first week or two of July that Will talked to you
9   about any problems with the defendant?
10  A.     (Shakes head in the negative).
11  Q.     Is that a yes or no?
12  A.     No.
13  Q.     While you were in the company of Terry Dandy, did
14  Terry Dandy ever talk to you about having any problems
15  with the defendant?
16  A.     No.
17  Q.     I want to talk to you about the afternoon of July
18  16th of 2000.  Do you remember where you were that early
19  afternoon?
20  A.     At Shay house.
21  Q.     Shay, once again, is also known as Shanae
22  Anderson?
23  A.     Yes.
24  Q.     Did you and Shay ever leave her home that late --
25  that early afternoon on July 16th of 2000?
26  A.     Yes.
27  Q.     Where did the two of you go?
28  A.     To the Andersons' house.
```

GERALD A. DOHRMANN, C.S.R.#2046

1    Q.    How did you get from Shay's house to the

2    Andersons' house?

3    A.    We walked.

4    Q.    About how long did it take you to walk there?

5    A.    A long time.

6    Q.    Where was Shay living at that point?

7    A.    In Berkeley.

8    Q.    When you got to the Andersons' home, was Will and

9    Terry there?

10    A.    Yes.

11    Q.    While you were there, did you or Shay in your

12    presence ever drink any type of alcohol?

13    A.    No.

14    Q.    Did either of the two of you young ladies ever

15    smoke any type of marijuana?

16    A.    No.

17    Q.    Did you engage in any type of drugs or narcotics

18    that afternoon?

19    A.    No.

20    Q.    Were you under any type of medication or under

21    any type of medicine that might have made it difficult

22    for you to understand what was going on?

23    A.    No.

24    Q.    While you were in the presence of Will and Terry

25    that afternoon, did you ever see either of those two

26    young men drink any alcohol?

27    A.    No.

28    Q.    Did you see them do any type of drugs?

```
1   A.     No.
2   Q.     As far as you can remember, did they seem to be
3   coherent and understanding of what you guys were talking
4   about that afternoon?
5   A.     Yes.
6   Q.     At sometime later that afternoon, did you or Shay
7   decide to make a phone call outside of the Andersons'
8   home?
9   A.     Yes.
10  Q.     Who decided to make the phone call?
11  A.     Shay.
12  Q.     Did you accompany Shay to make the phone call?
13  A.     Yes.
14  Q.     Do you remember -- do you remember where the two
15  of you went in order to make the phone call?
16  A.     Down the street to the pay phone.
17  Q.     Was there a reason why you didn't make the phone
18  call inside of the Andersons' home?
19  A.     There was no house phone.
20  Q.     While you were outside making the phone call, do
21  you remember what if anything Will and Terry were doing?
22  A.     They were in the house for a minute and they came
23  back out, walked towards us at the phone booth, told us
24  they was going to Mario's house.
25  Q.     Did you know who Mario was?
26  A.     Yes.
27  Q.     Who is Mario?
28  A.     Will's cousin.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
1    Q.    Did you know at that point where Mario lived?
2    A.    Down the street.
3    Q.    Approximately, if you can remember, how far from
4    where the four of you were at that time did Mario live?
5    A.    I don't know.  I know he stayed down the street.
6    I never been to his house.
7    Q.    How long were Will and Terry gone after they left
8    to go to Mario's?
9    A.    About 15, 20 minutes.
10   Q.    When they returned back to where you and Shay
11   were, what if anything did you remember any of them
12   saying?
13             MS. LEVY:  Objection, Your Honor.  It ca
14   for hearsay if it's Mr. Dandy.
15             THE COURT:  Sustained.  Offered for the  ·uth
16             MR. STALLWORTH:  No, Your Honor, just th
17   witness's further actions that afternoon and her a     y
18   to remember and perceive the events ·in which she i
19   going to testify to.
20             THE COURT:  To the extent that it's relevant,
21   I will allow it not for the truth of what was stated.  I
22   don't know what was stated, but not for the truth of
23   that, but just to show and explain the course of conduct
24   of the parties.  Not to be accepted for the truth.  It
25   is hearsay.
26             MR. STALLWORTH:  Q.  Ms. Moore, what if
27   anything did Will or Terry say to you when they returned
28   from Mario's home?
```

GERALD A. DOHRMANN, C.S.R.#2046

1  A.      We were going to wait for him.

2  Q.      Why were you going to wait for Mario?

3  A.      So he can come with us.

4  Q.      Was any other particular reason why you wanted to

5  wait for Mario?

6  A.      'Cuz Shay hadn't seen him in awhile.  She wanted

7  to see him.

8  Q.      Was Shay and Mario related?

9  A.      Yes.

10  Q.      How were they related?

11  A.      They were cousins.

12  Q.      When Will and Terry returned to where you and

13  Shay were, was there a point where Will directed your

14  attention or tried to direct your attention to a certain

15  somebody?

16  A.      Yes.

17  Q.      What, if anything, do you remember Will saying?

18  A.      Pointed out a car down the street.

19  Q.      What did he say after he pointed out the car down

20  the street?

21  A.      "There go that N-I-G-G-A Ivan."

22  Q.      After he made that comment, did you look in the

23  direction in which he had referenced?

24  A.      Yes.

25  Q.      What did you see?

26  A.      A gray car.

27  Q.      Do you remember what type of gray car you saw?

28  A.      Yes.

GERALD A. DOHRMANN, C.S.R.#2046

```
 1    Q.      What type of car was it?
 2    A.      Cadillac.
 3    Q.      Had you ever seen that gray Cadillac before?
 4    A.      No.
 5    Q.      What was the Cadillac doing when you first saw
 6    it?
 7    A.      It was stopped for a minute, and then it made a
 8    U-turn, went back down the way it came.
 9    Q.      What street was that?
10    A.      San Pablo.
11    Q.      Do you remember the way in which Will said,
12    "There goes that N-I-G-G-A, Ivan"?
13    A.      He said it nonchalantly, just kind of like
14    laughed at it.
15    Q.      Did you at some point thereafter see that gray
16    Cadillac again?
17    A.      Yes.
18    Q.      About how much time passed from when you first
19    saw the Cadillac to the second time you saw it?
20    A.      About 15 minutes, 20 minutes.
21    Q.      When you saw the Cadillac the first time, did you
22    see who was driving the Cadillac?
23    A.      No.
24    Q.      When saw the Cadillac the second time, did you
25    hear anybody in the group of the four of you say
26    anything?
27            MS. LEVY:  Objection, Your Honor.  If it's not
28    Mr. Anderson, it's hearsay.
```

