```
 1  correct?
 2  A.      Yeah.
 3  Q.      How many times prior to July 16th, 2000, had you
 4  seen Mr. Ivan Kilgore?
 5  A.      Twice.
 6  Q.      I'm sorry?
 7  A.      Twice.
 8  Q.      So, on July 16th would have made the third time?
 9  A.      No.
10  Q.      Second time?
11  A.      Yes.
12  Q.      Now, you testified in court today that you had
13  heard that one of Will's friends had gotten into it with
14  Ivan; is that correct?
15  A.      Yes.
16  Q.      And you couldn't remember his name; is that
17  correct?
18  A.      Yes.
19  Q.      Do you recall testifying at the Preliminary
20  Hearing that his name was Scoop, or Snoop, or something
21  like that?
22  A.      Yes.
23  Q.      Was that the gentleman's name?
24  A.      Something like that.
25  Q.      Directing your attention to the drawing beside
26  you here -- and for the record, Your Honor, it's
27  People's exhibit 4 for Identification -- you put dots on
28  this.  You recall that?
```

```
1   A.      Yes.
2   Q.      Now, if you could join me over here -- perhaps,
3   we need the microphone.  Thank you.
4           Now, the first time the car went down San Pablo,
5   did it turn onto 30th?
6   A.      No.
7   Q.      You have to use --
8   A.      No.
9   Q.      Just went down San Pablo?
10  A.      No.
11  Q.      Okay.  You have to use the microphone, Ms. Moore.
12  A.      No.  It's not working.
13  Q.      Yes, it is.
14  A.      Would you like to speak into it?
15  Q.      Ms. Moore --
16          THE COURT:  I'm sorry.  I can't hear now,
17  either.
18          MS. LEVY:  She asked me, did I not just see
19  her speak into it.
20  Q.      If you hold it close to your mouth.
21          THE COURT:  If you would, please.  Even six
22  inches from your mouth.  We can't hear too well.
23          When you say the first time, you are talking
24  about the time the car drove on by.
25          MS. LEVY:  That's correct.
26  Q.      The first time you saw the Cadillac, did it go --
27  A.      It never drove by.  It stopped at the stop sign,
28  at the stoplight that was down the street, and it made a
```

```
 1   U-turn where it could.  It never came past us.
 2   Q.     Okay.  So, you are saying, was the car going --
 3   am I going the right direction?  North on this map?  Was
 4   the car going that way the first time?
 5   A.     That's going towards Berkeley; right?
 6              MR. STALLWORTH:  I'm sorry.  I didn't hear the
 7   answer.
 8              MS. LEVY:  Why, Ms. Moore was asking if north
 9   is toward Berkeley, and I'm deferring to Mr. Stallworth,
10   Your Honor.  I'm horrible at directions.  Or is north
11   going towards --
12              THE COURT:  Does it say north on there?
13              MS. LEVY:  There is an N with an arrow, but I
14   don't know.
15              THE COURT:  That's usually what -- well, it
16   doesn't make any difference.
17          The first time you saw it, was the car going
18   toward Berkeley or going --
19              THE WITNESS:  Going towards Berkeley.
20              MS. LEVY:  Q.  And it stopped at the stop
21   sign.
22          Now, is there a stop sign on the corner where you
23   guys were?
24   A.     No, it wasn't up that close.  It was down this
25   way (Indicating).
26   Q.     Okay.
27              THE COURT:  Down toward Oakland?
28              THE WITNESS:  Yes.
```

```
 1              MS. LEVY:  Q.  Can you show me where the
 2   stoplight is, please?
 3   A.      I can't show you.  It's not on here.
 4   Q.      Roughly where you believe.
 5   A.      Down here roughly.
 6   Q.      Before San Pablo?
 7   A.      Yes.
 8   Q.      Before -- okay.  So, from the corner here, you
 9   first saw the Cadillac at the stoplight below, and
10   indicating south of San Pablo; correct?
11   A.      Yes.
12   Q.      And then the car went away.
13   A.      It made a U-turn and went back the way it was
14   going.
15   Q.      Okay.  So, it was going north and went beyond you
16   and made the U-turn, or did they make it here before the
17   corner?
18   A.      Way before the corner.  Yes.
19   Q.      Okay.  Can you show me where they made the U-turn
20   on the map?
21   A.      Down here is not on the map.  Quit asking me
22   that.
23              MS. LEVY:  And, again, Your Honor, she is
24   indicating south of San Pablo that is not depicted on
25   the map.
26              THE COURT:  Yes.  Toward the bottom of
27   People's No. 4 there is a horizontal couple lines that
28   indicates San Pablo Avenue.  She was indicating below
```

```
 1    that off the diagram.
 2           MS. LEVY:  Thank you, Your Honor.
 3    Q.    And it made the U-turn and it was gone, I think
 4    you said, for about 10 minutes; is that right?
 5    A.    Yes.
 6    Q.    I'm sorry?
 7    A.    Yes.
 8    Q.    Okay.  And then it came back north, again the
 9    same direction?
10    A.    Yes.
11    Q.    And it stopped right where everybody was on the
12    corner or --
13    A.    Not on the corner.
14    Q.    Where did the Cadillac stop?
15    A.    Right where you see the red dot.
16    Q.    Okay.  And that's on 30th Street.
17    A.    Yes.
18    Q.    And then after the shooting, what did the
19    Cadillac do?
20    A.    Went up a little bit more and made a U turn and
21    came back right where the red dot was.
22    Q.    On the wrong side of the street?
23    A.    Yes.
24    Q.    Thank you.  You may have your seat.
25           Your Honor, I wonder -- I know we had a break
26    earlier now.  I wonder if we can take a midmorning break
27    at this time, a comfort break.
28           THE COURT:  All right.  Please remember the
```

1  admonition, ladies and gentlemen, not to talk about the

2  case, or form or express any opinion about it.

3      Are we going to be able to finish with this

4  witness this morning?

5          MR. STALLWORTH:  I think so.

6          (Whereupon, the mid-morning recess was taken)

7                    ---o0o---

```
 1                      - AFTER RECESS -
 2                         ---o0o---
 3          (Whereupon, the following proceedings were had in
 4   open court with the presence of the jury)
 5              THE COURT:  Jurors and alternates have
 6   returned, both counsel and Mr. Kilgore are present.
 7          Ms. Levy.
 8              MS. LEVY:  Q.  Ms. Moore, did you ever observe
 9   T and Mr. Kilgore get into a fight?
10   A.    No.
11   Q.    And when Will told you about the fight or fights
12   with Mr. Kilgore, did he ever mention that T and Mr.
13   Kilgore had fought?
14   A.    No.
15   Q.    And when you first spoke to the police, both in
16   your taped statement and in your written one, you did
17   not mention Terry Dandy at all; is that true?
18   A.    I don't know.
19   Q.    If you did mention him, you used the name Richard
20   Davis?
21   A.    I don't know.
22   Q.    So, you were lying to the police to protect
23   Terry?
24              MR. STALLWORTH:  Objection.  Argumentative.
25              THE COURT:  Overruled.
26              MS. LEVY:  Q.  Is that true?
27   A.    Yes.
28   Q.    And in your original statement to the police, you
```

GERALD A. DOHRMANN, C.S.R.#2046

1  told them that Will said, quote, "There goes that nigger

2  again," unquote, and you took that to mean he was

3  talking about Ivan; is that true?

4  A.     No.

5  Q.     It's not true?

6         May I approach the witness, Your Honor?

7              THE COURT:  Yes.

8              MS. LEVY:  And the statement I'm referring to

9  is on the last couple of lines.

10             THE COURT:  This, again, is a written

11 statement?

12             MS. LEVY:  Yes, Your Honor.

13             MS. LEVY:  Q.  Ms. Moore -- I'm sorry.  Is

14 that the statement that you can't read?

15 A.     Excuse me?

16 Q.     You had mentioned earlier you couldn't read.  Is

17 that --

18 A.     Yes.  Why would you bring it back to me?

19             MS. LEVY:  May I approach the witness, Your

20 Honor?

21             THE COURT:  Yes.

22         (Short discussion off the record)

23             MS. LEVY:  Your Honor, I believe there's been

24 an agreement by Mr. Stallworth and I.

25         While we were standing there, William --

26             THE COURT:  Wait a minute.  Tell me what the

27 agreement is first.

28             MS. LEVY:  I believe Mr. Stallworth said after

```
 1  I read this portion, he would stipulate that it is part
 2  of Ms. Moore's statement to the police back on July
 3  16th, 2000.
 4              THE COURT:  So, the part of the written
 5  statement --
 6              MS. LEVY:  Yes.
 7              THE COURT:  -- so we can clarify.
 8              MR. STALLWORTH:  The written statement.  Yes.
 9              THE COURT:  So, this is a witness statement.
10  And it gives the answers here, Ms. Moore.  You did not
11  handwrite that statement.  It was written by a police
12  officer?
13              THE WITNESS:  Yes.
14              MS. LEVY:  "While we were standing
15              there, Will pointed to a gray
16              Cadillac that was making a U-turn on
17              29th Street and said, 'There goes
18              that nigger,' close quote."
19         I'm sorry.
20              "And said, quote, 'There goes that
21              nigger,' close quote, 'again.'  I
22              took this to mean Ivan."
23              MR. STALLWORTH:  And I would stipulate that is
24  what the police officer wrote in his report.
25              THE COURT:  All right.  That stipulation will
26  be entered into the record.
27              MS. LEVY:  If I may have a moment, Your Honor.
28              THE COURT:  Yes.
```

1    MS. LEVY: Your Honor, I have no further

2    questions at this time.

