```
 1   Q.      And did you have a GSR test performed on the
 2   vehicle?
 3   A.      That actually was requested by the D.A.'s office.
 4   But one was done.  Yes.
 5   Q.      And what is a GSR test?
 6   A.      A GSR is a gunshot residue test, or it's the
 7   collection aspect of it, anyway.
 8   Q.      What is the other aspect of the test?
 9   A.      The tests are routinely collected, meaning they
10   are small.  I don't know, little probe, I guess, if you
11   will, with some sticky stuff on the back, and it's
12   usually used on the hands and it's used on a car.
13           You attach the item, you seal that in a little
14   box, and we put it in evidence.  That's done numerous,
15   numerous times.
16           The second aspect would be having that actually
17   analyzed by the Crime Lab where they take it and do
18   whatever test they do to see if there is gunshot powder
19   or residue on that.
20   Q.      Was the first part are the GSR test done on any
21   part of the Cadillac?
22   A.      Yes.
23   Q.      And what part was that first part?
24   A.      I believe one sample was taken from the interior
25   right rear window area, and the second was on the
26   exterior of the same window.
27   Q.      And what is required for the second part of that
28   test to be completed?
```

GERALD A. DOHRMANN, C.S.R.#2046

1   A.     To have it actually analyzed is a decision made

2   by a senior member of the District Attorney's office as

3   well as either a commander of the Homicide Section or a

4   captain of the police department.

5   Q.     Was that second part done in this case?

6   A.     Not that I'm aware of, no.

7   Q.     Do you know why?

8   A.     It generally costs, and you evaluate the cost and

9   the need for the test to be done.

10  Q.     And in your investigation of this particular

11  homicide, did you see a particular need to have the

12  second part of the GSR test given?

13        MS. LEVY:  Your Honor, I object.  The answer

14  already came in, it was requested by the District

15  Attorney's office, not by the sergeant.  So, that

16  question seems illogical.

17        THE COURT:  I will allow it.

18        MR. STALLWORTH:  Q.  Based on your investi-

19  gation, did you see a need for the second part of the

20  GSR test to be done?

21  A.     No.

22  Q.     Why was that?

23  A.     Basically based on witness statements and what

24  evidence we did recover, I didn't feel there was any

25  doubt that there was a weapon fired from that vehicle.

26  Q.     If someone wanted to do the second part of that

27  test, is the evidence still available for that?

28  A.     It absolutely is.

1   Q.    In November of 2000, were you contacted by an

2   attorney with regard to checking on the status of your

3   homicide investigation of the murder of William

4   Anderson?

5   A.    I believe it was actually October 31st, and it

6   was a person who claimed to be an attorney, but I had no

7   proof of that.

8   Q.    Where did that call come from?  What area?

9   A.    That I don't know.

10  Q.    On November 1st of 2000, did you receive

11  information regarding the possible surrender of the

12  defendant, Ivan Kilgore?

13  A.    Yes.

14  Q.    What city did that information come from?

15  A.    Sacramento.

16  Q.    Based on that information, did you go to

17  Sacramento and arrest a person named Ivan Kilgore?

18  A.    Yes, I did.

19  Q.    Do you see that person here in court this

20  afternoon?

21  A.    Yes, I do.

22  Q.    Could you point to that person and describe what

23  he is wearing?

24  A.    The gentleman seated at the defense counsel with

25  the plaid shirt on, the checkered shirt.

26        MR. STALLWORTH:  Thank you.  May the record

27  reflect that the witness identified the defendant?

28        THE COURT:  It will.

```
 1            MR. STALLWORTH:  Q.  About five months later,
 2   April 2nd of 2001, did you have contact with a person
 3   named Matthew Bryant?
 4   A.    Yes.
 5   Q.    Would you describe the circumstances surrounding
 6   that contact?
 7   A.    Yes.  He was under arrest.  The arresting officer
 8   notified me he had had possible information regarding my
 9   homicide, and brought him to the Homicide Section to be
10   interviewed.
11   Q.    Were you specifically told about this particular
12   homicide investigation of the death of William Anderson?
13   A.    I believe it was.  I think that's how the officer
14   got in touch with me.  I think, you know, he gave the
15   details to whoever answered the phone, and they referred
16   him to me.
17            MS. LEVY:  Your Honor, I ask that that be
18   stricken.  It sounds like the officer doesn't know that
19   much.
20            THE COURT:  Well, it's pretty clear.  As to
21   that part, what the answer is, the answer is he's not
22   certain.
23            MR. STALLWORTH:  Q.  Did you meet with Matthew
24   Bryant after receiving that information?
25   A.    Yes.
26   Q.    Where did you meet with him?
27   A.    It's one of our interview rooms in the Homicide
28   Section.
```

1   Q.    Had you met Matthew Bryant before?

2   A.    No.

3   Q.    When you met with Matthew Bryant, can you give us

4   an idea of how you conducted the interview with him?

5   A.    (No response)

6   Q.    Was that too broad?

7   A.    Little bit too broad, I think.

8   Q.    Did you ask him questions about the homicide or

9   did you just let him tell you about what he knew?

10  A.    I started off, I just wanted to know exactly what

11  he's talking about, what he knew, or how he knew it.

12  So, it was kind of open for him to explain why he wanted

13  to come and talk to me.

14  Q.    Did he eventually have a conversation with you

15  about what he knew regarding your homicide investi-

16  gation?

17  A.    Yes.

18  Q.    How did he do that?

19  A.    I don't recall specifically.  I think it was

20  along the lines of his relationship with Mr. Jones.

21  Q.    Did you supply Matthew Bryant with any

22  information about the homicide investigation before he

23  started to tell you what if anything he knew about it?

24  A.    Are you meaning giving him details of the case

25  before he tells me?

26  Q.    Yes.

27  A.    No.

28  Q.    That would not be a way in which you would

```
 1   conduct an interview like that; is that fair to say?
 2   A.      Yeah.   That's fair to say.
 3   Q.      Are you sometimes contacted by people who tell
 4   you that they have information about a homicide that you
 5   are investigating?
 6   A.      Far too often.   Yes.
 7   Q.      Are you particularly critical of that type of
 8   information from people contacting you about it?
 9   A.      Absolutely.
10   Q.      Did you start off being particularly critical
11   about what if anything Matthew Bryant might be telling
12   you about your homicide investigation in this case?
13   A.      Yes.
14   Q.      When he began telling you about what he knew, did
15   it seem to corroborate any of the information you had
16   gathered already?
17   A.      Yes.
18   Q.      And in what way?
19   A.      In several ways.   His relationship with the
20   driver of the car, saying he had spoken with both the
21   driver and Mr. Kilgore; the fact that he said that --
22              MS. LEVY:   Object, Your Honor.   May we
23   approach?
24              THE COURT:   Sure.   This is hearsay.   Is there
25   an objection?
26              MS. LEVY:   Objection.
27              THE COURT:   Sustained to this hearsay.
28              MR. STALLWORTH:   As to Raymond Jones.   I'm
```

1   sorry.  Actually, double hearsay.  You're right.  I will

2   move to a different area, the best I can.

3   Q.     Did Matthew Bryant talk to you about trying to,

4   or being asked to recover a weapon that was used in the

5   murder of William Anderson?

6   A.     Yes.

7   Q.     And where did he tell you that he was allegedly

8   requested to recover that weapon from?

