```
 1   nickname Sick, S-i-c or S-i-c-k?
 2   A.     At one point I had a nickname, and another point
 3   I actually had the name of Steven Hill.
 4   Q.     And that was from an anonymous caller saying it's
 5   Steven Hill had been involved with the homicide?
 6   A.     Right.
 7   Q.     And you weren't able to locate a Mr. Sick, or
 8   Steven Hill.
 9   A.     Well, I couldn't find any Sick.  I found a Steven
10   Hill, who was a male in his 40's.  The description of
11   the passenger was male in the 20's.
12   Q.     So, you never found the right Steven Hill.
13   A.     No.
14   Q.     When you first spoke to Mr. Jones, you gave him
15   his Miranda rights?
16   A.     Yes.
17   Q.     And in fact at the time that you spoke with Mr.
18   Jones, you had already arrested him for murder.
19   A.     Correct.
20   Q.     In your opinion, when you spoke with Mr. Jones,
21   did he appear to be under the influence of anything?
22   A.     No.
23   Q.     Any alcohol smell on his breath?
24   A.     No.
25   Q.     But he did tell you having some beers and smoking
26   a blunt before going to the corner of 30th and San
27   Pablo; correct?
28   A.     I believe that's correct.  Let me just confirm
```

```
1   exactly when he said that was.   (Examining)
2            THE COURT:   So, we are about to take the
3   evening recess.  As I understand the question, the
4   sergeant testified that he didn't notice signs, if you
5   will, of intoxication or being under the influence of
6   alcohol or drugs on the 1st.
7            And your question was, did he acknowledge that he
8   had something to drink and a blunt on the 16th?
9            THE WITNESS:   And I found the answer to that,
10  sir.
11           THE COURT:   Good.
12           THE WITNESS:   Yes, he said that he had been
13  drinking, but he wasn't noticing a drunk, and that was
14  when this shooting happened, and he had smoked a blunt.
15           MS. LEVY:  Q.   And if you go a little farther,
16  he also admitted, "Yeah, I was pretty high, though.  I
17  smoked weed"; correct?
18  A.       "Two beers" (Examining)  "Yeah.  Yeah.  I was
19  pretty high, though.  I smoked weed."
20           THE COURT:   On that note, let's take the
21  evening recess.
22           Ladies and gentlemen, I suspect that we will
23  probably almost be through with the prosecution's
24  case-in-chief.  So, the case, I think, is still going
25  along at the same pace that we thought it might.
26           Over the weekend, please remember the admonition
27  not to discuss the case among yourselves or with anyone
28  else; please don't do any independent investigation or
```

1    research; let's not form or express any opinion until

2    after we have heard all of the evidence from both sides.

3          So, we will be in recess until Monday morning at

4    9:30.

5          And if counsel would remain for a few minutes,

6    please.

7                        ---o0o---

8          (Whereupon, the following proceedings were had in

9    open court without the presence of the jury)

10         THE COURT:  All right.  The jury has gone.

11   Before we go off the record -- or I guess we can be off

12   the record at this point.

13         (Short discussion off the record)

14         (Whereupon, the evening recess was taken)

15                        ---o0o---

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1                    FRIDAY, MARCH 14, 2003
 2                          ---o0o---
 3                  - P R O C E E D I N G S -
 4                          ---o0o---
 5          (Whereupon, the following proceedings were had in
 6   open court without the presence of the jury)
 7          THE COURT:  In the Kilgore matter, the record
 8   should reflect that counsel and Mr. Kilgore are present.
 9   The jury is not.
10          Before we get into the motion, just for today, I
11   thought that we might at least go over to see if there
12   is any controversy in the exhibit record.
13          I have asked Ms. Boyns to make each of you a copy
14   of the exhibit record.  There are what?  Maybe 20 items
15   here or so.
16          Let me ask Mr. Stallworth here first, are there
17   any of these items that you will not be offering into
18   evidence?
19          MR. STALLWORTH:  The only one that I have got
20   a question mark on is People's No. 9, the photograph of
21   the 12-gauge shotgun.
22          THE COURT:  That hasn't even been marked for
23   Identification yet.
24          MR. STALLWORTH:  I don't plan on introducing
25   the rifle, only maybe as demonstrative purposes in my
26   closing.  I will make sure I will preface it to the jury
27   if I do so.
28          THE COURT:  It definitely would not come into
```

```
 1   evidence.
 2              MR. STALLWORTH:  Correct.
 3              THE COURT:  So, Ms. Levy, just going through
 4   these, item No. 1, the aerial overview, any objection to
 5   that one?
 6              MS. LEVY:  No, Your Honor.
 7              THE COURT:  It will be admitted.
 8                              (Whereupon, People's Exhibit
                                 No. 1, previously marked for
 9                               Identification, is now
                                 admitted into Evidence)
10
11              THE COURT:  No. 2, the photographs A
12   through -- A through R.
13              MS. LEVY:  Your Honor, perhaps I can speed
14   this up.  I have no objections to the items that have
15   been presented.  I guess my only comment would be as to
16   the transcripts, and I would prefer the jury have the
17   tapes.  And 9 hasn't been --
18              THE COURT:  It would be my intention not to
19   admit the transcripts into evidence.  And if they ask to
20   hear the tapes, we can deal with it then, I suppose,
21   about whether or not they should be able to use those
22   transcripts not as evidence but for the purpose of
23   following along.
24         So, that means those are the only ones that you
25   are objecting to at this point?
26              MS. LEVY:  Yes, Your Honor.
27              THE COURT:  So, then, No. 1 is admitted.  No.
28   2 is admitted.  No. 3 is admitted.  No. 4 is admitted.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   No. 5 is admitted.  No. 6 is admitted.  No. 7 is
 2   admitted.  No. 8 is admitted.
 3                           (Whereupon, People's Exhibit
                             No. 2 through 8, previously
 4                           marked for Identification,
                             is now admitted into
 5                           Evidence)
 6          THE COURT:  Any objection to the purges?  It's
 7   labeled as a transcript.  It's not really a transcript.
 8   I think --
 9          THE CLERK:  It says "purge."
10          THE COURT:  I'm looking at 8-A.  It says a
11   transcript.
12          MS. LEVY:  It is, Your Honor.
13          THE CLERK:  It is a transcript.
14          THE COURT:  So, 8-A should remain marked for
15   Identification at this point; true?
16          MR. STALLWORTH:  True.
17          THE COURT:  How about, 8-B?
18          THE CLERK:  The purge.
19          THE COURT:  Dispatch purge.  No problem with
20   that one?  That's the purge itself.
21          MS. LEVY:  No, Your Honor.  I think it's
22   somewhat confusing, but we discussed it, and I think
23   that the jury could look at that if they wish to.
24                           (Whereupon, People's Exhibit
                             No. 8-B, previously marked
25                           for Identification, is now
                             admitted into Evidence)
26
27          THE COURT:  And 8-C, the transcript, will
28   remain marked for Identification only.
```

