```
 1              THE DEFENDANT:  There was one more thing
 2   counsel failed to do.
 3              THE COURT:  Go ahead.
 4              THE DEFENDANT:  Counsel refused, as requested
 5   by the defendant, to subpoena all medical records
 6   related to the emergency visit.
 7              (Short discussion off the record)
 8              THE COURT:  Well, I see some disagreement.
 9   These are allegations that may be borne out or not borne
10   out.
11              MS. LEVY:  Understood, Your Honor.
12              THE DEFENDANT:  Well, if I could readdress
13   that issue, I would like to.
14              THE COURT:  That's fine.  Your indication is
15   that she basically refused to request or subpoena
16   medical records.
17              THE DEFENDANT:  She failed to request a -- or
18   subpoena those issues from Highland Hospital relating
19   to --
20              THE COURT:  Whose medical records?
21              THE DEFENDANT:  The deceased in relation to
22   the emergency visit due to this incident.
23              THE COURT:  To being shot.
24              THE DEFENDANT:  Yes.
25              THE COURT:  You feel the testimony of the
26   Coroner was not sufficient --
27              THE DEFENDANT:  No, I do not.
28              THE COURT:  -- in certain respects?
```

GERALD A. DOHRMANN, C.S.R.#2046

1          All right.  Is that it for the public stuff?

2               THE DEFENDANT:  Yes.

3               THE COURT:  Now, with Mr. Stallworth here, in

4   very general terms, why do you believe that the

5   remainder of these things needs to be kept at an

6   in-camera basis?  Just generally speaking.  Don't

7   disclose anything that shouldn't be disclosed.

8               THE DEFENDANT:  I'm trying to figure out the

9   way to say this.

10              (Short discussion off the record)

11              THE DEFENDANT:  The thing I would like to

12  discuss further are things that may tend to incriminate

13  me.

14              THE COURT:  All right.  And how many of those

15  are there, roughly?

16              THE DEFENDANT:  I would say five or ten.

17              THE COURT:  All right.  Mr. Stallworth, it's

18  my understanding in reading the cases, even a general

19  description, that's probably sufficient if there should

20  be a new trial.  So, at this point I'm going to ask you

21  to step outside.  We will phone you when we get ready to

22  go back on the record again.  Same extension?

23              MR. STALLWORTH:  Yes.

24              THE COURT:  All right.  At this point, the

25  courtroom should be closed to others.

26              (Whereupon, Mr. Stallworth leaves the courtroom)

27              (Whereupon, the in-camera proceedings were had on

28  the record at this time, but not contained herein)

```
 1            (Whereupon, Mr. Stallworth enters the courtroom)
 2            THE COURT:  All right.  Back on the public
 3  record then.  Mr. Stallworth has returned.
 4            Does either side have any comment concerning Mr.
 5  Kilgore's list of contentions, both those that were
 6  heard by both parties and some that were heard by only
 7  the defense, as to whether or not he has presented a
 8  colorable claim of ineffective assistance of counsel,
 9  which I recognize "colorable" is a very thin coat, if
10  you will, as to whether or not he should be represented
11  by an attorney other than Ms. Levy for the purpose of
12  filing his motions for new trial?
13            MR. STALLWORTH:  I would only briefly comment
14  that the majority of issues that were brought up, I
15  believe, don't meet that standard.  However, to err on
16  the side of caution, I believe that it may be appro-
17  priate to have the defendant appointed a different
18  counsel in order to make an official record to file the
19  motion.  That's what my brief understanding of the
20  Stewart case is.
21            THE COURT:  And, Ms. Levy, do you wish to be
22  heard?
23            MS. LEVY:  Yes, Your Honor.  Although I am
24  more aware of all of Mr. Kilgore's complaints probably
25  better than the Court in what has been heard today, and
26  all of the specifics, I have to agree with Mr.
27  Stallworth.  I do not believe it reaches a colorable
28  claim; however, I would ask the Court to appoint him a
```

1   new attorney, one to protect the records, so that it's

2   not the Court kind of making the decision but another

3   independent attorney assisting Mr. Kilgore.

4         And in view of some of these allegations I feel

5   are below the belt, I rather not represent him.  I mean

6   I can, but at this point I would urge the Court to give

7   him new counsel.

8         THE COURT:  All right.  Based on the totality

9   of the circumstances here -- and I'm not making a

10  specific finding as to colorable claim, although

11  basically the cases that I read don't call for the

12  defense to answer each and every one of these allega-

13  tions, they just indicate that there has to be a

14  colorable claim.  And, frankly, I'm aware of some of

15  them that I heard during the course of the trial.

16        But based on this, on the totality of it, and in

17  the interests of justice, truly, the Court will appoint

18  another counsel, order the appointment of another

19  counsel to represent Mr. Kilgore for a motion for new

20  trial.

21        So, I'm going to ask the clerk, please, Ms.

22  Boyns, to phone the Alameda County Bar Association, the

23  court-appointed division.  I spoke with them the other

24  day, telling them they might be expecting a call from

25  me.

26        Please indicate that the Court wants an attorney

27  to represent Mr. Kilgore on a motion for new trial.  I

28  would like whoever they select, please, to phone the

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   court, just so I could tell him or her the idea of the
 2   complexity of it.
 3           But we need to set a court date for that attorney
 4   to appear.  And the question is what day do you want it
 5   to be?
 6           I'm assuming we should get him an attorney soon.
 7   How about Thursday, the 3rd?  I have a few motions on
 8   that day, but it's pretty open.
 9                   MS. LEVY:  I'm available, Your Honor.
10                   THE COURT:  Are you going to be around?
11                   MR. STALLWORTH:  I will be here.
12                   MS. LEVY:  And perhaps I should be here just
13   to talk to the attorney.
14                   THE COURT:  Absolutely.
15                   MS. LEVY:  That would be fine, Judge.
16                   THE COURT:  Absolutely.  So, I will see you
17   Thursday.
18                   MS. LEVY:  Would that be 9:00 a.m. calendar or
19   9:30?
20                   THE COURT:  It will be the 9:00 a.m. calendar.
21   If everybody is here, perhaps we could discuss and you
22   could discuss in chambers with the attorney, just so he
23   will have some idea, and then we will call it and get
24   him to accept the appointment.
25           But I want to make sure whoever it is knows what
26   they are getting into.  Sometimes these are fairly
27   clearly cut; sometimes it's a little broader brush.
28           And, again, I would ask Mr. Dohrmann if you can
```

1    do so between now and the 3rd prepare the transcript of

2    this proceeding, the public part and then the in-camera

3    part separately under seal.

4            See you Thursday.

5                MR. STALLWORTH:   Thank you, Your Honor.

6                          ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                    **FRIDAY, JULY 11, 2003**

2                        ---o0o---

3                    **- P R O C E E D I N G S -**

4                        ---o0o---

5              THE COURT:  All right.  On the record in the

6   matter of Ivan Kilgore, No. 141033, Mr. Stallworth is

7   present; Mr. Kilgore is present.  Ms. Levy is not

8   present.

9              The matter is set today for a very limited

10  purpose, and that is seeking appointment of counsel to

11  represent Mr. Kilgore on his motion for a new trial

12  based on ineffective assistance of counsel alleged by

13  Mr. Kilgore as to Ms. Levy's representation.

14             Thus far in these proceedings, Mr. Kilgore has

15  been interviewed by another member of the Bar Associa-

16  tion, Michael Berger, who informed the Court that he

17  would be unable to represent Mr. Kilgore.

18             The Court contacted the Bar Association again,

19  and Mr. Albert Thews, T-h-e-w-s, has been sent by the

20  Bar to interview with Mr. Kilgore.

21             This morning I have had a conversation with Mr.

22  Thews, basically to tell him factually where the posture

23  of the case was and to provide him with a copy of the

24  transcript of Mr. Kilgore's oral motion, at least the,

25  quote, public, unquote, parts of that transcript, I  ·

26  believe, from June 27th when he was stating his color-

27  able claim pursuant to People vs. Stewart, which I

28  believe is 171 Cal.App.3d.

GERALD A. DOHRMANN, C.S.R.#2046

1    Mr. Thews and Mr. Kilgore met off the record with

2  the Court, and Mr. Stallworth was standing by, in terms

3  of where we were in this case, the time involved.

4    And it's my understanding, Mr. Thews, that you

5  would be able to -- I know that your schedule has been

6  booked now for awhile, including services of *pro tem*

7  judge, including some minor surgery, and commitments to

8  other capital cases, this not being a capital case.  The

9  decision was made that you would speak with Mr. Kilgore

10 today, look at the transcript of the proceeding over the

11 weekend, and perhaps look at the transcript of the

12 confidential, sealed portions of the transcript today.

13    Mr. Kilgore informed me that he had given Mr.

14 Berger a number of pages of notes dealing with issues

15 that he wished to raise in his motion, or by his motion,

16 and we are attempting -- we don't have those now -- we

17 are attempting to get them back.

18    The plan was to put the matter over until Monday

19 morning.  Anybody have anything else?

20    THE DEFENDANT:  I would also like to comment,

21 in addition to the ineffective assistance of counsel,

22 there was some legal issues as far as rulings and so

23 forth that Ms. Levy had initially wanted to address the

24 Court with about matters of the trial that I haven't

25 mentioned anywhere in any of these proceedings.

26    THE COURT:  Do they relate to ineffective

27 assistance of counsel?

28    THE DEFENDANT:  No, they don't.  They pertain

