1   reflects the transcript accurately.

2           THE COURT:  Thank you.

3           MR. PYLE:  Q.  Now, in view of the statement

4   by Mr. Bryant about threats by Sergeant Green, did you

5   consider moving to exclude Mr. Bryant's statement or the

6   tape altogether on the grounds it was an involuntary

7   statement because of the threats?

8   A.    I, in fact, filed a motion that was heard

9   pretrial exactly to that issue regarding Mr. Jones'

10  testimony that the Court denied.

11  Q.    I'm sorry.  Mr. Jones' testimony?

12  A.    I'm sorry.  As to Mr. Matthew Bryant, I did not.

13  Q.    Okay.  Now, did you not interview Mr. Bryant

14  before he testified?

15  A.    Correct.

16  Q.    And you did not ask your investigator, Mr. Beers,

17  to interview him; is that correct?

18  A.    It was my understanding, when I picked up the

19  case, Mr. Beers had been the investigator and had

20  attempted contact with Mr. Bryant to no avail.

21  Q.    And that was -- you had heard that the previous

22  attorney, Mr. Harry Traback, had sought the present

23  address of Matthew Bryant and some other witnesses,

24  also; is that correct?

25  A.    I cannot verify what Mr. Traback did or did not

26  do, but I do know Mr. Beers had attempted contact with

27  Mr. Bryant three or four times.

28  Q.    Now, one possible option would be to make inquiry

1    of the District Attorney if he had any later addresses

2    for Mr. Bryant and these other witnesses; is that

3    correct?

4    A.    Correct.

5    Q.    Now, I understand you did not make such an

6    inquiry.

7    A.    That's correct.

8    Q.    And was that because you thought if you made such

9    an inquiry, that it might cause the District Attorney to

10   go out and locate those witnesses?

11   A.    No.  It was my belief that an interview of Mr.

12   Bryant would not be helpful to Mr. Kilgore.

13   Q.    Did you at some point think that if you did not

14   attempt to contact these witnesses or to ask the

15   District Attorney about their whereabouts, that perhaps

16   these witnesses would not show up in court?

17   A.    You are asking about my thought processes, Mr.

18   Pyle.  That may have entered my mind.

19   Q.    In any event, you elected not to follow up on

20   getting this information from the District Attorney.

21   A.    Mainly because I felt an interview of Mr. Bryant

22   would not be helpful.

23   Q.    There's also a witness, Mr. Kevin Tomlinsonn?

24   A.    That's correct.

25   Q.    And now there had been some -- you were aware of

26   a 1997 conviction of Mr. Bryant -- excuse me -- Mr.

27   Kilgore in Oklahoma; is that correct?

28   A.    That's correct.

1   Q.   And at some point this 1997 conviction also came

2   up in the cross-examination of Kevin Tomlinsonn?

3        Page 306 and 307 on the transcript.

4   A.   (Examining)  It was my recollection that Mr.

5   Tomlinsonn was asked about a prior felony.

6        If I could review the pages.  (Examining)  It

7   does not refer to a prior murder, but prior felony

8   conviction.

9   Q.   Okay.  Let me approach it this way:  You called

10   Mr. Kilgore's landlord as a witness.

11   A.   Correct.

12   Q.   And that was Mr. Kevin Tomlinsonn.

13   A.   Correct.

14   Q.   And Mr. Tomlinsonn testified that the defendant

15   became a tenant in his building and worked around the

16   building in small capacities.

17   A.   Correct.

18   Q.   And Mr. Tomlinsonn testified, in response to

19   questions from you at page 290 in the transcript, he

20   testified that the defendant was, quote, reliable and

21   trustworthy, unquote.

22   A.   Correct.

23   Q.   Now, I believe, also at page 290 and 291, you

24   asked some questions about whether Mr. Tomlinsonn had

25   become aware of Mr. Kilgore's reputation for truth and

26   veracity within his community.

27   A.   Correct.

28   Q.   There was an objection by the District Attorney,

1   and then you asked some more questions on page 291 --

2   A.      Correct.

3   Q.      -- regarding the defendant's reputation for truth

4   and veracity, or at least related to that subject

5   matter; is that correct?

6   A.      (Examining)  Yes.

7   Q.      And then at page 298 of the transcript, the Court

8   said it would allow Mr. Tomlinsonn to testify as to Mr.

9   Kilgore's reputation for reliability and trustworthiness

10  but not as to his reputation for truth and veracity; is

11  that correct?

12  A.      That's correct.

13  Q.      Now, before you called Mr. Tomlinsonn as a

14  witness, did you consider the possibility that the

15  reputation questions might open the door to the prose-

16  cutor asking damaging questions about Mr. Kilgore's

17  reputation?

18  A.      Well, the damage was about Mr. Kilgore's prior

19  felony.  And when I had spoken to Mr. Tomlinsonn prior

20  to his testifying, he indicated that he was aware there

21  had been something.  He didn't know what Mr. Kilgore's

22  prior was.  And it was my opinion that Mr. Tomlinsonn

23  would testify the same and felt the same about Mr.

24  Kilgore regardless of that prior felony conviction.

25  Q.      Now, did you not make any kind of a motion in

26  limine or otherwise seeking to prohibit the prosecutor

27  from asking questions about prior felony convictions or

28  other bad acts of Mr. Kilgore?

```
 1   A.       No, I did not.
 2   Q.       Now, at page 306 and 307 of the transcript, the
 3   District Attorney asked Mr. Tomlinsonn the question, he
 4   asked him:
 5              "If you had known that he --"
 6              Meaning Mr. Kilgore.
 7              "-- had a felony conviction in 1997,
 8              would that have changed your opinion
 9              as to -- or would that have changed
10              your decision to hire him to work
11              for you?"
12              Is that correct?
13   A.       Correct.
14   Q.       Now, you did not make any objection to that
15   question --
16   A.       No.
17   Q.       -- or seek to strike it, or to otherwise keep Mr.
18   Tomlinsonn from answering that question.
19   A.       No, because it's my understanding that if you go
20   into someone's reputation of character, the other party
21   can add information that they may not have had about the
22   individual, and then ask if that changes their opinion.
23   Q.       Yes.  But, now, as to felony convictions, isn't
24   the inquiry about felony convictions limited to those
25   convictions that relate to the character trait that has
26   been testified to, in this case, reliability and trust-
27   worthiness?
28   A.       I would think that a homicide conviction would
```

```
 1   have some impact on someone's reliability and trust-
 2   worthiness.
 3   Q.    Okay.  Would you think -- now, this felony
 4   conviction in 1997 was the equivalent of involuntary
 5   manslaughter; is that correct?
 6   A.    Under California law.  Yes.
 7   Q.    Was it your belief that a conviction for
 8   involuntary manslaughter would be relevant to the
 9   question of reliability and trustworthiness?
10   A.    I would think it could be.  Yes.
11   Q.    Now, at page 308, the prosecutor asked Mr.
12   Tomlinsonn about the defendant being charged with
13   murder, and whether the possibility of the defendant
14   being convicted of murder, would that change your
15   opinion about whether or not you would hire him as a
16   manager; is that correct?
17   A.    Yes.
18   Q.    You did not make an objection to that question.
19   A.    Correct.
20   Q.    You did not find anything objectionable about
21   that question.
22   A.    (Examining)  Actually, looking at it now, perhaps
23   there is.
24   Q.    You had asked Mr. Tomlinsonn, I believe at page
25   298 of the transcript, whether or not the fact that you
26   asked him, beginning at the bottom of page 298, if he
27   was able to hire Mr. Kilgore back today, would you do
28   that?  Mr. Tomlinsonn said yes.
```

| | |
|---|---|
| 1 | A. And in fact I think that question might have |
| 2 | opened the door for Mr. Stallworth to ask about what if |
| 3 | Mr. Kilgore was convicted on the prior case. But, yes, |
| 4 | I did ask that. |
| 5 | Q. And then at page 307 -- 306 and 307 -- the |
| 6 | prosecutor asked Mr. Tomlinsonn if it would have changed |
| 7 | his decision to hire Mr. Kilgore to work for him if he |
| 8 | knew he had a 1997 felony conviction; is that correct? |
| 9 | A. Correct. |
| 10 | Q. And he also followed up, and asking if it would |
| 11 | concern Mr. Tomlinsonn whether the manager of his |
| 12 | building would have been someone with a felony |
| 13 | conviction; is that correct? |
| 14 | A. Correct. |
| 15 | Q. And you did not make an objection to either of |
| 16 | those questions. |
| 17 | A. Correct. |
| 18 | Q. Would you agree that it would -- that it's an |
| 19 | improper question to ask a character witness whether he |
| 20 | knows that the defendant has committed acts inconsistent |
| 21 | with character trait as opposed to whether he has heard |
| 22 | that the defendant has such -- had committed such acts? |
| 23 | A. Honestly, I don't see the distinction. Usually |
| 24 | people don't watch someone when they are in the act of |
| 25 | committing a prior felony. |
| 26 | Q. There was one other question with regard to Mr. |
| 27 | Bryant's taped testimony. |
| 28 | After looking at the transcript of the tape |

1  recording that Mr. Bryant made -- rather, Sergeant Green

2  made of the Bryant interview, does the transcript

3  suggest that these statements by Mr. Bryant on the tape

4  might provide evidence of premeditation?

5  A.    You are asking me to evaluate what I think the

6  tape implies?

