1    So, both of those cases were reversed.  And, as I

2   told both of you -- or, perhaps, I don't know if Mr.

3   Stallworth was there when I said it, I think he was --

4   but my view of both those cases and the logic of it is

5   that, based on what I read here and based on what I've

6   been given today, because this today was the first time

7   I had heard this part of the motion, is that it would be

8   my belief that, should Mr. Kilgore testify in this

9   proceeding, that his testimony here could not be used in

10   the Prosecutor's case-in-chief.  However, if, in the

11   event that there were a subsequent trial, the principles

12   discussed in Harris vs. New York that dealt with Miranda

13   issues being used to impeach -- I realize it's not a

14   completely analogous situation -- but the logic would

15   dictate that if Mr. Kilgore were to testify on this

16   motion, and if on this case he should have a retrial,

17   and testify inconsistently with the testimony that he

18   would give during this proceeding, that could be used to

19   impeach him.

20        That's my legal assessment of where we are.

21        MR. PYLE:  I understand the Court's position.

22   It is likely that in the future, should this become

23   necessary, it's likely that Mr. Kilgore would be arguing

24   that it should not be admitted for any purpose, but I

25   guess we will have to let --

26        THE COURT:  That certainly is something that

27   you want.

28        I mean I have given it some thought, and probably

1    not as much as you have, but I am familiar, and quite

2    familiar with at least People vs. Coleman, as having

3    been a probation officer for a number of years, and

4    having been involved in violations of probation both as

5    a prosecutor and as a probation officer in many, many

6    years gone by.  I was very familiar with that case.

7         In fact, when I taught probation officers as an

8    attorney at various places throughout the state, this

9    was a case that usually got cited for what it said, and

10   I'm satisfied that it's probably true, and I'm agreeing

11   I'm extending it one more notch and just by logic

12   getting to the Harris vs. New York.

13        And my opinion on it, should Mr. Kilgore decide

14   to testify in this matter, the fact that I'm advising

15   both of you that my feelings about what they are is not

16   binding, but somebody certainly might consider it when

17   they consider whether or not Mr. Kilgore would be

18   testifying here voluntarily as a factor.  I don't know

19   what they would decide or what they would think.

20        So, I'm not going to exclude the D.A., and the

21   D.A. is going to be able to cross-examine and use that

22   engine that's used by you and every defendant, for every

23   defendant you represent, on cross-examination, he has

24   the same right.  The idea is to be seeking the truth.

25   And if I'm only hearing it from one side without

26   cross-examination, obviously there is no justice to

27   that.

28             MR. PYLE:  I would like to call Mr. Ivan

GERALD A. DOHRMANN, C.S.R. #2046

```
 1    Kilgore.
 2              THE COURT:  All right.  Would you step forward
 3    and be sworn?
 4                         IVAN KILGORE,
 5              called as a witness on behalf of
 6              the Defendant, after having been
 7              first duly sworn, testified as
 8              follows:
 9              THE COURT:  And I believe by this time Ms.
10    Boyns probably knows how to spell Mr. Kilgore's name.
11              THE CLERK:  Correct.
12              THE COURT:  Just to advise counsel to be
13    cognizant of the purpose of this hearing.  I'm not
14    looking to re-try all of the things surrounding Mr.
15    Kilgore in this particular hearing, and hopefully it
16    will stay focused on the issues at hand.
17              MR. PYLE:  My intent is to talk about the
18    events leading up to the shooting, not the shooting
19    itself.
20                    DIRECT EXAMINATION
21              MR. PYLE:  Q.  Mr. Kilgore, you are the
22    defendant in this case.
23    A.    Yes.
24    Q.    Calling your attention to July 16th, 2000, where
25    did you live at that time?
26    A.    509 Sycamore in Oakland, California.
27    Q.    That's an apartment building?
28    A.    Yes.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
1    Q.    Is it also a storefront in that location?

2    A.    Yes, it is.

3    Q.    Were you doing some work on the storefront that

4    day?

5    A.    Yes, I was.

6    Q.    Did at some point it become necessary to go to

7    Home Depot for some supplies?

8    A.    Yes, it did.

9    Q.    Who was working with you at that time?

10   A.    At the tame it was a young man by the name of Sic

11   and another man by the name of Raymond Jones.

12         THE COURT:  Who was the first one?

13         THE WITNESS:  Sic.

14         THE COURT:  S-i-c?

15         THE WITNESS:  I believe so.

16         MR. PYLE:  Q.  Did you all go to the Home

17   Depot?

18   A.    Yes, we left some time that afternoon to go to

19   Home Depot to pick up some supplies.

20   Q.    Did you go by car?

21   A.    Yes, we did.

22   Q.    And do you recollect who drove and what car you

23   took?

24   A.    I drove to Home Depot.

25   Q.    Whose car did you take?

26   A.    My car.

27   Q.    You arrived at Home Depot, and did you purchase

28   some supplies?
```

| | |
|---|---|
| 1 | A.    Yes, I did purchase some supplies. |
| 2 | Q.    And who was with you at the Home Depot? |
| 3 | A.    Raymond Jones and Sic was with me at Home Depot. |
| 4 | Q.    What happened after you purchased the supplies? |
| 5 | A.    In the process of purchasing the supplies, I was |
| 6 | waiting at the check-out counter.  I had Raymond Jones |
| 7 | pull the car around to the part so they can go ahead and |
| 8 | load the supplies while I was paying out the tag. |
| 9 | From that point we proceeded -- or should I say |
| 10 | Raymond Jones proceeded to drive from there to back to |
| 11 | the apartment complex. |
| 12 | Q.    With the supplies in the car? |
| 13 | A.    Yes. |
| 14 | Q.    And you were headed.  So, if I understand you |
| 15 | correctly, Raymond Jones is in the car, he is driving; |
| 16 | sic is in the car -- |
| 17 | A.    Yes. |
| 18 | Q.    -- and you were in the car. |
| 19 | A.    Yes. |
| 20 | Q.    And you were headed back to your storefront. |
| 21 | A.    Yes, we was. |
| 22 | Q.    Did anything happen on the way? |
| 23 | A.    Yes.  As we were driving on the back streets, |
| 24 | which would have been San Pablo, as we approached 30th |
| 25 | and San Pablo, Raymond Jones made a sudden U-turn and |
| 26 | approached some individuals on the corner that he had |
| 27 | identified to be William and T. |
| 28 | Q.    When you say he had identified them, how did you |

1    know he had identified them?

2    A.    In the process of making his U-turn, he stated

3    that there goes William and T.

4    Q.    What happened after he made the turn?

5    A.    As we approached the corner, I noticed T to be

6    pulling a weapon out from underneath his coat, and he

7    fired at us, and I responded by firing back at T.

8    Q.    Now, did you have a weapon in the car at that

9    time?

10    A.    Yes, I did have a weapon in the car.

11    Q.    And how long had the weapon been in the car?

12    A.    The car -- the weapon had been in the car all

13    day, since earlier that morning, some time since around

14    7:00 o'clock.

15    Q.    Had you had any prior dealings with Will --

16    sorry -- the other person's name is --

17    A.    T.

18    Q.    -- T.

19    A.    Yes. I had had some prior --

20         MR. STALLWORTH: Sorry. Objection at this

21    point as to relevancy, Your Honor.

22         MR. PYLE: I will withdraw the question, Your

23    Honor.

24    Q.    Okay. If I understand you correctly now, you are

25    approaching Will and T in the car. Raymond Jones is

26    driving.

27    A.    Yes.

28    Q.    And your testimony is that T pulled the gun?

```
 1   A.      And fired.  Yes.

 2   Q.      And fired.  And you fired back?

 3   A.      Yes.

 4   Q.      What happened?

 5   A.      I noticed, as we made the turn on the corner,

 6   someone had fell.  And shortly after the turn, Raymond

 7   Jones made a U-turn and turned back around.  At that

 8   moment I noticed to be William who had been struck.

 9   Q.      Was William the person you had shot at?

10   A.      No, he wasn't.  Excuse me?  I didn't understand

11   the question.

12   Q.      Yes.  Did you intend to hit William?

13   A.      No, I did not.

14            MR. PYLE:  That's all of the questions I have.

15            MR. STALLWORTH:  I don't have any questions

16   for him.

17            THE COURT:  Thank you.  You may step down.

18            MR. PYLE:  We have no more witnesses to call,

19   Your Honor.

20            THE COURT:  Defense rests.

21            MR. PYLE:  Yes.

22            THE COURT:  Prosecution?

23            MR. STALLWORTH:  No witnesses by the prose-

24   cution, Your Honor.

25            THE COURT:  Prosecution rests.  Were there any

26   items of evidence that are --

27            MR. PYLE:  We would ask to admit items A and B

28   into evidence.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1              THE COURT:  I'm forgetting what they are.  Oh,
 2   these are the photos?
 3              THE CLERK:  Yes.  That's it.
 4              THE COURT:  And what was B?
 5              MR. PYLE:  B was the police report state-
 6   ment --
 7              MR. STALLWORTH:  Go ahead.
 8              MR. PYLE:  Yes, of the O.P.D. statement signed
 9   by Bianca Moore.
10              THE COURT:  Okay.  I think there was testimony
11   about the salient parts of that.  I don't think anybody
12   went over them line by line.  So, basically the points
13   that you brought out are in the record, so I'm not going
14   to admit the documents.  They will remain marked for
15   Identification only.
16         Okay.  I have heard the evidence.  It seems to me
17   that it's been spaced out over a bit of time.  Are the
18   points that were brought out in your brief sufficient
19   for me to review in terms of this motion or now that you
20   actually have --
21         Mr. Kilgore, give me a break.  Let me at least
22   talk to him sometimes.
23         Are the points that you brought out in your brief
24   sufficient for me to review with the evidence and make a
25   decision, or is there anything else that's been brought
26   out here that you would like to have further briefing
27   on?
28         As I know, in terms of the testimony particularly
```

1  of Ms. Levy, there probably are some things that you had

2  not heard before.  That's the reason I asked.