```
 1              THE COURT:  I will accept it not for the truth
 2   of the matter stated, but it's going basically to
 3   explain the circumstances, so the jury has the entire
 4   picture.
 5              Again, not to be received by you for the truth of
 6   what was stated -- I don't know what's going to be said
 7   here -- but rather just the words that were spoken and
 8   any effect it might have.
 9              MR. STALLWORTH:  That's correct, Your Honor.
10   Q.    Ms. Moore, when you saw the Cadillac the second
11   time, did you hear anybody say anything?
12   A.    Yes.
13   Q.    And who did you hearsay something?
14   A.    Terrence.
15              MS. LEVY:  Your Honor, perhaps we can take a
16   break.  The witness seems upset and I can't -- I
17   couldn't hear before when she was crying.
18              THE COURT:  The answer was "Terrence".
19              Are you okay to proceed or you want to take a
20   break?
21              THE WITNESS:  I'm fine.
22              THE COURT:  Okay.
23              MS. LEVY:  Your Honor, objection, again.  If
24   it's Mr. Dandy who made the statement, it's hearsay and
25   it's not relevant.
26              THE COURT:  It is clearly hearsay, and I'm not
27   allowing it for the truth of the matter stated, but
28   given the previous testimony, I'm going to allow it just
```

```
1   for the words that were spoken as it might explain and
2   have some bearing on whatever took place next. It's not
3   to be considered for the truth of what was stated.
4             MR. STALLWORTH:  Q.  Ms. Moore, what did you
5   hear Terrence say?
6   A.    He said, "He got a gun."
7   Q.    And what was your reaction?
8   A.    I turned.
9   Q.    After you heard --
10  A.    I --
11  Q.    I'm sorry?
12  A.    I turned to look.
13  Q.    What did you see when you turned to look?
14  A.    A car pull up on the side of us, then I was
15  pushed.
16  Q.    Who pushed you?
17  A.    Will.
18  Q.    Did Will say anything to you before he pushed
19  you?
20  A.    No.
21  Q.    After Will pushed you, what do you remember
22  happening next?
23  A.    Car drove up a little bit and turned around and
24  came back and pulled in front of me.
25  Q.    Before the car pulled in front of you -- strike
26  that.
27        After Will pushed you, did you get a look at who
28  was inside of the car?
```

```
 1   A.      No.
 2   Q.      Is it your testimony that the car had been --
 3   makes a U-turn and then pulls back toward the same area?
 4   A.      Yes.
 5   Q.      When it pulled back towards the same area, did
 6   you get a look at who was inside of the car?
 7   A.      Yes.
 8   Q.      What do you see?
 9   A.      I see a man and a gun.
10   Q.      What part of the car did you see the man in?
11   A.      The backseat.
12   Q.      The man in the backseat was the man with the gun?
13   A.      Yes.
14   Q.      Did you get a look at the person with the gun in
15   the backseat?
16   A.      Yes.
17   Q.      Do you see that person here in court this
18   morning?
19   A.      Yes.
20   Q.      Would you point to him and describe what he's
21   wearing for the record?
22   A.      Beige checkered shirt.
23            MR. STALLWORTH:  May the record reflect the
24   witness has identified the defendant?
25            THE COURT:  Same man you indicated was Ivan
26   earlier, Ms. Moore?
27            THE WITNESS:  Yes.
28            THE COURT:  It will.
```

```
1              MR. STALLWORTH:  Q.  Did you tell where the
2    defendant was pointing the gun when you saw him at that
3    point?
4    A.    Yes.
5    Q.    Who was he pointing the gun at?
6    A.    At me.
7    Q.    What were you doing?
8    A.    Looking at him.
9    Q.    What was going on in your head at that point?
10   A.    I was just praying.
11             THE COURT:  I'm sorry.  I didn't hear the last
12   word.  You were just --
13             THE WITNESS:  Praying.
14             THE COURT:  -- praying.
15             MR. STALLWORTH:  Q.  What was Will doing, if
16   you can remember, at that point?
17   A.    He was laying on the ground.
18   Q.    Could you tell whether or not Will was saying
19   anything at that point?
20   A.    He wasn't.
21   Q.    Do you remember where Shay was at that point?
22   A.    She was a little bit away from me, to my right
23   side.
24   Q.    Do you remember whether or not the defendant
25   pointed the gun at that point at anybody other than you?
26   A.    No.
27   Q.    Do you remember whether or not the defendant said
28   anything while he had the gun pointed at you?
```

1   A.      No, he didn't.

2   Q.      Do you remember where Terry was at, if you

3   recall, at that point?

4   A.      No.

5   Q.      After the defendant pointed the gun at you --

6   strike that.

7           How long did he point the gun at you?

8   A.      I don't know.  Seemed like a long time, but it

9   wasn't.

10  Q.      Did you say anything to the defendant while he

11  was pointing the gun at you?

12  A.      Just said, "I got a son to live for," and I just

13  started praying some more.

14  Q.      What happened next?

15  A.      He drove off.

16  Q.      Did you see in what direction the car drove off?

17  A.      Towards San Pablo.

18  Q.      Could you tell who was driving the car?

19  A.      No.

20  Q.      Could you tell if there was any other persons in

21  the car other than the defendant and the driver of the

22  car?

23  A.      Yes.

24  Q.      Who else was in the car?

25  A.      Somebody in the passenger's seat.

26  Q.      Did you recognize the driver or the person in the

27  passenger's seat as someone that you knew?

28  A.      No.

1    Q.    What did you do after the Cadillac drove away?

2    A.    I told Will to get up.

3    Q.    Did Will respond in any way?

4    A.    Yes.

5    Q.    What did he say?

6    A.    Told me he was hit.

7    Q.    Could you tell whether or not he had been hit at

8    that point?

9    A.    No.

10   Q.    Do you remember what if anything Shay was doing

11   at that point?

12   A.    She was still standing there.

13   Q.    Do you remember whether or not Terry was around

14   at that point?

15   A.    No.

16   Q.    What's the next thing that you remember doing?

17   A.    Turned around and I looked at Will, and I took

18   off running towards the house.

19   Q.    Towards whose house?

20   A.    His mom's house.

21   Q.    What did you do when you got there?

22   A.    I didn't have to do nothing.  She was already

23   coming out the door.

24   Q.    Did you say anything to her, to Will's mom, when

25   you saw her?

26   A.    Just pointed down the street.

27   Q.    Did you ever return back to where you had last

28   seen Will?