3    THE COURT: Redirect, Mr. Stallworth?

4    MR. STALLWORTH: Yes, Your Honor.

5    REDIRECT EXAMINATION

6    MR. STALLWORTH: Q.  Good morning again, Ms.

7    Moore.

8    A.    Hi.

9    Q.    When you spoke to the first police officer in the

10   report that defense counsel had been showing you, at

11   about 6:10 p.m., did you know at that point whether or

12   not William was still alive?

13   A.    No, I didn't know.

14   Q.    Was that a concern that you had at that point?

15   A.    Yes.

16   Q.    Did you feel comfortable in talking to that

17   police officer at that point?

18   A.    No.

19   Q.    As you sit there this morning, do you have a

20   memory of what you talked about at that time?

21   A.    No.

22   Q.    Is that a no?

23   A.    No.

24   Q.    I'm sorry.  I'm going to ask one more time and

25   ask you to tell me if this is a yes or no:

26        At that point, when you spoke to the police

27   officer at 6:10 p.m., were you comfortable in talking to

28   him at that point?

```
 1   A.      No.
 2   Q.      Later that night, around midnight, when you spoke
 3   to Sergeant Green at the police department, did you know
 4   whether or not William was alive at that point?
 5   A.      No.
 6   Q.      Was that a concern of yours at that point?
 7   A.      Yes.
 8   Q.      Did you want to be at that police department at
 9   that time?
10   A.      No.
11   Q.      Do you have much of a memory, if any, of what you
12   told Sergeant Green at that point?
13   A.      No.
14   Q.      When the Cadillac made the U-turn and drove back
15   on the wrong side of the street, pointed the gun at you,
16   I want you to take a look at me this morning and let me
17   know how far the person with the shotgun was from you
18   when he pointed the shotgun at you.
19           Tell me to come closer or further away.  Just use
20   me as sort of a measuring point.
21   A.      Right there.
22           MR. STALLWORTH:  May the record reflect, as
23   best I can -- maybe the Court might want to help me
24   out -- I say about five feet?
25           THE COURT:  So you are saying to where Mr.
26   Stallworth is from where?  From where you are seated or
27   from the front part?
28           THE WITNESS:  Right here.
```

```
 1              THE COURT:  From where you are seated now?
 2              THE WITNESS:  Yes.
 3              THE COURT:  That probably would be, I would
 4   say, between six and eight feet, but the jurors'
 5   estimates are --
 6              MR. STALLWORTH:  That's fine.
 7              THE COURT:  Six or eight feet is probably more
 8   accurate.
 9   Q.   So, as the person with the shotgun was six to
10   eight feet away from you where I am right now, pointing
11   the shotgun at you, did you get a look at who that
12   person was?
13   A.   Yes.
14   Q.   And are you sure that's the person that you have
15   identified here in court this morning as the defendant,
16   Ivan Kilgore?
17   A.   Yes.
18              MS. LEVY:  Objection, Your Honor.  Improper
19   redirect.
20              THE COURT:  I will allow it.  The answer was
21   yes.
22              MR. STALLWORTH:  The answer was yes.
23   Q.   When you left William with Shay and saw Ms.
24   Anderson as you were heading back to the house, did
25   Terry run in front you or was he running with you at
26   that time?
27   A.   No.
28   Q.   And is it fair to say, based on your testimony
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   already, that the next time you saw Terry was when he
 2   came through the back of the house?
 3              MS. LEVY:  Objection, Your Honor.  Leading.
 4              THE COURT:  It is leading.  Sustained.
 5              MR. STALLWORTH:  Q.  When was the next time
 6   that you saw Terry after you last saw him on the street
 7   before the shooting?
 8   A.    Um, after they let us out the police station.
 9              MR. STALLWORTH:  If I can have a moment, Your
10   Honor.  (Examining)
11          Thank you, Ms. Moore.  I have no further
12   questions.
13              THE COURT:  Recross?
14                   RECROSS-EXAMINATION
15              MS. LEVY:  Q.  Ms. Moore, you said you weren't
16   comfortable talking to the police, but you wanted to
17   find out who had shot William; yes?
18   A.    No.
19   Q.    No.
20   A.    I already knew who did it.
21   Q.    But you didn't want to tell the police; right?
22   A.    Right.
23   Q.    And you lied to the police about Terry Dandy's
24   name and him being there or not; right?
25              MR. STALLWORTH:  Objection.  Beyond the scope.
26              THE WITNESS:  Didn't say he wasn't there.
27              MR. STALLWORTH:  Withdrawn.
28              MS. LEVY:  Q.  And you responded, you saw
```

```
 1   Terry after they let you out of the police station about
 2   1:00 that morning?
 3   A.     I guess, if that was the time.  Yes.
 4   Q.     And where was Terry?
 5   A.     Sitting on the stairs with me, on the side of the
 6   police station, waiting for Shay.
 7   Q.     Outside the police station what?
 8   A.     Waiting for Shay.
 9   Q.     And you waited for Shay, too?
10   A.     Yes.
11   Q.     And then the three of you went home together?
12   A.     We went to the Andersons' house.
13   Q.     Together; yes?
14   A.     Yes.
15   Q.     And did you talk about the shooting at all?
16   A.     No.
17   Q.     And you and Shay remained friends for quite some
18   time after the July 16th shooting?
19   A.     Yes.
20   Q.     Have you ever spoken to her since July 16th about
21   William being shot?
22   A.     No.
23   Q.     Not a word.
24   A.     I don't talk about it.
25   Q.     Were you at the funeral for Mr. Anderson?
26   A.     Yes.
27   Q.     And Shanae was there?
28   A.     Yes.
```

1    Q.    And you didn't talk about it then.

2    A.    No.

3    Q.    You haven't talked to Terry about it since the

4    shooting?

5    A.    No.

6    Q.    Not one word.

7    A.    No.

8    Q.    Did you talk to William's parents about it?

9    A.    (Shakes head in the negative).

10   Q.    Is that a no?

11   A.    Not about it, but we talk about him.

12   Q.    But you never spoken about what happened on the

13   corner other than in court and to the police and the

14   D.A. and my investigator; is that right?

15   A.    Right.

16   Q.    All right.  Did you have a problem with Terry

17   shortly before the shooting?

18          MR. STALLWORTH:  Objection.  Beyond the scope

19   of redirect.

20          THE COURT:  You have explored some areas that

21   were also beyond the area of cross.  I will allow it

22   briefly, but --

23          MS. LEVY:  I won't go too far into it, Your

24   Honor.

25   Q.    Ms. Moore, did you have a problem with Terry

26   before the shooting?

27   A.    Yes.

28   Q.    Is that yes?

```
 1   A.       Yes.

 2   Q.       In fact, you wrote William about it?

 3   A.       Yes.

 4   Q.       And --

 5            (Short discussion off the record)

 6            MS. LEVY:  Q.  And you in fact wrote William

 7   about a problem with T July 10th, just six days before

 8   the shooting; is that true?

 9   A.       Yes.

10   Q.       And, yet, you were willing to lie for Terry to

11   the police on July 16th; correct?

12   A.       Yes.

13   Q.       At what time, Ms. Moore, did you find out that

14   William had passed away?

15   A.       After the detectives got done talking to me.

16   Q.       Who told you that he had passed?

17   A.       One of the detectives.

18   Q.       Sergeant Green?

19   A.       I don't know his name.

20   Q.       When the District Attorney asked you about

21   Sergeant Green, you seemed to know who that was.

22   A.       Yes.

23   Q.       Hello?

24   A.       Yes, I know who he is.

25   Q.       But one of them told you.

26   A.       Yes.

27   Q.       And it was after you had done your taped

28   statement and everything; is that right?
```

```
 1   A.      Uh-huh (indicating yes).

 2   Q.      Right?

 3   A.      Yes.

 4   Q.      And if you had -- let me rephrase that.

 5           You weren't willing to give information to the

 6   police, because you thought William was still alive; is

 7   that true?

 8   A.      No, that ain't why I did it.

 9   Q.      I'm sorry?

10   A.      That's not why I did it.

11   Q.      Why did you do it?

12   A.      I told you already.

13   Q.      Could you tell me again, Ms. Moore, please?

14   A.      I was scared.

15              MS. LEVY:  I have no further questions.

16                     REDIRECT EXAMINATION

17              MR. STALLWORTH:  Q.  Ms. Moore, what was the

18   problem, if you can call it that, that you had with

19   Terry that you wrote about on July 10th of 2000?

20   A.      It was a personal problem.

21   Q.      Did it have anything to do with Will in

22   particular?

23   A.      Yeah.

24   Q.      What was it?

25   A.      Terry told Will something that wasn't true.

26   Q.      What did Terry tell Will?

27   A.      That I cheated on him.

28   Q.      Is that why you were upset at Will -- I'm
```

```
 1   sorry -- upset at Terry?

 2   A.    Yes.

 3            MR. STALLWORTH:  Thank you, Ms. Moore.  I have

 4   no further questions.

 5            THE COURT:  On that very narrow issue?

 6            MS. LEVY:  (Examining)

 7                    RECROSS-EXAMINATION

 8            MS. LEVY:  Q.  And in this letter that you

 9   wrote William, you told him you didn't like how T was

10   coming at you; is that right?

11   A.    Yes.

12   Q.    And what do you mean by that?

13   A.    We all had a discussion about the situation to

14   find out the truth about it.

15   Q.    You, William and --

16   A.    T.

17   Q.    -- T?

18   A.    Yes.

19   Q.    And so you were talking about how T was talking

20   or responding during that three-way conversation?

21   A.    Yes.

22            MS. LEVY:  I have no further questions, Your

23   Honor.

24            MR. STALLWORTH:  Nothing further, Your Honor.

25            THE COURT:  Thank you.  Ms. Moore, you will be

26   excused at this point for evidentiary purposes, but you

27   will be subject to recall.

28            MR. STALLWORTH:  Call as our next witness
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   Sergeant Phil Green.
 2                          PHIL GREEN,
 3                  called as a witness on behalf of
 4                  the People, after having been
 5                  first duly sworn, testified as
 6                  follows:
 7            THE CLERK:  Sergeant, after you are seated,
 8   police spell your first name and spell your last name.
 9            THE WITNESS:  Yes, ma'am.  My name is Phil
10   Green, P-h-i-l, G-r-e-e-n.
11            THE CLERK:  Thank you.
12                     DIRECT EXAMINATION
13            MR. STALLWORTH:  Q.  Good morning, Sergeant
14   Green.
15   A.    Good morning, sir.
16   Q.    How are you doing?
17   A.    I'm fine.  Thank you.
18            THE COURT:  Sergeant Green, why don't you hand
19   me that cup of water to your left so it doesn't get
20   knocked over.
21            THE WITNESS:  Thank you, sir.
22            MR. STALLWORTH:  Q.  By whom are you employed?
23   A.    By the Oakland Police Department.
24   Q.    How long have you been employed with the Oakland
25   Police Department?
26   A.    Slightly over ten years.
27   Q.    How long have you been a sergeant?
28   A.    Since July 1999.  I'm sorry.  '97.
```