9   A.     I guess it was the attic, for lack of a better

10  term, of 509 Sycamore.  Basically an access area above

11  the building he apparently had to crawl into.

12  Q.     Did you have an officer go to that area as best

13  you could describe it to see if there was a weapon

14  there?

15  A.     Yes.  I had the officer come to my office first,

16  and explained the best I could where it was described as

17  being, and asked him to go search that area.

18  Q.     Did the officer go search that area?

19  A.     Yes, he did.

20  Q.     What did that officer report back to you with

21  regard to his attempts to find a weapon?

22  A.     He said he made it up into the attic area.  It

23  appeared there had been some recent activity up there,

24  and I believe even some work on the air-conditioning

25  unit, that type of thing, and he said he was unable to

26  locate any weapon.

27  Q.     Did he tell you whether or not there was some

28  areas in that attic that he was unable to get to because

```
 1  of how the items were configured?

 2  A.      I don't remember.

 3  Q.      Did Matthew Bryant appear to be under the

 4  influence of any type of narcotics when you spoke to

 5  him?

 6  A.      No.

 7  Q.      Did he appear to be sober and coherent?

 8  A.      Yes, he did.

 9  Q.      When you spoke to Matthew Bryant to have an

10  interview with him on tape, was he freely, voluntarily

11  giving you information about what he said he knew about

12  this homicide?

13          MS. LEVY:  Objection, Your Honor.  I'm going

14  to have -- how can this witness determine Mr. Bryant's

15  state of mind?

16          THE COURT:  Sustained.  It calls for a

17  conclusion.

18          MR. STALLWORTH:  Q.  Did you make any types of

19  threats or promises to Matthew Bryant with regard to the

20  information that he provided to you?

21  A.      No.

22  Q.      Did you make any deals with him regarding

23  information that he had given you?

24  A.      No.

25  Q.      Did you have an opportunity to speak to the

26  person who reported the vehicle stolen in which Matthew

27  Bryant was in custody for?

28  A.      Yes.
```

1    Q.    Who was that person?

2    A.    I don't recall her name, although I have it here.

3    I know she was the mother of his child.

4    Q.    Did she explain to you whether or not she was

5    willing to proceed with her complaint about the vehicle

6    being stolen?

7    A.    Yes, she said she didn't want to press charges.

8          MR. STALLWORTH:  May I have a moment, Your

9    Honor?

10         THE COURT:  Yes.

11         MR. STALLWORTH:  (Examining)  Thank you,

12   Sergeant Green.  I have no further questions at this

13   time.

14         THE COURT:  Let's take the afternoon recess at

15   this point.  Please remember the Court's admonitions.

16         We will be in recess for about 15 minutes.

17         (Whereupon, the mid-afternoon recess was taken)

18                      ---o0o---

19

20

21

22

23

24

25

26

27

28

```
 1                    - AFTER RECESS -

 2                       ---o0o---

 3        (Whereupon, the following proceedings were had in

 4   open court with the presence of the jury)

 5           THE COURT:  Jurors and alternates have

 6   rejoined us.

 7        Were you going to call a witness out of order?

 8        Ladies and gentlemen, I was informed during the

 9   recess that there would be one witness, this time a

10   witness for the prosecution, that would be called out of

11   order.

12           MR. STALLWORTH:  Yes.

13           THE COURT:  Relatively short witness --

14           MR. STALLWORTH:  Yes, Your Honor.

15           THE COURT:  -- in terms of time.

16           MR. STALLWORTH:  Yes.

17           THE COURT:  Any objection?

18           MS. LEVY:  No, Your Honor.

19           THE COURT:  Fine.  So, we will put Sergeant

20   Green on hold, see him again, I expect, in a few

21   minutes.  And the next witness would be --

22           MR. STALLWORTH:  Officer Allan Miller.

23                     ALLAN MILLER,

24              called as a witness on behalf of

25              the People, after having been

26              first duly sworn, testified as

27              follows:

28           THE CLERK:  Officer, after you are seated and
```

1    after adjusting the microphone, please spell your first

2    name and spell your last name.

3              THE WITNESS:  Officer Allan Miller, A-l-l-a-n,

4    Miller, M-i-l-l-e-r.

5                      DIRECT EXAMINATION

6              MR. STALLWORTH:  Q.  Good afternoon, Officer.

7    How are you doing?

8    A.      Pretty good, sir.

9    Q.      By whom are you employed?

10   A.      Oakland Police Department.

11   Q.      How long have you been employed with the Oakland

12   Police Department?

13   A.      Approximately three years.

14   Q.      Were you on duty April 2nd of 2001 around 1:30 in

15   the afternoon?

16   A.      Yes, I was.

17   Q.      Were you requested at that time by Sergeant Green

18   to go to the attic located on top of 509 Sycamore

19   Apartments to try to see if you could find a shotgun?

20   A.      Yes, I was.

21   Q.      Did you go to that area, the attic of 509

22   Sycamore Apartments, to look for a shotgun?

23   A.      Yes, I did.

24   Q.      And can you tell us what you remember seeing in

25   your efforts to try to locate a weapon?

26   A.      Responded to the apartment building.  I can't

27   remember how many stories exactly.  We went up one of

28   the flights of stairs.  It was accessible to everybody.

GERALD A. DOHRMANN, C.S.R. #2046

```
 1   Wasn't like you had to be a resident of the building to
 2   get into it.  No security gate or anything.
 3        Went up to the top of the stairs.  And at the
 4   very top of the stairs, there is an access panel for the
 5   attic.  Couple of other officers boosted me up to the
 6   access panel.  I lifted it up and peaked at it and
 7   realized there wasn't a lot of room.  I had to drop my
 8   gun belt in order --
 9        MS. LEVY:  I'm sorry.  I am missing some of
10   the officer's words.  I was going to --
11        THE COURT:  Sure.  If you would scoot your
12   chair closer, that's great, and little bit slower now.
13        THE WITNESS:  After I was boosted up -- is
14   that better? -- I picked up and I noticed that there
15   wasn't enough room for myself and my gun belt.  It was
16   pretty tight quarters throughout most of the attic.
17        MR. STALLWORTH:  Q.  Officer Miller, how tall
18   are you?
19   A.    Six-foot tall.
20   Q.    And about how much do you weigh?
21   A.    180 pounds.
22   Q.    You weighed about 180 pounds back in April of
23   2001?
24   A.    I think I was a little lighter.  I had just
25   gotten out of the Academy.  Probably about 10 pounds
26   lighter.
27   Q.    About the same height, though?
28   A.    Yes, I was.
```

GERALD A. DOHRMANN, C.S.R.#2046

1  Q.    Okay.  You can continue.  What did you see next?

2  A.    The roof of the attic was a flat roof.  It was

3  pitched at an angle.  It started approximately four

4  feet, I believe, and went down at an incline to where it

5  would touch with the floor of the bottom of the attic --

6  probably about a 20-degree pitch from one end to the

7  other.

8        I could see in the roof there was a number of

9  different support beams with nails that were protruding

10 through that were pounded through the top of the roof,

11 so to be careful you didn't hit your head on any of the

12 nails.

13 Q.    Did it appear there was still construction going

14 on in the attic?

15 A.    It appeared that there was construction recently

16 in the attic.  I could see a number of what appeared to

17 be new beer cans, construction materials, like silicone

18 containers, stuff that's normally left behind during

19 construction.