```
 1          No. 9, not.

 2          No. 10 was admitted.  This was the plea

 3   agreement?  That was admitted for purposes of the

 4   motion?

 5          MS. LEVY:  That's correct, Your Honor.

 6          THE COURT:  Any objection to admitting it for

 7   trial?

 8          MR. STALLWORTH:  No, Your Honor.

 9          MS. LEVY:  No, Your Honor.

10          THE COURT:  It will be admitted.

11                         (Whereupon, People's Exhibit
                            No. 10, previously marked
12                          for Identification, is now
                            admitted into Evidence)
13

14          THE COURT:  No. 11 will be admitted.

15                         (Whereupon, People's Exhibit
                            No. 11, previously marked
16                          for Identification, is now
                            admitted into Evidence)
17

18          THE COURT:  No. 12 will remain marked for

19   Identification only, the transcript.

20          MS. LEVY:  Your Honor, I'm sorry.

21          THE COURT:  Excuse me, 11-A.  Thank you.

22          MS. LEVY:  Thank you.

23          THE COURT:  Too much coffee this morning, Ms.

24   Levy.

25          No. 12, the Thomas map, will be admitted.

26                         (Whereupon, People's Exhibit
                            No. 12, previously marked
27                          for Identification, is now
                            admitted into Evidence)
28
```

```
 1              THE COURT:   No. 13, the beanie cap, will be
 2   admitted.
 3                                (Whereupon, People's Exhibit
                                  No. 13, previously marked
 4                                for Identification, is now
                                  admitted into Evidence)
 5
 6              THE COURT:   Are you offering all four of your
 7   previously marked exhibits A through D, photos of the
 8   car?
 9              MS. LEVY:   I am, Your Honor.
10              THE COURT:   Any objection to any of those?
11              MR. STALLWORTH:   No objection.
12              THE COURT:   They will all be admitted.
13                                (Whereupon, Defendant's
                                  Exhibits A through D,
14                                previously marked for
                                  Identification, is now
15                                admitted into Evidence)
16              DEFENDANT'S MOTION TO EXCLUDE PRIORS
17              THE COURT:   All right.   As to the other issue
18   of the day, I assume there is only one, and that's what
19   do we do with the Oklahoma situation?   Roughly worded.
20         Basically there has been an objection by the
21   defense to the use of the Oklahoma case or anything that
22   deals with it for the purposes of impeachment, and we
23   have now all had a chance to look at this, and I would
24   like, I guess, and perhaps to make it a little shorter,
25   is to ask Mr. Stallworth for what purposes would you
26   intend to introduce what testimony?
27              MR. STALLWORTH:   The People are willing to
28   concede as the Oklahoma prior as defined, it is similar
```

```
 1   to a California involuntary manslaughter, therefore,
 2   would not use it to impeach the defendant based on a
 3   serious or violent felony.
 4           THE COURT:  I agree with that.  And I'm sure
 5   Ms. Levy would, too.
 6           MS. LEVY:  Correct.
 7           MR. STALLWORTH:  Additionally, with regard to
 8   impeaching defendant with the felony as a conviction for
 9   a first-degree manslaughter, I would also concede that
10   given the differences in language and interpretation, I
11   don't even plan on doing that.
12           I concede I won't reference that.  That may be
13   something Ms. Levy might want to consider dealing with
14   it at some point.
15           My sole purpose for introducing any of the
16   evidence regarding the Oklahoma prior would be, after
17   having listened to the defendant, if he were to testify,
18   and whether or not his explanation of what transpired is
19   similar under the 1101(b) similar plan, means, method
20   and *modus operandi;* two, under the Pat, P-a-t, line of
21   cases.
22           And for the record I would briefly like to --
23   maybe I don't have to do this since the Court has the
24   copy of the transcript.  I have summarized what I
25   believe his testimony from the Oklahoma prior consisted
26   of, and I don't know if you want me to make a record of
27   that or if we can agree upon that.
28           THE COURT:  I have read it.  I don't know if
```

```
1   you want it marked for Identification at some point or

2   not.  I have read it.  Just for the purpose of the

3   motion?

4          MR. STALLWORTH:  Just for the purpose of the

5   motion.

6          THE COURT:  In fact, if you like, you can

7   have -- although mine is a copy, if there is no

8   objection, it can be marked, as I put a couple of sticky

9   pages on it, but I have not written on it at all.

10         MR. STALLWORTH:  Either we can use your copy

11  or I will burn another clean one.  I have an extra one

12  downstairs.  We can get it marked.