```
1   to errors and rulings and so forth like that.
2              THE COURT:  Well, I'm willing to listen,
3   obviously, to whatever properly winds up in the motion.
4   But, as you know, or should know, under 1181 there are a
5   number of things that can be a part of a motion for new
6   trial; there are some things that are not part of a
7   motion for new trial but are appellate issues --
8              THE DEFENDANT:  Yes.
9              THE COURT:  -- and you are going to have to
10  rely on a lawyer to guide you through those.
11             I know you like to do your own homework.  Read
12  1181 of the Penal Code.  If there are motions to be
13  properly part of your new trial, they have to be either
14  in that list or someway in the case law, such as what
15  Fosselman says.  So, those need to be discussed.
16             As I say, you know, if you or your family has the
17  funds to go out and hire a lawyer, that's fine.  That
18  lawyer can do pretty darn much anything they want to do.
19  But when you are relying on court-appointed counsel,
20  basically they are not going to be able to provide all
21  that kind of -- this is probably the wrong word --
22  quote, unquote, hand-holding kind of care that maybe
23  somebody that's paying a fee is entitled to.
24             And I want to be able to get you the best lawyer
25  to present your motion that I can.  And in this county,
26  that starts at least in my opinion with those lawyers
27  that are qualified on the capital team.  And if the
28  situation becomes such that we can't find a lawyer from
```

```
 1   that, then I'm going to have to look elsewhere.
 2        I believe -- I don't know -- I believe from
 3   history I have never had to do this in my career, that I
 4   can appoint a new attorney.  Whether they want to be
 5   appointed or not, under Bar Association rules, I believe
 6   that attorney would have to accept unless they had some
 7   kind of conflict.  But that's a bad footing to start on.
 8        THE DEFENDANT:  Yeah.  What I was saying, the
 9   motions were initially going to be raised in the new
10   trial motion, and I just want to acknowledge to the
11   Court those issues were also something that I would want
12   my attorney to review, too.
13        THE COURT:  If they are part of 1181, it seems
14   to me to make sense, unless there are things that Ms.
15   Levy should really handle for some reason, that the same
16   lawyer ought to file a motion on all those things.
17        THE DEFENDANT:  Yes.
18        THE COURT:  But this is not something -- from
19   the other side of it, this is not something that I want
20   to drag out until 2004; okay?  This is something that we
21   need to get on with, get it done, both for your benefit
22   and for everybody else's.
23        Anything else?
24        THE DEFENDANT:  No.
25        MR. STALLWORTH:  No, Your Honor.
26        MR. THEWS:  All right.  Albert W. Thews.  I'm
27   here because the Bar Association has called me about
28   this case.  At this point in time, I acknowledge receipt
```

```
 1   of the transcript of 35 pages of a hearing on June the
 2   27th.   I will review that over the weekend, and I would
 3   respectfully request Monday morning I should be able to
 4   give you a decision as to whether I can accept the case
 5   or not.
 6             THE COURT:   Done.  We will basically clear the
 7   courtroom so you can speak with Mr. Kilgore here.
 8             MR. THEWS:   Thank you.
 9             THE COURT:   If you want to do it over in those
10   seats there to have a little more privacy, that's fine
11   with me.
12             MR. THEWS:   I think that's fine.
13             THE COURT:   If you want to read the sealed
14   transcript, it's right here.  I will lodge it with the
15   clerk.
16             MR. THEWS:   After we talk, I will read that
17   and go from there.
18             MR. STALLWORTH:   Thank you, Your Honor.
19                         ---o0o---
20
21
22
23
24
25
26
27
28
```

1              **MONDAY, JULY 14, 2003**

2                          ---o0o---

3                    **- P R O C E E D I N G S -**

4                          ---o0o---

5          THE COURT:  In the matter of People versus

6    Kilgore.  It's No. 141033.  Mr. Thews is present.  Mr.

7    Stallworth is present.  Ms. Levy at this point is not

8    present.  Mr. Kilgore is present.

9          And the matter is on today solely to determine

10   whether or not Mr. Thews was going to accept appointment

11   in this matter for the purpose of filing the motion, and

12   it is my understanding that the motion is for new trial

13   based on ineffective assistance of counsel.

14         And it is my understanding, Mr. Thews, you are

15   not going to accept appointment.

16         MR. THEWS:  That's correct, Your Honor.  I'm

17   unable to accept the appointment at this time.

18         Further, I would advise the Court that I obtained

19   from Michael Berger last Friday notes from Mr. Kilgore,

20   together with the transcript of the 27th of June

21   hearing, both the sealed transcript and the other.  I'm

22   returning those notes and the copies of the transcripts

23   to Mr. Kilgore at this time.

24         THE COURT:  All right.  The sealed transcript.

25         MR. THEWS:  He has a copy of the sealed

26   transcript, the sealed transcript the Court has here.

27         THE COURT:  That's correct.  Okay.  And

28   remember that is not a public document.  You got a copy.

GERALD A. DOHRMANN, C.S.R.#2046

1  The Court has a copy under seal.  Enough said.

2          MR. THEWS:  I would indicate to the Court that

3  I spent about five hours on Saturday going through cases

4  and rapidly going through the cases that cited the cases

5  the Court gave me on Friday, and I spent about three

6  hours going through Pope and Strickland, and doing some

7  extra research.  I am convinced I'm not able to take

8  this appointment.

9          THE COURT:  All right.  Frankly, Mr. Thews, I

10  am getting at a little bit of a loss at this point.  We

11  referred the matter to a number of attorneys at this

12  point, and I have not researched nor has anybody

13  provided me with any case law in terms of what happens

14  once the motion is made.

15          He has made an oral motion.  Mr. Kilgore has made

16  an oral motion that you are aware of, and you have read

17  both the sealed transcript and the public transcript, I

18  will refer to it.

19          But in terms of actually sitting down and having

20  a motion prepared, that would be the next normal step.

21  And whether that requires a full hearing, whether it

22  requires the Court just reviewing the transcript of now

23  both the trial transcript -- although I sat as the trial

24  court -- but certainly the preliminary examination

25  transcript with regards to points that Mr. Kilgore

26  recently raised, or whether it requires a full

27  evidentiary hearing, I haven't gotten that far.

28          I am aware of cases that have been cited to me,