7  Q.    Yes.

8  A.    I'm reluctant to do that, Mr. Pyle.

9  Q.    I'd like to ask you some questions about Bianca

10  Moore and her testimony.

11       Bianca Moore testified at trial as a witness for

12  the prosecution?

13  A.    Correct.

14  Q.    Now, prior to trial, you had been furnished with

15  a statement that Bianca Moore had given to the police?

16  A.    Correct.

17  Q.    And I believe you also had a transcript of the

18  taped interview she gave to sergeants Green and Olivas?

19  A.    Olivas.

20  Q.    Olivas.

21  A.    Yes, I did.

22  Q.    And you also had some notes from Sergeant Green

23  and Sergeant Olivas that they had taken just prior to

24  that taped interview; is that correct?

25  A.    Correct.

26  Q.    And those were -- that interview was in July

27  17th, 2000, I believe a little after midnight; is that

28  correct?

1  A.    I don't have the paperwork, Mr. Pyle.  I can't

2  tell you when that particular interview was held.

3  Q.    Okay.  Do you recollect that the statements she

4  had signed for the police was taken at approximately

5  1810 to 1840 hours, which I guess would be 5:00 -- I'm

6  sorry -- 6:10 p.m., starting at 6:10 p.m.; does that

7  sound about right?

8  A.    You are looking at the paper.  I will assume that

9  you are reporting what is on the paper, and take your

10  word for it.

11  Q.    In any event, it was taken shortly after the

12  shooting.

13  A.    That was my understanding.  Yes.

14  Q.    Now, at trial, page 335 of the transcript, Bianca

15  Moore testified that she saw the man in the car who had

16  a gun; is that correct?

17  A.    Correct.

18  Q.    And at page 355 of the transcript, you were

19  cross-examining Bianca Moore, and you asked her, at line

20  18, whether she had told the police in that first

21  interview, moments before the shooting, that Bianca

22  Moore thought it was Ivan or one of his friends; is that

23  correct?

24  A.    Correct.

25  Q.    You asked that question.  She said she did not

26  recall that; is that correct?

27  A.    Correct.

28  Q.    And you showed her the three-page police report

```
 1  and asked her if she had seen that before; correct?

 2  A.    Correct.

 3  Q.    And that was a copy of the police report she had

 4  signed at the bottom of each page?

 5  A.    That's correct.

 6  Q.    And at page 356 of the transcript she said she

 7  could not read the writing in the report; correct?

 8  A.    Correct.

 9            MR. PYLE:  Could we mark this three-page

10  document entitled Statement, Oakland Police Department,

11  as defendant's B?

12                          (Whereupon, Defendant's
                             Exhibit B now marked for
13                           Identification)

14            THE COURT:  Is this the statement that you

15  just referred to with Bianca Moore on -- I don't know if

16  I ever did get the date -- about 6:10 p.m.?

17            MR. PYLE:  This is.  This purports to be a

18  statement taken of Bianca Moore on 16 July, 2000,

19  between 1810 and 1840 hours.  It was apparently taken by

20  Officer E. Gerbaudo, G-e-r-b-a-u-d-o, serial number

21  8307P.

22  Q.    I show you a copy of the police report.  I may

23  have some questions about it.

24            Now, the signed statement said on page 3 of 3,

25  quote:

26                "I think it was Ivan or one of his

27                friends that shot William."

28  A.    That's correct.
```

1    Q.      "I saw a guy with a black shotgun in

2           the back of the Cadillac, but I'm

3           not sure I can recognize him,"

4           unquote.

5       Is that correct?

6    A.    That's correct.

7    Q.    Went on to state in the statement she could

8    recognize Ivan if she saw him again.

9    A.    That's correct.

10    Q.    And this was the statement, exhibit B that you

11    have there, that Bianca Moore claimed she could not read

12    the writing; is that correct?

13    A.    That's correct.

14    Q.    Now, you did not question her further about her

15    signed statement?

16    A.    (Examining)  I'm reviewing her testimony, and

17    nothing jumps out at me regarding that statement, but

18    there were certainly questions around what she had said.

19    Q.    You did not call Officer Gerbaudo, serial No.

20    8307P, to testify that she in fact had made those

21    statements that are reflected in exhibit B.

22    A.    That's correct.  Mr. Pyle, on page 366, starting

23    at lines 26, it looks like I do ask her again about her

24    original statement, about what she first told the

25    police.

26    Q.    I'm sorry.  Page 366?

27    A.    Line 26.

28    Q.    Yes.  You stated at page 366:

```
 1                    "Now, it's true that you first told
 2                    the police that you did not think
 3                    you would be able to recognize the
 4                    person in the back of the Cadillac;
 5                    is that correct?"
 6           And she said, "Correct."
 7     A.    And that's referring to that statement that's
 8     been marked as exhibit B.
 9     Q.    Okay.  Now, you had these other statements, the
10     rough notes of sergeants Green and Olivas, that had been
11     furnished to you, also; is that correct?
12     A.    That's correct.
13     Q.    I'd like to show you a copy of those notes, which
14     has been marked as exhibit A.
15     A.    (Examining)
16     Q.    Now, in the next-to-the-last page of that
17     exhibit -- and that page has a 2 with a circle around it
18     up at the top.  Do you see that?
19     A.    Yes.
20     Q.    And you understood those to be Sergeant Olivas's
21     notes?
22     A.    Honestly, it's usually difficult for me to tell
23     which investigator is writing which notes, but I'm
24     pretty sure on the stand I tried to clarify whose notes
25     were which.
26     Q.    Do you recollect Sergeant Green making any
27     references to whose notes were whose when he testified?
28     A.    As I just answered, Mr. Pyle, I do recall trying
```

1   to straighten out whose notes were whom.

2   Q.    At the bottom of page 2 in the last paragraph, it

3   says:

4               "Bianca was close to the car.

5               Bianca believed Ivan was the shooter

6               because it was his car, and Will was

7               having problems with Ivan."

8         Is that correct?

9   A.    Correct.

10  Q.    You did not seek to have Officer Olivas or Green

11  either to testify that Bianca Moore had made that

12  statement to them; is that correct?

13  A.    Without reviewing the testimony of those

14  sergeants, I cannot say for sure whether I asked them

15  that question or not.

16  Q.    I believe Sergeant Olivas didn't testify, did he?

17            MR. STALLWORTH:  Sergeant Olivas did not

18  testify at the trial.

19            THE COURT:  That's an agreed-upon stipulation?

20            MR. STALLWORTH:  Yes.

21            MR. PYLE:  So stipulated.

22  Q.    You from know from your experience as a criminal

23  attorney, if you had called an officer to authenticate

24  these notes, and in particular the statement that Bianca

25  believed it was Ivan was the shooter because it was his

26  car, you know from your experience that you could

27  probably have obtained an officer to testify and authen-

28  ticate those notes?

GERALD A. DOHRMANN, C.S.R.#2046

```
 1  A.      That's correct.
 2  Q.      Now, going to a slightly different matter.  At
 3  the preliminary examination Bianca Moore had testified
 4  that the weapon used was a sawed-off shotgun?
 5  A.      I did not review the Preliminary Hearing
 6  transcript, Mr. Pyle, but I will take your word for it
 7  that that is in her testimony.
 8          THE COURT:  Let's clarify that.  When you say
 9  you did not review the preliminary transcript, are you
10  referring to that for the purpose of this hearing or for
11  the purpose of the trial?
12          THE WITNESS:  For the purpose of this hearing,
13  Your Honor.
14          THE COURT:  Thank you.
15          MR. PYLE:  Q.  For the record I'm referring to
16  the preliminary transcript of June 4th, 2001, at page 29
17  and later page 30.
18          THE COURT:  Well, I understood her answer,
19  albeit I didn't clear it up any further, that she had
20  reviewed the PX.
21          But did you review it before trial.
22          THE WITNESS:  I did.
23          THE COURT:  She had reviewed it for trial,
24  just not for the purpose of this hearing.
25          THE WITNESS:  And, Mr. Pyle, I'm referring to
26  the trial transcript.  Page 357 I did ask Ms. Moore
27  about her knowledge regarding that Cadillac at lines 3
28  to 9.
```

```
 1              MR. PYLE:  Q.  Okay.  And you said, after Will
 2    pointed out the Cadillac, that you asked Ms. Moore
 3    whether she believed it was Ivan's car; is that correct?
 4    A.     Actually the question on line 3:
 5                  "This Cadillac, when you saw it, you
 6                  didn't know it belonged to Ivan; is
 7                  that true?"
 8    Q.     And she answered the question:
 9                  "When I saw it the first time when
10                  Will pointed it out or when it came
11                  back?"
12           And then you asked:
13                  "After Will pointed it out, then you
14                  believed that was Ivan's car;
15                  correct?"
16           And she said, "Yes."
17    A.     And then I asked:
18                  "But you had never seen Ivan in a
19                  vehicle before that; correct?"
20    Q.     And she said, "Yes, you're correct."
21    A.     Yes.
22    Q.     Dr. Herrmann had given testimony that the shotgun
23    had been fired from no more than 12 feet away; is that
24    correct?
25    A.     I believe he estimated about eight to twelve
26    feet.  Yes.
27    Q.     Now, when he testified to that, you did not seek
28    to examine him on his qualifications to give such
```

1   testimony.