3              MR. PYLE:  I believe -- I believe there is

4  enough in the motion and the points and authorities,

5  Your Honor.

6              THE COURT:  All right.  It's now 10 minutes to

7  4:00.  When do you want to argue it?  Just in terms of

8  getting your thoughts together and looking at the notes.

9  And I realize you probably took most of the testimony

10  today, I have taken notes.

11      .    In this particular case I'm going to ask Mr.

12  Dohrmann, if he would, to prepare the testimony of Ms.

13  Levy, so I can have it available; okay?  The officers

14  and Mr. Beers were all pretty short.

15              Right now we are without a trial.  Monday we have

16  further hearings on a motion to suppress.  As far as I

17  know, since we don't have a trial right now, we can

18  probably do it -- can I have our calendar?

19              MR. STALLWORTH:  I should probably inform the

20  Court that I'm going to be out of the office starting

21  next Tuesday, the 25th, and I won't be returning until

22  Friday, March the 5th.

23              MR. PYLE:  The 24th?

24              MR. STALLWORTH:  Yes.  I won't be available

25  from Tuesday, the 24th of February, through March the

26  4th, which is a Thursday.  I would be back on Friday,

27  March the 5th.

28              THE COURT:  That certainly fits smack into

GERALD A. DOHRMANN, C.S.R.#2046

```
 1   what I'm doing here.  What do you suggest?
 2            MR. STALLWORTH:  The following Friday, March
 3   the -- what's that?  12th?
 4            MR. PYLE:  I have to be in another county that
 5   day.
 6            MR. STALLWORTH:  We could do the week through
 7   March the 8th.  I'm assigned to go to trial, but I
 8   wouldn't start evidence until the following week, maybe
 9   the week after that, so I could conceivably take out a
10   morning through the week of March 8th, any day that
11   week.
12            THE COURT:  Okay.  And I could probably do
13   that also if necessary.
14            THE CLERK:  Any day is available.
15            THE COURT:  What do we have?
16            THE CLERK:  Any day is available.
17            THE COURT:  Okay.  So, I would assume that you
18   probably wouldn't want to do it the day you got back.
19            MR. STALLWORTH:  I would prefer not to.
20            THE COURT:  How does the 10th or 11th look for
21   you?
22            MR. PYLE:  Not the 11th, but the 9th or the
23   10th.
24            THE COURT:  9th or the 10th?
25            MR. PYLE:  Yes.
26            THE COURT:  Make it right in the middle of the
27   week, the 10th.
28            MR. STALLWORTH:  Sounds fine.
```

1    MR. PYLE:  Yes.  I think counsel and I have a

2  trial that's set for that day.  But since both of us --

3    THE COURT:  Well, yes.  Okay.  So, over to

4  March the 10th, 9:00 o'clock, for argument and decision.

5    MR. STALLWORTH:  Thank you, Your Honor.

6    THE COURT:  Thank you.

7    (Whereupon, the evening recess was taken)

8                    ---o0o---

1   **WEDNESDAY, MARCH 10, 2004**

2                         ---o0o---

3          - P R O C E E D I N G S -

4                         ---o0o---

5   ARGUMENTS AND RULING ON MOTION FOR NEW TRIAL

6          THE COURT:  In the matter of People versus

7   Kilgore.

8          Could we have counsel's appearances, everyone

9   this morning, please?

10         MR. STALLWORTH:  Darryl Stallworth for the

11  People.

12         MR. PYLE:  Walter K. Pyle for the defendant,

13  Mr. Kilgore.

14         THE COURT:  Ms. Levy, the trial attorney, is

15  also present.  Mr. Kilgore is present and in custody.

16         Since we met last, I have had an opportunity to

17  review your papers; I have had an opportunity to review

18  the trial testimony; I have had an opportunity to review

19  a transcript that I asked Mr. Dohrmann to prepare for me

20  of Ms. Levy's testimony post-trial.

21         Neither side requested to file additional

22  briefing.  I'm aware of the arguments that are made

23  here.

24         Mr. Pyle, anything further or clarifications,

25  since there's been some testimony, actually, since you

26  filed the papers?

27         MR. PYLE:  Well, I would.  Yes, I would like

28  to make a statement.

```
 1              THE COURT:  Sure.
 2              MR. PYLE:  The points and authorities, we
 3    focused on a number of issues which I think are -- can
 4    be readily resolved on legal principles.
 5              We talked about the tape involving Matthew Bryant
 6    and the failure to object or ask to edit the tape.  We
 7    believe the Matthew Bryant tape was very prejudicial
 8    because it painted Mr. Kilgore in a very bad light as a
 9    drug dealer and provided -- it provided evidence of
10    premeditation in which the jury easily seized upon.
11              The District Attorney has suggested that this
12    tape was properly admitted for a couple of reasons, but
13    the record reflects that Mr. Bryant initially stated
14    that he had a lack of recollection of making certain
15    statements to Sergeant Green.  This was, I believe, some
16    two years previous, so it's not remarkable that he might
17    not remember everything that he said to Sergeant Green.
18    So, all we have there at that point is failure of
19    recollection.
20              But then the tape is played to Mr. Bryant, and he
21    says -- and he is asked certain questions, "Now, do you
22    remember making this statement to Sergeant Green?"  He
23    said, "Yes."  And, "Do you remember make that
24    statement?"  He says, "Yes."
25              So, at that point, then, he said, "Yes, I did
26    make those statements."  So, at that point then there
27    was no real -- well, we have the failure of recollection
28    and there is no inconsistency.
```

1    We mentioned, we set out in our brief People vs.
2    Sam for the proposition of lack of recollection is not
3    inconsistent with another statement, and the court in
4    that case said specifically said there is nothing
5    inconsistent between the fact that the witness in that
6    case, a fellow by the name of Tubby -- there is nothing
7    inconsistent between the fact of the witness gave a
8    statement to the officer over two years earlier, nothing
9    inconsistent in the substance of the statement and his
10   present claim of a lack of recollection.

11   Indeed, says the Sam court, the circumstances can
12   be quite consistent.  So, there was no -- so, there was
13   no inconsistent prior statement, was not a ground.

14   The District Attorney, I believe -- Ms. Levy,
15   also -- stated the possible grounds would be a prior
16   consistent statement, and I believe then the argument
17   developed they were suggesting it was the prior
18   consistent statement of Raymond Jones.  But that's not
19   so, either.

20   I had mentioned a case in my examination of Ms.
21   Levy of People vs. Coleman, and this is not the
22   probation case.  I did not give a citation, because at
23   that time I didn't know what it was.  But the citation
24   is 71 Cal.2d 1159, in particular page 1166.  And in that
25   case, a witness had given a statement to his father and
26   his wife, and the prosecution sought to use that as a
27   prior consistent statement, because it was made before
28   he was arrested by the police.

1    THE COURT:  What was the cite you said?

2    MR. PYLE:  71 Cal.2d 1159 and specifically at

3  pages 1166 -- 1165 and 1166, primarily on page 1166.

4    And the Court pointed out that there is --

5  everybody was overlooking the last phrase in section

6  791(b) of the Evidence Code which says this prior

7  consistent statement can be used under certain circum-

8  stances, and concludes that it can be used if, provided,

9  the statement was made before the motive of fabrication

10 is alleged to have arisen.

11    And in People vs. Coleman, they said, well, this

12 fellow Stevenson, who made the statement, there was no

13 proof that he had made that statement before the motive

14 to fabricate had arisen, because by the time Stevenson

15 made that statement, he realized he was in trouble.  And

16 they pointed out the motive to fabricate arose when

17 Stevenson realized the predicament he was in.  And he

18 was -- it could be very easily argued that he was not

19 making this statement off the cuff or without any

20 motive, but rather he was trying to protect himself at

21 the defendant's expense.

22    THE COURT:  And how factually, just so the

23 record is clear, how does that fit into our scenario

24 here?

25    MR. PYLE:  Well, this fits in very neatly,

26 because Raymond Jones, if we are trying to say it is a

27 consistent statement, statements by Raymond Jones were

28 made after he had been given a choice to become a

GERALD A. DOHRMANN, C.S.R.#2046

1 | defendant or a witness. And at that point he realized
2 | the predicament he was in, and his subsequent choice to
3 | become a defendant -- excuse me -- to become a witness
4 | instead of a defendant suggests very strongly he was
5 | trying to protect himself at the defendant's expense.

6 | So, I believe there is simply no legal grounds
7 | for admitting the tape.

8 | And, in any event, there certainly was damaging
9 | and incriminating statements on the tape. Even if we
10 | were to say certain statements were to be admissible,
11 | the other statements were -- there certainly is no
12 | reason for allowing prejudicial evidence to go in that
13 | had no basis. And the tape, could at a minimum, could
14 | have been edited, but I don't think we even get to that
15 | part of the argument, because clearly the tape was not
16 | admissible for any purpose.

17 | Along that same lines, counsel stated she had not
18 | interviewed Mr. Bryant. She had various reasons, but I
19 | believe none of those reasons really measure up to a
20 | reason not to investigate the case fully. I think she
21 | could have found out in an investigation, interview of
22 | Mr. Bryant would have given her additional information
23 | on cross-examination. Perhaps if she had learned that
24 | Mr. Bryant felt he was coerced, as mentioned, it came
25 | out at trial, she could have moved to exclude his state-
26 | ments entirely.

27 | The evidence also showed that Bianca Moore had
28 | eventually testified she could testify Mr. Ivan Kilgore

1  as the shooter, but initially she told Officer Gerbaudo,

2  G-e-r-b-a-u-d-o, immediately after the shooting some-

3  thing different, and she told Officer Olivas something

4  different, also.

5        And this information was readily available.  And

6  this information, counsel did not follow up on this by

7  presenting this impeaching testimony, which is in

8  exhibits A and B at this hearing.