```
 1  A.    No.
 2            MS. LEVY:  Your Honor, I didn't hear the
 3  response.
 4            THE COURT:  Did you get the last response, Mr.
 5  Dohrmann?
 6            (Record re-read by the Reporter)
 7            MR. STALLWORTH:  Q.  Would you like to take a
 8  little bit of a break at this point, Ms. Moore?
 9            THE WITNESS:  (Nods head in the affirmative).
10            THE COURT:  We will be in recess for a few
11  minutes, ladies and gentlemen.  Please remember the
12  admonitions.
13            (Whereupon, the mid-morning recess was taken)
14                        ---o0o---
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```

```
 1                      - AFTER RECESS -
 2                          ---o0o---
 3           (Whereupon, the following proceedings were had in
 4   open court with the presence of the jury)
 5           THE COURT:  Ms. Moore, I know this is hard on
 6   you.  If you need another break, will you just tell me?
 7           THE WITNESS:  (Nods head in the affirmative).
 8           THE COURT:  Okay.
 9           MR. STALLWORTH:  Thank you, Your Honor.
10   Q.    Good morning again, Ms. Moore.
11           At this point I'm going to have the record
12   reflect that we will be referring to what has been
13   premarked as People's 4 for Identification.
14           I'm going to ask, with the Court's permission,
15   that Ms. Moore be allowed to briefly step out of the
16   witness chair and help me identify or reference certain
17   points on People's 4.
18           THE COURT:  She can.
19           MR. STALLWORTH:  Q.  I want to you take a look
20   at People's 4 first, Ms. Moore, and let me know if you
21   recognize the area depicted in People's 4.
22   A.    Yes.
23   Q.    Put the microphone up.
24   A.    Yes.
25   Q.    How do you recognize it?
26   A.    The street.
27           THE COURT:  Ms. Moore, that microphone is
28   really cheap.  You really need to hold it almost like
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   you are doing a Karaoke up close to your mouth.
 2            THE WITNESS:  It's the street that the
 3   Andersons stay on.
 4            MR. STALLWORTH:  Q.  And this corner of 30th
 5   and San Pablo, is that the area where you and Shay and
 6   Will and Terry were when the Cadillac came back the
 7   second time?
 8   A.     Yes.
 9   Q.     I'm going to take a white dot with the letter W
10   on it, for Will, and as best you can with the pointer,
11   can you just point on the map where it was Will was
12   laying when the car made the U-turn before it left?
13   A.     Right here (Indicating).
14   Q.     Is that about right?
15   A.     Yes.
16   Q.     I'm going to take an orange dot with the letter B
17   on it, for Bianca, and let me know where you were
18   standing when the defendant pointed the gun at you.
19   A.     This supposed to be the telephone pole.
20            MS. LEVY:  Your Honor, I missed that whole
21   response.
22            THE COURT:  Did you get it, Mr. Dohrmann?
23            (Record re-read by the court reporter)
24            MR. STALLWORTH:  Q.  If A represents People's
25   4 as the telephone pole, can you show me where you were
26   the best you can remember when the defendant pointed gun
27   at you?
28   A.     The telephone pole or telephone booth?
```

1   Q.    I'm sorry. The telephone booth.

2   A.    This would be the telephone pole; right?

3   Q.    Yes, the first one.

4   A.    Right there.

5   Q.    Right here?

6   A.    Yes.

7   Q.    And I'm going to take a lime-colored dot with an

8   S on it, for Shay, also known as Shanae Anderson, and if

9   you could point to where she was in relationship to you.

10   A.    In this area (Indicating).

11   Q.    Now, I'm going to take a red dot with the word

12   "car" on it -- actually, just a red dot with no word on

13   it -- and show me where the car was in relationship to

14   you when you saw the defendant point the gun at you.

15   A.    (Indicating) Right here.

16   Q.    And is it your testimony at this point, when the

17   defendant is pointing the gun at you, you don't know

18   where Terry Dandy is at?

19   A.    No.

20   Q.    Thank you, Ms. Anderson. You can have a seat

21   again.

22        I'm sorry. Ms. Moore. Thank you. You can have

23   a seat again.

24        Ms. Moore, after you ran by Will's mother, was

25   there some point soon thereafter that the police

26   department wanted to talk to you and ask you some

27   questions?

28   A.    Yes.

```
 1   Q.    I ask you to speak up a little bit more into the
 2   microphone.   I know it's difficult.
 3   A.    Yes.
 4   Q.    Did you want to speak to the police department at
 5   that point?
 6   A.    No.
 7   Q.    Why not?
 8   A.    Because I was scared and I was worried.
 9   Q.    What were you scared and worried about?
10   A.    The whole thing that happened.  Everything.
11   Q.    Do you remember telling the first officer you
12   spoke to that --
13         MS. LEVY:  Objection, Your Honor.  It's an
14   improper question on direct.
15         MR. STALLWORTH:  I will rephrase it.
16   Q.    When you first spoke to the police officer, did
17   you tell that officer whether or not you knew who had
18   shot Will?
19   A.    No.
20   Q.    Why didn't you tell the police officer then that
21   you knew the defendant was the person who had done the
22   shooting?
23   A.    I was scared.  I wasn't focusing on talking to no
24   police.  I was trying to answering questions quickly so
25   I can get to the hospital.
26   Q.    As you sit on the witness stand this morning, do
27   you have any doubt or any concerns about having seen the
28   defendant with the shotgun as you described here in your
```

GERALD A. DOHRMANN, C.S.R.#2046

1   testimony?

2   A.      Excuse me?

3   Q.      I will rephrase it.

4           Do you remember, as you sit here now, recognizing

5   the defendant as the person with the shotgun in the back

6   of the Cadillac on this particular night?

7   A.      Yes.

8   Q.      When the police department spoke to you, they

9   asked you about Terry Dandy.  Do you remember giving the

10  police department a different name than Terry Dandy?

11  A.      Yes.

12  Q.      Do you remember why you did that?

13  A.      'Cuz I didn't want him to go to jail.

14  Q.      What did Terry Dandy say if anything to you about

15  how to identify who he was?

16          MS. LEVY:  Objection.  Hearsay, Your Honor.

17          THE COURT:  Again, not offered for the truth

18  of the matter, just to explain the reason she gave the

19  police the apparently incorrect information.

20          MR. STALLWORTH:  Q.  What was it that, if

21  anything, that Terry Dandy told you about why you should

22  give the police department a different name?

23  A.      He didn't tell me why.  He just told me to use

24  that name.