GERALD A. DOHRMANN, C.S.R.#2046

1   Q.      What's your current assignment?

2   A.      I'm a sergeant assigned to the Homicide Section.

3   Q.      How long have you been working in the Homicide

4   Section?

5   A.      Since December of 1999.

6   Q.      In July of 2000, approximately how many homicide

7   cases had you investigated either as a primary or

8   secondary detective?

9   A.      I'd estimate I investigated approximately seven

10  as the primary and either as a secondary or loosely

11  involved in maybe 30 cases by that time.

12  Q.      On July 16th of 2000, were you working in the

13  homicide department then?

14  A.      Yes.

15  Q.      And around 7:00 p.m. that evening did you get a

16  call out to a possible homicide near 30th and San Pablo

17  in West Oakland?

18  A.      Yes.

19  Q.      What did you do when you first received that

20  phone call?

21  A.      I was at home at the time.  So, I had to get

22  ready.  I made notification to my partner at the time,

23  Sergeant Lou Cruz, made sure he was aware of the call

24  and then we both began to respond to the location.

25  Q.      Can you give us a brief summary on the protocol

26  that's used to determine who gets the phone call and

27  what particular day regarding what particular homicide?

28          MS. LEVY:  Objection, Your Honor.  Irrelevant.

GERALD A. DOHRMANN, C.S.R.#2046

1    THE COURT:  Overruled.

2    THE WITNESS:  The procedure is there is two

3    homicide sergeants assigned to a standby duty.  That

4    duty goes from 7:00 or 9:00 in the morning on a Friday

5    until 9:00 in the morning the following Friday.  During

6    that one-week time, those two investigators will receive

7    every homicide call-out, whether it's a murder, an

8    officer involved with a shooting, a suspicious death.

9    And whoever had the most recent case would be the

10   secondary, meaning, you know, if I hadn't had a case for

11   a while, and Sergeant Cruz, for example, had one earlier

12   in the week, then I would be able to call up.  So, I

13   would be the lead on the case.  That's how it works.

14   MR. STALLWORTH:  Q.  Did that situation exist

15   on July 16th around 7:00 p.m. of 2000?

16   A.    Yes.

17   Q.    Did you get the call from home?  Can you tell us

18   again what was one of the first things you did?

19   A.    One of the first things I do, actually, get

20   dressed, get my suit on, and got my things together, so

21   I can begin to drive again right away.  I believe some

22   time after I left the house, I got had ahold of Sergeant

23   Cruz via cell phone.

24   Q.    What did you do after you got ahold of Sergeant

25   Cruz?

26   A.    I met with Sergeant Mufarreh, who was the

27   on-scene sergeant, patrol sergeant.

28   MS. LEVY:  Excuse me, Your Honor.  May we

```
1   approach briefly?
2            THE COURT:  Yes.
3            (Short discussion off the record)
4            MR. STALLWORTH:  Q.  Can you tell us again,
5   Sergeant Green, why it is that you first talked to
6   Sergeant Mufarreh?
7   A.    I don't -- I don't know if the patrol desk who
8   makes the call had asked me to call him or if I just
9   called him on my own.  I know the patrol desk would have
10  needed to give me his cell phone number but I didn't
11  know if he asked to be contacted or not or if I did it
12  on my own.
13  Q.    When you talked to Sergeant Mufarreh, is he at
14  the actual crime scene, 30th and San Pablo, when you
15  speak to him?
16  A.    I believe he was.  But I can't be certain of
17  that.
18  Q.    And what is his role while he is at the crime
19  scene, if you know?
20  A.    As the scene sergeant, he's responsible for the
21  entire scene, directing the officers at the scene to
22  make sure the scene is secured, which means blocked off
23  from foot and vehicular traffic, make sure if there's --
24  make sure if there's witnesses there, they are contacted
25  and an officer is assigned to that witness to take
26  statements or get descriptions.  They are responsible to
27  make sure a technician arrives.  Any follow-up,
28  preliminary follow-up investigation should be handled by
```

GERALD A. DOHRMANN, C.S.R. #2046

1    the scene sergeant, meaning all of the initial steps to

2    locate and identify a suspect prior to my arrival should

3    be handled by that sergeant, as well as make notifi-

4    cations if they need me to come out to notify the watch

5    commander, and et cetera.

6    Q.    Did Sergeant Mufarreh give you a summary of

7    having done some of those things you just mentioned?

8    A.    Yes.

9    Q.    And having received that summary from Sergeant

10   Mufarreh, do you remember whether or not a person

11   without giving me his name was identified as a suspect

12   in this particular homicide?

13   A.    Yes.

14   Q.    After receiving this information from Sergeant

15   Mufarreh, what's the next thing that you remember doing?

16   A.    I remember arriving at the.scene.

17   Q.    And would that have been around 8:05 p.m.?

18   A.    Yes, sir.

19   Q.    What do you remember about the crime scene when

20   you first arrived?

21   A.    I remember for a July evening it was a little bit

22   on the cooler side, maybe a bit overcast.  The scene was

23   blocked off with police -- yellow police tape at 30th

24   and San Pablo, and about mid-block, which would have

25   been east of San Pablo.  I remember there was some foot

26   traffic on San Pablo as well as vehicular traffic.

27   There of were several police cars there, a technician

28   was there, and Sergeant Mufarreh was there.

1    MR. STALLWORTH:  I'm going to refer to what's

2    already been premarked as People's No. 2.

3    Q.    Sergeant Green, taking a look at People's No. 2,

4    to you recognize what those photos depict in People's 2?

5    THE WITNESS:  May I approach, sir?

6    THE COURT:  Yes.

7    THE WITNESS:  (Examining)  I'm not sure what

8    the orientation on all of the photographs, but

9    generally, yes.

10    MR. STALLWORTH:  Q.  And with regard to the

11    photographs A through D, there is a person being

12    administered to.

13    I guess I should have asked this question first.

14    When you arrived, was the victim still at the crime

15    scene?

16    A.    No, sir.

17    Q.    So, when you are looking at People's 2, the

18    photographs that you are referencing are starting from

19    the second row E through R; is that fair to say?

20    A.    Yes, sir.

21    Q.    And looking at photographs E through R, do you

22    recognize that area as being the area as you remember

23    seeing it on July 16th of 2000, 30th and San Pablo?

24    A.    Yes, sir.

25    Q.    What are some of the things you first do when you

26    arrive at the crime scene?

27    A.    I usually get a walk-through of the scene either

28    by the primary reporting officer, the sergeant or

```
1   technician.
2   Q.    Do you remember doing that in this particular
3   case?
4   A.    Yes, I believe it was technician Vigilienzone.
5   Q.    Anything that you remember about, or anything
6   that you made a mental note of when you first started to
7   do the walk-through of the scene?
8   A.    Nothing in particular, sir.
9   Q.    Does the technician give you an idea of what type
10  of, if any, evidence of weapons or strike marks or
11  anything like that were in the area?
12  A.    I don't recall at that time if -- if he had
13  mentioned a possible pellet being recovered.  I can't
14  say for sure.  At some point I learned it might have
15  been a pellet, like a BB pellet recovered.  He did
16  direct me to the area of a pay phone where he had
17  mentioned that the body was before my arrival.
18  Q.    Did you notice anything or not notice anything in
19  particular about this particular crime scene when you
20  got there?  Let me rephrase the question.
21        What were you looking for, if anything, when you
22  got to the crime scene?
23  A.    Well, the one thing I look for is any evidence
24  that may have been overlooked.  I like to try to and
25  orientate myself with the scene as far as the conditions
26  out there at the time, whether there's witnesses in the
27  area or not, different locations where someone could
28  have had a vantage point of the scene.  I make sure that
```

GERALD A. DOHRMANN, C.S.R.#2046

1   the canvass has been done to my satisfaction, meaning

2   looking for witnesses.

3   Q.   At that point when you were at the crime scene,

4   has Sergeant Mufarreh already given you a summary of

5   what some witnesses have said transpired regarding the

6   investigation of your homicide?

7   A.   Yes.

8   Q.   Based on that information, do you try to find any

9   corroborating physical evidence or anything that is

10  useful with regard to what you know about what may have

11  just transpired?