20 Q.    Were you able to physically stand up inside of

21 the attic once you got through the first part?

22 A.    I don't remember being able to stand up.

23 Q.    Were you mostly crawling then or were you --

24 A.    I started at squatting to be able to go through

25 most of it.  I had to step from beam to beam, but I

26 actually ended up on my chest, pulling myself along,

27 trying to check between all of the different beams.

28 Q.    And were you able to inspect every area of the

```
 1  attic?
 2  A.      No, I wasn't.
 3  Q.      What prevented you from inspecting all areas of
 4  the attic?
 5  A.      My size.
 6  Q.      In the areas where you were unable to go any
 7  further, could you see what was beyond that area?
 8  A.      Correct.
 9  Q.      What were you able to see when you were prevented
10  from physically being able to move to that area?
11  A.      You could -- from being on the support beams that
12  supported the ceiling below that run diagonally but
13  horizontally, there was what is called fire blocks,
14  blocks between the beams to keep fire from spreading.
15          So, you could look down the aisles of the floor,
16  but also there would be a fire block where you couldn't
17  see any further than that.
18          So, I went along as far as I could.  It was
19  probably approximately 20 to 30 feet of the roof space I
20  couldn't inspect.
21  Q.      How long were you up there?
22  A.      I think about an hour.
23              MR. STALLWORTH:  Thank you, Officer Miller.  I
24  have no further questions.
25                      CROSS-EXAMINATION
26              MS. LEVY:  Q.  Good afternoon, Officer Miller.
27  A.      Good afternoon.
28  Q.      And it sounds like you just had gotten out of the
```

```
 1   Academy when you went to do this errand on Sycamore?
 2   A.     Yes, I did.
 3   Q.     Couple weeks?  Couple months?
 4   A.     I'd been with the department for about five years
 5   prior to that as a reserve officer, but I was actually
 6   fully employed with them for probably two or three
 7   months at that point in time.
 8   Q.     And you mentioned that someone was trying to lift
 9   you up?  Did I understand that?
10   A.     Correct.
11   Q.     And your gun belt, which is kind of bulky, you
12   couldn't get through; correct?
13   A.     I don't know whether I couldn't get through with
14   it.  I could see, once I got up there, it would be more
15   of a hindrance, so I took it off and handed it down.
16   Q.     That's what I was going to ask you.  Did you take
17   your gun belt off?  And it sounds like you did.
18          The officer that was with you, what officer was
19   that?
20   A.     I believe it was Chuck Agalagua (phonetic).
21   Q.     I'm sorry?
22   A.     Agalagua.
23   Q.     Agalauga?
24   A.     Agalagua.
25   Q.     You wouldn't know how to spell that, would you?
26   A.     No, I wouldn't.
27   Q.     Is he shorter than you?
28   A.     Yes, he is.
```

1  Q.    Thinner than you?

2  A.    No.

3  Q.    Bigger than you?

4  A.    Bigger than me.

5  Q.    So, if you boosted him up, it would have been

6  even worse in terms of getting through the spaces that

7  you were --

8  A.    Correct, plus himself and Ray Samples (phonetic),

9  who is also there, they are about 10, 15 years older

10  than me, which makes it a little bit harder to get

11  around, also.

12        THE COURT:  Careful.

13        MS. LEVY:  Q.  When you finished there at 509

14  Sycamore, I'm sure you reported to the sergeant and

15  said, "I couldn't get up, couldn't get up and look

16  everywhere."

17  A.    Correct.

18  Q.    To your knowledge, did they send a nice, little,

19  thin, short officer get up in the area?

20  A.    I have no idea whether or not they did.

21  Q.    Now, the District Attorney asked you what you

22  could see, and you mentioned something about 20 or 30

23  feet of roof.  That's what you could kind of see through

24  the beams and the other materials you were describing?

25  A.    To my recollection, the attic space was probably

26  larger than this room.  It started about four-foot at

27  one end of height and went all the way down to nothing

28  where it touched with the floor, running lengthwise from

1   one end of the room with the other, with the support

2   beams that supported the ceiling below, which I believe

3   are like two by tens, two by twelves.  In every 10 to 12

4   feet between those were fire blocks, which was another

5   piece of wood.  So, you couldn't see straight down

6   throughout the whole roof.

7   Q.    I'm going to assume you were looking very hard

8   for a weapon up there.

9   A.    I was looking extremely hard.  I didn't know what

10  I was looking for, whether it was supposed to be a large

11  gun or small gun.  So, I was looking everyplace I could.

12      I did notice where the walls met with the floor

13  there is a lot of spaces where stuff could be dropped

14  down, also.

15  Q.    But from your careful observation, you saw no

16  metal or anything that you could say, "Oh, boy, I think

17  that might be a gun"?

18  A.    I saw nothing that looked like it could have been

19  a firearm.

20  Q.    Can you describe for me, when the other officer

21  was trying to boost you up, how big a space that was?

22      I mean I get the feeling it was just a narrow

23  area just to get in up there; am I correct?

24  A.    I think it was approximately standard size, about

25  two feet by three feet.

26      THE COURT:  Given your description, that was

27  what we call an access panel?

28      THE WITNESS:  Yes.

1           THE COURT:   In other words, it's something you
2    can get --
3           THE WITNESS:   Pick up and push.
4           THE COURT:   Sort of move it over --
5           THE WITNESS:   Yes, sir.
6           THE COURT:   -- and then go up through the hole
7    in the roof, basically.   Hole in the ceiling.
8           THE WITNESS:   Yes, sir.
9           MS. LEVY:   I have no further questions, Your
10   Honor.
11                      REDIRECT EXAMINATION
12          MR. STALLWORTH:   Q.   Just briefly.
13          So, initially to get into the attic, there is a
14   small area that you had to be boosted up to get into; is
15   that fair to say?
16   A.     Correct.
17   Q.     And then once you are in, that's when you find
18   the other areas that are too small up there, the fire
19   blocks that prevented you from moving around.
20   A.     Correct.   There is some places where the roof
21   went down with the fire blocks and you probably had
22   maybe two or three inches of space where something could
23   have been slid through.   But, on the other hand, you had
24   have to be a lot smaller to reach those points.
25   Q.     And then, lastly, just to get to the first point
26   where you were at, you got boosted into.   If you were
27   about six-three, 250 pounds, could you even have gotten
28   into that area if someone had boosted you?

1  A.    I think it's possible, depending on who was

2  helping you up.  I think the opening was big enough that

3  you could probably get into that.

4         MR. STALLWORTH:  Thank you, Officer Miller.

5         THE COURT:  There is always one more.

6                    RECROSS-EXAMINATION

7         MS. LEVY:  Q.  Just so I'm clear, that opening

8  that you were trying to get pushed up into is to get

9  into the attic.

10  A.    Correct.

11  Q.    And once you were in there, that's when it goes

12  down to zero, and you were trying to walk carefully on

13  the beams and watching the boxes?

14  A.    Correct.

15  Q.    You could have used someone like me up there,

16  huh?

17  A.    You could probably search more of it than I could

18  have.

19         MS. LEVY:  Thank you.  No further questions.

20         MR. STALLWORTH:  No further questions, Your

21  Honor.

22         THE COURT:  Thank you.

23      Just for the record, noting Ms. Levy appears to

24  be shorter than the six feet, stated by the officer.