13         THE COURT:  Anyway, I have read it, so

14  actually I know what it states.

15         MR. STALLWORTH:  Essentially, in summary, the

16  Oklahoma testimony suggests that the defendant believed

17  the victim to be somewhat of a violent nature or violent

18  history, violent background.  He also believed the

19  victim to have stolen items from him, particularly guns.

20         He suggested in his testimony in Oklahoma that

21  the victim had made negative comments toward him.  He

22  also suggested that the victim had some type of drug

23  problem or had some type of drug relation in his

24  involvement as a gang leader, an OG Bang member.

25         Thereupon, as the testimony continues, he says

26  that he goes to the house where the victim is.  There is

27  some dispute on whether or not he knows if the victim is

28  there or not, but there is a confrontation, by the
```

```
 1   defendant's account, whereby he believes the victim is
 2   making him afraid or threatening or paranoid to the
 3   extent that he believes the victim has a gun.  A gun was
 4   never recovered from the scene.
 5          He thereafter shoots the victim, and in sum,
 6   explains it was as a result of his fear, and the
 7   defendant was either armed or about to shoot him or
 8   about to confront him.
 9          I suspect that if he were to testify in this case
10   to create or testify to a similar defense, I would argue
11   to this Court that I should be allowed to in my cross-
12   examination question him in those areas basically under
13   a number of cases, but the one I'm I am going to cite is
14   Carpenter, 15 Cal.4th at 312.
15          And Carpenter, I believe, basically sets the
16   standard by which you can use a prior uncharged crime or
17   conduct in order to impeach a witness.  And the three
18   levels and standards are basically that information or
19   that event has to be material; the material fact has to
20   show some tendency to prove that material fact; and,
21   three, there is no rule or policy of exclusion.
22          And based on what I have summarized to the Court,
23   I would argue first and foremost that I suspect his
24   explanation will be very similar in this case to the
25   Oklahoma explanation, which would make it relevant
26   regarding the similar plan and scheme, but most
27   importantly in this case, the mental state.  I'm going
28   to be arguing premeditation.
```

1        Also, in the People vs. Steele case, 27 Cal.4th

2   1230, cited by defense counsel, it mentions the doctrine

3   of chances, which essentially says that the more often

4   one does something, the more likely something was

5   intended, either premeditated rather than acted upon.

6        In this particular case, I suspect that there may

7   be testimony by the defendant suggesting this was

8   spontaneous or was an accident or was the heat of

9   impulse.  And it would be my intention at that point to

10  cross-examine him based on his own testimony about his

11  Oklahoma shooting event.

12       Secondly, as in the People vs. Steele case and

13  the People vs. Carpenter case, in both those cases, the

14  defendant was charged with a murder, and evidence of a

15  similar murder was introduced.  And in both of those

16  cases, the defendant admitted to killing and gave

17  similar self-defense explanations, whereas fear in both

18  of those cases, the Court allowed the prosecution to

19  introduce evidence.

20       Lastly, with regard to the rule or policy of

21  exclusion, essentially evidence of other crimes is

22  inherently prejudicial; however, it is not inadmissible.

23  The Court has the discretion to determine whether or not

24  the probative value outweighs the prejudicial effect.

25       And in this case we've got a killing that took

26  place in 1995 and one in 2000.  They are merely five

27  years apart.  We aren't introducing evidence in

28  cross-examination, not in our case-in-chief.  The only

1    way this evidence comes in is if the defendant testifies

2    to a similar plan or puts his mental state at issue,

3    which essentially he does by pleading not guilty.

4          The defendant has testified -- strike that.

5    Given that our evidence comes through a transcript by

6    which the defendant has testified to, and not any other

7    hearsay information; additionally, it is not in our

8    case-in-chief, only through cross-examination, and

9    having already conceded I do not intend on addressing

10   the conviction status of the case, which is what a

11   number of the cases cited I think concerns, I will

12   conclude that the People should be allowed to, based on

13   the defendant's testimony in this case, to explore and

14   cross-examine him in these areas.

15         I will be more than happy to have the Court give

16   a limiting instruction, as the Court did in People vs.

17   Millwee.  I don't have the cite right here, but I follow

18   up with that.

19         THE COURT:  Millwee, I think, is 18 Cal.4th

20   page 96.

21         MR. STALLWORTH:  In Millwee, under similar

22   circumstances, the Court instructed the jury to not

23   consider this evidence to show the defendant's

24   propensity to commit a crime, or that the defendant is a

25   bad person, but only to show the mental state, what was

26   at issue in that particular case.

27         And in this case, obviously, it is a murder case

28   in which I am going to be arguing premeditation given

```
 1   the facts as the Court has heard already in the evidence
 2   of this case.
 3        I will submit -- respectfully submit to the Court
 4   that given the defendant's testimony, and maybe at some
 5   point thereafter we would be able to explore these areas
 6   based on the cases.
 7        Submitted.
 8        THE COURT:  Ms. Levy, now that we have the
 9   transcript, it certainly enlightens you as well as the
10   Court as to the situation that Mr. Stallworth is
11   attempting to have introduced into evidence.
12        At this point, as I have indicated earlier, I
13   think there is more than one issue.  First of all, under
14   Ewoldt, which is 7 Cal.4th, which is the case most often
15   cited, I guess, when you are dealing with this kind of
16   issue, it describes different purposes for which 1101(b)
17   evidence can be presented.
18        It falls into essentially three levels, as I read
19   it.  The first is intent, which requires the necessity
20   of the lowest amount of similarity to be acceptable; the
21   next is common -- what's commonly called common plan or
22   scheme, sometimes referred to as modus operandi in
23   committing the crime, which indicates that it takes more
24   than intent but not as high as the third level, which is
25   to prove identity, which almost has to be where the
26   phrase "signature crime" is attached to it.
27        I don't think that these are signature crimes.
28   And part of the admissibility of this would depend, if
```