```
 1   both federal and state cases, that at least discuss that
 2   issue somewhat.  I'm trying to follow as best I can the
 3   guidelines of Fosselman and Stewart, but the first step
 4   in that we have accomplished.  He, Mr. Kilgore, has gone
 5   on record and stated his basic reasons for believing
 6   there was ineffective assistance of counsel.  And it was
 7   pretty much conceded that there was a colorable claim,
 8   which allows the filing of a motion.  It's getting the
 9   motion filed I'm having a problem with.  Where we go
10   after that, I don't know.
11            MR. THEWS:  I could shed some light on that if
12   the Court wishes.
13            THE COURT:  Sure.  I would be glad to listen
14   to it and maybe Mr. Stallworth would, too.
15            MR. THEWS:  This would be based on, as I said,
16   the short time I had for research Saturday and Sunday.
17            Under the statutory basis for a new trial, I
18   think that could be done by the trial counsel.  Because
19   she did the trial, she's able to point out the areas
20   which would fit into the statutory basis, and the Court
21   is familiar with it.  It's an ordinary motion that we
22   all make orally, usually at the end of the trial, unless
23   we need to amplify it with additional case law.
24            THE COURT:  Well, I agree within every area
25   except ineffective assistance of counsel.  The case
26   law --
27            MR. THEWS:  I was about to address that if I
28   may.
```

1       As to ineffective assistance of counsel, it seems

2    to me that Fosselman, that we discussed earlier,

3    provides that that is a none statutory basis for a new

4    trial.

5       If we agree that Fosselman gives us a nonstatu-

6    tory basis for a new trial, then I think we must look to

7    the standards required for effective assistance of

8    counsel.  And I did that Sunday.  I went to People vs.

9    Pope, a 1979 case, at 23 Cal.3d 412; and then I went to

10   the federal case, which established the federal law,

11   which is Strickland vs. Washington, a 1984 case, at 466

12   U.S. 668.

13      Those two cases seem to indicate that, in looking

14   at ineffective assistance of counsel, the standard is,

15   was there error or an omission on the part of trial

16   counsel which materially prejudiced the case of the

17   client.

18      You can look at the cold record to determine, and

19   in this case it is my thought -- and I'm not, as I say,

20   this is brief research -- it is my thought that it could

21   be looked at as to the trial transcript and the

22   Preliminary Hearing transcript.  And Mr. Kilgore has

23   pointed out areas where apparently the cross-examination

24   was not effective, because there were certain statements

25   made at the Preliminary Hearing that were not cross-

26   examined to determine are they true now or are they not

27   at the trial.

28      So, I think that's sort of an analysis that could

1  be made.

2        Once we find those areas, then the question is,

3  has it materially prejudiced the client?  The courts in

4  the appellate issue seem to indicate that when we are

5  looking at such a cold record, that the presumption is

6  that the trial counsel engaged in a trial tactic in

7  doing this thing or not doing this thing.

8        Now, I am aware also from research that there is

9  a case out of Ventura County, which is People vs.

10 Andrade, a 2000 case, 79 Cal.App.4th 651, and I read

11 cases that cited Andrade.  I did not shepardize.

12        But in that particular case there was a

13 conviction of two counts of 459 first, a trespass, and

14 attempt false imprisonment, a 220, 242 and 12024.  The

15 trial counsel was discharged and new counsel was

16 retained, and moved for a new trial on the basis that

17 the prior attorney had not provided effective assistance

18 of counsel.

19        The trial court was disturbed in this case, and

20 the trial court was persuaded that the motion just had

21 to be granted.  He says:

22              "I don't think it's a case that any

23              of us in good conscience could live

24              with in its present picture."

25        However, in granting that new trial motion, the

26 Court then took evidence at a hearing on the motion for

27 new trial.  That evidentiary hearing took the color of a

28 habeas proceeding under either state or federal law, and

1   so there were affidavits or declarations provided,

2   together with live testimony, and then the District

3   Attorney was able to participate in the hearing and

4   previous defense counsel was able to give an explana-

5   tion.  We are talking now about almost a full-blown

6   *habeas* hearing.

7        It is the sense that I get from the appellate

8   courts that they would like the trial court to resolve

9   the issue if they can.  However, I also found, in

10  reading the cases which had cited Dennis, that there is

11  a case called People vs. Smith, a 1993 case, at 6

12  Cal.4th 684.  A petition for rehearing was denied on the

13  3rd of February of 1994.

14       At page 706 in that case, the California Supreme

15  Court addressed the trial court's discretion when faced

16  with a claim of incompetent trial counsel, and they

17  indicated that it was the trial judge's call to

18  determine whether they would go onto a full-blown

19  evidentiary hearing or not.  That was my understanding

20  of the case.

21       And so I think, procedurally, that's where we

22  are, Judge.

23            THE COURT:  All right.  As I say, I appreciate

24  just your counsel in the matter at this point.  I'm

25  trying to get the motion on Mr. Kilgore's behalf

26  formalized --

27            MR. THEWS:  Yes.

28            THE COURT:  -- in a typewritten motion.  It

```
 1   sounds like I'm going to have to deal further with the
 2   Bar Association in that regard, and will.
 3          Now, you have given Mr. Kilgore back his
 4   information?
 5             MR. THEWS:  I have.
 6          Mr. Kilgore, have you examined the information?
 7             THE DEFENDANT:  Yes.
 8             MR. THEWS:  Does it appear to be the same
 9   pages and notes that you gave to Mr. Berger?
10             THE DEFENDANT:  Yes.
11             MR. THEWS:  All right.  Yes, I have.  Thank
12   you, Your Honor.
13             THE COURT:  All right.
14             MR. THEWS:  I should further --
15             THE COURT:  Thank you.
16             MR. THEWS:  -- indicate to the Court that I'm
17   a certified criminal law specialist.  My practice is a
18   trial practice.  That's one basis for the certification.
19   And the second basis of the certification is that I sit
20   between 50 and 60 days a year as a Juvenile Court
21   referee, commissioner or judge pro tem pursuant to the
22   order of the Presiding Judge.  Those are both bases for
23   certification.
24          I'm not a certified appellate lawyer.  I just
25   dislike the appellate practice.  I dislike habeas
26   practice.  The only thing I'm interested in in an
27   appellate practice is what are the current issues that I
28   need to preserve if I'm doing a trial.
```

1          THE COURT:  All right.  Thank you very much,

2    Mr. Thews.  I appreciate your counsel in the matter.

3          So, it sounds like I'm going to have to contact

4    the Bar Association again, Mr. Kilgore.  At this point I

5    have -- let me get it in chambers, let me get it so I

6    can put it on the record.

7          Just in asking Ms. Boyns to keep track of what

8    the Bar has told us, we have seen in court both Michael

9    Berger and you, Mr. Thews.  Apparently other attorneys

10   that have been contacted and declined appointment at the

11   outset were William DuBois, Robert Beles, Barry Karl,

12   with a K, Albert Wax, and Robert Platt.

13         It sounds as if I may have to have some

14   additional personal contact with the Bar Association,

15   but we will keep trying.

16         MR. THEWS:  If I could make a suggestion.

17   There are some attorneys on the panel that do both trial

18   and appellate work.  Such an attorney probably would be

19   ideally suited if you go to a full-blown evidentiary

20   hearing on the issue of incompetence of counsel.

21         THE COURT:  Would the Bar Association know who

22   those attorneys were?

23         MR. THEWS:  I would think that Jim Giller

24   would know, who is the chairman of the panel.  I'm not

25   sure that Toni, who parcels out the cases, or the other

26   lady, would.

27         THE COURT:  All right.  Thank you.  Maybe I

28   will just phone Mr. Giller then.  I know he's usually

```
1   not very hard to find.
2           MR. THEWS:  Either Mr. Giller or perhaps Jack
3   Noonan down in Livermore, who is also on the committee.
4   And I don't recall who else is on.
5           THE COURT:  I know both quite well.  Thank
6   you.
7           MR. THEWS:  Thank you, Your Honor.
8           THE COURT:  It is my intention to have contact
9   with either one or both of the individuals.  I know that
10  Mr. Giller is the Chair of the court-appointed list.
11          Would you rather come back a week from today, on
12  Monday or Friday?  Friday is our Law & Motion day.  It's
13  going to be a little crowded in here.
14          THE DEFENDANT:  Monday.
15          THE COURT:  Monday?
16          THE DEFENDANT:  Yeah.  That's fine.
17          THE COURT:  And at this point I'm going to ask
18  Ms. Boyns to ask Ms. Levy to be here also on Monday.
19          THE CLERK:  Okay.
20          MR. STALLWORTH:  9:00 o'clock or 9:30, Your
21  Honor?
22          THE CLERK:  9:00 o'clock.
23          THE COURT:  9:00 o'clock.
24          MR. THEWS:  Thank you.
25                      ---o0o---
26
27
28
```

1              **MONDAY, JULY 21, 2003**

2                        ---o0o---

3                  **- P R O C E E D I N G S -**

4                        ---o0o---

5              THE COURT:  On the record, if we might, in the

6    Kilgore matter.  For the record, Mr. Stallworth is here

7    representing the People; Ms. Levy is present, who is

8    still counsel of record, and Mr. Pyle is present, having

9    been sent by the Bar Association after a call from the

10   court for the purpose of filing and perhaps proceeding,

11   depending on what's necessary, on the Motion for New

12   Trial.

13             Mr. Pyle, I met with you one day last week.  I

14   don't even remember what day it was.

15             MR. PYLE:  When I saw Mr. Stallworth in the

16   elevator, but I don't remember when that was.

17             THE COURT:  You have had a chance to at least

18   read the transcripts on the one proceedings where

19   statements were made for the basis of the motion, both

20   the public comments and the private comments.  You had a

21   chance to speak with Mr. Kilgore this morning.

22             MR. PYLE:  Yes.

23             THE COURT:  What is your thought?

24             MR. PYLE:  My thought, I would be available

25   for the appointment, and it looks like there is a lot of

26   paper to go over.

27             THE COURT:  That's probably true.  All right.

28   Mr. Pyle, then, is appointed for the purpose of the

```
 1   motion.
 2          You are going to ask the Bar about the funding of
 3   the transcript, and you have spoken with the reporter
 4   about that.
 5          MR. PYLE:  Yes.  And he says it would take
 6   approximately two weeks when the funding is provided.
 7          THE COURT:  Ms. Levy is in the courtroom now.
 8   I don't expect anything is going to happen for awhile
 9   here.  I don't know that it's going to be necessary for
10   her just to show up every time or not.
11          Ms. Levy, as I understand it, a couple of weeks
12   ago you brought and stored with the court under the
13   table over there your files on Mr. Kilgore's matter?
14          MS. LEVY:  That's correct, Your Honor.
15          THE COURT:  And I understand just from the
16   rules of evidence that, if there is a motion concerning
17   counsel, that you have no objection if he looks at those
18   files?
19          MS. LEVY:  In fact, I brought them, Your
20   Honor, to assist the new attorney.  And he is free to
21   take them with him.
22          THE COURT:  And, Mr. Kilgore, since that's
23   actually your privilege, any problem with Mr. Pyle
24   looking at the records Ms. Levy had during the trial?
25          THE DEFENDANT:  No.
26          THE COURT:  That's noted.
27          You indicated August 15th?
28          MR. PYLE:  Yes, Your Honor.
```

```
 1              THE COURT:   That's fine.  August 15th.