2   A.      Mr. Pyle, I had the weapon test fired by an

3   expert.  Mr. Kilgore knows this.  Mr. Kilgore gave me

4   the make of the weapon; the make of the ammunition.  I

5   went to Forensic Labs.  They test fired the shot, and

6   the ballistics expert's estimate was exactly the same as

7   Dr. Herrmann.

8   Q.      So, for whatever reason you did not seek to

9   examine Dr. Herrmann on his ability to do this?

10  A.      Because my expert confirmed his position.

11  Q.      Okay.

12          THE COURT:  Hang on a minute, please.

13          (Short discussion off the record)

14          THE COURT:  Sorry for the interruption.

15      Mr. Dohrmann, would you re-read the last

16  question?

17          (Record re-read by the court reporter)

18          THE COURT:  Thank you.

19          MR. PYLE:  Q.  Was there any -- at some point

20  Dr. Herrmann expressed the opinion that the weapon was

21  not a sawed-off shotgun?

22  A.      I believe that's true because of the pattern, and

23  he mentioned it was quite close that he thought a

24  sawed-off shotgun would not get.

25  Q.      You did not seek to use that testimony or

26  evidence along those lines to contradict Bianca Moore's

27  testimony that it was a sawed-off shotgun.

28  A.      No.

1    Q.      Bianca Moore later testified that the deceased

2    was shot by -- next to a telephone pole?

3    A.      I believe so.  Yes.

4    Q.      And she was at a telephone -- or telephone, I

5    will call it -- a booth at the time of the shooting?

6    A.      My understanding, without looking at the exact

7    testimony, was Ms. Moore and Mr. Anderson and the other

8    two individuals were near the phone.  And I believe Ms.

9    Moore in her trial testimony or her statement said that

10   Mr. Anderson was a little further down the street near a

11   fire hydrant.

12   Q.      Mr. Kilgore had asked you to have your investi-

13   gator go out and measure the distances from the

14   telephone pole to San Pablo?

15   A.      Mr. Kilgore was quite in love with the different

16   distances and the weapon, and thought that that was

17   going to turn the case around.  Yes.

18   Q.      As I understand it, you did not ask your

19   investigator to do that.

20   A.      Because it was my opinion, after having spoken to

21   the ballistics expert, that the estimate of how far the

22   gun had been shot was accurate.  No, I did not.

23   Q.      Now, if I recall correctly, there was some

24   testimony -- I'm sorry.  Was there a statement, one of

25   the witnesses said there had been two shots fired;

26   correct?

27   A.      There was a Mary Loggins and a Mary Washington --

28   frankly, at this point I cannot recall specifically

```
 1   which one -- but one of those women had testified to
 2   more than one shot.  Yes.
 3   Q.    Okay.  Now, didn't Terry Dandy also tell Sergeant
 4   Green there had been two shots?
 5   A.    Terry Dandy was the best friend of the victim.  I
 6   was not going to interview or call him as a witness, but
 7   I believe in his statement he did mention more than one
 8   shot.
 9   Q.    Now, when Bianca Moore gave her signed statement
10   to the police, which is exhibit B there, she did not
11   mention Terry Dandy at all.
12   A.    No, she used a different name.  I believe it was
13   Richard Davis.
14   Q.    Oh, that particular statement, she didn't even
15   mention Davis, either, did she?
16   A.    Well, now that I have had an opportunity to
17   review it, that's correct.
18   Q.    And at the preliminary examination, Bianca Moore
19   had testified -- she was asked if she would lie to
20   protect Terry Dandy, and she had said, "I guess"?
21   A.    I told you, Mr. Pyle, I did not review the
22   Preliminary Hearing transcript for today.  If I didn't
23   ask her at the trial, I can only rely on what you are
24   looking at.
25   Q.    Okay.  You don't recall asking Bianca Moore any
26   questions at trial about whether she lied to protect
27   Terry Dandy.
28   A.    (Examining)  I'm reviewing the testimony.  It's
```

1   my recollection that we did get into her relationship

2   with him and the fact she did not give his name and gave

3   a false name for him.  But if I asked that specific

4   question, I have to go through the testimony a little

5   closer.

6   Q.    As you sit here right now, you don't recall.

7   A.    Excuse me, Mr. Pyle.  On page 378 line 15:

8           "QUESTION:  And when you first spoke

9           to the police, both in your taped

10          statement and in your written one,

11          you did not mention Terry Dandy at

12          all; is that true?

13          "ANSWER:  I don't know.

14          "QUESTION:  If you did mention him,

15          you used the name Richard Davis?

16          "ANSWER:  I don't know.

17          "QUESTION:  So, you were lying to

18          the police to protect Terry?"

19       There was a objection.  It was overruled.  So, I

20   did ask that.

21   Q.    Okay.  Do you recall her being asked at the

22   preliminary examination -- I'm referring to page 33 of

23   the cross-examination:

24          "If Terry Dandy had in fact fired a

25          shot at Mr. Kilgore's car, you,"

26          meaning Bianca Moore, "probably

27          wouldn't tell us that, would you?"

28          And Bianca Moore said she was not sure.

```
 1              THE COURT:  Is the situation any different
 2   that you remember today whether or not that was at the
 3   PX?
 4              THE WITNESS:  I thought Mr. Pyle was referring
 5   me to a page in the trial testimony.  But I'm looking at
 6   page 353 of the trial testimony, line 25, where I asked:
 7              "Do you recall telling the police
 8              that you ran into him when you went
 9              to the bathroom in the Anderson
10              house and that's when you -- he told
11              you to say his name was Richard
12              Davis?"
13              MR. PYLE:  Q.  Okay.  But you recall any
14   testimony about being asked -- her being asked at the
15   preliminary examination about whether she would tell
16   about the fact that whether or not Terry Dandy had fired
17   a shot at Mr. Kilgore's car?
18   A.     Again, Mr. Pyle, I did not review any of the
19   Preliminary Hearing transcript for today's hearing.  I
20   did the trial transcript.
21   Q.     Okay.  Now, was it your understanding that when
22   Bianca Moore ran into the house to the bathroom, that
23   was after she had given the statement, which is exhibit
24   B?
25   A.     No.  It's my understanding it was before she
26   talked to the police.
27              And, in fact, Mr. Pyle, while you were asking me
28   questions -- I'm looking at page 349 and 350 of the
```

```
 1  trial testimony regarding that extra shot -- and I did
 2  ask her if she heard more than one gunshot and if Terry
 3  or Will had a weapon.
 4  Q.    And she said no, she had not heard more than one
 5  shot.
 6  A.    That's correct.
 7        THE COURT:  Hang on a second.
 8        (Short discussion off the record)
 9        MR. PYLE:  Q.  Now, Bianca Moore, I believe,
10  testified at the preliminary examination, but in any
11  event at trial, that after Will Anderson had been shot,
12  that the car made a U-turn and came back and stopped?
13  A.    Can you direct me to where you are referring to,
14  Mr. Pyle?
15  Q.    Oh, let's see here.
16  A.    Do you know if it was on her direct or cross?
17  Q.    (Examining)  I believe at page 334, although it
18  doesn't say there if the car stopped, but I think in the
19  examination it said the car stopped.
20        THE COURT:  Well, your --
21        MR. PYLE:  All right.
22        THE COURT:  -- statements about what's in the
23  PX transcript aren't really evidence.
24        MR. PYLE:  Right.  Okay.
25  Q.    In any event, she testified that the car made a
26  U-turn and then pulled back to the same area.
27  A.    That's correct.
28  Q.    That's where she saw Ivan Kilgore.
```

| 1 | A. | (Examining)  She testified, when asked: |

A.      (Examining)  She testified, when asked:

2              "When it pulled back, did you get a

3              look at who was inside the car?"

4         And she answered, "Yes."

5    Q.    Now, Raymond Jones' testimony indicated that that

6    never happened where the car turned around.

7    A.    Can you direct me to a page, please?

8    Q.    I'm sorry.  That was the preliminary examination.

9    I can't give you that testimony.

10        In any event, you don't have a recollection as

11   you sit here today.

12   A.    That Mr. Terry Dandy allegedly --

13   Q.    No.  Mr. Raymond Jones gave contrary testimony.

14   A.    About the U-turn?

15   Q.    About the -- well, about the U-turn and coming

16   back, and Bianca Moore saying she saw the man at the

17   window.  Do you remember what Mr. Jones testified at?

18   A.    I believe Mr. Jones said that he made a U-turn

19   going over the island across San Pablo.

20   Q.    You went into a lot of detail, but do you recall

21   cross-examining Mr. Raymond Jones at trial about the

22   route of the car?

23   A.    Can you direct me to a specific area, Mr. Pyle?

24   Q.    I cannot.  I'm sorry.

25   A.    I am reviewing on page 161, I see Mr.

26   Stallworth's questions regarding where the vehicle was

27   going.  If I might have a moment, I can review my

28   cross-examination.