9        All of these things sort of fall in with the

10 construction of a defense.  It's clear, I think, from

11 both from the transcript and from the hearing we had at

12 the last session that initially the defense was

13 constructed on the basis of self-defense, and the

14 questions on cross-examination and questions on direct

15 examination seemed to be -- seemed to bear that out.  It

16 seemed to suggest that the defense was going to be

17 reasonable -- excuse me -- was going to be self-defense,

18 either reasonable or unreasonable self-defense.

19       And as a result that, when the strategy changed

20 after the Court made its ruling regarding 1101(c) of the

21 Evidence Code, at that point then the inconsistent

22 statements of witnesses like Bianca Moore then became

23 much more important.

24       So, the evidence in exhibits A and B, which could

25 have been brought out and emphasized, did not ever go to

26 the jury, and the jury was unaware of this important

27 evidence, which later became important in making a

28 defense based upon reasonable doubt.

1    There was also, as I believe also counsel did not
2  bring out along those same lines, Bianca Moore had said
3  the car turned around and came back and stopped.  But
4  Raymond Jones had said otherwise.  And the women in the
5  car that drove by.  Mary Washington and the other people
6  also didn't -- didn't see this happen, but counsel made
7  no efforts to bring this to emphasize this information
8  in the testimony by Raymond Jones or otherwise.

9    The attorney for Mr. Kilgore had suggested that
10  the evidence was at the close of the State's case, I
11  believe at page 61 of the hearing and 62.  At the close
12  of the State's case, the jurors could have had a reason-
13  able doubt as to whether one shot as fired or more.  And
14  that that would be a basis for a reasonable doubt.

15    If we look at counsel's final argument, however,
16  we talk about there was argument and counsel had pointed
17  out to the jury, yes, one more shot could have been
18  found -- could have been fired, but there was no --
19  counsel did not suggest that it was fired by Terry
20  Dandy.  The argument was that somebody could have fired
21  another shot, and the jury was left to consider, well,
22  was it the defendant, Mr. Jones?

23    THE COURT:  Was there evidence as to Terry
24  Dandy?  And the shot, if there were multiple shots --
25  and there was some conflict in the evidence in that
26  regard, I heard, as I recollect, no testimony about
27  where that second shot came from -- could have come from
28  the vehicle itself, although there was some evidence to

GERALD A. DOHRMANN, C.S.R. #2046

 1   the contrary on that.  Somebody said there was only one
 2   shot from the vehicle.
 3          MR. PYLE:  That's correct.  And the District
 4   Attorney, I believe, argued a second shot could really
 5   have been an echo.  Mary Washington and the women in the
 6   car said they heard multiple shots, but it was never --
 7          THE COURT:  Well, one of them said that.
 8          MR. PYLE:  I believe so.
 9          THE COURT:  As I recall, there were three
10   women in the car.  One of them didn't say that, one of
11   them did, and one of them did not testify in this trial.
12          MR. PYLE:  So, the defense, as it was ulti-
13   mately presented to the jury, was confusing, because I
14   believe there was a self-defense instruction, but it
15   didn't really apply to the facts, and counsel did not
16   bring out any evidence to show that it was in fact a
17   second shot fired.
18          And that, as Mr. Terry Dandy had indicated in his
19   statements to the police, there was a second shot.  He
20   said there was a second shot fired, but this was not
21   brought out.
22          I think -- I think one of the officers, I think
23   Sergeant Green, made some reference at some point that
24   one of the witnesses had said there was a second shot,
25   but there was -- I don't believe he said Mr. Terry Dandy
26   said that.
27          So, there wasn't really any evidence to base this
28   defense of reasonable doubt based upon more than one

1   shot being fired, because there was no indication or no
2   suggestion where that second shot may have been fired.

3        The logical way to build a case, of course, would
4   be to say it was fired by Terry Dandy, and that if that
5   was to be the defense, then it was fired by Terry Dandy,
6   whether they would have called Terry Dandy as a witness.
7   And I think counsel said she didn't want to call Terry
8   Dandy because she thought he might not be favorable to
9   them.

10       Well, no, one of these people are going to be
11  favorable to the defendant, but it would have been a
12  possible course simply to call that witness, subpoena
13  that witness and say -- ask him, "Did you hear more than
14  one shot?  No further questions."

15       So, we have discussed briefly during the examina-
16  tion -- the examination -- the examination of Kevin
17  Tomlinsonn.  And counsel suggested perhaps that may
18  perhaps he -- she did open the door and perhaps, by
19  implication, perhaps that may not have been handled
20  correctly.

21       With respect to the Oklahoma prior, the Court --
22  I reviewed the transcript and the Court focused on
23  1101(c) of the evidence -- of the code, 1101(c) of the
24  Evidence Code, and we suggested that counsel should have
25  presented more specific facts as to what Mr. Kilgore's
26  testimony would have been, either in the form of a
27  hearing here at the last session or by specifically in
28  writing, the statement by Mr. Kilgore as to exactly what

1  his testimony would have been.

2        The Court noted that, and the argument had to do

3  with whether there was a similarity between what

4  happened in Oklahoma and what happened in Oakland.  As

5  it came out in Mr. Kilgore's testimony, the things were

6  not similar.

7        In the Oklahoma testimony -- briefly

8  summarized -- Mr. Kilgore said, "I made a mistake.  I

9  should feel like a fool.  I thought he was going to pull

10 a gun on me, and he didn't."

11       In the Oakland case, the case at bar, the

12 evidence would have been, "I didn't make any mistake at

13 all.  I was confronted with somebody who had a gun, and

14 I fired a shot, hit the wrong guy."

15       And so he was responding to a shot being fired at

16 him.  It was not a case of negligence or accident or

17 some other similar situation, which was the case in

18 Oklahoma.  And I believe --

19       THE COURT:  Just in that regard, I don't know

20 that I should consider Mr. Kilgore's testimony after the

21 fact on the issue.  The issue of your motion was made in

22 that regard by Ms. Levy before trial or at least at the

23 very -- Mr. Pyle, are you following me?

24            MR. PYLE:  Yes.

25       THE COURT:  Or at least at the very first part

26 of the trial.  And it came to pass that when we were

27 looking at that motion, Ms. Levy acknowledged at Mr.

28 Kilgore's noticing it, a mistake had been made in the

1062

```
 1   paperwork, because initially the paperwork had both of
 2   the situations, both the Oklahoma situation and the one
 3   we have before us today as being a, quote, unquote,
 4   mistake.  However, that was corrected before the Court
 5   made its ruling to the fact that, in Mr. Kilgore's
 6   position, was that a shot was fired.  So, that was
 7   before the Court.
 8         And my reasons for granting it, for allowing some
 9   examination, depending on what the testimony was, it's
10   really hard sitting here to predict what the testimony
11   is going to be and the extent of the allowable cross-
12   examination.  As I believe -- and I don't know that we
13   referred to it under this terminology -- but basically
14   it was the Court's belief, in terms of credibility on
15   the issue, two people lie dead at Mr. Kilgore's hands.
16         And there is a line of cases over a long period
17   of time that discussed the doctrine of chances and the
18   question of credibility.  I heard that and I made my
19   decision at the time.  That may be grounds for somebody
20   further down the road looking at it, depending on the
21   outcome of this motion, obviously.  But certainly those
22   issues were raised by Ms. Levy correctly before the
23   motion was decided.
24         MR. PYLE:  Very well, Your Honor.  I will move
25   on to the issue to another related issue, which is the
26   failure to make a motion under Evidence Code section
27   352.
28         My impression from reading the transcript is that
```

```
 1   this was a close question as to the admissibility of the
 2   Oklahoma evidence, and this would have been -- the case
 3   cried out for a request to exclude the evidence pursuant
 4   to Evidence Code section 352.
 5          I can think of no tactical reason not to make
 6   such a request.   There is no downside to it, and there's
 7   certainly, had the ruling been favorable, it certainly
 8   would have changed the entire -- put the entire case in
 9   a different light.
10          I'm not going to belabor very much over the rest
11   of the evidence brought out at the hearing.   I just
12   point out a number of things where counsel said I didn't
13   make an investigation as far as the reasonable doubt, at
14   page 62, and she didn't make an investigation as to the
15   attic, because her investigators thought it was too
16   large to get in there.
17          THE COURT:   Let me talk about that for a
18   second.   I wondered about it when it was a raised, and I
19   didn't really research this issue, and there may have
20   been some changes in California law.   And I recognize
21   from the testimony of one officer that did go up there
22   and go back in a ways -- and looking at Mr. Beers, Mr.
23   Beers wasn't going up in that attic by any way, shape or
24   means, somebody smaller could have.   But what if that
25   person -- Ms. Levy?   "Yes, I have a moving picture of
26   her going around there up in the attic"?
27          But let me ask you this, Mr. Pyle:   From a legal
28   standpoint, if some physical evidence had been found up
```

GERALD A. DOHRMANN, C.S.R.#2046

1    there, how would that have been handled by the defense?

2            MR. PYLE:  Well, I think it would -- I think

3    the evidence would have been that nothing would have

4    been found up there.  The implication --

5            THE COURT:  Nothing was.

6            MR. PYLE:  Well, it wasn't, but the officer

7    said, "I couldn't really -- I couldn't really get in

8    there and look around, because I couldn't -- I couldn't

9    get back to where --"

10           THE COURT:  His testimony stands for what it

11   was, but don't say that nobody went up there.  The

12   officer did get up there, and he went back as far as his

13   sized person could reasonably go.  But, I agree, there

14   was some area beyond which he did not go.  But the

15   question remains, and he testified, "I didn't find

16   anything."  But if something had been found up there --

17           MR. PYLE:  Well, then, depends on what it was.

18   If it was a shotgun, it might not be good for Mr.

19   Kilgore.  We contend that nothing would have been found

20   up there.