25  Q.      Do you remember what name he told you to use?

26  A.      Richard something.  I don't know.

27  Q.      Ms. Moore, while you were out there with Terry

28  and Will and Shay before the defendant came by in the

```
 1   Cadillac, did Terry or Will have any type of weapon on
 2   them?
 3   A.      No.
 4   Q.      Did you or Shay have any type of weapon on you?
 5   A.      No.
 6   Q.      Did anybody say anything in your presence about
 7   having a weapon or doing anything to the defendant
 8   before he drove by?
 9   A.      No.
10   Q.      Before you heard Terry say he's got a gun, did
11   Will or Terry in your presence do anything, or run
12   towards the car, or anything to that effect?
13   A.      No.
14           MR. STALLWORTH:   Thank you, Ms. Moore.  I have
15   no further questions, Your Honor.
16           THE COURT:   Questions, Ms. Levy?
17           MS. LEVY:   Thank you, Your Honor.
18                    CROSS-EXAMINATION
19           MS. LEVY:  Q.   Good morning, Ms. Moore.
20   A.      Good morning.
21   Q.      Now, when you gave that wrong name to the police
22   for Terry Dandy, that was Shanae who told you to do
23   that; is that right?
24   A.      No.
25   Q.      Did you tell her to use the wrong name?
26   A.      No.
27   Q.      And you're sure, or do you know that that is not
28   any name that Terry Dandy goes by?
```

```
1   A.      Excuse me?

2   Q.      Have you ever heard Terry Dandy called Richard

3   Davis other than that evening on July 16th, 2000?

4   A.      No.

5   Q.      I'm sorry?

6   A.      No.

7   Q.      Now, you mentioned that your brother and Will

8   were best friends.  Isn't T Will's best friend?

9           MR. STALLWORTH:  Objection.  Misstates the

10  witness's testimony.

11          THE COURT:  The witness can answer.  It

12  depends on the time frame, I think, but perhaps you can

13  clarify that.

14          THE WITNESS:  Is it a crime for a person to

15  have more than one best friend?

16          MS. LEVY:  Q.  So, they were both his best

17  friends; right?

18  A.      Correct.

19  Q.      And Will and T -- T was Will's god-brother; is

20  that right?

21  A.      That's what they called each other.  Yes.

22  Q.      Did Will ever call your brother his god-brother,

23  or brother, as he did Terry Dandy?

24  A.      Yes.

25  Q.      You testified, now, you first lived together with

26  Will back in February of 2000; is that right?

27  A.      Yes, a little after that.  Uh-huh (indicating

28  yes).
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   Q.     And that was in Modesto before you moved to
 2   Fresno?
 3   A.     Yes.
 4   Q.     Now, when you were up in Oakland in the summer of
 5   2000, where was your son?
 6   A.     With his father.
 7   Q.     What city is that?
 8   A.     Vallejo.
 9   Q.     Now, you mentioned some of the activities you and
10   Shanae and Will and T did together.  Did you all hang
11   out on the corner occasionally?
12   A.     No.
13   Q.     Did you ever see Will sell drugs on the corner?
14   A.     No.
15          MR. STALLWORTH:  Objection, relevancy.
16          THE COURT:  I don't know what the relevance is
17   at this point.  Sustained.  The answer was no.  It may
18   be stricken.
19          MS. LEVY:  Q.  Now, you spoke to the police in
20   the police car just a short time after this incident
21   happened; correct?
22   A.     Yes.
23   Q.     And then you made a taped statement later that
24   same evening?
25   A.     Yes.
26   Q.     Were you still scared when you made your taped
27   statement?
28   A.     Yes.
```

```
 1   Q.    But you were in the police station at that time;
 2   correct?
 3   A.    Yeah.
 4   Q.    And you never told the police that you had known
 5   who Ivan was, because Will pointed him out to you; is
 6   that true?
 7   A.    Yes, that's true.
 8   Q.    And you never told the police that Terry Dandy
 9   said, "He's got a gun"; is that true?
10   A.    I don't recall.
11         MS. LEVY:  May I approach the witness, Your
12   Honor?
13         THE COURT:  Yes.
14         MS. LEVY:  Q.  Ms. Anderson, I'm going to --
15   A.    Ms. Moore.
16   Q.    I'm sorry.  I got that from Mr. Stallworth.
17         Ms. Moore, I'm going to show you what is
18   purporting to be a typed-up of what you said to the
19   police.  I'd like you to review the bottom of page 5 and
20   the top of page 6, please.
21         THE COURT:  Just to yourself.
22         MS. LEVY:  Q.  Quietly to yourself.
23   A.    Where to start?
24   Q.    How about here?  Maybe up here a little; okay?
25   A.    (Examining)
26   Q.    And let me know when you have had an opportunity
27   to review that, and please continue onto page 6 at the
28   top.
```

| | | |
|---|---|---|
| 1 | A. | (Examining) |
| 2 | Q. | Have you had an opportunity to review that, Ms. |
| 3 | Moore? | |
| 4 | A. | How far down do you want me to go? |
| 5 | Q. | Just a few lines on page 6 would be fine. |
| 6 | A. | Uh-huh (indicating yes). |
| 7 | Q. | You had an opportunity to review that? |
| 8 | A. | Yes. |
| 9 | Q. | And in fact the police asked you specifically, |
| 10 | "Did Will say anything?"  Correct?  You read that on |
| 11 | here? |
| 12 | A. | Yes. |
| 13 | Q. | And you said, "No"; right? |
| 14 | A. | Yes. |
| 15 | Q. | And then the police said, "Did anybody else there |
| 16 | say anything?", and you said, "No"; is that correct? |
| 17 | A. | Yes. |
| 18 | Q. | And then you were asked, "Did the shooter say |
| 19 | anything?"  And you said, "No"; correct? |
| 20 | A. | Yes. |
| 21 | Q. | So, you didn't want to tell the police that |
| 22 | information that you're telling us here in court today? |
| 23 | A. | It's not that I didn't want to.  I was scared and |
| 24 | I was ready to go.  I was trying to move things along as |
| 25 | quick as I could. |
| 26 | Q. | Okay.  And this was -- you got to start this tape |
| 27 | about midnight, something after the shooting.  Does that |
| 28 | sound about right? |

```
 1   A.     Uh-huh (indicating yes).
 2   Q.     Is that a yes?
 3   A.     Yes.  I suppose so.
 4          MS. LEVY:  Your Honor, may I approach the
 5   witness again?
 6          THE COURT:  Yes.
 7          MS. LEVY:  Q.  If you would review the first
 8   line, it says it's zero zero colon 18 hours; is that
 9   correct?
10   A.     Yes.
11   Q.     And do you know what that means in the regular
12   clock?
13   A.     No.
14          MR. STALLWORTH:  I'm willing to stipulate that
15   the interview took place shortly after midnight.
16          MS. LEVY:  Thank you, counsel.
17          THE COURT:  Perhaps even 18 minutes after
18   midnight.
19          MR. STALLWORTH:  Even better.
20          MS. LEVY:  Q.  Now, you never saw the
21   shooting; correct?
22   A.     Excuse me?
23   Q.     Did you see the shot when it went out of the gun?
24   A.     No.
25   Q.     So, you never saw the actual shooting.
26   A.     No.
27   Q.     And you just heard a gunshot.
28   A.     Yes.
```