12  A.   Yes, but it's a little bit broad.   Not sure

13  exactly what you mean by it.

14  Q.   Sure.   Based on what you were told by Sergeant

15  Mufarreh, did you find any physical evidence

16  corroborating any of that information?

17  A.   Not evidence per say.   I mean there is witnesses

18  there, and the story that I was told, you know, is

19  definitely possible it could have happened the way it

20  was described to me based on the setting there.

21  Q.   And the information that you were given, were you

22  told how many shots had been fired?

23  A.   Yes.

24  Q.   And what were you told?

25  A.   It was either one or two shots.

26  Q.   And did you see any evidence of anything other

27  than one or two shots being fired --

28  A.   No.

GERALD A. DOHRMANN, C.S.R.#2046

| | |
|---|---|
| 1 | Q.      -- when you looked at the crime scene? |
| 2 | A.      No, I didn't. |
| 3 | Q.      And the information that you were given for the |
| 4 | purposes of your investigation, were you told whether or |
| 5 | not there were any type of struggle, any type of |
| 6 | exchange with any gunfire? |
| 7 | A.      No, I was not. |
| 8 | Q.      And having that conversation, did you see any |
| 9 | evidence of an exchange of gunfire, any other strike |
| 10 | marks, or anything to suggest to you in your experience |
| 11 | that something more than one shot was fired? |
| 12 | A.      No. |
| 13 | Q.      While you were at the crime scene, do you check |
| 14 | to see what type of calls if any are being made into the |
| 15 | Oakland Police Department regarding the shooting? |
| 16 | A.      While I'm at the scene, not necessarily. |
| 17 | Q.      When you are at the crime scene, do you or are |
| 18 | you directed to people who have been identified as |
| 19 | possible witnesses? |
| 20 | A.      Yes. |
| 21 | Q.      And while you are at the crime scene, did you |
| 22 | have an opportunity to talk to someone that is |
| 23 | identified to you as a Richard Davis? |
| 24 | A.      Yes. |
| 25 | Q.      How did Richard Davis appear to you physically |
| 26 | when you met and spoke with him at the crime scene? |
| 27 | A.      Well, he seemed fine.  He was in the back of a |
| 28 | police car.  He was coherent. |

1          In my brief conversation with him in the back of

2     the police car, he didn't appear to be under the

3     influence of any intoxicants or drugs.

4          The reason I even spoke with him initially when I

5     was told by Officer Hazel that --

6          MS. LEVY:  Objection, Your Honor.  I'm

7     concerned about maybe we should approach.

8          MR. STALLWORTH:  I will get out of there.

9          THE COURT:  Next question.  I think she is

10    concerned about a hearsay response.

11        Next question.

12        THE WITNESS:  Yes, sir.

13        MR. STALLWORTH:  Q.  Without telling me what

14    if anything Mr. Dandy told you, did he appear

15    cooperative?

16    A.    Yes.

17    Q.    I'm sorry.  I said Mr. Dandy.  The person you

18    spoke to was identified to you as Richard Davis.

19    A.    Yes.

20    Q.    Did you speak with any other person identified as

21    a witness while at the crime scene?

22    A.    No.

23        THE COURT:  Would it be good time for the noon

24    recess?

25        MR. STALLWORTH:  Yes.

26        THE COURT:  We will take the noon recess.

27        Please remember the Court's admonitions not to

28    discuss the case, or form or express any fixed or other

1    opinion, or to do any independent investigation or

2    research.

3         We will be in recess until 1:30.

4         (Whereupon, the luncheon recess was taken)

5                    ---o0o---

1          **- AFTERNOON PROCEEDINGS -**

2                    ---o0o---

3          (Whereupon, the following proceedings were had in

4    open court with the presence of the jury)

5              THE COURT:  Jurors and alternates have

6    rejoined us; both counsel are present, as is Mr.

7    Kilgore.  Sergeant Green remains on the stand.

8          Good afternoon.

9              THE WITNESS:  Good afternoon, sir.

10             MR. STALLWORTH:  Q.  Good afternoon, Sergeant

11   Green.

12   A.     Good afternoon.

13   Q.     How are you doing?

14   A.     Fine.  Thank you.  And you?

15   Q.     Just fine.

16         After you met with and spoke to Terry Dandy, did

17   you have an opportunity to meet with and interview

18   Bianca Moore around 12:05 a.m. on July 17th, 2000?

19   A.     Yes.

20   Q.     And how did Bianca Moore appear to you when you

21   first saw her?

22   A.     She appeared distraught.  She was upset.  She was

23   coherent, not under the influence of any alcohol or

24   drugs that I could determine.  She didn't appear to be

25   too thrilled to be down at my office.

26   Q.     How long did you question Bianca, if you can

27   remember?

28   A.     I don't recall for sure.  I can refer to my notes

```
 1   to look at that, but --
 2   Q.     Do you have your notes in front of you?
 3   A.     Yes, sir.
 4   Q.     With the Court's permission, I'll give you a
 5   moment to refer to your notes.  When you have, let me
 6   know.
 7   A.     (Examining)  Looks like only about 21 minutes
 8   that we actually spoke.
 9   Q.     Do you know how long Bianca had been at the
10   police department before she had an opportunity to speak
11   with you?
12   A.     Let's see.  About 8:55 p.m. she was actually
13   placed in an interview room at the police department.  I
14   asked to escort her to the restroom around 9:30.  That's
15   when we first met, if you will, or spoke.  But the
16   interview didn't start until after five minutes after
17   midnight.
18   Q.     So, roughly between two to three hours before you
19   even spoke to her, she was in the interview room at the
20   police department.
21   A.     Yes, sir.
22   Q.     As far as you can remember, did it appear that
23   Bianca Moore was being cooperative with you during your
24   interview?
25   A.     Yes.
26   Q.     After you had your interview with Bianca Moore,
27   did you have in your mind at that point an idea of who
28   the suspect might be in this homicide investigation?
```

1  A.     Yes.

2  Q.     Who was that person?

3  A.     Ivan Kilgore.

4  Q.     What had you based that on at that point?

5  A.     Based on witness statements; based on the

6  information gathered at the scene; based on a call that

7  had come in moments after the reported shootings from a

8  person identified himself as Ivan Kilgore, trying to

9  report his car stolen.

10 Q.     When did you first become aware of the call that

11 was made by a person who identified himself as Ivan

12 Kilgore?

13 A.     That was before I even made it to the scene.

14 Sergeant Mufarreh had told me over the telephone.

15 Q.     What if anything did you do in order to verify

16 that someone identified himself as Ivan Kilgore had

17 called and reported a car stolen?

18 A.     I ordered a radio purge from the radio room or a

19 printout of the calls that come in.

20        MR. STALLWORTH:  May the record reflect that

21 I'm referring to what has been premarked as People's 8

22 B.

23        May I approach the witness, Your Honor?

24        THE COURT:  Yes.  What was that marked as?

25        MR. STALLWORTH:  8-B.

26        THE COURT:  Thank you.  That's a two-page

27 document.

28        MR. STALLWORTH:  It is a three-page document.

```
 1              THE COURT:  And that's a purge?

 2              MR. STALLWORTH:  A purge.

 3              THE COURT:  I'm sure you will have the witness

 4   explain what that is.

 5              MR. STALLWORTH:  Yes.

 6   Q.     Sergeant Green, handing you what's been marked as

 7   People's 8-B, do you recognize what that document is?

 8   A.     (Examining)  Yes, sir.

 9   Q.     And how do you recognize it?

10   A.     Couple ways.  This is a standard format for the

11   Oakland Police radio --

12              MS. LEVY:  The defense is to stipulate that's

13   a printout of the Oakland Dispatch from the evening of

14   July 16th, 2000, or a copy of it, perhaps.

15              THE COURT:  And perhaps then the sergeant

16   could explain what it is --

17              MR. STALLWORTH:  Exactly.

18              THE COURT:  -- since it's not a word-for-word,

19   how it gets created.

20              MR. STALLWORTH:  Very true.

21   Q.     Is that the purge that you requested to be

22   printed out regarding the information about an Ivan

23   Kilgore calling in and reporting a stolen vehicle?

24   A.     Yes.  It's actually the entire purge from the

25   initial call, and meaning the initial call of the

26   shooting and the subsequent reported auto theft.

27   Q.     A combination of both:  The initial calls into

28   the Oakland Police Department regarding the shooting,
```

1   and the person identified himself as Ivan Kilgore about

2   a stolen vehicle.

3   A.    Yes, sir.

4   Q.    Could you tell the jury what a purge is?  What

5   that means?

6   A.    Well, having never worked the radio room, I don't

7   know exactly how it all falls into place.

8         But basically when a call comes in into the radio

9   room, the dispatcher receives a call and immediately

10  starts typing.

11        Everything done in the city, whether it's a phone

12  call coming in or an officer made a car stop, is

13  assigned an instant number, which relates to the order

14  in which it's received, starting at midnight throughout

15  the rest of the day for that particular date.

16        From those, you can go up and pull specific

17  incidents and just get on the computer screen and print

18  out just the specific incident you are talking about.

19        Some of them are very, very lengthy.  Some are

20  just one line where it might say a dispatcher took a

21  break and new dispatcher came on.  But everything is on

22  that terminal.

23        So, this would be a -- page 1 and page 2 appear

24  to be a copy of the purge from the initial shooting, and

25  page 3 is a copy of the purge from the reported auto

26  theft.