25         MS. LEVY:  I will stipulate to that, Your

26  Honor.

27  ///

28  ///

1                           **PHIL GREEN,**

2                    called as a witness on behalf of

3                    the People, after having been

4                    previously duly sworn, testified

5                    further as follows:

6              THE COURT:  Welcome back.

7              THE WITNESS:  Thank you.

8              THE COURT:  Cross-examine.

9              MS. LEVY:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11             MS. LEVY:  Q.  Good afternoon, Sergeant Green.

12    A.     Good afternoon, ma'am.

13    Q.     Now, you were the lead investigator on this case;

14    is that true?

15    A.     That's true.

16    Q.     Now, you know we just heard from Officer Miller.

17    You saw him leave?

18    A.     Right.

19    Q.     When he got back from 509 Sycamore and said he

20    couldn't get up there, did you think to send a little

21    officer to go search around the attic?

22    A.     No.

23    Q.     And I'm going to ask you some questions.

24           Now, you, with the District Attorney, discussed

25    interviewing Mr. Matthew Bryant.

26    A.     Right.

27    Q.     And it seems pretty clear from your testimony you

28    did not send a call out to the jail and say, "Hey, I

```
 1   would like to see Mr. Raymond --" sorry.  Let me start
 2   and try that again.
 3          You interviewed Matthew Bryant.
 4   A.     Right.
 5   Q.     And he is the one that told you that Mr. Kilgore
 6   had called him and told him to go get the gun from the
 7   attic.
 8   A.     I don't know if it was call or they spoke in
 9   person.  But, yes, he asked him to do that.  Yes.
10   Q.     And Mr. Kilgore offered him five hundred dollars.
11   A.     Correct.
12   Q.     And Mr. Bryant never told you he got any money;
13   correct?
14   A.     Right.
15   Q.     And can you tell me how tall Matthew Bryant was
16   back in July of 2000?
17   A.     No.  I don't know.
18   Q.     Was he over six feet?
19   A.     I have no idea.
20   Q.     You don't remember if he was taller than you or
21   not?
22   A.     I really don't.
23   Q.     Now, you also discussed a gentleman named Richard
24   Davis.  You interviewed him?
25   A.     Yes.
26   Q.     And that was pretty shortly after the homicide?
27   A.     Right.
28   Q.     And can you tell me what he was wearing when you
```

```
 1   spoke with him?
 2   A.      No, I don't remember.
 3   Q.      Do you remember if he had a jacket or not?
 4   A.      I don't remember.
 5   Q.      And in fact you interviewed Ms. Moore, Ms.
 6   Anderson and Mr. Davis at the police department, not so
 7   much at the scene; true?
 8   A.      Right.
 9   Q.      And did anybody -- let me rephrase that.
10           When did you learn that Mr. Richard Davis isn't
11   Richard Davis but Terry Dandy?
12   A.      I believe sometime later on from where -- the
13   prosecutors in Municipal Court.
14   Q.      And that would have been roughly June of 2001;
15   does that sound about right?  At the Preliminary
16   Hearing?
17   A.      Yeah.  It would have been some time around then.
18   Maybe before.  I'm not sure exactly when.
19   Q.      Now, I'm also going to assume, being an Oakland
20   Police officer, it's not uncommon for people to lie to
21   you; true?
22   A.      True.
23   Q.      And it is more common that somebody being charged
24   will lie to you than a witness; true?
25   A.      Not necessarily.
26   Q.      And in fact this gentleman, Terry Dandy, didn't
27   even give you his right name; correct?
28   A.      Correct.
```

1    Q.    Do you recall how tall or how much Mr. Dandy

2    weighed?

3    A.    No, I don't.

4    Q.    Is it common in your experience to have a witness

5    give a false name?

6    A.    No.

7    Q.    Now, you also spoke to Ms. Bianca Moore?

8    A.    Right.

9    Q.    And Ms. Shanae Anderson.

10    A.    Right.

11    Q.    They both told you that the other gentleman there

12    was Richard Davis; correct?

13    A.    Right.

14    Q.    And you also testified, when you first got to the

15    crime scene, you didn't find any evidence other than a

16    body, which I don't mean to make light of, but and a

17    pellet or two, I believe you mentioned, was found with

18    the clothing?

19    A.    Right.  I didn't find any of that.  In fact, the

20    body was gone when I got there, was my testimony.

21    Q.    Sorry.  But you did look for additional evidence.

22    Didn't you tell us that?

23    A.    I did.

24    Q.    Now, could you tell from your examination of the

25    crime scene whether two weapons had been fired?

26    A.    It didn't appear to be.  No.

27    Q.    Because there was no casings or bullet fragments

28    in the area.

```
1   A.      Right.

2   Q.      And it is possible to have someone shoot with

3   nothing to be found on the ground, no casing, no bullet;

4   is that possible?

5   A.      That's possible.  Yes.

6   Q.      So, the fact that you didn't find another bullet

7   wouldn't necessarily mean only one weapon was fired.

8   A.      Yes, it wouldn't exclude that entirely, no.

9   Q.      And you also mentioned it was kind of chilly out

10  that evening?

11  A.      As I recall it, yes.  I made reference in my

12  notes it was maybe in the 50's, or so, was my

13  estimation.

14  Q.      Do you recall, did you put a jacket on?  Were you

15  kind of nippy when you were looking around?

16  A.      We always wear slacks and coats, so --

17  Q.      In the summer?

18  A.      Yes.

19  Q.      When it's warm out, you still have your coat on?

20  A.      When we are investigating a homicide, we treat it

21  seriously.  We look serious.

22  Q.      And you mention it was cloudy weather, and there

23  was some foot traffic, some car traffic.

24  A.      That's right.

25  Q.      And I'm sure you the didn't bother to sit and

26  count how many pedestrians or vehicles went by; true?

27  A.      Yeah, that wasn't my role out there.

28  Q.      You were busy doing other things.
```

1  A.    Right.

2  Q.    From your recollection, would you describe it as

3  light traffic?  Heavy traffic?  Medium?

4  A.    I would say the traffic on San Pablo Avenue was

5  moderate traffic for the time of day and day.

6  Q.    Now, you went to the autopsy.  Did you also get

7  involved with transporting the deceased's clothing from

8  the Coroner?

9  A.    No.

10 Q.    That was another officer?

11 A.    That was a technician.

12 Q.    Did you ever look at the victim's clothing?

13 A.    No.

14 Q.    So, you wouldn't know if he had a coat on,

15 either.

16 A.    I could look through the notes in my file.  I'm

17 sure it would say in there.  But right now, I don't

18 know.

19 Q.    Well, at some point maybe I will ask you to do

20 that, but not right now.

21 A.    Sure.

22 Q.    Now, you mentioned, and the District Attorney has

23 shown us what's previously been marked as People's

24 exhibit 13, the black beanie.

25 A.    Yes.

26 Q.    Now, you see a lot of these in Oakland?

27 A.    Yes.

28 Q.    So, in and of itself, the fact that there was a

1   black beanie at 509 Sycamore didn't solve the crime for

2   you; true?

3   A.      True.

4   Q.      In fact, do you have any information that could

5   tell you whose black beanie that is?