```
 1   Mr. Kilgore is going to testify as to what he was going
 2   to testify to -- and I'm not asking you to disclose that
 3   to me at this point -- Mr. Kilgore could say, "I wasn't
 4   there."
 5        Mr. Kilgore could say, "I was the guy in the
 6   front seat," or, "I was the driver.  I was not the guy
 7   with the shotgun."
 8        Mr. Kilgore could say, "I was the guy in the
 9   backseat.  I had the shotgun, and the shotgun went off
10   completely by accident when the car went over a bump,"
11   or something like that.
12        Mr. Kilgore could say that, "I was going by to
13   talk it over with Will, and maybe there was going to be
14   a fight, but when he went for his firearm, I fired."
15        And depending on what his testimony was, it may
16   affect its admissibility for what purpose it could be
17   admitted.
18        And I don't know if you want to deal with that
19   now.  I will say this at the outset.  It seems to me,
20   given what you have told me in open court about this
21   situation, that one of the issues to be concerned about
22   is credibility under 1101(c).
23        And I think Mr. Stallworth referred to one of the
24   cases, People vs. Millwee, M-i-l-l-w-e-e, 18 Cal.4th 96
25   at pages roughly 129 to 131.
26        There is another case that I think was cited by
27   Mr. Stallworth in his papers, an older case, People vs.
28   Ricketts, a 1970 case, at 70, I think, Cal.App.3d page
```

```
 1   441.
 2         And there was that somewhat older case that I
 3   cited earlier, Lizenbaugh, at 14 Cal.2d page 403, the
 4   case involving the drowning spouses.
 5         And for whatever I can, I'd like an argument from
 6   you, if there is one, why this should not be allowed for
 7   credibility purposes.  I think it may well be similar
 8   enough for that, particularly if its as the situation
 9   you explained, the explanation for this shooting is the
10   same as it was essentially the same as it was in 1995.
11         Beyond that, in terms of identity, I have
12   indicated that on the record that I have seen between
13   these two.  This is not a signature crime.  Mr.
14   Stallworth has certainly stated a number of similarities
15   that I think can be considered, but he will tell you
16   right up front, I don't consider this for identity at
17   all.
18         Intent is sort of an issue in this case, given
19   the defense, if it's to be that, actual and reasonable
20   belief, which would mean he would get an acquittal, or
21   actual and unreasonable belief, which means he would
22   wind up with a manslaughter, if that's what the jury
23   believed.  And I don't know if you want me to address
24   that or if you want to address that now, so you will
25   know for certain what's going to be -- or how do you
26   want to proceed on that?
27         I'm telling you I'm inclined to let it in on
28   credibility based on what I have heard so far, with that
```

616

```
 1   limitation.
 2              MS. LEVY:  I'd like to address that.
 3              THE COURT:  Sure.
 4              MS. LEVY:  In the Oklahoma case, the testimony
 5   was Mr. Kilgore walked into a house.
 6              THE COURT:  I read it.
 7              MS. LEVY:  This is a drive-by, I mean, so I
 8   would like to take the Court's comment that it's not
 9   similar.  I really don't see the similarities.  The only
10   ones I see are that Mr. Kilgore believed in both
11   instances that the victim was armed.
12         Now, in Oklahoma, it was because of what the
13   Court read, his weapons were stolen and his other friend
14   said, "Yeah, I've got your 45," and he was clearly under
15   the impression that the victim also was armed and in
16   fact saw him rise up and about to shoot before he shot
17   him.
18              THE COURT:  I'm agreeing with you.  I'm saying
19   the issue of identity, as far as I'm concerned, it isn't
20   there.  I'm saying the issue of common plan or scheme, I
21   have heard the prosecution witnesses testify, but I
22   haven't heard --
23              MS. LEVY:  I know.  I know.  And the Court --
24   I did a brief summary of Mr. Kilgore's testimony in my
25   original motion, because I think the Court does have to
26   know.  In our case Mr. Kilgore was assaulted and robbed
27   twice.  The Court has heard the testimony.
28              THE COURT:  Well, I have heard testimony that
```

1   people said, "He told me that."  I haven't heard any

2   testimony that that actually happened yet.

3           MS. LEVY:  And people saw him injured and

4   people heard about it.  And clearly the defense has --

5   in fact, I have other witnesses that Mr. Stallworth

6   knows about, the lady that was living with Mr. Kilgore

7   at the time, and his sister, who observed the injuries.

8           Now, the only ones, Your Honor, who observed the

9   actual activities were Will, who is gone, T, I know Mr.

10  Stallworth made a hell of an effort to find Mr. Dandy,

11  and Mr. Kilgore, who I would like to put on the stand.

12          So, right there, you have got no similarity.  He

13  had been physically attacked by these two gentlemen

14  together.  In fact, I spoke with two --

15          THE COURT:  I'm not disagreeing with you.

16          MS. LEVY:  Therefore, I don't see a common

17  plan or scheme.  And I understand credibility is always

18  at issue; but if you look at how prejudicial priors are,

19  there have to be some hallmarks of trustworthiness.

20          In Lizenbaugh, he tried to kill the wife.  It

21  didn't work.  Drowned her in the bathtub the second

22  time, I mean those type of crimes.

23          In Ricketts that I picked up from the D.A., I

24  don't even think that helps his case.  Give me a minute,

25  Judge, to find my notes on it.

26          In Ricketts, the defendant said he's caught in a

27  stolen car within weeks, six weeks, and he says, "Yeah,

28  my buddy in MacArthur Park loaned it."  That's the same

```
 1   defense.