 2         And, Ms. Levy, since this just concerns -- is

 3   there going to be any other business other than the

 4   preparation of the motion at this point for the next few

 5   meetings?

 6              MR. PYLE:   Nothing that I'm aware of.

 7              THE COURT:   If there is, notify Ms. Levy; if

 8   not, we will find you.

 9              MR. PYLE:   I expect it will be sort of what-

10   do-we-do-now kind of thing?

11              THE COURT:   That's what I thought.  I hate

12   counsel to have to come back when they don't really have

13   to.

14         So, I will be glad to keep her records here if

15   you want to look at them since she allowed that.  And

16   your client has agreed.  Fell free to take them if it's

17   easier for you to do.

18              MR. PYLE:   Okay.

19                            ---o0o---

20

21

22

23

24

25

26

27

28
```

```
 1                FRIDAY, AUGUST 15, 2003

 2                      ---o0o---

 3              - P R O C E E D I N G S -

 4                      ---o0o---

 5           THE COURT:  The matter of Ivan Kilgore.

 6           MR. STALLWORTH:  Darryl Stallworth for the

 7  People.

 8           MS. LEVY:  Walter K. Pyle for Mr. Kilgore.

 9           THE COURT:  And Mr. Kilgore is present and in

10  custody.  Good morning.

11       It is my understanding that you now have had for

12  at least a brief period of time the transcripts and are

13  wending your way through them.

14           MR. PYLE:  Yes.  It may be there are some

15  transcripts that I have not yet received about some in-

16  chambers conferences, and I'm not sure about that.  I

17  just got that information this morning.  But we will

18  have to follow up on that, also.

19           THE COURT:  I don't know that every

20  in-chambers conference was taken down.  There may be.

21  Frankly, I have forgotten.  Mr. Stallworth's memory may

22  be better than mine.  But, obviously, get in touch with

23  Mr. Dohrmann at your earliest to determine whether there

24  is or not.

25           MR. PYLE:  This had to do with some evidence

26  of some prior conviction in Oklahoma, whether that

27  should be admissible or not.

28           THE COURT:  I think some of that was reported.
```

```
 1          Mr. Kilgore you were present in chambers during
 2   part of it.
 3          THE DEFENDANT:  No, I was talking about the
 4   proceedings that occurred outside in the courtroom, not
 5   in chambers.
 6          THE COURT:  In the courtroom?
 7          THE DEFENDANT:  Yes.
 8          THE COURT:  But not with the jury present.
 9          THE DEFENDANT:  Without the jury present.
10          THE COURT:  Hopefully, you have got -- would
11   he have those, Mr. Dohrmann?
12       (Short discussion off the record)
13          THE COURT:  If there were motions made, of
14   course it would not be a trial situation.  That would
15   perhaps be some kind of appellate issue based on some
16   ruling I made, but I don't know that it would fit within
17   the category that you are looking at it.  But figure out
18   what it is and get it from Mr. Dohrmann.
19       I didn't want to have a need one more thing.  "I
20   need one more thing."  I'm trying to get something
21   definitive going here.
22       How much longer are you going to need, do you
23   think?
24          MR. PYLE:  I would suggest the case be
25   continued for a month to see where we are at this time.
26          THE COURT:  I'm expecting -- I don't want to
27   continue it a month just to see where we are.
28          MR. PYLE:  All right.
```

```
 1              THE COURT:  I mean, what may happen, nobody
 2   does anything until three days before a month, and then
 3   comes in and tells me, "I need another month."  So, I'm
 4   expecting in good faith you will be proceeding on this.
 5              MR. PYLE:  Yes.
 6              THE COURT:  Mr. Stallworth, what does your
 7   schedule look like?
 8              MR. STALLWORTH:  Any Friday except September
 9   the 5th.  Anything after that is okay.
10              THE COURT:  All right.  A month.  How about
11   September 19th?
12              MR. PYLE:  That's fine.
13              THE COURT:  September 19th.
14              MR. STALLWORTH:  Thank you, Your Honor.
15              THE COURT:  And, please, if you are looking
16   through those and there are additional things you
17   believe are necessary, with the exception of next week,
18   Mr. Dohrmann and I with all likelihood will be here.
19   Let us know early on so we can get you those things.
20              MR. PYLE:  I will do that.
21                           ---o0o---
22
23
24
25
26
27
28
```

| | |
|---|---|
| 1 | **FRIDAY, DECEMBER 5, 2003** |
| 2 | ---o0o--- |
| 3 | - P R O C E E D I N G S - |
| 4 | THE COURT:  All right.  First, in the matter |
| 5 | of Ivan Kilgore, 141033. |
| 6 | MR. STALLWORTH:  Darryl Stallworth for the |
| 7 | People. |
| 8 | MR. PYLE:  Walter K. Pyle for Mr. Kilgore. |
| 9 | THE COURT:  Good morning.  Mr. Kilgore is |
| 10 | present and in custody.  Good morning. |
| 11 | MR. STALLWORTH:  Good morning, Your Honor.  I |
| 12 | have spoken with Mr. Pyle, and I received his Motion for |
| 13 | New Trial.  What I have also done is made a request for |
| 14 | my office to receive a rate for a transcript so that I |
| 15 | can respond in writing to the brief. |
| 16 | And I have met with Jerry Dohrmann, and we have |
| 17 | come up with a rate, and I'm waiting on the approval |
| 18 | from my office, which I believe will be forthcoming. |
| 19 | In that event, I am optimistic that I can respond |
| 20 | in writing by December the 22nd.  I understand the Court |
| 21 | may have vacation time there.  Mr. Pyle and I suggested |
| 22 | that we calendar the case for Friday, January the 9th. |
| 23 | By that time, he would have received my papers, the |
| 24 | Court would have received my papers, and that might be |
| 25 | an appropriate time to have the hearing. |
| 26 | MR. PYLE:  Or at least decide what we are |
| 27 | going to do.  Mr. Kilgore would like to have a hearing |
| 28 | with testimony by his former attorney and an opportunity |