GERALD A. DOHRMANN, C.S.R. #2046

```
 1              (Examining)  Referring to page 185 of the trial

 2    transcript, on cross-examination I asked at line 7:

 3              "Okay.  Isn't it true that when you

 4              came back down 30th, you made an

 5              illegal turn and tried to get out of

 6              there quickly?"

 7         Mr. Jones answered, "No, ma'am."

 8         But that looks like the closest I got to the

 9    route of the vehicle.

10    Q.   Turning to another subject, Mr. Kilgore wanted

11    you to investigate the structure of the attic in the

12    apartment of 509 Sycamore, and he thought you could use

13    that information to refute the claim or statement by Mr.

14    Bryant that Mr. Kilgore had sent him to look for the gun

15    there; is that correct?

16    A.   Mr. Kilgore wanted me to do a lot of stupid

17    things in this case.  I was not about to go climb up in

18    an attic, Mr. Pyle.  That's correct.

19    Q.   As I understand, you did not send an investigator

20    to look at the attic, either?

21    A.   My investigator in this case is a heavyset

22    gentleman.  He would have had a lot worse trouble than I

23    would have.

24    Q.   Now, as I understand it -- turning to another

25    subject -- there are two lines of defense that you

26    considered, which included reasonable doubt and self-

27    defense?

28    A.   I had considered actual self-defense and
```

1   unreasonable self-defense.

2   Q.    Can you describe briefly the trial preparation

3   you did to prepare for reasonable doubt?

4   A.    Mr. Pyle, that's Mr. Kilgore's statement that he

5   had shot in response to Mr. Terry Dandy attempting to

6   get a weapon.

7   Q.    Do you recall anything else?

8   A.    Yes.  I recall after the judge ruled that Mr.

9   Kilgore's prior testimony from the Oklahoma murder was

10  going to come in, in which Mr. Kilgore sounded like he

11  was lying every other line, that I went and saw Mr.

12  Kilgore on a Saturday at Santa Rita, and we discussed

13  how that testimony was very damaging to him, and Mr.

14  Kilgore -- are you listening to me?

15  Q.    Yes.  Mr. Kilgore --

16  A.    Agreed with me that he could not take the stand

17  because of the damage of the prior testimony would do.

18  And we decided together on that date that the

19  government's witnesses, we felt, had some real problems

20  with identification, and that rather than pursue putting

21  Mr. Kilgore on the stand to explain the situation and

22  open him up to the incredibly damaging prior testimony,

23  that he would not testify.

24  Q.    Do you recall anything else you did to investi-

25  gate -- well, let me ask you this:  Do you recall what

26  you did to investigate the reasonable doubt defense,

27  including the identification?

28  A.    I really don't know what you are asking, but it

```
 1  was my position that the state of the evidence, as a
 2  result of the prosecution's case when they had rested,
 3  was of such a state that the jurors indeed could have
 4  had a reasonable doubt as to whether one shot was fired,
 5  or more, and that we could pursue the case on that
 6  basis.
 7  Q.    Well, I'm just trying to get some kind of brief
 8  description from you if you did some particular investi-
 9  gation to support the reasonable doubt defense.
10  A.    I just told you, Mr. Pyle, it was my belief that
11  the state of the evidence at the end of the prose-
12  cution's case, I did not do any additional investigation
13  at that time.
14  Q.    I believe Mr. Kilgore -- turning to another
15  matter -- I believe Mr. Kilgore had asked you to submit
16  a jury instruction relating to second-degree, drive-by
17  murder.
18  A.    I do not recall that specifically.  He may indeed
19  have asked me to do that.
20  Q.    Do you recall whether you did submit such an
21  instruction?
22  A.    No, I can't recall at this time.
23        THE COURT:  The requested jury instruction
24  should be in the court file as a matter of record.
25        MR. PYLE:  Q.  Now, the information on -- it
26  has an allegation involving section 12022.55 of the
27  Penal Code, an allegation that the defendant, with the
28  intent to inflict great bodily injury and death, caused
```

```
 1   death to Mr. William Anderson as a result of discharging
 2   a firearm from a motor vehicle.
 3   A.    At this point I can't remember if it was the
 4   12022.53 sub (d) or sub (5), but I do recall that the
 5   Court and Mr. Stallworth and I had some conversation
 6   regarding one of the enhancements that we found not to
 7   apply to Mr. Kilgore's case.
 8   Q.    Do you recall giving any consideration to an
 9   instruction as to a lesser included enhancement
10   involving section 12022.7, which I believe has to do
11   with great bodily injury rather than death?
12             THE COURT:    That raises an interesting
13   question.  Is there such a thing as a lesser included
14   enhancement?
15             THE WITNESS:    That was going to be my
16   response, Your Honor.  I have never heard of requesting
17   a lesser enhancement.
18             MR. PYLE:    Well --
19             THE COURT:    I know that at times people have
20   suggested that, but, you know -- and I'm not asking this
21   with any purpose in mind other than rhetorical -- but I
22   don't know of anything, any case or any law, and it
23   could well be there is that talk about lesser included
24   enhancements.
25             MR. PYLE:    Well, I have a reference here to a
26   case called People vs. Eck, E-c-k, 76 Cal.4th 759, where
27   at least, according to my excerpt, says, quote, the
28   Court says:
```

1     "We hold that the phrase 'intent to

2     inflict great bodily injury' in

3     section 12022.55 has the same

4     meaning as it has in section

5     12022.7."

6     And it goes on to say that the lesser enhancement

7 provided -- prescribed by section 12022.7 is subsumed

8 into 12022.55, which suggests --

9     THE COURT:  I have seen that.  I don't know.

10 What I have seen the District Attorney do at least in

11 this county -- and that's where my experience is limited

12 to -- is they will charge a whole series of enhance-

13 ments -- for instance, just as an example, under

14 12022.53(b), (c) or (d) -- that is the use of a firearm

15 where a GBI or death is caused, the use of a firearm,

16 and they will list all of them.

17     And it would be my holding, also, that if the

18 greater were found, the lessers were subsumed into it,

19 but I don't know in those cases that all three of those

20 enhancements I have seen in the Information.  I don't

21 know anything that tells me you get a letter enhance-

22 ment.  You may be able to find something, but I haven't

23 seen it.

24     What was the page number on that, again?

25     MR. PYLE:  This is Eck, 76 Cal.4th at page

26 763.

27     THE COURT:  763.  Thank you.  Go ahead.

28     MR. PYLE:  There is also a discussion in the

```
 1   Forecite book in note 1720 -- 17.20, note 8 -- which the
 2   Forecite book is page 1160.  There is a short discussion
 3   on a lesser included enhancement which says approxi-
 4   mately what he had just been talking about here.
 5   Q.    With one other matter regarding the jury
 6   instructions, had Mr. Kilgore asked you -- I will put it
 7   this way -- did you consider asking for a jury
 8   instruction saying that Mr. Jones' testimony should be
 9   viewed with greater caution than the ordinary witness
10   due to the fact, first, that he at one point in his
11   testimony had stated that he had been taking controlled
12   substances and, second, because he had made -- had
13   chosen to become a witness instead of a defendant?
14   A.    It's my belief Mr. Jones was an accomplice and,
15   again, you have to look at the court circuit.  I believe
16   the accomplice instruction, that you should regard that
17   testimony very carefully with distrust, was given.
18   Q.    But you didn't ask request a separate instruction
19   that would indicate that, because he had made a deal,
20   that his testimony should be regarded with greater
21   caution?
22   A.    I believe in the credibility of witnesses
23   section, that where there are multiple facets that the
24   jury can consider, that we indeed threw in this one that
25   you can consider whether a witness testified in exchange
26   for a lesser sentence.  So, that was given to the jury.
27   Q.    I think Mr. Jones testified in his preliminary
28   examination that his level of intoxication was such that
```

GERALD A. DOHRMANN, C.S.R.#2046

 1    his senses could have been dulled.  Do you recollect

 2    that in his preliminary examination testimony?

 3    A.     I believe he testified to smoking a blunt and

 4    drinking some beer.

 5            THE COURT:  Now, counsel is talking about the

 6    PX testimony, and I am assuming your answer is going to

 7    be the same.  Your answers seem to be --

 8            THE WITNESS:  In this particular case, Judge,

 9    I do recall Mr. Jones' Preliminary Hearing testimony

10    regarding, I believe, again, smoking one marijuana

11    blunt, having a 40-ounce, and then one or two other

12    beers.

13            MR. PYLE:  Q.  But I believe you did not ask

14    Mr. -- did not call this prior testimony to Mr. Jones'

15    attention when he testified at trial; is that correct?

16    A.     Mr. Pyle, without reviewing that testimony, I'm

17    not going to answer that, because some of the questions

18    you have asked me appear to be somewhat different.  So,

19    I would like to review my cross.

20    Q.     Do you recall anything --

21            THE COURT:  Well, wait a minute.  She is

22    reviewing.

23            MR. PYLE:  I'm sorry.

24            THE COURT:  She is reviewing it now.

25            THE WITNESS:  In fact, on my cross-examination

26    I questioned Mr. Jones regarding his heroin use on page

27    177.