21           THE COURT:  And nothing was.

22           MR. PYLE:  And the implication, as I read the

23   testimony presented to the jury, was that the shotgun

24   could have been up there, and it just wasn't found by

25   the police, because they couldn't get back there.

26           And I'm suggesting that perhaps additional

27   efforts should have been made and perhaps could have

28   been made with a smaller person, or with a mirror

1  whatever -- whatever investigative -- but you have to go

2  up there and find out how far back in the attic you can

3  go.

4        THE COURT:  My concern is, if something was

5  found, obviously, it would be the defense's ethical

6  obligation to turn that evidence over.

7        MR. PYLE:  Yes, I think it would.

8        THE COURT:  As the record stands, they at

9  least went back as far as they could reasonably go and

10  found nothing, the size of the person that went, who was

11  decidedly, objectively, looked smaller than Mr. Beers.

12        MR. PYLE:  Yes, Mr. Beers is a large man.

13        THE COURT:  He is.

14        MR. PYLE:  In sum, I believe the evidence

15  shows there was not adequate investigation; there was

16  not adequate presentation of the evidence; and

17  particularly the tape involving Matthew Bryant's state-

18  ment to the officers, I think particularly it was

19  damaging, and had not that come in, the outcome of the

20  trial could have been different; I think there was not

21  enough examination of -- not enough vigorous cross-

22  examination of the witnesses and not enough utilization

23  of the evidence in the Preliminary Hearing transcript to

24  try to establish a reasonable doubt defense.

25        And that's all I have to say at this point, Your

26  Honor.

27        THE COURT:  Okay.  I considered, in light of

28  all of the issues that you raised in your brief

```
 1   concerning both the tape of Mr. Bryant, the failure to

 2   request a hearing regarding the testimony of Mr.

 3   Kilgore, should he testify, and how far that would have,

 4   or it would evolve at all to allow exploration of the

 5   Oklahoma incident --

 6           MR. PYLE:  Your Honor, there was one other

 7   matter.

 8           THE COURT:  Let me finish, so you keep that

 9   thought.  I'm just going through these to make sure you

10   had a chance to touch on all of them, and I think you

11   did touch on the allegation that there was ineffective

12   assistance on cross-examination of Raymond Jones.

13           Raymond Jones; the 402 hearing about the volun-

14   tariness of his own statement; Bianca Moore.  One issue

15   you didn't discuss this morning was the ballistics

16   opinion that the Court allowed Dr. Herrmann to give

17   based on his years of experience.

18           But go ahead.

19           MR. PYLE:  As to that issue, I believe it's

20   covered adequately in the briefs.  There was no --

21   regardless of what the evidence might have shown and

22   additional questions have been asked, as the record

23   stands, I believe he was not shown to be qualified to

24   express such an opinion.  And if he was an expert on

25   those things, then his testimony about this not being a

26   shotgun -- not being a sawed-off shotgun could have been

27   offered to rebut the testimony of Bianca Moore who said

28   it did resemble a sawed-off shotgun.
```

```
 1              THE COURT:  All right.  The other point?
 2              MR. PYLE:  The other point was, I think I
 3    mentioned in the -- at the hearing that -- and counsel
 4    did not request a jury instruction having to do with a
 5    second-degree drive-by -- the difference between first-
 6    degree drive-by shooting and second-degree drive-by
 7    shooting resulting in death, my understanding is that
 8    the special finding that would be made by the jury as to
 9    second-degree murder would be premised upon an intention
10    to inflict great bodily injury; whereas, the first-
11    degree murder by driving by, the intent would be to
12    cause death.  And I believe that I cannot see any reason
13    for not requesting such a finding, special finding, or
14    jury instruction to that effect.
15              THE COURT:  And was there evidence upon which
16    to base that?
17              MR. PYLE:  Well, I think intent is always --
18    is always -- is always before -- is always before the
19    jury.
20         There was a case, People vs. Garcia, 63 Cal.App.
21    4th 820, and the issue was, they discussed the
22    second-degree drive-by statute.  And the issue is
23    slightly different from what it is here.  But in that
24    case it was similar in that the defendant was charged
25    with -- he was charged with discharging -- the fellow
26    was shot.  Some people were approaching the car, shots
27    were fired, and the man fell dead.  And the defendant,
28    Mr. Garcia, was charged with shooting from a motor
```

```
 1   vehicle with the intent to inflict death.  And as it
 2   ended up, they found him not guilty of first-degree
 3   drive-by, but they found him guilty of second-degree
 4   murder.
 5            THE COURT:  And did Mr. Garcia testify in that
 6   case or not?
 7            MR. PYLE:  I believe he did testify.  I
 8   believe -- yes, he did.  He said that he froze up and
 9   somebody else took the gun from him.  He basically
10   denied that he was the shooter in that case, but the
11   court ended up -- the jury ended up convicting him of
12   second-degree murder rather than first degree.
13            And the court goes on to talk about whether or
14   not this finding should have been submitted to the jury,
15   which was a legal issue in the case.  But I think it
16   illustrates the principle that when it comes to a
17   question of intent, whatever the evidence is, it's
18   sufficient to find an intent to inflict great bodily
19   injury, particularly when coupled with effective argu-
20   ment of counsel.
21            There was also evidence -- it occurs to me there
22   was some evidence that Raymond Jones testified that his
23   understanding and his conversation with the defendant
24   was that they were going over there, and there was going
25   to be a fight but not necessarily any -- there was going
26   to be a confrontation, a fight, but no killing.
27            THE COURT:  Mr. Stallworth, you have been
28   patient.
```

GERALD A. DOHRMANN, C.S.R.#2046

1   MR. STALLWORTH:  Just briefly, Your Honor.

2   The People would submit that the defense motion

3   for new trial does not even come close to overcoming a

4   strong presumption that Ms. Levy's conduct falls within

5   the wide range of reasonable professional assistance.

6   The points which were brought out by Mr. Pyle in his

7   brief and in his oral presentation this morning fall

8   very short of even coming close to overcoming that

9   presumption.

10   Matthew Bryant's tape was properly admitted as a

11   form of impeachment.  My moving papers reflect numerous

12   references to where Mr. Bryant's statement, after having

13   his memory refreshed from listening to the tape, that he

14   stated the statements were untrue, the result of

15   coercion, and repeatedly stated he could not remember.

16   The case cited in my brief reflects the standard

17   by which you determine whether or not a statement is

18   inconsistent.  And a point in this particular case was

19   that "inconsistent" in effect is more important than

20   "contradiction" in express terms.

21   The sum of his testimony clearly showed he was

22   being inconsistent with his taped statement.

23   Even if the Court were to entertain the idea that

24   this statement was not admissible and would have ruled

25   as much had Ms. Levy objected to it, a more favorable

26   result would not have been obtained.

27   The evidence in this case was so overwhelming in

28   that it produced three eye-witnesses; consciousness of

1  guilt, Mr. Kilgore in his reporting his car stolen;
2  physical evidence which corroborated all of the
3  eye-witnesses' testimony.

4       Moving onto his discussions regarding Bianca
5  Moore, it was clearly referenced in her statements
6  during trial that she was initially afraid to identify
7  Mr. Kilgore.  She repeatedly mentioned and stated in
8  trial that she knew who he was, and she had no trouble
9  identifying him.  Ms. Levy's cross-examination of Ms.
10 Moore covered all of these points vigorously and
11 repeatedly.

12      The Oklahoma prior, as the Court has already
13 referenced and mentioned, was only an issue if Mr.
14 Kilgore had chosen to testify, and the Court's ruling
15 was merely that if he were to testify and evidence
16 became apparent that there was some similarity, the
17 Prosecutor would have an opportunity, after having laid
18 that foundation, to explore those certain areas.

19      And the record was clear that the Prosecutor had
20 agreed and also presented to the Court that those things
21 would take place before any reference would be made.

22      Ms. Levy testified in this hearing that it was
23 her and her client's decision not to testify for fear
24 that there may in fact be some exposure to the Oklahoma
25 prior which would not be in her client's favor.

26      The 352 issue brought up by defense counsel is of
27 no issue in this case, because the defendant did not
28 testify.  He would have had to testify for the Court to

GERALD A. DOHRMANN, C.S.R.#2046

1   even consider objecting to the Oklahoma prior evidence

2   coming in under those particular issues.  So, it is of

3   no consequence in this particular case.

4   I would conclude, Your Honor, by simply referring

5   to the standard that has been set for review in cases

6   where a motion for new trial based on ineffective

7   assistance of counsel has been brought before the

8   courts.  And it's simply that the reviewing court should

9   avoid second-guessing counsel's informed choice and

10  tactical alternatives.

11  Ms. Levy has been an attorney for over 25 years.

12  She's had numerous trials involving serious felonies,

13  most of which have been murder.  She is a criminal law

14  specialist.  She is one of the finest defense attorneys

15  in this particular county.

16  Her work and her advocacy in this case is

17  unquestioned, and there is nothing in the moving papers

18  and in the presentation of this hearing to suggest

19  anything otherwise.

20  I respectfully submit to the Court that this

21  motion be denied.

22              THE COURT:  Mr. Pyle --

23              MR. PYLE:  Yes.

24              THE COURT:  -- response, if any?

25              MR. PYLE:  In response to the District

26  Attorney's statements, first, as to the tape, there is

27  one other case that I cite the Court to, People vs.