| | |
|---|---|
| 1 | Q. Did you hear more than one gunshot? |
| 2 | A. No. |
| 3 | Q. Now, the D.A. asked you if Terry or Will had a |
| 4 | weapon, and you said no; right? |
| 5 | A. Right. |
| 6 | Q. You didn't pat him down to see if they were |
| 7 | carrying, did you? |
| 8 | A. Why would I have to do that? |
| 9 | Q. The answer is no; right, Ms. Moore? |
| 10 | A. Yes. |
| 11 | Q. Okay. And in fact Terry was wearing a puff coat |
| 12 | that night, wasn't he? |
| 13 | A. No. |
| 14 | Q. You remember that distinctly almost three years |
| 15 | later. |
| 16 | A. Yes. |
| 17 | Q. And you're positive he was not wearing a puff |
| 18 | coat. |
| 19 | A. He doesn't own a puff coat. |
| 20 | Q. You know all of Terry's clothes? |
| 21 | A. Terry lived with me. Why wouldn't I know all of |
| 22 | his clothes? |
| 23 | Q. Was he wearing a jacket that evening? |
| 24 | A. Yes, he was. |
| 25 | Q. Can you tell me what kind of jacket he was |
| 26 | wearing? |
| 27 | A. It was an Old Navy pullover. |
| 28 | Q. Now, you discussed going down the street, and |

```
 1    Will and T went to go get Mario; is that correct?
 2    A.    Uh-huh (indicating yes).
 3    Q.    Is that yes?
 4    A.    Yes.
 5    Q.    Okay.  And you testified when you were in court
 6    the last time on this matter you didn't go down that
 7    street because there were a lot of drug sales; correct?
 8    A.    Not necessarily drug sales.  I just don't go down
 9    there.  It's a bad area.
10          MS. LEVY:  Your Honor, may I --
11    Q.    Well, do you recall this line of questioning back
12    at the Preliminary Hearing, quote:
13                "That's what I meant --"
14          And counsel, page 44, line 6:
15                "That's what I meant.  First, the
16                four of you walked to the corner;
17                right?
18                "ANSWER:  Yes.
19                "QUESTION:  Why didn't you guys walk
20                over to Mario's house?
21                "ANSWER:  'Cuz I don't go down that
22                street.
23                "QUESTION:  This is a lot of dope
24                sales going on down there; right?
25                "ANSWER:  Yes."
26          Do you recall those questions and answers?
27    A.    Yes.
28    Q.    And in fact the corner that you and Shanae and
```

GERALD A. DOHRMANN, C.S.R. #2046

```
 1   William and Terry were on, I think you told us is real
 2   close to where Mario lives; correct?
 3   A.    I suppose so.  Yes.
 4   Q.    Didn't you tell us that earlier?
 5   A.    I know Mario stays down that street.  I don't
 6   know how close it is down that street, but I know he
 7   stay down that street.
 8   Q.    And that street is very close to the corner of
 9   30th; right?
10   A.    Yes.
11   Q.    I'm asking, is it --
12         MR. STALLWORTH:  Objection, asked and
13   answered.
14         THE COURT:  No, it's been asked.  I don't know
15   if it's directly been answered.
16         THE WITNESS:  Yes.
17         MS. LEVY:  Q.  You also testified that Will
18   said, quote, "There go that nigga, Ivan"; correct?
19   A.    Uh-huh (indicating yes).
20   Q.    You have to answer --
21   A.    Yes.
22   Q.    -- yes or no, Ms. Moore.
23         Okay.  And you never told the police that; true?
24   A.    True.
25   Q.    You never mentioned, "There go that nigger," and
26   you never mentioned the name of Ivan; true?
27   A.    True.
28   Q.    When the Cadillac went by the first time, did you
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   think Ivan was driving?
 2   A.      Went by the first time where?
 3   Q.      When you were on the corner back on July 16th of
 4   2000, you testified that the Cadillac went by and then
 5   was gone for 10 minutes, 20 minutes.  Do you recall that
 6   testimony?
 7   A.      Uh-huh (indicating yes).  Yes.
 8   Q.      When it went by the first time, did you see who
 9   the driver was?
10   A.      No.
11   Q.      Did you think the driver was Ivan?
12   A.      Yeah.
13   Q.      Now, sitting here today, do you specifically
14   recall whether anybody said anything out of the Cadillac
15   immediately prior to the shot?
16   A.      Excuse me?
17   Q.      Do you recall back on July 16th, 2000, when the
18   Cadillac went by immediately prior to the shooting, did
19   anyone in the Cadillac say anything?
20   A.      No.
21   Q.      Now, isn't it true that immediately after the
22   shot, Terry Dandy took off running to the Anderson
23   house?
24   A.      No.
25   Q.      Do you recall telling the police that you ran
26   into him when you went to the bathroom in the Anderson
27   house and that's when you -- he told you to say his name
28   is Richard Davis?
```

1   A.      Yes.

2   Q.      So, he got to the Anderson house before you;

3   correct?

4   A.      Yes.

5   Q.      So, he must have left the corner before you;

6   correct?

7           MR. STALLWORTH:  Objection, speculation.

8           THE COURT:  It would call for a conclusion.

9           MS. LEVY:  Thank you, Your Honor.

10  Q.      When you got to the Anderson house, Terry was

11  inside the home; correct?

12  A.      Yes, he was coming through the back door.

13  Q.      Was Shanae at the Anderson residence?

14  A.      Yes.

15  Q.      Was anybody staying with Will on the corner after

16  the shot?

17  A.      His mom was there.

18  Q.      Okay.  By you just told us, as you were going

19  into the residence, his mom was coming out; right?

20  A.      Yes.

21  Q.      And that you were the last one to leave the

22  corner; is that true, Ms. Moore?

23  A.      No.

24  Q.      Who was?

25  A.      Shay was the last one to leave the corner.

26  Q.      She didn't -- she didn't tell you to stay with

27  Will?

28  A.      No.  I told her to stay with Will.

1   Q.     Now, when you first spoke to the police, which

2   was moments after this incident, you told them that you

3   thought it was Ivan in the car; is that right?

4   A.     I don't recall.

5   Q.     Do you recall telling the police that you're not

6   sure if you could identify the guy in the backseat?

7   A.     Yes.

8   Q.     And what -- do you recall what color you told the

9   police the weapon was?