27  Q.    When you received that information, those three

28  pages, did you also receive a tape at that point?

```
 1   A.     No, sir.  I requested one.
 2   Q.     How soon after did you eventually get a chance to
 3   hear the tape that reflected what you see in People's
 4   8-B?
 5   A.     I don't recall.  Usually it takes a week or two
 6   to get the tape.
 7   Q.     Sometime later did you listen to the tape that is
 8   reflected in the accounts on People's 8-B?
 9   A.     Yes.
10   Q.     What you heard on that tape, does it correlate to
11   what you see referenced in People's 8-B?
12   A.     Yes.
13   Q.     Have you recently had an opportunity to listen to
14   the 911 tape and the information regarding the report of
15   the stolen vehicle by Ivan Kilgore?
16   A.     Yes.
17   Q.     And have you looked at a transcript that was
18   prepared that attempts to reflect or reference the
19   information in the 911 call and the information
20   regarding Ivan Kilgore's, or the person identified
21   himself as Ivan Kilgore reporting a stolen vehicle?
22   A.     Yes.
23   Q.     And does that purport to reference and correlate
24   with the purge sheets identified in People's 8-B?
25   A.     It does.  I noted there was errors in this
26   transcript, in this transcription.  Obviously, some of
27   the terms that were used weren't understood by the
28   person transcribing.  But it did generally reflect what
```

```
 1   occurred and what was said.
 2   Q.     Referring to what has been premarked as People's
 3   8-A, it is a seven-page document which is the trans-
 4   cription of the information that comes from the 911
 5   calls and the report of a stolen vehicle that's
 6   referenced in People's 8-B.
 7        Showing you, with the Court's permission,
 8   People's 8-A, do you recognize that transcript?
 9   A.     (Examining)  Yes.
10   Q.     Is that the transcript you reviewed after
11   listening to the information on the tape regarding 8-B?
12   A.     Yes, this is a copy.  I believe the copy I had
13   another face sheet saying who transcribed it and
14   whatnot.  But this looks like a copy of the same.
15        MR. STALLWORTH:  At this time, Your Honor, the
16   record should reflect that I have placed in the tape
17   recorder what has already been marked as People's 8.
18   It's the tape of the 911 calls and the information
19   regarding the person who identified himself as Ivan
20   Kilgore.
21        I've also made copies of the transcription that
22   would hopefully allow the jury to follow along as best
23   they can.
24        With the Court's permission, I would like to play
25   the tape; but before doing that, hand out the tran-
26   scripts to the jury.
27        THE COURT:  Ms. Levy?
28        MS. LEVY:  No objection, Your Honor.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1          THE COURT:  So, I'm going to allow you to see
 2   the transcription.  And, again, just as the sergeant
 3   testified, in this particular one, there are apparently
 4   some errors that he noticed in listening to it.  The
 5   transcription itself is not evidence to the extent that
 6   it's relevant to this matter.  What's on the tape is
 7   relevant.
 8          And I'm going to ask, if you would, please, Mr.
 9   Stallworth, to give Sergeant Green a copy of it.
10          MR. STALLWORTH:  A additional one?
11          THE COURT:  Well, what I want to ask him to do
12   is to follow along and listen to it at the same time
13   it's being played along with the transcription, and if
14   he sees an error that he mentioned, put a little
15   checkmark so he can clarify that after the conclusion of
16   it.
17          THE WITNESS:  I may have a clean copy here.
18          MR. STALLWORTH:  Q.  I have an extra copy
19   unless you got one right there.
20   A.     Thank you.
21          THE COURT:  You don't have another one, do
22   you?
23          MR. STALLWORTH:  I will give you People's 8-A,
24   if that's okay.
25          THE COURT:  I won't mark it.
26          MR. STALLWORTH:  Okay.
27          I gave the reporter a copy, and I would also
28   stipulate that the reporter need not report the tape.
```

```
 1              MS. LEVY:  So stipulated, Your Honor.

 2              THE COURT:  On behalf of Mr. Dohrmann, thank

 3   you.

 4              THE COURT:  Does Sergeant Green understand

 5   what I'm asking to you do?

 6              THE WITNESS:  Yes, sir.

 7          (Whereupon, the tape is played to the jury as

 8   follows:)

 9              "QUESTION:  (Unclear)

10              "ANSWER:  Hi, Oakland C.H.P.  There

11              was shots fired 30 at that San

12              Pablo.  A young man was shot with a

13              gun.

14              "QUESTION:  (Unclear)

15              "ANSWER:  I did transfer the caller

16              to the ambulance.  So, what further

17              can I give you?

18              "QUESTION:  (Unclear)

19              "ANSWER:  I didn't get anything like

20              that, cause I wanted --

21              "QUESTION:  (Unclear)

22              "ANSWER:  Yes, I do.  Her name was

23              Dorothy.  Her cell is 510-290-3451.

24              And we do have another call on it.

25              Let me find out if they have further

26              information.

27              "QUESTION:  Could you put in lock

28              2046?
```

```
 1            "ANSWER:  All right.  They're
 2            transferring the information to me.
 3            I'm sorry for taking the time on
 4            this.
 5            "QUESTION:  We're already on the way
 6            there.
 7            "ANSWER:  Okay.  What she said when
 8            I connected to the ambulance was she
 9            heard a noise, she saw someone call
10            and she knew they'd been shot.
11            "QUESTION:  (Unclear)
12            "ANSWER:  I didn't find out how many
13            shots were fired.  If they were
14            rapid, I didn't get any information
15            on that.  Cause I wanted to get the
16            medical rolling.
17            "QUESTION:  That's okay.  (Unclear).
18            2046.  Said someone else is calling
19            in on it?
20            "ANSWER:  There was a second call on
21            it.  One of the other call takers is
22            giving me the information on it now.
23            "QUESTION:  (Unclear)
24            "ANSWER:  Okay.  Okay.  It's a
25            (Unclear) William Adam Robert David
26            is the grandmother.  Her number is
27            the 510-290-3790.
28            "QUESTION:  And this is the grand-
```

```
 1              mother of the victim?
 2              "ANSWER:  Yes.  Did they say old the
 3              victim was?  No.  Did she say how
 4              many shots were fired?  (Unclear).
 5              All she said was that my grandson
 6              has been shot and she was
 7              hysterical.
 8              "QUESTION:  Okay.  (Unclear)
 9              "ANSWER:  All right.  Thank you,
10              Oakland."
11          (Gap in tape)
12              "QUESTION:  Good.  Hello.  Is this
13              Dorothy?
14              "ANSWER:  Yeah.
15              "QUESTION:  Hi, this is the Oakland
16              Police Department.  Do you have any
17              suspect information?
18              "ANSWER:  No.  (Unclear) the police
19              right here.
20              "QUESTION:  Oh, you talked to the
21              police already?
22              "ANSWER:  Yeah, they right here.
23              "QUESTION:  Okay.
24              "ANSWER:  All right."
25          (Gap in tape)
26              "ANSWER:  Hello.
27              "QUESTION:  (Unclear)
28              "ANSWER:  502-5700.
```

```
 1              "QUESTION:  502-5700?
 2              "ANSWER:  Yes, ma'am.
 3              "QUESTION:  (Unclear).
 4              "ANSWER:  Yes, ma'am.  I heard the
 5              noise.  Yes.
 6              "QUESTION:  Fire and medical, are
 7              you on the line?
 8              "ANSWER:  Yeah, I'm on the line.
 9              "QUESTION:  Oh, yes, ma'am, 30th and
10              San Pablo.  I need an ambulance here
11              quick.
12              "QUESTION:  You know what happened
13              there?
14              "ANSWER:  My nephew got shot.
15              "QUESTION:  Okay.  And so your phone
16              number is 502- --
17              "ANSWER:  2 just 205-7700.
18              "QUESTION:  (Unclear).  Yes.  Okay.
19              Bye-bye.  Sir, are you there?
20              "ANSWER:  Yes.
21              "QUESTION:  I noticed to ask you
22              some questions; okay?
23              "ANSWER:  Okay.
24              "QUESTION:  (Unclear) an ambulance,
25              and we're gonna be sending in
26              officers as well; okay?
27              "ANSWER:  Ah, yeah.
28              "QUESTION:  What's your name?
```

```
 1              "ANSWER:  My name is Bill Ward.
 2              W-A-R-D.
 3              "QUESTION:  Okay.  What does the
 4              person look like that did this?
 5              "ANSWER:  I don't know, ma'am.  I
 6              just -- I was in the house.  I heard
 7              some noise.  And his girlfriend come
 8              running down the street.
 9              "QUESTION:  (Unclear)
10              "ANSWER:  Yes, he's laying there on
11              the sidewalk.
12              "QUESTION:  When you came out of the
13              house, you just seen him laying in
14              the street?
15              "ANSWER:  Yes, ma'am.
16              "QUESTION:  Is the girlfriend there?
17              Can she tell you what he looks like?
18              The person that shot him.
19              "ANSWER:  Oh, I don't know, ma'am.
20              I just -- I'm running down the
21              street with my cellular, okay.  Here
22              come a police officer now.
23              "QUESTION:  (Unclear).
24              "ANSWER:  Yeah, he's coming up now."
25          (Gap in tape)
26              "QUESTION:  Police 35.
27              "ANSWER:  Hi, CHP.  I'm sure you got
28              the shots fired over on San Pablo?
```

```
1              "ANSWER:  (Unclear) San Pablo,
2          Uh-huh (indicating yes).
3              "ANSWER:  Yeah, and I have a phone
4          number just in case you're needed as
5          a witness or anything.  She just put
6          her phone down.
7              "QUESTION:  Okay.
8              "ANSWER:  It's 510- --
9              "QUESTION:  Okay.  Hold on.
10             "ANSWER:  Okay.  Okay.  Her number
11         is 510- --
12             "ANSWER:  Yeah, 332-9914.
13             "QUESTION:  And her name?
14             "ANSWER:  I don't know her name.
15         She just put the phone down.  I
16         couldn't get her back on the line.
17             "ANSWER:  (Unclear) witness?
18             "QUESTION:  No.  She just said that
19         somebody's been shot, and I went to
20         transfer it, and she just put the
21         phone down.
22             "ANSWER:  Okay.  Well, we got it.
23             "QUESTION:  Thanks.  Bye.
24             "ANSWER:  All right.  Bye-bye."
25        (Gap in tape)
26             "QUESTION:  Oakland Register 35.
27             "ANSWER:  Yes, I would like to
28         report my car stolen?
```

```
 1              "QUESTION:  Okay.  I'd ask you to
 2         call nonemergency line at 777-3333.
 3              "ANSWER:  Thanks."
 4         (Gap in tape)
 5              "QUESTION:  (Unclear).
 6              "ANSWER:  Yes, I'd like to report my
 7         car stolen.
 8              "QUESTION:  You know your license
 9         number?
10              "ANSWER:  Let me look in my box and
11         see if I can find it.  It was just
12         stolen, I guess, within the last 30
13         minutes.  I give you a description,
14         start off with that while I'm
15         looking?  Hello?
16              "QUESTION:  No.  Is the car
17         registered in your name?
18              "ANSWER:  Yes.
19              "QUESTION:  All right.
20              "ANSWER:  Hello?
21              "QUESTION:  Yes.
22              "ANSWER:  Yes, it's registered in my
23         name.  My name's -- can you do it by
24         that, cause I can't seem to find my
25         papers on it?
26              "QUESTION:  What's your last name?
27              "ANSWER:  Kilgore.  K-I-L-G-O-R-E.
28              "QUESTION:  K-I-L-G-O-R-E?
```

```
 1              "ANSWER:  Yes.
 2              "QUESTION:  What's your first name?
 3              "ANSWER:  Ivan.
 4              "QUESTION:  '85 Caddy?
 5              "ANSWER:  Yes.
 6              "QUESTION:  Okay.
 7              "ANSWER:  Why did it take so long
 8              for me to get through to y'all?
 9              "QUESTION:  Cause we're shorthanded
10              and (Unclear).
11              "ANSWER:  No, I've been on call for
12              like 30 minutes almost.
13              "QUESTION:  Yeah, we're shorthanded.
14              "ANSWER:  Oh, okay.
15              "QUESTION:  (Unclear) had a shooting
16              over there and everybody in the
17              neighborhood is calling in at the
18              same time.
19              "ANSWER:  Where?
20              "QUESTION:  We had a shotting in
21              Oakland, and everyone's calling in
22              at the same time.
23              "ANSWER:  Oh, today?
24              "QUESTION:  (Unclear)
25              "ANSWER:  510-433-5077.
26              "QUESTION:  The address?
27              "ANSWER:  509 Sycamore.
28              "QUESTION:  What type of Caddy is
```