6   A.      No, I do not.

7   Q.      And, if you recall, were you at 509 Sycamore

8   doing this search, or were you brought items?

9   A.      No, I was there doing the search.

10  Q.      Was that black beanie found with about five or

11  six other hats and caps together in the closet there?

12  A.      I don't recall any other hats there.

13  Q.      Could you have forgotten?

14  A.      I wouldn't -- I wouldn't think I had forgotten.

15  No.

16  Q.      And you agree with me there is nothing

17  distinctive about that black beanie --

18  A.      True.

19  Q.      -- as to distinguish it from any other black knit

20  beanie.

21  A.      True.

22  Q.      And the distance from 509 Sycamore and 30th and

23  San Pablo, what would you say it is?

24  A.      Oh --

25  Q.      And you could estimate.

26  A.      Yeah.  I would estimate it to be maybe between

27  two and three miles, roughly.

28  Q.      Now, you mentioned earlier, in response to a

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   question from the District Attorney -- and, forgive me,
 2   I'm not sure if it was Ms. Bianca Moore or Ms. Shanae
 3   Anderson -- but one of them had found out that William
 4   Anderson had died before you interviewed them.
 5   A.    Right.
 6   Q.    Which of the ladies?
 7   A.    That was Shanae.
 8   Q.    Did you tell Ms. Bianca Moore that William
 9   Anderson had died?
10   A.    No.
11   Q.    Did anybody in the police station tell Bianca
12   Moore that William Anderson had died, if you know?
13   A.    I don't know.
14   Q.    But you personally told Shanae.
15   A.    Right.
16   Q.    Why didn't you tell Bianca?
17   A.    It may sound a bit callous, but I knew earlier on
18   that Mr. Anderson was dead, and by disclosing that, it
19   makes it more difficult to get information.  People
20   become very emotional, sometimes hysterical.
21         Sometimes I have had family members and loved
22   ones literally fall on the ground.  And I know that I
23   need to get as much information as I can, as soon as I
24   can about the identity of the suspect, and start
25   following up leads.
26         So, unfortunately, it's somewhat selfish on my
27   part to get my job done.  And the reason I told Shanae
28   is, she was becoming a little bit more reluctant to be
```

```
 1  down at the police department.  She was very anxious to
 2  leave, and I felt that once I told her that he was in
 3  fact dead, that she would realize the severity of
 4  everything as opposed me saying, "Hey, he was shot," .
 5  it's very important.  I told her the finality of it and
 6  how important it really was that we get the story down.
 7  Q.     And in fact she wanted to get to the hospital to
 8  see how Will was?
 9  A.     She did.
10  Q.     And Bianca did, too?
11  A.     Yes.
12  Q.     I would imagine Mr. Terry Dandy, who told you he
13  was Richard Davis, also wanted to?
14  A.     They all wanted to go to the hospital.
15  Absolutely.
16  Q.     Plus nobody really likes being in the police
17  department in a little interview room without windows
18  and such.
19  A.     It's not the most comfortable place to be,
20  especially after a traumatic incident.
21  Q.     In fact, all three of them had been placed in
22  small interview rooms about the size of 12 by 10, which
23  is a desk and two chairs and no windows.
24  A.     Two of them were, and one was in a larger room
25  with windows.
26  Q.     Do you know who was in the big room with the
27  windows?
28  A.     I can tell if I look at my notes here.
```

```
1   Q.     Sure.  Please go ahead, Sergeant Green.
2   A.     (Examining)
3          THE COURT:  While he is in there, should he be
4   looking for that other thing you were going to ask him
5   about?
6          MS. LEVY:  What?
7          THE COURT:  The weight of the victim?
8          MS. LEVY:  Yes.  Thank you, Judge, for
9   remembering.
10         THE WITNESS:  Shanae Anderson was in the
11  larger room, which is room 203.
12         MS. LEVY:  Q.  And did you have an opportunity
13  to find out what Mr. Anderson's clothes were?  And I'm
14  concerned about his sweater or jacket or coat.
15  A.     Okay.  (Examining)  He had a black, gray and
16  brown jacket.
17  Q.     Doesn't say "woolen" or any more descriptive?
18  A.     No, it does not.  There's -- I would imagine
19  there's photographs of it, but I don't have those handy.
20  Q.     That's fine.  And the first person you inter-
21  viewed that evening was -- do you know who?
22  A.     Richard Davis.
23  Q.     Terry Dandy?
24  A.     Yes.
25  Q.     And did Mr. Dandy -- well, I'm going to scratch
26  that.
27         Who did you interview next?
28  A.     Next was Bianca Moore.
```

1    Q.    Now, Ms. Moore, did she tell you that the car

2    slowed down and the guy in the Cadillac, after shooting

3    William, pointed the weapon at her?

4    A.    Well, in her direction.  Yes.

5    Q.    Ms. Anderson?

6    A.    You asked me about Bianca Moore, I believe.

7    Q.    I'm sorry.  Ms. Moore told you that had happened

8    with the Cadillac.  Did Ms. Anderson also tell you that?

9    A.    I will have to refer to the notes here.

10   Q.    Certainly.  Certainly.

11   A.    (Examining)  No, she didn't say it was pointed at

12   her.

13   Q.    And in fact Ms. Moore told you that it was

14   pointed at both her and Ms. Anderson, didn't she?

15         Again, please take your time.  I'm going to be

16   asking you about these statements.

17   A.    Okay.  (Examining)  I don't see any notes to that

18   effect that it was specifically her and Anderson.  It

19   may be in the transcript, but I don't see it in my notes

20   right now.

21   Q.    And you did go on tape with Ms. Anderson and Ms.

22   Moore after you completed your interview.

23   A.    Not after we completed it.  But before it was

24   completed, we did.  Yes.

25   Q.    Well, let me ask you this:  Is it Oakland Police

26   Department's procedure and policy to talk to both

27   suspects and witnesses before anything is recorded on

28   audiotape or videotape; true?

```
 1   A.      True.
 2   Q.      So, you had spoken with Ms. Moore, then you got
 3   her taped statement afterwards.
 4   A.      Right.
 5   Q.      When you finished her taped statement, did you
 6   tell -- well, I guess you told me you didn't tell Ms.
 7   Moore at that point that Will had passed.
 8   A.      No.
 9   Q.      Now, in your questioning of Ms. Anderson, did she
10   indicate to you whether the person in the Cadillac that
11   shot said anything prior to the shooting?
12   A.      You mean did the suspect say anything?  Is that
13   the question?
14   Q.      Yes, sir.
15   A.      No.
16   Q.      She said, "No, they didn't."
17   A.      No.  I don't remember her saying anything.  I
18   don't remember specifically asking her.
19   Q.      Okay.  Do you want to look through --
20   A.      Okay.
21           MR. STALLWORTH:  Objection, relevancy.
22           MS. LEVY:  Prior consistent and inconsistent
23   statements.
24           THE COURT:  Overruled on that basis.
25           MR. STALLWORTH:  Prior inconsistent statement?
26   She testified that he didn't say anything.
27           THE COURT:  We are talking about Shanae now.
28           MS. LEVY:  I believe the testimony was the
```