 2        I think the Court would be way out of line to

 3   generalize that to any self-defense previously used is

 4   going to come in because you used it before.  In our day

 5   and age, in the streets of Oakland, for what I read,

 6   Oklahoma gangs, you may have need of self-defense more

 7   than once in your life.  If there was similarities, it

 8   would go to that.

 9        As he said before, the guy stole your weapons.

10   You knew he was armed.  He said it before.  If you say

11   it here, I'm going to let these twelve people know you

12   said it before.

13        These are totally, I want to look at the language

14   here -- (Examining) if you can give me a minute, please,

15   Your Honor -- from People vs. Sam, at 71 Cal.2d at

16   190 -- well, starting at 194, I didn't know exactly

17   where this quote is from, but the Court said:

18             "There is no connecting link between

19             the prior and the present acts as

20             alleged or could reasonably be

21             inferred.  The acts were independent

22             of one another and apparently

23             spontaneous in each instance."

24        THE COURT:  I think the page is 205.

25        MS. LEVY:  Thank you, Your Honor.

26        I think that's exactly what we have here.  If

27   someone from Oklahoma was here, and if it was during a

28   funeral, and Mr. Kilgore went to the home where
```

1  everybody -- if you had anything like that, even with

2  the intent that someone stole, Your Honor, this is

3  different.

4       Mr. Kilgore never alleged in his testimony in

5  Oklahoma that he had been assaulted or hurt by any of

6  these guys.  They were his buddies.  From what I read --

7  and, frankly, the testimony is slightly confusing -- but

8  and he knew they were armed in this situation, the

9  defense would testify, and I would like to tell the

10  Court what I anticipate Mr. Kilgore's testimony will be

11  so you can evaluate it.

12       THE COURT:  You certainly can, but I don't

13  want to indicate to you that you have to.  That's my

14  point.

15       MS. LEVY:  I understand.  That is my choice.

16  And I would tell the Court, when Mr. Kilgore takes the

17  stand -- and I also phrase that "if Mr. Kilgore takes

18  the stand," because, frankly, even with the Court's

19  ruling for the defense, counsel cannot guarantee the

20  Court at this point Mr. Kilgore will take the stand.

21       THE COURT:  No problem with that.

22       MS. LEVY:  Okay.  If Mr. Kilgore takes the

23  stand, he will testify and in fact his girlfriend at the

24  time confirmed what Ivan told her, but contrary to

25  Raymond Jones, Mr. Kilgore would testify he did not go

26  back to the house to get Mr. Jones.  They were riding

27  with Sick on the way to Home Depot.  On the way back,

28  saw these gentlemen.

1    Mr. Kilgore and both witnesses I intend to have
2  on Monday are saying, not only the barricade that we
3  have heard about that was put up immediately after the
4  first physical assault, but that he slept with a gun
5  over his bed, and would not let Betsy, his girlfriend,
6  or his sister, whose nickname is BB, the two initials,
7  wouldn't let them out of the house.  He locked his
8  little sister in there.  He was petrified about what was
9  going to happen.
10    The gun was with him when he moved.  It was in
11  the backseat of the car.
12    He saw these guys.  And again the witnesses that
13  testified, you could see the defense was attacking their
14  credibility quite as well as I could, and again trying
15  to understand that they are victims and witnesses.  And
16  that on that corner Mr. Kilgore was shot at by the
17  mysterious T, who didn't wear a puff coat.  Obviously,
18  he wasn't armed, because the ladies, I'm sure, patted
19  him down every time they saw him, and in response to the
20  shot, shot back.
21    And what corroborates that is Sergeant Green's
22  testimony of one to two shots.
23    So, it's my position this is actual self-defense.
24  I don't know if the Court feels Oklahoma was of a lower
25  level.  And the situations are so different that Mr.
26  Stallworth is asking this Court to say, if you use
27  unreasonable self-defense and then you want to use
28  self-defense, you can't use it twice in a lifetime,

```
 1    because you are lying.
 2          And I just -- I'm sorry, Your Honor.  The cases
 3    all need more than that.
 4          THE COURT:  All right.  My position is this,
 5    and I tend to agree with you in terms of common scheme
 6    or plan.
 7          Having read this now and having listened to the
 8    prosecution's evidence, that if that's what I'm left
 9    with, it seems to me that the situations in the cases
10    that I have read are not clear enough to qualify for
11    common plan or scheme.
12          Those cases -- and if we have this marked for
13    Identification, we don't have to go through it all for
14    the record -- but I think those cases, People vs. Sam
15    and People vs. Ewoldt that talk about the existence of a
16    plan, not a series of similar, spontaneous acts, if you
17    look at this situation, in the commission of the act
18    itself, of the killing, if you will, in each of these
19    two cases, they appear to be quite different.  What is
20    similar, although not in the commission of the act, is
21    the reason given for the act in both cases, that, "I
22    thought the person was going for a gun, and, therefore,
23    I shot him."
24          MS. LEVY:  Isn't it different if you are shot
25    at, Judge?
26          THE COURT:  It may be, but that's one of the
27    things.  I haven't heard any evidence that he was shot
28    at yet.
```

```
 1              MS. LEVY:  I told the Court --
 2              THE COURT:  And if you say it's T that shot at
 3   him, it's not T who is out buried someplace.
 4              MS. LEVY:  No, it's not.
 5              THE COURT:  It's Mr. Anderson.
 6              MS. LEVY:  No, it's not.  But from that, I
 7   conclude Mr. Kilgore isn't a sharp shooter, but he was
 8   shot at, and that also distinguishes this.
 9         And, again, the Court is coming down with Mr.
10   Stallworth's argument, if he thought he was in fear, he
11   can bring it in before.  I think it's way too broad.
12              THE COURT:  Well, it's an issue that if he is
13   going to testify that he was shot at, that is also an
14   issue of credibility.
15         As I have heard -- the only thing I've heard is
16   that one witness that we don't know if he is an eye-
17   witness or an ear-witness's, if you will, one witness
18   telephoned in and said, "I've heard one or two shots in
19   this urban community."  There could have been a shot and
20   echo.  I don't know.  And it could have been two shots.
21   I don't know.
22              MS. LEVY:  But the Court -- I'm sorry.
23              THE COURT:  But in terms -- my point is that
24   this is not a situation where somebody is stealing
25   something from a store, or something of that nature.
26   This is a situation where there are two dead people, one
27   in Oklahoma and one here.
28         And although you indicate that you believe that
```