```
 1   to give testimony himself.
 2              THE COURT:  I saw that in your papers.  Of
 3   course, when we do schedule a hearing, you will
 4   certainly have the opportunity to do that.
 5              MR. PYLE:  Okay.
 6              THE COURT:  Interestingly, the attorney
 7   involved just finished a jury trial in this department.
 8   In fact, it's not quite over yet.  And I made her aware
 9   of your interest.  So, she is aware of it.
10              MR. PYLE:  Okay.
11              THE COURT:  Okay.  So, January 5th then.
12              MR. STALLWORTH:  9th.  I'm sorry.
13              THE COURT:  January 9th.  Sorry, you are
14   correct.  And the papers to be filed by the prosecution
15   December 22nd?
16              MR. STALLWORTH:  Yes, Your Honor.
17              MR. PYLE:  On the 9th, what do we plan on
18   having?
19              THE COURT:  Well, that's not a regularly
20   scheduled motion today for this department.  So, if you
21   and counsel agree, Mr. Stallworth agree that you want to
22   go ahead with the hearing that day, I will be prepared
23   to do that.  If you want to use that date just --
24              MR. PYLE:  To define issues.
25              THE COURT:  Make sure all of the papers are
26   in, and schedule what and when you want to do that, I'm
27   fine, too.
28              MR. PYLE:  Okay.
```

GERALD A. DOHRMANN, C.S.R.#2046

1          MR. STALLWORTH:  That's fine.

2          THE COURT:  Done.

3          MR. STALLWORTH:  Thank you, Your Honor.

4          THE COURT:  January 9th, then.

5          THE CLERK:  Yes.

6          THE COURT:  I will put it back up here.

7                    ---o0o---

| | |
|---|---|
| 1 | **FRIDAY, JANUARY 9, 2004** |
| 2 | ---o0o--- |
| 3 | **- P R O C E E D I N G S -** |
| 4 | ---o0o--- |
| 5 | DEFENDANT'S MOTION FOR NEW TRIAL (CONT'D) |
| 6 | THE COURT: Calling the matter of People |
| 7 | versus Ivan Kilgore, No. 141033. |
| 8 | Counsel, your appearances this morning? |
| 9 | MR. STALLWORTH: Darryl Stallworth for the |
| 10 | People. |
| 11 | MR. PYLE: Walter K. Pyle for the defendant, |
| 12 | Mr. Kilgore. |
| 13 | THE COURT: And Mr. Kilgore is present in |
| 14 | custody this morning. |
| 15 | Good morning, everyone. |
| 16 | MR. STALLWORTH: Good morning. |
| 17 | THE COURT: Mr. Pyle is here representing Mr. |
| 18 | Kilgore for the purpose of this motion for a new trial. |
| 19 | Such was ordered, based on the nature of the motion, |
| 20 | based on the contention that trial counsel, Ms. Levy, |
| 21 | provided ineffective assistance of counsel. She is also |
| 22 | present in the courtroom. |
| 23 | Mr. Pyle, I have read and considered the papers |
| 24 | more than once that you filed on, I believe, November |
| 25 | the 24th; I have read the response filed on January the |
| 26 | 5th by Mr. Stallworth; and I have also had an |
| 27 | opportunity, pursuant to your motion, to review the |
| 28 | testimony of Matthew Bryant, Paul Herrmann, Raymond |

| | |
|---|---|
| 1 | Jones, Bianca Moore, Mary Loggins and Mary Washington. |
| 2 | In your papers, on the first page, cover page, |
| 3 | you indicated that in addition to the points and |
| 4 | authorities mentioned in your motion, you wished to be |
| 5 | given the opportunity to have Mr. Kilgore testify in his |
| 6 | own behalf, and you also wish to be allowed to call Ms. |
| 7 | Levy to clarify some points; true? |
| 8 | MR. PYLE: That is true, Your Honor. When I |
| 9 | say "having an opportunity to testify on his own |
| 10 | behalf," we were discussing there is an alternative way |
| 11 | which we can present written evidence what he was going |
| 12 | to testify to, also. |
| 13 | THE COURT: Well, you can do that, but it's |
| 14 | not subject to cross-examination that way. And this is |
| 15 | not a free ride for either side. In our system Mr. |
| 16 | Stallworth could not put on evidence without you having |
| 17 | the opportunity to have that evidence face the engine of |
| 18 | cross-examination. |
| 19 | MR. PYLE: Yes. |
| 20 | THE COURT: And the same is true for you and |
| 21 | Mr. Kilgore. You can't sit and throw darts in the blind |
| 22 | without being subject to cross-examination. |
| 23 | MR. PYLE: Yes. I recognize that. |
| 24 | THE COURT: That would be the Court's ruling. |
| 25 | MR. PYLE: Yes, I recognize. Whatever |
| 26 | evidence he presented, he would still be subject to |
| 27 | cross-examination by the District Attorney. But, yes, |
| 28 | we would like to do that to develop the record. We |

1    have -- Mr. Kilgore received these only yesterday, and

2    we have been discussing them now, but we would ask for a

3    date for a hearing to be set.

4              THE COURT:   That was today.   I'm assuming that

5    you have discussed this and have some plan when you

6    asked to testify at a hearing.   I mean I set aside the

7    whole day for you today.   I have one 10-minute matter

8    other than yours.   Ms. Levy has a matter in some other

9    courtroom this morning that we had to call and get her

10   excused from so she could be here.

11             I don't mean to hassle you too much, but just in

12   looking an at this, this case is now a year old, close

13   to it, since the verdict came in.

14             MR. PYLE:   My understanding -- I may have

15   misinterpreted -- but my understanding was that what was

16   going to happen today was not to be determined.

17             Might I have a few minutes?

18             THE COURT:   Sure.

19             (Short discussion off the record)

20             MR. PYLE:   Your Honor, again, I have discussed

21   this with Mr. Kilgore.   It is our position that -- I

22   want to clarify.   I didn't receive these, the District

23   Attorney's opposing papers, until Tuesday, the 6th, and

24   I have discussed this with Mr. Kilgore.   And until we

25   received his papers, we were not in the position to plan

26   strategy or tactics for a hearing, and I believe we are

27   not really ready to proceed because of that fact.

28             We simply need a little bit of time to prepare

```
 1   tactics, strategy.
 2            THE COURT:   It seems to me, just in looking at
 3   what the District Attorney did respond to, given the
 4   overall claim of ineffective assistance of counsel, that
 5   part of it, Mr. Kilgore has been talking about for some
 6   number of months now, and the District Attorney's papers
 7   on page 2 start out:
 8            "Given the points and authorities
 9            that he's submitted, that there is a
10            presumption, a strong presumption,
11            that counsel's conduct falls within
12            the wide rang of reasonable
13            professional assistance.   In
14            addition, the defendant must demon-
15            strate that it's reasonably probable
16            a more favorable result would have
17            occurred in the absence of counsel's
18            failings."
19        The rest of his arguments concerning how she was
20   allegedly ineffective, and that is, failing to object to
21   the claim of Matthew Bryant's taped statement, that's
22   really got nothing to do with any testimony by Mr.
23   Kilgore.   That's a legal decision.
24        And Matthew Bryant gave a statement, and the
25   question concerns the level of her cross-examination:
26   Was it sufficient?
27        Next, point two at page 4 -- at least the way the
28   D.A. has it outlined, and I think he tried to line it up
```

```
 1   pretty much with yours -- he responds that counsel was
 2   ineffective -- trial counsel was ineffective for not
 3   asking for a 403 hearing concerning the testimony of
 4   Raymond Jones and whether the statement he gave the
 5   police was voluntary or not.  That really has little to
 6   do with Mr. Kilgore's testimony.
 7          Third, cross-examination of prosecution
 8   witnesses, suggesting that was ineffective, his testi-
 9   mony may have something to do with that, but I know he's
10   been working with this for months, because it was in his
11   papers, and that's discussed.
12          And then there is, talking about Dr. Herrmann's
13   opinion about, since the Court allowed it, about his
14   ability to testify in his opinion based on his
15   experience how far the shotgun blast that struck the
16   victim was from the victim, how far the shotgun was from
17   the victim, what is it that you need time to do?
18          MR. PYLE:  I agree with the Court in part and
19   I don't agree with everything.
20          THE COURT:  That's why I asked.
21          MR. PYLE:  Right.  Let me start backwards with
22   Dr. Herrmann's testimony.
23          THE COURT:  And relate it to why Mr. Kilgore
24   can't -- I mean today was the day.  I didn't set today
25   just so we can come in and say, okay, fine.  Your
26   request to put on evidence is a part of your motion.
27          MR. PYLE:  Yes.
28          THE COURT:  And, if you would, if you would
```