28            MR. PYLE:  Q.  And did he later -- did Mr.

GERALD A. DOHRMANN, C.S.R. #2046

```
 1  Jones also testify, notwithstanding that use of heroin,
 2  that he was not high?
 3  A.     Again, you are leaving me no choice but to review
 4  his entire testimony.  If you have something to refer me
 5  to --
 6         MR. STALLWORTH:   Look at the transcript on
 7  page 206, there appears to be -- actually, if you start
 8  at page 205, it appears to be cross-examination in the
 9  area of what he drank and what he ate and what he may
10  have been impaired by, by Ms. Levy.  Starting on page
11  205 --
12         MR. PYLE:   I don't have anything.
13         (Short discussion off the record)
14         MR. PYLE:   Q.   I believe at page 222 --
15         THE COURT:   Well, there is a question pending
16  right now, I think, or do you want to withdraw that and
17  ask another?
18         MR. PYLE:   I'm sorry.
19         THE WITNESS:   I would agree.  Mr. Stallworth
20  pointed out the testimony at page 205 near the bottom.
21  I did question him specifically about what he had been
22  ingesting that day.
23  Q.     Okay.  What I'm getting at, you never specifi-
24  cally asked him in words that he testified at the
25  preliminary examination that he says his senses could
26  have been dulled as a level of his intoxication?
27  A.     Mr. Pyle, I think the inference is quite clear if
28  someone had been drinking for breakfast and had a blunt.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1    Specifically, did I ask him, "Were you impaired?"  I do

 2    not see that in the transcript right now.

 3    Q.    Well, I'm looking at page 222 of the transcript

 4    where you asked him:

 5              "You told the D.A. that you were

 6              sober on July 16th; is that right?"

 7          And he says, "Yes."

 8    A.    And I followed up:

 9              "And that's with two beers, a blunt

10              and maybe some heroin?"

11    Q.    Yes.

12    A.    So, if I didn't ask the specific question, it is

13    clearly implied.

14    Q.    Okay.  Thank you.

15          There was an exhibit E at the Preliminary Hearing

16    transcript which was inconsistent with the testimony of

17    Raymond Jones at trial?

18    A.    I don't know what you are referring to.  Could

19    you be a little more specific about what at the

20    Preliminary Hearing?

21    Q.    At trial didn't Mr. Jones sketch a drawing

22    showing the direction he went with the car?

23    A.    (Examining)

24          THE COURT:  Perhaps you could refer counsel to

25    page in the trial testimony?

26          Once we get to the end of this question, the

27    reporter is going to have to stop because his disk is

28    full.
```

1     THE WITNESS:  I'm looking through the direct.

2  At about page 167 I do not -- I'm sorry.  At the bottom

3  of 167 it appears that Mr. Stallworth was asking Mr.

4  Jones to put X's and mark where he was at the time of

5  the shot.

6     MR. PYLE:  Your Honor, the defendant asks if

7  he can take a bathroom break.

8     THE COURT:  Okay.  Probably a good time,

9  because the reporter's disk is full.  So, we will shut

10  down the record.

11     2:00 o'clock.

12     MR. STALLWORTH:  Fine.

13     THE WITNESS:  No problem.

14     (Whereupon, the luncheon recess was taken)

15                    ---o0o---

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1              - AFTERNOON PROCEEDINGS -

 2                      ---o0o---

 3         THE COURT:  All right.  In the matter of

 4    People versus Kilgore, the parties have reassembled; Ms.

 5    Levy remains on the stand under oath.

 6         Mr. Pyle.

 7         MR. PYLE:  Yes.

 8         THE COURT:  Mr. Pyle, before you ask your next

 9    question, during the lunch hour, I did read People vs.

10    Eck, and, interestingly, it turns out to be pretty much

11    the situation as I outlined to you that I had dealt with

12    before.

13         Mr. Eck was convicted of two counts of attempted

14    murder, two counts of 245, personal use under 12022.5,

15    and also personal GBI under 12022.7 and 12022.55.  And

16    the trial court -- one of the allegations was the trial

17    court had erred in failing to stay the three years under

18    12022.7 since punishment had been imposed under

19    12022.55, and the court did say what you said it said,

20    it was subsumed, but it didn't deal specifically with a

21    lesser, saying it was a lesser included specifically.

22         And in Mr. Kilgore's case, I don't know he was

23    charged with such a lesser.  In fact, I don't believe he

24    was.  I think the only allegation -- I think there was a

25    use clause which was under a case that I saw in a slip

26    opinion during the course of this trial that I brought

27    to counsel's attention, called People vs. Navarro.   I

28    don't know what's happened to that historically.
```

```
 1            In that case, there happened to have been a use
 2    clause and the 12022.55, and it said that same kind of
 3    thing:  You couldn't sentence on both.  And I brought
 4    that case to both counsel's attention during the trial
 5    of Mr. Kilgore.  But I did read it.
 6            MR. PYLE:   Thank you.
 7    Q.    Ms. Levy, you had a copy of the entire
 8    Preliminary Hearing transcript in this case in your
 9    possession before trial; is that correct?
10    A.    Correct.
11    Q.    Now, you are aware at the preliminary examination
12    that Raymond Jones testified he did not see any kind of
13    a shotgun go into the car in his presence, and had said
14    that -- testified that most likely the shotgun was
15    already in the car; is that correct?
16    A.    That is, and you provided me that section of the
17    Preli sinaby-Hearing transcript to review.
18    Q.    Now, did you bring any of that evidence out at
19    trial?
20    A.    I did not.  But in Mr. Stallworth's direct, on
21    page 160, starting with lines 12, Mr. Stallworth
22    basically covered from Mr. Jones whether he had seen
23    anything with Mr. Kilgore when Mr. Kilgore got in the
24    backseat of the Cadillac and before.
25            And in fact he follows up on line 21 with the
26    question:
27                "When the defendant got into the
28                Cadillac, did you look to see if he
```

```
 1              had anything with him?"
 2         And the answer is, "No."
 3   Q.    Okay.
 4   A.    But in the cross that I'm reviewing of the trial,
 5   I do not believe I brought that up.
 6   Q.    Okay.  And in the preliminary examination
 7   transcript -- in the preliminary examination Mr. Jones
 8   had also had testified that when he was going over there
 9   in the car that day, the only thing he understood was
10   going to happen, there was going to be a fight.
11   A.    Yes, and he testified in accord with that at the
12   trial.
13   Q.    And he also testified at the preliminary examina-
14   tion that that was what Ivan said, too:  There was going
15   to be a fight?  Page 15?
16              THE COURT:  Of the PX?
17              MR. PYLE:  Of the PX of 6/4.
18              THE WITNESS:  Correct.
19              MR. PYLE:  Q.  Okay.
20   A.    Yes, that is what Mr. Jones testified at the
21   Preliminary Hearing.
22   Q.    And I believe you did not bring out at trial
23   that's what Ivan said, too.
24   A.    That's correct.
25         Excuse me, Mr. Pyle.  I just found on page 203,
26   line 26, my cross-examination.  I did ask about the
27   weapon.
28              "QUESTION:  And you never saw him
```

GERALD A. DOHRMANN, C.S.R. #2046

```
 1                    carry a weapon, a shotgun, out of
 2                    the vehicle."
 3              It goes on to page 204:
 4                    "ANSWER:  No.
 5                    "QUESTION:  Never saw one the whole
 6                    day but for right when the shooting
 7                    occurred.
 8                    "ANSWER:  Yes."
 9   Q.    Very good.
10         Referring to the Preliminary Hearing transcript
11   again, at page 16, Mr. Jones said he told the District
12   Attorney that he, Mr. Jones, had told Ivan not to do
13   anything stupid, quote, "like shoot someone," unquote,
14   and he said that Ivan agreed with him in that regard; is
15   that correct?
16   A.    That's correct.
17   Q.    I believe you did not bring out at trial that
18   this reference to, quote, "like shoot someone," unquote.
19   A.    That's correct.
20   Q.    Did you ever give consideration to call Terry
21   Dandy as a witness just to establish the fact that two
22   shots were fired?
23   A.    I did not call Mr. Dandy, because I was convinced
24   he would do anything he could to convict Mr. Kilgore.
25   Q.    I believe Mr. Kilgore wanted you to file a
26   Pitchess motion to discover whether there were
27   complaints in other instances that Sergeant Green had
28   coerced or intimidated witnesses?
```

1   A.     That was referring to Mr. Jones and his

2   testimony.  Yes, he did, and I felt that that was not

3   appropriate.

4   Q.     And did he also refer to Mr. Bryant's testimony?

5   A.     Mr. Kilgore requested the Pitchess specifically

6   as to Mr. Jones.

7   Q.     Okay.  And can you tell us the reason for not

8   requesting the Pitchess motion?

9   A.     From what I know of Mr. Jones' testimony -- and

10   although I filed a motion to keep it out of the trial --

11   I don't believe it would fall within the category of

12   being coerced.  So, I didn't think it would be helpful.

13           THE COURT:  It would be an interesting legal

14   point to see what the declaration would say, since it

15   would be based on hearsay and not from the client.  Just

16   an aside.

17           MR. PYLE:  Q.  When the trial court ruled that

18   the Oklahoma testimony could be used against Mr.

19   Kilgore, did you consider filing your writ in the Court

20   of Appeal?

21   A.     No, I did not.

22   Q.     Can you tell us the reason for that?

23   A.     Yes.  First off, I'm not expert at filing writs.

24   I believe I have only done one in my 23-plus-year

25   career; secondly, I felt that the Court had based its

26   decision on reviewing the testimony, and that the Court

27   of Appeal is not going to be sympathetic to our cause.

28   Q.     Did you give consideration to calling the witness