28  Parks, which is 4 Cal.3d 955.

```
 1            THE COURT:  4 Cal.3d?

 2            MR. PYLE:  955 at 960.  It was 1971 case.

 3            What the Court states on page 960, says the

 4    witness claimed lapse of memory, and there were not any

 5    new statements inconsistent -- well, I will stop there.

 6    Lapse of memory.  And the Court pointed out it was not

 7    established that the witness was deliberately evasive or

 8    that her asserted lapse of memory was untrue.

 9            I think that is relevant to this District

10    Attorney's argument here.

11            The court goes on to say, which also touches on

12    this, that if it's necessary to refresh the memory of

13    the witness, it should be done out of the presence of

14    the jury through the use of a -- going to be used as a

15    prior recorded statement, it should be done out of the

16    presence of the jury.

17            THE COURT:  Which we tried to do here.

18            MR. PYLE:  Yes.  And I suggest that was

19    adequate at that point and made the use of the tape

20    unnecessary and highly prejudicial.

21            With regard to the statements by Bianca Moore

22    that the reason why she didn't identify Ivan Kilgore as

23    the shooter, my learned opponent suggests it was because

24    she was afraid of Ivan Kilgore, but that was not really

25    brought out on cross-examination; because if that was

26    so, why would she mention him at all?

27            If she was afraid of him, one would think that

28    the logical chain of events would be that she would not
```

1   even mention the name.  But that was not brought out.

2   That argument was not brought out on cross-examination.

3         Now, whether or not the defendant should have

4   testified, we suggested that counsel should have offered

5   to have the defendant testify.  My understanding is that

6   the purpose of having the defendant testify is in order

7   to find out exactly what the testimony would have been

8   and how that would have fit in with all of the other

9   evidence.  This could have been achieved if in fact Mr.

10  Kilgore's testimony had been offered.

11        And, finally, counsel suggests that all these

12  things were the result of tactics and strategy, but the

13  law of effective assistance of counsel also requires

14  that any tactics and any strategy and any decisions must

15  all be informed, with full investigation.

16        THE COURT:  Let me ask you just a couple of

17  questions.  First of all, the cite on Garcia again?

18        MR. PYLE:  Is 63 Cal.App.4th 820.

19        THE COURT:  Thank you.  I have it on Coleman;

20  I have it on Clarks.

21        As I understand it, as to that final argument you

22  made, in terms of the question about whether or not Mr.

23  Kilgore could testify, you feel that, beyond the written

24  motion, that Ms. Levy made concerning that and the

25  Court's discussion and decision regarding that, saying

26  basically there is a potential that I will allow that,

27  depending on what the questioning is, that there should

28  have been some hearing at which there was some proffer

```
 1   before the issue was taken up in front of the jury, and
 2   the Court should have ruled categorically one way or the
 3   other, not reserving the right to change its mind,
 4   depending on what the testimony was, and what I'm after
 5   for is this:  I'm trying to think, Ms. Levy certainly
 6   laid the foundation in the most succinct terms about
 7   what Mr. Kilgore's testimony would surround, the very
 8   basic premise of it, which was self-defense.  And the
 9   Court's ruling was based on things that were stated at
10   the time that I wasn't absolutely going to rule it out,
11   because, one, the doctrine of chances, which we referred
12   to, and the other reasons stated in the record, there
13   could be issues that go to Mr. Kilgore's credibility.
14   Those issues could be raised on direct; they could have
15   stemmed from cross-examination.
16        Your feeling was that the Court had an
17   obligation -- or, no, you didn't say that.  Your feeling
18   was Ms. Levy should have asked the Court to have a
19   hearing outside the presence of the jury, and Ms. Levy
20   should have asked the Court to make a finding at that
21   point about whether or not Oklahoma was going to be
22   brought up or not, beyond her written motion.
23        MR. PYLE:  Yes.  And I'm not absolutely sure
24   that the Court could never change its mind on that, but
25   this is often done with, for example, the common -- the
26   common situation is, the use of prior convictions for
27   impeachment.
28        THE COURT:  Well, that's pretty easy, though,
```

```
 1   because it involves, for impeachment purposes -- and we
 2   are sort of getting aside here -- Castro motions,
 3   Beagle-Castro motions involve issues of whether the
 4   enumerated offense involves moral turpitude at all, the
 5   age of the prior, the circumstances.  And those are
 6   normally pretrial motions, again, that are done on
 7   paper.
 8         Circumstances are not gone into, but there is
 9   conduct that can go to credibility.  And we don't know
10   what's going to come out.  It's fine to put it on a
11   piece of paper.  It may be fine to have some sort of
12   pretrial open hearing.  But hopefully you would not be
13   saying that it would tie the Court's hands, as I usually
14   don't like to do this for either side, because circum-
15   stances dictate occasionally there be a change.
16         And without my telling Mr. Kilgore and Ms. Levy
17   that, based on what I knew from the motion itself, there
18   was a possibility that those issues would come before
19   the jury, depending upon the testimony, their decision
20   was made there.  And I don't know that it would have
21   changed if there had been a hearing, because it still,
22   as you just stated, could be open to change.
23         And then where would the Court's finding go?
24   Because I would have misled Mr. Kilgore and Ms. Levy,
25   and now he is up on the stand, and the jury has heard
26   what he has to say, and if the circumstances arose, I'm
27   saying, no, you have to answer that question.
28              MR. PYLE:  Well, I think that's --
```

1        THE COURT:  It puts the Court on --

2        MR. PYLE:  It certainly, to a certain extent,

3   it does.  And my understanding is the way these things

4   are handled is that if the -- I don't think it's an

5   insurmountable problem, even in the case that we have

6   here.  But, generally speaking, if counsel asks for a

7   pretrial ruling on a particular point, the question is,

8   does the Court have enough information as to exactly how

9   the evidence will come out at trial?

10       Before the trial starts, of course, in many cases

11  the Court doesn't have enough information.  And so the

12  Court -- and I think the case is People vs. Morris, and

13  I don't know if I remember the citation, I think it's at

14  53 Cal.3d, but it talks about in some situations you may

15  get a denial of an in-limine motion, but you may have to

16  renew that, because very often the evidence has changed

17  by the time you seek to introduce or bar the evidence

18  that has been talked about in the motion in limine.

19       But the case also says that if in fact you can

20  tell what the evidence will be -- in other words, if you

21  know what the evidence is going to be and there is not

22  really any room for doubt, then you don't have to make

23  that renewal of your in-limine motion, because the Court

24  has had all of the evidence before it.

25       And I think that is something along those lines.

26  I think that's what I'm saying here, that if

27  something -- I think at this point -- at the point where

28  the Court made its ruling under 1101(c) and 1101(b) and

```
 1   all of those sections, that it seems to me there was
 2   enough information, and would have been more specific
 3   information available had Mr. Kilgore given specific
 4   testimony as to what he was going to say on the stand.
 5   I think at that point there would be enough evidence
 6   that the Court could make a ruling, although its hands
 7   were not tied, I think it figures in cases like People
 8   vs. Morris where you say, well, nothing is perfect,
 9   but -- and maybe there is a point where the defendant
10   has to take a certain chance, but at least at that point
11   he would be able to evaluate the pros and cons of it.
12              THE COURT:  So, basically you would be getting
13   a theoretical as close to a guarantee and you are
14   predicting on what Mr. Stallworth's cross-examination
15   might have been, depending on his testimony at that
16   time.
17              It's a difficult question.  And you have raised
18   it here, but it's difficult.  It places the Court on
19   sort of the horns of a dilemma:  Damned if you do and
20   damned if you don't kind of thing.
21              And it puts Mr. Kilgore and his attorney on sort
22   of the horns of a dilemma, because if they do put him
23   on, and he does testify, and part of his testimony
24   unbeknownst, maybe raising the thought none of us even
25   had, opens the door now he finds himself in a circum-
26   stance that he didn't want to find himself in.  But, you
27   know, I ruled what I ruled.  I appreciate your comment
28   in that regard.
```

1        Anything further?

2            I'd like to take a break and read these cases.

3            MR. PYLE:  Yes.  I think we mentioned People

4    vs. Simon in our brief where there is such a procedure

5    that was suggested by the court.

6            That's all I have to say.

7            THE COURT:  All right.  Thank you.  Give me a

8    few minutes.  I would like to read a few of these cases

9    just to clarify a couple of points in my mind.  We will

10   be in recess.

11           (Whereupon, the mid-morning recess was taken)

12                        ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 **- AFTER RECESS -**

2 ---o0o---

3 THE COURT: I have had an opportunity to look

4 at Coleman and Garcia, Clarks during the brief recess,

5 gather my thoughts a little bit in terms of what counsel

6 has said this morning. I'm not going to discuss each

7 and every issue here but have some comments about some.

8 The record speaks for itself as to others.

9 First of all, as to Matthew Bryant, I am aware

10 that the law provides -- and I think it's in CALJIC

11 2.13, maybe the last paragraph -- that if a jury finds

12 that it does not believe that -- I don't recall or I

13 don't remember -- if they disbelieve that statement,

14 that's inconsistent with an earlier statement. I

15 believe it is my obligation to at least make an initial

16 finding in that regard about whether or not the jury

17 even gets to consider that.

18 And I can tell you at this point that I did

19 consider that and I did not believe Mr. Bryant's

20 statement that he did not recall.

21 We went through the process of listening to the

22 tape and things that were rather blatant he did recall

23 and then made a statement that basically -- but he lied

24 to the police for various reasons. Other things he

25 continued not to recall, and, frankly, I did not believe

26 that. And that's an issue, it's a factual question to

27 be decided by the jury, and let them do that.

28 Overall, on the totality of it, Mr. Pyle has

GERALD A. DOHRMANN, C.S.R.#2046

 1    named a number of issues here that could have been

 2    presented differently or could have been presented in

 3    his view more effectively.  It is always easier, I

 4    believe, rather than to be the person in the trial with

 5    jurors and alternates sitting in the box and having the

 6    action taking place right in front of your eyes, it is

 7    easier to look at it in hindsight and on the printed

 8    page.

 9            I guess the sports analogy, which I don't mean as

10    an insult to anybody of Monday-morning quarterbacking,

11    is always easier than having to play the game on the

12    field.

13            I don't know that I have ever tried a perfect

14    case either as a lawyer or been involved in one as a

15    judge.  I'm sure that there are mistakes that I have

16    made.  I am certain there were when I was a lawyer.  But

17    as a judge, I'm also certain that close scrutiny would

18    reveal that I have made some mistakes probably some in

19    almost every case, if I were to look closely at them.