10  A.     Yes.

11  Q.     What color?

12  A.     Chrome.

13  Q.     I'm sorry?

14  A.     Chrome.

15  Q.     Earlier today you said it was black; is that

16  true?

17  A.     No, I didn't.

18  Q.     Now, you also told the police in that first

19  interview moments after the shooting that you thought it

20  was Ivan or one of his friends.  Do you recall that?

21  A.     No.

22         MS. LEVY:  May I approach the witness, Your

23  Honor?

24         THE COURT:  Yes.

25         MS. LEVY:  Q.  I'm going to show you a

26  three-page police report.  You have seen this paper

27  before, haven't you, Ms. Moore?

28  A.     Yes.

```
 1   Q.    And would you review it to yourself quietly and
 2   see if it refreshes your memory?
 3   A.    Just like I said the last time, I cannot read
 4   this writing.
 5   Q.    You can't read that?
 6   A.    No.
 7   Q.    And when did you say that the last time?  When
 8   you were in court before?
 9   A.    Yes.
10   Q.    Yes?
11   A.    Yes.
12   Q.    Is that your signature on the bottom?
13   A.    Yes.
14   Q.    So, you can't read this when it says, "I
15   think --"
16             THE COURT:  Whoop.
17             MS. LEVY:  I will withdraw it.
18             THE COURT:  Thank you.
19             MS. LEVY:  Q.  Do you recall describing what
20   the gentleman in the back of the car was wearing?
21   A.    Yes.
22   Q.    What was that?
23   A.    A black pullover of some sort.
24   Q.    Did you mean a hat or beanie?
25   A.    Yes.
26   Q.    And what else, if you recall?
27   A.    (Shakes head in the negative).  That's all.
28   Q.    Do you recall telling the police it was dark
```

```
 1   clothing?

 2   A.     Yes.

 3   Q.     This Cadillac, when you saw it, you didn't know

 4   it belonged to Ivan; is that true?

 5   A.     When I saw it the first time when Will pointed it

 6   out or when it came back?

 7   Q.     After Will pointed it out, then you believed that

 8   was Ivan's car; correct?

 9   A.     Yes.

10   Q.     But you had never seen Ivan in a vehicle before

11   that; correct?

12   A.     No.

13   Q.     Am I correct?

14   A.     Yes, you're correct.

15   Q.     And immediately after the shot, you were hiding

16   behind the telephone pole; is that correct?

17   A.     Yes.

18   Q.     And in fact you were asked a question in court

19   before as to whether you could see the person in the

20   backseat holding the gun.  Do you recall that question?

21   A.     No.

22   Q.     Do you recall answering, yes and no, "My mind was

23   a blank"?

24   A.     No.

25   Q.     Did you have an opportunity before testifying

26   today to speak with Mr. Stallworth, the District

27   Attorney?

28   A.     Yes.
```

| | | |
|---|---|---|
| 1 | Q. | And you had an opportunity to review all of your |
| 2 | statements? | |
| 3 | A. | Yes.  Not with him. |
| 4 | Q. | By yourself? |
| 5 | A. | Yes.  But I didn't. |
| 6 | Q. | You didn't what, Ms. Moore? |
| 7 | A. | I didn't read over the papers he gave me. |
| 8 | Q. | You never reviewed it for today? |
| 9 | A. | No. |
| 10 | Q. | But you did before you testified the last time; |
| 11 | is that true? | |
| 12 | A. | I'm not sure. |
| 13 | Q. | Do you recall the windows in the back of the |
| 14 | Cadillac? | |
| 15 | A. | Yes. |
| 16 | Q. | Can you tell me -- can you describe them to me? |
| 17 | A. | Tinted. |
| 18 | Q. | Okay.  And on this particular evening back on |
| 19 | July 16th of 2000, can you tell me if they were up or | |
| 20 | down? | |
| 21 | A. | They were down halfway. |
| 22 | Q. | Do you know how far that was? |
| 23 | A. | Was halfway. |
| 24 | | MS. LEVY:  Your Honor, if the record would |
| 25 | reflect I'm showing the witness what's been marked as | |
| 26 | defendant's B for Identification. | |
| 27 | Q. | I'm showing you a picture.  Do you recognize what |
| 28 | that is that I'm showing you? | |

| | |
|---|---|
| 1 | A.      A car. |
| 2 | Q.      Okay.  Can you tell what type of car? |
| 3 | A.      A Cadillac. |
| 4 | Q.      All right.  And can you see how far down the back |
| 5 | window is? |
| 6 | A.      Uh-huh (indicating yes). |
| 7 | Q.      Is that yes? |
| 8 | A.      Yes. |
| 9 | Q.      Okay.  Is that approximately how far down the |
| 10 | window was back on July 16th of 2000? |
| 11 | A.      Yes. |
| 12 | Q.      Okay.  And I'm going to show you, there's some |
| 13 | other pictures.  Does that appear to be the same car, |
| 14 | same window? |
| 15 | A.      (Examining)  It's the same car.  Yes. |
| 16 | THE COURT:  Which exhibit was that? |
| 17 | MS. LEVY:  Defendant's A for Identification. |
| 18 | THE COURT:  Thank you. |
| 19 | MS. LEVY:  And I'm going to show the witness, |
| 20 | Your Honor, defendant's C for Identification. |
| 21 | Q.      Does that appear to be the same? |
| 22 | A.      Yes.  Same car, uh-huh (indicating yes). |
| 23 | Q.      Okay.  And, finally, defendant's D for Identifi- |
| 24 | cation, does that appear to be the same car? |
| 25 | A.      (Examining)  Uh-huh (indicating yes). |
| 26 | Q.      Is that a yes |
| 27 | A.      Yes. |
| 28 | Q.      Okay.  And I guess the ·most important thing, the |

1   window was no farther down on July 16th than is shown in

2   A, B, C and D; right?

3   A.    Uh-huh (indicating yes).  Not really.

4   Q.    Not really.

5   A.    You can tell they different.

6   Q.    What's different?  In the pictures?

7   A.    (Examining)  Yes.

8   Q.    My question is, was that how far the window that

9   was down on July 16th, or was it higher, further down,

10  if you can remember?

11  A.    It was about it.

12  Q.    And what could you see in the backseat from the

13  window being halfway down?

14  A.    At what point in time?

15  Q.    I'm sorry?

16  A.    At what point in time?

17  Q.    Well, let's talk about the first time you saw the

18  vehicle.

19  A.    When it was coming down San Pablo?

20  Q.    Was that the first time you saw it?

21  A.    Yes.

22  Q.    Okay.  What could you see into the backseat of

23  the vehicle with the window down, as it was?