1       it?

2       "ANSWER:  A Fleetwood.

3       "QUESTION:  It's a 4-door?

4       "ANSWER:  4-door.

5       "QUESTION:  What color?

6       "ANSWER:  Gray.

7       "QUESTION:  Thank you (Unclear).

8       "ANSWER:  Thank you.  Hello?

9       "QUESTION:  Yes.

10      "ANSWER:  What'd you say?

11      "QUESTION:  It looked like you

12      already called?

13      "ANSWER:  I already called?

14      "QUESTION:  Oh, you called on 911.

15      "ANSWER:  Yeah.  Yeah.

16      "QUESTION:  Okay.  Bye-bye.

17      "ANSWER:  Okay.  Thank you."

18     (Gap in tape)

19      "QUESTION:  13.

20      "ANSWER:  I'm sorry.  Where you

21      calling?

22      "QUESTION:  Affirm 909.

23      "ANSWER:  904, I need (Unclear) 7

24      x-ray 245 gunshot, 30th at San

25      Pablo.  Anybody need a break for a

26      245 shooting at 38th and San Pablo?

27      "QUESTION:  382 (Unclear).

28      "ANSWER:  320 on San Pablo.  30 on

GERALD A. DOHRMANN, C.S.R.#2046

```
 1              San Pablo.  Victim was either shot

 2              or stabbed.  He's on the corner.

 3              Fire and medical's en route.  1755

 4              no further details.

 5              "QUESTION:  Copy and (Unclear).

 6              "ANSWER:  904.

 7              "QUESTION:  If they don't want to

 8              copy that, I'll be en route up there

 9              as well.

10              "ANSWER:  904.

11              "QUESTION:  3Adam6, we're going that

12              way.

13              "ANSWER:  3Adam6 they can't be, 18

14              (Unclear) are at the ringer right,

15              that's --

16              "QUESTION:  No, we cleared the ring.

17              "ANSWER:  Okay.

18          (End of tape)

19          MR. STALLWORTH:  I should have the record

20  reflect that apparently there is some additional

21  information on this call in that that was not

22  transcribed given the long pause, as best we can, still

23  without requiring the Court to report it, or to play it

24  to see if it's legible or not legible, I guess.

25          (Tape being played, but no transcription on this)

26          (End of Tape)

27          MR. STALLWORTH:  Q.  Sergeant Green, having

28  listened to People's 8, were there any specific
```

```
 1    notations you made with regard to your ability to
 2    understand some of the information on that tape that's
 3    different from the transcript that I have given you,
 4    identified as People's 8-A?
 5    A.    Just a few.  Most of them are fairly insigni-
 6    ficant.  Some of the "unclears", I was able to make out
 7    better when I was listening on my own headset, as I am
 8    having a hard time picking it up here.
 9          But most of it has to do with, you know, just
10    identifying who is saying what, meaning the dispatcher
11    that gave the number, or just clarifying a few things
12    that were unclear.
13    Q.    Did you mark those on the clean copy that you
14    were given?
15    A.    Yes, I did.
16          MR. STALLWORTH:  May I have that marked as
17    People's next in order?
18          THE COURT:  Sure.
19          MS. LEVY:  Perhaps I could review it, Your
20    Honor, and see those changes.
21          THE COURT:  Sure.  It can be marked.  Why
22    don't you mark it 8, whatever the next letter would be.
23          MR. STALLWORTH:  8-C.
24          THE COURT:  C or D, or whatever it is.
25                          (Whereupon, People's Exhibit
                             No. 8-C marked for Identifi-
26                          cation)
27          THE COURT:  While you are looking at it,
28    Sergeant Green, apparently the transcript, or at least
```

1  the one I have marked as 8-A, sort of stops and there is

2  a gap on the tape and then it starts up again.  Were you

3  able to hear that other part?

4           THE WITNESS:  Just a little bit of it.  I mean

5  the general context was just asking for more resources,

6  asking for a technician.  And the technician was going

7  there.  Asking for an E.T.A. for medical, and they are

8  letting them know that the scene was clear for fire and

9  medical, which means they can come on there.

10          THE COURT:  I heard something about Fruitvale

11 Avenue.

12          THE WITNESS:  That was a separate incident.

13          THE COURT:  Different call.

14          THE WITNESS:  Well, that -- although most of

15 the talk was about that specific call, they did what

16 they call hold the air necessarily.  So, that means

17 other people, priority calls can still be dispatched.

18 That's what was going on with that.

19          THE COURT:  So, the part about Fruitvale

20 Avenue has no significance to your knowledge to this

21 particular incident.

22          THE WITNESS:  It sounded like it was an

23 entirely different incident with a different incident

24 number and everything.

25          MR. STALLWORTH:  Q.  Sergeant Green, showing

26 you again what's been marked as People's 8-B, can you

27 tell from that purge sheet, or maybe you know from your

28 investigation, what time it was when the first 911 call

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   came in on this homicide?
 2   A.     (Examining)  It's indicated on this form here as
 3   1747, which would be 5:47 p.m.
 4   Q.     And looking at the third page of People's 8-B,
 5   can you determine what time the caller identified
 6   himself as Ivan Kilgore called in to report the Cadillac
 7   stolen?
 8   A.     It's noted here as 1754:09, or 5:54:09 p.m.
 9   Q.     5:54?
10   A.     Yes, and 9 seconds.
11   Q.     Is that the 911 call or the second call?
12   A.     That is the --
13         THE COURT:  Just in listening to the tape, it
14   sounded like he called 911, the person called 911, and
15   were asked to call back on a nonemergency number?
16         THE WITNESS:  (Examining)  Yes, sir.  I can't
17   tell.  I don't know if it was --
18         THE COURT:  It shows the first call shows
19   relating to that incident was --
20         THE WITNESS:  Yes.
21         THE COURT:  -- 5:54 and 9 seconds.
22         THE WITNESS:  My -- my experience would tell
23   me that's coming in on the 911, because the dispatcher
24   referenced that on the normal call, saying, "You already
25   called."  So, they are putting it on the same incident,
26   both calls.
27         MR. STALLWORTH:  Q.  So, the first call into
28   911 reporting a shooting was at 5:47 p.m., and the call,
```