```
 1   shooter said, "What's up?"
 2             THE COURT:  I'm looking in my notes.
 3             MR. STALLWORTH:  Raymond Jones said, not the
 4   girls.
 5             THE COURT:  Do you have some specific part in
 6   your notes?
 7             MS. LEVY:  Your Honor, may I approach the
 8   witness?
 9             THE COURT:  Sure.  If it's the easier way,
10   sure.
11             THE WITNESS:  (Examining)
12             MS. LEVY:  Q.  Have you had an opportunity to
13   review that?
14   A.    Yes.
15   Q.    And in fact is that Ms. Anderson's taped
16   statement?
17   A.    Yes, it's a transcript of the tape.  Yes.
18   Q.    And she says that nobody in the car said
19   anything; correct?
20             MR. STALLWORTH:  Objection.  Misstates what
21   that transcript says.  She didn't hear anything.
22             THE COURT:  Well, that's a question --
23             MS. LEVY:  I can rephrase.
24             THE COURT:  -- for cross-examination.
25        Does looking at that refresh your recollection
26   about what she said at all?
27             THE WITNESS:  Yes, sir.  I'd like to clear up,
28   if I may.
```

```
 1              THE COURT:  You can explain any answer.
 2              THE WITNESS:  Okay.  This transcript here, my
 3   partner at the time, Sergeant Olivas, asked the specific
 4   question.  That was:
 5              "Okay.  Did he say anything?  Was he
 6              talking at all?"
 7         Referring to the shooter.
 8         And her answer was, "He didn't say anything."
 9         Then, the follow-up question from Sergeant Olivas
10   said:
11              "Could you hear anybody else inside
12              the car talking?
13              "ANSWER:  I didn't -- I didn't hear
14              nobody talking."
15              MS. LEVY:  Q.  Thank you.  And when you
16   questioned Ms. Bianca Moore, did she say that anybody in
17   the car made any statements?
18   A.      (Examining)
19   Q.      And perhaps I can make this a little shorter.  I
20   don't mean to have you fishing through all of your
21   papers.
22   A.      Thank you.
23   Q.      And I'm handing Sergeant Green what appears to be
24   a transcript of the statement of Ms. Bianca Moore.
25   A.      (Examining)  The question is, did the shooter say
26   anything?
27              "ANSWER:  No."
28   Q.      Did either Ms. Anderson or Ms. Moore say that
```

```
 1  anybody in the crowd with them said anything prior to
 2  the shooting?  And I hand you back Ms. Moore's
 3  statement.
 4  A.    (Examining)
 5            MR. STALLWORTH:  Objection, hearsay.
 6            MS. LEVY:  Inconsistent prior statement, Your
 7  Honor.
 8            MR. STALLWORTH:  Who?
 9            THE COURT:  It wasn't what was said.  The
10  question was, "Did they say anything was said?"  Yes or
11  no.
12            THE WITNESS:  Yes.
13            MS. LEVY:  Q.  And what did Ms. Moore say in
14  her recorded statement?
15            THE COURT:  Now, your objection was hearsay?
16            MR. STALLWORTH:  Yes.
17            THE COURT:  And what is this prior --
18            MS. LEVY:  Inconsistent statement.
19            THE COURT:  With what?
20            MS. LEVY:  With her testimony here in court.
21            THE COURT:  We should have a sidebar.  I'm not
22  aware of where you are talking about.
23        (Short discussion off the record)
24            MS. LEVY:  Q.  Did you have an opportunity to
25  review that?
26  A.    Yes.  Just give me one second.  (Examining)
27  Q.    And for the record, are you looking at your
28  additional notes?
```

```
 1   A.     Yes.
 2             THE COURT:  And the question was, did anybody
 3   there in the vicinity of the corner or the phone booth,
 4   did they say anything about people in the car, or about
 5   the car?
 6             MS. LEVY:  And I can even narrow it down, Your
 7   Honor.
 8             THE COURT:  All right.
 9             MS. LEVY:  Q.  As to Ms. Moore, whose
10   statement I believe you have, Sergeant Green, did she
11   say that either Will or T, who you know as Richard
12   Davis, said anything about the vehicle as it came
13   around?
14             MR. STALLWORTH:  The second time.
15             MS. LEVY:  Q.  Either time.
16   A.     The first time, yes; the second time, no.
17   Q.     And referring now to Ms. Moore?
18   A.     Right.
19   Q.     She said who said what the first time?
20   A.     She said the first time Will.  (Examining)  The
21   question was:
22             "And what did Will say?
23             "Look.  Look, Boo, there go that
24             nigger Ivan."
25   Q.     And I'm going to show you now Mrs. Anderson's
26   taped statement.  And what did she say either Will or T
27   said as the car came up?
28             MR. STALLWORTH:  First time or the second
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1  time?
 2              MS. LEVY:  Q.  Either time.
 3  A.     (Examining)
 4              MR. STALLWORTH:  The first time first?
 5              MS. LEVY:  That would be fine.
 6  A.     As I recall, in looking through this, Ms.
 7  Anderson, I don't believe, was aware of the first pass.
 8  Her early comment would be the second pass right before
 9  the shot, and she heard someone say, "Oh, shit," and she
10  thought it was Will, but she wasn't certain.
11  Q.     Did you have an opportunity to review both Ms.
12  Anderson's and Ms. Moore's original written statements
13  to the officers on the scene?
14  A.     I did at one point, yes.  Not recently.
15  Q.     And in Ms. Moore's statement, the written one,
16  does she ever mention a name Ivan?
17              MR. STALLWORTH:  Objection, hearsay.
18              MS. LEVY:  Prior inconsistent statement.
19              MR. STALLWORTH:  No foundation for this
20  witness.
21              THE COURT:  Well, it doesn't have to be from
22  this witness.  If it's inconsistent with later
23  testimony, then I suppose it's inconsistent with the
24  fact that early on she said she didn't know who it was
25  or didn't give any names and later did.  So, on that
26  basis, I will allow it.
27              MR. STALLWORTH:  Can I ask that the record
28  reflect the statement was written by the police officer
```

```
 1    and not a taped statement with regard to this exception
 2    to the hearsay?
 3              THE COURT:  I think I asked that question of
 4    Ms. Moore this morning, if she wrote it out or was it
 5    written by the police officer.  I asked that question,
 6    and she said the police officer wrote it.
 7              MR. STALLWORTH:  Correct.  I just wanted that
 8    for the record.
 9              THE COURT:  It's in there.
10              MS. LEVY:  Q.  Have you had an opportunity to
11    review her statement now?
12    A.    I'm doing that right now.  (Examining)
13              THE COURT:  And the question was, at the scene
14    statement taken by the police officer at the scene, did
15    she mention the name Ivan?
16              MS. LEVY:  Exactly.
17              THE WITNESS:  She did.
18              MS. LEVY:  Q.  Sorry?
19    A.    She did mention the name Ivan in the statement.
20    Yes.
21    Q.    May I just review that with you?  (Examining)
22              However, she doesn't say that Will or T said
23    that; true?  She mentioned she believes it's someone
24    named Ivan.
25    A.    Well, not even that.  She said the person that
26    Will had been fighting with had been named Ivan, and she
27    had been introduced to him.
28              MR. STALLWORTH:  That's what it says in the
```

GERALD A. DOHRMANN, C.S.R. #2046

1  written statement.

2          THE WITNESS:  In the written statement.  Yes,

3  sir.

4          MS. LEVY:  Q.  However, she does not say, as

5  the Cadillac came along, Will or T made a comment with

6  the name Ivan.

7      And I'm referring to page 2 at the top paragraph.

8          THE COURT:  Just so that the sergeant is

9  clear -- make sure I have got your question right -- the

10  first time that they saw the car down near 29th Street,

11  a comment was made about, look, there it goes, et

12  cetera, et cetera.  And your question was did Ms. Moore

13  say that comment there goes blah, blah, Ivan, or did

14  she -- in other words, was the word "Ivan" mentioned in

15  that first pass?

16          THE WITNESS:  (Examining)  Yeah.  At the top

17  of page two of that statement, it says that she told the

18  officer that Will said, "There goes that nigger again,"

19  and she took that to mean Ivan.

20          MS. LEVY:  Q.  And she also said that she

21  didn't know she would be able to identify the male in

22  the backseat; true?

23  A.      (Examining)

24          MR. STALLWORTH:  In the written statement.

25          MS. LEVY:  That's what's he's looking at.

26          THE COURT:  Just so the record is clear.

27          THE WITNESS:  "I'm not sure if I can ID the

28  male in the back seat," is what she said.