```
 1   in the City of Oakland, this is commonplace, well, I can
 2   tell you that in the job that I have done -- and I've
 3   been involved in the criminal justice system in this
 4   county since 1965 in one respect or another, all with
 5   adults and mostly with serious crimes -- this is the
 6   first time this has come up in my memory.
 7              MS. LEVY:  Well, but the Court is aware of the
 8   multiple murders, special circumstances.
 9              THE COURT:  There are.
10              MS. LEVY:  And those cases go through this
11   Court.
12        And, again, the Court, I think, is in essence
13   saying, because Mr. Kilgore was put in fear before, he
14   is now again.  And all we have from Oklahoma is Mr.
15   Kilgore's testimony which refers to other individuals'
16   testimonies.
17        The fact that in fact the victim in Oklahoma was
18   armed, I mean --
19              THE COURT:  Was that in here?
20              MS. LEVY:  There was testimony regarding a
21   letter that Mr. Kilgore talked about, and then the
22   lawyer said, "Well, didn't they testify?"
23              THE COURT:  I read that.  But they were also
24   saying other witnesses were going to testify.
25              MS. LEVY:  But we don't know what they said.
26              THE COURT:  That's right.  We don't know that
27   they said anything.
28              MR. STALLWORTH:  They didn't testify.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1            MS. LEVY:  All we have from Oklahoma is Mr.
 2   Kilgore's testimony and the results.
 3            THE COURT:  And maybe I missed it.  In reading
 4   this last night, which I did before I left, and I was
 5   tired just like you were, I saw that Mr. Kilgore
 6   referred to other people who, quote, unquote, would come
 7   in and testify or would be able to come in and testify.
 8   Did any of them?
 9            MS. LEVY:  No.  The lawyer in essence at two
10   or three occasions -- and I can't mark it, if you want
11   me to look -- said, "Oh, you saw them in court?"  And he
12   said, "Yeah, they were here.  They testified."
13        And the issue -- Darryl, it's in here.  I'm not
14   making this up.  I read this last night, too.
15            THE COURT:  Maybe you should find it.
16            MR. STALLWORTH:  His defense witnesses
17   testified.
18            MS. LEVY:  Yes.
19            MR. STALLWORTH:  We can talk about that.
20            MS. LEVY:  It's in here.  We all read it.  My
21   recollection is as good as everybody's.
22            THE COURT:  Absolutely, and maybe better than
23   mine.
24        I'm just saying that I read something about
25   additional witnesses.  I read it last night after work.
26   But I thought those were people that would come in and
27   testify.  I didn't know that they ever actually did
28   testify.
```

GERALD A. DOHRMANN, C.S.R.#2046

625

```
 1          MS. LEVY:  My specific memory -- and I'm
 2   looking as we are talking --
 3          THE COURT:  Give me a page.
 4          MS. LEVY:  -- at least twice his lawyer said,
 5   "And she was here, and he was here in court."
 6          THE COURT:  While you are looking, let me get
 7   15 Cal.4th.
 8      (Examining)  I assume we all agree that the
 9   reference to "OG" in this transcript is not original
10   guidelines.
11          MS. LEVY:  The typos are incredible in this,
12   Judge, but I think we all got what they meant to be.
13          THE COURT:  Original gangster.  Yes.
14          MR. STALLWORTH:  I know that -- off the
15   record.
16          THE COURT:  Yes, let's go off while she is
17   looking for it.  Don't say anything now.  We're not on
18   the record.
19      (Short discussion off the record)
20          THE COURT:  Ready to go back on the record?
21          MS. LEVY:  Yes.
22          MR. STALLWORTH:  Yes.
23          THE COURT:  All right.  We have been off the
24   record for a few minutes discussing the transcript,
25   particularly at page 41.
26      Go ahead.
27          MS. LEVY:  Your Honor, can I refer the Court
28   to page 46, cross-examination, line 9 -- I'm sorry, line
```

1    13:
2              "So, you're telling the jury that
3              all of these witnesses who are
4              friends of yours, who you ran around
5              with, that got up there and said you
6              were an A trade Crip (phonetic),
7              they were lying."
8         Again, we don't know what else they said, but I
9    think without a full transcript, there were defense
10   witnesses.  Mr. Kilgore informally informed me there was
11   a witness there who testified that she had gotten the
12   gun from the victim after he was dead.
13        So, you know, if you want, you know, to rule on
14   that -- off the record.
15             (Short discussion off the record)
16             THE COURT:  Back on the record, please.
17        I have read those pages referenced by the
18   defense, and I have asked Mr. Stallworth to give me a
19   point page citation on People vs. Carpenter, which is in
20   15 Cal.4th, you said page 380, but I think the admission
21   of other crimes evidence actually begins at the bottom
22   of page 378.  See if there is anything else here --
23             MS. LEVY:  Your Honor, may I make some brief
24   comments?
25             THE COURT:  Let me just finish glancing over
26   it.
27             (Examining)  Just looking at page 379, there is a
28   paragraph in quotes that seems to be citing Wigmore that