```
 1   relate them as to how it would affect Mr. Kilgore
 2   testifying.  And if you want to start with Dr. Herrmann,
 3   that --
 4              MR. PYLE:  Mr. Kilgore's testimony would not
 5   affect anything having to do with Dr. Herrmann, his
 6   opinion.  And that would -- that I think --
 7              (Short discussion off the record)
 8              THE COURT:  I mean that's pretty much going to
 9   be a legal argument, I think.
10              MR. PYLE:  I think it probably is, Your Honor.
11   However, and with regard to the cross-examination of
12   prosecution witnesses, I don't have too much of a
13   problem with that, really.
14              Yes.  There may be some -- well, what I'm saying,
15   probably most of that would not involve Mr. Kilgore's
16   testimony.  There might be some additional evidence,
17   depending on what Ms. Levy has to say about that.
18              With the 403 hearing, however, what we had hoped
19   to be able to do was to present evidence as to what Mr.
20   Kilgore's testimony would have been, had there been a
21   403 hearing at the trial.
22              THE COURT:  This is concerning the admissi-
23   bility of the Oklahoma incident?
24              MR. PYLE:  Yes.
25              THE COURT:  I mean he's had that in his mind
26   for some time.  I'm assuming, since it's being used to
27   supplement your motion, that you were not just shooting
28   in the blind; that when you made that statement in your
```

GERALD A. DOHRMANN, C.S.R. #2046

1   papers, that you had some purpose that you were cogni-
2   zant of and prepared to do.

3           MR. PYLE:  Oh, yes.

4           THE COURT:  And now you are telling me you are
5   not prepared.  It certainly is not based on anything
6   that the D.A. wrote.

7           MR. PYLE:  No.  We didn't know that until we
8   got the papers.  We didn't know what his defense or what
9   his response was going to be, or what his tactics were
10  going to be until we got his papers.  So, we were not
11  really in a position to say we are prepared -- if he
12  says that, we are prepared if he says that, and we are
13  prepared if he says something else.

14          So, yes, we have most of this actually in mind as
15  to how it's going to be presented, but we just don't
16  have -- we don't really have enough to say we are ready
17  to go right this morning.

18          THE COURT:  What, pray tell, have we been
19  doing for the last three or four months?

20          MR. PYLE:  Well, we have been -- we have been
21  communicating; we have been talking.  And I have -- and
22  I do have an outline of the testimony that's of -- I
23  know what he is going to probably testify about.  I
24  simply need a little more time to go over that with him
25  to make sure we are all on the same page.

26          THE COURT:  From a lawyer's standpoint,
27  dealing with legal issues, you are prepared to deal with
28  Mrs. Levy this morning?

GERALD A. DOHRMANN, C.S.R.#2046

1    |    MR. PYLE:   I can deal with Ms. Levy in -- let
2    me see (Examining)
3    |    THE COURT:   I mean your first point, it seems
4    to me, you could ask Ms. Levy some questions about that.
5    |    MR. PYLE:   Yes.
6    |    THE COURT:   I don't think Mr. Kilgore -- and
7    I'm hypothesizing here -- would have a whole lot to say
8    about that.   That was a legal decision concerning not
9    objecting to the playing of the tape of Matthew Bryant.
10   |    MR. PYLE:   Yes.
11   |    THE COURT:   Point two in your points and
12   authorities is something that Mr. Kilgore would be
13   testifying about, I assume.
14   |    MR. PYLE:   Yes.
15   |    THE COURT:   Point three concerning the
16   testimony of ineffective cross-examination of Raymond
17   Jones, both at the 402 hearing and his testimony, and
18   the testimony of Bianca Moore may be something that you
19   might want to ask both about.   I don't know.   It seems
20   logical.
21   |    Point four would seem to pertain to Ms. Levy
22   only.   That's a legal question concerning Dr. Herrmann.
23   |    MR. PYLE:   Yes.
24   |    THE COURT:   And then in sum, overall, you
25   believe he received ineffective assistance of counsel.
26   |    What I'm saying, Mr. Pyle, I set aside the day,
27   for the exception of about 10 minutes, and I was hoping
28   to get something done today.

1          **THURSDAY, FEBRUARY 19, 2004**

2                    ---o0o---

3              **- P R O C E E D I N G S -**

4                    ---o0o---

5       DEFENDANT'S MOTION FOR NEW TRIAL (CONTINUED)

6                   **PHIL GREEN,**

7              called as a witness on behalf of

8              the Defendant, after having been

9              first duly sworn, testified as

10             follows:

11          THE CLERK:  Officer, after you are seated and

12     after adjusting the microphone, please spell your first

13     name and spell your last name.

14          THE WITNESS:  My name is Phil Green, P-h-i-l,

15     G-r-e-e-n.

16          THE COURT:  And just for the record, this is

17     in the matter of People versus Kilgore, and we have been

18     taking the testimony of trial counsel, Deborah Levy, and

19     we are interrupting that testimony at this point to take

20     the testimony of Sergeant Green.

21          Ready to proceed?

22          MR. PYLE:  Yes.  I would like to have an item

23     marked as an exhibit, looks like a face sheet and

24     attached to one, two, three pages of notes which I

25     believe will be relative to Sergeant Green, and two

26     pages of notes -- excuse me -- three pages of notes,

27     also, which will be relevant to Sergeant Olivas.

28          THE COURT:  What item will that exhibit be?

```
 1                THE CLERK:  I think A.

 2                THE COURT:  Were there any other -- it's been

 3      awhile.  Were there any defense exhibits filed as to

 4      her?

 5                MR. STALLWORTH:  I don't remember any being

 6      filed.

 7                THE CLERK:  I looked and I couldn't find a

 8      record.

 9                THE COURT:  Do you have any in mind?

10           So, let's go with Defense A.  If we find a

11      problem, we will re-letter it.  So, right now, the

12      Defense A is six pages of notes, cover sheet.

13                MR. PYLE:  A face sheet plus six pages of

14      notes.

15                               (Whereupon, Defendant's
                                 Exhibit A now marked for
16                               Identification)

17                THE COURT:  Thank you.  Go ahead.

18                MR. PYLE:  On the face sheet, for the record,

19      it talks about interview with the person Bianca Moore.

20      If I may show this to the officer.

21                THE COURT:  Sergeant Green, since the notes

22      you have, apparently, are some of yours and some of

23      Sergeant Olivas, in testifying, you need to rely

24      apparently on your notes and your memory --

25                THE WITNESS:  Yes, sir.

26                THE COURT:  -- not on Olivas's.

27                          DIRECT EXAMINATION

28                MR. PYLE:  Q.  Sergeant Green, you were one of
```

1   the officers involved in the investigation of the

2   William Anderson shooting; is that correct?

3   A.      Yes, sir.

4   Q.      And as part of that investigation, you took a

5   statement from Bianca Moore?

6   A.      Yes, sir.

7   Q.      And she claimed to be present at the time of the

8   shooting.

9   A.      Yes.

10  Q.      I have shown you what is exhibit A there, and I

11  see you have that in front of you.  Can you tell us in

12  your own words what exhibit A is?

13  A.      Exhibit A is seven pages.  The top sheet is what

14  we call an Interview Room Door Log, which is hung on the

15  outside of the interview room to document our comings

16  and goings with the witness, suspect or interview

17  person; next three pages are notes written by myself;

18  and the last three are notes written by Sergeant Olivas

19  relating to the Bianca Moore interview.

20  Q.      You were obviously present when you wrote those

21  notes on the first three pages?

22  A.      Yes, sir.

23  Q.      Were you also present when Sergeant Olivas was

24  writing his notes?

25  A.      Yes.

26  Q.      And those are the second three sets of pages at

27  the end.

28  A.      Yes.

1  Q.    All right.  I'd like to refer to your notes which
2  I understand are the first three pages after the door
3  log.
4  A.    Yes, sir.
5  Q.    And those, up at the top of the first page of
6  your notes, there is, I believe, a date, and that says
7  what?  Does it say 7/17?
8  A.    7/17/00.
9  Q.    And there is 201 in the middle?
10 A.    That's the room number.
11 Q.    And then there are some initials out to the
12 right-hand side?
13 A.    Yes, sir.
14 Q.    What do those say?
15 A.    PG, which are my initials, slash EJO for Enoch
16 Joseph Olivas.
17 Q.    You recognize those first three pages of hand-
18 written notes as your notes?
19 A.    Yes, sir.
20 Q.    Would you tell us briefly your procedure?  What
21 I'm getting at, how are these notes prepared?  When did
22 you start taking the notes?  And how were the notes
23 prepared?
24 A.    These notes are taken during the interview.  As
25 soon as we sat down, we wrote the date and time we went
26 in.
27       We began asking the interview person background
28 information -- in this case, her name, her address and

```
 1   whatnot -- and then we immediately, as we began talking,
 2   started taking notes.
 3   Q.     And she would tell you information, and you would
 4   write that information down in your notes?
 5   A.     Yes, sir.
 6   Q.     And it looks like just under the date there is a
 7   time; is that visible on your --
 8   A.     Yes, sir.
 9   Q.     -- copy?
10          And what time did you start talking?
11   A.     0005, which is five minutes after midnight on the
12   17th.
13          THE COURT:  Let me stop you for a couple of
14   seconds.
15          (Short discussion off the record)
16          THE COURT:  Sorry for the interruption.
17          MR. PYLE:  Q.  I'm going to ask you some
18   questions about the first page of your nets, and go down
19   one, two, three, four, five paragraphs there, and that
20   pertains to some information about somebody named Ivan?
21   A.     Yes, sir.
22   Q.     And you obtained that information from Bianca
23   Moore.
24   A.     Yes.
25   Q.     It looks like a description of a gentleman.
26   A.     Yes.
27   Q.     This was the description she gave you?
28   A.     Yes.
```

1  Q.    And could you read those notes for the record?
2  And just read those notes for the record?
3  A.    Yes, sir.  Paragraph 5 says, "Ivan, MB," which
4  means male black; "20 to 21", referring to age; "6-
5  zero", referring to feet; "160 slash 170," regarding the
6  weight; "fair, lighter brown," referring to his
7  complexion; "last seen with slight hair, and he drives
8  unknown car."
9  Q.    The information that he drives an unknown car,
10  she was telling you that he drove a car, but she did not
11  know what kind of a car it was?
12  A.    Basically, I asked her what kind of car he has,
13  and she said she didn't know.
14  Q.    There is nothing -- well, let me ask you this:
15  Is there anything in there -- I see on the next para-
16  graph, the sixth paragraph, she tells you something how
17  many times she's seen Ivan before?
18  A.    Yes.
19  Q.    What do your notes reflect she told you in that
20  regard?
21  A.    Two times before.
22  Q.    Now, when you say "two times before," we are
23  speaking of two times before this incident?
24  A.    Right.
25          MR. PYLE:  That's all of the questions I have.
26          THE COURT:  Cross?
27          MR. STALLWORTH:  No questions, Your Honor.
28          THE COURT:  May the witness be excused?