```
 1   Betty Varela?
 2   A.      I believe the name is Betsy.
 3   Q.      Betsy.  Yes.
 4   A.      And I did.  I contacted her.  I had her on line
 5   as a witness.  I also had Mr. Kilgore's younger sister,
 6   Helvetia, under subpoena and prepared to come and
 7   testify.
 8   Q.      And your reason for not calling either of those
 9   witnesses?
10   A.      On that Saturday visit to Santa Rita, after the
11   judge ruled that the Oklahoma prior testimony could come
12   in, Mr. Kilgore and I sat down at Santa Rita, and I
13   explained to him I was quite concerned that if we
14   brought in Betsy and Helvetia -- which is
15   H-e-l-v-e-t-i-a, I believe -- if we brought her in to
16   testify, that it would focus the jury even more so on
17   the fights that Mr. Kilgore and Will and T had had, and
18   provide even a greater motive for Mr. Kilgore to shoot
19   Mr. Anderson.
20   Q.      Thank you.
21   A.      I would also like to state, Mr. Kilgore agreed
22   with my decision at the time.
23              MR. PYLE:  May I have a moment to confer?
24              THE COURT:  Yes.
25           (Short discussion off the record)
26              THE WITNESS:  Might I add, I was just able to
27   find in the trial transcript at page 224 where I did ask
28   Mr. Jones about the conversation about "don't do nothing
```

```
 1   stupid."  It's at page 224, line 17:
 2              "QUESTION:  And you also mentioned
 3              earlier that you told Mr. Kilgore,
 4              'Don't do no stupid shit.'  Do you
 5              remember that?
 6              "ANSWER:  Yes.
 7              "QUESTION:  Now, when you said that,
 8              Mr. Kilgore agreed, 'Oh, yeah, I
 9              ain't going to do nothing stupid,'
10              something like that?
11              "ANSWER:  Yes."
12         MR. PYLE:  Q.  There was no mention in that
13   testimony about the words, quote, "like shoot somebody,"
14   unquote.
15   A.    No.
16   Q.    Now, with regard to the Oklahoma prior, you would
17   agree, and you were aware at the time, that the law as
18   it pertains to other crimes evidence is that it's not
19   merely admissible because somebody like the District
20   Attorney asserts an admissible purpose.
21   A.    Mr. Pyle, I filed a motion.  I litigated that.
22   That was the Judge's decision, not mine.
23   Q.    The District Attorney, as I understand from the
24   transcript, said he had some 20 or so or maybe 27 points
25   of similarity or points of relevance; is that correct?
26   A.    I recall something like that.  Yes.
27   Q.    Did you ask that the District Attorney be
28   required to provide those -- those some 20 or 27 points?
```

1  A.    I did not.

2  Q.    Did you insist that the District Attorney show

3  the relevancy of the points he thought he was going to

4  be showing were similar?

5  A.    Mr. Pyle, I litigated the motion as vigorously as

6  I could, and the Judge ruled.  I never conceded or

7  agreed that the Oklahoma prior was admissible.  In fact,

8  I distinctly recall raising my voice with the Judge and

9  getting very upset because I thought he had ruled

10 incorrectly.

11 Q.    Did you at any time advise Mr. Kilgore that the

12 matters in the Oklahoma testimony, that they could be

13 used without limitation, for example, gang issues and

14 things like that?

15 A.    No.

16 Q.    At some point did Mr. Kilgore give you some

17 papers that contained his version of the events and a

18 description of the things he would testify if he were

19 called as a witness?

20 A.    Mr. Kilgore provided me with more paper than any

21 other defendant I have ever represented.  I think I have

22 at least three notebooks full of Mr. Kilgore's legal

23 interpretations, his -- his position of inconsistencies

24 in the testimony, and, yes, his statement of what he

25 would testify to if he were called at trial.

26 Q.    And was that fairly early on in the case that he

27 provided that proposed testimony?

28 A.    Again, I have so much writings from Mr. Kilgore,

GERALD A. DOHRMANN, C.S.R. #2046

1  it is my recollection that that was not amongst the
2  papers that I got from Mr. Traback, and that he had Mrs.
3  Betsy Varela prepare one and give it to me.  But it was
4  clearly before trial.
5  Q.    With regard to the motion in the hearing on the
6  Oklahoma prior conviction, on the testimony in that
7  case, did you ever consider seeking to have an in-camera
8  hearing to determine what Mr. Kilgore would testify to?
9  A.    I had presented to the Judge a brief summary in
10  my motion requesting that the Oklahoma prior not be used
11  against Mr. Kilgore.  I did not request that we do a 402
12  hearing and testify for the judge.
13  Q.    In camera.
14  A.    Correct.
15       MR. PYLE:  That's all of the questions I have
16  at this time.
17       MR. STALLWORTH:  Thank you, Your Honor.
18              CROSS-EXAMINATION
19       MR. STALLWORTH:  Q.  Good afternoon, Ms. Levy.
20  A.    Hello.
21  Q.    Could you give us a brief summary of your back-
22  ground, your education, and your training in becoming a
23  criminal defense attorney?
24  A.    Certainly.  I graduated with a bachelor of arts
25  with a liberal arts degree, a special major, in Women's
26  Studies from Kansas University in 1977.  I graduated
27  from Florida State University, College of Law, with a JD
28  in 1980.

| | |
|---|---|
| 1 | I was then JAG for the United States Navy from |
| 2 | 1981 to 1984. |
| 3 | I came out to California on orders, took the |
| 4 | California Bar exam.  I had previously passed the |
| 5 | Florida Bar exam in 1980.  I passed the California Bar |
| 6 | exam in 1983. |
| 7 | I started working for the Solano County Public |
| 8 | Defender's Office until '88.  I briefly did one year of |
| 9 | civil defense work, insurance defense, and then in 1990, |
| 10 | I opened up my own office, and have been practicing |
| 11 | criminal defense since then. |
| 12 | In 1991 I took and passed the legal specialist |
| 13 | exam for criminal law.  I'm currently, and have been, a |
| 14 | certified specialist in criminal law. |
| 15 | Q.    Since 1991? |
| 16 | A.    Correct. |
| 17 | Q.    And do you sit on a court-appointed board |
| 18 | specifically available to defend defendants who are |
| 19 | charged with capital cases? |
| 20 | A.    I do. |
| 21 | Q.    And over, say, the last ten to 15 years, approxi- |
| 22 | mately how many cases have you represented defendants |
| 23 | where they have been charged with either capital penalty |
| 24 | or special circumstances resulting in life without |
| 25 | parole? |
| 26 | A.    I don't have a list in front of me, but I would |
| 27 | estimate at least ten to twelve trials, and I know |
| 28 | that's not counting just a regular old homicide that |

1   will get you life.

2   Q.    In addition to those ten to twelve special

3   circumstances, or death penalty cases, how many homicide

4   cases have you represented people charged with over the

5   last 10 to 15 years?

6   A.    If we include three strikes, or special cases

7   where someone is looking at life, I would say it would

8   be another 10 to 15.

9   Q.    Given your training and experience and your

10  certification in criminal law, could you give us just a

11  general idea of how you prepare to represent someone

12  charged with a serious crime, in particular, the

13  decisions you make based on any input you might get from

14  your client?

15  A.    I generally find when I meet my client, the first

16  thing they want to do is tell me everything that

17  happened from their perspective.  And I have learned

18  that it's more important if I read the discovery, the

19  police reports, the statements regarding the case before

20  I speak to my client.  It gives me a much more balanced

21  view of what's involved in the case.  And then when I go

22  speak to my client, I can say, well, witness X says

23  this, or there is a statement here, or some physical

24  evidence that my client isn't accounting for in what we

25  are talking about.

26        I usually find that my clients feel like they

27  know the law and want to assist me, and that in essence

28  they don't know what they are talking about.  So, I

1   generally don't like help from my clients.

2   Q.      In this particular case, when you represented Mr.

3   Kilgore, how did you form your decisions on what you

4   would do or not do as you prepared for the trial?

5   A.      Once I reviewed the entire file, I did get with

6   the investigator that Mr. Kilgore's previous attorney

7   had used.  That made a lot of sense to me, because he

8   had a history of the case and could give me information

9   I didn't have.

10          I asked him to interview certain witnesses.  And

11  generally it is not my practice to interview every

12  possible witness.  That tends to not be fruitful, in

13  that there's some witnesses that just are not going to

14  be helpful to the defense.  And in general if there are

15  prosecution witnesses that seem to be clearer in what

16  they are saying, in general I would not interview them

17  again, because it rarely is helpful.

18  Q.      In this particular case, when you were questioned

19  on direct examination about Matthew Bryant, was there

20  something in particular about his taped statement that

21  you reviewed that led you to believe that a second

22  interview with Matthew Bryant would not be helpful to

23  your client?

24  A.      There were a lot of reasons.  One, Mr. Bryant was

25  somewhat squeezed into a position that he had already

26  made statements by the time I had the case, and within

27  his statements I felt that there was inconsistencies

28  that I could use without interviewing him.  And I guess

| 1 | basically I just felt he would not give us anything for |
| 2 | the defense with an additional interview. |
| 3 | Q.    When you were questioning Matthew Bryant while he |
| 4 | testified in trial with regard to his previous taped |
| 5 | statement, was there some point after direct examination |
| 6 | by the prosecutor that you concluded that Matthew Bryant |
| 7 | had either been inconsistent or evasive with regard to |
| 8 | what he had said or what he remembered about his taped |
| 9 | statement? |
| 10 | A.    Yes.  Mr. Bryant said, "I didn't say it," or, "I |
| 11 | don't remember what I said," and I felt that those were |
| 12 | two bases on which the Judge would allow any prior |
| 13 | statement of his in.  So, I felt it was going to come |
| 14 | in. |
| 15 | Q.    As an experienced criminal defense attorney, do |
| 16 | you make tactical decisions about how often you are |
| 17 | going to object to evidence that you may have already |
| 18 | concluded will be admissible? |
| 19 | A.    Absolutely.  I feel that in the position where I |
| 20 | think the Judge is ruling incorrectly even, I will |
| 21 | object.  If I'm overruled, I generally will not make the |
| 22 | same objection, because it's my belief, you know, the |
| 23 | jury is watching us, and they are going to get the |
| 24 | impression I'm not listening to the Judge. |
| 25 | I also think it is irksome to the jury to have an |
| 26 | attorney jump up every two minutes, "Objection, |
| 27 | objection."  I try to save my objections -- well, and |
| 28 | there's also a way that, by objecting, I can highlight a |