20            The question before me is whether Ms. Levy fell

21    into that range of competency that the law requires of

22    an attorney representing a defendant in a criminal case.

23    As Mr. Stallworth noted, she has experience, broader

24    than most.

25            For instance, I am aware, and I was aware before

26    she testified to it here, she had worked as a JAG before

27    in the service, and unlike the glamor of that that you

28    see on television, basically in the trenches, you try

1   what comes.

2          I know that she was a Public Defender for a
3   period of time, and has been in private practice for a
4   long period of time, and has in fact tried cases in this
5   Court.  It's refreshing to have her in court, and I try
6   not to bias my feelings about her based on that, as she
7   is very forthcoming and very direct in terms of what she
8   does.

9          I found that if there needs to be a motion filed,
10  she will file it.  She's prompt in that regard.  She
11  does not -- she is not one that tells me she needs to
12  have a week to get the motion together.  It's normally
13  in there one day, if it's not there already at the
14  outset.

15         I believe she preserves her record well, at least
16  she has in my court in other cases as in this one.

17         And basically what I'm saying is if one reads in
18  context the entire testimony of this trial and the flow
19  of witnesses, how they went, and her tactical decisions
20  in certain regards, and the last one we talked a little
21  bit about just before the recess when we argued whether
22  or not the Court was going to consider under any circum-
23  stances allowing circumstantially the Oklahoma homicide
24  before the jury, which I decided for the reasons stated
25  at the time under certain circumstances I would allow
26  that, to me she, one, clearly fits within that range of
27  providing effective assistance of counsel.

28         As a second side to that, a corollary side to

1    that, is nonetheless if someone were to find that on one
2    of these, well, she should have done this, she really
3    should have done this, whatever that particular point
4    was, did it affect the outcome?  In that regard I
5    suppose, I don't know if I'm supposed to consider this.

6         Quite frankly, the offer made in support of this
7    motion, including Mr. Kilgore's testimony, confirmed
8    some of those things that hopefully being consistent he
9    would have testified to before the court, which would
10   have been confirmation of some of the things that Mr.
11   Jones testified to -- Mr. Jones testifying before Mr.
12   Bryant in this case.

13        So, looking at the totality of this, I'm not
14   satisfied that the defense has met its burden to show
15   Ms. Levy's representation in this case was ineffective.
16   I find it fit, as I said before, well within the range
17   of effective assistance of counsel, and thus I'm denying
18   the motion for a new trial on that basis.

19        And hopefully this morning I have allowed both
20   sides to make whatever record they need to make with
21   regard to this motion.

22        Now, with regard to sentencing in this case, I
23   know that Ms. Levy is here, and I don't know if you want
24   to give this any thought or not.  She is counsel of
25   record for the trial.  I don't know if counsel is ready
26   for sentencing, or if there is going to be further argu-
27   ments in sentencing, or how you wish to proceed.

28        I have basically denied the motion insofar as Mr.

1   Pyle's representation is concerned, in that he was sent

2   by the Bar specifically to represent Mr. Kilgore on this

3   motion.  So, at this point I think it goes back to Ms.

4   Levy.

5          How do you wish to proceed?

6          MS. LEVY:  Your Honor, this is somewhat

7   unusual for me in my career, but I would urge the Court

8   not to reappoint me at this point.

9          THE COURT:  I don't think I have ever

10  unappointed you.

11         MS. LEVY:  I would ask to be unappointed or

12  relieved from the case.  I feel at this point what has

13  happened between Mr. Kilgore and I, I don't feel he

14  would feel comfortable if I represented him in

15  sentencing, and, frankly, I would not feel comfortable.

16         So, I would urge the Court to consider, since Mr.

17  Pyle is now intimately familiar with the case, that he

18  could continue representing him at sentencing, would be

19  my request.

20         THE COURT:  The issues concerning sentencing,

21  I think, are pretty narrow.  I know that during the

22  course of the trial I read a case in the advance

23  sheets -- and I don't, Navarro, I think was the name of

24  it, and I don't know if that's still good law or not,

25  because I never updated it from the time of the slip

26  opinion -- but basically it seemed to indicate that the

27  use clause that was found here would be subsumed into

28  the charge.

| | |
|---|---|
| 1 | MS. LEVY:  The life term, I believe. |
| 2 | THE COURT:  And I think that is still the |
| 3 | case, but I don't know what Mr. Pyle's position would be |
| 4 | in that regard.  I don't know, for one, if he's read the |
| 5 | probation officer's report, if he is in a position. |
| 6 | MS. LEVY:  Your Honor, frankly, Mr. Stallworth |
| 7 | and I had a brief conversation yesterday.  Mr. |
| 8 | Stallworth had asked me regarding the probation report. |
| 9 | And if it's been prepared, I have never picked it up |
| 10 | from the Clerk's Office.  So, I am not in possession of |
| 11 | it and I haven't seen it. |
| 12 | MR. PYLE:  I have not seen one, either. |
| 13 | THE COURT:  Well, it is an unusual situation. |
| 14 | That's for sure. |
| 15 | What's your position, Mr. Pyle, in terms of |
| 16 | representing Mr. Kilgore for the limited purpose of the |
| 17 | sentencing? |
| 18 | MR. PYLE:  I'm willing to represent him at |
| 19 | sentencing, Your Honor. |
| 20 | THE COURT:  Mr. Stallworth, do you have any |
| 21 | say one way or the other? |
| 22 | MR. STALLWORTH:  That sounds fine to me. |
| 23 | THE COURT:  There may be a copy of the |
| 24 | probation report downstairs.  There may be.  I have an |
| 25 | original here, and I have a copy that ordinarily |
| 26 | accompanies a prison commitment. |
| 27 | And I guess we can handle this one a couple ways, |
| 28 | if you want to go downstairs and check to see if it's |

```
 1    there; if not, I'm sure Wanda would make you a copy
 2    right now.
 3            (Short discussion off the record)
 4            THE COURT:  All right.  You ask to be
 5    relieved.
 6            MS. LEVY:  Yes, Your Honor.
 7            THE COURT:  And, Mr. Pyle, you are willing to
 8    complete this?
 9            MR. PYLE:  Yes.
10            THE COURT:  All right.  Then, Ms. Levy will be
11    relieved.
12         Well, let me do this, Mr. Kilgore.  I haven't
13    asked you about that.  Who would you rather have
14    represent you for purposes of sentencing:  Ms. Levy or
15    Mr. Pyle?
16            THE DEFENDANT:  Mr. Pyle.
17            THE COURT:  Ms. Levy is relieved then.  Mr.
18    Pyle is appointed for the purpose of sentencing.
19         Let me get you this.  Wanda, here it is.  In
20    terms of timing?
21            MR. PYLE:  Mr. Stallworth and I are engaged in
22    battle in another matter.
23            THE COURT:  That's ironic, but I guess Alameda
24    County is a smaller place than we sometimes think.
25            MR. PYLE:  So, I'm going to be, or starting
26    that this afternoon, I guess.
27            THE COURT:  Is that a four-day court?
28            MR. STALLWORTH:  Yes, Your Honor.
```

GERALD A. DOHRMANN, C.S.R.#2046

```
 1              THE COURT:  Could I have our futures list,
 2    please?
 3         I know the probation report contains a number of
 4    written statements that were submitted by others for
 5    attachment.  Are you going to want to have a person or
 6    persons to speak at the sentencing hearing?  Anybody
 7    additional want to speak?
 8              MR. STALLWORTH:  No, Your Honor.  If your
 9    Friday calendars are busy, I know they can be, I think
10    because both Mr. Pyle and I are in the same trial in
11    front of Judge Conger --
12              THE COURT:  And she is on Fridays, also.
13              MR. STALLWORTH:  We can probably do one day.
14    We will start later in the morning or later in the
15    afternoon.
16              THE COURT:  My Fridays are not necessarily
17    that busy.
18              MR. STALLWORTH:  Okay.
19              THE COURT:  And I'm trying to clean those out.
20    They are busy on the first and third Friday but not
21    necessarily on the second and fourth.  And probably this
22    Friday may be a little soon.
23         But the 26th, which is the fourth Friday of the
24    month, hopefully that will allow you time to evaluate
25    the probation officer's report.
26              MR. PYLE:  I'm sorry.  Which Friday?
27              THE COURT:  The 26th.
28              THE CLERK:  March 26th.
```

```
 1              MR. PYLE:   I'm scheduled to be at a
 2    conference, Bar Association matter, all day that day.
 3              THE COURT:   The latest I would be willing to
 4    go would be April the 9th.  And the reason I'm picking
 5    these odd Fridays is to allow counsel time enough to say
 6    whatever they want to say.
 7              As Mr. Stallworth suggests, if we get into one of
 8    those before your trial begins in the other court in the
 9    morning, for one, you are going to feel pressured here;
10    and, two, you are going to feel pressured there.
11              MR. PYLE:   The 2nd of April?
12              THE COURT:   The 9th.
13              MR. PYLE:   All right.  We will make it the
14    9th.
15              THE COURT:   Mr. Stallworth?
16              MR. STALLWORTH:   That's fine, Your Honor.
17              THE COURT:   That will be for report and
18    sentence.
19              MR. STALLWORTH:   Thank you, Your Honor.
20              THE COURT:   And if there is going to be any
21    motions or action based on the probation officer's
22    report or any other issue, please either side notify
23    counsel so that we can deal with those.
24              MR. STALLWORTH:   We shall.
25              THE COURT:   Thank you.
26              MR. STALLWORTH:   Thank you, Your Honor.
27                            ---o0o---
28
```

GERALD A. DOHRMANN, C.S.R.#2046

1      **FRIDAY, APRIL 9, 2004**

2                      ---o0o---

3           **- P R O C E E D I N G S -**

4                      ---o0o---

5           PROCEEDINGS ON SENTENCE

6           THE COURT:  In the matter of People versus

7   Kilgore, No. 141033.

8        Counsel, your appearances this morning?

9           MR. STALLWORTH:  Darryl Stallworth for the

10  People.

11          MR. PYLE:  Walter K. Pyle for the defendant.

12          THE COURT:  Today is the day set for report

13  and sentence.  I have received, read and considered the

14  probation officer's report along with attachments

15  thereto.