24  A.    I couldn't tell if the window was down.

25  Q.    When it came by the first time, you couldn't tell

26  if the window was up; is that what you are saying?

27  A.    Uh-huh (indicating yes).

28  Q.    What?

```
 1   A.      Yes.

 2   Q.      Okay.  When it went by the second time, could you

 3   tell?

 4   A.      Yes.

 5   Q.      What could you see inside into the backseat of

 6   that car?

 7   A.      I could see a person bringing hisself back into

 8   the window.

 9   Q.      Moving back inside the window; correct?

10   A.      Yes.

11   Q.      I'm sorry?

12   A.      Yes.

13   Q.      Now, I asked you about testifying about your mind

14   going blank and you didn't recall that; correct?

15   A.      Uh-huh (indicating yes).

16   Q.      Is that yes?

17   A.      Yes.

18           MS. LEVY:  Okay.  For counsel's edification,

19   I'm on the page 25 at the bottom:

20           "QUESTION:  Were you --"

21           I'm sorry.  I'm going to start at line 19 on page

22   25:

23           "QUESTION:  Were you by yourself or

24           was there someone else near you?

25           "ANSWER:  No.  Shay was a short

26           distance behind me.

27           "QUESTION:  Okay.  And did you get a

28           good look at the person holding the
```

```
 1                   gun at that point?
 2                   "ANSWER:  Yes and no.
 3                   "QUESTION:  Okay.  Can you explain
 4                   your answer?
 5                   "ANSWER:  The reason I say that is
 6                   because after I seen the gun, my
 7                   mind went blank.  I don't know.
 8                   "QUESTION:  What portion of the
 9                   person were you able to see before
10                   your mind went blank?
11                   "ANSWER:  The whole top part."
12            Do you recall that testimony?
13     A.     Yes.
14     Q.     And is that accurate, that you could see the
15     whole top part of the person in the backseat?
16     A.     Yes.
17     Q.     Now, you mentioned some kind of beanie or
18     something on the person's head.  How far down the
19     forehead did the hat that you saw go?
20     A.     Right here (Indicating).
21            MS. LEVY:  For the record, Your Honor, it
22     looks as if the witness is indicating slightly above her
23     eyebrow line.
24            THE COURT:  Sorry.  Could you show me again?
25            THE WITNESS:  (Indicating)
26            THE COURT:  Yes, it will.
27            MS. LEVY:  Q.  So, if the hat was down to his
28     eyebrow line, you could see his eyes; is that right?
```

| | | |
|---|---|---|
| 1 | A. | Uh-huh (indicating yes). |
| 2 | Q. | Yes? |
| 3 | A. | Yes. |
| 4 | Q. | And you saw some dark clothing from what you |
| 5 | | testified earlier; is that correct? |
| 6 | A. | Yes. |
| 7 | Q. | Do you also recall testifying previously that you |
| 8 | | don't know the number of shots that were fired? |
| 9 | A. | No. |
| 10 | Q. | At the prior court hearing, the question was: |
| 11 | | "Okay.  How many gunshots did you |
| 12 | | hear? |
| 13 | | "ANSWER:  To my acknowledgment, I |
| 14 | | don't recall." |
| 15 | | Do you recall that testimony? |
| 16 | A. | No.  But if it's there, I guess I said it. |
| 17 | Q. | Would you like to see it? |
| 18 | A. | No. |
| 19 | Q. | Sorry? |
| 20 | A. | No. |
| 21 | Q. | Now, in one of your statements, you talked to T |
| 22 | | after this shooting; is that correct? |
| 23 | A. | Yes. |
| 24 | Q. | And he called you from jail? |
| 25 | A. | Yes. |
| 26 | Q. | Was that your last contact with T? |
| 27 | A. | Till then and now? |
| 28 | Q. | Have you seen Terry lately? |

GERALD A. DOHRMANN, C.S.R.#2046

```
 1  A.      Yes, I see him around.

 2  Q.      Have you told Mr. Stallworth where he is?

 3  A.      He never asked.

 4  Q.      I'm sorry?

 5  A.      He never asked.

 6  Q.      And in fact have you been in contact with Mr.

 7  Stallworth, or the District Attorney's office, after

 8  your testimony at the Preliminary Hearing in June of

 9  '01?

10  A.      No.

11  Q.      Now, previously you had told the police that Ivan

12  and Will were fighting about stuff, and you didn't know

13  what it was all about; correct?

14  A.      I don't know.  I don't know what they were

15  arguing over.  I don't know what the thing was.

16  Q.      But you didn't tell the police that they were

17  arguing about money, did you?

18  A.      I don't know.

19  Q.      You don't remember?

20  A.      Uh-uh (indicating no).

21  Q.      Is that yes or no, ma'am?

22  A.      No, I don't remember.

23  Q.      Okay.  But you mentioned to me earlier you have

24  reviewed your statements prior to testifying today?

25  A.      No.  I said I had them.  I didn't look over them.

26          MS. LEVY:  I'm sorry.  May I approach the

27  witness, Your Honor?

28          THE COURT:  You may.
```

```
 1          My recollection of the testimony is she did
 2   indicate Mr. Stallworth gave her an opportunity to
 3   review the statements, but she didn't.
 4          MS. LEVY:  I remembered that, Your Honor, when
 5   Ms. Moore corrected me.
 6   Q.    Ms. Moore, I'm going to show you again what's a
 7   typed-up statement of your audio-taped interview with
 8   the police, and I would like you to read about the first
 9   ten lines to yourself quietly, please.
10   A.    (Examining)
11   Q.    Have you had an opportunity to do that?
12   A.    Yes.
13   Q.    Did you tell the police that Will and Ivan were
14   fighting over money?
15   A.    That's what it says.
16   Q.    That's what this says?
17   A.    Yes.
18   Q.         "QUESTION:  And has William had
19              problems with Ivan in the past?
20              "ANSWER:  Yes, he have.
21              "QUESTION:  And what has he said
22              about that?
23              "ANSWER:  He said that they got into
24              it.  For what, I'm not sure."
25          Now, isn't that what you told the police, Ms.
26   Moore?
27   A.    Yes.
28   Q.    So, you never mentioned money; right?
```

```
1   A.      Right.
2   Q.      In fact, you spoke to an investigator for the
3   defense, and you told them that Ivan and Will had gotten
4   into fights about three previous times.  Do you recall
5   that?
6   A.      Not fights.
7   Q.      Not fights?
8   A.      Yes.
9   Q.      So, you didn't say that to the investigator;
10  correct?
11  A.      I'm not sure what I told him, but I know the
12  three previous times they didn't get into no fight.
13  Q.      What happened the three previous times?
14  A.      He went over there to get his money.
15  Q.      I'm sorry.  Could you repeat that, please?
16  A.      He went to go talk to Ivan so he can get his
17  money.
18  Q.      And you were with Will, so you know what
19  happened; right?
20          MR. STALLWORTH:  Objection, argumentative.
21          THE COURT:  Sustained as to the form of the
22  question.
23          MS. LEVY:  Q.  Were you with William those
24  times that he went to go get his money?
25  A.      No.
26  Q.      Now, it's true that you first told the police
27  that you did not think you would be able to recognize
28  the person in the back of the Cadillac; is that correct?
```