```
1   which is the person who identified himself as Ivan
2   Kilgore, was approximately around 5:54 p.m.
3   A.     Yes, sir.
4   Q.     With that information on your purge sheet, were
5   you able to trace where that phone call had come from?
6   A.     Yes.
7   Q.     And where did the trace lead you to?
8   A.     509 Sycamore and the unit was five.
9   Q.     What unit?
10  A.     Five.
11  Q.     Were you able to determine who lived at 509
12  Sycamore, unit No. 5?
13  A.     Yes.
14  Q.     Who was that person?
15  A.     Ivan Kilgore.
16  Q.     With the name of Ivan Kilgore, what did you do,
17  if anything, with regard to running the information or
18  checking out the driver's license, or anything like
19  that?
20  A.     Yeah, I ended up running the name on the computer
21  through D.M.V., found a license match with a residence
22  out of Pittsburg.  I ordered a photograph from D.M.V.
23  Q.     Did you give a BOL to arrest Kilgore, PC 187
24  around 12:45 a.m. on July 17th?
25  A.     Yes.
26         THE COURT:  And perhaps you could explain to
27  the jury what all that means.
28         THE WITNESS:  Yes, a BOL is a "Be on the
```

1  Lookout," and then to "arrest on PC" is to arrest on

2  probable cause.

3       So, what I did was call the Pittsburg Police

4  Department, not knowing if that Pittsburg address was a

5  good address or still a contact.

6       But feeling that perhaps Mr. Kilgore may go to

7  Pittsburg, two things, I wanted him arrested, and also I

8  didn't want an officer making a vehicle stop and have no

9  idea what they are walking up on, if in fact he is an

10  armed suspect.  In addition to that, I had the vehicle

11  entered as a felony vehicle.

12  Q.    And what does it mean to enter it as a felony

13  vehicle?

14  A.    When you enter a car on the system through

15  D.M.V., the police run the license plate.  The most

16  common way is a stolen vehicle.  So, an officer runs the

17  license plate and it will come back that that car is

18  stolen.

19       You can also enter it as lost or whatnot, or you

20  can enter it as a felony vehicle, which again, if an

21  officer stops it or runs the plate, they will know that

22  to use caution.

23       And then there is some other descriptors in the

24  field to contact me, and the registered owner is wanted

25  for murder, that sort of thing.

26  Q.    You mean when you first were made aware that

27  there was a person named Ivan Kilgore reporting a stolen

28  vehicle at Sycamore Apartments, did you try to get

GERALD A. DOHRMANN, C.S.R.#2046

```
 1  anyone to go over to the apartments?

 2  A.    Yes.

 3  Q.    And what happened when you tried to do that?

 4  A.    I told Sergeant Mufarreh over the telephone that

 5  I wanted him to go to the location and detain Kilgore.

 6  He said he eventually went there, and there was no

 7  answer at the door.

 8  Q.    What if anything else did you do with regard to

 9  the apartment complex and number that you traced back to

10  Ivan Kilgore?

11  A.    I asked Sergeant Mufarreh to take some officers

12  and secure the apartment and await the search warrant.

13  Q.    Were you responsible for obtaining a search

14  warrant before going into the apartment?

15  A.    Not exactly.  Can I explain?

16  Q.    Please do.

17  A.    I directed the officers to make entry into the

18  apartment prior to the search warrant to search for the

19  suspect and to secure the scene so we didn't have

20  officers standing outside the door and possibly a guy

21  behind the door with a shotgun.

22        As they were doing that, Sergeant Cruz began

23  preparing the search warrant for me.  I called in

24  Sergeant Olivas from home to help me further up along

25  the investigation, so I can interview without any delay.

26  It takes quite a while for a search warrant.

27  Q.    Were you shortly thereafter able to obtain a

28  search warrant?
```

1  A.    Yes, sir.

2  Q.    What did you do with the search warrant?

3  A.    We executed the search warrant, meaning we went

4  to the residence and searched it.

5  Q.    Approximately what time did you do that?

6  A.    I don't recall specifically.  Around 3:00 in the

7  morning, if I can look at my log here.

8  Q.    If you want a chance to refer to your notes, then

9  do so, and let me know when you are finished.

10  A.    Thank you.

11        THE COURT:  You mean you got some poor judge

12  out of bed at 3:00 o'clock in the morning to sign the

13  warrant?

14        THE WITNESS:  It was about 2:46 when the judge

15  signed the warrant, sir.  At 3:40 in the morning we

16  actually executed the warrant.

17        MR. STALLWORTH:  Q.  What did you mean by

18  "executed the warrant"?

19  A.    Sorry for that term.  That's what we use, though.

20  We served the warrant.  We went and conducted the

21  search.

22  Q.    Were you able to get into the house after the

23  house had -- the apartment unit had already been into

24  earlier?

25  A.    Yes, officers were standing by inside the unit.

26  Q.    No one had been found in the apartment in the

27  earlier attempt; is that correct?

28  A.    That's correct.

1    Q.      And when you get there, what do you see?

2    A.      Not a whole lot.  We basically took a couple of

3    items of indicia or, you know, papers with Mr. Kilgore's

4    name on it; took couple other items:  A watch cap, some

5    indicia with a woman's name on it, I don't recall the

6    name; and we jotted down some telephone numbers off the

7    caller I.D. on the phone.  That was about it.

8    Q.      Were you able to find any type of weapon in the

9    unit?

10   A.      No.

11   Q.      You said something about clothing.  Did you

12   retrieve any type of clothing from the unit?

13   A.      Yes.

14   Q.      What did you retrieve?

15   A.      A black knit-like beanie cap.  Watch cap.

16           MR. STALLWORTH:  May the record reflect I'm

17   referring to what has been premarked as People's 13?

18   Showing it to defense counsel.

19           May I approach the witness, Your Honor?

20           THE COURT:  Yes.

21           MR. STALLWORTH:  Q.  Sergeant Green, showing

22   you what's been marked as People's 13, do you recognize

23   that item?  First of all, can you tell us what that item

24   is?

25   A.      Yes, this is a black knit-style watch cap, beanie

26   cap.

27   Q.      And is that the beanie cap that you retrieved

28   from the apartment identified as being Ivan Kilgore's in

1  the early morning of July 17th, 2000?

2  A.    Yes.

3  Q.    Where did you retrieve this cap from?  What part

4  of the unit?

5  A.    The hall closet.

6  Q.    Referring to what has been premarked as People's

7  12, a poster board of a Thomas Guide map -- and I'm

8  going to ask Sergeant Green, with the Court's

9  permission, to look at People's 12 and see if he

10  recognizes the area depicted in People's 12, and if he

11  does, I'm going to ask him to speak up, because I know

12  he can speak up, and let us know what he recognizes

13  about People's 12, first of all.

14  A.    It's a blown-up version of most of West Oakland,

15  including Lake Merritt and parts of Alameda, Oakland

16  Estuary.

17  Q.    Handing you a light blue highlighter and ask you

18  to identify the area where you served or executed the

19  search warrant at 509 Sycamore Apartments in West

20  Oakland.

21  A.    (Examining)  (Marking)

22  Q.    Nice big circle there.

23  A.    (Marking).

24  Q.    I'm going to give you a yellow highlighter --

25  actually, an orange highlighter -- and ask you to

26  identify the area of 30th and San Pablo where you first

27  arrived at the crime scene in your investigation of the

28  homicide.

1   A.     (Marking)

2   Q.     Have a seat again.

3          In the early morning of July 17th, 2000, did you

4   also have an opportunity to interview a woman by the

5   name of Shanae Anderson?

6   A.     Yes.

7   Q.     As best as you can remember, how was her

8   demeanor, attitude and comprehension during your

9   interview?

10  A.     She was fairly upset during the interview,

11  meaning, you know, saddened.  We had informed her before

12  we interviewed her that Mr. Anderson had died.  So, she

13  was -- she's upset but fairly matter of fact, just

14  wanted to tell us what we wanted to know, or answer the

15  questions that we asked, and get out of there.

16  Q.     Did she appear cooperative under the circum-

17  stances?

18  A.     Absolutely, yes.

19  Q.     Later that morning, around 9:10 a.m., did you go

20  to the Coroner's Office to view the autopsy being

21  performed by Dr. Paul Herrmann?

22  A.     Yes.

23  Q.     Is that part of your protocol as the investigator

24  in a homicide?

25  A.     Yes.  One of the investigators goes down.

26  Usually it's the lead.  We try to.

27  Q.     And what if anything did you make note of in your

28  observation of the autopsy that was taking place of the

1  body of William Anderson?

2  A.    I noted, at the direction of the doctor, what

3  appeared to be eleven wounds to the abdomen and torso

4  area of Mr. Anderson, looked like couple of wounds to

5  his back, and like some bumps of some sort under the

6  skin on his back near the spine area, as well.

7          MR. STALLWORTH:   The record should reflect

8  that I'm now going to refer to what has been premarked

9  as People's 5.

10  Q.    Sergeant Green, do you recognize the person

11  depicted in People's 5?

12  A.    Yes, sir.

13  Q.    How do you recognize it?

14  A.    Well, first of all, I recognize the face and I

15  also recognize the injuries from the morning of the

16  autopsy.

17  Q.    In your experience as a homicide detective, what

18  in particular did you take note of regarding the

19  injuries of William Anderson as it relates to what

20  possible weapon may have been used?

21  A.    I got to say this is my first time that I had

22  seen what I thought was a shotgun wound during autopsy.

23  It's not necessarily common in our city.   I've seen

24  photographs of it, as well as speaking to Dr. Herrmann,

25  his opinion.   And I felt the same:   That was consistent

26  with an injury caused by a shotgun.

27  Q.    Later in the afternoon of July 17th, 2000, did

28  you receive some information about who the driver of the

```
 1   vehicle used in the homicide of William Anderson may

 2   have been?

 3   A.      Yes.

 4   Q.      How did you come to gather that type of

 5   information?

 6   A.      I was referred to a confidential informant.

 7   Q.      Was this someone that you had known, that you had

 8   worked with as a confidential informant, or someone

 9   referred to you?

10   A.      He was referred to me by my commanding officer,

11   Lieutenant Paul Berlin, who used to work homicide as

12   well as an investigator.