```
 1              MS. LEVY:  Q.  In fact, page 3, top of second
 2   paragraph, she says she thinks it was Ivan or one of his
 3   friends that shot William.
 4   A.    (Examining)
 5   Q.    Second full paragraph, perhaps.
 6   A.    That's correct.
 7   Q.    And that she wasn't sure she could recognize him,
 8   but that she knew Ivan.
 9              MR. STALLWORTH:  If you want to refer to the
10   written document, I rather you read it versus asking
11   this officer to recollect what the other officer wrote
12   down.
13              MS. LEVY:  That's fine.
14   Q.    Quoting from the statement, quote:
15              "I think it was Ivan or one of his
16              friends that shot William," close
17              quote.
18         And is that what she told the officer on the
19   street?
20   A.    That's what's on the statement.  Yes.
21   Q.    And in fact Ms. Moore, in her written statement,
22   said that she had never seen the guy before in the back
23   of the car; is that true?
24              THE COURT:  Ms. Moore?
25              MS. LEVY:  Q.  I'm sorry.  Ms. Anderson.  I
26   just asked about Ms. Moore.  Thank you, Your Honor.
27              THE COURT:  All right.
28              THE WITNESS:  (Examining)
```

```
 1              MR. STALLWORTH:  I would object as to
 2    relevancy at this point.  That's not inconsistent with
 3    what she testified to.
 4              MS. LEVY:  I disagree, Your Honor.
 5              THE COURT:  How is it inconsistent?  She
 6    indicated that Ms. Anderson, I think, herself said she
 7    said that.  How is it inconsistent?
 8              MS. LEVY:  I will withdraw the question, Your
 9    Honor.
10    Q.       And in fact, Sergeant Green, do you have Ms.
11    Anderson's statement in your hands still?
12    A.       The transcript?
13    Q.       The taped statement?
14    A.       Yes.
15              THE COURT:  This is the taped interview that
16    you took, you participated in?
17              THE WITNESS:  Yes, sir.
18              MS. LEVY:  Q.  And at the end of Ms.
19    Anderson's statement, you asked -- or your partner asked
20    if Will had mentioned having problems with anybody, and
21    she indicates no?
22              MR. STALLWORTH:  Objection.  Hearsay.
23              THE COURT:  It is hearsay.  What's it being
24    offered for?
25              MS. LEVY:  It was, obviously, a prior
26    inconsistent statement.
27              THE COURT:  Inconsistent.  Again, I'm not
28    aware she indicated she was aware of a problem.
```

1          MS. LEVY:  Q.  And while we are still with Ms.
2    Anderson, did she describe the weapon, the color of the
3    weapon?
4    A.     (Examining)
5    Q.     On the back page.
6    A.     Thank you.  (Examining)  Yes, she said the gun
7    was black.
8    Q.     Now, you mentioned that Ms. Moore and Ms.
9    Anderson both seemed upset, and I'm sure this was not a
10   pleasant time for either of them.
11         Did you seem to feel Ms. Moore wanted to give you
12   information to help you capture whoever shot and killed
13   Mr. Anderson?
14   A.     Yes.
15   Q.     And you asked Ms. Moore also about the color of
16   the weapon?
17   A.     (Examining)  Yes.
18   Q.     And what color did she say?
19   A.     Black.
20   Q.     Now, during the taped statement of Ms. Moore, she
21   also described a friend of Ivan's to you?
22         And I will refer you -- well, maybe I'll just
23   show you, Sergeant Green.
24         May I approach, Your Honor?
25             THE COURT:  Yes.
26             MS. LEVY:  Q.  I will direct you to start with
27   people associated with Ivan.
28   A.     (Examining)  Yes.

GERALD A. DOHRMANN, C.S.R.#2046

1  Q.    She described a light skinned male as an

2  associate of Ivan's from out of state; is that correct?

3  A.    Yes.

4  Q.    And reading that description of a friend of

5  Ivan's, in your opinion, Sergeant Green, does that

6  describe Mr. Ivan Kilgore's height, weight, complexion?

7          MR. STALLWORTH:  Objection, relevancy.  Or

8  objection, hearsay, and then relevancy.

9          THE COURT:  Can I see counsel at sidebar,

10 please?

11      (Short discussion off the record)

12          MR. STALLWORTH:  Just one second, Your Honor.

13          THE COURT:  While I'm thinking of it, before

14 everybody leaves this evening, remember to leave the

15 transcript, if you would.  Either put it on the -- well,

16 put them on the table there when you leave.

17      During course of the trial, you have heard

18 obviously some hearsay evidence, but there's been no

19 objection to it.  You heard some that there has been an

20 objection to.

21      As to that last question, there was an objection

22 to it.  It is hearsay, and the Court sustained it, and

23 you should not consider the question or the answer, if

24 there was any given.

25          MS. LEVY:  Your Honor, Mr. Stallworth and I

26 have worked out a stipulation that I might briefly read

27 to the jury.

28          THE COURT:  Okay.  Who is going to do it?

```
 1   You?
 2               MS. LEVY:  I would like to, Your Honor.
 3               THE COURT:  All right.
 4                        STIPULATION
 5               MS. LEVY:  Stipulated by both parties that
 6   Bianca Moore, when asked by Sergeant Green and/or his
 7   partner, Ivan, comma, people associated with him, you
 8   said there were two male blacks that you had seen with
 9   him before.  And she described one in his 20's, about
10   five-foot-eight, 200 pounds, bald, and he's apparently
11   from out of state, and he's light skinned.
12               MR. STALLWORTH:  So stipulated.
13               THE COURT:  That was the answer or the
14   question and the answer that was given on the subject
15   matter?
16               MR. STALLWORTH:  Correct.
17               MS. LEVY:  Thank you, Your Honor.
18   Q.    Sergeant Green, do you know if Mr. Kilgore is
19   from out of state?
20   A.    I know he has been out of state.  Whether he's
21   actually from out of state, I don't know.
22   Q.    And I believe you testified early on in your
23   testimony that you believed there may have been one or
24   two shots fired on this particular incident, July 16th,
25   2000, at 30th and San Pablo?
26   A.    No, I don't necessarily believe that there may
27   have been.  However, there was reported to me that there
28   may have been one or two.
```