```
1    indicates:
2              "The reasoning underlying use of an
3              actor's prior acts as circumstantial
4              evidence of that actor's later
5              intent is well explained by Wigmore.
6              It is based on the doctrine of
7              chances -- the instinctive
8              recognition of that logical process
9              which eliminates the element of
10             innocent intent by multiplying
11             instances of the same result until
12             it is perceived that this element
13             cannot explain them all.  Without
14             formulating any accurate test, and
15             without attempting by numerous
16             instances to secure absolute
17             certainty of inference, the mind
18             applies this rough and instinctive
19             process of reasoning, namely, that
20             an unusual and abnormal element
21             might perhaps be present in one
22             instance, but the oftener similar
23             instances occur with similar
24             results, the less likely is the
25             abnormal element likely to be the
26             true explanation of them.  In short,
27             similar results do not usually occur
28             through abnormal causes; and the
```

```
 1                       recurrence of a similar result tends
 2                       (increasingly with each instance) to
 3                       negative accident or inadvertence or
 4                       self-defense or good faith or other
 5                       innocent mental state, and tends to
 6                       establish (provisionally, at least,
 7                       though not certainly) the presence
 8                       of the normal, i.e., criminal,
 9                       intent accompanying such an act; and
10                       the force of each additional
11                       instance will vary in each kind of
12                       offense according to the probability
13                       that the act could be repeated,
14                       within a limited time under given
15                       circumstances, with an innocent
16                       intent."
```

17        That's probably more articulate than I have been
18   about it, but it's basically the thought that concerns
19   me.  I don't think this is a common event as you
20   describe it.  It's an unusual event.  It's an event, the
21   result of which two people have died.
22             MS. LEVY:  That's the only similarity, Your
23   Honor.  I think the Court needs something additional
24   because of the prejudicial nature of this evidence.
25             THE COURT:  You misunderstand what I'm saying.
26   I'm not saying that these acts as such come in as a
27   common plan or scheme.
28             MS. LEVY:  I know that.

```
 1                  THE COURT:  Because they tend to be
 2     dissimilar.
 3                  MS. LEVY:  I know that.
 4                  THE COURT:  What I'm suggesting is that the
 5     defendant's explanation of these is similar enough, and,
 6     as Wigmore apparently stated, the occurrences are
 7     unusual enough with their repetition, they become less
 8     believable.
 9                  MS. LEVY:  What I'm saying, the only
10     repetition is somebody died.  That's it.
11                  THE COURT:  No, it's not.  The other
12     similarity is that following the death, the defendant
13     apparently said, "I thought he was going for a gun."
14                  MS. LEVY:  And here he is going to say, "I was
15     shot at."  I think that is an incredible distinction.
16     It's not the same defense.
17          There, he was burglarized; his weapons were gone;
18     he was never assaulted.
19          I mean I think they are totally different, Judge.
20     When you are shot at, every time you are shot at, the
21     law gives you the opportunity and the right to shoot.
22     Every time.  And the Court is saying because he shot --
23     and the time element, in the one that I mentioned with
24     the car being gone, oh, my buddy at MacArthur Park, they
25     were six weeks apart.  This is years.
26                  THE COURT:  I guess part of the concern is --
27     and I haven't read your papers again lately -- this is a
28     little different from what you told me before.
```

```
 1            MS. LEVY:  It is.  In my papers, there is a
 2   word missing on my -- I didn't number my pages.  It's
 3   the last page, the top line, I left out "and shot" after
 4   "pulled out the weapon."  And that is my mistake, and,
 5   frankly, until I was talking to Mr. Kilgore closely this
 6   morning, I had not noticed that.
 7            THE COURT:  What page is that now?
 8            MS. LEVY:  My last page.  They are unnumbered
 9   on my original motion.
10            THE COURT:  And this is the papers that
11   were -- you filed more than one of these.  These were
12   the ones you filed in February or March.
13            MS. LEVY:  February 24th, Your Honor.
14            THE COURT:  What page?
15            MS. LEVY:  Last.
16            THE COURT:  Last page.
17            MS. LEVY:  Third page, top line.
18            THE COURT:  (Examining)
19            MR. STALLWORTH:  If you take a look at line 2
20   on that page where it says "he shot only in self-defense
21   as he knew Terry would shoot," not "Terry had shot."
22            MS. LEVY:  That's also my error.  That should
23   be "had shot."
24        Anyway, our position, if Mr. Kilgore testifies,
25   his testimony is going to be that he and this car was
26   shot at first.
27        And I'm sorry, Your Honor.  That is very unclear
28   there, and it sounds like unreasonable self-defense in
```

GERALD A. DOHRMANN, C.S.R. #2046

1   my moving papers.

2           MR. STALLWORTH:  May I have a brief response?

3           THE COURT:  Yes.  The problem is, it keeps

4   fluctuating here, and I've been looking and literally

5   doing hours of research based on one theory, and now at

6   12:25 I am hearing a different theory.

7           MR. STALLWORTH:  That's also my concern, to

8   this extent:  That Mr. Kilgore has had an opportunity to

9   review the transcript, and he understands it very well,

10  the motions that are before the Court regarding whether

11  or not I get to explore his prior behavior in Oklahoma.

12          What I would say for the record, that if he were

13  to take the stand, I am in my full right as the

14  Prosecutor able to explore the consistencies or incon-

15  sistencies of his testimony on direct and the plausi-

16  bility and possibilities of it.  And in doing so, it

17  becomes very clear to the Court, and I think it will,

18  that this is in fact a similar defense of an honest but

19  unreasonable belief in self-defense.

20          Before I would go into those areas, you can rest

21  assured I would make sure there is a good and solid

22  record through my cross-examination.  I would lay every

23  foundation as humanly possible before going into that

24  area.  But I would submit to the Court that that is very

25  likely to happen.

26          MS. LEVY:  My only comment would be that Mr.

27  Kilgore has not seen the transcript from Oklahoma.  I

28  took it home and I read it last night.  So, I can