```
 1                MR. STALLWORTH:  Yes.

 2                MR. PYLE:  Yes.

 3                THE COURT:  Thank you, Sergeant Green.

 4                THE WITNESS:  Thank you, Your Honor.

 5                THE COURT:  Do you expect Olivas to be any

 6      longer than Sergeant Green?

 7                MR. PYLE:  No.

 8                THE COURT:  Why don't we put him on so we can

 9      get him back on the street where he belongs.

10                        ENOCH JOSEPH OLIVAS,

11                     called as a witness on behalf of

12                     the Defendant, after having been

13                     first duly sworn, testified as

14                     follows:

15                THE CLERK:  Officer, after you are seated and

16      after adjusting the microphone, please spell your first

17      name and spell your last name.

18                THE WITNESS:  Okay.  First name is Enoch,

19      E-n-o-c-h, middle of Joseph, common spelling, last name

20      Olivas, O-l-i-v-a-s.

21                        DIRECT EXAMINATION

22                MR. PYLE:  Q.  Sergeant Olivas, beside you

23      there you have something marked exhibit A, which is a

24      collection of seven pages.  And I understand from the

25      testimony of Sergeant Green who came before you, the

26      last three pages of that exhibit are your notes; is that

27      correct?

28      A.    I'm looking at it right now.  And, yes, that is
```

1  correct.

2  Q.    Now, it's my understanding that these notes were

3  notes you wrote down when you and Sergeant Green were

4  talking to Bianca Moore.

5  A.    Yes, sir.  That is correct.

6  Q.    And that was a few minutes after midnight on July

7  17th of 2000?

8  A.    Correct.  I have the time to be five minutes

9  after midnight.

10  Q.    Later on, the two of you took a taped -- actual

11  taped statement; is that correct?  Do you have a

12  recollection of that?

13  A.    Yes, I do.  Yeah, we did take a taped statement.

14  Q.    And these notes were taken before the tape

15  recorder was turned on.

16  A.    That is correct.

17  Q.    The notes which you identify as your notes being

18  the last three pages of the exhibit, up in the upper

19  right-hand corner of each page, the pages are numbered

20  one, two and three; is that correct?

21  A.    Yes, sir.  That's correct.

22  Q.    I'd like to turn to page 2, which would be the

23  next-to-the-last page of the exhibit.

24  A.    Okay.

25  Q.    And I want to ask you some questions about that

26  last paragraph there.

27        Before I do, would you describe briefly how you

28  took those note?  You were sitting at a table --

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    -- with Bianca Moore? |
| 3 | A.    Yes. |
| 4 | Q.    And you and Sergeant Green would ask her |
| 5 | questions? |
| 6 | A.    That is correct. |
| 7 | Q.    And then she would make a response? |
| 8 | A.    Yes. |
| 9 | Q.    And you would take notes as to what she said. |
| 10 | A.    Correct. |
| 11 | Q.    In that last paragraph on page 2, which is the |
| 12 | next-to-the-last paragraph -- next-to-the-last page of |
| 13 | the exhibit, could you read those notes for us? |
| 14 | A.    Of course.  Once again, when we are taking notes, |
| 15 | and I'm taking notes, I'm abbreviating and I'm in an |
| 16 | outline form.  That's why it may have sound choppy.  But |
| 17 | I'm keeping up with the conversation, so the last |
| 18 | paragraph of my page 2 notes? |
| 19 | Q.    Yes. |
| 20 | A.         "Bianca was close to the car. |
| 21 |              Bianca believes Ivan was the |
| 22 |              shooter, because it was his car, and |
| 23 |              Will was having problems with Ivan." |
| 24 | Q.    Okay.  Do you have any other recollection about |
| 25 | that part of the conversation? |
| 26 | A.    No, sir, I do not. |
| 27 | Q.    Okay.  But we can -- you are confident that that |
| 28 | accurately reflects the substance of what she told you |

1  about who Ivan was, or why she believed Ivan was the

2  shooter.

3  A.    That is correct.  And as she was talking, I was

4  writing it down.

5          THE COURT:  Could you read it one more time?

6  I was trying to take notes, too.

7          THE WITNESS:  Yes, Your Honor.

8          "Bianca was close to the car.

9          Bianca believes Ivan was the

10          shooter, because it was his car, and

11          Will was having problems with Ivan."

12          THE COURT:  Thank you.

13          THE WITNESS:  You're welcome.

14          MS. LEVY:  That's all of the questions I have.

15          THE COURT:  Cross?

16          MR. STALLWORTH:  No questions, Your Honor.

17          THE COURT:  I have got one.

18      Was there a lead investigator during this inter-

19  view of Ms. Moore?

20          THE WITNESS:  Yes.

21          THE COURT:  Who was the lead?

22          THE WITNESS:  Sergeant Phil Green.

23          THE COURT:  I have heard before during

24  testimony in other cases that when a person is a lead

25  investigator, they ask most of the questions?

26          THE WITNESS:  Yes.  It's two-fold.  They ask

27  most of the questions, and then the second investigator

28  will conduct questions, ask backup questions, if

1   everything wasn't covered, or just to clarify some

2   issues; or while the lead investigator and the person

3   are having dialogue, the second investigator was quiet,

4   may think of a question to when it's his or her turn,

5   that's when they ask.

6           THE COURT:  You functioned as a lead investi-

7   gator in interviews other than with Bianca Moore?

8           THE WITNESS:  Oh, with many, many.

9           THE COURT:  And my question concerns this:   In

10  terms of your experience, when there are two

11  individuals, two officers interviewing someone, and

12  there is a lead questioner and someone else who plays

13  the role that you just described, is there a difference

14  in how the notes are taken?

15          THE WITNESS:  No.  I'll answer it from my

16  personal experience.

17      If I'm the lead investigator having dialogue, a

18  lot of times I'm establishing that rapport with that

19  individual.  A lot of times my notes won't be as

20  detailed, because I don't want to separate the rapport

21  by stopping and taking notes, or I should say mine are

22  more difficult to read because I'm going a lot faster

23  trying to scribble as we are talking.  But we are both

24  taking notes.

25          THE COURT:  But there may be some difference

26  in the notes, depending on who is asking questions,

27  because the other person is sitting there not engaged in

28  that rapport.

```
 1              THE WITNESS:  That is correct.

 2              THE COURT:  Based on mine, questions either

 3   side?

 4              MR. PYLE:  No questions.

 5              MR. STALLWORTH:  No questions, Your Honor.

 6              THE COURT:  May he be excused?

 7              MR. STALLWORTH:  Yes.

 8              MR. PYLE:  Yes.

 9              THE COURT:  Thank you.

10              THE WITNESS:  You're welcome, Your Honor.

11              THE COURT:  Could I have exhibit A, please?

12              THE WITNESS:  Yes.

13              THE COURT:  Thank you.

14              THE WITNESS:  You're welcome.

15              THE COURT:  All right.  I know that I have

16   seen Ms. Levy here.  I assume that's going to be a

17   longer interview.

18              MR. PYLE:  We also have Monte Beers here.  He

19   is going to be a little longer than these two people.

20              THE COURT:  I will go ahead and handle the

21   civil matter, because the people have been here, and in

22   that case, it's been requested that the hearing we hold

23   is confidential.

24         So, anybody that's not associated with the civil

25   matter on the calendar today will be asked to leave the

26   courtroom, please, except, obviously, the courtroom

27   staff.

28         These hearings vary in their length of time.  We
```

1    will try to get back to you as soon as we can.

2             MR. PYLE:   All right.

3             (Whereupon, the mid-morning recess was taken)

4                          ---o0o---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1                      - AFTER RECESS -

 2                         ---o0o---

 3              THE COURT:  Are we ready again?

 4              MR. STALLWORTH:  Yes.

 5              THE COURT:  Ready, Mr. Pyle?

 6              MR. PYLE:  Yes.

 7              THE COURT:  Back on the record in the Kilgore

 8    matter.

 9          Mr. Pyle, your next witness.

10              MS. LEVY:  Yes.  I would like to call Mr.

11    Monte Beers.

12              THE CLERK:  Stop and raise your right hand,

13    please.

14                      MONTE BEERS,

15              recalled as a witness on behalf of

16              the Defendant, after having been

17              first duly sworn, testified

18              further, as follows:

19              THE CLERK:  Sir, after your seated and after

20    adjusting the microphone, please spell your first name

21    and spell your last name.

22              THE WITNESS:  It's Monte Beers, M-o-n-t-e is

23    the first name, last name B-e-e-r-s.

24                   DIRECT EXAMINATION

25              MR. PYLE:  Q.  Mr. Beers, what is your

26    business or profession, please?

27    A.      I'm a California licensed private investigator.

28    Q.      And you are familiar with Mr. Ivan Kilgore, the
```

1  defendant in this case?