```
 1   piece of evidence for the jury that I rather just
 2   quietly go in with the rest of the testimony.  So, I
 3   will only object if I think I'm going to win and the
 4   Judge is going to sustain it, number one.  And when I
 5   think there is a legal basis for what's happening, I
 6   will not object.
 7   Q.    On direct examination you were questioned about
 8   Bianca Moore's pretrial statements and her initial
 9   unwillingness to give details of your client in whether
10   or not she recognized him as the shooter.  You remember
11   that.
12   A.    Yes.
13         MR. PYLE:  Could I interrupt and ask that the
14   answer to the last question be re-read?  I'm not quite
15   sure I heard it.  I'm not sure.
16         THE COURT:  Would you re-read the last
17   question and answer, please?
18         (Record re-read by the court reporter)
19         MR. PYLE:  Right.  I apologize.
20         MR. STALLWORTH:  Q.  Did you remember, Ms.
21   Levy, that Bianca Moore's testimony came after the
22   testimony of Raymond Jones and Shanae Anderson?
23   A.    Now that you mention it, I do.
24   Q.    Do you recall that both Raymond Jones and Shanae
25   Anderson had already in court identified your client as
26   the person responsible for the shooting of William
27   Anderson?
28   A.    Yes, they did.
```

1  | Q.    Was that a consideration you had when you made a
2  | decision on how vigorously you wanted to cross-
3  | examination Ms. Moore -- cross-examine Ms. Moore
4  | regarding her ability to identify your client?
5  | A.    That was a consideration, and the fact of the
6  | case that 10 minutes after the shooting, Mr. Kilgore
7  | called O.P.D. and reported his car stolen, I thought was
8  | incredibly bad testimony and evidence for the defense,
9  | and I didn't think there was a defense of, "It wasn't
10 | me."  I didn't think that was possible.
11 | Q.    Just concluding in the cross-examination area,
12 | based on your training and experience, do you have a
13 | rule or policy on how long or how much attention you
14 | want to draw to certain areas of cross-examination that
15 | have been covered by you already?
16 | A.    I do try to not ask the same question three or
17 | four times, or if I feel that I have made a point on
18 | cross-examination, I think it is -- how do I phrase
19 | it? -- you can lose jurors if you keep repeating.  And
20 | even if you would keep attacking a witness, you can get
21 | the jury to believe that or feel sympathy for the
22 | witness, that the defense attorney is trying to make
23 | them change their testimony, or attacking the witness at
24 | some point.
25 | Q.    And, lastly, with regard to the pretrial hearing
26 | outside the presence of the jury regarding the Oklahoma
27 | prior, is it your memory that the Court's ruling would
28 | be subjected to cross-examination by the prosecutor with

```
1   regard to eliciting any type of evidence from that
2   Oklahoma case that would have been similar to what your
3   client may have testified to?
4   A.    Yes.   That was my understanding; that if Mr.
5   Kilgore were to take the stand in the trial, that the
6   portions of the Oklahoma testimony that were in any way
7   similar to the shooting in the Oakland case would have
8   come in.
9   Q.    You also were aware, and I believe you may have
10  actually requested the Court to make sure that the jury
11  would be admonished with regard to how they would be
12  interpreting any evidence from the Oklahoma case.
13  A.    Yes.
14        MR. PYLE:   Could we have that question read
15  back?
16             THE COURT:   Yes.
17        (Record re-read by the court reporter)
18             THE WITNESS:   And it was my understanding that
19  it would be limited for the jury to use only to see if
20  there were similarities to the Oakland case.
21             MR. STALLWORTH:   Thank you, Ms. Levy.  I have
22  no further questions.
23             MR. PYLE:   I do have two questions in
24  redirect.
25             THE COURT:   That's fine.  As to the issues
26  raised by Mr. Stallworth?
27             MR. PYLE:   Yes.
28  ///
```

GERALD A. DOHRMANN, C.S.R.#2046

| 1 | REDIRECT EXAMINATION |
|---|---|

2      MR. PYLE:  Q.  Going back a couple of

3  questions to the point you said you thought certain

4  things would be brought out by the District Attorney on

5  cross-examination regarding the Oklahoma case.

6  A.    Yes.

7  Q.    Could you elaborate and tell us what things you

8  thought?  Give us a little more insight as to what

9  damage you thought could be done in that regard by Mr.

10  Stallworth?

11  A.    Number one, the jury would hear Mr. Kilgore was

12  responsible for another death.  I thought that was

13  incredibly damaging.

14  Q.    Okay.

15  A.    That if they heard that, they didn't have to hear

16  anything else, number one.

17      Number two, if the jury heard -- and, as you are

18  aware, we never narrowed down specifically what Mr.

19  Stallworth would or would not be able to bring up from

20  the Oklahoma prior -- but after reading the prior testi-

21  mony, it was so bad even reading it, and Mr. Kilgore,

22  when I gave -- he just -- he sounded like a liar, and I

23  was concerned that the jury listening to him trying to

24  explain why he had to shoot at the corner in Oakland and

25  then believed that he lied on the stand in Oklahoma

26  would have been terribly damaging.

27  Q.    Now, what information was that he lied on the

28  stand in Oklahoma, if any?

1    A.    You have to read the transcript, Mr. Pyle.  It's
2    just the way he answers the questions and the way things
3    are phrased.  He does not sound candid.
4    Q.    There was never any direct proof that he had lied
5    during that Oklahoma trial, was there?
6    A.    Some very extensive cross-examination.  And it
7    sounded like a lot of his testimony -- I mean I can't
8    give you specifics, because I have not looked at that
9    since the motion.  He did not sound credible.
10   Q.    But there was no -- he never said -- he never
11   said, "I told a falsehood," in that.  For example, he
12   didn't come out in sentencing and said, "I testified
13   falsely in trial with reference to the Oklahoma case."
14   A.    We were only looking at his testimony at the
15   trial, and he didn't have to say that.  It sounded very
16   much like he was not being straight with the Court.
17   Q.    Okay.  On the other hand, the jury didn't find
18   him guilty of murder in that case, did they?
19   A.    That wasn't the issue.  It was his testimony at
20   that trial.
21   Q.    Well, did you consider perhaps the Oklahoma jury
22   gave at least some credence to his testimony in finding
23   him --
24   A.    That wasn't my concern.  I was concerned about
25   this jury finding out there was a prior murder, even if
26   it was involuntary manslaughter, that Mr. Kilgore was
27   directly responsible for causing; two, the Oklahoma case
28   deals with someone being shot as they were attempting to

1  shoot Mr. Kilgore.

2  Q.     Or, more specifically, Mr. Kilgore thought

3  somebody, the other person, had a gun.

4  A.     Correct.

5  Q.     Now, at some point you formed the -- shifting

6  gears here -- at some point you formed the opinion that

7  you did not think of a defense of "it wasn't me."  You

8  didn't think that kind of defense was possible at some

9  point during the trial?

10  A.     Before we went to trial, because of the fact that

11  Mr. Kilgore is on tape to the police reporting his car

12  stolen 10 minutes after the shooting where the witnesses

13  describe his vehicle.

14  Q.     Was there still a possibility of a defense of

15  unreasonable self-defense?

16          THE COURT:  Is this a question that's related

17  to the cross-examination?

18          MR. PYLE:  Well, I thought it was.  She was

19  talking about the defense of "it wasn't me."  I think it

20  is.

21          THE COURT:  I will allow some latitude.

22          THE WITNESS:  In my closing argument, the

23  first statement I said to the jury was, "Was there more

24  than one shot fired?"  Reasonable doubt.  And it was my

25  attempt to elicit an imperfect self-defense without --

26  well, and also that if the jury believed that there

27  could have been more than one shot, that would have led

28  them to have to conclude Mr. Kilgore shot back.