16       Mr. Pyle, you have filed some motions with regard

17  to those things.  I guess we ought to go through those

18  first.

19       First of all, turning to the sentencing memo that

20  you filed yesterday, I am assuming you received a copy

21  of that, Mr. Stallworth, although somewhat belatedly.

22          MR. STALLWORTH:  Yes, Your Honor.

23          THE COURT:  Turning to the first issue that

24  deals with objection to circumstances in aggravation,

25  described in the probation officer's report, I believe

26  what you are referring to is those listed under the

27  criteria of the sentencing factors, rule 421 at the top

28  of page 4 of the probation officer's report?

```
 1              MR. PYLE:  Yes.

 2              THE COURT:  Just in looking at that, given the

 3    required sentence for this particular conviction, I

 4    don't know that factors in aggravation and factors in

 5    mitigation really apply.  I think your objections are

 6    well noted.

 7              What I'm going to do -- and I don't know if you

 8    wish to be heard on this, Mr. Stallworth, or not -- but

 9    I will just direct the clerk to send a copy of this

10    particular motion as attendant to the documents that go

11    to the Department of Corrections, so it becomes a part

12    of their file.

13              So, your objections will be noted and set forth

14    at this time.

15              You wish to be heard on it?

16              MR. STALLWORTH:  That's fine, Your Honor.

17    Submitted.

18              THE COURT:  In terms of objection to the

19    imposition of the use enhancement, that's an interesting

20    issue.  During the course of this trial -- in fact in

21    its fairly early stages -- I think there was a case that

22    looked at this issue, and I believe its name was People

23    vs. Navarro, and it was in a slip opinion from March

24    19th of '03.  I brought it to counsel's attention, and

25    it was later rebrought to my attention by Ms. Levy.

26              In preparing for today's hearing, I tried to find

27    the cite for that case and was directed to 106 Cal.App.

28    4th page 1444.  And in the hardbound volume it wasn't
```

1   there.

2         So, my investigation had to proceed a little

3   further.   What I found is that the matter had been

4   reviewed and some modifications were made, but on June

5   25th of '03, the matter was ordered nonpublished,

6   meaning it is not citable authority.

7         The case stood for the proposition, in facts very

8   similar to these, that where there has been a finding of

9   first-degree murder with the, quote, unquote, drive-by

10  special circumstance, that an additional sentence was

11  not applicable under 12022.53(j).   That section requires

12  that the penalty be imposed but not if another section

13  requires a greater penalty, which in this case it would,

14  although not.

15        Although not discussed in it, and I don't know if

16  you can 654 enhance it or not -- I have got my own

17  thoughts on what that's about -- but I understand your

18  motion clearly, and there was a case that, and I'm not

19  aware of any other case on the books that discusses that

20  precise issue.   I did not have the research attorney

21  look at it.

22        Did you have anything further with regard to that

23  part of your motion?

24        MR. PYLE:   I don't, Your Honor.   I wasn't able

25  to find anything, either.

26        THE COURT:   Mr. Stallworth, any thoughts as to

27  that part?

28        MR. STALLWORTH:   I would state that it appears

1  to be fine with the People that the greater punishment
2  under the special circumstance finding would be lead in
3  the Court's ultimate decision and the sentencing today,
4  and the People come to both with that acknowledgment and
5  would not need to suggest or request the enhancements
6  under the less severe punishment involving the verdicts
7  in this case.

8          THE COURT:  You wish to be heard?

9          MR. PYLE:  No, Your Honor.

10         THE COURT:  What I would intend to do is this:
11  is to not impose any additional sentence for that
12  particular enhancement, but rather stay imposition of
13  any further sentence as to that enhancement until and if
14  the judgment becomes final.  At that point the stay
15  would become permanent.  I'm not going to impose an
16  additional term at this point.

17         Next is your objection to use of the prior
18  conviction, pointing out that the conviction for first-
19  degree manslaughter in Oklahoma was the equivalent of a
20  conviction of involuntary manslaughter in the State of
21  California, and, therefore, would not be considered
22  under California law to be probative of being a serious
23  or violent felony under California law.

24         It's my recollection that that issue was brought
25  up during the course of the trial, and I think all
26  parties agreed with basically the conclusion that you
27  came to.  I think Ms. Levy presented a motion in that
28  regard.  I think we looked at it.  I think Mr. Stall-

 1   worth got some further information on it.  Somebody had

 2   downloaded the Oklahoma statute, and we all had a chance

 3   to look at it.  And it's my recollection that we agreed

 4   that the prior was not a serious or violent felony and

 5   would not be used to enhance his sentence in that way in

 6   this case.

 7          Is that your recollection, Mr. Stallworth?

 8          MR. STALLWORTH:  Yes, Your Honor.

 9          MR. PYLE:  That's my understanding, too.  I

10   put this in here because the probation report seemed to

11   imply perhaps maybe otherwise.

12          THE COURT:  Perhaps two things can be heard

13   together.  The last of your sentencing memorandum refers

14   to an objection to individual restitution to the

15   victim's family based on wages or profits lost, your

16   point being that the type of restitution that's claimed

17   in that, it claims both lost profits and the cost of

18   goods sold rather than an allocation of the profits

19   attributable to the goods, that's one objection; and the

20   other is that you question whether or not a family

21   member of a homicide victim is eligible for wages or

22   profits lost.

23          The other side of this is sort of collaterally

24   related.  Is a declaration signed -- well, has he signed

25   the original?

26          MR. PYLE:  Yes.

27          THE COURT:  All right.  I have a copy of it

28   here, of Mr. Kilgore indicating basically that he has no

GERALD A. DOHRMANN, C.S.R. #2046

```
1    ability to pay a restitution fine at this point given
2    the low wages currently available for prison work.  You
3    wish to be heard further on that?
4              MR. PYLE:  Just two points.  Given the budget
5    crisis, I don't see any grounds to expect that's going
6    to improve in the future; second, I would request that
7    in the setting of a restitution fine that the Court also
8    take into consideration any direct restitution the Court
9    might order be paid.
10             THE COURT:  As to part one, I would hope over
11   the next few years that the financial situation in this
12   state will improve.  I think we are all hopeful of that
13   for a variety of reasons.  I have given some thought to
14   the imposition of a fine and will take those factors
15   into consideration.
16             Any other legal reason why sentence should not be
17   pronounced?
18             MR. PYLE:  No, Your Honor.
19             THE COURT:  Formal arraignment waived?
20             MR. PYLE:  Yes.
21             THE COURT:  The defendant in this matter, Ivan
22   Kilgore --
23             MR. STALLWORTH:  Your Honor --
24             THE COURT:  I'm sorry.
25             MR. STALLWORTH:  -- would it be okay --
26             THE COURT:  It will.  You indicated before we
27   started, and I apologize for moving on to deal with
28   legal issues rather than people issues, unfortunately.
```

```
 1    You indicated to me before that a family member wished
 2    to speak for a few moments?
 3              MR. STALLWORTH:  Yes, Your Honor.
 4              THE COURT:  Fine with me.
 5              MS. ANDERSON:  Talk, Your Honor?
 6              THE COURT:  I'm sorry.  I almost forgot you.
 7              MS. ANDERSON:  Thank you, Your Honor.
 8         And to Your Honor, Judge Kingsbury, and the
 9    officers of this court, it has been a long three years
10    and four months waiting for this day.  When I was first
11    told it would take three to four years to go through
12    this process, I -- I didn't believe it.  But going
13    through it now, I understand the process and why you
14    take this long as it does.
15         My husband and I would like to thank the District
16    Attorney, Darryl Stallworth, for being our son's voice
17    in what was still and is still most an unbelievable and
18    difficult time for us.  No parent should have -- should
19    ever have to go through this.  We would like to thank
20    Your Honor for hearing our son's voice through Mr.
21    Stallworth.
22         On behalf of our son, his grandmother, his uncle
23    and his friends, we would like to thank you from the
24    bottom of our heart.
25         I wish I could say that putting this creature
26    away would stop the killing of our young men here in
27    Oakland, but it won't.  But what it will stop, it will
28    stop this predator from preying on another victim and
```

1  causing hurt to another family, to ever go through what
2  we would go through or what we did go through.  Now, the
3  predator becomes the prey, and has no control over his
4  destiny.  This young man's concern and fear is how to
5  survive life.
6       Will was a loving and a delightful young man, and
7  we will love him forever.  And I dare say Ivan Kilgore
8  will never forget a young man that he never knew.
9       And I would like to again say thank you on behalf
10  of my family.  This has not been an easy process.  No
11  mother should ever have to go through what I have gone
12  through losing a child, but I just like to thank
13  everyone for your patience with my family.
14       Thank you.
15       THE COURT:  Thank you.
16       Let me say that -- and I know it came out some-
17  what even back as far as jury selection -- that I've had
18  three careers in the criminal justice system in Alameda
19  County, and the first was as a probation officer for
20  somewhat over ten years before I became an attorney.
21  And like the probation officer in this case, a man named
22  Jeff Wilson, who I don't recall ever meeting, one of my
23  assignments for the past five or six years that I was a
24  probation officer, the last five or six years was doing
25  just what Mr. Wilson did in this case, and that's inter-
26  viewing people who had been convicted of serious crimes,
27  several of them homicides, a few involving the death
28  penalty.