| 1 | A. | Correct. |
| 2 | Q. | Were you trying to cover for Ivan? |
| 3 | A. | No. |
| 4 | Q. | I'm sorry? |
| 5 | A. | No. |
| 6 | Q. | Why did you tell the police that, Ms. Moore? |
| 7 | A. | So I wouldn't have to go through this. |
| 8 | Q. | You're here anyway. |
| 9 | A. | Exactly. |
| 10 | Q. | You don't want to be here; correct? |
| 11 | A. | No, I don't. |

12  Q.   Do you recall telling my investigator that you
13  heard about Ivan and Will getting into it three times
14  previously when the Cadillac drove by the first time?
15  A.   Why are you trying to ask me the same question in
16  a different way and add more to it?

17          MS. LEVY:  Your Honor, could you direct the
18  witness --

19          THE COURT:  She should answer questions, but
20  that question to me was vague.  I didn't understand it.

21          MS. LEVY:  Q.  When you spoke to the defense
22  investigator, you told him that when the Cadillac, on
23  July 16th, 2000, went by the corner, that's when Will
24  told you he had gotten into fights with Ivan three times
25  before.

| 26 | A. | No. |
| 27 | Q. | You didn't say that to my investigator. |
| 28 | A. | (Shakes head in the negative)  That's not what |

```
 1   happened.
 2   Q.      My question is, Ms. Moore --
 3   A.      No.
 4   Q.      -- did you ever tell law enforcement that you
 5   knew Terry Dandy was not Richard Davis?
 6   A.      No.
 7   Q.      Did you tell my investigator that you knew Ivan's
 8   Cadillac from before?
 9   A.      From before?   When?
10   Q.      Prior to July 16th, 2000.
11   A.      No.
12   Q.      So, on this particular evening, back on July
13   16th, 2000, you were all on the corner all together how
14   many minutes would you say?
15   A.      I don't know.
16   Q.      About half-hour?   Little less?
17           MR. STALLWORTH:   Objection.   Vague as to what
18   points.
19           THE COURT:   Sustained.   I've heard two periods
20   of time standing:   One, the first time out, and when
21   they came back.   I'm not sure if your question means the
22   first or second or both.
23           MS. LEVY:   Q.   Ms. Moore, you told us that you
24   and Shanae and Will and T went to the corner from the
25   Anderson home on that evening back in July 16th of 2000;
26   correct?
27   A.      No.   I said me and Shay went to the pay phone.
28   Q.      Okay.   And at that point Will and T went to get
```

```
 1   Mario; correct?
 2   A.     Yes.
 3   Q.     From the time you walked out of the Anderson
 4   residence to when you went back to the Anderson
 5   residence and saw Will's mom coming out, how long were
 6   you on the corner?
 7   A.     (No response)
 8   Q.     About?
 9   A.     How long was I on the corner?  Me and Will was
10   standing on the corner for about five minutes.
11   Q.     Okay.  Didn't you tell us you and Shanae walked
12   out first?
13   A.     The pay phone is not on the corner.
14   Q.     Is it near the corner?
15   A.     Yes, it's near the corner.
16   Q.     How long a time from when you left the Anderson
17   home till you went back to the Anderson home, roughly?
18   A.     I don't know.
19   Q.     Ten, 15 minutes?
20   A.     No.  It was longer than that.
21   Q.     Half-hour, maybe?
22   A.     Probably about an hour, hour and a half.
23   Q.     And --
24   A.     I don't know.
25   Q.     Okay.  I understand you weren't timing it
26   exactly, but about an hour, hour and a half.  And what
27   time of the evening was it?
28   A.     I don't know.
```

```
 1   Q.     Do you know if the sun was out, or it was evening

 2   or getting dark?

 3   A.     The sun was going down.

 4   Q.     And how long of that hour, hour and a half were

 5   you and Shanae alone near the phone booth around the

 6   corner?

 7   A.     About 15 -- 15 minutes at the most.

 8   Q.     And do you recall speaking to my investigator

 9   over the phone and telling him that you couldn't

10   identify anyone in the car, but you're sure it was

11   Ivan's Cadillac?

12          MR. STALLWORTH:  Objection.  Vague as to which

13   time.

14          MS. LEVY:  She only spoke to my investigator

15   once, Your Honor.  That shouldn't be a problem.

16          MR. STALLWORTH:  Which time she saw the car?

17   It's two times.

18          THE COURT:  The question was -- I will ask Mr.

19   Dohrmann to re-read the question.

20          (Record re-read by the Reporter)

21          THE COURT:  Overruled.  You can answer.  Did

22   you tell the investigator that?

23          THE WITNESS:  I don't remember.

24          MS. LEVY:  Q.  And in fact the weapon that you

25   described both to the police and on the phone to my

26   investigator was a sawed-off shotgun, chrome colored; is

27   that correct?

28   A.     Yes.  To the -- yeah.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
1   Q.    I'm sorry?
2   A.    Yes.
3   Q.    What else did you say, Ms. Moore?
4   A.    Nothing.
5             THE COURT:  Mr. Dohrmann, would you read the
6   last part of the answer?
7             (Record re-read by the Reporter)
8             MS. LEVY:  I think we can leave it at that,
9   Your Honor.  Thank you.
10  Q.    Now, when you first spoke to the police on tape,
11  did you mention to them that you could describe Ivan
12  somewhat, but you didn't know what car he drove.  Do you
13  recall that?
14  A.    No.
15            MS. LEVY:  May I approach the witness, Your
16  Honor?
17            THE COURT:  You may.
18            MS. LEVY:  Q.  Ms. Moore, I'm going to show
19  you another page of your taped transcript.  I would like
20  you to review from about line 1 to line 10, please.
21  A.    (Examining)
22  Q.    Have you had an opportunity to review that?
23  A.    Yes.
24  Q.    Does that refresh your recollection?
25            THE COURT:  Does that help your memory?
26            THE WITNESS:  Oh, yeah.
27            MS. LEVY:  Q.  And did you tell the police
28  that you didn't know if Ivan had a car or not; is that
```

GERALD A. DOHRMANN, C.S.R.#2046