13   Q.      Were you able to come up with a name of the

14   person who was suspected as being the driver of the

15   vehicle used in this homicide?

16   A.      Yes.

17   Q.      And what name was that?

18   A.      Raymond Jones.

19   Q.      What did you do when you received the name of

20   Raymond Jones?

21   A.      I went up to my office, ran the name through the

22   system to see if I could find a match to that name.

23   Q.      Were you able to find a match?

24   A.      Yes, I was.

25   Q.      What did you do with that information?

26   A.      I took that information and I corroborated it

27   further.  Not only was I given a name but some

28   characteristics on his body and whatnot.
```

| | |
|---|---|
| 1 | Looking through our records and the photograph, |
| 2 | it was clear that the person I had identified as the |
| 3 | person who was described as being the driver. |
| 4 | Q.   Did you eventually try to contact or arrest the |
| 5 | person identified as the driver, Raymond Jones? |
| 6 | A.   Yes. |
| 7 | Q.   When did you do that? |
| 8 | A.   It was about 6:00 o'clock in the morning. |
| 9 | Q.   Where did you conduct this -- or where did you |
| 10 | find Raymond Jones that evening? |
| 11 | A.   At his place of employment, which was the Merritt |
| 12 | Bakery. |
| 13 | Q.   What did you do after you arrested Raymond Jones |
| 14 | at the Merritt Bakery? |
| 15 | A.   I had him transported to Homicide Section and we |
| 16 | interviewed him. |
| 17 | Q.   How did Raymond Jones appear to you when you |
| 18 | first made contact with him at the police department |
| 19 | before your interview? |
| 20 | A.   He seemed nervous, maybe scared.  He was -- he |
| 21 | was coherent. |
| 22 | Q.   Did he appear to be under the influence of any |
| 23 | type of alcohol? |
| 24 | A.   No, not at all. |
| 25 | Q.   Did he appear to be under the influence of any |
| 26 | type of drugs or narcotics? |
| 27 | A.   No. |
| 28 | Q.   Did he appear to understand the questions that |

1  you were posing to him?

2  A.    Absolutely.

3  Q.    Were you able to understand the answers as he

4  relayed to you?

5  A.    Yes.

6  Q.    Did you make Raymond Jones aware of why you had

7  arrested him at that point?

8  A.    Yes, I did.

9  Q.    What did you tell him?

10 A.    I told him he was under arrest for murder.

11 Q.    Do you remember what his response, if any, was at

12 that point?

13 A.    I don't recall specifically.

14 Q.    During the first part of your interview with

15 Raymond Jones, or you go on tape, does Raymond Jones

16 admit any involvement in the shooting of William

17 Anderson the day before?

18 A.    Yes.

19 Q.    And what does he tell you?

20 A.    He stated that he was the driver of the car both

21 before and after the shooting.

22 Q.    Does he initially from the beginning of the

23 interview tell you that he's the driver of the vehicle?

24 A.    At the very beginning of the interview, he did

25 not.  He ended up saying that he gave kind of a story of

26 his working and going home and making contact with the

27 defendant, but did not tell us that he was the driver.

28 Q.    How long did you speak with Raymond Jones before

| 1 | he revealed that he was the driver of the vehicle? |
|---|---|

1  he revealed that he was the driver of the vehicle?

2  A.    Probably about two and a half hours or so.

3  Q.    During that two and a half hour period of time,

4  did you make any type of physical threats upon Raymond

5  Jones?

6  A.    Absolutely not.

7  Q.    Did you make any type of promises or deals with

8  Raymond Jones with regard to what he might or might not

9  say?

10  A.    No.

11  Q.    Did you give Raymond Jones an idea of how far you

12  were along in your investigation of the homicide?

13  A.    I'm not sure I understand.

14  Q.    How much did you tell Raymond about what you knew

15  regarding or your suspicions of who was responsible for

16  the murder and how it transpired?

17  A.    I never told him that we had any names of anybody

18  we were looking at.  You know, that's something for him

19  to tell me.

20       But I did tell him he was identified as being in

21  the vehicle, and having involvement, and, you know, we

22  needed to hear what he had to say and his explanation,

23  you know, why and how he was involved.

24  Q.    Did you ever talk to Raymond Jones about whether

25  or not he could be a witness or a defendant in this

26  particular investigation?

27  A.    Not -- not flat out like that.  But basically,

28  you know, I told him how he'd be perceived by the D.A.,

GERALD A. DOHRMANN, C.S.R.#2046

| | |
|---|---|
| 1 | and what would be looked at throughout the case will be |
| 2 | his cooperation, his remorse, his honesty.  I also told |
| 3 | him that if he was honest with what happened, that a |
| 4 | D.A. team would come in and review what he had to say, |
| 5 | and perhaps they would talk to him. |
| 6 | Q.    Did Raymond Jones appear cooperative at that |
| 7 | point? |
| 8 | A.    I'm not sure it was exactly at that point, but he |
| 9 | ended up -- I remember one thing.  He had like a sigh |
| 10 | at one point and he asked for a break and I believe a |
| 11 | cigarette, and he would tell us what really happened. |
| 12 | Q.    Did Raymond Jones ever tell you that he saw the |
| 13 | defendant with the shotgun at any time before he |
| 14 | actually heard the shot while he was driving the |
| 15 | vehicle? |
| 16 | A.    He said he did not. |
| 17 | Q.    On July 19th, 2000, around 9:00 a.m., did you |
| 18 | receive information about where the vehicle, the |
| 19 | Cadillac in question, might be? |
| 20 | A.    Yes. |
| 21 | Q.    How did you come about that information? |
| 22 | A.    I received a call, and I don't remember if the |
| 23 | call -- if I received information on a note or if I |
| 24 | actually talked to the person myself.  I cannot recall. |
| 25 | But I received information via a phone call. |
| 26 | Q.    What type of information did you receive? |
| 27 | A.    I was told that the vehicle was parked somewhere |
| 28 | around the Round Table, I believe, near Lake Merritt. |

GERALD A. DOHRMANN, C.S.R.#2046

1   Q.    Did you have anybody go out there to see if the
2   vehicle was in fact in that area?
3   A.    Yes, I asked for Officer Mike Brown, who would be
4   working in that area that day, to see if he could search
5   the area and find it.
6   Q.    Was the vehicle recovered?
7   A.    Yes.
8   Q.    Did you have an opportunity to take a look at the
9   vehicle?
10  A.    Yes, I drove out there.
11  Q.    Referring to what has been marked as People's 7,
12  do you recognize the vehicle depicted in photographs S
13  through DD in People's 7, sergeant?
14  A.    Yes, although AA and BB, I never saw -- saw those
15  documents.
16  Q.    When you observed the vehicle, did you look in
17  the front seat? And I'm talking about photograph W
18  through Z, the middle row?
19  A.    I never entered the vehicle.  I looked through
20  the window.  I don't recall seeing what looks like a
21  club there in W and X.  I don't recall that.
22  Q.    What about the screwdriver on the right front
23  passenger's seat?  Do you have a memory as you sit there
24  now of whether or not you saw that there?
25  A.    Yeah.  I do recall a screwdriver.  Yes.
26        THE COURT:  And which picture was that?
27        MR. STALLWORTH:  Picture W.
28  Q.    Did you check to determine whether or not that

GERALD A. DOHRMANN, C.S.R.#2046

1   vehicle had any signs of forced entry when you visited
2   it?
3   A.      Yes, I looked.  I didn't see any forced entry at
4   all.
5   Q.      Was there any type of damage done to the ignition
6   or anything like that?
7   A.      No, sir.
8   Q.      Were the doors -- did the doors appear they had
9   been pried open or broken into, or anything of that
10  nature?
11  A.      No, but I do recall the right rear door was
12  unlocked.
13  Q.      Did you check the license plate number of the
14  vehicle and determine who it was registered to?
15  A.      Yes.  It was the same vehicle, the same license
16  that we were looking for earlier, registered to Ivan
17  Kilgore.
18  Q.      The same vehicle that was reported stolen on the
19  evening of July 16th, 2000, did it match the same
20  information that was given on that day?
21  A.      Yes.
22  Q.      On July 20th, 2000, did you put out a warrant for
23  the arrest of Ivan Kilgore for the murder of William
24  Anderson?
25  A.      Yes.  Actually, the D.A. files the charges and
26  the judge signs the warrant.  And I received a copy of
27  that warrant and entered it -- entered it into the
28  system, or had it entered into the system.

GERALD A. DOHRMANN, C.S.R.#2046

```
1   Q.    About two months later, in September of 2000, did
2   you receive some information on who might have been or
3   the person suspected of being the other passenger in the
4   vehicle?
5   A.    I didn't receive the information then, but I was
6   going through the file again and came across that
7   information.  Yes.
8   Q.    What did you come across?
9   A.    I came across a note from my current partner,
10  Sergeant Medeiros, that said that he received a phone
11  call from a person --
12           MS. LEVY:  Objection, Your Honor.  Hearsay.
13           THE COURT:  Sustained.
14           MR. STALLWORTH:  Q.  Were you able to check
15  and see -- I will ask you this way:  Were you ever able
16  to determine who the other passenger in the vehicle was?
17  A.    No.
18  Q.    What efforts did you make in order to determine
19  who that might -- person might have been?
20  A.    I called Richmond Police Department, ran checks
21  through our system and through D.M.V., trying to confirm
22  the name I was given, and also compare that against the
23  description that I was given by others describing that
24  person.
25  Q.    When you had the Cadillac, did you have the
26  Cadillac towed to Oakland Police Property?
27  A.    It was towed where it's photographed there, the
28  Eastmont Substation on 73rd Avenue.
```