```
 1   Q.     Now, when you spoke with Mr. Richard Davis, who
 2   we know as Terry Dandy, I believe, in response Mr.
 3   Stallworth's questions, you said he appeared fine, not
 4   under the influence of anything; is that true?
 5   A.     True.
 6   Q.     When you had him on tape, did you notice that he
 7   was sniffing a lot with his nose?
 8   A.     I don't recall.
 9   Q.     Now, you also spoke to Mr. Raymond Jones.
10   A.     Right.
11   Q.     And you got information from a confidential
12   informant that he was the driver, found him at the
13   bakery, went right there and arrested him --
14   A.     Correct.
15   Q.     -- and charged him with murder?
16   A.     I don't charge anybody with murder.  I arrested
17   him.
18   Q.     Arrested him for murder.
19   A.     Yes.
20   Q.     And you interviewed him at the CID room?
21   A.     Yes.
22   Q.     And Mr. Jones told you that he indeed had been
23   the driver of the Cadillac that went by 30th and San
24   Pablo and shot Mr. Anderson?
25   A.     Yes.
26   Q.     Did you notice Mr. Jones appeared to be under the
27   influence when you were speaking to him?
28   A.     No, he did not appear to be.
```

1   Q.    Did you notice if he was sniffing a lot on the

2   statement when he was taped?

3   A.    No, not that I recall.  And when I listened to

4   him again yesterday, I don't recall excessive sniffing,

5   either.

6   Q.    And did you ask Mr. Jones about some barricades

7   that had been put up in Ivan Kilgore's apartment?  Do

8   you recall?

9   A.    No, I don't.  (Examining)

10          MS. LEVY:  Your Honor, may I approach the

11   witness briefly?

12          THE COURT:  Certainly.

13          MS. LEVY:  Q.  Sergeant Green, the notes from

14   the interview with Mr. Jones have both Sergeant Green

15   and Olivas's name.  Can you recognize these as your

16   notes or your partner's?

17   A.    These are Olivas's notes.  (Examining)

18   Q.    I'm sorry.  Again, perhaps, if I can direct

19   you --

20   A.    I'm almost done by now.  These are my notes.

21   Q.    Okay.  Please don't take my copy with you.  Thank

22   you.  Fine.

23          Sergeant Green, in your notes, did Mr. Jones

24   mention when Ivan Kilgore barricaded his door at 509

25   Sycamore?

26   A.    Let's see.  (Examining)  Okay.  Why, it didn't

27   say "barricaded".  It said "boarded."

28   Q.    And when did Mr. Kilgore, according to Mr. Jones,

1    do that?

2    A.      After he had been robbed.

3    Q.      And in fact Mr. Jones told you that Mr. Kilgore

4    had been robbed and assaulted twice in a short frame of

5    time; is that correct?

6    A.      Correct.

7    Q.      And did Mr. Jones indicate that Will Anderson and

8    T were the responsibles?

9            MR. STALLWORTH:   Objection, hearsay.

10           MS. LEVY:   I will withdraw that.

11   Q.      Now, when you spoke to Mr. Jones, he denied ever

12   seeing a weapon 16 July of 2000; correct?

13   A.      No.

14   Q.      Other than at the time of the shooting.

15   A.      He denied seeing one prior to the shooting.

16   Q.      So, Jones didn't know where the gun came from.

17           Let me ask you this:   He had not seen Mr. Kilgore

18   take the gun into the car; right?

19   A.      That's what he said.   Yes.

20   Q.      And he didn't see Mr. Kilgore take the weapon out

21   of the car; correct?

22   A.      Correct.

23   Q.      And when the Oakland Police Department came

24   across the Cadillac with the same license plate, there

25   was no weapon in the car.

26   A.      Correct.

27   Q.      As a result of your speaking with Mr. Jones, you

28   had more information -- well, let me withdraw that.

```
 1          When Mr. Jones left the police department after
 2   speaking to you, the charges against him had been
 3   dropped; is that true?
 4   A.     No, I booked him into jail.
 5   Q.     And you had already spoken to the victim in the
 6   case, and she did not want to press charges.
 7   A.     You are talking about the wrong person, ma'am.
 8   You are talking about Mr. Jones?
 9   Q.     I'm getting really confused.  I apologize to you,
10   the jury, the Court.
11          Let's talk about Matthew Bryant.
12   A.     Very well.
13          THE COURT:  So we are clear, when you finished
14   your interview with Jones, you booked him into jail.
15          THE WITNESS:  Yes, sir.
16          THE COURT:  Did you have a question?
17          MS. LEVY:  Q.  I can start with the first
18   question you may know without looking at your notes.
19   A.     Okay.
20   Q.     Matthew Bryant, as you told us, got word to you
21   when he was in custody he had some information on
22   something; right?  Mr. Bryant, if I didn't say that.
23   A.     Right.  When he was in custody with an officer,
24   not in a custodial setting.
25   Q.     Okay.  Was he just arrested then as opposed to
26   being in jail at that time?
27   A.     Right.
28   Q.     So, he asked to speak to someone about this
```

```
 1   homicide as soon as he could.
 2   A.     I don't know if it was put that way or not.
 3   Q.     As soon as he was arrested?
 4   A.     I don't know exactly when it was in relationship
 5   to his physical arrest.  It was shortly thereafter.  We
 6   can say that.
 7   Q.     And you spoke, as you told us, to the complaining
 8   witness, his baby's mama, about the case.
 9   A.     Right.
10   Q.     And she did not want to press charges.
11   A.     Right.
12   Q.     So, when Matthew Bryant left your interview, he
13   just went home; is that correct?
14   A.     I don't know where he went.
15   Q.     But he didn't go back to jail.
16   A.     He did not go to jail.
17   Q.     And there were no charges on him after the
18   discussion you had.
19   A.     Right.  I conferred with the District Attorney's
20   office, the Prosecutor that handles charging auto
21   thefts, and he said he would not file charges on the
22   case.
23   Q.     And that gave you the opportunity to release Mr.
24   Bryant to the streets.
25   A.     Yes.
26   Q.     No, you got a call -- I'm sorry.  I'm jumping
27   around here.
28          When you spoke to Raymond Jones, in response to
```

1  Mr. Stallworth's questions, you said you never said to

2  him, "You can be a witness or a defendant"; correct?

3  A.    Right.

4  Q.    Did you imply that to him?

5  A.    It could certainly be implied, but I don't recall

6  specifically saying, you know, "Here, you sit in this

7  chair or that chair."

8  Q.    Did you tell Mr. Jones that if he didn't

9  cooperate, he could be looking at a murder charge?

10 A.    No.  I'm quite clear, no matter what he did, he

11 would be looking at a murder charge.  That's what he is

12 going to jail for.  There was no confusion about that

13 whatsoever.

14 Q.    Did you inform Mr. Jones that a murder charge

15 carried 25 years to life as a sentence?

16 A.    No, because it could also carry death or life

17 without.  So, I didn't say anything like that.

18 Q.    You gave him none of those options.

19 A.    No.

20 Q.    Now, you mentioned that you had a confidential

21 informant tell you that Raymond Jones was the driver of

22 the car, and then you had a confidential informant tell

23 you where the car is.

24       My question is, was that the same confidential

25 informant?

26 A.    I'm not certain, but I believe it is.

27 Q.    Now, the passenger Mr. Stallworth was asking you

28 about that you tried to find, all you had on him was a