```
 1    concur, he is aware of the issues that we are arguing.
 2             THE COURT:  Well, unlike the rest of us, Mr.
 3    Kilgore was there when the testimony was given.  Mr.
 4    Kilgore was there in 199 -- June 13th, 1997 when the
 5    testimony was given.
 6             MS. LEVY:  Yes.  I was just responding to the
 7    D.A.'s comment that he read the transcript.  No, he
 8    certainly was present as he was testifying in Oklahoma.
 9             MR. STALLWORTH:  The similarities will come
10    out in his testimony either on direct or cross.  And
11    before we are allowed to go into that area, I would make
12    sure that the record is clear on that.  Even if its the
13    record in the Oklahoma case he talks about being crossed
14    by the Prosecutor, "How did you shoot the victim," or
15    "Where were you?", and he can't even explain.  He gives
16    somewhat of a, "I was in fear.  I was paranoid.  I was
17    in a state of shock," which sounds similar to what Ms.
18    Levy had just suggested about his shooting of William
19    Anderson, in that he believed he was shot or being shot
20    at by Terry Dandy.
21             So, even in the new revised defense of Ivan
22    Kilgore, it shares similarities to his defense theory in
23    the Oklahoma prior, as stated by him in his paranoia,
24    state of shock, afraid, reasons for having fired the
25    weapon back in Oklahoma.
26             MS. LEVY:  Your Honor, if I might, Mr. Kilgore
27    is insistent that I inform the Court that he had told me
28    his defense, and when I wrote this motion, when he read
```

```
 1   it, he had told me to correct it, and it was the defense
 2   attempt perhaps to go either way that it came out the
 3   way it was written.  But Mr. Kilgore wanted me to tell
 4   you that.
 5            THE COURT:  Anybody have an additional plot
 6   they want to put on the record?
 7            MR. STALLWORTH:  Just lastly, when the line of
 8   cases which talk about this type of evidence being
 9   introduced to show premeditation and mental state, it
10   does not require that the similar theories of defense be
11   exact, only in that the similar explanations were being
12   made.
13        So, the explanation of self-defense by way of
14   believing he had a gun or by believing that he was being
15   shot at is not dissimilar.  It's just a different type.
16            THE COURT:  Is it your position that an after-
17   the-fact explanation is probative of premeditation and
18   deliberation?
19            MR. STALLWORTH:  Very much so.
20            THE COURT:  All right.  Is it your position
21   that these two incidents, as you know them to be, have
22   enough material points of similarity in the commission
23   of the crime to involve a common act or scheme?
24            MR. STALLWORTH:  I counted 27 similarities in
25   my review of the transcript.
26            THE COURT:  I used word "material".  How many
27   of those 27 were material?
28            MR. STALLWORTH:  I would say at least 20.
```

1      MS. LEVY: I would like to hear the list, Your

2    Honor.

3      THE COURT: I guess there can be some dispute

4    about that.

5      All right. I obviously noted some similarities

6    between the two, but by and large, this to me is a close

7    call, and I'm guided by Ewoldt that talks about the

8    gravity of this kind of evidence coming in and that the

9    courts should scrutinize it very carefully because it

10   can prove to be highly prejudicial.

11     And the Court, I don't think I'm creating

12   anything new here. As I indicated, this does not

13   appear, given Ms. Levy's offer of proof as of today that

14   there is an issue concerning identity of the shooter,

15   and it doesn't appear there is an issue concerning the

16   general intent that the act was performed with, in other

17   words, he meant to fire the gun and he fired the gun,

18   the issue is about mental state and the existence or

19   non-existence of the element of self-defense and the

20   existence or non-existence of an honest but unreasonable

21   belief of a need to defend oneself against imminent

22   peril to life or great bodily injury.

23     The Court is going to allow an exploration into

24   some of this, and at some point would give this

25   instruction, or words very similar to this, because I

26   don't know if Ms. Levy, one, will make a decision to

27   call Mr. Kilgore; and if she does, whether or not she

28   will get into this in direct. It will read something

1   like this:

2   The Court will allow examination of the defendant

3   concerning a crime other than that for which he is here

4   on trial.  This evidence may not be considered by you to

5   prove that the defendant is a person of bad character or

6   that he has a disposition or propensity to commit crime.

7   Such evidence may only be considered in your

8   determination of the defendant's credibility concerning

9   the presence or absence of the need for self-defense, or

10  of any mistake of fact testified to by the defendant as

11  related to the existence or non-existence of the mental

12  state of malice aforethought, a necessary element to

13  prove the crime of murder, as charged in the

14  Information, period, unquote.

15  I had gone on to talk about actual but unreason-

16  able belief.  That may well wind up as a jury

17  instruction, as will accident, that is, actual and

18  reasonable belief.  Probably both of them will.  But I

19  have taken that out, given the explanation I have been

20  given today.

21  So, factor that into your thinking, and I hope

22  everybody has had an opportunity to state their position

23  on the record.  I think it's clear.  That's my decision.

24          MS. LEVY:  Thank you, Your Honor.

25          MR. STALLWORTH:  Thank you, Your Honor.

26          THE COURT:  And how should we mark this

27  exhibit, that is, the transcript?  Just People's next in

28  order?

```
 1              MR. STALLWORTH:  Yes.  I don't have any other
 2    evidence.
 3              THE COURT:  Should this be People's 14, just
 4    transcript of Oklahoma proceedings, or transcript of
 5    defendant's Oklahoma testimony, consisting of a cover
 6    sheet?  And it goes to page 95.
 7                                  (Whereupon, People's Exhibit
                                     No. 14 marked for Identifi-
 8                                   cation)
 9                            ---o0o---
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```