2  A.    Yes, sir.

3  Q.    And you are also familiar that his attorney was

4  Deborah Levy?

5  A.    Yes, sir.

6  Q.    And Ms. Levy, I understand, you did some

7  investigation for her in connection with this case; is

8  that correct?

9  A.    Yes, sir.

10  Q.    There was a witness in the case by the name of

11  Matthew Bryant.  Have you heard that name before?

12  A.    Yes, sir.

13  Q.    Did Ms. Levy ever ask you to contact Mr. Matthew

14  Bryant?

15  A.    No, sir.

16  Q.    She did not ask you to interview him.

17  A.    No, sir.

18  Q.    Did Ms. Levy ever ask you to investigate the

19  attic at 509 Sycamore in Oakland?

20  A.    No, sir.

21        MR. PYLE:  That's all of the questions I had.

22        MR. STALLWORTH:  I don't have any questions.

23        THE COURT:  I will just finish my notes.

24  Okay.

25        MR. STALLWORTH:  I don't have any questions,

26  Your Honor.

27        THE COURT:  May he be excused?

28        MR. STALLWORTH:  Yes.

```
 1              MR. PYLE:  Yes.
 2              THE COURT:  Mr. Beers.
 3              THE WITNESS:  Thank you, Your Honor.
 4              MR. PYLE:  I will go get Ms. Levy.
 5              THE COURT:  Good morning, Ms. Levy.
 6              THE WITNESS:  Good morning, Judge.
 7                        DEBORAH LEVY,
 8                  called as a witness on behalf of
 9                  the People, after having been
10                  previously duly sworn, testified
11                  further as follows:
12              THE COURT:  Ms. Levy was previously sworn on
13    January 9th, and we interrupted her, I believe, direct
14    examination by Mr. Pyle basically for record purposes
15    that she had not had a chance to review her record and
16    any notes she might have had on the case.
17              And I presume you have had a chance to do that
18    now?
19              THE WITNESS:  Yes, Your Honor.
20              THE COURT:  Ready to resume?
21              MR. PYLE:  I am.
22                  DIRECT EXAMINATION (CONTINUED)
23              MR. PYLE:  Q.  I understand the District
24    Attorney, since the last hearing, furnished you with
25    some transcripts?
26    A.      I have a part of the trial transcript.
27    Q.      I'd like to ask you some questions about Matthew
28    Bryant and the portion of the trial that dealt with the
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   taped -- tape-recorded statement of Matthew Bryant.

 2         You will recall in the trial that the District

 3   Attorney had asked Mr. Bryant some questions about what

 4   he had told Sergeant Green in an interview; correct?

 5   A.    I do recall that.

 6   Q.    And when the Prosecutor asked these questions of

 7   Mr. Bryant about the things he had told to Sergeant

 8   Green, Mr. Bryant said he didn't remember saying a

 9   number of those things; is that correct?

10   A.    That's correct.

11   Q.    And at that point the Prosecutor played the tape

12   for Mr. Bryant out of the presence of the jury; is that

13   correct?

14   A.    I know the tape was played.  I will assume it was

15   out of the presence of the jury at that point.

16   Q.    Would it help you if you had a copy of the tran-

17   script in front of you?

18   A.    I'm going to assume that it was done outside the

19   presence of the jury.  I don't have a problem with that.

20   Q.    And then the jury -- you recall then the jury

21   being brought back in at some point?

22   A.    Yes.

23         MR. PYLE:  Just for the record, I believe the

24   jury came back at page 253 of the transcript.

25   Q.    The Prosecutor then questioned Mr. Bryant and

26   asked him if Mr. Kilgore had told Mr. Bryant that he,

27   Mr. Kilgore, had shot somebody on July 16th.  Do you

28   recollect that testimony?
```

```
 1   A.      Yes.

 2   Q.      That question?

 3           And Mr. Bryant said that Mr. Kilgore had never

 4   told him that; is that correct?

 5   A.      (Nods head in the affirmative).  I have to review

 6   the transcript, but --

 7   Q.      You have page 265 there?

 8   A.      (Examining)

 9   Q.      At the top of the page?

10   A.      (Examining)  Thank you.  I have been able to

11   review that.  That is correct.

12   Q.      However, the Prosecutor went on to ask Mr. Bryant

13   that on the tape-recorded statement with Sergeant Green,

14   he asked him:

15               "Did Mr. Bryant tell Sergeant Green

16                that the defendant said he shot

17                someone?"

18           And Mr. Bryant said, "Yes, I did."

19   A.      Correct.

20   Q.      Indicating that was what he told Sergeant Green;

21   correct?

22   A.      Correct.

23   Q.      And Mr. Bryant went on to say he had been

24   untruthful to Sergeant Green when he said that; correct?

25   A.      Correct.

26   Q.      And Mr. Bryant went on to testify that he never

27   in fact had actually talked to the defendant after the

28   shooting; is that correct?
```

1    A.      That's correct.

2    Q.      And after, then the Prosecutor had the tape

3    recording marked as exhibit 11 and indicated that he

4    wanted to play the tape to the jury, and also to pass

5    copies of the transcript of that tape recording out to

6    the jury; is that correct?

7    A.      Correct.

8    Q.      You did not make an objection to the playing of

9    the tape; is that correct?

10   A.      Correct.

11   Q.      And you did not make an objection to distributing

12   copies of the transcript to the jury.

13   A.      Correct.

14   Q.      And then the Prosecutor played the tape to the

15   jury, beginning at page 259 of the transcript; is that

16   correct?

17   A.      Yes.

18   Q.      And on the tape -- on the tape Mr. Bryant told

19   Sergeant Green that on the tape Mr. Bryant said that Mr.

20   Kilgore had gotten jumped and some weed had been taken

21   from him, page 262.

22   A.      That's correct.

23   Q.      And Bryant also said, on page 263, he said,

24   "Yeah, Giz had been known to sell weed"; is that

25   correct?

26   A.      Correct.

27   Q.      And Giz, he identified, as being the defendant,

28   Mr. Kilgore.

1  A.     Correct.

2  Q.     And I think we have touched on this at the last

3  hearing.  But since then you have reviewed some tran-

4  scripts.  Do you have any recollection whether up to

5  that point in the trial, do you recall whether there had

6  been any testimony that Mr. Kilgore had sold weed?

7  A.     I have had a chance to review that.  And, no,

8  there was not any testimony regarding that prior to the

9  tape being played.

10 Q.     And you understand "weed" to be a common

11 terminology for marijuana?

12 A.     I do.

13 Q.     And on the tape -- referring to page 265 of the

14 transcript -- on the tape Mr. Bryant told Sergeant Green

15 that Raymond Jones had told Bryant that Giz had shot a

16 guy?

17 A.     Correct.

18 Q.     And then Bryant told Sergeant Green how Mr. Jones

19 described the shooting to him, Mr. Bryant.

20 A.     Correct.

21 Q.     The Prosecutor on direct examination had earlier

22 asked, at page 265, asked Mr. Bryant if Sergeant Green

23 had made any threat in relation to Bryant giving Green

24 the statement; is that correct?

25 A.     Correct.

26 Q.     And Bryant responded yes, and said these threats

27 had to do with Mr. Bryant having been arrested for his

28 second auto theft.

```
1    A.      Correct.
2    Q.      And Bryant later testified, at page 281, that
3    giving the statement to Sergeant Green turned out to be
4    Mr. Bryant's ticket out of jail?
5    A.      (No response)
6    Q.      Referring to page 281, lines 8 to 10.
7    A.      (Examining)  Yes.
8            THE COURT:  I'm sorry.  Who described it as
9    that in the transcript?
10           MR. PYLE:  I believe Ms. Levy is asking
11   Matthew Bryant.
12           THE COURT:  And those words are Ms. Levy's
13   words or --
14           MR. PYLE:  The question was from Ms. Levy:
15           "And because the sergeant asked you
16           what else do you know, you thought
17           you would tell him about this."
18       And Mr. Bryant said, "Yes."
19       And Ms. Levy said:
20           "You thought it would be your ticket
21           out of the jail?"
22       And Mr. Bryant responded, "Actually, it was"; is
23   that correct?
24   A.      That's correct.
25           THE COURT:  Thank you.  I'm assuming if it's
26   incorrect at some point, you will let me know, Mr.
27   Stallworth.
28           MR. STALLWORTH:  I would, Your Honor.  That
```