```
 1   Q.      Was there any evidence of -- there was some
 2   evidence of more than one shot, was there?
 3   A.      As we discussed, there was a Mary Loggins and a
 4   Mary Washington.  One of them told the police at the
 5   time that the shooting happened, that they had heard
 6   more than one shot.
 7           When my investigator spoke with them around the
 8   time of the trial, they did not recall saying that, but
 9   I was able to put them on the stand, bring out their
10   prior statement that there were multiple shots and that
11   someone was seen running away from the corner, looked
12   like they were hiding something, which the witness also
13   did not remember.  The only other evidence was a
14   statement by Terry Dandy that there was more than one
15   shot.
16   Q.      And just to follow up and conclude here on this
17   one point, your purpose in making that argument to the
18   jury was to suggest -- I'm sorry -- that the unreason-
19   able self-defense or --
20   A.      Reasonable doubt, first of all; because if the
21   jury wasn't convinced there was only one shot, I was
22   able to argue, as I did in my closing, that we don't
23   know, and that there's sufficient, enough evidence to
24   believe that Terry shot, also, or William.  And that the
25   jury also -- I will leave it at that.
26   Q.      And then I believe I only have a couple more
27   points with regard to the Matthew Bryant tape.
28           If I understand your response to questions by Mr.
```

 1  Stallworth, you felt the tape could be used because Mr.
 2  Jones -- Mr. Bryant had said at one point, "I did not
 3  say it to Sergeant Green"?
 4  A.    That's correct.  He also said, "I don't
 5  remember," and I think that is considered an incon-
 6  sistent statement, and on both those bases, I believe
 7  Mr. Stallworth would have been able to play that tape to
 8  the jury.
 9  Q.    Now, you said that Bianca Moore, in response to a
10  question by the District Attorney, Bianca Moore had
11  testified after Raymond Jones and Shanae -- am I
12  pronouncing that right -- Anderson?
13  A.    That's correct.
14  Q.    All right.  I withdraw the question.
15        I have no further questions.
16        MR. STALLWORTH:  No further questions, Your
17  Honor.
18        THE COURT:  Thank you.
19        MR. PYLE:  Could we take a break?  Mr. Kilgore
20  needs to use the bathroom.
21        THE COURT:  Sure.
22        (Whereupon, the mid-afternoon recess was taken)
23                     ---o0o---
24
25
26
27
28

GERALD A. DOHRMANN, C.S.R.#2046

```
 1                    - AFTER RECESS -
 2                       ---o0o---
 3              THE COURT:  Mr. Pyle.
 4              MR. PYLE:  Yes, Your Honor.  Somewhere along
 5    the line, I think I indicated that Mr. Kilgore might
 6    testify in this case.  It's our intent to call him as a
 7    witne s.
 8              I think somewhere along the line, I also
 9    indicated that it might be appropriate to take that
10    testimony with the District Attorney not present; that
11    is, in effect to have an in-camera hearing.  And I'm
12    making that request to that effect at this time.
13              THE COURT:  How would you -- so you would be
14    denying the Prosecutor his opportunity to cross-examine?
15              MR. PYLE:  Well, I would suggest the Prose-
16    cutor would be able to submit questions or points of
17    similarity at some point, some points of similarity to
18    the Court to have the Court -- to have those questions
19    determined by the Court.
20              The issues of relevancy would be submitted by the
21    District Attorney and the Court would have an oppor-
22    tunity to consider those and ask questions of the
23    witness, Mr. Kilgore, if those points of similarity --
24              THE COURT:  You wish to be heard?
25              MR. STALLWORTH:  Absolutely opposed to such a
26    creation.
27              The points and authorities submitted by the did
28    defense counsel clearly outline, after a year of review
```

GERALD A. DOHRMANN, C.S.R. #2046

 1  and of work by the defendant, what areas were to be
 2  considered for a motion for new trial.  Any statement or
 3  any testimony that needs to be provided in order to
 4  illustrate these points has to be subjected to cross-
 5  examination for the People to properly respond to the
 6  motion.

 7       I would also note that if the defendant were to
 8  testify, his testimony would have to come under the
 9  umbrella of the points mentioned in the points and
10  authorities; otherwise, there is going to be a need for
11  some discovery by the defense counsel, so the prose-
12  cution can properly prepare for cross.  I would, but as
13  I understand the nature of this hearing, this motion,
14  his testimony would have to reflect that which has been
15  pointed out in his moving papers.

16       THE COURT:  Well, I have certainly considered
17  this to be an evidentiary hearing held; that Mr. Kilgore
18  had presented at least initially on its face a
19  sufficient showing to grant an evidentiary hearing, and
20  this is what I presume that we are holding now.

21       It certainly is a novel issue and a matter of
22  first impression for this Court that the Prosecutor
23  would not have the right to see and confront Mr. Kilgore
24  through the process of cross-examination about those
25  items that he wishes to bring to the Court's attention.
26  The Prosecutor, I would guess, would have much more
27  information at hand than I do.

28       I'm assuming, like all trials, that neither the

1    Court nor the jury heard every bit of evidence that

2    either side had put together.

3         Are there any cases that say that this is

4    permissible to do?  And specific, not some case on some

5    other point, but some case that holds that an evidenti-

6    ary hearing, particularly one where there is issues in

7    question that affect both sides, and more specifically,

8    it would be helpful if it was on a motion for new trial,

9    that at the evidentiary phase of the trial, the Prose

10   cutor can be excluded from cross-examination?

11        MR. PYLE:  There is a case, and I'm not quite

12   sure whether it fits in.

13        THE COURT:  I will look at it.  Just tell me

14   the cite.

15        MR. PYLE:  Okay.  People vs. Collins.  I'm not

16   sure exactly what.  It's a 1986 case, 42 Cal.3d 378.

17        THE COURT:  All right.  Let me at least

18   familiarize myself with it.  42 Cal.3d 378.  It would

19   have been nice to have had this beforehand.

20        (Short Recess)

21                        ---o0o---

22

23

24

25

26

27

28

GERALD A. DOHRMANN, C.S.R.#2046

1    **- AFTER RECESS -**

2    ---o0o---

3    THE COURT:  While looking at the opinion here,

4    it appears in that case that the defendant was charged

5    with committing either the crime of burglary of an

6    automobile under 459 of the Penal Code, or the crime of

7    receiving stolen property under 496.

8    The Information further alleged a prior

9    conviction of burglary.

10    It goes on to say, at the start of the trial the

11    prosecution disclosed that the defendant had also

12    apparently, in addition to the Information, suffered a

13    prior conviction for robbery; that that service of

14    sentence thereon had been stayed.

15    "The defendant moved at the

16    conclusion of the People's case to

17    prohibit use of the prior con-

18    victions to impeach him if he chose

19    to testify.  The motion was denied,

20    the court ruling it had no dis-

21    cretion in the matter, but was bound

22    by California Constitution, Article

23    I, section 28 subdivision (f) . . .

24    to admit the convictions to impeach

25    the defendant.  Defendant declined

26    to testify and was found guilty of

27    burglary but not guilty of receiving

28    stolen property."

1     The matter was reversed.

2          And just looking at the headnotes in the case,

3  the court seems to explain that the judge did have

4  discretion, particularly under 352, to exclude any such

5  convictions when its probative value is outweighed by

6  the undue risk of prejudice.  And the Court of Appeal

7  affirmed, but the Supreme Court reversed and sent the

8  matter back.

9               "The Court of Appeal was directed to

10              reverse the judgment of the trial

11              court on the issue with directions

12              that it follow on remand certain

13              procedures directed toward the

14              ascertainment of what defendant's

15              testimony would be in the event he

16              took the stand in his own defense

17              and the trial court's ruling

18              thereon."

19         It talked about the federal procedural principle,

20 providing denying of a motion to exclude prior

21 conviction is not reviewable if the defendant fails to

22 testify, not inconsistent with any constitutional

23 mandate and should be a part of the law of California.

24         It went on to say:

25              ". . . the rule was not applicable

26              to bar defendant from raising the

27              issue on appeal, since, at the time

28              of trial, California rules did not

1           require an accused to testify or

2           even to make an offer of proof in

3           order to preserve his claim of

4           improper impeachment."

5       I understand the logic of that case, and that's

6   why we have Beagle-Castro motions today.  Without

7   getting into the specifics of the prior particularly,

8   it's the fact of the conviction itself, not the

9   underlying facts of the conviction.

10      I don't find that Collins applies to this

11  situation where in effect now we are having an evidenti-

12  ary hearing on the motion, and to deny the prosecution

13  the right to cross-examine on any issues raised, I

14  think, would certainly unfairly affect the prosecution's

15  position in this case.

16      So, on that basis, the motion is denied.

17          (Short discussion off the record)

18          MR. PYLE:  The second request would be that

19  this hearing be conducted, in view of the Court's

20  ruling, with the prosecution present, but the record be

21  sealed at this time after the testimony was taken --

22  testimony be taken not in open court but --

23          THE COURT:  As far as I know, this record

24  would not even be transcribed unless there is some --

25  depending on the Court's ruling -- unless there was some

26  request by some further court up the line, if that's

27  proper.

28          The other question is this:  Off the record I

GERALD A. DOHRMANN, C.S.R.#2046

1   raised with you this morning, Mr. Pyle, and raised with

2   both of you before the break, what could this testimony

3   be used for?  And in discussing it with you this

4   afternoon, you cited to me two cases, one of which I was

5   familiar with and one I was not.  One was a 1975 case,

6   People vs. Coleman, at 13 Cal.3d 867; and the other,

7   after a slight stutter over the name of the case, is In

8   Re Ramona R., a 1985 case, at 37 Cal.3d 802.

9          The Coleman case was a situation where the

10  defendant was on probation when he was charged with a

11  new offense, and the probation violation was to precede

12  the trial.  And Mr. Coleman, the defendant, wished to

13  testify on his own behalf at the probation violation

14  hearing, which was to precede the trial, and the court

15  refused that, and it was sent back, as error, to do

16  that.

17         In Ramona R., it was an analogous situation in

18  that Ramona R. basically was 17, and it was a murder

19  case, and wanted to testify at a fitness hearing, but

20  wanted that testimony not be able to be used at a

21  subsequent trial.  That was also denied, and it was sent

22  back with the instructions to hold a new fitness

23  hearing, the concept being not that all evidence is

24  relevant evidence, but the fact that you get to the

25  underpinnings, if you will, of constitutional values

26  about a person's right to be able to present testimony

27  on an issue and not be confronted with the opposing view

28  of the right to against self-incrimination.