1    That career, coupled with this, sitting,

2    listening to homicide trials in this department, it's

3    troubling by the futility of it all that sitting,

4    listening to a trial, something happens:  Bad decisions

5    are made out on the street, people that should not have

6    firearms settle trivial and minor disputes out of the

7    end of a gun, taking lives of other people who had a

8    right to live, and maybe had some problems themselves,

9    but a right to live and a right to enjoy their own

10   lives.

11   And as a probation officer talking to the

12   individuals that had committed these crimes, the whole

13   thing is just senseless.  And in this case, again, the

14   whole thing was just senseless.

15   Mr. Kilgore was a person, regardless of exactly

16   what happened out there, who had no legal or any other

17   business having a deadly weapon such as a firearm.  If

18   firearms are not present, these kinds of shootings would

19   not occur.  It is so easy, so easy to stand at a

20   distance when you don't have to look somebody in the eye

21   and take their life face to face if you really think you

22   have the need to do so; but to do it such as in this

23   kind of case, there is just no explanation for that.

24   And I know Mr. Kilgore does not appreciate these

25   particular words.  That's fine.  But it's true.  Mr.

26   Kilgore is a man that is filled with self-justification

27   for his act, and maybe he needs that to survive.  He

28   should have learned after the Oklahoma experience that

1  life behind a gun can only lead to one eventuality, and

2  here you are.

3       Either counsel wish to add any remarks at all?

4       MR. STALLWORTH:  No, Your Honor.

5       MR. PYLE:  No, Your Honor.

6       THE COURT:  As I indicated, then, Ivan

7  Kilgore, having been convicted of murder in the first

8  degree, and the jury having found true the special

9  circumstance that the murder in the first degree was

10 intentional and perpetrated by means of discharging a

11 firearm from a motor vehicle intentionally at another

12 person or persons outside the vehicle, with the intent

13 to inflict death, it's the judgment of this Court, and

14 it's hereby ordered, adjudged and decreed, that in

15 punishment for this offense, he be imprisoned in the

16 state prison in the State of California for the term

17 prescribed by law, which in this case is life without,

18 without the possibility of parole.

19      The jury also found true the allegation that, in

20 and during the commission and attempted commission of

21 this offense, the defendant personally and intentionally

22 discharged a firearm and proximately caused the death to

23 William Anderson, an enhancement under 12022.53 paren

24 (d) close paren of the Penal Code.

25      The Court has discussed this portion of the

26 sentence with counsel on the record this morning, and

27 the Court does believe that to enhance the sentence,

28 which would be 25 to life as an indeterminate term.

1    Under this particular code section, it would be viola-

2    tive of dual punishment statutes and also perhaps be

3    violative of 12022.53(j) of the Penal Code, since the

4    greater penalty is being imposed under the offense

5    itself.

6         Thus, for this particular enhancement, since mine

7    is the sentence, not until the final judgment of appeals

8    are taken, the Court will not impose an additional term

9    for this enhancement, but rather stay the imposition of

10   any additional enhancement pending the final order of

11   judgment in this case, or the finality of judgment in

12   this case, at which time the stay will become final.

13   Thus, I'm reserving the right to use this as an enhance-

14   ment if it should become applicable in the future.

15        By my record Mr. Kilgore, as of today, has 1,256

16   actual days of credit.  He is awarded that credit.

17        In almost all types of cases, persons committed

18   to the Department of Corrections are entitled to conduct

19   credits, some 20 percent, some 50 percent.  But in this

20   particular kind of offense, there are two code sections

21   that preclude credit.  One of them, 190(e) of the Penal

22   Code, does provide for a pre-sentence conduct credit but

23   no conduct credit while a person is in prison, meaning

24   they have to serve the full term, 96 Cal.App.4th 66 at

25   page 71, People vs. McNamee, M-c-N-a-m-e-e.

26        Section 2933.2 of the Penal Code precludes pre-

27   sentence conduct credit, and that is noted in the

28   Supreme Court case of People vs. Cooper, 27 Cal.4th 38

1    at page 40 and 41 and footnote 2.

2        Now, given the sentence in this case, I don't

3    know that establishment of credits in this case is

4    particularly warranted.  So, I'm saying these words for

5    the benefit of the future.  So, the Court does award no

6    conduct credits pursuant to 2933.2 and People vs.

7    Cooper.

8        MR. PYLE:  The Court will note our objections

9    to the declining to award conduct credits.

10        THE COURT:  Do you have more than an

11    objection?

12        MR. PYLE:  No, just to say that I think it's

13    violative of the 14th Amendment, the due process clause.

14    And that's all I will say at this point.

15        THE COURT:  All right.  So, in terms of other

16    parts of the sentence, the Court will order blood and

17    saliva samples pursuant to section 296, and the Court

18    has already signed that order.

19        MR. PYLE:  The Court will note our objection

20    to that.  It's violative of the 14th Amendment.

21        THE COURT:  So noted.

22        The Court will order a restitution fine in this

23    matter of 65 hundred dollars pursuant to 12022.4 of the

24    Penal Code.

25        The probation officer also recommends a parole

26    restitution fine under 1202.45, but since under this

27    sentence the defendant is not eligible for that, the

28    Court will not specifically impose it.  The Court would

1    impose it in an amount of 65 hundred dollars should it

2    become applicable at sometime in the future.

3          In terms of direct restitution to victims, I do

4    have a notice on behalf of the Victim's Compensation

5    claims through the State of California, the restitution

6    fund indicating that in claim 608643, $5,000 was paid,

7    and is certainly orderable as restitution.

8          You wish to be heard as to that amount?

9          MR. PYLE:  No, Your Honor.  Submitted.

10         THE COURT:  So, that will be ordered.

11         As to individual restitution, I did receive

12   attached to the probation officer's report a number of

13   impact statements and some loss issues in terms of funds

14   actually lost that amounts, to there is a page here, and

15   I asked, Mr. Stallworth, if you could clarify a bit for

16   me what that was.  Did you have an opportunity to do

17   that?

18         MR. STALLWORTH:  Yes.  I spoke with the

19   family, and it was a document produced by both Mr. and

20   Mrs. Anderson that was reviewed by florist FTD in order

21   to come up with the figures for the lost time of work

22   and the services that they provide in their bridal shop.

23         THE COURT:  So, this is lost earnings from --

24         MR. STALLWORTH:  Their business while they

25   were here in court.

26         THE COURT:  All right.  And I think the total

27   on that, it says one thing, and then it was changed by

28   only a dollar.  I'm assuming that was based on -- I see

```
 1   it.  I'm assuming that was based on the math involved.

 2              MR. STALLWORTH:  Yes.

 3              THE COURT:  And you have stated your position

 4   in writing.

 5         You wish to be heard further?

 6              MR. PYLE:  No, Your Honor.  But I will

 7   actually incorporate our written objections on page 3 of

 8   my memo.

 9              THE COURT:  The Court will order that amount,

10   $1,162.54.  And that will be payable to Samuel or Gerlen

11   Anderson.

12              THE CLERK:  Samuel --

13              THE COURT:  Samuel or -- and Gerlen is

14   G-e-r --

15              MS. ANDERSON:  Gerlen.

16              THE COURT:  I'm sorry.  G-e-r-l-e-n Anderson

17   and the address noted in the probation officer's supple-

18   mental.

19         Just because it's noted here, I will indicate for

20   the record the probation officer recommends that the

21   defendant participate in an anger management program

22   while in prison.

23         Mr. Kilgore, I want to inform you of your

24   appellate rights.  And I'm sure, given the amount of

25   work that you have done on your own case, you are

26   probably quite well aware of your appellate rights

27   already, but let's make sure we are all on the same

28   page.
```

```
 1          You do have a right to appeal.  Your Notice of
 2   Appeal has to be filed within 60 days.  It needs to be
 3   filed in the Alameda County Superior Court rather than
 4   the Court of Appeal.
 5          And just by your gestures between you and
 6   counsel, I'm gathering that's already been prepared and
 7   will be filed?
 8              MR. PYLE:  We intend to file it.
 9              THE COURT:  All right.  You are aware that the
10   Notice of Appeal must indicate clearly that you are
11   appealing -- Mr. Pyle prepared this, I'm sure he did
12   that -- and what it is you are appealing from, whether
13   or not it's the entire judgment or some particular part
14   of it.
15          Do you understand that you have those rights?
16              THE DEFENDANT:  Yes.
17              THE COURT:  And the requirements you have to
18   file the notice within 60 days.
19              THE DEFENDANT:  Yes.
20              THE COURT:  Anything further by either side?
21              MR. PYLE:  No, Your Honor.
22              MR. STALLWORTH:  No, Your Honor.
23              THE COURT:  Mr. Kilgore then will be remanded
24   to the Sheriff of Alameda County for delivery to the
25   Department of Corrections pursuant to this order.
26              MR. STALLWORTH:  Thank you, Your Honor.
27              THE COURT:  Thank you, gentlemen.
28                           ---o0o---
```

```
 1  STATE OF CALIFORNIA )
                        ) ss.
 2  COUNTY OF ALAMEDA   )

 3

 4                CERTIFICATE OF REPORTER

 5       I, GERALD A. DOHRMANN, Certified Shorthand

 6  Reporter, do hereby certify that I am an Official Court

 7  Reporter of the Superior Court of the State of

 8  California, and that, as such, I reported the

 9  proceedings had in the above-entitled matter at the time

10  and place set forth herein.

11       I further certify that my stenograph notes were

12  thereafter prepared by computer-assisted transcription

13  into typewriting, and that the foregoing pages numbered

14  1 through 1102 constitute a full, true and correct

15  transcription of said notes in the above-entitled

16  proceedings.

17       Dated at Oakland, California, this 12th day of

18  April, 2004.

19

20

21                        GERALD A. DOHRMANN
                          _____
22                        GERALD A. DOHRMANN, C.S.R. 2046

23

24

25

26

27

28
```

GERALD A. DOHRMANN, C.S.R. #2046